**Wayne E. Borgeest**
**Joan M. Gilbride**
**Robert A. Benjamin**
**KAUFMAN BORGEEST & RYAN LLP**
**200 Summit Lake Dr**
**Valhalla, New York 10595**
**(914) 741-6100 (Telephone)**
**(914) 741-0025 (Facsimile)**
**wborgeest@kbrlaw.com**
**jgilbride@kbrlaw.com**
**rbenjamin@kbrlaw.com**

*Attorneys for Axis Reinsurance Company*

DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                                     :
AXIS REINSURANCE COMPANY,                                            :        No. 07-CV-7924 (GEL)
                                                                     :
                                        Plaintiff,                   :
                        v.                                           :
                                                                     :
PHILLIP R. BENNETT, et al.,                                          :
                                                                     :
                                        Defendants.                  :
                                                                     :
-------------------------------------------------------------------- X
                                                                     :
In re                                                                :        Chapter 11
                                                                     :
REFCO, INC., et al.,                                                 :        Case No. 05-60006 (RDD)
                                                                     :
                                        Debtors.                     :        Jointly Administered
                                                                     :
-------------------------------------------------------------------- X
                                                                     :
AXIS REINSURANCE COMPANY,                                            :        Adv. Proc. No. 07-1712-RDD
                                                                     :
                                        Plaintiff,                   :
                        v.                                           :
                                                                     :
PHILLIP R. BENNETT, et al.,                                          :
                                                                     :
                                        Defendants.                  :
                                                                     :

------------------------------------------------------------ X
                   :

TONE N. GRANT, et al.,              :      Adv. Proc. 07-2005-RDD

                   :

             Plaintiffs,     :

      v.                :

AXIS REINSURANCE COMPANY,    :

                   :

             Defendant.    :

                   :
------------------------------------------------------------ X
                   :

LEO R. BREITMAN, et al.,       :      Adv. Proc. No. 07-2032-RDD

                   :

             Plaintiffs,     :

      v.                :

AXIS REINSURANCE COMPANY,    :

                   :

             Defendant.    :

                   :
------------------------------------------------------------ X
                   :

AXIS REINSURANCE COMPANY,    :      (1) No. 07-CV-9420-GEL

                   :      (2) No. 07-CV-9842-GEL

             Plaintiff,      :      (3) appeal not yet assigned

      v.                :

PHILLIP R. BENNETT, et al.,     :

                   :

             Defendants.   :
------------------------------------------------------------ X
                   :

TONE N. GRANT, et al.,            :      No. 07-CV-9843-GEL

                   :

             Plaintiffs,     :

      v.                :

AXIS REINSURANCE COMPANY,    :

                   :

             Defendant.    :

                   :
------------------------------------------------------------ X

**APPELLANT'S BRIEF IN SUPPORT OF ITS APPEAL FROM THE BANKRUPTCY COURT'S ORDERS: (1) DISMISSING AXIS'S COMPLAINT WITHOUT PREJUDICE WHILE RETAINING THE COUNTERCLAIMS; AND (2) GRANTING SUMMARY JUDGMENT REQUIRING AXIS TO ADVANCE <u>DEFENSE COSTS PRIOR TO AN ADJUDICATION OF COVERAGE</u>**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................... iii

**JURISDICTIONAL BASIS** ........................................................................ 1

**ISSUES PRESENTED** .............................................................................. 1

**STATEMENT OF THE FACTS** ............................................................... 1

**PROCEDURAL POSTURE** ....................................................................... 6

**STANDARD OF APPELLATE REVIEW** .............................................. 10

**ARGUMENT** ............................................................................................ 10

**I.    THE   BANKRUPTCY   COURT'S   RETENTION   OF   THE COUNTERCLAIMS   IS   INCONSISTENT   WITH   THE BANKRUPTCY COURT'S DISMISSAL OF AXIS'S COMPLAINT AND HAS RESULTED IN PIECEMEAL LITIGATION** .................. 10

**II.   THE   BANKRUPTCY   COURT   ERRONEOUSLY   GRANTED SUMMARY JUDGMENT TO THE INSUREDS CONTRARY TO THE EXPRESS UNAMBIGUOUS TERMS OF THE INSURANCE CONTRACT, BASED UPON A MISAPPLICATION OF PRIOR CASELAW, AND IGNORING BASIC CONCEPTS OF CONTRACT INTERPRETATION** .......................................................................... 13

**A.    The Axis Policy Language Addressing Payment of Defense Costs is Materially and Unavoidably Different from the Worldcom Policy Language** ........................................................................................... 14

**B.    The Clear and Unambiguous Language of the Axis Policy Does Not Require Advancement When Axis Has Denied Coverage** .................. 17

i

**C.**    **New York Law Does Not Compel the Advancement of Defense Costs Where an Insurer Has Disclaimed Coverage Under a D&O Policy** .. 23

**D.**    **Public Policy Prevents the Court From Gifting Coverage to the Insureds Which They Did Not Purchase** .............................................. 25

**CONCLUSION** ........................................................................................................ 27

# **TABLE OF AUTHORITIES**

## **Cases**

*Albert J. Schiff Assoc., Inc. v. Flack*, 417 N.E.2d 84 (N.Y. 1980)..............18, 19, 20, 24

*Carlin Equities Corp. v. Houston Casualty Co.*, 2007 WL 2456958, Index No. 05-cv-9508-LAP (S.D.N.Y. August 24, 2007)................................................................ 24, 25

*Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687 (N.Y. 2002)...................................................................................17, 18, 20

*Cornellier v. American Casualty Co.*, 389 F.2d 641 (2d Cir. 1968).........................19

*Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000)................................................10

*Drilling v. New York Life Insurance Co.*, 137 N.E. 314 (N.Y. 1922) .......................17

*Federal Insurance Company v. Kozlowski*, 792 N.Y.S.2d 397 (App. Div. 1st Dep't 2005) .................................................................. 5, 24, 25

*Government Employees Insurance Co. v. Kligler*, 42 N.Y.2d 863 (N.Y. 1977).. ............ 19

*In re WorldCom*, 2007 U.S. Dist LEXIS 67669 (S.D.N.Y. September 14, 2007)............ 10

*In re WorldCom, Inc. Securities Litigation*, 354 F.3d 455 (S.D.N.Y. 2005).... 6, 14, 15, 24

*International Business Machines v. Liberty Mutual Insurance Co.*, 363 F.3d 137 (2d Cir. 2004) ................................................................................................................ 5

*Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 1989 WL 162315 (S.D.N.Y. Aug. 4, 1989) ................................................................................ 10

*Moshiko, Inc. v. Seiger & Smith, Inc.*, 529 N.Y.S.2d 284 (App. Div. 1st Dep't), *aff'd*, 529 N.E.2d 420 (N.Y. 1988)........................................................................ 19

*Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33 (2d Cir. 2006)...................................................................................24

*Stephens v. National Distillers and Chemical Corp., et al.*, 1996 WL 271789, (S.D.N.Y. May 21, 1996)..............................................................…........25

## JURISDICTIONAL BASIS

This Court has jurisdiction, pursuant to 28 U.S.C. § 158(a), to review Axis Reinsurance Company's ("Axis") appeal from Bankruptcy Court Orders: (1) dismissing Axis's complaint without prejudice while retaining the counterclaims; and (2) granting summary judgment requiring Axis to advance defense costs prior to an adjudication of coverage.

## ISSUES PRESENTED

(1) Whether the Bankruptcy Court, having previously determined that it must dismiss Axis's complaint seeking a declaratory judgment of no coverage due to overlap with the underlying securities fraud litigation, was correct in failing to also dismiss counterclaims seeking a declaratory judgment of coverage.

(2) Whether the Bankruptcy Court should have ordered Axis to pay defense costs where the Axis Policy only provides for advancement of **covered** defense costs, Axis denied coverage, and the Bankruptcy Court previously ruled it could not determine the merits of coverage under the Axis Policy.

## STATEMENT OF THE FACTS

Refco, Inc. ("Refco")[1] has admitted that, over a seven-year period, its former Chairman, President and Chief Executive Officer, Phillip Bennett, hid hundreds of millions of dollars of uncollectible receivables that should have shown up on Refco's balance sheet as related-party transactions. *See* Exhibit A to the Declaration of Joan M.

---

[1] The name "Refco," as used throughout this appeal, refers to Refco, Inc., the publicly traded company formed pursuant to the August 2005 initial public offering, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO. "Refco" also refers to subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

Gilbride, dated November 28, 2007 (hereinafter "Gilbride App. Decl."). This massive fraud, about which it has been alleged other Refco directors and officers had knowledge, or in which they actually participated, led to Refco's announcement in October 2005, just two months after going public, that its prior financial statements could no longer be relied upon.[2] As a result of this announcement, dozens of criminal and civil complaints were filed against Bennett and other Refco directors and officers, alleging fraud and various other misdeeds by the defendants (the "Underlying Actions").

Axis is an excess directors' and officers' liability ("D&O") insurer of Refco and its directors and officers. In anticipation of Refco's late-spring, early-summer IPO in 2005, Axis received a written warranty letter from Refco, signed by CEO Phillip Bennett on behalf of all prospective insureds (the "Warranty"). In reliance upon the Warranty and other information (including financial information) provided to Axis, Axis issued Securexcess Policy Number RNN 506300 (the "Axis Policy") – which had a policy period commencing on August 11, 2005 – the date of Refco's IPO. *See* Exhibit B to the Gilbride App. Decl. Barely two months after going public, on October 17, 2005, Refco filed for bankruptcy as a result of this massive fraud and the resulting fallout. The Underlying Actions were then submitted to Axis for coverage.

On March 6, 2006, Axis denied coverage under the Axis Policy to the Defendants[3] for these matters on several grounds: (1) breach of a January 21, 2005

---

[2] A detailed description of the Refco fraud can be found in the 363 page Examiner's Report (Bankr. S.D.N.Y. filed July 11, 2007) (05-60006, Doc. 5530). The Examiner's Report recounts the detailed factual basis for the allegations of fraud against Bennett and others.

[3] Axis denied coverage to all Insureds for all claims arising out of Refco's demise. The Insureds other than Refco, the individual directors and officers (herein "Individual Insureds") have divided themselves into four categories: (1) the "Officer Insureds" – Klejna, Murphy, Sexton, Sherer and Silverman; (2) the "Director Insureds" – Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen; (3) the "Indicted Insureds" – Bennett, Grant and Trosten; and (4) the "Cooperating Defendant" – Maggio (collectively "Insureds").

Warranty Letter executed by Bennett on behalf of all Insureds under the Axis Policy; (2)

the "Knowledge Exclusion" (Endorsement 6); (3) an Exclusion in the Application; and

(4) the Pending and Prior Litigation Exclusion.  *See* Exhibit C to the Gilbride App. Decl.

In connection with the underwriting of the Axis Policy, Axis requested and

received the Warranty which provides, in pertinent part:

> No person(s) or entity(ies) proposed for this insurance is cognizant of any
> fact, circumstance, situation, act, error or omission which he/she/it has
> reason to suppose might afford grounds for any Claim, as such term is
> defined within the Policy, such as would fall within the scope of the
> proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group
> Ltd., LLC, et al.]

It further provides that:

> It is agreed by the undersigned on behalf of all Insureds under the Policy,
> that with respect to the above statements, that if such knowledge exists,
> any claim arising therefrom is excluded from the proposed insurance.

The Warranty was signed by Phillip Bennett, "on behalf of all Insureds under the

Policy," on January 21, 2005.  *See* Exhibit D to the Gilbride App. Decl.

The Knowledge Exclusion, found at Endorsement 6 of the Axis Policy,[4] provides

that there is no coverage for Claims, "based upon, arising out of, directly or indirectly

resulting from, in consequence of, or in any way involving any fact, circumstance,

situation, transaction, or event, which any Insured had knowledge and had reason to

suppose might give rise to a Claim that would fall within the scope of the insurance

afforded by this Policy."  *See* Exhibit B to the Gilbride App. Decl.

Axis's analysis of these issues, as well as an Exclusion in the Application and the

Pending and Prior Litigation Exclusion, required a determination, essentially, of whether

Bennett and/or certain other Insureds were aware of facts, circumstances, and/or

---

[4] Reference to the Axis Policy also includes reference to certain terms and conditions of the
primary policy which the Axis Policy incorporates by reference.

situations which gave them reason to suppose a Claim might arise therefrom.   Axis concluded, based on the tacit public admissions in Refco's SEC filings, that Bennett and potentially certain other Insureds, did have such knowledge or information at the relevant times.[5]  This conclusion has been borne out by the Examiner's Report as well as various other documents filed within the Underlying Litigation.    All of this background information was provided to the Bankruptcy Court as part of Axis's papers in opposition to the first preliminary injunction motion.  *See* Exhibit E to the Gilbride App. Decl.

None of the Defendants responded in any way to Axis's denial of coverage letter dated March 6, 2006, and in May 2007, Axis commenced a declaratory judgment action seeking a judicial declaration that, pursuant to these terms of the Axis Policy, conditions and exclusions, there is no coverage under the Axis Policy in connection with the Underlying Actions.  *See* Exhibit C to the Gilbride App. Decl.

The plain terms of the Axis Policy provide only for payment of ***covered*** Defense Costs.  The Axis Policy requires that Axis make the initial determination of whether or not something is covered.   Furthermore, the policy terms do not impose upon Axis a duty to defend such as may be found in other types of liability insurance.   In fact, the Axis

---

[5]      Specifically, Axis concluded that the Warranty dated January 21, 2005 was false, and a misrepresentation, because Bennett, and possibly other Insureds, did indeed possess knowledge of facts, circumstances, situations, acts, errors or omissions which they had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.  With respect to the Exclusion in the Application, Axis concluded that, as of February 8, 2005, Bennett, and possibly other Insureds, were aware of facts, circumstances or situations involving Refco which they had reason to believe might result in a "claim" being made and that this knowledge, coupled with Bennett's failure to make the necessary disclosures pursuant to Question 12 of the Application, precludes coverage for all Insureds.   Also, Axis determined that there was no coverage under the Knowledge Exclusion because, as of August 11, 2005, Bennett, and possibly other Insureds, possessed knowledge of facts, circumstances, situations, acts, errors or omissions which they had reason to suppose might afford grounds for a claim under the Policy.  Finally, Axis's disclaimer based on the pending and prior litigation exclusion was based on certain prior litigations other than the CFTC action, of which Axis only became aware on April 30, 2007.  The CFTC action simply lends further support to Axis's disclaimer on that ground.

Policy provides that "The Insurer will have no duty under the Policy to defend any Claim. The Insureds must defend any Claim made against them." Therefore, the general principle that "the duty to defend is broader than the duty to indemnify" is simply not applicable to this insurance policy.[6]

Put another way, Condition D(2) provides for the payment of "covered Defense Costs on an as-incurred basis." Defense Costs is a defined term – meaning costs incurred in connection with the defense of a Claim. The exclusions in the Warranty, the Knowledge Endorsement, and the Application all mandate that the Axis Policy does not respond to this Claim. Since the Axis Policy does not provide coverage for this Claim, costs incurred in defense of these matters are not Defense Costs incurred in defense of a Claim covered by the Axis Policy. *Federal Insurance Company v. Kozlowski*, 792 N.Y.S.2d 397, 404 (App. Div. 1st Dep't 2005) (holding no duty to pay defense costs where the claim is excluded from coverage). Based on the express policy terms, Axis, having reasonably denied coverage, is not obligated to advance any Defense Costs unless or until it is finally determined pursuant to applicable law that such Defense Costs are covered by the Axis Policy.

Unlike duty to defend policies, which may require the insurer to defend claims even if the insureds are only *arguably* entitled to coverage, policies that provide for reimbursement of covered defense costs (such as the Axis Policy) only entitle the insured to costs once coverage is established. That is the contract that these Insureds purchased and that is the contract that Axis seeks enforced, pursuant only to its terms.

---

[6] Moreover, the obligation to defend is not without limits. *International Business Machines v. Liberty Mutual Ins. Co.*, 363 F.3d 137, 145 (2d Cir. 2004). "[A]n insurer's duty to defend is limited absolutely by the scope of the coverage purchased." *International Business Machines*, 363 F.3d at 144.

The cases cited by the Insureds, and relied upon by the Bankruptcy Court, specifically *WorldCom*,[7] all involve a Court looking to the express terms of the policy at issue and finding that the policy expressly requires advancement of defense costs prior to the final adjudication of coverage. Each of the policies in the cases relied upon by the Insureds expressly required advancement of defense costs prior to a final adjudication of coverage. The Axis Policy contains no such provision. Just the opposite – it only requires the advancement of defense costs that Axis agrees are covered. There is an explicit difference in the contract language found in the WorldCom policy and that found in the Axis Policy. **Unless and until it is determined that this claim is covered, the Insureds are not entitled to the advancement of defense costs.**

## PROCEDURAL POSTURE

There are three separate but related adversary cases involved in this appeal. They are Case No.'s 07-1712, 07-2005, 07-2032. However, as these cases were all consolidated together by the Bankruptcy Court on October 2, 2007, they will generally be discussed together.

Axis denied coverage to the Insureds for Loss arising out of the Underlying Actions by letter dated March 6, 2006. None of the Insureds responded to that letter. On May 23, 2007, Axis filed a complaint in the Bankruptcy Court for the Southern District of New York (the "Axis Complaint") seeking a judicial declaration confirming its determination that the Axis Policy does not provide coverage to any of the Insureds for

---

[7] *In re WorldCom, Inc. Securities Litigation*, 354 F.3d 455 (S.D.N.Y. 2005). In fact, **the insurers in WorldCom did not contest coverage based on the terms of the policy** – only that the policy itself was procured through fraud. The insurers in WorldCom did not assert that an exclusion applied to bar coverage, as Axis does here. *Id.* at 462 (noting insurer does not dispute coverage under policy, including defense costs).

any Loss incurred in connection with the Underlying Actions (Bankr. S.D.N.Y. Index No. 07-1712).

On or about July 12 and 13, 2007, the Officer Insureds filed Answers and Counterclaims to the Axis Complaint. In their Counterclaims, these Officer Insureds sought the same relief as that sought by Axis in the Axis Complaint, namely, a judicial declaration of whether the Axis Policy covers the Loss incurred by the Officer Insureds in the Underlying Actions. Also on July 12, 2007, the Director Insureds and Indicted Insureds filed motions to dismiss or stay the Axis Complaint, and the Officer Insureds filed motions for a mandatory preliminary injunction ordering Axis to pay Defense Costs prior to an adjudication of coverage. On August 10, 2007, Arch Insurance Company (another excess D&O insurer) filed a motion to intervene in the declaratory judgment action for the purpose of opposing the Officer Insureds' motions for a mandatory preliminary injunction ordering Axis to pay Defense Costs.

Axis filed briefs in opposition to the motions for a preliminary injunction ordering Axis to pay Defense Costs and to dismiss the Axis Complaint on August 13, 2007, and filed its Answers and Affirmative Defenses to the Officer Insureds' Counterclaims on August 16 and 23, 2007.[8] The Insureds filed reply briefs on or about August 27 and 29, 2007, and oral argument was heard on the motions on August 30, 2007. On August 31, 2007, the Bankruptcy Court entered an Order granting the Officer Insureds' motion for a preliminary injunction ordering Axis to pay Defense Costs and dismissing the Axis Complaint without prejudice (the "August 31, 2007 Order"). Axis filed a Notice of Appeal on September 4, 2007, from the August 31, 2007 Order of the Bankruptcy Court

---

[8] In its Affirmative Defenses to Counterclaims, Axis again asserted the absence of coverage as a defense.

granting the Officer Insureds' application for a preliminary injunction ordering advancement of defense costs from Axis. The Bankruptcy Court also dismissed the Axis Complaint without prejudice, but retained the counterclaims. On September 10, 2007, Axis filed a Notice of Appeal of the Bankruptcy Court's August 31, 2007 Order, which dismissed Axis's Complaint without prejudice.

On September 7, 2007, upon the suggestion of the Bankruptcy Court, Axis filed its complaint in the District Court seeking a judicial declaration confirming its determination that the Axis Policy does not provide coverage to any of the Insureds for any Loss incurred in connection with the Underlying Actions (S.D.N.Y. Index No. 07-7924).

On September 4, 2007, the Indicted Insureds filed an Adversary Complaint in a separate adversary case (Bankr. S.D.N.Y. Index No. 07-2005) against Axis for a declaratory judgment and injunctive relief seeking the advancement of Defense Costs. The Indicted Insureds filed motions on September 5, 2007, for a preliminary injunction requiring Axis to advance their Defense Costs. Axis filed its opposition to this motion for a preliminary injunction on September 9, 2007 and the Officer Insureds filed a motion to intervene for the limited purpose of commenting regarding the injunction motion on September 10, 2007. The Bankruptcy Court held oral argument on the Indicted Insured motion for preliminary injunction on September 11, 2007 – one week after they filed their complaint against Axis. On September 12, 2007, the Bankruptcy Court issued an Order granting, in part, the motion for a preliminary injunction to require Axis to pay officer and director defense costs in the underlying litigations and for relief from the automatic stay to the extent necessary to permit such advancement. On September 19,

2007, Axis filed a Notice of Appeal from the September 12, 2007 Order in Bankr. Index No. 07-2005.

On September 17, 2007, the Director Insureds filed an adversary complaint against Axis seeking a declaratory judgment and injunctive relief to compel Axis to advance their defense costs (Bankr. S.D.N.Y. Index No. 07-2032).

On September 25, 2007, the Director Insureds, the Officer Insureds and the Indicted Insureds filed motions for summary judgment to require Axis to advance defense costs in the underlying litigations.  Axis filed its opposition to all Defendants summary judgment motions on October 4, 2007.  On October 10, 2007, the Officer Insureds, the Indicted Insureds, and the Director Insureds filed their reply briefs in support of their motions for summary judgment to require Axis to advance defense costs in the underlying litigation.  Oral argument was heard by the Bankruptcy Court on October 12, 2007.  On October 19, 2007, the Bankruptcy Court issued an Order granting the Defendants motions for summary judgment.  On October 22, 2007, Axis filed a Notice of Appeal from the October 19, 2007, Order.

On October 24, 2007 the Bankruptcy Court held a conference wherein Officer Insured Klejna requested leave to file a summary judgment motion in the Bankruptcy Court on the ultimate issue of coverage.  The Bankruptcy Court Ordered Axis and Officer Insured Klejna to meet and confer and submit a discovery schedule to the Bankruptcy Court.

On November 13, 2007, the District Court entered an Order withdrawing the reference from the Bankruptcy Court for all of the foregoing matters and setting the briefing schedule for these appeals.

## STANDARD OF APPELLATE REVIEW

On appeal from the Bankruptcy Court's Orders, a District Court must review the Bankruptcy Court's conclusions of law on a *de novo* basis. *In re Worldcom*, 2007 U.S. Dist LEXIS 67669, at *15 (S.D.N.Y. September 14, 2007).

## ARGUMENT

**I.    THE BANKRUPTCY COURT'S RETENTION OF THE COUNTERCLAIMS IS INCONSISTENT WITH THE BANKRUPTCY COURT'S DISMISSAL OF AXIS'S COMPLAINT AND HAS RESULTED IN PIECEMEAL LITIGATION**

The Bankruptcy Court dismissed Axis's Complaint, but incongruously permitted the Insureds' counterclaims – which seek exactly the same relief Axis sought in its Complaint – to survive, and imprudently granted summary judgment based on these same counterclaims. This ruling denied Axis the ability to seek the very same relief that the Bankruptcy Court then partially granted to the Insureds. *See* Exhibit E to the Gilbride App. Decl. Such a result not only contravenes basic fairness, but has resulted in piecemeal litigation of overlapping issues. It is axiomatic that federal policy disfavors such a result. *See, e.g., Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000); *Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 1989 WL 162315 (S.D.N.Y. Aug. 4, 1989).

Axis filed a Complaint seeking a declaration that the matters submitted to it were not covered under the Axis Policy. The Officer Insureds answered Axis's Complaint and filed Counterclaims seeking a declaration that the matters submitted to Axis were covered

under the Axis Policy. The Bankruptcy Court dismissed Axis's Complaint, finding that "there is a substantial overlap between the issues raised in the complaint and the pending litigation." 8/30 Tr. at p. 57-8; Exhibit F to the Gilbride App. Decl (the "8/30 Tr."). It is beyond cavil that this same overlap exists whether a party is seeking a declaration of coverage, or a declaration of no coverage. Counsel to Insureds admitted as much at the August 30, 2007 hearing, saying "you really can't litigate [the advancement issue] in the abstract by itself without the coverage under the policy also being in dispute." 8/30 Tr. at p. 11 l. 14-17.

Once the Bankruptcy Court dismissed Axis's Complaint – seeking a declaration of no coverage – fundamental fairness dictated that the Bankruptcy Court also should have dismissed the counterclaims – seeking a declaration of coverage. Without the counterclaims there is no basis for the summary judgment Order requiring Axis to advance Defense Costs. Similarly, the Indicted Insureds and the Director Insureds were permitted by the Bankruptcy Court to file adversary actions against Axis seeking the same relief sought through the Officer Insureds' counterclaims.

The Bankruptcy Court's inconsistent Orders are not only fundamentally unfair, but will lead to different courts considering the same issues. The Bankruptcy Court's dismissal forced Axis to seek a judicial declaration of no coverage at the District Court while the Bankruptcy Court retained jurisdiction over the counterclaims. It is clear that the Bankruptcy Court did not limit its jurisdiction to the advancement issue. The Bankruptcy Court also indicated openness to consider the proposed summary judgment motion by one Officer Insured on the ultimate issue of coverage – directing Axis and this Officer Insured to begin discovery, prior to the District Court's withdrawal of the

11

reference from the Bankruptcy Court. The resulting division of the coverage dispute is in contravention of judicial economy and had the potential to lead to inconsistent and duplicative rulings by different Courts. For that reason alone, the Bankruptcy Court's ruling must be reversed.

The Bankruptcy Court's retention of the counterclaims is also entirely inconsistent with its denial of Arch Insurance Company's motion to intervene. The Bankruptcy Court determined that Arch could not litigate the issue of "coverage" because of a state court ruling that it was premature for Arch to litigate coverage. 8/30 Tr. at 18. Arch, however, carefully tailored its motion to intervene to the specific issue of advancement which was the subject of a preliminary injunction motion. The Bankruptcy Court held that Arch could not intervene because the issues of coverage and advancement were too closely intertwined. The Bankruptcy Court was concerned "if I permitted Arch to intervene, we would be frequently interrupted in litigation by considerations of whether what Arch is in particular seeking at that moment (if I permitted it to intervene) would be an end run around that order or whether the order would be binding on it." 8/30 Tr. at 18. Clearly, the Bankruptcy Court understood that the issues of "coverage" and "advancement" were too closely related to be divided. Nevertheless, an hour after denying Arch's intervention motion, and after indicating to Axis that the Bankruptcy Court's "inclination" was that "it seems to me it all should go" the Bankruptcy Court changed course and permitted the Officer Insureds to prosecute their counterclaim for a declaration of coverage.[9] 8/30 Tr. at 60. By permitting the counterclaims to proceed, the

---

[9] In fact, the Bankruptcy Court initially indicated dismissal of the entire litigation – including the counterclaims – was its "preliminary ruling" and its "strong inclination." 8/30 Tr. at 60.

Bankruptcy Court completely contradicted the entire basis for its denial of Arch's motion to intervene and its dismissal of Axis's complaint.

The Indicted Insureds and the Director Insureds – both of which successfully moved for the dismissal of the Axis Complaint – subsequently filed adversary actions against Axis which were consolidated with the Officer Insureds' counterclaims and part of the joint motion for summary judgment on the issue of advancement.    Having successfully achieved dismissal of the Axis Complaint for a declaration of no coverage, it makes no sense that the same Insureds were permitted to prosecute adversary complaints predicated upon an assumption of coverage.

Coverage or no coverage – one Court should make that determination, albeit the District Court or the Bankruptcy Court.    Clearly, the Bankruptcy Court believes the District Court is the appropriate forum and, as such, its inconsistent rulings on the dismissal of Axis's complaint and retention of the counterclaims cannot stand.[10]

## II.    THE BANKRUPTCY COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT TO THE INSUREDS CONTRARY TO THE EXPRESS UNAMBIGUOUS TERMS OF THE INSURANCE CONTRACT, BASED UPON A MISAPPLICATION OF PRIOR CASELAW, AND IGNORING BASIC CONCEPTS OF CONTRACT INTERPRETATION

The Bankruptcy Court ignored the plain language of the insurance contract which only provides for the advancement of **covered** defense costs.    The Axis Policy allows

---

[10] It is Axis's position that, having dismissed Axis's complaint, the Bankruptcy Court should have also dismissed the counterclaims, and not encouraged the filing of additional adversary actions against Axis by other Insureds seeking advancement of defense costs.    If the Bankruptcy Court had dismissed the counterclaims, it never would have made the erroneous decision to grant summary judgment on the advancement of defense costs.    Accordingly, if the District Court agrees with Axis that the Bankruptcy Court should have dismissed the counterclaims, the advancement issue is moot because the Bankruptcy Court never should have issued that ruling.    If the District Court agrees with the Bankruptcy Court's retention of the counterclaims, however, Axis has also appealed the Bankruptcy Court's erroneous grant of summary judgment, which itself was fatally flawed.

Axis to make the initial good faith determination of what is covered. Since the Bankruptcy Court divested itself of the power to determine that Axis's coverage disclaimer was incorrect, the Bankruptcy Court should not have ordered Axis to advance defense costs which Axis had determined were not **covered**. Further, the Bankruptcy Court interpreted a line of caselaw which is clearly inapplicable to the terms of the Axis Policy. Finally, in its interpretation of the Axis Policy, the Bankruptcy Court ignored basic concepts of contract interpretation and failed to give all terms of the contract meaning – selectively excising certain terms necessary to reach its outcome determinative decision.

## A. The Axis Policy Language Addressing Payment of Defense Costs is Materially and Unavoidably Different from the Worldcom Policy Language

The language found in the Axis Policy is materially and unavoidably different from the language found in the WorldCom policy, upon which the Bankruptcy Court based its decision. In *WorldCom*, the District Court held that the express terms of the WorldCom policy governed until a Court determined that rescission of the policy was proper. In *WorldCom*, the District Court examined the express terms of the WorldCom policy and found that, in light of the fact that the insurers did not contend coverage was excluded by any of the terms, conditions or exclusions of the policy,[11] the policy continued in force and the express terms of the WorldCom policy required the advancement of defense costs while the rescission action was still pending. *WorldCom*, 354 F.3d at 462.

---

[11] Here, Axis contends that coverage for the Underlying Actions is excluded based upon exclusions such as the Warranty Letter, which by its terms, becomes an exclusion, and the prior knowledge exclusion. Neither of these exclusions require a final adjudication of fact.

The Axis Policy is materially different from the WorldCom policy.  The Axis Policy does not contain the express advancement language found in the WorldCom policy, and, unlike the WorldCom insurers, Axis has denied coverage *pursuant to* the terms, conditions and exclusions of the Axis Policy.  The WorldCom insurers asserted that the policy itself was a nullity and sought to void the terms of the WorldCom policy.  Axis has not rescinded the Axis Policy and seeks to have its terms applied, as written.  The WorldCom policy is attached to the Gilbride App. Decl. at Ex. G.  The difference between exclusion and rescission is material when comparing Axis's position to that of the insurers in *WorldCom*.  In *WorldCom*, the insurers did not assert the applicability of an exclusion; rather, they asserted the policy itself should be rescinded because it was procured through fraud.  Despite Axis's attempts to inform the Bankruptcy Court of this difference, the Bankruptcy Court misinterpreted the facts of *WorldCom* and believed the *WorldCom* case was based on an exclusion.  For example, when discussing *WorldCom*, the Bankruptcy Court said, "these cases all deal with exclusions."  SJ Tr. at 25; Exhibit H to the Gilbride App. Decl. ("SJ Tr.").  That is flatly wrong.  In *WorldCom*, the Court never considered the exclusions in the WorldCom policy because the WorldCom insurers never asserted coverage defenses based on the terms of the WorldCom policy.  The WorldCom insurers asserted that none of the policy terms actually existed.  This is a completely different situation from Axis, which asserts that the terms of the Axis Policy exclude coverage for this Claim.

In *WorldCom*, the Court held that, until rescission was adjudicated, the terms of the policy governed.  Since the insurers in *WorldCom* had not denied coverage based on the terms of the policy, the terms of the WorldCom policy expressly called for the

advancement of defense costs *__prior to__* the final disposition of the claim. In contrast, Axis

has denied coverage and the terms of the Axis Policy only provide for the advancement

of __covered__ defense costs. A comparison of the relevant policy provisions follows:

|                       **WorldCom Policy**                       |                       **Axis Policy**                       |
| --- | --- |
| THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; **HOWEVER, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.** (Declaration Page, emphasis added) | THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED. (Declaration Page) |
| Under both Coverage A and Coverage B of this policy, except as hereinafter stated, the Insurer **shall advance**, at the written request of the Insured, Defense Costs **prior to the final disposition of a Claim**. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss. (Clause 8 at p. 10, emphasis added) | The Insurer will pay **covered** Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer. (Condition D(2) at p. 8, emphasis added) |

Unlike the WorldCom policy, the Axis Policy does not call for the advancement

of defense costs prior to the final disposition of a claim. In fact, the Axis Policy only

requires the payment of __covered__ defense costs on an as-incurred basis. Axis declined

coverage and the Bankruptcy Court previously ruled that it could not and would not reach

the issue of whether Axis's coverage determination was correct. Moreover, the Axis

Policy must be enforced as written and there was no basis whatsoever for the Bankruptcy Court to re-draft the Axis Policy because the Insureds now wish the policy they purchased contained the language found in the WorldCom policy. *See Drilling v. New York Life Insurance Co.*, 137 N.E. 314, 316 (N.Y. 1922) ("A contract for insurance is no different than any other contract. The insurance company is entitled to have its contract enforced by the courts as written.") There is a material and unavoidable difference between these two policies – the Axis Policy does not provide for the advancement of defense costs prior to an adjudication of coverage – and no court should rewrite the Policy.

On appeal, the District Court cannot ignore the differences in contractual language between the WorldCom policy and the Axis Policy. To do so would require the District Court to excise the word "covered" from the first sentence of Condition D(2). This is exactly what the Bankruptcy Court did, saying "you're putting too much weight on the word 'covered'". SJ Tr. at 25. Fundamental principles of contract interpretation, however, require that the policy should be read as a whole with effect given to every provision. *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 693 (N.Y. 2002) (insurance policy to be construed in a manner that "leaves no provision without force and effect"). Ignoring the word "covered" leaves that word without any force or effect, a result contrary to New York law.

## B. The Clear and Unambiguous Language of the Axis Policy Does Not Require Advancement When Axis Has Denied Coverage

The word "covered" is unambiguous and has been defined by decades of New York jurisprudence. Importantly, the New York Court of Appeals has held:

17

> We start our analysis by noting that the coverage under the policies in this case is not merely what is found under the heading "insuring agreement". Just as this clause affirmatively indicates the coverage which is included, so does the "exclusion" clause tell us expressly what is not. In policies so drawn, the protection the insured has purchased is the sum total, or net balance, however one labels it, of a coming together of the two. For it is not either alone, but the combination of both, which defines the scope of the protection afforded no more and no less.

*Albert J. Schiff Assoc., Inc. v. Flack*, 417 N.E.2d 84, 86 (N.Y. 1980). Axis does not dispute that the Underlying Actions constitute a Claim which falls within the Insuring Agreement. However, the analysis does not end there. To be "covered" by the Axis Policy, the Claim must also not be excluded by the remaining terms of the Axis Policy. Here, at least three separate and distinct terms operate to exclude this Claim from "coverage" under the Axis Policy: (1) the Warranty; (2) the Knowledge Exclusion; and (3) the exclusion in the Application.[12] To grant summary judgment for the Insureds, the Bankruptcy Court had to excise the word "covered" from the sentence – "The Insurer will pay <u>covered</u> defense costs on an as-incurred basis." (emphasis added). Simply deleting a word from the bargained-for terms of this Policy is contrary to every principle of contract interpretation. *Consolidated Edison*, 774 N.E.2d, at 693. The Bankruptcy Court redrafted the Axis Policy and provided the Insureds with a benefit Axis did not subscribe to and the Insureds did not purchase. *Schiff*, 417 N.E.2d, at 87 ("for the insured to extend its coverage to more than it originally bargained, it would have had to enter into a supplemental contract expanding the insuring clause or contracting the exceptions.")

---

[12] The pending and prior litigation exclusion also operates to exclude coverage for the Underlying Litigation.

18

Under New York law, if the terms of an insurance contract are clear and unambiguous, they must be accorded their plain and ordinary meaning and the policy enforced as written. *Govt. Employees Ins. Co. v. Kligler*, 366 N.E.2d 865, 866 (N.Y. 1977); *Schiff*, 417 N.E.2d, at 87 ("it is axiomatic that, while a contract of insurance is to be construed liberally in favor of the insured, where its terms are clear and unambiguous, they must be so read. . . For our task is to find, not to alter the intention of the parties."). New York law views the plain meaning of an insurance contract, such as the Axis Policy, from the viewpoint of sophisticated business people. *Moshiko, Inc. v. Seiger & Smith, Inc.*, 529 N.Y.S.2d 284, 288 (1st Dep't 1988), *aff'd*, 529 N.E.2d 420 (N.Y. 1988). Most importantly, New York courts have historically noted that it is not the function of a court to rewrite insurance policies so as to provide coverage which a court might consider more equitable. *Cornellier v. Am. Cas. Co.*, 389 F.2d 641, 644 (2d Cir. 1968). The fact that the insured may have contracted for coverage that was of little use to it at the time of the loss does not mean that it is entitled to more beneficial coverage for which it did not contract. *Id.*

The language at Condition D(2) is clear and unambiguous. "The Insurer will pay **covered** Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not **covered** under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer." (emphasis added). Following plain logic, the use of the term "**covered**" in the first sentence of Condition D(2) would necessarily have the same meaning as its use in the second sentence. Thus, this Condition clearly states that if Defense Costs are ***covered*** by the Axis Policy, they will be paid on an as-incurred basis. However, if the Insurer pays these ***covered*** Defense Costs,

19

but it later turns out that the Defense Costs were not ***covered***, the Insured agrees to pay them back. As held by the New York Court of Appeals, the analysis of what is "covered" includes an analysis of <u>both</u> the insuring agreement and the exclusions. *Schiff*, 417 N.E.2d, at 86. The Bankruptcy Court construed the clear meaning of the word "covered" differently in the first and second sentence. The Bankruptcy Court's interpretation resulted in a twisting of the meaning of the bargained for policy and a rewriting of the Axis Policy to provide coverage where none is available.

The Insureds appear to argue that the word "covered" in the first sentence of Condition D(2) avoids consideration of applicable exclusions in the policy, but the same word in the next sentence includes applicable exclusions. Changing the definition of a term from one sentence to the next runs contrary to fundamental concepts of contract interpretation. *See Consolidated Edison*, 774 N.E.2d, at 693. The Bankruptcy Court never addressed this issue of contract interpretation.

The second sentence of Condition D(2) is not superfluous, as the Insureds have contended. The second sentence of Condition D(2), which provides for repayment if it is finally determined that any Defense Costs paid are not covered, applies in situations where the insurer advances defense costs subject to a reservation of rights – this clause provides the "string" to that payment. The primary and first excess insurers are in precisely this position. They both reserved the right to deny coverage based on Exclusions A and B (personal profit and fraud, respectively), each of which require "a final adjudication adverse to such Insured establishing that the Insured" acted in violation of the exclusion. Insurers relying on these "final adjudication" exclusions need a mechanism to retroactively recover their defense cost payments when a "final

adjudication" is actually achieved. The second sentence of Condition D(2) provides such a mechanism. The Bankruptcy Court completely ignored the difference between exclusions which explicitly contain a "final adjudication" requirement, and those which do not. Accordingly, the Bankruptcy Court failed to give meaning to each term of the insurance contract – the Bankruptcy Court's ruling gives no additional meaning to those exclusions which actually contain an express "final adjudication" requirement. Instead, the Bankruptcy Court created an entirely new standard, saying "the insurer is obligated to advance the defense costs with the caveat that if it is clear from the policy itself and claim made against the insured that the claim would not be covered then such an obligation could be decided on a summary judgment basis and no defense costs would need to be advanced." SJ Tr. at 46. Axis already determined that it was clear from the policy and the allegations in the Underlying Actions, that the claim was not covered – and Axis filed litigation seeking a declaration of its determination. However, the Bankruptcy Court dismissed Axis's complaint. Accordingly, by dismissing the Axis Complaint and bifurcating the advancement issue, the Bankruptcy Court created a rubric whereby there was no possibility for Axis to succeed. The Bankruptcy Court prevented Axis from arguing the very thing that was necessary for a finding requiring the advancement of defense costs – coverage.

If defense costs must be advanced for claims where the insurer has denied coverage until there is a final adjudication, as the Insureds assert, the language requiring a final adjudication for some exclusions, but not others is rendered superfluous. Under the Bankruptcy Court's unreasonable interpretation, all exclusions would require a final adjudication – whether they say so or not. The exclusion in the Warranty specifically

does <u>not</u> require a final adjudication and neither does the knowledge exclusion endorsement. The Bankruptcy Court rendered the distinction between those exclusions which require a final adjudication – and those that do not – meaningless.[13]

The Insureds' assertion that Condition D(2) requires the payment of Defense Costs for uncovered Claims is also plainly refuted by Condition D(3). *See* Exhibit I to the Gilbride SJ Decl. Condition D(3) addresses situations where some parts of a Claim may be covered, but others are not. For example, a suit is brought against officers (who are covered by the policy) and employees (who are not covered by the policy.) Condition D(3) provides that the Insureds and the Insurer should use their "best efforts to determine a fair and proper allocation of all such amounts . . . ." Tellingly, Condition D(3) concludes that:

> If the Insureds and the Insurer are unable to agree upon an allocation, then until a final adjudication is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of Loss, ***including Defense Costs, which the parties agree is not in dispute***. (emphasis added).

The Policy expressly provides that if there is a disagreement over coverage of Defense Costs, Axis is only required to advance the amount not in dispute. Here, Axis

---

[13] For example, the Refco policies contain a specific litigation exclusion at Endorsement 7 – excluding coverage for anything related to the "Edward McElwreath Case." Under the rule of law the Bankruptcy Court created, if a claim were made which is indisputably related to the Edward McElwreath Case, the insurer would be forced to pay millions of dollars of defense costs until such time it was permitted to obtain a judicial declaration that the exclusion was triggered. Because the Bankruptcy Court has held it cannot consider the issue of whether or not the exclusion is triggered, the Insureds would not even have to present a colorable argument that the claim was outside the exclusion. Such a result would render an insurer's good faith ability to deny coverage meaningless. The insurance policy would no longer be a contract for the transfer of risk, but would be a funding mechanism creating a financial guarantee for the insured. Where else can someone pay a couple of hundred-thousand dollars and receive a guaranteed return of tens of millions of dollars?

has disclaimed coverage for the entire claim – not just a portion of a claim. According to the plain language of the Policy, Axis is not compelled to advance any Defense Costs. The Policy unambiguously provides that **_covered_** defense costs will be paid as incurred, but if there is a dispute as to coverage; Axis is only obligated to make payment of the undisputed amount.[14] The Bankruptcy Court failed to consider the incongruous result achieved through its interpretation of the Axis Policy – if Axis says 1% of the claim is covered and denies coverage for 99% of the claim, it appears the Bankruptcy Court agrees Axis can make this determination on its own accord and only advance 1% of the defense costs. According to the Bankruptcy Court, however, because Axis disclaimed coverage for 100% of the claim, Axis is divested of the ability to make that determination on its own and must advance 100% of the defense costs until there is a final determination of coverage. This illogical result should not stand.

## C. New York Law Does Not Compel the Advancement of Defense Costs Where an Insurer Has Disclaimed Coverage Under a D&O Policy

New York cases addressing advancement of defense costs in a D&O policy where the insurer asserts that an exclusion prevents coverage, follow the analytical path

---

[14] This is precisely the result that the Officer Insureds advanced in their reply to their motion to dismiss the coverage litigation brought by Arch Insurance Company, another excess D&O insurer of Refco, excess of the Axis policy. The Officer Insureds argued in that case that

> Arch has already denied coverage based on the prior knowledge exclusions. In the [sic] context, its remedy is quite clear and adequate: in conformance with its denial letter, it may simply refuse to indemnify any of the Defendants when and if their liability ever does exceed $40 million so as to trigger the Arch Policy.

Reply Mem. in Support of Officer Insureds' Motion to Dismiss or Stay the Amended Compl. for Declaratory Relief, at 8-9 (internal citation omitted). *See* Exhibit J to the Gilbride App. Decl. The Officer Insureds have admitted that they have no right to seek the advancement of Defense Costs where the insurer has denied coverage. According to the Officer Insureds, "in conformance with [Axis's] denial letter, [Axis] may simply refuse to indemnify . . . ."

established by the New York Court of Appeals in *Schiff*, and hold that the Court must determine whether or not the exclusion applies to bar coverage before ordering the advancement of defense costs. *Kozlowski*, 792 N.Y.S.2d 397, a case cited by the Insureds, distinguishes between an insurer's duty to advance defense costs when it has asserted that the policy is void and should be rescinded and when it asserts application of an exclusion. In *Kozlowski*, the insurer sought: (1) to rescind the policy; and (2) to deny coverage based on a "personal profit" exclusion. As in *WorldCom*, the Court held that the insurer's rescission defense was not a justification for withholding advancement of defense costs. The Court then went on to apply the terms of the policy. With respect to the personal profit exclusion, the Court held that "[t]o the extent such liabilities are excluded from coverage by the personal profit exclusion, ***Federal is not required to pay for defense costs***." *Id.* at 404 (emphasis added). Therefore, the Court considered the exclusion on the merits (something the Bankruptcy Court previously ruled it could not do) in deciding the advancement issue and found that the personal profit exclusion would not exclude coverage for the underlying matters in their entirety. *Id.* at 402-03 (examining allegations of complaint and finding that the "allegations in each of the underlying actions demonstrate that the claims asserted do not solely and entirely fall within the personal profit exclusion").

Likewise, in *Carlin Equities*, 2007 WL 2456958, Index No. 05-cv-9508-LAP (S.D.N.Y. August 24, 2007), a case involving the same "covered defense costs" policy language found in the Axis Policy, the District Court examined the exclusions before ruling on the advancement of coverage. The Court only ordered advancement of defense

24

costs for those insureds for whom coverage was not excluded under the Carlin Equities'
policy.

This is precisely the analysis that is necessary to determine whether Axis must
advance defense costs – the Court must first determine whether the Claim is covered by
the Axis Policy, analyzing **BOTH** the insuring agreements and the application of
exclusions that the insurer contends bar coverage. *Parks Real Estate Purchasing Group v.
St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (the protection the
insured is entitled to is the net balance of the insuring agreement minus the exclusions).

*Kozlowski* and *Carlin Equities* demonstrate that when an insurer has denied
coverage based on a policy exclusion, there is no duty to advance defense costs unless a
court has determined that the insurer's coverage position is incorrect. The Bankruptcy
Court had to reach the issue of whether exclusions bar coverage for these Insureds under
the Axis Policy – failing to do so, the Bankruptcy Court awarded the Insureds a benefit
well beyond the terms, conditions and exclusions of the Axis Policy. Since the
Bankruptcy Court had previously ruled that it could not reach those issues, the summary
judgment motions seeking the advancement of defense costs should have been denied in
their entirety.

### D. Public Policy Prevents the Court From Gifting Coverage to the Insureds Which They Did Not Purchase

The public policy arguments discussed by the Bankruptcy Court regarding the
availability of D&O insurance are unavailing. D&O insurance is entirely voluntary.
Unlike auto insurance, which the legislature has mandated that every driver procure, there
is no statutory requirement that companies provide their directors and officers with
insurance. *Cf. Stephens v. National Distillers and Chemical Corp., et al.*, 1996 WL

271789, at *5 (S.D.N.Y. May 21, 1996) (noting areas where New York legislature has legislated insurance). Some companies buy a lot, some a little, and some buy none at all. While insureds under a D&O policy have a right to the coverage that they purchased, they do not have any right to expect broader coverage than they purchased. D&O policies are freely negotiated at arms length by experienced professionals. Different insurers offer a variety of different terms and conditions from which directors and officers can select coverage. It is not credible for the Bankruptcy Court to accept the Insureds' argument that public policy dictates that they should be gifted millions of dollars in contravention of the express terms of the insurance contract negotiated on their behalf. There is no *right* to D&O insurance – it is a benefit which can be purchased. Here, the benefit sought – coverage for this claim, including payment of defense costs – was not purchased based upon the warranty signed on behalf of all insureds and the prior knowledge exclusion. Axis expressly sought to exclude from coverage anything that any Insured already knew about which might result in a claim. That the Insureds, or at least Bennett, knew that the facts underlying the current litigation existed and might result in a claim is uncontroverted. This is precisely the type of claim that the Axis Policy was drafted to exclude from coverage.

The public policy arguments articulated in *WorldCom* do not exist here. The *WorldCom* Court was worried that if defense costs were not advanced by the insurer, the insured defendants would face harm because they would not be able to defend themselves in the underlying litigation. Despite repeated opportunities to do so, none of the Insureds have asserted that they would be any less capable of defending themselves in the absence

beyond the ruling of any other court and does so in a manner that works a gross injustice to the judicial process.

Dated: November 28, 2007

Respectfully submitted,

KAUFMAN BORGEEST & RYAN LLP

By: _____

Wayne E. Borgeest
Joan M. Gilbride
Robert A. Benjamin
200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
wborgeest@kbrlaw.com
jgilbride@kbrlaw.com
rbenjamin@kbrlaw.com

*Attorneys for Plaintiff Appellant*
*Axis Reinsurance Company*

DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                               :

AXIS REINSURANCE COMPANY,        :      No. 07-CV-7924 (GEL)

                               :

                   Plaintiff,     :

          v.                   :

PHILLIP R. BENNETT, et al.,         :

                               :

                  Defendants.    :

------------------------------------------------------------------ X
                               :

In re                            :      Chapter 11

                               :

REFCO, INC., et al.,              :      Case No. 05-60006 (RDD)

                               :

                  Debtors.      :      Jointly Administered

------------------------------------------------------------------ X
                               :

AXIS REINSURANCE COMPANY,        :      Adv. Proc. No. 07-1712-RDD

                               :

                   Plaintiff,     :

          v.                   :

PHILLIP R. BENNETT, et al.,         :

                               :

                  Defendants.    :

------------------------------------------------------------------ X
                               :

TONE N. GRANT, et al.,            :      Adv. Proc. 07-2005-RDD

                               :

                   Plaintiffs,    :

          v.                   :

AXIS REINSURANCE COMPANY,        :

                               :

                  Defendant.    :

------------------------------------------------------------------ X
                               :

LEO R. BREITMAN, et al.,                      :        Adv. Proc. No. 07-2032-RDD
                                              :
                        Plaintiffs,           :
             v.                               :
                                              :
AXIS REINSURANCE COMPANY,                     :
                                              :
                        Defendant.            :
                                              :
                                              :
----------------------------------------------------------------- X
                                              :
AXIS REINSURANCE COMPANY,                     :        (1) No. 07-CV-9420-GEL
                                              :        (2) No. 07-CV-9842-GEL
                        Plaintiff,            :        (3) appeal not yet assigned
             v.                               :
                                              :
PHILLIP R. BENNETT, et al.,                   :
                                              :
                        Defendants.           :
----------------------------------------------------------------- X
                                              :
TONE N. GRANT, et al.,                        :        No. 07-CV-9843-GEL
                                              :
                        Plaintiffs,           :
             v.                               :
                                              :
AXIS REINSURANCE COMPANY,                     :
                                              :
                        Defendant.            :
                                              :
----------------------------------------------------------------- X


## <u>DECLARATION OF JOAN M. GILBRIDE</u>

I, Joan M. Gilbride, declare under penalty of perjury that the following declaration is true

and accurate and made based on my personal knowledge except where otherwise stated:

1.    I am a member of Kaufman Borgeest & Ryan LLP, attorneys for plaintiff Axis Reinsurance Company ("Axis") in this action.

2.    This Declaration submits true and accurate copies of documents in support of Appellant Axis's Appeal From the Bankruptcy Court's Orders: (1) Dismissing Axis's Complaint Without Prejudice While Retaining the Counterclaims; and (2) Granting Summary Judgment Requiring Axis to Advance Defense Costs Prior to an Adjudication of Coverage.

3.    Attached as Exhibit A is a true and accurate copy of the Form 8-K filed by Refco, Inc. (signed by Movant Klejna) with the United States Securities and Exchange Commission on October 11, 2005 (with exhibits).

4.    Attached as Exhibit B is a true and accurate copy of Axis's Securexcess Policy RNN 506300 (the "Axis Policy").

5.    Attached as Exhibit C is the March 6, 2006 letter from Wayne E. Borgeest to Pam Sylwestrzak.

6.    Attached as Exhibit D is the Warranty Letter signed by Bennett on behalf of all insureds under the Axis Policy on January 21, 2005.

7.    Attached as Exhibit E are true and accurate copies of the August 31, 2007 Orders of Judge Robert D. Drain granting Insureds' Application for a Preliminary Injunction Ordering Advancement of Defense Costs by Axis and granting Insureds' Motion to Dismiss the Axis Complaint.

8.    Attached as Exhibit F is a true and accurate copy of the transcript of the August 30, 2007 oral argument on the Application for a Preliminary Injunction Ordering Advancement of Defense Costs and Motion to Dismiss.

9.    Attached as Exhibit G is a true and accurate copy of Directors and Corporate Liability Insurance Policy No. 874-91-08, issued to WorldCom by National Union Fire Insurance Company of Pittsburgh, Pa.

10.    Attached as Exhibit H is a true and accurate copy of the October 12, 2007 transcript of the oral argument on the Insureds' Motions for Summary Judgment.

11.    Attached as Exhibit I is a true and accurate copy of U.S. Specialty Insurance Company Directors, Officers and Corporate Liability Insurance Policy 24-MGU-05-A10821.

12.    Attached as Exhibit J is a true and accurate copy of the Reply Memorandum in Support of Officer Defendants' Motion to Dismiss or Stay the Amended Complaint for Declaratory Relief.

13.    Attached as Exhibit K is a true and accurate copy of the September 11, 2007 transcript of the oral argument on the Indicted Insureds' Motion for a Preliminary Injunction.


I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Dated:  Valhalla, New York
        November 28, 2007


Joan M. Gilbride
KAUFMAN BORGEEST & RYAN LLP
200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
jgilbride@kbrlaw.com

# EXHIBIT A

8-K 1 a05-17426_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

## FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): October 10, 2005

## Refco Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 001-32604 | 20-2537426 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

One World Financial Center
200 Liberty Street, Tower A
New York, New York
(Address of principal executive offices)

10281
(Zip Code)

Registrant's telephone number, including area code:  (212) 693-7000

Not Applicable.
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.    Entry into a Material Definitive Agreement**

The press releases attached hereto as Exhibit 99.1 and Exhibit 99.2 are incorporated by reference into this Item 1.01. The attached press releases disclose the existence of a prior material affiliate transaction with an entity controlled by Phillip Bennett, the President, Chief Executive Officer and Chairman of Refco Inc. and Refco Group Ltd., LLC.

**Item 2.02.    Results of Operations and Financial Conditions**

The press releases attached hereto as Exhibit 99.1 and Exhibit 99.2 are incorporated by reference into this Item 2.02. The attached press releases disclose information about the results of operations and financial condition of Refco Inc., Refco Group Ltd., LLC, Refco Finance Inc. and their affiliates.

In addition, the press releases disclosed that in light of the investigation by the Audit Committee of Refco Inc., each of Refco Inc., Refco Group Ltd., LLC and Refco Finance Inc. will likely delay the filing of its Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2005, due on October 17, 2005. At this time, it cannot be estimated when the Fiscal 2006 second quarter 10-Q filings will be made.

**Item 4.02.    Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

The press releases attached hereto as Exhibit 99.1 and Exhibit 99.2 are incorporated by reference into this Item 4.02. The attached press releases disclose that, after consultation by the Audit Committee of Refco Inc. with its independent accountants, Refco Inc. determined, on October 9, 2005, that its financial statements as of, and for the periods ending, February 28, 2002, February 28, 2003, February 29, 2004, February 28, 2005 and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance Inc. should no longer be relied upon.

**Item 5.02.    Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers**

The press releases attached hereto as Exhibit 99.1 and Exhibit 99.2 are incorporated by reference into this Item 5.02. The attached press releases disclose that, at the request of the Board of Directors of Refco Inc., Mr. Bennett, the President and Chief Executive Officer of Refco Inc. and Refco Group Ltd., LLC, has taken a leave of absence. William M. Sexton, who recently announced his impending resignation as Executive Vice President and Chief Operating Officer of Refco Inc. and Refco Group Ltd., LLC, will remain with Refco Inc. and has been appointed as Chief Executive Officer of Refco Inc. Joseph J. Murphy, Chief Executive Officer of Refco Global Futures and President of Refco, LLC, has been appointed President of Refco Inc. and Refco Capital Markets, Ltd. Also at the request of the Board of Directors of Refco Inc., Santo C. Maggio, President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd., has taken a leave of absence. Peter McCarthy has been appointed President of Refco Securities, LLC.

2

Item 7.01.   Regulation FD Disclosure

The press releases disclosing various items are attached hereto as Exhibit 99.1 and Exhibit 99.2 and are incorporated by reference into this Item 7.01.

Item 9.01.   Financial Statements and Exhibits

    (c)  Exhibits

    99.1 Press Release, dated October 10, 2005.

    99.2 Press Release, dated October 11, 2005.

3

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Refco Inc.

Date:  October 11, 2005

By:  /s/ Dennis A. Klejna
Name:  Dennis A. Klejna
Title:  Executive Vice President,
          General Counsel and Secretary

4

EX-99.1 2 a05-17426_1ex99d1.htm EX-99.1

Exhibit 99.1

### Refco Announces Undisclosed Affiliate Transaction

NEW YORK, October 10, 2005 - Refco Inc. (NYSE: RFX) today announced that it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million.  Mr. Bennett today repaid the receivable in cash, including all accrued interest.  Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible.  The Company believes that all customer funds on deposit are unaffected by these activities.  Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

This receivable from the entity controlled by Mr. Bennett was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet.  The receivable was not shown as a related party transaction in any such financials.  For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon.

At the request of the Board of Directors Mr. Bennett has taken a leave of absence.  William M. Sexton, who recently announced his impending resignation as Executive Vice President and Chief Operating Officer of Refco Inc. and Refco Group Ltd., LLC, will remain with the Company and has been appointed as Chief Executive Officer of Refco Inc.  Mr. Sexton said, "I am staying at Refco because I believe in our employees, customers and franchise.  I am excited about the opportunities ahead and am eager to work with our management team to help the Company achieve even greater success."  Joseph J. Murphy, Chief Executive Officer of Refco Global Futures and President of Refco LLC, has been appointed President of Refco Inc.

and Refco Capital Markets, Ltd. Mr. Murphy said, "We continue to see strong momentum across our businesses with record derivative contract and foreign exchange volume in the quarter." Mr. Sexton and Mr. Murphy have been leaders of the senior management team at Refco for the past six years, and have been instrumental in the Company's growth and success. Also at the request of the Board, Santo C. Maggio, President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd., has taken a leave of absence. Peter McCarthy has been appointed President of Refco Securities, LLC.

In light of the Audit Committee's investigation, the Company, Refco Group Ltd., LLC and Refco Finance Inc. each will likely delay the filing of its Quarterly Report on Form 10-Q for the quarterly period ending August 31, 2005, due on October 17, 2005. The Company cannot estimate at this time when the Fiscal 2006 second quarter Form 10-Q filings will be made or when the Audit Committee investigation will be concluded.

Business Highlights

For the quarter ended August 31, 2005, derivatives brokerage and clearing contract volumes increased by 61 million contracts, or 40.3%, to 212 million contracts for the second quarter compared to the same quarter a year ago, and by 5 million contracts, or 2.5%, compared to the quarter ended May 31, 2005.

Foreign exchange dollar volumes increased by $172 billion, or 56.4%, to $477.4 billion for the second quarter compared to the same quarter a year ago, and by $67.6 billion, or 16.5%, compared to the quarter ended May 31, 2005.

The average net customer securities financing portfolio, or average domestic net repo book, increased by 27.4% for the quarter ended August 31, 2005 to $47.0 billion from $36.9 billion for the quarter ended August 31, 2004.

As of August 31, 2005, cash and cash equivalents were $648.6 million (of which approximately $230 million was subsequently used to redeem a portion of the Company's subordinated debt), and regulated subsidiaries reported net capital of $665.8 million and excess

2

regulatory capital of $279.3 million. These figures do not reflect the $433 million received today from Mr. Bennett to settle his outstanding receivable.

### About Refco Inc.

Refco Inc. (NYSE: RFX) is a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base. Refco's worldwide subsidiaries are members of principal U.S. and international exchanges, and are among the most active members of futures exchanges in Chicago, New York, London and Singapore. In addition to its futures brokerage activities, Refco is a major broker of cash market products, including foreign exchange, foreign exchange options, government securities, domestic and international equities, emerging market debt, and OTC financial and commodity products. Refco is one of the largest global clearing firms for derivatives. For more information, visit www.refco.com.

### Cautionary Note Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of the 1995. In this press release, all statements other than statements of historical fact are forward looking statements that involve risks and uncertainties and actual results could differ. These forward looking statements are based on assumptions that we have made in light of our experience and on our perceptions of historical events, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. Although we believe that these forward looking statements have a reasonable basis, you should be aware that numerous factors, including the outcome of the Audit Committee's investigation; changes in domestic and international market conditions; competition; our ability to attract and retain customers; our relationships with introducing brokers; retention of our management team; our ability to manage our growth or integrate future acquisitions, our exposure to significant credit risks with respect to our customers, international operations and expansion, system failures, the performance of third-party suppliers, changes in regulations or exchange membership requirements, the effectiveness of compliance and risk

3

management methods, potential litigation or investigations, employee or introducing broker misconduct or errors, reputational harm, and changes in capital requirements, could cause actual results to differ materially from our expectations. Because of these factors, we caution that you should not place undue reliance on any of our forward looking statements. Further, any forward looking statement speaks only as of today. It is impossible for us to predict how new events or developments may affect us. The Company disclaims any intention or obligation to update or revise any forward-looking statements, either to reflect new information or developments or for any other reason.

4

EX-99.2 3 a05-17426_1ex99d2.htm EX-99.2

Exhibit 99.2

### Refco Supplements Prior Disclosure

NEW YORK, October 11, 2005 – Refco Inc. (NYSE: RFX) today supplemented its disclosure yesterday regarding its discovery of a receivable owed to the Company by an entity controlled by Phillip R. Bennett. The receivable in the amount of approximately $430 million was repaid yesterday in full. Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company. The nature and facts surrounding these transfers are being investigated by the Audit Committee.

The Company confirms that it has adequate liquidity to run the business in the ordinary course.

The Company also announced that it had voluntarily contacted the United States Securities and Exchange Commission, the Commodity Futures Trading Commission, the New York Stock Exchange, and other regulators and is cooperating fully with them.

About Refco Inc.

Refco Inc. (NYSE: RFX) is a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base. Refco's worldwide subsidiaries are members of principal U.S. and international exchanges, and are

among the most active members of futures exchanges in Chicago, New York, London and Singapore. In addition to its futures brokerage activities, Refco is a major broker of cash market products, including foreign exchange, foreign exchange options, government securities, domestic and international equities, emerging market debt, and OTC financial and commodity products. Refco is one of the largest global clearing firms for derivatives. For more information, visit www.refco.com.

### Cautionary Note Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of the 1995. In this press release, all statements other than statements of historical fact are forward looking statements that involve risks and uncertainties and actual results could differ. These forward looking statements are based on assumptions that we have made in light of our experience and on our perceptions of historical events, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. Although we believe that these forward looking statements have a reasonable basis, you should be aware that numerous factors, including the outcome of the Audit Committee's investigation; changes in domestic and international market conditions; competition; our ability to attract and retain customers; our relationships with introducing brokers; retention of our management team; our ability to manage our growth or integrate future acquisitions, our exposure to significant credit risks with respect to our customers, international operations and expansion, system failures, the performance of third-party suppliers, changes in regulations or exchange membership requirements, the effectiveness of compliance and risk management methods, potential litigation or investigations, employee or introducing broker misconduct or errors, reputational harm, and changes in capital requirements, could cause actual

results to differ materially from our expectations. Because of these factors, we caution that you should not place undue reliance on any of our forward looking statements. Further, any forward looking statement speaks only as of today. It is impossible for us to predict how new events or developments may affect us. The Company disclaims any intention or obligation to update or revise any forward-looking statements, either to reflect new information or developments or for any other reason.

# EXHIBIT B



## SECUREXCESS DECLARATIONS

SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

| COMPANY: Axis Reinsurance Company | POLICY NUMBER: RNN 506300 |
|---|---|

| Item 1.  Policyholder:<br>Refco, Inc.<br>550 West Jackson Boulevard<br>Suite 1300<br>Chicago, IL 60661 | Item 2.  Policy Period:<br>a.  Inception Date: August 11, 2005<br>b.  Expiration Date: August 11, 2006<br><br>Both dates at 12:01 a.m. at the<br>address listed in Item 1 |
|---|---|

Item 3.   Limits of Liability (inclusive of defense costs):
       a.   Each **Claim**      $ 10,000,000
       b.   Maximum aggregate Limit of Liability for all **Claim(s)**
           During the **Policy Period** of all **Insurance Products**    $ 10,000,000

Item 4.   **Underlying Insurance and Insurance Products:**   See Endorsement No. 1

Item 5.  Endorsements Attached at Inception: SE 1000, SE 1300, SE 0522, SE 1010, MU 1032, Manuscript #6

Item 6.   Notices to Insurer:

| Notice of **Claim(s)** To Be Sent To:<br>Axis Financial Insurance Solutions Claims<br>Address:  Connell Corporate Park<br>         Three Connell Drive<br>         P.O. Box 357<br>         Berkeley Heights, NJ 07922-0357 | All Other Notices To Be Sent To<br>Axis Financial Insurance Solutions<br>Address:  Connell Corporate Park<br>         Three Connell Drive<br>         P.O. Box 357<br>         Berkeley Heights, NJ 07922-0357 |
|---|---|

| Item 7.  Pending and Prior Claim Date: 06/04/04 | Item. 8  Terrorism Coverage Premium:<br>$10,000 |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_____
Authorized Representative

_____9/1/05_____
Date

_____
Secretary

_____
President

SE 0100 (Ed. 02 03)        Page 1 of 1        Printed in U.S.A.

## SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the **Underlying Insurance** and all information provided to the **Insurer** and any or all of the **Underlying Insurers**, and subject to the provisions of this Policy, the **Insurer** and the **Policyholder**, on its own behalf and on behalf of all **Insureds**, agree as follows.

I.   **INSURING AGREEMENT**

With respect to each **Insurance Product**, the **Insurer** shall provide the **Insureds** with insurance during the **Policy Period** excess of all applicable **Underlying Insurance**. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable **Primary Policy** and, to the extent coverage is further limited or restricted thereby, to any other applicable **Underlying Insurance**. In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable **Underlying Insurance**.

The insurance afforded under this Policy shall apply only after all applicable **Underlying Insurance** with respect to an **Insurance Product** has been exhausted by actual payment under such **Underlying Insurance**, and shall only pay excess of any retention or deductible amounts provided in the **Primary Policy** and other exhausted **Underlying Insurance**.

II.  **DEFINITIONS**

A.  **Claim(s)** means the event(s) which take place during the **Policy Period** and which trigger(s) coverage under the insuring agreement(s) of the **Underlying Insurance**.

B.  **Insurance Product** means each separate type of insurance identified as an **"Insurance Product"** in Endorsement No. 1 to this Policy.

C.  **Insured(s)** means any person(s) or entity(ies) that may be entitled to coverage under the **Primary Policy** at its inception.

D.  **Insurer** means the company identified as **"Insurer"** in the Declarations.

E.  **Policy Period** means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

F.  **Policyholder** means the person(s) or entity(ies) identified in Item 1. in the Declarations.

G.  **Primary Policy** means the specific policy identified as the **"Primary Policy"** under the applicable **Insurance Product** listed in Endorsement No. 1 to this Policy.

H.  **Sublimit** means any **Underlying Limits** which:

1.  applies only to a particular grant of coverage under such **Underlying Insurance**; and
2.  reduces and is part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in Item 4 of the Declarations.

I.  **Underlying Insurance** means each insurance policy which constitutes all or part of an **Insurance Product**, as scheduled in Endorsement No. 1 to this Policy.

J.  **Underlying Insurers** means any or all of the companies who issued the policies of **Underlying Insurance**.

K.  **Underlying Limits** means, with respect to each **Insurance Product**, an amount equal to the aggregate of all limits of liability for each **Insurance Product** stated in Endorsement No. 1 to this Policy, plus the

uninsured retention or deductible, if any, applicable to the **Primary Policy** under such **Insurance Product**.

III.  CONDITIONS OF COVERAGE

A.  For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

1.  All of the **Underlying Insurance** in effect as of the inception date of the **Policy Period** shall be maintained in full effect with solvent insurers throughout the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** as provided in Section IV. below; and

2.  All **Insureds** shall comply fully with all of the provisions of this Policy.

B.  As a condition precedent to coverage under this Policy, the **Insured** shall give to the **Insurer** as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any **Underlying Insurance**, ii) any **Underlying Insurance** not being maintained in full effect during the **Policy Period**, or iii) an **Underlying Insurer** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

C.  If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the **Insurer** of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change.  No amendment to any **Primary Policy** or **Underlying Insurance** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Insurer so agrees in writing.  The Insurer may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Insurance** on the **Insured** paying any additional premium required by the **Insurer** for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Policyholder** must give the **Insurer** written notice of any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

IV.  REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A.  If the **Underlying Limits** are partially reduced solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as excess insurance over the remaining **Underlying Limits**.

B.  If the **Underlying Limits** are wholly exhausted solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as primary insurance with respect to the applicable **Insurance Product(s)** and the retention or deductible, if any, applicable under the **Primary Policy(ies)** shall apply under this Policy.

C   If any Underlying Limits are subject to a Sublimit then coverage hereunder shall not apply to any Claim which is subject to such Sublimit, provided however, that the Underlying Limit shall be recognized hereunder as depleted to the extent of any payment of such Claim subject to such Sublimit.

V.  LIMITS OF LIABILITY

A.  The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the **Insurer's** liability for each **Claim** under the applicable **Primary Policy**, and shall be the maximum amount payable by the Insurer under this Policy for a single **Claim**, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.

B.  The amount stated in Item 3.b. in the Declarations shall be the maximum aggregate amount payable by the **Insurer** under this Policy with respect to all **Claims** during the **Policy Period** for all **Insurance Products**.

C.  This Policy does not provide coverage for any **Claim** not covered by the **Underlying Insurance**, and shall drop down only to the extent that payment is not made under the **Underlying Insurance** solely by reason of exhaustion of the **Underlying Insurance** through payments thereunder, and shall not drop down for any other reason. If any **Underlying Insurer** fails to make payments under such **Underlying Insurance** for any reason whatsoever, including without limitation the insolvency of such **Underlying Insurer**, then the **Insureds** shall be deemed to have retained any such amounts which are not so paid. If the **Underlying Insurance** is not so maintained, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Insurance** been so maintained.

D.  Payment by the **Insurer** of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

## VI. SETTLEMENTS AND DEFENSE

A.  No **Insured** under this Policy may, without the **Insurer's** prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

B.  The **Insurer** may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable **Underlying Insurance** has been exhausted.

C.  The **Insured**, and not the **Insurer**, has the duty to defend all **Claims** under this Policy.

## VII. SUBROGATION

A.  In the event of payment under this Policy, the **Insurer** shall be subrogated to all rights of recovery of each and all **Insureds** against any person or organization, and the **Insureds** shall do whatever is necessary to secure those rights to the satisfaction of the **Insurer**, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of such **Insureds**.

B.  Any amount recovered after payment under this Policy and any **Underlying Insurance** policies shall be apportioned among the Insurer and the **Underlying Insurers** net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

## VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the **Policyholder** shall be the sole agent of all **Insureds** with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

## IX. NOTICE

A.  With respect to any **Claim**, situation that could give rise to a **Claim**, or other matter as to which insurance may be sought under this Policy, the **Policyholder** or any **Insured** must give the **Insurer** written notice contemporaneously with and in the identical manner required by the applicable **Primary Policy**.

B.  All notices under this Policy shall be sent to the **Insurer** at the address set forth in Item 6. in the Declarations.

X.  MODIFICATION, CANCELLATION AND NONRENEWAL

A.  No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the **Insurer**.

B.  The **Policyholder** may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

C.  The **Insurer** may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the **Policyholder** written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the **Policy Period** shall terminate at the date and hour specified in the notice.

D.  The **Insurer** shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the **Policyholder**.

E.  The **Insurer** shall have no obligation to renew this Policy upon its expiration. If the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice to the **Policyholder** by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

F.  Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any **Underlying Insurance** is rescinded by agreement or legal process for fraud or other material misrepresentation by the **Policyholder** or any of the **Insureds**, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any **Insurance Product** containing such rescinded **Underlying Insurance**.

XI. EXCLUSIONS

The **Insurer** shall not be liable for any amount in any **Claim** taking place during the **Policy Period** and arising under any **Insurance Product**, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

A.  Any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

B.  Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

Endorsement No. 1

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

The Schedule of **Underlying Insurance** and **Insurance Products** is as follows:

A.  **Insurance Product:**   Directors and Officers Liability

1.  **Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| HCC | 24-MGU-05-A10821 | $10,000,000 | 08/11/05-08/11/06 |

2.  Other Underlying Policies

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| Lexington | 1620924 | $7,500,000 | 08/11/05-08/11/06 |

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date      9/11/05

Endorsement No. 2

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

In the event you need to contact someone about this Policy for any reason, please contact us at:

Axis Reinsurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ  07922-0357
Fax No.:  1 (908) 286-5600

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department
of Insurance to obtain information or make a complaint at:

Illinois Department of Insurance
Consumer Division of Public
Services Section
Springfield, Illinois 62767

SE13 00 (Ed. 02 03)                    Page 1 of 1                    Printed in U.S.A.

Endorsement No. 3

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## ILLINOIS AMENDATORY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

1.  Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL,** paragraph **C.** is amended by deleting the words "delivering or" in the first sentence and the words "delivery or" in the second sentence of that provision.

2.  Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL,** paragraph **F.** is deleted.  Provided, however, the **Insureds** and the **Insurer** hereby agree that the **Insurer** shall have the same rights under law to rescission that it had if Section X. F. had not been included in the Policy or deleted by this endorsement.

All other provisions remain unchanged.

_Jean Luhar_
Authorized Representative

_9/1/05_
Date

SE 0522 (Ed. 0205)                                    Printed in U.S.A.

Endorsement No. 4

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## PRIOR NOTICE EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed that the **Insurer** shall not be liable for any amount from any **Claim** which is based upon, arising from, or attributable to or in consequence of any fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance.

All other provisions remain unchanged.

_____
Authorized Representative

_____9/11/05_____
Date

SE1010 0203

# EXHIBIT C

# KAUFMAN BORGEEST & RYAN LLP

ANDREW S. KAUFMAN*
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†
JONATHAN D. RUBIN†
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER*
CHRISTOPHER E. ENGIACINTO*
ANN MARIE COLLINS†‡
JONATHAN R. BRUNO*
PAUL J. COLUCCI

OF COUNSEL:
MARIBETH ELEVIN
SHERRI M. FELDMAN*
MARGARET J. DAVINO†‡

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
THOMAS GIBBONS
HEATHER LASCHETTER*
CAROL S. DOTY†‡‡
ADELIA A. ADELE
BARBARA ANN M. COSTELLO
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON
ROCCO B. MITRA,*
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BRENDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
FRANK K. STALANO†‡
JACQUELINE R. TOMASSO
JENNIFER FILZ
GINA M. ROGUE*
MICHAEL R. JANES
YAEL YEFMAN*

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

R. EVON HOWARD*‡
LEONARD R. COOPER†
JULIE ANN LEVINSON†‡‡
JOHN B. MULLANY*
JEFFREY C. GERSON†‡
CATHERINE KELLEHER*
REBECCA GOODMAN
PETER IANNACEN
ANDREW R. JONES
CHRISTOPHER GOMEZCHT
JAMES T. DE SILVA
KEITH L. KAPLAN††
DANIEL C. LYNCH*
VINCENT C. ANSALDHI
BRENDA COUSZA*
DAVID J. VARRIALE*‡‡
DOUGLAS J. DOMSKY
KIMBERLY CLESPO
TIMOTHY R. MCCARTHY*
JEFFREY A. GRALNICK
TRACEY KEISER-PENTOSON
KATHERINE J. HOOPER†‡
DAMIEN SMITH
ANDREW S. KUFLOWITZ*‡

MATTHEW M. FERGUSON*
JEANNE M. VALENTINE
EDWARD R. NOFSECA*
MATTHEW SPENCEL
PAUL T. CURLEY

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
‡‡ALSO ADMITTED IN CT
* ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
* ALSO ADMITTED IN TX
* ALSO ADMITTED IN FL
* ADMITTED IN FL ONLY
* ADMITTED IN NJ ONLY
* ADMITTED IN NJ ONLY
* ADMITTED IN CA ONLY
* ADMITTED IN CA & NJ ONLY
* ADMITTED IN CA, VA, DC ONLY
* ADMITTED IN CA, VA, DC ONLY
‡BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 6, 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Pam Sylwestrzak
Senior Vice President
Marsh USA, Inc.
500 West Monroe Street
Chicago, IL 60661-3630

| Re: | | | |
|---|---|---|---|
| | Insured | : | Refco, Inc. |
| | Claimant | : | Various – *See* Exhibit A, attached |
| | Policy No. | : | 506300 |
| | Claim No. | : | BH 9826 |
| | Our File No. | : | 481.001 |

Dear Pam:

As you know, we represent AXIS US Insurance ("Axis"). This is further to our December 16, 2005 letter, wherein we generally reserved all of Axis's rights in law and equity, as well as our March 1, 2006 letter attaching the issued policy. We are attaching to this letter, as Exhibit A, a schedule of all matters for which Axis has received notice under the captioned policy (the "Noticed Matters"). We request that you immediately review the attached Exhibit A and advise us if you believe any matter noticed to Axis is not listed. We again also ask that all communications on this matter be directed to the undersigned, on behalf of Axis.

We are directing this letter to you as the authorized agent of the Insureds, including the individual Insured Persons. To the extent that you are not acting as the authorized representative for any of the Insureds, please immediately advise us of the proper representative for any such Insureds.

The purpose of this letter is to describe the workings of the Axis Policy, to convey Axis's position regarding coverage, and to reserve Axis's rights. Axis has reviewed the Noticed Matters in light of the Policy provisions. Please be aware that we do not

NEW YORK CITY OFFICE
99 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291

LONG ISLAND OFFICE
1305 FRANKLIN AVENUE
GARDEN CITY, NEW YORK 11530
TELEPHONE: 516-248-6000
FACSIMILE: 516-248-6677

CALIFORNIA OFFICE
CORPORATE CENTER AT MALIBU CANYON
26635 WEST AGOURA ROAD
CALABASAS, CALIFORNIA 91302
TELEPHONE: 818-880-0992
FACSIMILE: 818-880-0993

NEW JERSEY OFFICE
9 CAMPUS DRIVE
PARSIPPANY, NEW JERSEY 07054
TELEPHONE: 973-451-9600
FACSIMILE: 973-451-0150



PLAINTIFF'S EXHIBIT

attribute any merit to the Noticed Matters, and reference them herein only to describe the matter submitted for coverage. In this letter we also make certain requests for information. Those requests are generally in bold. Should further pertinent information come to light, Axis may revise its position accordingly, and it reserves the right to do so. Nothing in this letter, including any requests for information, is intended to waive any rights Axis may have under the Policy, at law, or in equity, all of which are expressly reserved. Axis's position is necessarily based upon information that has been made available to us at this point. If you have any other information we should consider, please let us know. Axis will reevaluate its coverage position described herein upon the receipt of any relevant information.

We have had the opportunity to review the Noticed Matters, as well as the various coverage letters submitted by the primary carrier, US Specialty Insurance Company ("HCC" and the "Primary Policy") and the first excess carrier, Lexington Insurance Company ("Lexington" and the "Lexington Policy"). For the reasons set forth below, Axis is denying coverage for each of the Noticed Matters. Additionally, Axis expressly reserves its right to rescind the captioned policy and any prior policy.

### THE LITIGATION

#### Noticed Matters

To date, Axis has received notice of twenty-four matters. *See* Schedule of Litigation, attached at Exhibit A. The Noticed Matters consist of: (1) federal securities putative class actions; (2) a derivative action; (3) a criminal action; (4) state court tort actions; (4) a breach of contract and fraud action (Sillam); (5) adversary proceedings brought in bankruptcy court; and (6) an action based on fraudulently obtaining a loan (BAWAG).

Securities Class Actions

1. Frontpoint Financial Services, Inc., et al. v. Refco Inc., et al., No. 05-cv-08663-GEL, complaint filed (S.D.N.Y., 10/11/05);

2. Jonathan Glaubach, et al. v. Refco Inc., et al., No. 05-cv-08692, complaint filed (S.D.N.Y., 10/12/05);

3. Miriam Lieber, et al. v. Refco Inc., et al., No. 05-cv-08667-LAP, complaint filed (S.D.N.Y., 10/12/05);

4. Sandra E. Weiss, et al. v. Refco Inc., et al., No. 05-cv-08691-GEL, complaint filed (S.D.N.Y., 10/12/05);

5. Anthony L. Wakefield, et al. v. Refco Inc., et al., No. 05-cv-08742-GEL, complaint filed (S.D.N.Y., 10/14/05);

6. Jacob Baker, et al. v. Phillip R. Bennett, et al., No. 05-cv-08923, complaint filed (S.D.N.Y., 10/19/05);

7. Craig Becker, et al. v. Refco Inc., et al., No. 05-cv-08929-GEL, complaint filed (S.D.N.Y., 10/20/05);

8. Bruce Nathanson, et al. v. Phillip R. Bennett, et al., No. 05-cv-08926-GEL, complaint filed (S.D.N.Y., 10/20/05);

9. American Financial International Group – Asia, LLC, et al. v. Refco Inc., et al., No. 05-cv-08988-PKC, complaint filed (S.D.N.Y., 10/21/05);

10. Ravindra Mettupatti, et al. v. Phillip R. Bennett et al., No. 05-cv-09048, complaint filed (S.D.N.Y., 10/24/05);

11. Todd Weiss, et al. v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, complaint filed (S.D.N.Y., 10/26/05);

12. Scott K. Weit, et al. v. Phillip R. Bennett, et al., No. 05-cv-09611-GEL, complaint filed (S.D.N.Y., 11/11/05);

13. City of Pontiac General Employees' Retirement System, et al. v. Phillip R. Bennett, et al., No. No. 05-cv-09941, complaint filed (S.D.N.Y., 11/23/05).

Shareholder Derivative Action

14. Verun Mehta, et al. v. Phillip R. Bennett, et al., No. 05-cv-08748, complaint filed (S.D.N.Y. 10/14/05).

Criminal Proceedings

15. United States of America v. Phillip R. Bennett, et al., No. 05-MAG 1720, complaint filed (S.D.N.Y. 10/12/05).

State Court Actions

16. Banesco Holding C.A., et al. v. Refco Inc., et al., No. 05603681 (Supreme Court of New York, 10/17/05);

17. Miura Financial Services v Refco Inc., et al., No. 05603683 (Supreme Court of New York, 10/17/05);

18. Multiplicas Casa De Bolsa v. Refco Inc., et al., No. 05603683 (Supreme Court of New York, 10/17/05).

The Sillam Action

19. Bankruptcy Trust of Gerard Sillam v. Refco Group, LLC, et al., No. 05603931 (Supreme Court of New York 11/04/05).

Adversary Actions

20. Markwood Investments v. Refco Capital Markets, Ltd and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05);

21. Banco De America, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05);

22. BAC International Bank v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05);

23. Reserve Invest (Cyprus) Ltd v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

The BAWAG Action

24. BAWAG P.S.K., et al. v. Refco, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

## D&O INSURANCE PROGRAM

Refco, through its broker Marsh, approached various insurers in July 2004 attempting to place a tower of Private Company D&O insurance in anticipation of an eventual public offering. As a result of this solicitation, Refco Group Ltd., LLC was insured by a tower of D&O insurance with a Policy Period from August 5, 2004 to August 5, 2005. This was later extended to August 11, 2005 (the "04/05 Policy"). After the August 11, 2005 IPO, Refco, Inc. ("Refco") was insured by a tower of Public Company D&O insurance with a Policy Period from August 11, 2005 to August 11, 2006 (the "05/06 Policy").

### Private Company Policy Tower – The 04/05 Policy

HCC Primary – The Primary Policy on the 04/05 Policy tower (the "04/05 Primary") was written by HCC. The 04/05 Primary provided a $10 million Limit of Liability, excess a retention of $500,000. This 04/05 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

(B) The Insurer will pay to or on behalf of the Insured Organization Loss arising from Claims first made against it during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

The 04/05 Primary excluded Claims based on Wrongful Acts allegedly committed prior to June 4, 2004. Coverage for E&O clams also was excluded.

**Greenwich First Excess** – The Greenwich first excess layer to the 04/05 Policy tower (the "Greenwich 04/05 Policy") insured $10 million excess of the $10 million 04/05 Primary. The Greenwich 04/05 Policy followed form to the terms and conditions of the 04/05 Primary Policy.

The Greenwich 04/05 Policy included a Pending and/or Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending prior to August 5, 2004.

**Axis Second Excess** – The Axis second excess layer to the 04/05 Policy tower (the "Axis 04/05 Policy") insured $10 million excess of the $20 million in Underlying Limits. The Axis 04/05 Policy followed form to the 04/05 Primary, or any more restrictive Underlying Policy. The Axis 04/05 Policy repeats the exclusion for Pending and/or Prior Litigation as of August 5, 2004.

The Axis 04/05 Policy also contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 2 is marked effective August 5, 2004 and is dated April 25, 2005.

**Public Company Policy Tower – The 05/06 Policy**

HCC Primary – The Primary Policy on the 05/06 Policy tower (the "05/06 Primary") was written by HCC. The 05/06 Primary provided a $10 million Limit of Liability, excess retentions of nil/$500,000/$500,000. This 05/06 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B) The Insurer will pay to or on behalf of the Company Loss arising from:

(1) Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

(2) Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

Coverage also was extended pursuant to Endorsement 11, to include Derivative Demand Investigative Costs:

The Insurer will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased, up to the amount of the Derivative Demand Investigation Costs Sub-Limit [$250,000].

Coverage was further extended pursuant to Endorsement 15, to include Controlling Shareholder Coverage:

The Insurer will pay to or on behalf of the Controlling Shareholder Loss arising from a Securities Claim first made during the Policy Period or the Discovery Period (if applicable) against such Controlling Shareholder for Wrongful Acts, provided, that one or more Insured Persons and/or the Company are and remain co-defendants in such Securities Claim along with such Controlling Shareholder.

Phillip Bennett was defined as the Controlling Shareholder. A $300,000 retention was to apply to Defense Costs under this coverage extension, but did not apply to any other Loss under the extension.

**Lexington First Excess** – The Lexington first excess layer to the 05/06 Policy tower (the "Lexington 05/06 Policy") insures $7.5 million excess of the $10 million 05/06 Primary. The Lexington 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy.

The Lexington 05/06 Policy also includes a Pending and Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending on or prior to August 4, 2004.

**Axis Second Excess** – The Axis second excess layer to the 05/06 Policy tower (the "Axis 05/06 Policy") provides a Limit of Liability of $10 million excess of $17.5 million in Underlying Limits. The Axis 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy, or any more restrictive Underlying Policy.

The Axis 05/06 Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

> In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.
>
> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy also contains a Knowledge Exclusion Endorsement at Endorsement 6 which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy notes a Prior and Pending Claim Date of June 4, 2004.

**February 8, 2005 HCC Application**

Phillip Bennett completed an HCC application "for Directors, Officers and Private Organization Liability Coverage" and signed it on February 8, 2005. This application asks at Question 12:

(a) Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? __ Yes     __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b) Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Bennett did not check either box for Questions 12(a) and 12(b).

**January 14, 2005 Axis Warranty**

Axis requested and received a warranty (the "Axis Warranty"). The Axis Warranty states:

(a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Axis Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005.

### COVERAGE DISCUSSION

The Noticed Matters are excluded from coverage under both the Axis 04/05 Policy and the Axis 05/06 Policy based on: (1) the Axis Warranty; and (2) the Application for the Axis 04/05 Policy and the Axis 05/06 Policy. Moreover, the Noticed Matters are additionally excluded under the Axis 05/06 Policy based on: (1) the Claim made date; and (2) the Knowledge Exclusion. Axis also reserves its rights to rescind both Policies based on material misrepresentation in the application. Finally, additional terms and conditions further serve to exclude or limit coverage if coverage were otherwise available, which it is not. All of the foregoing is detailed below.

Each of the Noticed Matters is excluded from coverage under the Axis 04/05 Policy and the Axis 05/06 Policy pursuant to the Axis Warranty, attached at Exhibit B. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. It is inconceivable that Mr. Bennett was not aware of the alleged fraud when he executed the Axis Warranty "on behalf of all Insureds under the Policy." The Axis Warranty explicitly excludes coverage for all Insureds for any Claim arising from the undisclosed knowledge. Accordingly, each of the Noticed Matters is excluded from coverage for all Insureds and Axis hereby denies coverage.

Each of the Noticed Matters also is excluded from coverage based on the Application for the Axis 04/05 Policy and the Axis 05/06 Policy.[1] Question 12(b) to the Application required disclosure of any known "fact, circumstance or situation. . . [which]

---

[1] The Axis 04/05 Policy contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to Axis Reinsurance Company on U.S. Specialty Insurance Company's form shall be accepted by the Insurer as the Application for this Policy

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

The Axis 05/06 Policy also contains similar wording at Endorsement 5. Accordingly, the February 8, 2005 application was explicitly incorporated as the application for the Axis 04/05 Policy (Private Company) and again when Axis issued the Axis 05/06 Policy (Public Company).

might result in a claim being made." The Application further states that Axis will not be "liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b)." Mr. Bennett had a duty to disclose the alleged financial fraud in answer to Application question 12(b). His failure to disclose such fraud excludes coverage for any Claim brought in connection with the financial fraud. Accordingly, Axis is further denying coverage for each of the Noticed Matters because each is brought in connection with information which should have been disclosed in Application question 12(b).

We note that the Axis Warranty and the Application do not contain an adjudication requirement. We further note that Axis's denial of coverage on these two grounds is as to all Insureds. The Axis Warranty and the Application were filed on behalf of all Insureds. Accordingly, Axis denies coverage for each of the Noticed Matters because each of the Noticed Matters arises out of information which was known to Mr. Bennett, and others, at the time he completed the Axis Warranty and the Application, on behalf of all Insureds.

In addition to the Axis Warranty and the Application, Axis separately denies coverage under the Axis 05/06 Policy for each of the Noticed Matters because each is a Claim first made before the inception of the Axis 05/06 Policy, on August 11, 2005. The Noticed Matters are interrelated, as defined in Condition (C) of the 05/06 Primary Policy.[2] All of the Noticed Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others whereby unreported loans were made between various entities in an effort to disguise financial losses. This alleged fraud was reflected in the financial statements which are the subject of the Noticed Litigation. Additionally, the BAWAG action concerns Mr. Bennett's loan transactions in connection with the alleged fraud. The bankruptcy court adversary proceedings and state court tort actions arise from Refco customers' inability to access assets held by Refco – which assets were inaccessible due to the alleged fraud. Finally, the Sillam action alleged fraud in the Refco financial statements issued in connection with the IPO. Accordingly, each of the Noticed Matters is connected to the allegedly fraudulent scheme to manipulate Refco's financial results and Axis is treating each of the Noticed Matters as a single interrelated Claim. The Noticed Matters are deemed a Claim first made on the date the first such Noticed Matter was made. The Sillam action raised related allegations in its earlier June 30, 2005 complaint. This places a Claim made date for the Noticed Matters at least as early as June 30, 2005.[3] As this is prior to the August 11, 2005 inception of the Axis 05/06

---

[2] Condition (C) of the 05/06 Primary Policy states:

> All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

[3] The Sillam action references an earlier September 8, 2004 complaint which would also potentially bring the Claim Made date prior to the inception of the Axis 05/06 Policy.

Policy, the Noticed Matters would constitute a Claim Made prior to the Axis 05/06 Policy Period.

Axis further denies coverage under the Axis 05/06 Policy based on the Knowledge Exclusion Endorsement. The Knowledge Exclusion Endorsement excludes coverage for any Claims based on facts any Insured had knowledge of at the inception of the Policy. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. As with the Axis Warranty, we think it inconceivable that Mr. Bennett was not aware that his actions "might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy" on the inception date of the Axis 05/06 Policy, August 11, 2005. Coverage on this basis is not only denied as to Mr. Bennett, but also as to all Insureds under the Policy.

In addition to the above grounds for denial of coverage for the Noticed Matters, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy on the basis of fraud in the Application. The Application required Refco to attach, as part of the Application, audited financial statements for the two years preceding the Application. Refco has since admitted that its financial statements from 2002 through 2005 cannot be relied on. As noted above, both the Axis 04/05 Policy and the Axis 05/06 Policy were issued in material reliance upon the Insured's representations in all parts of the Application, including the attached financial statements. Accordingly, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy. Axis explicitly reiterates our March 1, 2006 letter wherein Axis issued the Axis 05/06 Policy, which letter is hereby incorporated by reference. In that letter Axis noted that the issuance and delivery of the Axis 05/06 Policy should not be interpreted as a ratification of the existence of a valid insurance contract.

<center>*     *     *</center>

While the foregoing is dispositive of Axis's coverage responsibilities in connection with the Noticed Matters, additional terms and conditions would serve to limit or exclude coverage if the Noticed Matters were not excluded in their entirety, which they are. For the sake of completeness, we will detail those terms and conditions which would also limit or exclude coverage of the Noticed Matters.[4]

---

The Sillam action further references an earlier April 25, 2003 complaint brought in France. We do not currently have a translated version of this April 25, 2003 complaint, but it may contain related allegations which would dictate a Claim Made date for the Noticed Matters of April 25, 2003, prior to the inception of the 04/05 Policy. Accordingly, coverage would also be denied under the Axis 04/05 Policy.

[4] The Noticed Matters have only been submitted to Axis for coverage under the Axis 05/06 Policy. Accordingly, our discussion in this section focuses only on the Axis 05/06 Policy. Axis has herein denied coverage for the Noticed Matters under the Axis 04/05 Policy, but other coverage limitations may exist if coverage were otherwise afforded under the Axis 04/05 Policy, which it is not. Axis will provide a more detailed coverage analysis under the Axis 04/05 Policy if Insureds were to submit the Noticed Matters for coverage under the Axis 04/05 Policy. Axis reserves all rights available in the Axis 04/05 Policy, in law, and in equity, including, but not limited to, the right to rescind the Axis 04/05 Policy.

The Axis 05/06 Policy follows form to the Primary Policy, or more restrictive Underlying Insurance. Axis directs your attention to the definition of Loss in the Lexington 05/06 Policy. The Lexington 05/06 Policy does not include Defense Costs within its definition of Loss. Accordingly, Axis adopts this more restrictive definition of Loss. As such, Defense Costs are not covered by the Axis 05/06 Policy.

The Axis 05/06 Policy, at Clause IX(A), requires that the Insured give notice of any Claim to Axis contemporaneously and in the same manner as notice is required to be given to HCC. The Primary Policy, at Condition B(1) and (4), requires that notice of Claims be given as soon as practicable, in writing, and by certified mail. To the extent that Axis did not receive notice as soon as practicable and in the prescribed manner, Axis reserves its rights.

As noted above, the 05/06 Primary Policy only insures the Refco entity (and Refco Subsidiaries) for Securities Claims and Derivative Demand Investigative Costs. Certain of the Noticed Matters do not name individual defendants and do not qualify as Securities Claims. The 05/06 Primary Policy, at Condition D(3), provides for an allocation where a Claim contains covered and non-covered matters. Axis reserves its right to exclude from coverage any Claims that are not Securities Claims against Refco or any of its Subsidiaries.

The 05/06 Primary Policy provides coverage pursuant to Insuring Agreements A and B(1) for Insured Persons. Insured Persons is defined to include present and past directors or officers of Refco, and employees solely with respect to Securities Claims. **For each individual named as a defendant in the Noticed Matters at Exhibit A,** please identify: (1) current position, if currently employed; (2) date the current position was assumed; (3) any prior positions and dates prior positions were held; and (4) whether Refco will be indemnifying the individual. If Refco is permitted or required to indemnify and/or if Refco has determined that it will or will not indemnify any of the individual defendants, please provide us with a copy of the Board resolution providing such indemnification decision.

The 05/06 Primary Policy also provides coverage based on Refco Subsidiaries. Subsidiary is defined at Definition (O) of the 05/06 Primary Policy as any entity:

(1) during any time on or before the inception of the Policy Period in which [Refco Inc] owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

(2) created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, [Refco Inc.] owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent

thereof), either directly or indirectly through one or more other Subsidiaries.

An entity ceases to be a Subsidiary when [Refco Inc.] ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or legal equivalent thereof), wither directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy will respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective date that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

For each entity named as a defendant in any of the Noticed Matters at Exhibit A, please identify: (1) whether such entity is or ever was a Subsidiary; (2) the effective date such entity became a Subsidiary; and (3) if applicable, the effective date such entity ceased to be a Subsidiary. Axis reserves its right to deny coverage for any entity named as a defendant in the Noticed Matters which is not Refco Inc. or a Subsidiary, as defined above.

Endorsement 15 of the 05/06 Primary Policy extends coverage to Philip Bennett as Controlling Shareholder for Securities Claims where he is co-defendant with another Insured Person or the Company. To the extent that certain of the Noticed Matters are not Securities Claims, coverage would not be available under this Endorsement. Also, even if certain of the Noticed Matters are Securities Claims, coverage under this Endorsement 15 would only be available where, and so long as, another Insured Person and/or the Company is a co-defendant with Mr. Bennett. Axis also notes Clause (8) of Endorsement 15 which amends the Change in Control section of the 05/06 Primary Policy. This change limits coverage under Endorsement 15 to Wrongful Acts allegedly committed prior to Refco's bankruptcy filing on October 17, 2005. Axis reserves its rights to deny coverage under this Endorsement 15 for any Claims based on Wrongful Acts allegedly committed on or after October 17, 2005.

Additionally, the definition of Loss is limited to amounts insurable by law. It is well-settled that Loss does not include the restoration or disgorgement of ill-gotten gain. Thus, insurance cannot be used to pay an Insured for amounts an Insured wrongfully acquires or is forced to return, or to pay the corporate obligations of the Insured. Accordingly, pursuant to the well-known Vigilant, Conseco, and Level 3 cases, any amounts eventually sought as disgorgement would not be recoverable as Loss.

Exclusion (A) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a

final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage

To the extent that any Insured is subject to a final adjudication establishing that the Insured received any profit or advantage to which such Insured was not legally entitled, Axis reserves the right to deny coverage for such Insured.

Exclusion (B) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted

To the extent that any Insured is subject to a final adjudication establishing that the Insured committed a criminal or deliberately fraudulent or dishonest act, Axis reserves the right to deny coverage for such Insured.

Axis has not yet identified and established the relationship between or among each of the parties to each of the Noticed Matters. The "Insured vs. Insured" exclusion at Exclusion (F) of the 05/06 Primary Policy, as modified by Endorsement 15, may serve to exclude certain of the Noticed Matters from coverage. Axis reserves its rights accordingly.

Further to Axis's above denial based on the Claim made date of this interrelated Claim, Axis specifically notes Exclusion (H) of the 05/06 Primary Policy which excludes Claims:

Arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time

Please provide us with copies of any notices of claims or circumstances sent in respect of any policy of which this Policy is a renewal or replacement, including, but not limited to, the 04/05 Policy tower. Axis reserves its rights to deny coverage for any matters excluded subject to this Exclusion (H).

The Axis 05/06 Policy only applies excess of and does not contribute with any other valid and collectable insurance, pursuant to Condition (G)(1) of the 05/06 Primary Policy. Please provide us with a schedule of any applicable insurance available to Refco, Inc., any Subsidiaries, or any Insured Persons which is not otherwise noted in

this letter. To the extent that other insurance is available to such Insureds, Axis reserves it right to deny coverage.

Certain of the Noticed Matters allege that Refco improperly denied access to customer accounts as a result of the alleged fraud orchestrated by Mr. Bennett, and others. Endorsement 6 to the 05/06 Primary Policy excludes Claims, in relevant portion:

> Arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the Company or by any Insured Person, any service for others for a fee; provided, that this exclusion will not apply to a Claim against an Insured Person for a Wrongful Act in connection with the management or supervision of the Company or any division or group therein.

Axis reserves its right to deny coverage for any matter properly excluded by this Endorsement 6.

Refco has been the subject of a well-publicized SEC investigation.[5] Endorsement 14 to the 05/06 Primary Policy notes that the "Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any [Wells Notice or SEC Investigation]." It appears that several of the Noticed Matters are based upon the SEC Investigation. Accordingly, any Claim "arising out of, based upon or attributable to" the SEC Investigation would be excluded and Axis reserves its rights.

Axis reminds Insureds of Condition (D)(1) of the 05/06 Primary Policy which states, in relevant part:

> The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlement, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

No settlement of a covered Claim will be binding upon Axis without Axis's express consent and Axis reserves its rights accordingly. Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent.

Axis further reminds Insureds, especially given the Insured's bankruptcy posture, of Condition (K) to the 05/06 Primary Policy which states that "[n]o assignment of

---

[5] We are also aware that Refco received a Wells Notice during the Policy Period, but are not privy to the subject matter thereof. Please provide us with a copy of the Wells Notice and any response thereto. Axis reserves its rights in connection with this Wells Notice accordingly.

interest under this Policy will bind the Insurer without the Insurer's written consent." Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent and Axis specifically reserves its rights in this regard.

Finally, Axis notes Condition (H)(1) to the 05/06 Primary Policy which notes, in relevant part, that "the Insureds will give the Insurer all information, assistance and cooperation that the Insurer my reasonably request."

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions or exclusions of the Axis 04/05 Policy or the Axis 05/06 Policy. Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the Axis 04/05 Policy or the Axis 05/06 Policy, at law, or in equity, all of which are expressly reserved. Axis reserves the right to alter, supplement or modify this statement of its coverage position as other and additional information may become available. Axis's denial of coverage of the Noticed Matters is necessarily based upon information that has been made available at this point. If you have any other information we should consider, please let us know.

If you have any questions in connection with the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest

Enclosures
Exhibit A – Noticed Matters
Exhibit B – Axis Warranty

cc:
Tracy Forsyth, Axis
Leslie Ahari, Ross Dixon & Bell LLP, Counsel to US Specialty
Barbara Seymour, D'Amato & Lynch, Counsel to Lexington

## EXHIBIT A

### Schedule of Noticed Litigation

1. Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

2. Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

3. Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

4. United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

5. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

6. Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

7. Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill

& Partners, L.P., HSBC Securities (USA) Inc., William Blaire & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

8. Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

9. Miura Financial Services v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New York, 10/17/05).

10. Multiplicas Casa De Bolsa v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New York, 10/17/05).

11. Jacob Baker, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

12. Craig Becker, On Behalf of Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

13. Bruce Nathanson, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc., No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

14. American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al., No. 05-cv-08988-PKC, (S.D.N.Y 10/21/05).

15. Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L.

O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc., No. 05-cv-09048, (S.D.N.Y. 10/24/05).

16. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

17. Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al., No. 05603931 (Supreme Court of New York 11/04/05).

18. Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

19. Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco Administration LLC; Refco Capital LLC; Refco Capital Holdings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco

Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

20. Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

21. Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

22. BAC International Banks, Inc. v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

23. Reserve Invest (Cyprus) Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

24. City of Pontiac General Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v. Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer, Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrilly Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc and Grant Thornton LLP, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

## EXHIBIT B

Axis Warranty[1]

 REFCO

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1200
Chicago, IL 60661
ph 312 788 2000
www.refco.com

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

    a.  No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

        _See attached_

    b.  No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: _Refco Group LTD. LLC_

Signature: _____

Title: _President CEO._
      (Chairman of the Board or President)

Date: _Jan 21, 2005._

---

[1] Also attached to the Axis Warranty, but not included here are: (1) a January 14, 2005 memo from Ellen Brooks to Phillip Bennett requesting Bennett complete the warranty; and (2) a January 14, 2005 letter from Grant Cornelis to Ellen Brooks describing and attaching the Louis Capital Markets, L.P. v. Refco Group Ltd., LLC, et al. suit. It appears the letter and suit were both attached to the memo sent to Bennett. Axis does not contend that the Louis Capital Markets suit is related to the Noticed Matters.

# EXHIBIT D

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com

 **REFCO**

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

a.  No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance. EXCEPT:

_See attached_

b.  No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: _Refco Group LTD, LLC_

Signature: _Nip Bur_

Title: _PRESIDENT & CEO_
(Chairman of the Board or President)

Date: _Jan 21. 2005_

MEMORANDUM

TO:        Phillip Bennett

FROM:      Ellen Brooks *EB*

SUBJECT:   Directors and Officers Coverage

DATE:      January 14, 2005


Axis Reinsurance Company is one of three insurance carriers for our present D&O coverage that was placed August 5, 2004. Due to the $30,000,000 total limit that T.H. Lee required us to purchase, we had to layer the coverage. Axis is the 2nd layer with $10,000,000 limit. They are requiring you to sign a warranty letter confirming that we currently do not have a claim against our D&O policy.

We did not reveal this case at the time the Axis underwriter was reviewing our application, therefore, they are now asking for a copy of the complaint and also a copy of the court filing of the dismissal. The complaint is attached, but we are still waiting on the court to send Herrick, Feinstein LLP the dismissal order.

If you have any questions, please do not hesitate to give me a call.

Thank you.

# HERRICK, FEINSTEIN LLP

A NEW YORK LIMITED LIABILITY PARTNERSHIP INCLUDING NEW YORK PROFESSIONAL CORPORATIONS

2 PARK AVENUE
NEW YORK, NY 10016-9301

TELEPHONE: (212) 592-1400
FACSIMILE: (212) 592-1500

WEB: www.herrick.com

104 CARNEGIE CENTER,
PRINCETON, N.J. 08540-6232

2 PENN PLAZA
NEWARK, N.J. 07105-2245

WRITER'S DIRECT DIAL:

(212) 592-1588

E-MAIL: gcom@herrick.com

January 14, 2005

BY E-MAIL

Ms. Ellen Brooks
Refco, LLC
550 West Jackson Boulevard
Suite 1300
Chicago, Illinois 60661

Re:    Louis Capital Markets, L.P., v. Refco Group Ltd., LLC, et al.

Dear Ms. Brooks:

Pursuant to your request to Therese Doherty for the status of the above-referenced litigation, please be advised of the following:

This matter is pending in the Supreme Court of the State of New York, County of New York, and is filed under Index No. Case No. 04601028/04. On April 14, 2004, plaintiff filed a complaint against Refco Group ltd., LLC, an employee of Refco Securities SA, and four registered representatives and employees of Refco Securities, LLC. The complaint arises out of the termination of employment by four of the individual defendants with plaintiff and alleges that Refco Group Ltd., LLC, "acting through its subsidiaries" and "their agents," (a) tortiously interfered with contractual relationships between plaintiff and several of its employees; (b) aided and abetted breach of fiduciary duty by each of several former employees of plaintiff; (c) committed unfair business practices; (d) breached an implied-in-fact contract with plaintiff; and (e) tortiously interfered with plaintiff's economic advantage. The complaint seeks damages as follows: (a) on the first three causes of action, "not less than $4.5 million per year in lost profits" plus 9% interest, as well as future profits to be determined; (b) on the fourth cause of action, "not less than $4.5 million per year" plus 9% interest per year; and (c) on the fifth cause of action, "an amount in excess of $18 million"; together with 9% interest, punitive damages and other relief. On September 23, 2004, the court granted the defendants' motion to dismiss the complaint. We have been advised by the Court to expect an order to be issued before the next conference date of January 27, 2005.

HF:NY2: #509103 v.1 #05704-0000

HERRICK, FEINSTEIN LLP

Ms. Ellen Brooks
January 14, 2005
Page 2

As you requested, we have attached a copy of the complaint with exhibits. We will forward to you a copy of the court order as soon as we receive it. Please feel free to contact me if we can be of further assistance.

Very truly yours,

Grant R. Cornehls

cc:    Therese M. Doherty

HFNY2: 9809103 v.1 #05704-0000

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART

------------------------------------------------------x

LOUIS CAPITAL MARKETS, LP, Successor to
LOUIS CAPITAL MARKETS, LLC,

                                    Plaintiff,

              - against -

REFCO GROUP LTD., LLC, ALAIN FELLOUS,
MICHAEL BENISTY, HENRI CONDRON,
BENJAMIN CHOUCHANE, LIONEL MELLUL and
MARCOS PAGANI,

                                    Defendants.

------------------------------------------------------x

**ORIGINAL**

Index No.

0 4 6 0 1 0 2 8

**COMPLAINT**

Plaintiff, LOUIS CAPITAL MARKETS, LP, successor to LOUIS

CAPITAL MARKETS, LLC ("LCM"), by its attorneys Bolin & Boone, for its Complaint

alleges as follows:

**FILED**

APR 14 2004

NEW YORK
COUNTY CLERK'S OFFICE

## THE NATURE OF THE ACTION

I.      This is an action for: (1) tortious interference with employment

agreements, (2) aiding and abetting the breach of LCM's employees' fiduciary duties to

LCM; (3) unfair business practices; (4) breach of implied-in-fact contract; and (5)

tortious interference with LCM's expectancy of an economic advantage, against REFCO

Group Ltd., LLC, (acting through its subsidiaries, such as Refco Overseas Ltd., and

Refco Securities Paris, S.A., and their agents, such as Alain Fellous) (the "REFCO

Defendants"); and for: (6) conversion and misappropriation of intangible business assets

1

and opportunities, (7) breach of agreement, and (8) breach of fiduciary duties by and among LCM's former employees (the "Former LCM Employees").

2.    The action arises out of the REFCO defendants' attempts in 2001 to form a business combination with LCM, and the REFCO defendants' scheme, deliberately and methodically carried out over the ensuing years, to steal LCM's proprietary business through corporate espionage, to interfere with LCM's agreements with its Former Employees, and to misappropriate through them and by other means LCM's trade secrets and business opportunities.

## THE PARTIES

3.    Louis Capital Markets, LP is a limited partnership organized in 2003 and existing under the laws of the State of New York. It is the successor to Louis Capital Markets LLC (collectively "LCM"). LCM is a broker-dealer registered with the Securities and Exchange Commission (the "SEC") and it is a member of the National Association of Securities Dealers, Inc. It is principally engaged in retailing corporate equity securities "over-the-counter." Its principal place of business is located at 67 Wall Street, New York, New York.

4.    Upon information and belief, REFCO Group Ltd., LLC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. It is a global financial giant which offers a broad range of financial products and services through its subsidiaries and affiliates

2

throughout the world including Refco Overseas Ltd. and REFCO Securities Paris, S.A. (collectively "REFCO").

5.    At all relevant times, Alain Fellous was President of REFCO Securities Paris, S.A., which, upon information and belief, is owned or controlled by REFCO Group Ltd., LLC.

6.    Michael Benisty is now employed by REFCO as an Executive Vice President in New York. Before 2002, he was also employed by REFCO. In February 5, 2002, he resigned from REFCO and started work as a Senior Vice President at LCM. As alleged in the paragraphs that follow, Benisty was a corporate "mole" or spy for RECFO while he was employed at LCM. He was fired by LCM on December 6, 2002, after LCM discovered he intended to return to REFCO to set up and duplicate LCM's unique equity trading business for REFCO in New York City.

7.    Benjamin Chouchane was hired by LCM on May 20, 2002 as a Sales Assistant. On December 9, 2002, he suddenly resigned from LCM to join Benisty at REFCO.

8.    Henri Condron was hired by LCM on March 24, 2002 as a Middle and Front Office Operator. On December 31, 2002, he suddenly resigned from LCM to join Benisty and Chouchane at REFCO.

9.    Lionel Mellul was hired by LCM on July 1, 2002, as a Vice President. On February 14, 2003, he accepted the offer from LCM to become a Senior Vice President to develop LCM's Institutional Sales Department. On February 4, 2004, he suddenly resigned from LCM to join Benisty and the other Former LCM Employees at

3

REFCO the next day. A copy of Mellul's Employment Agreement with LCM is attached as Exhibit "A."

10.    Marcos Pagani was hired by LCM in August 2001. On February 14, 2003, he accepted the offer from LCM to become a Director to develop its Institutional Sales Office. On February 4, 2004, he suddenly resigned with Mellul to join the other Former Employees at REFCO the next day. A copy of Pagani's Employment Agreement with LCM is attached as Exhibit "B."

## THE FACTS

11.    Success in the business of trading securities or commodities of any kind depends in large measure on two key capabilities: (a) cultivation and maintenance of relationships with customers; and (b) familiarity with specific markets and the development and execution of trading strategies carefully tailored to those markets. Both capabilities are intangible. But both capabilities constitute crucial components of the intellectual capital employed by Firms engaged in the trading business. Like any other service business, this intellectual "know how" is usually the decisive key to success or failure in the trading industry.

12.    Prior to 2000, REFCO was best known in the financial community as a global giant in the international commodities markets. In particular, REFCO was (and is) known as a dominant presence in the trading of such commodities as metals, agricultural products, energy, and currencies – and with instruments and contracts related to the exchange of such commodities.

4

13.   Prior to 2000, REFCO had only a relatively small presence and participation (and then only derivatively) in the markets for equity securities -- especially the equity markets in the United States.

14.   Prior to 2000, REFCO participated in the U.S. equity markets primarily through its relationship with Raymond James & Company.

15.   In or about August 2000, defendant Fellous, then President of Refco Securities, S.A., met with Michael Benamhou, one of the Managing Partners of LCM, during a dinner in Saint Tropez.

16.   Over the following months, the relationship begun in August 2000 between the principals of LCM and Fellous ripened and grew.

17.   Upon information and belief, in or about March 2001, REFCO terminated its relationship with Raymond James.

18.   The growing relationship between LCM and REFCO culminated in a "Piggy Back" Clearing Agreement on about March 27, 2001, between REFCO and LCM in which LCM agreed to handle and execute equity security transactions for REFCO's European customers.

19.   LCM and REFCO began conducting business under their Clearing Agreement and asked their attorneys to draw up papers to formalize their agreement.

20.   During the following year and a half, the attorneys for LCM and REFCO exchanged many drafts of a definitive Introducing Broker Agreement (the "Broker Agreement") to formalize and fill in the details of the then existing Clearing Agreement under which LCM and REFCO were conducting their business relationship.

21.   Prominent among the drafts of the Broker Agreement exchanged

5

between the parties' attorneys for many months was a non-solicitation clause in which REFCO agreed not "…to hire, contract with, or solicit to hire or contract with, any person who has performed services…" by LCM for REFCO under the Broker Agreement.

22.    By November 19, 2001, REFCO itself requested a reciprocal "non-solicitation/non-compete" clause from LCM regarding REFCO's clients introduced to LCM by REFCO.

23.    The mutual "non-solicitation/non-compete" clauses were intended to memorialize and confirm a vital and essential aspect of the business relationship and business practices then existing between REFCO and LCM which LCM honored in all respects.

REFCO's New Overtures to LCM in 2001

24.    The new business relationship between REFCO and LCM proved to be mutually gratifying, so much so, that during the months while negotiations regarding the definitive Broker Agreement were still in progress, Fellous floated the idea that LCM and REFCO might form a Joint Venture under LCM's name to give REFCO an even more direct presence in the U.S. equity securities markets in order to better service REFCO's European accounts.

25.    The principals of LCM did not greet this overture with unbridled enthusiasm. They saw the overture as a proposal to take over LCM. They wanted, instead, to maintain LCM's independence as entrepreneurial equity traders on Wall Street with a growing reputation for success in the domestic securities industry. Nevertheless, the principals at LCM and Fellous discussed the idea of some sort of Joint Venture on

6

many occasions over the following months, but the discussions of such an arrangement essentially ended by December 2001.

REFCO's "Mole" Benisty

26.     At about the same time in the winter of 2001, while negotiations of the definitive Broker Agreement were still in progress, Benisty (who was then employed as a sales representative at Refco Securities Paris, S.A.) approached LCM about the possibility of employment with LCM in New York. Benisty professed to have a strong interest in leaving France and working in the equity securities business in New York City.

27.     The principals of LCM immediately told Benisty they could not even begin to entertain such an idea because it would violate the terms of the draft Broker Agreement as well as the spirit of LCM's existing business relationship with REFCO.

28.     Surprisingly, Fellous called LCM shortly afterwards in early 2002 and urged LCM to employ Benisty in New York, ostensibly so that Benisty would not accept other employment in New York City and "go to work for the competition."

29.     As an accommodation to Fellous, LCM hired Benisty on February 5, 2002, as Senior Vice President as alleged before.

30.     After he was hired in 2002, Benisty acquired first hand knowledge of LCM's trading strategies, became well acquainted with LCM's key marketing and operations employees, and he thereby acquired essentially all of the "intellectual capital" of LCM's business.

31.     Upon information and belief, throughout 2002, however, Benisty maintained almost daily contact with Fellous at REFCO (although none of his responsibilities at LCM required any such contact with Fellous).

32.     Upon information and belief, Fellous and REFCO were plotting throughout 2002 to duplicate for themselves LCM's equity trading business in New York City.

33.     By early December 2002, Benisty had so insinuated himself into the heart of LCM's business and had so gained the trust of the principals of LCM that decided to offer him a partnership interest in the Firm.

34.     In the meantime, negotiations regarding the Broker Agreement finally concluded after more than 18 months, and LCM sent REFCO the final execution copy of the Broker Agreement for signature on or about December 3, 2002.

35.     After over eighteen months of negotiations, LCM assumed the signing would be perfunctory.

36.     To the astonishment of LCM, however, Fellous and REFCO refused to sign the final definitive Broker Agreement, primarily because of the "non-solicitation/non-compete" clause which, by then, had been included in the drafts of the Broker Agreement previously exchanged between the parties' attorneys for months.

37.     Three days later, Benisty was forced to reveal to the principals of LCM that REFCO intended to essentially duplicate LCM's business in New York City.

38.     LCM fired Benisty on the spot on December 6, 2002. A copy of LCM's termination letter to Benisty, dated December 6, 2002, stating the reasons for his termination is attached as Exhibit "C."

8

REFCO Completes its Theft of LCM's Business

39.     As alleged before, throughout 2002, REFCO through Benisty essentially was engaged in corporate espionage and theft against LCM by appropriating LCM's intellectual capital.

40.     The remaining step in the scheme involved REFCO's systematic recruitment of LCM's marketing staff – the individuals whose job it was to develop and maintain LCM's account relationships and who were, for all practical business purposes, LCM's public "face" to its accounts and customers.

41.     Almost immediately after LCM discovered REFCO's plot and fired Benisty on December 6, 2002, REFCO recruited two of LCM's key employees: Benjamin Chouchane was hired by REFCO three days later on December 9, 2002 and Henri Condron was hired within the month on December 31, 2002. Both quit LCM and went directly to REFCO.

42.     To say the least, LCM was alarmed at the discovery of the REFCO plot and quickly acted to require its other key employees (such as Mellul and Pagani) including all of its seven sales traders and 14 other employees to sign new employment agreements to try to stop the raid in progress by REFCO.

43.     The employment agreements were specifically intended to stop the raid as clearly shown by Exhibits "A" and "B" under the first heading entitled "Terms and Conditions of Employment with LCM" and elsewhere in other provisions of the agreements.

44.     It was now obvious that REFCO intended to buy the remaining part of LCM's business it had not already stolen from LCM by offering LCM's already

9

well-compensated employees extraordinarily lucrative compensation packages (all out of proportion to their nominal jobs) instead of forthrightly offering to buy the business directly and outright from LCM's owners.

45.   Upon information and belief, REFCO quickly learned about the new employment agreements and temporarily suspended its raid.

46.   After a relatively brief interval, presumably for cosmetic purposes, REFCO resumed its raid on LCM employees in early February 2004. It began by hiring both Mellul and Pagani on February 5, 2004.

47.   Since the departure of Benisty and the other key LCM employees, LCM has lost many of its accounts and untold opportunities to further grow their business.

48.   Before Benisty's termination and the beginning of REFCO's raid of LCM's employees, LCM's operating income had grown at an ever accelerating annual rate of over 35% per year. Within two weeks of the sudden departure of Mellul and Pagani, LCM's weekly operating income plunged by more than 50%.

49.   The REFCO Defendants deceptive acts and practices in the conduct of their business violate the New York State General Business Law §349, especially §§349(a) and (h).


### AS AND FOR A FIRST CAUSE OF ACTION
(Tortious Interference With Contractual Relations
Against the REFCO Defendants and Benisty)

50.   LCM repeats and realleges the allegations contained in ¶¶ 1 through 49.

10

51.   As alleged before, the REFCO defendants and Benisty were well aware and knew of the employment agreements between LCM and its employees.  In fact, Benisty knew all about the agreements first hand.

52.   The REFCO defendants and Benisty nevertheless actively enticed, encouraged, and ultimately succeeded in the causing the defendants Mellul and Pagani to breach their employment agreements with LCM.

53.   As a result of these defendants' interference with LCM's contractual relationships, LCM has sustained and will continue to sustain pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

### AS AND FOR A SECOND CAUSE OF ACTION
(Aiding and Abetting the Breach of Fiduciary Duties
Against the REFCO Defendants and Benisty)

54.   LCM repeats and realleges the allegations contained in ¶¶ 1 through 53.

55.   At all relevant times, the Former LCM Employees, including Benisty, were privy to the private and confidential workings of LCM's business.

56.   At the time of their employment with LCM, the Former LCM Employees (including Benisky) stood in a fiduciary relationship with their employer, LCM, and at all times they owed LCM the duty of loyalty and the duty of utmost good faith and fair dealing.

57.   By deserting LCM and absconding with its confidential information, the Former LCM Employees breached their fiduciary duties to LCM.

11

58.    The REFCO defendants and Benisty knowingly and deliberately encouraged, enticed, aided and abetted the Former LCM Employees to breach their fiduciary duties to LCM.

59.    As a result of these defendants' acts, LCM has suffered and will continue to suffer lost revenue, the benefit of the loyalty of its key employees and their productivity, has lost business opportunities, has incurred costs and has otherwise been damaged while the Former LCM Employees and the REFCO defendants continue to benefit from their wrongful acts, all to LCM's injury and detriment.

### AS AND FOR A THIRD CAUSE OF ACTION
(Unfair Business Practices Against the REFCO Defendants and Benisty)

60.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 59.

61.    The REFCO Defendants' acts alleged before, including most particularly their deliberate piracy of the Former LCM employees *en masse* as a means of appropriating to themselves LCM's business, constitute devious, malicious, unscrupulous and Unfair Business Practices, crippling LCM's business in the process.

62.    LCM has suffered and will continue to suffer ever-mounting damage to its business as a result, including, but not limited to, lost profits now flowing to the REFCO defendants which must be disgorged, as well as lost business opportunities.

12

## AS AND FOR A FOURTH CAUSE OF ACTION
(Breach of Implied-In-Fact Contract Against the REFCO Defendants)

63.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 62.

64.    As alleged before, the successive drafts of the Broker Agreement prepared and exchanged by the parties' attorneys over the course of many months accurately reflected the actual agreement and business practices carried on between LCM and REFCO.

65.    Central to the business arrangement and practice between LCM and REFCO was the agreement not to "poach" or solicit employees or business from one another.

66.    By their consistent course of conduct and dealing spanning many months, LCM and REFCO manifested their agreement and confirmed its existence in fact.

67.    REFCO's piracy of LCM's employees, and through them a substantial portion of LCM's business, constituted a breach of their long-standing, implied-in-fact agreement.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Tortious Interference with an Economic Advantage
Against the REFCO Defendants)

68.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 67.

13

69.     Founded in April 1999, LCM until February 2002, had quickly established itself on Wall Street as a thriving, prospering, and rapidly growing entrepreneurial broker dealer.

70.     Since its operations began in February 2002, LCM experienced accelerating operating income growth, almost doubling every year.

71.     LCM had every reason to expect to continue maintain its revenue and income growth derived from its brokerage business at comparable or accelerating rates well into the future, having survived the costs and dangers typical of a small business in its "start up" stages, and LCM was finally poised and well-positioned to begin to compound the rate of its income growth based upon the solid revenue base it had developed.

72.     LCM had developed and established a customer base and a reputation for their skills and savy in the equity markets that appeared to assure that the Firm would meet or surpass its expectations for business growth.

73.     In addition to, and to the piracy of the Former LCM Employees, its violations of New York General Business Law §349, and other malicious and wrongful acts, the REFCO Defendants tortiously interfered with LCM's customer base and intentionally undermined the financial underpinnings of its anticipated business growth, a collateral effect of which will be to deprive LCM of future opportunities for business growth.

74.     As a result of these defendants' wrongful conduct, LCM has suffered and will continue to suffer pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

14

### AS AND FOR A SIXTH CAUSE OF ACTION
(Conversion of Intangible Business Assets and Property
Against the Former LCM Employees and Benisty)

75.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 74.

76.    As alleged more extensively before, the Former LCM Employees and Benisty during the course of their employment at LCM were exposed and thus came into possession of valuable intangible intellectual property including customer and account relationships and LCM's trading and other business strategies (collectively, the "Assests").

77.    The Former LCM Employees and Benisty appropriated the Assests to their own use and effectively sold them to REFCO in exchange for lucrative employment arrangements with REFCO which the could nver have obtained without having first appropriated and offered the Assets to REFCO.

78.    The Former LCM Employees and Benisty thus converted the Assets to their own personal use and benefit.

79.    As a result of the conversion of LCM's Assets by the Former LCM Employees and Benisty to their own use and benefit, those benefits must be disgorged and surrendered to LCM in their entirety.

15

### AS AND FOR A SEVENTH CAUSE OF ACTION
(Breach of Agreements Against Defendants Mellul and Pagani)

80.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 79.

81.    Defendants Mellul and Pagani voluntarily signed  agreements (Exhibits "A" and "B") with LCM and agreed to abide by "The Terms and Conditions of Employment with LCM," as well as the other provisions contained in the agreements.

82.    By suddenly quitting work at LCM and immediately accepting "employment" with REFCO (in addition to appropriating LCM's Assets for themselves), Mellul and Pagani knowingly and deliberately breached their agreements with LCM , including the provisions of ¶¶ 1, 2, 3 and 4 thereof.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
(Breach of Fiduciary Duties Against the Former LCM Employees and Benisty)

83.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 82.

84.    As alleged before, the Former LCM Employees and Benisty as employees stood in a fiduciary relationship with LCM and owed to LCM the duty of the utmost good faith and fair dealing.

85.    As alleged more extensively before, the Former LCM Employees and Benisty breached their duties of loyalty, good faith and fair dealing, and instead they deliberately betrayed the trust reposed in them for their own selfish gains and benefit all to the great damage of LCM.

16

APR-18-04 12:58 FROM DENNIS KLEJNA          ID:12123898850          PAGE    3/11

## LOUIS CAPITAL MARKETS, LLC

Monday, July 31ˢᵗ 2002   Feb 14ᵗʰ, 2003   VK

Attention: Lionel Mellul

Dear Lionel:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

Your Compensation and Benefits are as follows:

1. A minimum draw against future commission of $10,000 per month (up to march 31ˢᵗ 2003);

2. An incentive of 25% of the gross commissions generated by the customers you will bring in to LCM (with a minimum of 1.25c/ share to be eligible);

3. An incentive of 35% of the net profit you will bring to your department;

4. A fully paid health insurance plan[1];

5. A fully paid dental insurance plan[2]; and

6. Two weeks of vacation per year the first year, three weeks after two years of employment.

---

[1] Does not include a family plan

[2] Does not include a family plan

1172582.2

87 WALL STREET, SUITE 1005 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 908-4400, FACSIMILE (212) 908-8274

### Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that:

1122582.2

APR-19-04 12:57 FROM:DENNIS KLEJNA          ID:12123988850          PAGE 5/11



1.    **Non-Solicitation.** For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.    **Nondisclosure of Confidential Information.** Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries. You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1122582.2

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.    **Non-Compete.**    While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other then Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.    **Work Product/Business Opportunities.** You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

1122382.2

APR-18-04  12:58 FROM DENNIS KLEJNA              ID:1212306850              PAGE  7/11

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof, upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.    **Protection of Company's Name.**  You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1122582.2

APR-19-04 12:50 FROM DENNIS KLEJNA                ID:12123928650              PAGE  8/11



without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122382.2

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

1122582.2

APR-18-04 12:59 FROM:DENNIS KLEJNA          ID:12123908550          PAGE 10/11

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
     Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____          07.20.200?
Signature                        Date

1122522.2

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

Marie-Laure HERVET (CIC)          _____
Nicolas MERCIER (CIC)             _____
Patricia FLAMBA (CIC)             _____
Chafika YASSINE (CIC)             _____
Younis BOUBA (CIC)                _____
Karim Benguigui (Bque Jfossay)    _____
Christian FLEURY (Bque Jfossay)   _____
Michel YOSYOUSSEF (First NY)      _____
Dan LANE (First NY)               _____
Michel GALANTE (First NY)         _____
Marc De LIMA (First NY)           _____
Roger MUELLER (Sutafid)           _____
Stephane ROFFLER (ING-BBL)        _____

_____                   _____
_____                   _____
_____                   _____
_____                   _____
_____                   _____

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible
for introducing to Louis Capital Markets, LLC.

MELLUL LIONEL _____     _____

(Name of Employee)                Date

1122552.2



# L O U I S   C A P I T A L   M A R K E T S ,   L L C

MEMBER NASD/SIPC

Monday November 17th 2002  *feb 14th, 2005*  *MB*

Attention: Mr. Marcos Pagani-Toledano

Dear Mr. Pagani-Toledano:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term.  Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

Your Compensation and Benefits are as follows:

- A guaranteed draw against commission of $10,000/month until the end of 2003

- An incentive of 25% of the gross commission generated by the customers you will bring in to LCM

- An incentive of 35% of the net profit generated on mark-up

- A fully paid health insurance plan[1]; (eligible after 2 months)

- A fully paid dental insurance plan[2]; (eligible after 2 months)

- Three weeks of vacation per year

- .An  E2 working permit

- Sponsorship for Series 7 & 63

---

[1] Does not include a family plan

[2] Does not include a family plan

*MB*     *MP*

1122582.2



## Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that:

1122582.2

1.  **Non-Solicitation.** For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.  **Nondisclosure of Confidential Information.** Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or any of its affiliates or subsidiaries. You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1122582.2

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.    **Non-Compete.**   While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other then Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.    **Work Product/Business Opportunities.**   You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

1122582.2

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.    **Protection of Company's Name.** You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1123582.2

without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122582.2

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

1122582.2

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____
Signature

____02/18/03____
Date

1122582.2

APR-18-04 13:04 FROM:DENNIS KLEJNA          ID:12123908560          PAGE 11/11

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

| | |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible for introducing to Louis Capital Markets, LLC.

_____          _____
(Name of Employee)            Date

1122582.2



APR-19-04 '13:05 FROM·DENNIS KLEJNA          ID:12123908850          PAGE  3/3

# Louis Capital Markets, LLC

To: Michael Benisty                    December 6, 2002
530 Park Avenue Apt. 11C
New York N.Y. 10021

As of today Friday December 6th 2002, I Laurent Imbert Managing Partner of Louis Capital Markets, LLC. Here by inform Michael Benisty he is immediately terminated. We cannot carry on our business relationship since we found out Mr. Benisty is in the process of setting up a competing business and has taken proprietary and confidential information out of the office for that purpose. Moreover, his attitude has been unprofessional and contrary to Louis Capital Markets policies.

Laurent H. Imbert
Managing Member
Louis Capital Markets, LLC

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

In re                                                      :    Chapter 11
                                                           :
REFCO INC., et al.,                                        :    Case No. 05-60006 (RDD)
                                                           :
                    Debtors.                               :    Jointly Administered
                                                           :

---------------------------------------------------------------------- X

AXIS REINSURANCE COMPANY,                                  :
                                                           :    Adv. Proc. No. 07-01712-rdd
                    Plaintiff,                             :
                                                           :
        v.                                                 :
                                                           :
PHILLIP R. BENNETT, et al.,                                :
                                                           :
                    Defendants.                            :

---------------------------------------------------------------------- X

### ORDER GRANTING, IN PART, MOTION TO REQUIRE AXIS REINSURANCE COMPANY TO PAY OFFICER AND DIRECTOR DEFENSE COSTS IN UNDERLYING LITIGATIONS AND FOR RELIEF FROM THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, FOR THE ADVANCEMENT OF SUCH DEFENSE COSTS AND TO PERMIT CERTAIN OFFICERS TO PROSECUTE CLAIMS AGAINST AXIS REINSURANCE COMPANY

Upon the motion (the "Motion"), dated July 12, 2007, of Dennis Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer and Philip Silverman ("Movants") To Require Plaintiff to Pay their Defense Costs In Underlying Litigations And For Relief From The Automatic Stay, To the Extent Applicable, To Permit Plaintiff To Advance And/Or Pay Such Defense Costs And To Permit Defendants To Prosecute Claims Against Insurance Company, pursuant to 11 U.S.C. § 362(d), Bankruptcy Rule 4001(a), and Bankruptcy Rule 7065; and the Court having reviewed the

Motion and the objections and other pleadings related thereto; and upon the record of the August 30, 2007 hearing thereon (the "Hearing"); and the Court having found that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) adequate and sufficient notice of the Motion and the Hearing were given to all parties in interest and no other or further notice is necessary or required, and (iii) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court at the Hearing.

Therefore, it is hereby ORDERED that:

1.   The Motion is granted to the extent provided herein and otherwise denied without prejudice.

2.   All capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Axis Policy, as may be the case.

3.   Under Bankruptcy Rule 7065, effective ten days after entry of this Order Axis is directed, upon the exhaustion of the Lexington Policy, to advance, subject to a complete reservation of rights, privileges and defenses of the parties under the Axis Policy, the payment of the Defense Costs of Movants in the Underlying Actions that have been billed through the date of this Order, pending a final determination by this Court of Movants' claim that Axis has no right to withhold Defense Cost advances (a) unilaterally or (b) until there is a final determination by a court of competent jurisdiction of Axis' denial of coverage under the Axis Policy.

4.   The automatic stay imposed by 11 U.S.C. § 362(a), to the extent applicable, is hereby

modified (a) to permit the foregoing advancement of Defense Costs and (b) to permit the Movants to bring declaratory judgments or actions seeking monetary or equitable relief against Axis relating to Side A of the Axis Policy and matters related thereto.

5.  Axis shall notify counsel to the Plan Administrators of the Modified Joint Chapter 11 Plan (the "Refco Plan") of Refco, Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Plan Administrators") when the advancement of Defense Costs hereunder exceeds $100,000 in the aggregate, and in increments of $100,000 thereafter; provided, that if individual statements for Defense Costs exceed $100,000, Axis need only notify the Plan Administrators of payment of such bills, without breaking such advances into $100,000 increments.

6.  Entry of this Order shall be without prejudice to the right of the Plan Administrators or any party in interest to seek the reimposition of the automatic stay, to the extent it applies, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to Movants and Axis.

7.  Nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in paragraph 4 hereof.

8.  The Movants have stated that they intend to make a dispositive motion for a determination of whether Axis is entitled under the Axis Policy to withhold the advance of Defense Costs unilaterally or before coverage therefor is finally determined, and this Court has informed the parties that, subject to proper notice and briefing, it has reserved time on October 12, 2007 to hold a hearing on such a motion. Axis has informed the Court and the Movants that it intends to seek an expedited appeal of this Order, and the Court therefore has not directed the parties to propose a briefing schedule for such a dispositive motion. Subject to any ruling in

3

connection with such appeal, this Court will hold a telephonic status conference on September

14, 2007 at 2:00 p.m. on the scheduling of briefing and a hearing on the dispositive motion.

Counsel for the Movants shall initiate such call.


Dated: August 31, 2007
       New York, New York


                                    /s/ Robert D. Drain
                              UNITED STATES BANKRUPTCY JUDGE

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| REFCO, INC., *et al.*, | : | Case No. 05-60006 (RDD) |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------x

AXIS REINSURANCE COMPANY,          :
                                   :
              Plaintiff,           :
                                   :
      v.                           :    Adv. Proc. No. 07-01712 (RDD)
                                   :
PHILLIP R. BENNETT, LEO R. BREITMAN,    :
NATHAN GANTCHER, TONE GRANT,            :
DAVID V. HARKINS, SCOTT L. JAECKEL,     :
DENNIS A. KLEJNA, THOMAS H. LEE,        :
SANTO C. MAGGIO, JOSEPH MURPHY,         :
RONALD L. O'KELLEY, SCOTT A. SCHOEN,    :
PERRY ROTKOWITZ, GERALD SHERER,         :
WILLIAM M. SEXTON, PHILIP SILVERMAN,    :
ROBERT C. TROSTEN, AND DOES 1 TO 10,    :
                                        :
              Defendants.               :

------------------------------------------------------------------x

## ORDER DISMISSING THE COMPLAINT
## OF AXIS REINSURANCE COMPANY

Upon the motion (the "Motion"), dated July 12, 2007, of Defendants Leo R.

Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L.

O'Kelley, and Scott A. Schoen (the "Director Defendants"), for an order dismissing the

Complaint, dated May 23, 2007, of Axis Reinsurance Company ("Axis") pursuant to Rule

7012(b) of the Federal Rules of Bankruptcy Procedure, as more fully set forth in the Motion; and

the Court having jurisdiction to consider and determine the Motion pursuant to 28 U.S.C. §§ 157,

1334 and 2201; and due notice of the Motion having been provided; and upon all pleadings filed

with this Court, and the hearing held before the Court on August 30, 2007 (the "Hearing"); and it

appearing that the relief requested is appropriate; and all objections to the relief requested having

been overruled by the Court; and after due deliberation and consideration, and for good and

sufficient cause appearing therefor for the reasons stated by the Court on the record of the

Hearing:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:

A.     Applying New York choice of law rules, the Court concludes that New

York law applies to the Axis directors and officers liability insurance policy referenced in the

Complaint, the interpretation and application of the policy, and the dispute raised by the

Complaint.

B.     Under New York law, a declaratory judgment action commenced by an

insurer seeking a determination of coverage under an insurance contract should be dismissed

without prejudice or stayed where there is a substantial overlap of the underlying factual issues

in such coverage determination action and factual issues that will be adjudicated in a pending

underlying tort action or criminal proceeding.

C.     There is substantial overlap of the factual issues raised in this coverage

determination action commenced by Axis and the underlying tort and criminal proceedings

referenced in the Complaint pending before the United States District Court for the Southern

District of New York.

NOW, THEREFORE, It Is Ordered that:

1.     The Motion is granted in all respects.

2.     The Axis Complaint filed in the above-captioned adversary proceeding is

dismissed, without prejudice.

Dated:    August 31, 2007
          New York, New York

                                        /s/ Robert D. Drain
                                        United States Bankruptcy Judge

2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------X
                                        :
In Re:                                  :   05-60006
                                        :
     REFCO, LLC,                        :
                                        :
              Debtor.                   :
----------------------------------------X
                                        :
AXIS REINSURANCE COMPANY,               :   07-1712
                                        :
              Plaintiff,                :
                                        :
              v.                        :   One Bowling Green
                                        :   New York, New York
BENNETT, et al.,                        :
                                        :   August 30, 2007
              Defendants.               :
----------------------------------------X
```

TRANSCRIPT OF HEARING ON MOTIONS
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Klejna/Murphy:         MATTHEW R. GOLDMAN, ESQ.
                           HELEN B. KIM, ESQ.
                           Baker & Hostetler LLP
                           3200 National City Center
                           1900 East 9th Street
                           Cleveland, Ohio  44114-3485

For Director Defendants:   MICHAEL F. WALSH, ESQ.
                           SCOTT E. COHEN, ESQ.
                           Weil, Gotshal & Manges LLP
                           767 Fifth Avenue
                           New York, New York  10153-0119

For Axis Reinsurance:      JOAN M. GILBRIDE, ESQ.
                           WAYNE BORGEEST, ESQ.
                           ROBERT A. BENJAMIN, ESQ.
                           Kaufman, Borgeest & Ryan LLP
                           200 Summit Lane Drive
                           Valhalla, New York 10595

(Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


APPEARANCES CONTINUED:


For Defendants Schoen,      PAUL FERRILLO, ESQ.
  Jaekel Lee, Harkins,      Weil, Gotshal & Manges LLP
  Brightman, O'Kelly        767 Fifth Avenue
  and Gantscher:            New York, New York  10153-0119


For Phillip Silverman:      RICHARD CASHMAN, ESQ.
                            Times Square Tower
                            7 Times Square
                            New York, New York  10036-6524


For Tone Grant:             NORMAN L. EISEN, ESQ.
                            Zuckerman Spaeder LLP
                            1800 M Street NW, Suite 1000
                            Washington, D.C.  20036-5802


For Phillip Bennett:        DEBORAH ADLER, ESQ.
                            Golenbock, Eiseman, Assor,
                              Bell & Peskoe LLP
                            457 Madison Avenue
                            New York, New York  10022


For Arch Insurance:         DANIEL STANDISH, ESQ.
                            Wiley Rein LLP
                            1776 K Street NW
                            Washington, D.C.  20006


For Robert Trosten:         RACHEL M. KORENBLAT, ESQ.
                            Morvillo, Abramowitz, Grand,
                              Jason, Anello & Bohren, PC
                            565 Fifth Avenue
                            New York, New York  10017


(Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


APPEARANCES CONTINUED:



For Sexton and Sherer:     IVAN O. KLINE, ESQ.
                           Friedman & Wittenstein
                           600 Lexington Avenue
                           New York, New York  10022



Court Transcriber:         RUTH ANN HAGER
                           TypeWrite Word Processing Service
                           356 Eltingville Boulevard
                           Staten Island, New York 10312








Proceedings recorded by electronic sound recording,
transcript produced by transcription service

4

1  (Proceedings began at 10:20 a.m.)

2          THE COURT:  Okay.  Refco and the Axis Reinsurance

3  matters.

4                  [Pause in the proceedings.]

5          MR. GOLDMAN:  Good morning, Your Honor.

6          THE COURT:  All right.  There are a number of

7  matters on that generally come under the heading of the Axis

8  Reinsurance matters.

9          Have the parties discussed any particular order

10 that they want to proceed in?

11         MR. GOLDMAN:  Good morning, Your Honor.  Matthew

12 Goldman, Baker & Hostetler.  I will be speaking on behalf of

13 what we have called the moving defendants, the parties seeking

14 a preliminary injunction for advancement of defense costs.

15         Yes, I have spoken with Joan Gilbride -- yeah.  I

16 have spoken with Joan Gilbride.  I believe at least insofar as

17 Axis and the other moving defendants are concerned, the

18 appropriate procedure would be that this Court first determine

19 whether or not Arch should be permitted to intervene so that we

20 can determine whether or not they would be heard.

21         THE COURT:  Right.  I agree with you.

22         MR. GOLDMAN:  Our suggestion --

23         THE COURT:  I'd go with that first.

24         MR. GOLDMAN:  Okay.  Thank you, Your Honor.  Then

25 our suggestion would be that we proceed with the motion to

5

1    advance defense costs, the motion to file by the motions to

2    dismiss or to stay.  And insofar as the lift stay motions are

3    concerned, there is no objection to lifting the stay to the

4    extent that it is applicable to deal with the defense cost

5    issues.  That's not in dispute at all.  The only thing that is

6    potentially at issue in the lift stays in my supplemental

7    motion asking for permission to also enter into settlements.

8    We can put that at the end because nothing about the lift stay

9    interferes with this argument.

10            THE COURT:  Okay.  I appreciate that probably a

11   fair amount of thought went into that order of proceeding and

12   perhaps some tactical considerations, too, but it strikes me

13   given the lack of any opposition, except the limited amount to

14   the part of the lift stay motion that it ought to be be lifted

15   for all purposes, that I should hear the motion to dismiss

16   first and then deal with the issue of advancing defense costs,

17   particularly since the debtor doesn't seem to care about that

18   and it appears to be no dispute because they haven't taken any

19   position whatsoever on this and they've not opposed lifting the

20   stay.

21            MR. GOLDMAN:  Your Honor, I didn't actually say

22   it's that material in that order.

23            THE COURT:  Okay.

24            MR. GOLDMAN:  So, yeah, if the Court wishes to do

25   dismissal first, that is fine with us, Your Honor.

6

1          THE COURT:  Okay.  That's fine.

2          MR. GOLDMAN:  All right.  So I think then that

3   means that we start with intervention?

4          THE COURT:  So I need to hear from Arch, then,

5   first.

6          MR. GOLDMAN:  Thank you, Your Honor.

7          MR. STANDISH:  Good morning, Your Honor.  Daniel

8   Standish of Wiley Rein on behalf of Arch Insurance Company.

9          Your Honor, we seek to intervene in this case for

10  the limited purpose of opposing the request for the advancement

11  of defense costs notwithstanding the existence of a coverage

12  defense that bars coverage for the claim in its entirety.

13         Arch is in the same tower of insurance as Axis.

14  Arch has the policy that is ten million dollars excess of 40

15  million dollars.  At this point, the underlying limits have

16  been depleting rapidly.  We understand that the burn rate at

17  this juncture is about two million dollars a month.

18         The demand is that the officer defendants in this

19  case have made that Axis pay for their defense fees and costs

20  on an as-incurred basis notwithstanding the existence of a

21  threshold defense.  That is an issue that will affect Arch, as

22  well, in two different ways.  One, it will affect the amount of

23  the policy limits that remain under the Arch layer, as well as

24  affect Arch's rights potentially as a precedential matter if and

25  when Arch's policy is reached, which at this point given the

7

1  burn rate at least the amounts incurred would certainly

2  implicate that level.  So for that reason, Arch has a very

3  strong interest of that particular issue.

4          Arch also feels strongly about intervening in this

5  case because as Your Honor may recall in June of 2006 Your

6  Honor gave leave for Arch to file its declaratory judgment

7  action in New York Supreme Court in order to obtain an

8  adjudication of the coverage issues.  Your Honor found that

9  Arch would be prejudiced if it were unable to do so.

10         Once we got before Justice Freedman, the officer

11 defendants who are now demanding that Axis advance defense fees

12 and costs argued to Justice Freedman that the Arch suit should

13 be dismissed without prejudice, because it was totally

14 speculative whether or not the erosion of the underlying layers

15 would ever occur and Arch's policy would be implicated.  And

16 even if it did implicate Arch's layer, Arch could simply stand

17 on its denial and refuse to pay, thus directly contrary to the

18 position that they've now taken before this court in demanding

19 advancement.

20         So for that reason, we feel that Arch's interest --

21         THE COURT:  That wasn't the only reason they

22 opposed it, right?

23         MR. STANDISH:  That was not the only reason.

24 That's correct, Your Honor.  There was also an argument that it

25 would overlap with the underlying facts at issue in the

8

1  criminal prosecution going forward.

2          But Justice Freedman specifically did not reach

3  the issue of whether or not the insurers could be obligated to

4  include advance defense fees and costs notwithstanding the

5  existence of a threshold coverage defense.

6          Arch has moved promptly to intervene, Your Honor.

7  We've briefed this contemporaneously.  We filed with our

8  intervention papers our opposition to the request for

9  advancement and we don't feel that any of the defendants would

10  be prejudiced by the intervention.  In fact, it would be far

11  more efficient to adjudicate this issue in the context of the

12  same proceeding than have it litigated again at some future

13  juncture against Arch in a separate pleading.

14          So for that reason, Your Honor, we submit that

15  permissive intervention is appropriate here and should be, Arch

16  should be permitted to be in for this purpose.

17          THE COURT:  But it's not necessarily the same

18  issue, is it?

19          MR. STANDISH:  With respect to the primary policy

20  language it is, Your Honor.  Both the Axis policy and the Arch

21  policy incorporate by reference the language on which the

22  officers are relying for the advancement of defense fees and

23  costs.  They're focusing in the primary policy in condition (d)

24  that says that the insurer shall advance the covered advanced

25  costs on an as-incurred basis.  The dispute over whether or not

9

1   the advancement of covered advanced costs is required when the

2   policy excludes the defense costs is the same issue as to both

3   Axis and Arch.

4           The only distinction is in the policy provisions

5   on which Arch and Axis are relying for the denial of coverage.

6   Arch has its own prior knowledge exclusion in its policy and

7   there is no dispute in that case that that exclusion exists and

8   that it applies.  There's a dispute in the Axis case over

9   whether or not the exclusion actually is in the policy.  Axis

10   obviously takes the position that it is, but that dispute

11   doesn't exist as to Arch.

12           But with respect to the primary policy language,

13   the question of whether advancement of "covered defense costs"

14   means you have to advance uncovered defense costs is precisely

15   the same.

16           THE COURT:  Okay.

17           MR. STANDISH:  Thank you, Your Honor.

18           MR. KLINE:  Good morning, Your Honor.  Ivan Kline

19   from Friedman & Wittenstein in New York.

20           We represent in this action two of the officer

21   defendants, William Sexton and Sherer, arguing against the

22   intervention on behalf of them as well as defendants Klejna,

23   Murphy and Silverman, who are the five sort of moving insureds

24   on the advancement motion.

25           And even assuming there is some common question of

10

1   law, this is clearly a case where the Court should exercise its

2   discretion to deny the motion.  This case is about coverage

3   under the Axis policy, not the Arch policy.  We've asserted a

4   counterclaim against Axis; under the Axis policy we have not.

5   They are not mentioned or in any way involved the Arch policies

6   and we've made an advancement motion solely as against Axis

7   because its policy is now the one that's up, so to speak.

8           We have no claims against Arch.  We haven't asked

9   for advancement against Arch.  Arch wants to litigate not just

10  advancement in the abstract.  It specifically says it wants to

11  intervene to litigate whether the Arch policy requires Arch to

12  advance defense costs, but nobody's made that request, so I

13  don't know against whom they're going to litigate that, because

14  we haven't made the motion.  So procedurally there is a flaw in

15  what they seek to do, because nobody is seeking relief against

16  Arch, so they can't really be heard on an issue of when their

17  policy requires advancement of defense costs.  In fact, they

18  rely very clearly on a specific provision of their policy,

19  which we have not briefed, we have not addressed because we

20  have no claims against them.

21          There's also a procedural flaw which their own

22  proposed opposition brief sets out and that they didn't address

23  in their reply when we pointed it out.  They state in their

24  proposed brief and in opposing advancement that in order for

25  there to be an advancement motion, there has to be an

11

underlying claim to support the request for relief, which

advancement would go with.  For example, the five moving

insureds have counterclaims against Axis and it's those

counterclaims with declaratory injunctive relief that support

our request for advancement.

Arch points that out because it says others aren't

really empowered to advancement anyway, but then it still seeks

to adjudicate advancement under its policy just by itself

without being hooked on in any way to any claim by or against

it.  And it's created its own procedural conundrum.  It

recognized it can't come in here to seek to intervene and

litigate coverage under the policy, because that would be

barred by Justice Freedman's order.  So instead they're seeking

just to litigate this advancement issue, but you can't really

litigate that in the abstract by itself without the "coverage"

under the policy also being in dispute.  They themselves state

that in their proposed opposition brief.

In terms of the other procedural flaw would be if

Your Honor granted that intervention, you know, then what?  We

haven't made a motion against Arch, so how can Your Honor

adjudicate whether advancement is required under the Arch

policy when we haven't briefed it, and we have no intention at

this point of briefing it, and may never have to brief it.

And in terms of judicial efficiency, some court is

going to have the coverage dispute against Arch unless it, you

12

know, goes away due to one cause or another.  It's not going to

be this court, because by their own statement they can't come in

here now to seek to adjudicate coverage.  So to have this court

somehow rule in the abstract on advancement under the Arch

policy simply makes no sense when some other court will have

the coverage issue.  And in both cases they're going to be

raising the prior knowledge exclusion in their policy as the

key provision to look at.

          Now, clearly for purposes of efficiency, if we

ever want to seek advancement under the Arch policy, we'll have

to do something.  We'll have to do it in some court where

coverage is also at issue.  And in terms of what Arch's counsel

said we're already inconsistent positions, advancement was not

an issue before this.

          THE COURT:  Oh, you don't have to get into that

one.

          MR. KLINE:  All right.  I think that covers the

points I want to make, unless Your Honor has some further

questions.

          THE COURT:  Okay.  Why isn't counsel right that, as

you said, the common issue here is coverage under the primary

policy and coverage was raised in state court so why isn't this

really an end run around the state court decision?

          MR. KLINE:  There are different coverage issues.

This coverage issue is not reached by Justice Freedman.  At

13

pages 3 to 4 of the rule --

THE COURT:  But she said it was premature and this shouldn't be happening now.

MR. KLINE:  She found that the litigation of the application of the Arch exclusion was premature.  What Justice Freedman did not reach was the question that is being presented by the motion for preliminary injunction to be argued this morning of whether or not under language of the primary policy and applicable law an insurance company that has denied, regardless of the basis, can't -- has to be obligated to advance defense fees and costs notwithstanding the existence of that coverage defense when the demand is made and has to instead litigate issues of coverage all the way to a conclusion and then try to recoup those amounts.

That limited question is the question on which Arch seeks to intervene here, and that's the question that's presented by the motion for preliminary judgment.  Regardless of what the specific coverage defense is, the common issue is whether or not given the language of the primary policy that only requires the advancement of covered defense costs, the Court should turn a blind eye to that language and enforce the advancement of those defense fees and costs anyway until there's some final adjudication in the coverage litigation.

THE COURT:  But I mean, you're using the same term, "covered," "coverage."  It's the same term and it's the same

14

1   analysis, isn't it, that she went through?

2            MR. KLINE:  No, Your Honor.  The analysis --

3            THE COURT:  I mean, I understand that she had an

4   alternative basis for her ruling, so one of her bases -- we

5   went through this point on coverage.

6            MR. KLINE:  Your Honor, Justice Freedman did not

7   look at the advancement language in the policy.  In the Supreme

8   Court, the director defendants actually asked Justice Freedman

9   to enter an order for the advancement of defense fees and costs

10  until final adjudication of the coverage issue.  And in her

11  opinion she expressly did not reach that issue, so the specific

12  issue on which we seek to intervene in this matter were reached

13  by Justice Freedman.

14           THE COURT:  They're not asking for it here.

15           MR. KLINE:  They are, Your Honor, in their

16  preliminary injunction papers.

17           THE COURT:  Not from Arch.

18           MR. KLINE:  They are asking it from Axis and it

19  will be the same issue under the primary policy language

20  because both Arch and Axis incorporate by reference conditions

21  D-2 and D-3, which are at issue in this case.

22           Because of that overlap Arch has an interest in

23  the income.  I have no doubt that depending on the outcome here

24  one side or the other will be able to tout that, if and when

25  the Arch layer is ever reached.  And, given the burn rate on

1  defense expenses and the demands for settlement that are now

2  being bandied about, I have no doubt that the existence of

3  coverage under the Arch policy will be squarely at issue in the

4  very near future based on the communications that we're

5  receiving.  And at that point, we're going to have to deal with

6  this issue.  It's much more efficient to deal with the issue in

7  one proceeding when that same language is at issue on that

8  issue.

9           THE COURT:  Even though you have different

10 language in your own policy from --

11          MR. KLINE:  The exclusionary language differs.

12 That's correct, Your Honor.

13          THE COURT:  Okay.

14          MR. STANDISH:  Your Honor, I just want to

15 reiterate.  Their motion very clearly says they seek to

16 intervene to litigate the issue whether the Arch policy

17 requires Arch to advance defense costs.  They're not coming in

18 seeking to just talk about whether in general we can get

19 advancement or whether under the Axis policy we're entitled to

20 advancement and question whether they even have standing to do

21 that.

22          In that sense, they're like any insurer that may be

23 out there that may have language similar to the primary policy

24 in any case.  You wouldn't allow that insurer to come and

25 intervene in this case.  And here, they've already been told by

16

1    Justice Freedman they really can't do what they're now seeking

2    to do.  And if you look at their proposed brief, it's full of

3    references that their policy, their prior knowledge to

4    exclusion: they're seeking to argue the applicability of that

5    exclusion albeit to try to avoid advancement as against them,

6    which has not been sought.

7              THE COURT:  Okay.  Arch Insurance Company has

8    moved for permission to intervene under Rule 24(b) incorporated

9    by Bankruptcy Rule 7024 in this declaratory judgment litigation

10   between a lower tier insurer, Axis Reinsurance Company and

11   various defendants, former directors and officers of Refco,

12   Inc.  The movant acknowledges that there's not a complete

13   overlap of the issues in the Axis Reinsurance litigation and

14   the litigation that it would want to pursue if it were

15   permitted to intervene, which would be to seek a declaratory

16   judgment that it -- that is, Arch -- would not be obligated

17   under the Arch policy to advance defense costs to the directors

18   and officer beneficiaries of Refco's insurance with it.  That is

19   because exclusions relied upon by Arch in its policy differ

20   from exclusions relied upon by Axis.

21              The common issue that Arch relies upon for

22   purposes of Rule 24(b) is language in the first-tier policy

23   pertaining to covered claims as they relate to defense costs,

24   among others -- or "losses," as defined in the policy -- which

25   is a link in the logical chain that if broken might prevent

17

1  Arch from pursuing certain of its arguments, if not all of

2  them, that it does not have to advance coverage.  No

3  beneficiary of the policy has actually apparently at this time

4  sought to compel Arch to advance coverage.  I would also note

5  that the debtor in this case has appeared to be completely

6  neutral on the issue and is not a party to this litigation and

7  has taken no position whatsoever.

8          It appears to me that to the extent that it is a

9  common issue of law (and fact to the extent there's any factual

10 issue) in interpreting the relevant insurance policies, it

11 would not be a proper exercise of my discretion to permit Arch

12 to intervene.  As is clear from the briefing on the motions

13 before the Court today in connection with the Axis Reinsurance

14 matter, first, the actual language of the policy is important.

15   Second, issues of ripeness or whether the Axis litigation is

16 premature are important and are to some extent fact driven, in

17 particular driven by the claimed exigencies faced by the policy

18 beneficiaries, the officers and officers who have felt the

19 pinch of not getting the coverage at that tier.

20          To my mind, it would therefore be inefficient to

21 include Arch in this litigation at this time, and it would

22 instead be efficient to pursue the issues that are truly before

23 the Court in this litigation: that is, the issues involving

24 Axis and the directors and officers' claims against Axis and not

25 use this litigation as a funnel to invite any prospective

18

1  insurer to join some sort of massive proceeding.

2          That's compounded by two other considerations.

3  First, I note that Arch pursued in New York State court

4  declaratory judgment litigation regarding the terms of its own

5  policy and "coverage" under that policy, and the state court

6  ruled that that litigation was premature.  It seems to me, in

7  large extent this is an end run around that ruling -- that,

8  i.e., Arch's request to intervene here would be an end run

9  around that ruling -- and at a minimum that if I permitted Arch

10 to intervene, we would be frequently interrupted in litigation

11 by considerations of whether what Arch is in particular seeking

12 at that particular moment (if I permitted it to intervene)

13 would be an end run around that order or whether the order

14 would be binding on it.

15          Finally, as I noted at the pretrial conference on

16 this matter, I continue to have some concern, given (a) that

17 Refco's plan is confirmed and effective and substantially

18 consummated and (b) that Refco, the debtor, has no

19 participation in this litigation at all, as to the extent of my

20 jurisdiction over it.  And in light of all the other factors

21 that I've already mentioned arguing that I should not exercise

22 my discretion to further expand this adversary proceeding to

23 involve other insurers, it seems to me that Arch's issues, if

24 they're to be brought at all, should be brought in another court

25 when they become ripe.

19

1          So I'm not sure which of these counsel here took

2     the lead on this matter, but certainly you could submit an

3     order consistent with my ruling denying the motion.

4          I would ask you just to send a -- well, you can

5     work it out among yourselves.  I'd just ask one of you to send a

6     copy to Arch's counsel.  You don't have to settle it on him, but

7     just send him a copy at the same time you're sending it to

8     chambers, or as a courtesy you may want to send it to him a day

9     before, so he can determine that it's consistent with my ruling.

10

11          MR. KLINE:  Okay.  No problem.

12          THE COURT:  Okay.  Okay.  All right.  So that

13     leads to the motion to dismiss.

14                    [Pause in the proceedings.]

15          MR. WALSH:  Michael Walsh from Weil, Gotshal &

16     Manges on behalf of all of what we call the director

17     defendants.  That's Brightman, Ganter, Harkins, Jeakel, Lee,

18     O'Kelly and Schoen.  It seems like Your Honor is very familiar

19     with the background here, but I can just run through the

20     structure if that would be helpful.

21          THE COURT:  Okay.

22          MR. WALSH:  Refco arranged the known insurance in

23     the amount of 70 million dollars.  That consists of a primary

24     policy and five excess policies.  Axis provides a third tier in

25     that tower, that is, the second excess policy and all of the

20

1   excess policies follow the form of the primary policy, except

2   to the extent that they're explicitly different.  This means

3   that the excess insurers are actually bound by the terms of the

4   primary policy.  The language that's key to today's dispute both

5   in connection with the motion to dismiss and the motions to

6   compel advancement is the language in the primary policy that

7   requires the advancement of defense costs as they're incurred

8   and unless it is finally determined that such costs are not

9   covered.

10          We understand that this issue is now coming to a

11  head with respect to Axis because that the coverage or the

12  amount under the primary policy and the amount under the first

13  excess policy are almost used up, at least that's our

14  understanding.  So I know this states the obvious, but the only

15  reason we're here, Your Honor, is because Axis wants you to tell

16  them that they don't have to advance defense costs.  And the

17  rest of us, even though we've chosen different ways to oppose

18  that, are here because we want to make sure that they do pay.

19  Now, we recognize that Axis had two valid choices here.  The

20  first is to advance defense costs with a reservation of rights,

21  which is what we think is what the policy envisions, and the

22  second is seek a declaratory judgment that the costs are not

23  covered by the policy.

24          Now, U.S. Specialty, the insurer under the primary

25  policy, and Lexington, the insurer on the first excess chose --

21

1   ultimately chose option one, and they just they reserved their

2   rights, and Axis has chosen option two.

3           We recognize that seeking a declaratory judgment

4   of coverage can be perfectly appropriate.  And, for example, if

5   there were no underlying litigation claims or if the litigation

6   claims were -- did not overlap, we're not disputing the

7   procedure.  What we are disputing is when there's a substantial

8   overlap of the underlying facts, we believe the law is clear.

9   A declaratory judgment may not precede and has to defer to the

10  underlying litigation for a determination of those facts.  And

11  we believe this is pretty much the universal rule.  We don't

12  think the rule is different in Illinois than in New York.  I

13  think the rule is exactly the same.

14          And, Your Honor, there are at least two key

15  reasons for that rule.  The first is that there is a

16  significant risk that a determination -- an early determination

17  in the coverage action -- would be prejudicial in the

18  underlying actions either through collateral estoppel, the law

19  of the case, or even -- or for other issues.

20          The second reason is since if you're litigating the

21  same issues at the very least you're duplicating effort.  You're

22  running up even more defense costs, more expenses on the very

23  same things, and that seems to be counter to good sense and

24  issues of judicial economy.

25          So we filed our motion to dismiss and we believe

22

1    that what we're saying in the motion to dismiss is that because

2    the courts are clear, the courts are clear that when there is a

3    substantial overlap the coverage action must defer, that under

4    Rule 12(b)(6) Axis is not in a position to be able to prove

5    their case and therefore dismissal without prejudice is

6    appropriate.

7              Now, let me get to the core of the issue, which is

8    substantial overlap.  Here in Refco, on the one hand, we've got

9    the criminal and fraud actions.  And the factual issues

10   underpinning those actions all relate to whether Bennett and

11   others manipulated Refco's books and records.  All of the

12   alleged actions that relate to the manipulation appear in the

13   indictment and in the various securities complaints, and

14   interestingly enough, they're all explicitly referred to in

15   Axis's complaint.

16             On the other hand, we have the coverage action.

17   Now, Axis's characterization is that the factual issue is

18   whether Bennett failed to disclose potential claims based on

19   his alleged manipulation of the books and records.  But saying

20   it that way doesn't change the fact that the facts are really

21   the same.  Without the alleged manipulation, there's nothing

22   really to disclose.

23             Axis points to Illinois law, in particular the

24   Guidant [Ph.] case as determinative.  First of all, we strongly

25   disagree that Illinois law applies, and I can come back to

23

1   this, Your Honor, but the absence of a choice of law in the
2   contract means that under New York's choice of law rules look at
3   various factors, the most important of which is the location of
4   the insured risk.  And, given that Refco's principal place of
5   business was in New York, that's where the executive officers
6   did their business and all the allegations related to coverage
7   issues were about actions taken by certain executive officers,
8   it's hard to argue that New York was not the location of the
9   insured risk.  But even if New York law applied, we think that
10  the answer on substantial overlap would be the same and we're
11  going to focus on Guidant.

12          Now, before I do, though, I do want to make a
13  point that there are Illinois decisions on the issue of whether
14  advancement is appropriate during the pendency of a coverage
15  action where New York law and Illinois law appear to differ
16  markedly, and that is why we believe New York law is the law
17  that should apply here.  But for the substantial overlap, we
18  think the test is pretty much the same.

19          So in Guidant, what was going on?  In the
20  underlying actions, you have essentially a bunch of personal
21  injury claims that were couched in language of fraud.  And I'm
22  assuming that they were done that way because today's medical
23  dominated society if you're going to have something implanted in
24  your body, undoubtedly you're going to be signing a waiver, an
25  assumption of the risk.  And the only way around that is to

24

1 demonstrate that you are not told all of the appropriate facts.

2  So the underlying factual issue is the misrepresentation about

3 the safety of the medical device and the risk of the medical

4 device.

5           In the coverage action, however --

6           THE COURT:  Well, can I -- I'm sorry.  Go ahead.

7 Go ahead.

8           MR. WALSH:  in the coverage action, however, it's

9 not that the device was actually defective or unsafe, but that

10 complaints had been received by the company, that the company

11 knew about and didn't disclose, so that's why the Guidant case

12 made a distinction and we can -- they were saying that we can

13 make a determination.  The trial court can make a determination

14 that as a factual matter, yes, they received complaints or,

15 yes, they didn't receive complaints, and it's not really

16 dependent upon whether the device was defective or not.

17           So the distinction with our case is in Refco you

18 can't make that distinction.  Without one, you can't have the

19 other.  At the end of the day, Axis can't get up and explain to

20 you what was it that Bennett should have disclosed if in fact

21 he did not manipulate the books or he did not commit fraud.

22 What was there to disclose?

23           So as you noted earlier, Your Honor, although not

24 involving Axis, this is not the first time this issue came up.

25  Justice Freedman addressed this very issue in connection with

25

1  Arch's request for a determination on coverage.

2         The way I view it, Your Honor, this is a classic

3  problem of putting the cart before the horse.  You've got all

4  these -- this huge multi-district securities action that's all

5  coming together and you've got the criminal complaints, and then

6  you've got this coverage action.  And what I foresee is if this

7  coverage action really went forward on the issues and was going

8  to determine the issues of what Bennett did, what he thought,

9  et cetera, every plaintiff in the securities actions would have

10  to come into this court, and all the discovery about all the

11  facts would be taking place in this court.  And it just seems

12  completely backwards in my mind that the coverage dispute

13  becomes the litigation for all these issues rather than the

14  underlying actions.  I just don't think that can be right.

15         From a policy perspective, I have to ask myself

16  what, you know, what's the purpose of the D&O policy, and it's

17  to protect officers and directors against claims for

18  misconduct.  And in my view, it would completely defeat that

19  policy if the end result was that the insurer could do an end

20  run and avoid the defense costs and get a ruling that could be

21  used against the insured in the underlying actions.  That's not

22  what people will open all this insurance for.  That doesn't

23  provide any protection at all, so the answer here is, you know,

24  clearly Axis has an issue here.  They have to -- in our view,

25  they have to advance defense costs but they have the right to

26

1  get those costs back once there is a decision on coverage if,

2  in fact, it does go against the insureds.

3          On the part of the defendants, though, if they

4  don't get defense costs, they -- any insurance may very well be

5  a lower.  We think the courts have assessed those competing

6  risks and come down on this issue in favor of the insured.

7          So in this situation, we believe it's perfectly

8  appropriate that the insurer has to wait for the results of the

9  underlying action, and that's what you have today, and that's

10 our reason, Your Honor, for asking the Court to dismiss the

11 case.

12         THE COURT:  Okay.  So you take the view that I

13 don't need to look at the policy language itself and interpret

14 on the merits whether -- on a 12(b)(6) basis -- whether Axis is

15 right or not.  You just say it's premature?

16         MR. WALSH:  Your Honor, it is our expectation that

17 if this action was dismissed and especially if it was dismissed

18 with the determination that New York law applies that Axis

19 would go ahead and advance.  You know, they're a highly, highly

20 reputable company.  If, however, they stand up today and say

21 you know, no way we're advancing, then we'll have to go the next

22 step, but what we're asking for today is a dismissal.

23         THE COURT:  Okay.  Thank you.

24         MS. GILBRIDE:  Good morning, Your Honor.  Joan

25 Gilbride for Axis Reinsurance Company, Kaufman, Borgeest &

27

1  Ryan.

2          I'm a little confused after hearing oral argument

3  from the director defendants on their motion for dismissal.

4  Essentially, what they've sought from this court is a complete

5  dismissal of this action, but at the same time they appear to

6  be suggesting that they should get some sort of affirmative

7  relief in the form of advancement of defense costs.

8          THE COURT:  Not Mr. Walsh's clients.

9          MS. GILBRIDE:  It's just -- it's -- what they're

10  essentially seeking, though, Your Honor, is an inconsistent

11  result.

12          THE COURT:  But his clients haven't sought that.

13  They haven't sought any sort of affirmative relief.  They just

14  sought dismissal.

15          MS. GILBRIDE:  I just think it's important to note

16  that Axis's position has been, Axis's position for over a year,

17  is that there is no coverage for this matter under its policy.

18   They took this position over a year ago.  Axis is not going to

19  change that position if this action gets dismissed. In fact,

20  what the director defendants have said in their papers and I

21  think have suggested to Your Honor is if this action is

22  dismissed, they would have no alternative but to turn around

23  and seek relief under the policy in another forum.  And I think

24  that just demonstrates the inconsistency, which a dismissal of

25  this action would result in, particularly in light of the fact

28

1   that there are other defendants, other insureds who are seeking

2   affirmative relief from Your Honor.  In any event --

3            THE COURT:  But why would that be the case if the

4   other forum were, for example, the court handling the

5   underlying litigation?  Then all the discovery could be the

6   same, all the trials could be the same.  There wouldn't be two

7   courts with potentially conflicting rulings or conflicting

8   schedules, and particularly for the criminal defendants, risks

9   about the Fifth Amendment.

10           MS. GILBRIDE:  Well, Your Honor, that leads into

11  really what is the heart of this dismissal motion, which is

12  whether or not there are overlapping facts.  We believe the

13  issue is not whether there's substantial overlap of the facts,

14  but whether the ultimate issues in the two dispute are the same

15  and I think that that's clearly the test under Illinois law,

16  which we submit applies to this dispute.

17           And the ultimate issues in the two cases are

18  ultimate facts, the ultimate issues that the Court must

19  determine are entirely different.  The facts in the coverage

20  dispute concern -- we have a warranty letter that we received

21  from the insured.  The question is was the warranty letter

22  signed.  It was signed on behalf of all insureds.  Was there

23  knowledge by Mr. Bennett or any other insured at the time that

24  warranty letter was signed which might have led anyone to

25  assume that there could potentially be a claim.

29

1           Those issues are very different than the issues

2    that are in dispute in the securities fraud action, Your Honor.

3     You know, Axis does not have to establish that there was a

4    fraud here.  They simply have to establish that there was

5    knowledge that there was this warranty letter that was signed.

6     There's a knowledge exclusion in the policy, which we

7    understand there's issues about that.  Those issues are not in

8    dispute in the underlying securities litigation.

9           THE COURT:  I'm sorry.  Knowledge of what?

10          MS. GILBRIDE:  Knowledge of whether or not there

11   were facts at the time that the policies that was entered into

12   that could potentially lead to a claim.  That doesn't --

13          THE COURT:  And isn't the -- all of the litigation

14   brought against the Ds and Os a "claim" or potentially a

15   "claim"?

16          MS. GILBRIDE:  It is, Your Honor.  But it's not the

17   only claim that either Mr. Bennett or any other insured could

18   have had knowledge of at the time they signed that warranty

19   letter.

20          THE COURT:  But it's the only claim that they're

21   claiming on the policy on.

22          MS. GILBRIDE:  Well, I think it's -- you know, it's

23   a big picture "claim," but there were other issues and it's

24   important to note that the warranty and the prior knowledge

25   exclusion don't require knowledge of a claim.  They require

30

1   knowledge of a fact, a circumstances, a situation.  It's

2   extremely broad, Your Honor.

3              So, for example, if there was an auditor's letter

4   that was written in 2003 that Mr. Bennett was aware of and he

5   was aware that there were issues raised in that auditor's letter

6   that could potentially result in a claim and which ultimately

7   did result in partially at least in some of the claims.

8              THE COURT:  But aren't I right in assuming that by

9   now any litigant or more practically speaking any plaintiff's

10  lawyer would have jumped in and brought the claims against

11  these directors and officers and that therefore it's in the

12  litigation that's pending?

13             MS. GILBRIDE:  I think that that's a correct

14  assumption, Your Honor.

15             THE COURT:  So aren't I also correct that in that

16  litigation that's pending won't those people also want to obtain

17  discovery of auditor's letters that he might've been aware of or

18  that any of the other directors might have been aware of or any

19  of the other facts that would relate to a claim, because that's

20  what they're trying to establish, a claim.  Isn't it a complete

21  overlap of the policy?

22             MS. GILBRIDE:  Your Honor, I think there's no

23  question that there are overlapping facts in dispute.  There's

24  no question.  But the ultimate facts and the ultimate issues

25  that need to be decided in the coverage dispute are much

31

1  narrower and more focused than the very broad issues that are

2  in dispute in the underlying securities fraud litigation.  And

3  in fact, the coverage --

4        THE COURT:  I thought you were making the argument

5  the other way around.  I thought you were saying that, in fact,

6  the securities litigation is more focused because we could

7  be -- anything that might have gone through Bennett's mind could

8  exclude Axis from having to pay.  I mean, that's a pretty -- I

9  mean, I guess that's something that you can assert given the way

10 that provision is phrased -- "might give rise to a claim" --

11 although it kind of makes you wonder whether the insurance is

12 completely illusory.  But you're saying that the -- maybe I

13 misunderstood you then.  You're saying that the actual

14 litigation, the criminal litigation and then the securities

15 action and the like would be more narrowly focused or wider

16 focused?

17        MS. GILBRIDE:  I think, you know, narrow or wider

18 in different areas I think, Your Honor, but the important issue

19 is that the ultimate facts to be determined in the two actions

20 are different, and I think that's the test.  No one in the

21 securities litigation is going to care one way or the other

22 factually whether or not Mr. Bennett signed a warranty for an

23 insurance application.  That's simply not going to be an issue.

24        THE COURT:  Well, if you're talking that there's a

25 factual dispute as to whether the thing was actually executed?

1          MS. GILBRIDE:  I don't really think that's in

2     dispute, but that is, in fact, what we have to establish in

3     order to prevail in our coverage.

4          THE COURT:  But don't you think that the district

5     judge presiding over that litigation could decide that pretty

6     quickly?

7          MS. GILBRIDE:  Your Honor, I don't think that's an

8     issue that's before the district judge.  It's not an issue --

9          THE COURT:  No, but if, in fact, I determine that

10    this litigation before me is premature, particularly in light

11    of my very tenuous jurisdiction given that Refco's plan is

12    confirmed and effective and the provisions of the confirmation

13    order, which clearly contemplate that this type of litigation

14    could be elsewhere, why shouldn't the -- why shouldn't the easy

15    lifting issue not control this thing and the hard lifting issue

16    should, i.e., all the discovery as to whether there really was

17    something related to a fraud, which is already before the

18    district courts which probably have those issues?  What --

19    they're going to be doing the heavy lifting.  Why have two

20    courts do the heavy lifting, which requires all the parties to

21    duplicate the heavy lifting in two different forums because of

22    what appears to be perhaps even a hypothetical issue as to

23    whether Bennett signed the memorandum, which is easy lifting?

24    Why not have the district judge do that, too?

25          MS. GILBRIDE:  Your Honor, I -- you know, another

33

1    procedural conundrum that we're faced with here is that

2    dismissal is not sought by all of the insureds, so -- and there

3    are --

4              THE COURT:  No, but I can --

5              MS. GILBRIDE:  -- counterclaims --

6              THE COURT:  In controlling my docket, I can

7    certainly do that, particularly when I have real doubts about

8    jurisdiction.  That's what Judge Gonzalez did in WorldCom.

9              MS. GILBRIDE:  Your Honor, I -- you know,

10   obviously that is within your discretion and your control.  Our

11   position simply is that this is a dispute that does not involve

12   all of the over-arching issues that are involved in the

13   securities litigation.

14             THE COURT:  But other than whether Mr. Bennett

15   signed the memorandum or the warranty, what other issues are

16   different?

17             MS. GILBRIDE:  Just the very fact of the

18   insurance, Your Honor, it's not an issue in the underlying

19   securities litigation.

20             THE COURT:  What do you mean by that?

21             MS. GILBRIDE:  Whether or not there's coverage,

22   whether or not their defense costs are covered.

23             The issue -- the other motion that we're here on

24   today, the advancement of defense costs, whether or not those

25   defense costs will be covered, that's not an issue that is in

34

1  dispute or before --

2         THE COURT:  It could certainly --

3         MS. GILBRIDE:  -- Judge Lynch.

4         THE COURT:  It can certainly come before Judge

5  Lynch, though, couldn't it?  I mean, it came before Judge Cote

6  after Judge Gonzalez said he didn't have jurisdiction in

7  WorldCom.

8         And as a practical matter, as we all know,

9  litigations are also a forum for settlement, and as we all know

10  insurance in these settings is a major aspect, sometimes the

11  only aspect, but always a major aspect of the currency for

12  settlement.  So I would think whether it's Judge Lynch or a

13  special master he's going to appoint or a mediator, that's --

14  you know, it's going to be front and center there as a practical

15  matter.

16         And I'm sure that if there's a mediation or

17  settlement discussion in the securities litigation -- obviously

18  this doesn't apply to criminal litigation, but in the securities

19  litigation -- that one of the issues that the insurers will

20  raise, even if it's not teed up formally in front of Judge

21  Lynch, but in the negotiations is, well, "we don't have to pay

22  for this.  It's not covered, so, plaintiffs' lawyers, you should

23  look somewhere else.  Lower your demand, because you're settling

24  two things."  You're not only settling the fraud case, you're

25  settling whether this exclusion applies.

1          MS. GILBRIDE:  Well, Your Honor, one of the

2    practical issues that Axis faced in deciding which forum to

3    bring this litigation in is that there is no diversity

4    jurisdiction, so we could not be before Judge Lynch or any

5    other district judge, so there was no way for us as a practical

6    matter to get before Judge Lynch.  That was a consideration,

7    but we felt it was appropriate to bring the action in this

8    court, Your Honor, because of the fact that obviously that

9    we're -- you know, the bankrupt -- the debtor is here before

10   Your Honor and, you know, based upon prior rulings of Your

11   Honor with respect to the insurance policy, we believe that

12   this was an appropriate forum to be in.

13          THE COURT:  Well, I haven't made any rulings as --

14   you mean, the lift stay issue?

15          MS. GILBRIDE:  Yes, Your Honor.

16          THE COURT:  Okay.  But the plan confirmation order

17   says that "Notwithstanding anything in the plan or confirmation

18   order to the contrary, nothing in the plan or confirmation

19   order including, but not limited to the injunction provisions

20   shall be construed to prevent present or former directors and

21   officers of the Debtors from seeking and obtaining coverage and

22   payments from insurance policies of Refco, Inc. or from

23   insurance policies of any other Refco Entity by litigation

24   against relevant insurance companies nor to prevent insurance

25   companies, from making such payments."

1            MS. GILBRIDE:  Your Honor, we don't read that as

2    allowing us to affirmatively bring a declaratory judgment

3    action.  And perhaps it was an incorrect reading of that

4    provision, but our understanding was that was limited to the

5    individual directors --

6            THE COURT:  Okay.  But it's a --

7            MS. GILBRIDE:  -- and officers.

8            THE COURT:  -- big difference between seeking

9    relief from the stay and starting, you know, a whole

10   declaratory -- anyway, I'm not faulting you on that. Obviously,

11   we're here.  But I'm still having a hard time seeing why there

12   isn't overlap.

13           MS. GILBRIDE:  Your Honor, I could not stand in

14   front of you and honestly say there is no overlap.  There is

15   absolutely overlap.  It's just a question of whether the overlap

16   is of some facts, and there are some, many facts that are -- do

17   overlap, but there's not overlap of the ultimate facts and the

18   ultimate issues that are going to be determined in each

19   litigation.

20           This is a dispute that's about coverage.  There are

21   some issues that are similar that we've raised in terms of

22   Mr. Bennett's knowledge and other insureds' knowledge, but the

23   issue before Your Honor is an issue of policy interpretation,

24   contract interpretation.  The issue in the securities

25   litigation is an issue of whether or not there was fraud on the

37

1   shareholders, and that's certainly not an issue that's in our

2   case, whether or not there was a fraud.

3              THE COURT:  But --

4              MS. GILBRIDE:  So we don't believe that the

5   ultimate issue is --

6              THE COURT:  But isn't Mr. Walsh's argument right

7   that the prior knowledge of a claim that's the ultimate basis

8   for the disclaimer of coverage here and of defense costs, the

9   obligation to advance defense costs, isn't that different than

10  the types of fraud at issue in the <u>Guidant</u> [Ph.] case?

11             MS. GILBRIDE:  Your Honor, you know, I think that

12  the <u>Guidant</u> case is very on point with the issues that are at

13  issue here.  In <u>Guidant</u>, the question was whether or not there

14  was a nondisclosure of an underlying situation to the insurer.

15   It's the very same issue --

16             THE COURT:  No, but of what?

17             MS. GILBRIDE:  Of whether or not there was

18  litigation or prior claims, so it's almost -- it's very on

19  point, Your Honor.

20             THE COURT:  But your provision doesn't say that.

21  You're not looking to deny coverage here because Bennett didn't

22  disclose to you that there was an investigation in place and

23  that there was a claim that had been asserted.  It's that the

24  condition that might give rise to something like that was not

25  revealed to your client.

38

1          MS. GILBRIDE:  That's correct, Your Honor, but I

2    think that --

3          THE COURT:  And so --

4          MS. GILBRIDE:  -- the issu --

5          THE COURT:  -- if the fraud actions that were

6    pending in Guidant were not about what was already known to --

7    what specific claims that had been filed were already known to

8    the insured -- they were about whether the insured failed to

9    disclose information to the investing public about what it had

10   been doing with its medical business, if that litigation had

11   been about the failure to disclose -- if the 10K in that

12   litigation had failed to disclose specific litigation claims or

13   medical claims against it, there would have been an overlap,

14   right?

15         MS. GILBRIDE:  Well --

16         THE COURT:  But that's not what it was about.

17         MS. GILBRIDE:  Well, respectfully, Your Honor, I

18   think that issue in Guidant was whether or not -- was about

19   whether or not certain claims were disclosed to the insurer.

20   The situation that we have here --

21         THE COURT:  Not the securities litigation.

22         MS. GILBRIDE:  Not the securities litigation.

23         THE COURT:  Right.

24         MS. GILBRIDE:  But the claims involving the

25   products.  But I -- you know, respectfully I just, I think that

39

1  it's -- the question is whether or not there was nondisclosure

2  and whether it was about the securities litigation or not

3  securities litigation.  It was about facts that were known at

4  the time.  Here --

5          THE COURT:  No, but it's important to know what --

6  to distinguish what the particular facts are.  I mean, the

7  policy if -- if you're the -- if you're the court presiding over

8  the insurance dispute, you have to ask yourself, well, what

9  will I learn from the securities law action that will either be

10  dispositive or provide real guidance as to my dispute.  And in

11  the Guidant case if you're the judge presiding over that

12  insurance dispute, I'm not sure that those facts are relevant

13  because it's a different type of fraud.  There are two different

14  types of fraud that are being litigated.  The fact -- the

15  underlying nondisclosure is different.

16          MS. GILBRIDE:  I think that's -- it's correct that

17  the underlying nondisclosure was different.  There's no

18  question, but I think it was the fact of the nondisclosure that

19  was the issue and it was the same issue in both cases but the

20  ultimate issue in both cases was different, so I believe that

21  the Guidant -- how the Guidant court determined that issue is

22  very instructive in this situation for Your Honor.

23          THE COURT:  But isn't this doctrine of prematurity

24  or ripeness, isn't it really ultimately a doctrine based upon

25  considerations of fairness and efficiency as opposed to, you

40

1  know, distinctions or technical distinctions between the

2  ultimate issue in each matter?  I mean, obviously the ultimate

3  issue is going to be different in each matter because it's a

4  given that the people suing for securities fraud are not

5  specifically suing to enforce the terms of an insurance policy,

6  so it's -- you know, there's always going to be a difference on

7  the ultimate issue in some respects.

8          MS. GILBRIDE:  Your Honor, I do believe that it is

9  an issue of fairness and judicial economy and I believe -- you

10  know, we have a ripe dispute.  There's no question, but there's

11  a ripe dispute right now between Axis and its insureds.  Axis

12  is getting requests for advancement and requests to -- all

13  sorts of requests for depletion of its policy limits.  So

14  there's no question but that we have a ripe dispute and that we

15  believe that this is the appropriate forum to be in to resolve

16  that dispute.

17          We do not believe -- you know, all of the issues

18  that are in dispute in the securities litigation are not in

19  dispute in this case.  This is -- and I apologize if there was

20  any misimpression given, but I believe this is a much more

21  narrow --

22          THE COURT:  But isn't there always a dispute?  I

23  mean, it's not really a ripeness issue, is it?  If it were a

24  ripeness issue, then this doctrine of overlap wouldn't apply,

25  because the courts don't say that the securities -- that the

41

1   court handling the securities law case has to decide the

2   insurance dispute.  It just says that we're not going to -- we,

3   the insurance court, are not going to decide it.  Now, am I

4   right on that?

5           MS. GILBRIDE:  I think you are right on that, Your

6   Honor.  I think -- and what I was trying to articulate not very

7   clearly apparently was that you were asking whether this was

8   about judicial economy and fairness to the parties and I think

9   that that is what this is about and that is what drives that

10  doctrine, and this -- no one can suggest that this dispute is

11  premature.  This is not a premature dispute.  There is

12  certainly a dispute.  There is a dispute that can be litigated.

13   We believe it will be a much more narrow litigation than the

14  securities litigation that's in the District Court before Judge

15  Lynch.  And we believe that it serves the interests of judicial

16  economy and fairness to all parties.  And, you know, in

17  particular Axis who's being asked to make payments as policy

18  limits without being allowed to get a ruling from a court that

19  there's no coverage under the policy.

20          THE COURT:  But isn't -- doesn't in effect what

21  these overlap cases hold is that the insurer, you know, has to

22  take a back seat on that?  I mean, isn't that a consequence of

23  these decisions?

24          MS. GILBRIDE:  I think that is.  When -- and I

25  think when that happens the reason it happens is because the

42

1  issues that are in the coverage litigation are going to be

2  decided in the underlying litigation.  So, for example, if

3  there's an underlying dispute that involves issues of negligence

4  and issues of intentional conduct and the insurer is saying,

5  well, we don't cover intentional conduct, in those situations

6  courts -- and that's the vast majority of the cases that deal

7  with this issue -- the courts say, well, it's a waste of our

8  time to decide whether there was negligence or intentional

9  conduct, because that will be decided in the underlying case.

10              THE COURT:  Right.

11              MS. GILBRIDE:  Here, that's not the situation.  The

12  coverage issue that we have, whether or not the prior knowledge

13  exclusion applies and whether or not the warranty letter

14  applies, are not going to be decided in the securities

15  litigation.

16              So for those reasons, Your Honor, I don't

17  believe --

18              THE COURT:  I thought you were going somewhere

19  else.

20              MS. GILBRIDE:  -- the dismissal --

21              THE COURT:  I guess I thought you were going

22  somewhere else with that, which is that were going to have to

23  take our chances on advancing or not advancing defense costs

24  pending a decision, and that -- and I thought you were going to

25  say -- that's not fair and the cases don't deal with that issue,

43

1  but don't they?

2          MS. GILBRIDE:  Your Honor, I don't believe they do

3  because as far as I know, there's not one case cited before Your

4  Honor which has the precise language that is at issue in this

5  dispute where Axis is only required to advance covered defense

6  costs.

7          THE COURT:  But that --

8          MS. GILBRIDE:  Not --

9          THE COURT:  I'm sorry, go ahead.

10         MS. GILBRIDE:  No, I was just going to -- none of

11 the cases that have been put before Your Honor deal with that

12 precise issue and that certainly has not been an issue in any

13 dismissal rulings that have been put before Your Honor.

14         THE COURT:  But isn't it the case that the insurers

15 are declining -- in the cases where there's a dismissal without

16 prejudice based on this doctrine of substantial overlap, isn't

17 it the case that the insurers have denied coverage or sought to

18 rescind, which would include rescission of their obligation to

19 pay defense costs?

20         MS. GILBRIDE:  I think in the vast majority of the

21 cases that have so held, Your Honor, the situation was that you

22 have an insurer, a duty-to-defend insurer who was required to

23 advance defense costs, and was taking a position that because

24 there was negligence and intentional conduct they didn't have to

25 defend -- they didn't have to pay defense or provide a defense

44

1    for any of those claims.

2              THE COURT:  Right.

3              MS. GILBRIDE:  So in that situation where the

4    Court said the coverage dispute is premature, the insurer did

5    have a duty to defend the entire action, but our situation --

6              THE COURT:  So it was ripe because they had to pay

7    the money even though they said they didn't have to.

8              MS. GILBRIDE:  It was ripe, but based on the

9    policy language that was in dispute in those cases, I think

10   here the distinguishing fact is that Axis's policy only requires

11   it to advance "covered" defense costs.

12             THE COURT:  But doesn't everyone have a

13   distinguishing fact, that's why they brought their lawsuit to

14   rescind, you know.  I mean --

15             [Laughter.]

16             THE COURT:  I understand your --

17             MS. GILBRIDE:  Yeah.

18             THE COURT:  -- point --

19             MS. GILBRIDE:  Your Honor --

20             THE COURT:  -- of a specific provision, but --

21             MS. GILBRIDE:  Yeah.  I'm not sure how to answer

22   that.  I think that was in jest, but obviously there's always

23   different disputed facts.

24             I don't think I have anything more to add on this

25   issue unless Your Honor has any further questions for me.

45

1               THE COURT:  Okay.

2               MS. GILBRIDE:  But, you know, in summation I would

3     say that, you know, we don't believe dismissal is the

4     appropriate remedy.  If Your Honor is concerned about the

5     overlaps and facts, there are other remedies that could be

6     considered, particularly a stay or stay as part of the action

7     is that was what Your Honor is --

8               THE COURT:  Well, the directors and officers

9     represented by Mr. Walsh are looking for dismissal without

10    prejudice.  They recognize that this issue is going to come up

11    if it's not settled somewhere.  So I mean, isn't that tantamount

12    to a stay?

13              MS. GILBRIDE:  Your Honor, I think they do --

14              THE COURT:  And --

15              MS. GILBRIDE:  -- in the alternative ask for a

16    stay.

17              THE COURT:  Well, someone -- I don't think so.  I

18    think that's the criminal defendants --

19              MS. GILBRIDE:  Okay.  Okay.

20              THE COURT:  -- that are asking for a stay.

21              MS. GILBRIDE:  That's my confusion, then.

22              THE COURT:  I under -- this is kind of off the --

23    you can stay up there if you want.

24              MS. GILBRIDE:  Sure.

25              THE COURT:  But it's addressed to everybody and

46

1    really it's off the point, but I -- does anyone know how the

2    insurance litigation got before Judge Cote?  I would assume

3    that there would have been lack of diversity there as well.

4    Maybe no one argued -- maybe no one raised the issue.

5              MALE SPEAKER:  Your Honor, I believe there's a

6    motion of jurisdiction --

7              THE COURT:  There was.

8              MALE SPEAKER:  -- actions were filed by the

9    carriers in the same courthouse and --

10             THE COURT:  Okay.

11             MALE SPEAKER:  -- it was before Judge Cote.

12             THE COURT:  All right.

13             MALE SPEAKER:  Little different situation.

14             THE COURT:  All right.

15             MR. FERRILLO:  Your Honor, Paul Ferrillo from

16   Weil, Gotshal.  I was with Mr. Borgeest in that case, too.

17   There's another piece to that was I think Judge Cote took part

18   of this on the related jurisdiction and that the --

19             THE COURT:  Under bankruptcy.

20             MR. FERRILLO:  It was -- yes, on -- for the 1334.

21    She took a piece of it on the 1334.

22             THE COURT:  Well, that's conceivable here, I would

23   think.  I mean, I -- as I said, I've got -- I raised this

24   jurisdictional issue at the pretrial conference and I was

25   convinced enough then, since the policy is property of the

47

estate, and there's some possibility that it will flow over in

some way to the estate, that there could be jurisdiction here,

but as you all know my jurisdiction becomes constricted after a

plan goes effective.  And while it may still exist, it may

much -- it may more -- much more readily be employed by the

District Court that in an action that for a lot of reasons it

would be efficient for the District Court to employ it that

way, so I wouldn't necessarily rule out that you couldn't raise

it in that forum, but that's neither here nor there, I guess.

MS. GILBRIDE:  Thank you, Your Honor.

THE COURT:  Okay.

MR. WALSH:  Except a couple points, Your Honor.

First of all, I don't have any problem with your jurisdiction in

this case, but I understand the posture of the case is in --

THE COURT:  Well, let me be clear.  I've not

determined that I lack jurisdiction.  It's just that I need to

be careful about it and not over-extend it and let other issues

sort of creep in through the limited jurisdiction that I have.

MR. WALSH:  I appreciate that, Your Honor.

I just wanted to respond to a couple of things

that were said.  And perhaps I heard this wrong, but I thought

what was said was that what -- in Guidant the standard was not

a substantial overlap and I think that's incorrect.  Guidant

says "As a general matter a declaratory judgment action to

determine an insurer's duty to indemnify its insured should not

48

1   be decided prior to the adjudication of the underlying action

2   where the issues to be decided in both actions are

3   substantially similar."  So that's the standard under <u>Guidant</u>.

4           And we have essentially the same effect in New

5   York in the <u>Xerox</u> case where the Court said that "The general

6   rule is that a declaratory judgment as to a carrier's obligation

7   to indemnify may be granted in advance of trial of the

8   underlying tort action only if it can be concluded as a matter

9   of law that there is no possible factual or legal basis on

10  which the insurer may eventually be held liable under this

11  policy."  So I think that that sets the standard.  It doesn't

12  have to be, you know, precisely the same.

13          And, in fact, if there wasn't a substantial

14  overlap, I have to ask the question why is it that Axis spent

15  five pages and 20 paragraphs reciting the allegations in the

16  indictment and the Grant memo?  I think the only answer is

17  because those facts are key to the issue of -- that there had

18  to be disclosure of claims.

19          The only other thing I want to point out is the

20  contract, and maybe this goes to the issue of fairness, but the

21  contract requires advancement unless there's a "final

22  determination," and I think that's the quandry that Axis finds

23  itself in and that's what they should do.  They should live up

24  to their contract.  Thank you, Your Honor.

25          MS. GILBRIDE:  Your Honor, just briefly because I

49

1  can't let it go unchallenged, but the policy does not require

2  advancement.  It requires advancement of "covered" defense

3  costs, but --

4          THE COURT:  I know.  Mr. Walsh sort of cut back

5  his statement that he wasn't seeking a determination as to the

6  policy.

7          MS. GILBRIDE:  And it's a very key word in the

8  policy and it's, you know --

9          THE COURT:  I understand there's a heated dispute

10 over that issue.

11             [Pause in the proceedings.]

12         THE COURT:  Does anyone else want to be heard on

13 this particular motion; that is, the motion to dismiss?

14         MR. GOLDMAN:  Your Honor, Matthew Goldman.  I'm

15 assuming that the Court will proceed after this two-hour

16 motion.  It's --

17         THE COURT:  Yes.

18         MR. GOLDMAN:  -- our view obviously that -- I've

19 listened to a lot of what I was going to say already being

20 discussed with the Court, so --

21         THE COURT:  Okay.

22         MR. GOLDMAN:  -- I presume I'll get an opportunity

23 to be heard on that issue, Your Honor.

24         THE COURT:  Okay.

25         MR. GOLDMAN:  Thank you, Your Honor.

50

1          THE COURT:  Absolutely.  Also, the motion for

2    relief from the stay.

3                [Pause in the proceedings.]

4          THE COURT:  All right.  I have before me a motion

5    by certain defendants in this adversary proceeding, namely

6    Messrs. Brightman, Gantscher, Harkins, Jaekel, Lee, O'Kelly and

7    Schoen, who define themselves as the "director defendants," to

8    dismiss the adversary proceeding under Federal Rule 12(b)(6)

9    incorporated by Bankruptcy Rule 7012.  The standard for

10   determining a motion to dismiss is well recognized; that is,

11   the Court must accept all factual allegations in the complaint

12   as true, although the plaintiff must plead more than labels and

13   conclusions, and a formulaic recitation of the elements of the

14   cause of action will not do. See <u>Bell Atlantic Corporation v.</u>

15   <u>Toombley</u>, 127 Supreme Court 1965, 1995 (2007).  But, with the

16   caveat announced in the <u>Bell Atlantic</u> case or reaffirmed in the

17   <u>Bell Atlantic</u> case, the Court should determine whether, based

18   on the facts set forth in the complaint as well as other

19   sources that the courts are permitted to examine under Rule

20   12(b)(6) (including in particular documents incorporated in the

21   complaint by reference and matters which the Court may take

22   judicial notice of), the plaintiff should be entitled to

23   ultimately submit evidence and establish the facts alleged or

24   whether it should be precluded as a matter of law from going

25   forward.  Here these particular debtor defendants -- director

51

1   defendants -- are seeking dismissal without prejudice on a

2   relatively narrow basis.  That is, unlike certain of the other

3   beneficiaries of the Axis Reinsurance policy, they're not asking

4   the Court to determine that Axis is required to advance defense

5   costs by the terms of the policy.

6           Instead, although they're obviously not agreeing

7   with Axis's position that it's not required to advance those

8   costs, these director defendants contend that because of the

9   substantial overlap of the issues raised by Axis's declaratory

10  judgment complaint with the issues pending in respect of the

11  underlying claims which the beneficiaries contend trigger their

12  rights under the policy in the District Court in pending

13  securities litigation as well as in any other litigation, but

14  primarily that litigation, that the Court should not proceed

15  here with a determination of essentially those same issues, or

16  at least issues that substantially overlap with the issues

17  pending in the District Court.

18          This basis for dismissal without prejudice is well

19  recognized in the case law.  See National Union Fire Insurance

20  Company v. Xerox Corporation, 792 N.Y.S. 2d. 772 (New York

21  Supreme Court 2004), affirmed 807 NYS 2d. 344 (New York

22  Appellate Division 2006) as well as In Re:  Adelphia

23  Communications Corporation, 302 B.R. 439 (Bankr. S.D.N.Y.

24  2003).

25          It is not only, however, a principle in New York,

52

but also recognized, it appears to me, based on reading the

parties' pleadings, generally throughout the country; and Axis,

I believe, acknowledges the fundamental proposition that if

there is a substantial overlap of the issues in coverage

litigation with other pending litigation related to the claims

to be covered that the coverage litigation should take the back

seat.

Axis contends, however, that as a factual matter there is

not an overlap that would require a dismissal here.  It relies

heavily upon a decision out of Illinois, <u>Alliance Insurance</u>

<u>Company v. Guidant Corp.</u>, 839 NE 2d. 113 (Ill. App. 2005) in

making its argument.

I should note, however, that the <u>Guidant</u> case

enunciates the general proposition that a declaratory judgment

action to determine an insurer's duty to indemnify its insured

should not be decided prior to the adjudication of the

underlying action where the issues to be decided in both

actions are substantially similar.  That's at page 120.

So it appears to me, at least on the general

proposition, that there's no real conflict between the law of

New York and the law of Illinois here -- on this key

proposition of law.  And where there is no such conflict, the

court need not continue with a choice of law analysis.

However, I will do so because there is some

distinction, although I don't think a major one, between how the

53

1    <u>Guidant Corp.</u> case -- I'm sorry, the <u>Guidant Corp.</u> court

2    analyzed the overlap issue from how other courts have done so

3    in New York.

4            In that regard, although this is more relevant to

5    Axis's interpretation of its rights in respect of the policy

6    generally, which are not being litigated here by these

7    particular director defendants, Axis contends that this dispute

8    in this declaratory judgment action is governed by Illinois

9    law, whereas the director defendants contend, to the contrary,

10   that it should be governed by New York law.

11           I've not seen a provision in the policy itself

12   setting forth the choice of law, and no one has cited that to

13   me.  Instead, they have properly set forth the choice of law

14   rule in the absence of such a provision, which is that New York

15   choice of law rules should apply here given that this action is

16   being determined by a court in New York, and that the center of

17   gravity analysis (which, as far as I'm concerned, is

18   substantially the same as if not entirely the same as

19   substantial contacts analysis) would apply as to disputes in

20   respect of insurance coverage.

21           The parties also generally agree on the factors to

22   be considered in connection with such an analysis.  In looking

23   at those factors here, and taking note particularly of Refco,

24   Inc.'s headquarters and the place where its executives took the

25   actions or allegedly took the actions at issue here, as well as

54

1    the residence of substantially all the defendants, the

2    headquarters of the insurer, but primarily where the underlying

3    activity occurred, it appears to me that New York law should

4    apply.

5              And, therefore, to the extent that there is any

6    substantive difference on the so-called "substantial overlap

7    doctrine," I would follow the dictates of New York law and as

8    it applied by the New York cases.

9              In considering those cases, it appears to me that

10   the rationale for applying the doctrine fits these particular

11   circumstances.  That rationale is twofold.  First and most

12   important, it reflects a policy not to prejudice the parties'

13   rights in the underlying pending action with the risk of -- in

14   particular in criminal actions, but also in civil actions --

15   having to make disclosures and litigate in two forums with

16   potentially inconsistent results; and, as importantly in this

17   context -- and particularly given the insurance context and the

18   issue of advancing defense costs, greatly increased cost --

19   that rationale dovetails into the second rationale, which is

20   one based on judicial efficiency.

21             As discussed at oral argument, it appears to me

22   that this is not -- this doctrine is not really one that should

23   best be defined as "ripeness," per se, because there is

24   obviously a ripe issue that is being deferred in the cases that

25   apply the doctrine.  That is, the insurer contends one way or

55

1  another that it is not responsible for paying under its policy,

2  but the courts say nevertheless that that issue should not be

3  decided first where there's substantial overlap with the

4  underlying litigation.  Rather, the insurer should either

5  perform its obligations or at its own risk not perform them and

6  contend later that it never had an obligation to perform them

7  as the underlying litigation proceeds.

8           I note in this respect that as set forth at length

9  by Judge Cote in In Re:  WorldCom Inc. Securities Litigation,

10 354 F. Supp. 2d. 455 (S.D.N.Y. 2005), there are strong policies

11 under New York law with regard to interpreting insurance

12 policies in favor of the insured -- particularly in construing

13 the meaning of exclusions incorporated into a policy of

14 insurance or provisions seeking to narrow the insurer's

15 liability -- and, further, that the distinct and separate duty

16 of an insurer to pay defense costs, that is, distinct and

17 separate from a duty to indemnify, is broader than the duty to

18 indemnify and not to be taken lightly as a policy matter.  That

19 may help to explain in addition to notions of fairness and

20 efficiency why this doctrine goes beyond the doctrine of

21 ripeness.

22          Now, turning to Axis's argument that there is not a

23 substantial overlap between the litigation pending before me

24 and the multi-district securities litigation and other

25 litigation that it is asserted by the defendants here to give

56

1  rise to an obligation to advance defense costs (and if

2  liability is ultimately found or there's a settlement, an

3  obligation to pay indemnification), it appears clear to me that

4  there is indeed a substantial overlap between that litigation

5  and the declaratory judgment litigation before me.

6          Axis as set forth in its complaint is relying

7  primarily, although not exclusively, upon a "warranty" letter,

8  so called by Axis, received at the time that -- or "in

9  connection with," in the words of the complaint, "the

10 underwriting of the Axis policy."  That warranty letter

11 provides as follows:  "(a) No person or entity proposed for

12 this insurance is cognizant of any facts, circumstance,

13 situation, act, error or omission which he, she, it has reason

14 to suppose might afford grounds for any Claim [as such term is

15 defined in the policy] such as would fall within the scope of

16 the proposed insurance" and then one exception is listed to

17 that.

18          And then "(b) No person or entity proposed for this

19 insurance is cognizant of any inquiry investigation or

20 communication which he, she, it has reason to suppose might

21 give rise to a Claim [as such term is defined within the

22 policy] such as would fall within the scope of the proposed

23 insurance."

24          Other bases for the rejection of coverage are set

25 forth in paragraphs 49 and 50 of the complaint, as well as

1    paragraphs 52 and 53, but it seems to me that, leaving aside

2    issues of what's in the policy itself as opposed to what's

3    extrinsic to it and may give rise to some other claim, the

4    focus of the discussion regarding overlap has been over the

5    language quoted, and more particularly over the language quoted

6    in paragraph "(a)" of the so-called warranty.

7              It appears to me that if one considers the fact

8    that the plaintiffs in the securities fraud litigation are

9    suing the defendants in respect of "claims" or what would be

10   "claims" if they prevailed, they will be seeking in discovery

11   and seeking to prove, the defendants' "cognizance of

12   circumstances, situations, acts, errors or omissions that would

13   give rise to such a claim," i.e., their knowledge of, and/or

14   participation in frauds and other bases for the claims in the

15   securities action.  That will be the subject of the discovery -

16   - which, as is evident by the enormous costs that have already

17   been incurred (and I note here that we're now here in the third

18   layer or the second layer of excess coverage), is enormous --

19   multi-million dollars -- the plaintiffs will be, if they've not

20   already been, seeking to obtain from the defendants. Those are

21   also the issues that I believe that if the litigation is

22   decided on its merits will be determined by the District Court.

23

24             As I said in oral argument, I believe those are

25   also issues that would come up in any settlement discussions

58

with the insurer and the insurer's inevitable statement to the

plaintiffs that even if the defendants are liable the

plaintiffs shouldn't look to the insurers because they

disclaimed coverage under this warranty and the other

provisions set forth in the complaint.

So I believe that there is indeed a substantial

overlap between the issues raised in the complaint and the

pending litigation.  That's highlighted by the fact that the

complaint relies almost exclusively, if not exclusively, on

recitations from either -- well, recitations from documents

filed in the securities action or related criminal proceedings

to establish the breach of the warranty and the insurer's rights

under the other exclusions referred to in the complaint.

I believe these facts distinguish this matter from

the matter before the Court in the <u>Guidant</u> case, where it

appears clear to me that the court considering insurance

coverage issues in the <u>Guidant</u> case had to consider different

underlying factual issues as to the nature of the -- as to a

different type of fraud that would have given rise to arguably

a denial of coverage.

As I noted at oral argument, the issues that do

not overlap here -- and inevitably there will be some because

we're dealing with here an insurance policy as opposed to the

facts that might give rise to a right under the policy or under

related documents to disclaim coverage -- should not guide my

59

decision.  Those differences do not call into question issues
of efficiency or fairness.  As I said before, the heavy lifting
in this dispute is over the underlying factual point as to
whether there was knowledge of conditions giving rise to a
"claim."  That's heavy lifting in the first instance by the
parties in their discovery and in the second instance by the
parties and the court in determining the merits of that
contention, and that's already going to be taking place in the
District Court.  It seems to me that, therefore, this
litigation should be deferred under the substantial overlap
cases to await determination by the District Court of those
underlying issues.

        It also seems to me that there is a basis as
discussed in oral argument, if the District Court agrees, for
the District Court to have jurisdiction over these issues if
they are to be teed up there, as was done in the WorldCom
Securities case, which involved a similar situation where a
plan had been confirmed and gone effective and the bankruptcy
court had some concern about how involved it should be in
issues that should be primarily between third parties to the
bankruptcy case.

        So on that basis, I will grant the director
defendants' motion to dismiss, without prejudice, although I
would strongly encourage the parties if they were ultimately to
pursue this litigation to pursue it in a different forum

60

1   because of the jurisdictional concerns that I've raised.

2            Mr. Walsh, you can submit an order to that effect

3   after circulating it to counsel for Axis.

4            MR. WALSH:  I will do that, Your Honor.

5            THE COURT:  And I suppose to your allies in the

6   defendant group.

7            MR. WALSH:  Thank you, Your Honor.

8            THE COURT:  Okay.

9            MS. GILBRIDE:  Your Honor, if I may just to

10  clarify, you've now dismissed the entire litigation?

11           THE COURT:  Well, that's my inclination.  I'll hear

12  oral argument, but that's my inclination.  I'll hear oral

13  argument on this motion, but it seems to me it all should go.

14           MS. GILBRIDE:  Your Honor, it seems to me if

15  another court, another forum is going to hear this issue, there

16  really is no --

17           THE COURT:  Well, you know what?  As far as the

18  other defendants are concerned, that's my preliminary ruling.  I

19  don't want to -- I said specifically to Mr. Goldman and his

20  colleagues that I would hear them out on this other point, but

21  that's my strong inclination.

22           In other words, he has an uphill fight.

23           MR. GOLDMAN:  And I heard that, Your Honor.  Okay.

24   So I guess it's one of the disadvantages of going last.  You

25  get so many other things resolved for you and said.  Let me

61

1  make this easier for all -- everyone.

2          First of all, there's no reason for me to discuss

3  facts.  I don't think there's a single fact that has been raised

4  in here in our papers that has not been discussed by the Court

5  so far this morning: the provisions in question, and the

6  primary insurance policy, the follow-on provisions, and et

7  cetera.

8          I would add that I felt and feel that the Court

9  has raised the jurisdiction issue, of course, at the pretrial

10  hearing as well as today.  I will indicate for the benefit of

11  the Court that we in fact -- the reason I stated on the record

12  I believed this Court had subject matter jurisdiction under

13  1334 was that the estate continues to have an interest in

14  potentially obtaining proceeds of these policies; and in that

15  situation I would add, although it's not before the Court

16  immediately, that in the lift stay motion I reached agreement

17  with Mr. Kirschner's counsel that I am to put on the record that

18  we must provide him notice and give him an opportunity to be

19  heard if he wishes to be heard regarding any compromise

20  precisely because he recognizes that that interest is one of

21  import to him and, of course, we have no difficulty with that.

22          The Court did recognize as I had neglected to in

23  my moving papers, but did remember last night, that the plan

24  confirmation order in fact dealt with the lift stay issues that

25  were raised, but I don't think that that changes the Section

62

1    1334 issue and I don't think that the Section 1334 basis for

2    jurisdiction --

3            THE COURT:  No, I'm not --

4            MR. GOLDMAN:  Yeah.

5            THE COURT:  I agree with you.  I'm not -- and my

6    holding is not based on a finding that I lack jurisdiction,

7    only -- it only reflects that it's another factor in the

8    conclusion I reached that under the substantial overlap cases

9    the underlying basis for that doctrine would apply here, which

10   is that as bankruptcy cases end there's kind of a fade in the

11   role of the bankruptcy court. And when the case law is already

12   pointing you to go to the other court, that's another factor

13   that just increases my inclination to send it to the other

14   court.

15           MR. GOLDMAN:  I understand, Your Honor.  I would

16   add -- I would recognize, as we all must, the brave new world

17   of post-confirmation jurisdiction as it is, but I would add

18   further and would stress for the Court -- Your Honor, you have

19   acknowledged, I think, all of as I said the facts that I would

20   have reported to you in respect of our preliminary injunction

21   motion.  The one which I think you've also acknowledged earlier

22   in these arguments is that we are -- that Axis is, as they say,

23   up to bat.

24           The harm which Judge Cote identified for us as

25   defendants and actions particularly, of course, for the people

63

1  on whom -- on whose bases I speak who we have usually

2  characterized as the so-called innocent defendants is that we

3  will have disruption which Judge Cote identified as harm that

4  it has to be addressed immediately.  Lexington is out.  We are

5  facing immense obligations to proceed in these matters and we

6  need to have a lack of disruption of our ability to have a

7  defense mounted on behalf of the defendants.

8       I would add also the Court has identified that

9  Axis is relying and primarily on an interpretation of the word

10 "covered" in its policy language to argue that they can make

11 that determination on their own and ignore the obligation to

12 advance the costs -- defense costs "as incurred" with a

13 concomitant right of access to seek recoupment later on after

14 it is "finally determined" that -- presumptively by a court and

15 not by Axis -- that the defense costs should not have been

16 advanced.

17      And, of course, as the Court has already

18 acknowledged, this is language which has been identified as

19 important as a matter of case law and policy both by Judge Cote

20 and in the Kozlowski [Ph.] case.

21      We face that concern now.  We face the need for

22 the Court and not Axis to determine their obligation to advance

23 defense costs.  It is not just because they say so.  We face

24 the need now for a determination that it is covered as we have

25 identified in our moving papers, and, of course, the Court is

64

1    clearly familiar with them.  The case law is consistent that it

2    is simply a question of looking to see whether the issue in

3    dispute fits within the policy.  This is a securities

4    litigation.  It is expressly with an ensuring agreement (a) the

5    word "securities litigation" is there.  If this was a medical

6    malpractice case against one of these people, it'd be an

7    entirely different policy, but that's not the issue.  That's

8    what coverage is all about.  So we believe, Your Honor, that we

9    have merited or established a basis to proceed with the

10   preliminary injunction.

11           As the Court is well aware, we proceeded in the

12   manner that -- of a preliminary injunction -- as had happened

13   in WorldCom.  We believe we have the basis to prevail.  We

14   believe we've shown the necessary likelihood of success to do so

15   and given that we are going to face an almost immediate

16   disruption in defense efforts, we would ask the Court now to

17   enter the preliminary injunction with the understanding that we

18   would then be able to address any further issues that the Court

19   has at a later time.

20           Your Honor, my co-counsel reminds me that to the

21   extent that the Court is concerned about issues attentu --

22   dealing with the underlying merits, which we do not believe are

23   necessary to address in this situation, it is possible for the

24   Court to stay such portions of this proceeding.

25           As the Court is aware, this is a request for

65

1   partial relief.  That is what Judge Cote was looking at.  It's

2   not a request for complete relief.  It's a request for

3   advancement.  Thank you, Your Honor.

4          THE COURT:  Okay.

5          MS. GILBRIDE:  Your Honor, in view of the Court's

6   ruling on the prior motion, I believe that this issue of

7   advancement should be left for another court.  Since Your Honor

8   has deferred this litigation to another court, we're clearly

9   going to be in front of another court on this coverage issue

10  and I think in view of the Court's ruling on the director

11  defendants' motion that the Court should not rule on the

12  preliminary injunction hearing before it.

13          Be that as it may, with respect to the preliminary

14  injunction, we think that there's a very high standard that the

15  insureds must get past in order to get a preliminary injunction

16  with respect to defense costs.  We don't think they've even come

17  close to satisfying that.  They have not established

18  irreparable harm.  They've not even tried to establish

19  irreparable harm.

20          We don't think that they can establish the

21  likelihood of success on the merits.  Whether it's a substantial

22  likelihood or not, you know, we believe that it would be a

23  substantial likelihood that they have to establish because we

24  do believe that this is a mandatory injunction that they're

25  seeking and seeking to change the status quo.  The status quo

66

1 right now and has been for the past year is that Axis has

2 denied coverage for this case.

3        With respect to the merits of Axis's coverage

4 position, the policy language before Your Honor that's at issue

5 in this hearing is not the language that was before the Court

6 in the <u>WorldCom</u> hearing or in any of the -- the Kozlowski

7 hearing.  It was not the language that was at issue in any of

8 those cases.

9        Axis's language clearly states that they have to

10 advance only "covered" defense costs and the argument that's

11 being advanced by the insureds simply ignores that language.

12 There's another section of the policy --

13        THE COURT:  Well, I think they're saying that if

14 you interpret it the way Axis wants, then, in fact, the other

15 language that you're -- I think you're about to quote to me --

16 would be superfluous, which is, you know, fundamental contract

17 interpretation doctrine that you should never render another

18 provision superfluous, but --

19        MS. GILBRIDE:  I think if you look at the entirety

20 of Section (d) it's clear that that language is not superfluous.

21  It starts out by saying that Axis will advance covered defense

22 costs.  It then goes on to talk about if Axis advances defense

23 costs and ultimately they're not covered that they're ripe --

24 they're subject to recoupment by Axis.  That's for the situation

25 where there is an exclusion upon which an insurer reserves

67

1  rights, for example, a fraud exclusion that requires an

2  adjudication of fraud.  In that circumstance, the insurer would

3  reserve rights subject to a final adjudication of fraud and

4  then seek to recoup those defense costs at the end of the

5  litigation of the underlying case.

6          Section (d)(3), which is the allocation provision,

7  must also be considered in this context and the allocation

8  provision clearly says that if there's a dispute as to covered

9  and uncovered claims, the parties have to exercise best efforts

10  to come to a determination.  But if they cannot, then Axis must

11  only advance undisputed defense costs and --

12          THE COURT:  I probably opened up a can of worms,

13  because I -- not that I'm not fascinated by these contract-

14  interpretation points -- but because I think the ultimate issue

15  here is -- well, they're not making a motion for summary

16  judgment based on interpretation of the insurance policy.  It's

17  his motion for an injunction, so --

18          MS. GILBRIDE:  I --

19          THE COURT:  -- I understand.

20          MS. GILBRIDE:  Okay.  So, Your Honor, our position

21  is that based on your prior ruling, we don't believe that Your

22  Honor should rule on this motion for preliminary injunction,

23  but if you do, we don't believe that they've satisfied the

24  procedural threshold for recovery under Rule 65.

25          If Your Honor was so inclined to grant relief our

68

1    position is that Axis would request that there be a bond

2    established by the insureds that are seeking this relief that

3    would provide some assurance for Axis to recover in the event

4    that ultimately at the end of the day Axis prevails in its

5    coverage position.

6              THE COURT:  Okay.

7              MS. GILBRIDE:  Thank you, Your Honor.

8              MR. GOLDMAN:  I will not repeat myself.

9              Your Honor, two items: (1) the papers make this

10   point clear.  If Axis', I would say, strained interpretation of

11   the word "covered" were considered by the Court to be a valid

12   interpretation that would merely create an ambiguity we are

13   right in the situation of the Adelphia / Regis case: that

14   ambiguity should be construed in favor of the insured. But in

15   any event what we would like to stress for the Court is that

16   the urgency given that the Lexington policy exhausted in mid-

17   July of not having a disruption of the defense costs or the

18   reason we've sought injunctive relief and the language -- we

19   would be very happy to have the Court refer the underlying

20   coverage dispute that we will undoubtedly have with Axis and

21   the duty of theirs to step up and ultimately pay the covered

22   policy referred to Judge Lynch but we are requesting that this

23   Court rule on our preliminary injunction at this time in our

24   favor in order to avoid a disaster.

25             THE COURT:  All right.

69

1          MR. GOLDMAN:  Thank you, Your Honor.

2          THE COURT:  Okay.  Did someone else want to speak?

3          MR. EISEN:  Your Honor, Norman Eisen from

4    Zuckerman, Spaeder on behalf of the officer defendants who are

5    the indicted defendants as well.  I'll be very brief.

6          THE COURT:  Okay.

7          MR. EISEN:  But we joined in the motion and if I

8    may just add a couple of points just to emphasize Mr. Goldman's

9    points which are even more acute as to the three defendants.

10   We are facing trial in March.  The trial was continued from

11   October because of the enormous amount of discovery that needs

12   to be reviewed, so it is an even sharper dilemma for us.  We

13   would submit that the question is the Court having resolved the

14   choice of law question and the applicability of New York law

15   that under the WorldCom case it's a straightforward issue.  The

16   Court can't split this off in the same sense that the previous

17   advancement questions have by consent come before the court on

18   a lis se [sic] posture.  There's a narrow issue here that the

19   Court can separate off comfortably within the scope of its

20   jurisdiction and refer the rest elsewhere and --

21         THE COURT:  Well, I can't refer anything.

22         MR. EISEN:  Understood.  The rest can go elsewhere

23   but there is an independent basis for the Court to say, I will

24   address this narrow question.  It is, given the Court's

25   previous rulings, a straightforward one we think and let the

70

1    parties go off to resolve the issues where they may.  Opposing

2    counsel has made clear that Axis will not pay.  It was

3    virtually the first statement that was made.  It doesn't

4    believe that this is covered.  Months have passed since the end

5    of May when the complaint was filed.  These issues have been

6    joined and have been before the Court on motions for almost two

7    months, as you know, Your Honor is more familiar with the

8    WorldCom case than I am, there was a substantial lapse of time

9    there while these jurisdictional issues were resolved and I

10    think on behalf of all the defendants who are very actively

11    engaged in this civil and/or criminal litigation, but

12    particularly the ones who are facing the criminal issues, Your

13    Honor would really be exercising the Court's equity

14    jurisdiction to address this narrow question and leave the

15    parties to address the larger coverage issues in another forum

16    and with that I will -- unless the Court has any questions for

17    me I'll be seated.

18                THE COURT:  No, that's okay.  Thanks.

19                MR. EISEN:  Thank you, Your Honor.

20                MR. GOLDMAN:  I apologize to the Court.  Your

21    Honor, may I ask the Court's indulgence --

22                THE COURT:  You get the last word.

23                MR. GOLDMAN:  Thank you.

24                I just wanted to add for the Court that I had

25    realized before and should have mentioned that I -- yes, I

71

don't think that referral here is actually the option.  The
counterclaim is pending.  It's my understanding that the Court
does not believe at present it lacks subject matter
jurisdiction as to the issues raised by the counterclaim, and
so I would on that basis indicate to the Court that since the
counterclaim is pending and I believe the Court does have 1334
subject matter jurisdiction, that is a basis for the Court to
consider the preliminary injunction and grant it.

       THE COURT:  I.e., what you're saying is, if I
dismiss the adversary proceeding you'd still have a separate
proceeding pending?

       MR. GOLDMAN:  Absolutely, Your Honor, that's what
the counterclaim is there for.

       THE COURT:  Well, what about the issue about
likelihood of success on the merits?

       MR. GOLDMAN:  I believe that we have shown that we
would likely be able to prevail on the merits in the manner
that Judge Cote has described and as we have discussed at
length this morning.

       THE COURT:  Because your argument is, I would have
not to get into whether there was a fraud or not because it's
simply a matter of contract interpretation.

       MR. GOLDMAN:  Correct, Your Honor, as to the
advancement obligation.  Ultimately, there will be a
determination before Judge Cote --

72

1          THE COURT:  Right, as to the advancement issue.

2          MR. GOLDMAN:  Exactly.

3          MR. KLINE:  Your Honor, may I just be heard to

4   supplement one point, and I apologize.  Ivan Kline for Friedman

5   & Wittenstein.

6          Part of what's in our counterclaims is the fact

7   that even if Mr. Bennett's knowledge is shown we still have

8   coverage and we can adjudicate that and none of the issues

9   relevant to that will be before any other court because the

10  policy provisions or document relied upon by Axis is simply not

11  part of the policy.  The warranty is not part of the policy and

12  a prior knowledge exclusion is not in the policy.  Those have

13  nothing to do with Mr. Bennett's knowledge and will not be

14  adjudicated anywhere else, there will be no discovery in any

15  other case that relates to those issues.  That's what our

16  counterclaims are largely premised on.  Even if one assumes

17  knowledge or it's shown elsewhere, we still have coverage.

18  This Court, really, is the right court and as of now the only

19  court that can adjudicate our position on that and those are

20  what support our advancement request.

21          MS. GILBRIDE:  Your Honor, thank you for allowing

22  me to have the last word.  I hope it is the last word.  But,

23  frankly, what I'm hearing is that the insureds want to have

24  their cake and eat it too.  Your Honor has shown a disposition

25  to dismissing the action because you believe there's a

73

1    substantial overlap in the issues.  The counterclaims are based

2    on the very same disputed facts and disputed issues that are

3    asserted in our claim.

4              THE COURT:  See, let's explore that for a second.

5     They're saying that they're not because for them to win on the

6    -- they're saying for this advancement-of-cost issue all I have

7    to do is interpret the insurance policy as to what those

8    provisions that you and I went through mean as opposed to

9    finding that in fact they were triggered.  For you to win you

10   have to prevail on both issues.  You have to find that they

11   were triggered, too.  You have to convince the Court that they

12   were triggered.

13             MS. GILBRIDE:  Your Honor, in order for them to

14   prevail on their counterclaims they have to show that their

15   claims are covered claims.

16             THE COURT:  I know but that begs the question --

17   that has me assuming your interpretation of the contract is

18   right.

19             MS. GILBRIDE:  Well, Your Honor, you only get to

20   that interpretation -- I think in order to get to that issue

21   you need to determine whether or not the underlying claims --

22   it's the cart and the horse here.  I mean --

23             THE COURT:  But why is that?  Why would I need any

24   discovery as to what any of these defendants knew about the

25   alleged fraud if in fact the duty to advance defense costs is

74

1    something that has to wait for -- I'm sorry -- doesn't have to

2    -- your client's being relieved of the duty to advance defense

3    costs has to await a final determination on the merits that

4    it's a funding mechanism as opposed to an ultimate liability

5    mechanism?

6              MS. GILBRIDE:  But, Your Honor, our position is

7    that it is --

8              THE COURT:  Well, I know that's your position, but

9    in terms of deciding the issue it doesn't really implicate the

10   substantial overlap doctrine.  I'm not sure it does.

11             MS. GILBRIDE:  I believe it does, Your Honor, and

12   I believe it's fundamentally unfair --

13             THE COURT:  But why?

14             MS. GILBRIDE:  Because basically our position is

15   that the claims are not covered and you have to determine that

16   by looking at the underlying acts and finding whether or not

17   the warranty applies and whether or not the prior knowledge

18   exclusion applies.  I think that you can't do one without the

19   other, Your Honor.

20             THE COURT:  They could prevail without that; it's

21   just that only you have to win on both points.  They could win

22   on one.

23             MS. GILBRIDE:  But for them to win on one there

24   has to be an excision of a word from the insurance policy, the

25   word "covered" --

75

1          THE COURT:  Well, but again, that's the --

2          MS. GILBRIDE:  -- and I don't think Your Honor --

3    respectfully, I don't think Your Honor can make a determination

4    without getting into the facts on that regardless --

5          THE COURT:  But what facts?  I mean either it's

6    not ambiguous and it's based on the plain meaning of the

7    document or it's somewhat ambiguous but construed against the

8    insurer or the insurer is able to say, well, even if you

9    construe it against me it's still --

10          MS. GILBRIDE:  I think in order to grant a

11   preliminary injunction, Your Honor, you have to get the

12   substantial likelihood of success on the merits and I don't

13   think --

14          THE COURT:  But isn't -- again, I confess what --

15          MS. GILBRIDE:  Mr. Goldman.

16          THE COURT:  No.  No, that was --

17          MS. GILBRIDE:  Mr. Kline.  Mr. Eisen.

18          THE COURT:  No.  I'm going somewhere else.

19          MS. GILBRIDE:  Okay.

20          THE COURT:  When I read your argument about the

21   defendants taking inconsistent positions I kind of dismissed

22   that right away because it was in the context of the motion to

23   dismiss and, clearly, Mr. Walsh's clients weren't taking

24   inconsistent positions.  So I didn't even think about it,

25   whether they were inconsistent or not, but I'm not sure they

76

1    are inconsistent.  I mean Mr. Walsh's clients want your claim

2    dismissed, but even if you hadn't made that claim wouldn't any

3    beneficiary of this policy have a right to start a lawsuit

4    saying that you've wrongfully failed to pay?

5                    MS. GILBRIDE:  Yes, of course --

6                    THE COURT:  Now, I thought that wasn't truly ripe

7    -- when I came into this I thought that wasn't truly ripe -- in

8    the real term of ripeness, because other than saying you want

9    me to determine whether you don't have to pay you hadn't said

10   "we won't pay," but I thought I heard you say at the beginning

11   of this hearing --

12                   MS. GILBRIDE:  We said --

13                   THE COURT [to Ms. Kim]:  I'll do the talking.

14                   MS. KIM:  Sorry.

15                   THE COURT:  I thought I heard you say at the

16   beginning of this hearing, no matter whether you dismiss or not

17   "we won't pay," and that makes it ripe to me, I think.  I mean

18   if Axis is saying literally today, we're not going to go back

19   and rethink this and consider whether -- now that Judge Drain

20   is not going to decide for us whether we have to pay or not,

21   whether we're going to take the risk of not paying -- which,

22   you know, is certainly a legitimate thing for an insurer to do.

23    It's one thing to act unilaterally, it's another thing to ask

24   a court for a determination of whether they're acting properly.

25    At this point Axis would be acting unilaterally.  That raises

1    some fairly serious issues, you know, and maybe creates

2    potential liability beyond the coverage so -- but if you're

3    telling me today Axis has already made that decision, it's

4    going to act unilaterally and not withhold the money, then this

5    is ripe.

6              MS. GILBRIDE:  Your Honor, I can't make a

7    representation one way or the other about what Axis will do

8    because we didn't know what your ruling was going to be and so

9    --

10             THE COURT:  Well, no, but I thought you told me --

11   I mean I don't have a court reporter here, we're on electronic

12   transcript -- at the beginning of the hearing that --

13             MR. BORGEEST:  Your Honor, Wayne Borgeest on

14   behalf of Axis.  May I be heard briefly?

15             THE COURT:  On behalf of?

16             MR. BORGEEST:  Axis.

17             THE COURT:  Okay.

18             MR. BORGEEST:  If I may, Your Honor, Axis denied

19   coverage over a year ago so the company staked out its position

20   well over a year ago.  The position --

21             THE COURT:  Yes, but at that point it didn't

22   really matter.  I mean you could always change your mind --

23             MR. BORGEEST:  Well, no --

24             THE COURT:  No one was asking you for money then.

25             MR. BORGEEST:  Well, I think it did matter.  I

78

1    think that counsel was free to bring --

2                    THE COURT:  Do you really want to say that?

3                    MR. BORGEEST:  Counsel was free to challenge --

4                    THE COURT:  I mean --

5                    MR. BORGEEST:  Your Honor, Axis did not get so

6    much as a letter disputing the denial.

7                    THE COURT:  But --

8                    MR. BORGEEST:  I think what the counterclaim

9    defendants are saying is that for purposes of your jurisdiction

10   it's okay for them to prove that their clients were wrongly

11   treated but in denying us our prosecution of our complaint for

12   declaratory judgment of no coverage you're not allowing us to

13   prove that we are correct in our position and that obviously is

14   an absurd result.

15                   THE COURT:  It's not, I don't think so.  I'm

16   sorry, I beg to differ because it's two different issues.

17                   MR. BORGEEST:  No, but we filed an action for a

18   declaration of the Court --

19                   THE COURT:  Right.

20                   MR. BORGEEST:  -- that there's no coverage for

21   these individual insureds.

22                   THE COURT:  I understand and --

23                   MR. BORGEEST:  They have counterclaimed saying

24   that there is coverage for their insureds.

25                   THE COURT:  No, they have not.  They have

79

1  counterclaims saying that your client has to advance defense
2  costs.
3         MR. BORGEEST:  That's correct.
4         THE COURT:  And they have a different
5  interpretation of the contract than your client has.
6         MR. BORGEEST:  But, Your Honor.
7         THE COURT:  They say that that provision is a
8  funding mechanism subject to recoupment or reimbursement.  You
9  say it's a coverage issue.
10         MR. BORGEEST:  With all due respect, Your Honor,
11  Your Honor cannot --
12         THE COURT:  With all due respect I read it and
13  that's what it says.
14         MR. BORGEEST:  But, Your Honor, with all due
15  respect the Court cannot find that there is a funding
16  obligation without finding that there is coverage.
17         THE COURT:  I disagree completely.
18         MR. BORGEEST:  Well, then we have a disagreement
19  but --
20         THE COURT:  I can't find that there is no funding
21  obligation without finding that the insurer has no underlying
22  liability, but in terms of the issues as to the meaning of the
23  contract and what the provisions mean, as far as coverage and
24  the reference to "finally determined," that has nothing to do
25  with the evidence that's going to be coming out in the

1    litigation in the District Court.

2                    MR. BORGEEST:  But, Your Honor, how can the Court

3    find that there's a funding obligation in the face of a claim

4    which you now want us to take over to another courthouse where

5    we are going to prosecute the claim to find that there is no

6    coverage?

7                    THE COURT:  Oh, no, this litigation would have to

8    be limited to a fairly narrow set of issues.  It would not get

9    into that issue.

10                    MR. BORGEEST:  Your Honor, we're being put in a

11   very awkward position.  We responded to the motion to dismiss

12   by saying that we would litigate our coverage issues in a

13   narrow fashion without burdening the underlying securities

14   litigation.  Your Honor has given an indication that you're

15   inclined to reject that --

16                    THE COURT:  Because it wouldn't happen.

17                    MR. BORGEEST:  -- because of the overlap.

18                    THE COURT:  Right.

19                    MR. BORGEEST:  If there's overlap for our claim

20   for a declaration of no coverage there necessarily must be

21   overlap with their declaration of some claim that funding in

22   the absence of a determination of coverage.

23                    THE COURT:  All right.  I thought you were going

24   to stand up to say something completely different which is that

25   this isn't ripe --

1          MR. BORGEEST:  I'm sorry, Your Honor.

2          THE COURT:  -- and the insurer has really not made

3    up its mind, but I think we're just repeating the same

4    argument.

5          So, is the insurer saying it's not going to pay or

6    not?

7          MR. BORGEEST:  Your Honor, the insurer issued a

8    denial letter well over a year ago that went unchallenged.

9          THE COURT:  I understand that, but there's -- I

10   also understand that there's a big difference, and potentially

11   a legal difference as far as the insurer's liability, when push

12   really comes to shove and the request is made, because they

13   need the money -- they've gone through the first layer of

14   excess -- that it really won't fund, because that's when the

15   damages start and that's when penalties start for the insurer.

16    So that's a very serious decision for an insurance company to

17   make.

18         MR. BORGEEST:  It is and that's the reason why we

19   filed a declaratory judgment action --

20         THE COURT:  I understand, and that's why I thought

21   the insurer was deciding to act not unilaterally but to try to

22   get a judicial determination, and I don't fault you for that.

23   That's a good thing.  That's what responsible parties do; but,

24   although I had not decided this until preparing for this

25   hearing, it's not going to work here.  I can't give you that

82

1  determination.  So now you have to decide whether you're going

2  to act unilaterally -- in which case I think this motion is

3  ripe -- or not, and I'm happy to give you a little time to

4  decide that.

5         MR. BORGEEST:  Your Honor, we're prepared to

6  litigate the issue of coverage.  That's why we're here.  The

7  contract itself by its terms --

8         THE COURT:  You lost on that point.

9         MR. BORGEEST:  Okay.  Let me turn to another point

10  then.

11         THE COURT:  Okay.

12         MR. BORGEEST:  The contract by its terms gives

13  Axis the unilateral right to determine how much of the defense

14  costs are covered and how much it will pay.  Contractually, it

15  gives Axis that right unilaterally.

16         THE COURT:  I am happy to determine those issues

17  here -- those contract interpretation issues if you're telling

18  me that if I don't determine them you're going to withhold

19  coverage.

20         MR. BORGEEST:  Your Honor, we came here, filed

21  this action prepared to litigate the contract issues.  All

22  we're saying is you can't litigate some and not all.

23         MS. GILBRIDE:  Your Honor, you're asking us to go

24  to another courthouse to litigate this.

25         THE COURT:  No, I'm asking you to tell me whether

83

1    in fact your client's going to pay or not.  If they're not,

2    then I think this is ripe.  If they are going to advance

3    defense costs or they're considering it, it's either not ripe

4    or I'll give your clients some more time to consider this

5    issue.

6            MS. GILBRIDE:  Our position has consistently been

7    that we're not going to advance defense costs in the absence of

8    a judicial determination that we must.  Our policy says that we

9    -- it says that we must advance covered defense costs.

10           THE COURT:  Okay.  Then I believe this issue is

11   ripe.  So I have been persuaded -- Mr. Goldman has persuaded me

12   that I should dismiss the underlying action brought by Axis but

13   keep the counterclaim on the docket.

14           It seems to me as a practical matter it may make

15   sense to move to withdraw the reference of this matter, but

16   that's not something I can do.  I also need to know -- because

17   there's no record here really -- as to when these costs are

18   going to kick in.

19           MR. GOLDMAN:  Your Honor, they've already kicked

20   in.  We have bills that were submitted to Axis approximately

21   two weeks ago for July-time because the Lexington policy

22   exhausted with the payment of June-time so they have the bills,

23   we're waiting for payment.

24           MR. KLINE:  I don't believe this is a dispute,

25   Your Honor.

84

1          MS. GILBRIDE:  That's correct.

2          THE COURT:  There are outstanding bills?  How

3    much?

4          MS. GILBRIDE:  Approximately $2 million has been

5    submitted to us in the past month.

6          THE COURT:  And when were they submitted?

7          MS. GILBRIDE:  Plus, there's been a settlement

8    demand tendered to the carrier.

9          THE COURT:  When were the bills submitted?

10          MS. GILBRIDE:  Over the course of the last several

11    weeks.

12          THE COURT:  Well, we're really just talking about

13    the defense costs here; right?  Because the settlement demand

14    is going to be subject to a fairness hearing, notice to the

15    Refco Trustee and the like.  That money is not going to come

16    out-of-pocket for quite some time.

17          MR. GOLDMAN:  That's correct, Your Honor.

18    Obviously, Judge Lynch would have to have an approval on that

19    in accordance with Rule 23.

20          THE COURT:  What is your response on the bond

21    point?

22          MR. GOLDMAN:  In brief, Your Honor, it turns the

23    policy upside down.  They're asking us to be their insurer.

24    The policy terms are express.  I don't think there's any

25    difficulty interpreting it as exactly as the Court has

85

1  identified it, a funding vehicle.  It would be the same as

2  every --

3            THE COURT:  Well, no, I was just identifying the

4  issue not -- I wasn't --

5            MR. GOLDMAN:  I understand.  I understand, Your

6  Honor.  It would be the same as asking every automobile

7  accident person to bond the costs until the insurer decides

8  whose liable.  It doesn't work that way.  That's what insurance

9  is for.  That's what the particularity of an insurance contract

10 is all about.  It's their obligation to assume that risk and

11 contractually we would assert we will convince this Court that

12 they assume precisely that risk with the language that they

13 drafted.

14           THE COURT:  Is the discovery -- has there been any

15 change in the intensity of the litigation in terms of the

16 incurrence of legal fees and the like?

17           MR. GOLDMAN:  I'm sorry, the securities

18 litigation, Your Honor?

19           THE COURT:  Yes.

20           MR. GOLDMAN:  Yes, discovery started.

21           THE COURT:  And there's no like hiatus or anything

22 like that, it's moving ahead?

23           MR. GOLDMAN:  No.  We're not in hiatus world, Your

24 Honor.  We're in an incurring debt world.

25           THE COURT:  And you say the criminal trial is now

86

1    on for March?

2                    MR. EISEN:  Yes, Your Honor, and there has been, I

3    think -- because we were set initially for October -- there was

4    a very intense period which I think is some of what's in the

5    pipeline as a result of the continuance.  I know I was able to

6    take my summer vacation, so I think that there has been some

7    lessening there, although obviously we're going to need to get

8    ready for that as well.

9                    THE COURT:  You've agreed upon the amount of the

10   legal bills that have been submitted?

11                   MS. KIM:  Your Honor, the practice has been that

12   the parties simply submit the bills to the carrier and there

13   has not been any requirement of consent or --

14                   THE COURT:  No, I'm not talking about consent,

15   just literally what the amount is of the bills.

16                   MR. KLINE:  Your Honor, no one of us would have

17   any way to know the total because --

18                   THE COURT:  No, I thought you might have conferred

19   among --

20                   MR. KLINE:  No.  We only see our own.  Only Axis

21   would know the --

22                   MS. KIM:  Yes.  All we do, Your Honor, is submit

23   the bills and we understand it's a first come/first serve basis

24   and then they let us know when it's exhausted.  That's exactly

25   what happened with the U.S. Specialty and the Lexington

1    policies.

2             THE COURT:  But you say it's about $2 million?

3             MS. GILBRIDE:  Yes, Your Honor.  I mean we've just

4    gotten the bills in, so they haven't been the subject of any

5    sort of a review for what's been incurred but that's the gross

6    amount.

7             MR. CASHMAN:  Your Honor, I'm sorry, I haven't

8    spoken yet.  This is Richard Cashman.  We represent one of the

9    officer defendants, Philip Silverman, and I just wanted to

10   respond to Your Honor's question, and that is there are bills

11   that are coming, as well, because there has been a lot of

12   activity in these cases.

13            MS. KIM:  What do you recommend [sic]?

14            THE COURT:  Well, it seems to me that on the issue

15   of the contract interpretation one could get to that issue very

16   quickly.  It's a matter of contract interpretation and

17   consequently unless someone has a different view I should not

18   be thinking here about a lengthy injunction and if it is to be

19   teed up here it should be teed up promptly.

20            I continue to think, although this is beyond my

21   power, that given the existence of a securities action and the

22   inevitable tie-ins to settlements that a district judge might

23   want to have the reference but that's not for me to decide.

24            I also know that law firms generally are prepared

25   to wait a little bit for payment of their bills.  So I'm really

88

focusing on the ones that have been billed and not on some sort

of general green light for anything coming due over the next

several weeks or months. But I am prepared to conclude on the

basis of my review of the general principles set forth in the

WorldCom case with regard to how courts look at provisions in

indemnity policies in respect of the advancement of defense

costs, as well as the particular language at issue here on Page

8 of the policy, that as far as the "merits" aspect of a motion

for a preliminary injunction is concerned there is either a

substantial likelihood of success on the merits or -- and I

strongly emphasize the "or," because this is more where I'm

focusing -- sufficient questions going to the merits which in

light of the balance of the harms here would mean that on the

issue of the merits the movants have sustained that prong of

their request for a preliminary injunction. Going to the

"harms," although it is asserted -- and I accept this -- that

certain of the defendants are wealthy individuals, the amount

of the defense costs here -- $2 million -- following upon the

primary carriers' coverage limits being exceeded tells me that

these are extremely substantial defense costs that need to be

incurred as part of this schedule that's been set out by the

various courts -- the criminal court in particular, but also

the district court in the securities litigation -- and that to

run the risk of not having counsel proceed or to substantially

cut back upon their efforts because of unpaid bills is a

1  tremendous potential harm, particularly in a criminal context

2  (and I note that as Judge Gerber has in the <u>Adelphia</u> case,

3  there is a significant distinction between an indictment and a

4  conviction and the criminal trial is at the trial stage, not

5  the appellate stage).

6         That leaves, I believe, the issue initially raised

7  by counsel for Axis, and pressed by counsel for Axis, that a

8  ruling granting the request for a preliminary injunction is

9  fundamentally inconsistent with a ruling dismissing Axis'

10 underlying case, which obviously I just issued.  I do not

11 believe that it is inconsistent with that ruling or unfair to

12 Axis.  As I noted before, for Axis to prevail in its

13 declaratory judgment action it needs to prove two things: one,

14 it needs to prove that its interpretation of the contract --

15 the insurance policy -- as well as potentially the related

16 warranty, is the right interpretation, the correct

17 interpretation.  That is not a matter that substantially

18 overlaps with litigation anywhere else.  In particular, it

19 doesn't substantially overlap with litigation in the District

20 Court in the securities law action or with litigation in the

21 criminal action.  However, if Axis' interpretation of the

22 contracts as they apply to the duty to advance defense costs is

23 incorrect, then the plaintiffs on the cross-claim or the

24 counterclaim prevail as far as the defense costs advancement

25 issue is concerned.  Therefore, it seems to me that those

1  issues -- those contract interpretation issues -- are discrete

2  and can be decided by me.  As I noted, Axis needs to win two

3  things in order to not advance defense costs, however. In

4  addition to having its interpretation of the contract prevail,

5  it also has to convince a Court that the exclusions or its

6  right to rescind or its right under the warranty, so-called,

7  have been triggered, and that is what overlaps as I have

8  previously found, with the District Court litigation in the

9  criminal case. But it seems to me the plaintiffs' claim here --

10 and the only plaintiffs that would be left would be the

11 counterclaim plaintiffs -- is not subject to that problem and

12 can go forward.  As you can tell from my earlier remarks, I

13 toyed with the idea of somehow putting this off or delaying it

14 so that the whole matter could be joined with the District

15 Court litigation, because I think that in terms of settlement

16 and the like that may make sense, but that's not something I

17 can do, and I do have an obligation to exercise my jurisdiction

18 unless it's withdrawn from me, except where the law requires me

19 not to as in the "substantial overlap" case law. And so, there

20 having been a counterclaim filed which can survive as the only

21 claim in this adversary proceeding, I have jurisdiction to

22 determine the motion for a preliminary injunction.  I don't

23 believe that it is unfair to exercise that jurisdiction here or

24 inequitable, and, therefore, the equitable relief sought can

25 and should be granted.

91

1        There has been a request for a bond to be posted,

2   but as Mr. Goldman said and as I believe the case law provides,

3   that would be tantamount to advancing one's own defense costs

4   and contrary to the case law.

5        So let me be clear: as I said before, it seems to

6   me that the injunctive relief that I'm ordering here should be

7   limited to bills that are outstanding; and I believe this is

8   the case, but I want to be clear -- I am doing nothing more

9   than saying that.  The insurer, Axis, is directed to advance

10  defense costs based upon the beneficiaries' definition of or

11  interpretation of the provisions on Page 8 requiring

12  advancement, _i.e._, if there are other provisions, or to the

13  extent there are other provisions, of the insurance policy that

14  apply to the advancement of defense costs other than the issue

15  that's been teed up here -- _i.e._, whether there needs to be a

16  final determination or not -- I'm not overwriting those

17  provisions.  This just goes to the dispute as to whether there

18  needs to be a final determination of coverage or not related to

19  the advancement of defense costs.  So, for example, if Axis has

20  the ability to review for reasonableness or the like under the

21  insurance policy, that's not being overridden by this ruling.

22  The only thing that Axis is being directed to do is to comply

23  with the provision that requires defense costs to be advanced,

24  subject to the final determination, and we should schedule the

25  final hearing on this promptly, which I view to be a matter

92

1  that can be decided based on review of the contract unless

2  someone else tells me otherwise.

3          The parties have obviously done a lot of briefing

4  on the merits already of that issue.

5          MR. GOLDMAN:  Yes, Your Honor.

6          THE COURT:  So if we did this --

7          MR. GOLDMAN:  Your Honor, just one moment.

8             [Pause in proceedings.]

9          MR. GOLDMAN:  Your Honor, having conferred with

10  the small group of co-counsel we have here I think our

11  assessment is certainly if Axis wishes to file in a further

12  brief on the contract interpretation issue which we have always

13  felt is the narrow issue we have been presenting we would then

14  file a responsive brief and we would schedule with the Court's

15  cooperation as early as the latter part of September for a

16  further hearing on this.

17          THE COURT:  It would be on a motion for a summary

18  judgment though; right?

19          MR. GOLDMAN:  Yes, Your Honor, we could file a

20  motion for summary judgment.

21          THE COURT:  Or, I guess, a motion to dismiss.  It

22  could be either one.  It would really be a motion -- well --

23          MR. GOLDMAN:  We'll do a motion for partial

24  summary judgment.  That's what we're going to do.

25       [Other attorneys commenting in the background]

1          MR. GOLDMAN:  That's what we're going to do,

2     narrowed to the issues that the Court has identified we are

3     focused upon.

4          MS. GILBRIDE:  Your Honor, respectfully, on behalf

5     of Axis we intend to file an immediate appeal of Your Honor's

6     ruling today.

7          THE COURT:  Okay.

8          MS. GILBRIDE:  So we would ask that that be

9     factored into whatever briefing schedule is going to be

10    established.  We understand we have to do that within the next

11    ten days and we would ask that the order ordering us to advance

12    defense costs be deferred until we can get an appeal filed with

13    the District Court.

14         MR. GOLDMAN:  I understood that to be a request

15    for a stay?

16         THE COURT:  As long as it's an expedited appeal.

17         MS. GILBRIDE:  Oh, we intend to file it, you know,

18    as quickly as we can.

19         THE COURT:  No, no, that you request expedited

20    treatment --

21         MS. GILBRIDE:  Yes, we will.  We will, Your Honor.

22         THE COURT:  All right.  I mean I could actually --

23    I have a lot going on at the end of September and beginning of

24    October in various cases but I could give you October 12th just

25    for your own purposes and you could tell the District Court

94

1  that.

2          October 12th.  Friday.

3          MR. GOLDMAN:  Is that after the NCBJ?  I believe

4  it is actually or is it during?

5          THE COURT:  I don't know.

6          MR. GOLDMAN:  It doesn't --

7          THE COURT:  If it is -- I wasn't going to be going

8  to that.

9          MR. GOLDMAN:  I gathered.

10          THE COURT:  But I could give you that date.

11          MR. GOLDMAN:  One moment if I may, Your Honor.

12          THE COURT:  But I am inclined to grant this

13  request.  It seems to me while it's important to deal with the

14  billing issue -- for a lot of reasons I'm inclined to grant

15  this request.

16          MR. GOLDMAN:  And Your Honor let me make one

17  comment and then my co-counsel will speak if I may.  We have so

18  much expense coming up. The fear is that this not be

19  characterized as a stay that the appellate court presumes can

20  be continued --

21          THE COURT:  No, I don't -- that's why I asked for

22  --

23          MR. GOLDMAN:  -- I don't know that ten days

24  doesn't matter but six weeks does.

25          THE COURT:  That's why I requested an expedited --

95

1   that we'd be conditioning it upon an expedited appeal.

2           MR. KLINE:  Your Honor, can I suggest it might be

3   more appropriate -- we don't mind if they're given ten days to

4   pay but it should be incumbent upon them to get a stay from the

5   District Court.

6           THE COURT:  But you can do that in ten days.

7   That's easy to do.

8           MR. KLINE:  Right.  But absent a stay from the

9   District Court they should be required to follow Your Honor's

10  order and pay; otherwise they'll just file and say we don't

11  have to pay.

12          THE COURT:  My view is this issue could be well

13  teed up for the District Court within ten days, and I think

14  that's what counsel intended.

15          MR. KLINE:  I think with all respect it should --

16          THE COURT:  So I will -- it's stayed for ten days

17  but that's more than sufficient time to put in an appeal.

18          MR. GOLDMAN:  I understand.

19          THE COURT:  I know lawyers can wait ten days on

20  payment of their bills but I'm also, as I said, very cognizant

21  of the fact that the bills are very large and they're going to

22  be increasing in the future and that this issue on the merits

23  really needs to be decided very quickly -- this contract

24  interpretation issue -- and so I'm telling you all that I would

25  be free on October 12th to hear it, and I think that may be

96

1  useful for the District Court also, but I'm not going to impose

2  a briefing schedule on you because the next step of this is

3  going to be at the District Court; but as everyone now

4  understands that step has to result in some action by the

5  District Court within the next ten days or my stay is going to

6  be gone -- the stay that applies now is going to be gone.

7           MR. GOLDMAN:  That's fine.

8           Your Honor, we will be bringing on a summary

9  judgment motion probably before the District Court -- partial

10 summary judgment -- but that --

11          THE COURT:  All right.  But I think the October

12 date gives people -- particularly given all the work that they

13 have done on it and, I'm sure, will be doing on it, people will

14 be reciting these provisions of the insurance agreement in

15 their sleep and will be well enough prepared for a hearing in

16 October.

17          MR. GOLDMAN:  That already has happened.

18          THE COURT:  Okay.  That leaves the stay motion.

19          MR. GOLDMAN:  The stay motion and I --

20          THE COURT:  All right.  But before we go to that

21 you'll need to give me an order --

22          MR. GOLDMAN:  Yes.

23          THE COURT:  -- and you should do it promptly

24 because that's what's going to start their appeal, obviously,

25 and that needs to go forward promptly so --

97

1          MS. GILBRIDE:  There would be two orders, Your

2    Honor, right?

3          THE COURT:  Well, Mr. Walsh is going to give me an

4    order dismissing the main -- the adversary claim brought by

5    Axis, and Baker & Hostetler is going to give me an order

6    granting the preliminary injunction in connection with their

7    cross-claim, or counterclaim, excuse me.

8          MS. GILBRIDE:  Your Honor, if I heard you

9    correctly the ten days would then start to run from the date

10   that you sign that order?

11         THE COURT:  Well, from the entry of the order.

12         MS. GILBRIDE:  Right.

13         THE COURT:  No, no, I'm sorry, the ten days on the

14   --

15         MS. GILBRIDE:  To get an expedited --

16         THE COURT:  For the injunction?  Yes.

17         MS. GILBRIDE:  Yes.

18         THE COURT:  Yes.

19         MR. GOLDMAN:  All right, Your Honor, just because

20   we have discussed the stay issue at some length I have nothing

21   further to add.  I only wanted to make one -- I'll call it the

22   tangential point -- one of the reasons why we have sought the

23   stay modification to the extent it was necessary in light of

24   the plan confirmation order was precisely because demands to

25   the insurers need to be made under cooperation provisions in

98

1    many of these policies for them to put it in line for payment.

2     Obviously, they make their determinations in response but I

3    certainly did -- that was a primary reason why we wanted to get

4    this clarification and, of course, it's my understanding that

5    nothing in today's ruling with respect to the preliminary

6    injunction motion changes the fact that we would submit a

7    demand to the insurer.  It doesn't mean they're going to pay

8    it, obviously, but it does mean we have the right to do that.

9    That's in large part what the lift stay motion is all about.

10   We have, as I have said, agreed we will provide notice to Mr.

11   Kirschner regarding our doing so.

12              THE COURT:  Okay.

13              MR. KLINE:  Your Honor, Ivan Kline from Friedman &

14   Wittenstein.

15              It's been a long morning and I'll be very brief.

16   Our only point of our response is really we believe it would be

17   more appropriate to make sure that a particular settlement is

18   back before this Court for approval given that this is the

19   Court that has jurisdiction over the policy and has all the

20   insureds before it and no other court has that; whether it's in

21   the context of the stay or not to stay or using your authority

22   under Section 105 is really less important than we simply

23   believe that there should be some mechanism whereby a

24   particular settlement would be subject to this Court's review

25   and approval to make sure that all of the parties' rights

99

1    including those of the estate and those of other insureds are

2    not being prejudiced in any way, and I believe actually in the

3    letter from Axis that was submitted on their reply even

4    suggests that whatever the proposed settlement is would be one,

5    for example, that might prejudice the rights of other insureds.

6    I still don't know what the details are, so it's hard for us

7    to comment on that, but our point was simply we have no problem

8    with the concept of the stay being lifted to allow for the

9    payment of settlements; it's simply that we think it should be

10   in one form or another, a particular settlement should be

11   before this Court.

12            THE COURT:  Okay.  Well, again, I quoted the

13   language in Paragraph 34(c) of the confirmation order which I

14   believe enables the beneficiaries of the policies -- not just

15   the debtor but the other beneficiaries -- to seek and obtain

16   coverage and payments from those policies.

17            Now, it may be that the consequences of doing that

18   will affect the debtor in a way that would require some relief

19   here in terms of either a settlement or 9019 or the other

20   provisions of the plan but it's hard for me to conceive what

21   those would be and it seems to me that as long as there is

22   advance notice, not retroactive notice, but advance notice, of

23   any proposed settlement, that the plan administrator on behalf

24   of the estate will be able to protect the estate's rights and

25   that's, I gather, what Mr. Kirschner has concluded also.

1          It seems to me that the other beneficiaries, to

2     the extent the settlement involves insurance or -- well, I'll

3     leave it at that.  I mean obviously there are contribution

4     issues, too, but to the extent a settlement involves insurance

5     it should get notice of a settlement as far as approval by a

6     District Court is concerned in the MDL, for example.  So I

7     think as long as there is proper notice to other affected

8     parties that your concerns are taken into account.

9          MR. KLINE:  Your Honor, could I just ask then that

10    the order that they submit recite that there must be advance

11    notice, because I believe that the order they submitted calls

12    for post-disbursement notice --

13          THE COURT:  You're right.

14          MR. KLINE:  -- which is of no use for the

15    settlement

16          THE COURT:  It needs to be adequate advance

17    notice.

18          MR. KLINE:  And could the other insureds be

19    included in that so that if we wanted to seek relief in this

20    Court we could do so?  Frankly, I don't think Judge Lynch will

21    have any interest in hearing the claim of one insured against

22    another.  I think Judge Lynch's only concern in a Rule 23

23    approval is fairness to the plaintiffs in the class which is a

24    different issue.

25          So if we could just get that the notices to the

1  plan administrator and the other insureds in advance I think we

2  would withdraw any objection to their motion.

3         MS. KIM:  Well, Your Honor, I'd like to know "in

4  advance" of what? -- because all that we are seeking here is to

5  make sure that the automatic stay is not used as some kind of

6  procedural bar that interferes with the normal course under the

7  insurance policy for the carrier to determine whether or not a

8  settlement is reasonable, or not.  Obviously, any settlement

9  would be subject to the consent of the carrier and so what I

10 don't want to happen is to be required to give notice before

11 seeking consent or obtaining consent from the carrier -- after

12 the carrier.

13        THE COURT:  You're talking about getting advance

14 notice of approval by the court presiding over the litigation?

15  Is that what you're talking about?

16        MS. KIM:  Oh, that's fine.  We don't have any

17 problem getting advance notice.  Of course, we'd be required to

18 give notice to the parties to the underlying litigation.  They

19 would get notice just like any other party in terms of

20 obtaining approval before Judge Lynch on any settlement so I

21 just want it to be clear on the record what they're seeking.

22        THE COURT:  Well, I was asking you.  Is that what

23 you had in mind?

24        MR. KLINE:  All I'm asking is whatever advance

25 notice they promised Mr. Kirschner that we get.  I don't know

102

1  what they meant by advance notice to Mr. Kirschner but it must

2  be before disbursements.

3          THE COURT:  All right.  So you're --

4          MR. GOLDMAN:  We have no problem with that, Your

5  Honor.  Obviously we will circulate to him and to others an

6  order.  We have to have Mr. Kirschner look at it as well but

7  that order won't come in today. It will probably come in

8  tomorrow.

9          THE COURT:  Okay.  That's fine.

10          MR. GOLDMAN:  Your Honor, if I may we had

11  submitted to the Court a proposed order and as I review it in

12  respect of the preliminary injunction I think it is consistent

13  with the Court's ruling except that I would suggest that we

14  insert -- as it say there, "obligated to pay defense costs," I

15  would insert "ten days after entry of this order."

16          MS. GILBRIDE:  Your Honor, you know, I don't have

17  that order in front of me at the moment but I believe that's an

18  order ordering us to advance defense costs on behalf of all

19  insureds, not just the remaining insureds, No. 1, and I think

20  there's a reference to future costs in the order as well?  I'd

21  like the opportunity to review it before.

22          MR. GOLDMAN:  I think what we'll do is give her a

23  copy of what I have in my hands, Your Honor, if that's all

24  right.

25          THE COURT:  Well, let me take a look at it first.

103

1  Let me just take a quick look at it.

2              [Pause in proceedings.]

3         THE COURT:  Well, this applies to the defined term

4  "movants" not all the parties.

5         MR. GOLDMAN:  Your Honor, just on -- we have no

6  objection to it applying to other insureds, just so the Court

7  understands that.

8         MR. EISEN:  Your Honor, if I may, we joined -- the

9  other defendants joined in so if the Court is inclined -- and

10 obviously our situation was part of the Court's reasoning.  If

11 the Court is inclined after this order we'd just ask --

12        THE COURT:  No, your clients did join in.

13        MS. GILBRIDE:  Your Honor, there are no

14 counterclaims asserted on behalf of his clients.  There's no --

15 they have not answered, they have not asserted counterclaims,

16 there is no basis for the Court to order advancement of defense

17 costs on behalf of his clients.

18        MR. WALSH:  Nonetheless, Your Honor, there is an

19 advancement obligation and it seems completely illogical to

20 make a determination for one and not the other.

21        THE COURT:  That's true, but it's also -- it's

22 procedurally -- you can make a motion promptly but there's no -

23 -

24        MS. GILBRIDE:  They made a motion to dismiss.

25        THE COURT:  No, no, they made a motion to dismiss


1  your client's claims but the only motion for a preliminary

2  injunction before me and the only counterclaim before me is --

3              MR. WALSH:  We understand that, Your Honor, so if

4  that's what Axis requires that we go through all the procedural

5  --

6              THE COURT:  Well, it's what I require.

7              MR. WALSH:  Okay.  Then we'll do that.

8              THE COURT:  And the same for the criminal

9  defendants.

10             MR. EISEN:  Your Honor, our joinder in the

11 existing motion --

12             THE COURT:  That's not sufficient.

13             MR. EISEN:  Just to be clear, so what does Your

14 Honor require?  That additional counterclaims --

15             THE COURT:  On an adversary proceeding basis,

16 which is what the counterclaim was, you need to start an action

17 for advancement of defense costs and seek preliminary

18 injunctive relief.

19             MR. EISEN:  Your Honor, is it sufficient to -- you

20 know, the posture that we were in up to this point was we had

21 joined in the motion to dismiss so there was no pleading

22 requirement for us before today.  Pleading is held in -- it was

23 the motion to dismiss the insurers' claims and we did join in

24 the motion for preliminary injunction so --

25             THE COURT:  But, procedurally, I'm not comfortable

105

1  with that.

2              MR. EISEN:  Just so I understand the parameters of

3  that, if that is filed around the representation that's going

4  to be filed may we be included or can we within that ten day

5  period of the order are we going to need to submit --

6              THE COURT:  No.  I think you're going to need to

7  go through the procedural hoops.

8              MR. EISEN:  Will that require an additional

9  hearing or can we just submit those -- I only ask that question

10 --

11             THE COURT:  I don't know.  I'll have to decide

12 that.  I don't know.  I would find it unlikely, but let me read

13 the pleadings.

14             MR. EISEN:  Thank you, Your Honor.

15             THE COURT:  Okay.  They're all different.  Your

16 clients, although I doubt it, might be multi-millionaires or

17 multi-multi-millionaires.  I don't know.  I know one of Mr.

18 Walsh's clients is.

19             MR. WALSH:  Was that taking inflation into

20 account, Your Honor?

21             THE COURT:  No.  No, they're not.  They're not.

22 They're not withdrawing it.

23             MS. GILBRIDE:  So you could dismiss the action.

24 They're not even parties.

25             THE COURT:  No, I said they can start their own

106

1    action and as part of that adversary proceeding seek injunctive

2    relief.

3                    MS. GILBRIDE:  It's slightly inconsistent.

4                    THE COURT:  Well, I've already ruled on that.

5                    MR. EISEN:  Your Honor, at the risk of delaying

6    things may I quickly suggest another alternative that I think

7    would be easier for the Court which is to allow us the option

8    of intervention as opposed to filing independent adversary

9    proceedings?

10                   THE COURT:  I'm not aware of such an option.

11                   MR. EISEN:  Okay.

12                   THE COURT:  I'm just not.  So somehow you need to

13   tee it up so that it's before me as far as an affirmative

14   claim.

15                   MR. EISEN:  Understood and if we're able to puzzle

16   out another basis that we believe --

17                   THE COURT:  I'm not precluding you from puzzling

18   out another basis.

19                   MR. EISEN:  Thank you, Your Honor.

20                   THE COURT:  Okay.  So by movants here -- the

21   defined term "movants" is just your clients; right?

22                   MR. GOLDMAN:  The five that are named in the

23   motion.

24                   THE COURT:  Right.  It's not those who joined in

25   the motion or anything like that?

107

1          MR. GOLDMAN:  That's correct.  That is the

2    definition.

3          THE COURT:  All right.

4                  [Pause in proceedings.]

5          THE COURT:  Defense costs -- as I recall the

6    motion it's interpreted open-endedly; right?  It's going

7    forward as well?  And my ruling just covered defense costs

8    incurred today?

9          MR. GOLDMAN:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. GOLDMAN:  The motion defines it as the

12    contract defines it, Your Honor.

13          MS. GILBRIDE:  Your Honor, not to interrupt but

14    does it make sense to include your order on the dismissal

15    motion in this order as well so that for purposes of an appeal

16    that there's one order?

17          THE COURT:  No.

18          MS. GILBRIDE:  Okay.

19          THE COURT:  Okay.  Let me tell you what I've

20    written here because I believe this is the nature of my ruling

21    -- and it's Paragraph 3 -- "Effective ten days after entry of

22    this order Axis is directed upon the exhaustion of the

23    Lexington policy to pay defense costs of movants in the

24    underlying actions billed through the date of this order until

25    such time"  -- I'm sorry -- "pending a final determination by

108

1   this Court of Axis' claimed right to withhold such defense cost

2   payments until there's a final determination of its denial of

3   coverage under the Axis policies."  Because I'm not going to be

4   making a determination generally of coverage as this order had

5   provided.

6           MR. GOLDMAN:  So as I understand it and I believe

7   this is what the Court had discussed, we would have a right to

8   ask the Court to consider further defense costs presumptively

9   on or about October 12th?

10          THE COURT:  Yes, because this is just a

11   preliminary injunction.  We're going to have the final hearing

12   -- I can't have the final hearing on October 12th.

13          MR. GOLDMAN:  Yes.  I do not have a problem with

14   that language, Your Honor.

15          THE COURT:  All right.  So just to be clear, and I

16   think this is important for the record, too, I will not be

17   determining all of the issues as to whether your clients are

18   covered for defense costs.  What I am determining is whether

19   Axis is required to advance those monies now --

20          MR. GOLDMAN:  We understand that, Your Honor.

21          THE COURT:  -- as opposed to their argument which

22   is that because of the language on Page 8 that they could say

23   these aren't "covered" and, therefore, they don't have to be

24   advanced.

25          MR. GOLDMAN:  We understand that that is the

109

1    dispute the Court is considering.

2           MR. EISEN:  Your Honor, with the Court's leave, I

3    will be brief.  Our bills are also before Axis.  As the Court

4    knows, we joined in the motion.  We do not -- I've conferred

5    with my colleagues -- all of the indicted defendants -- the

6    presumptively innocent defendants as Your Honor noted -- are in

7    the most -- according to the Court's reasoning in the most --

8           THE COURT:  I can't do it.  I can't do it on the

9    procedural posture that we're in.  I understand logically your

10   clients' position, but they have not a procedural setting, I

11   believe, to seek a preliminary injunction.  They haven't

12   started an adversary proceeding, they haven't made a

13   counterclaim.  They are defendants in an adversary proceeding

14   that I've dismissed, and they have no counterclaim that

15   survived, because they didn't make a counterclaim.

16          MR. EISEN:  Your Honor, I understand.  I believe

17   it would not be improvident, though, for the Court to issue an

18   order that construes -- because it's the same policy at least

19   as to the --

20          THE COURT:  But orders don't do that.  I'm sorry,

21   I can't do that.  I won't do that.  You've heard my ruling.

22   There are aspects of a request for a preliminary injunction

23   that may not apply, conceivably, to your clients or to other

24   defendants, but on the fundamental issues you've heard my

25   ruling as to likelihood of success on the merits or the balance

110

1  of harms and substantial questions going to the merits and

2  that's as far as you could tell your clients that they could

3  have any sort of comfort at this point.

4        MR. EISEN:  Your Honor, whatever the balance of

5  harms may be as to others the assets have been frozen for the

6  defendants.

7        THE COURT:  Well, I understand, but sometimes, I

8  think -- not sometimes, always, unless the other side is

9  willing to waive it, and they're not waiving it and I

10 understand why -- you have to go through the procedural hoops.

11       MR. EISEN:  Thank you, Your Honor.

12       THE COURT:  Okay.  I've looked at the rest of the

13 order except for a numbering problem and my inserting after

14 "seeking reimposition of the automatic stay" in the next to the

15 last paragraph "to the extent it applies," I don't have any

16 other changes in it.

17       MR. GOLDMAN:  Thank you, Your Honor.

18       THE COURT:  Do you have a disc?

19       MR. GOLDMAN:  Not with us, Your Honor.

20       THE COURT:  Okay.  All right.  Well, then what I'd

21 ask you to do is to e-mail what you handed me, to chambers and

22 I'll mark it up as I read out.

23       MR. GOLDMAN:  Okay.  We will arrange that this

24 afternoon.

25       THE COURT:  Okay.

111

1                MR. GOLDMAN:  Thank you very much.

2                MS. GILBRIDE:  Your Honor, will we get the

3     dismissal order this afternoon as well?

4                THE COURT:  I don't know.  Are you going to submit

5     it to me?

6                MR. WALSH:  We'll try, Your Honor.

7                THE COURT:  Okay.  If not, it will be tomorrow.

8     It will get out very promptly.

9                MS. GILBRIDE:  Okay.  Thank you.

10               MR. EISEN:  Your Honor, one very quick -- it's not

11    on that motion.  Not at all.

12               THE COURT:  A different point?  Okay.  Good.

13               MR. EISEN:  We had a stay motion before the Court.

14     I believe the need for the stay motion has been obviated by

15    the overlap.

16               THE COURT:  It's moot.  It's moot.

17               You're right I should have addressed that but I

18    believe it's moot.

19               MR. EISEN:  Thank you, Your Honor.

20               THE COURT:  And in fact you could insert that in

21    the dismissal motion if you want or submit your separate order

22    on that if you wish.  You could talk to Mr. Walsh about that.

23                         *  *  *  *  *

24

25

112

* * * * *

    I certify that the foregoing is a court transcript from
an electronic sound recording of the proceedings in the above-
entitled matter, except where, as indicated, the Court has
modified the transcript.




                                        Ruth Ann Hager
Dated:  August 31, 2007

# EXHIBIT G

JUL-12-2004  10:45    KHOFFMAN, BURGESST & KIHN

POLICY NUMBER:
874-91-08

 *American International Companies®*

RENEWAL OF:
484-54-78

### Directors, Officers and Corporate Liability Insurance Policy

☐ AIU Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Penns.
☐ Granite State Insurance Company

☐ Illinois National Insurance Company
☒ National Union Fire Insurance Company of Pitts., PA®
☐ National Union Fire Insurance Company of Louisiana
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

**NOTICE:** EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

**NOTICE:** THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

**NOTICE:** THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

### DECLARATIONS

ITEM 1.  NAMED CORPORATION: *WORLDCOM, INC.*

MAILING ADDRESS:    *1133 19TH STREET*
*WASHINGTON, DC 20036*

STATE OF INCORPORATION OF THE NAMED CORPORATION:
*Georgia*

ITEM 2.  SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Corporation

ITEM 3.  POLICY PERIOD:    From: *December 31, 2001*    To: *December 31, 2002*
(12.01 A.M. standard time at the address stated in Item 1.)

ITEM 4.  LIMIT OF LIABILITY:    *$15,000,000*
aggregate for Coverages A and B combined (including Defense Costs)

*280128*
62334 (5/95)


EXHIBIT
6

ITEM 5.    RETENTION:

SECURITIES CLAIMS:

| | |
|---|---|
| Judgments & Settlements (all coverages) | None |
| Defense Costs (non-Indemnifiable Loss) | None |
| Defense Costs (Coverage B(I) and Indemnifiable Loss) | $5,000,000 |

for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under Clause 6 in certain circumstances)

OTHER CLAIMS:

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |
| Judgments, Settlements and Defense Costs (Indemnifiable Loss) | $5,000,000 |

for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts

ITEM 6.    CONTINUITY DATES:

A. Coverages A and B(II):          _August 9, 1991_

B. Coverage B(I):                  _June 1, 1995_

C. Coverages A and B:
   Outside Entity Coverage (Per Outside Entity)
   See Endorsement # 27

ITEM 7.    PREMIUM:                $1,950,000

ITEM 8.    NAME AND ADDRESS OF INSURER ("Insurer"):
           (This policy is issued only by the insurance company indicated below.)

           _National Union Fire Insurance Company of Pittsburgh, Pa._

           _175 Water Street_

           _New York, NY 10038_

280128
62334 (5/95)

JUL-12-2004  16:47    KAUFMAN BORGEEST & RYAN

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_

SECRETARY                          PRESIDENT

AUTHORIZED REPRESENTATIVE

COUNTERSIGNATURE DATE              COUNTERSIGNED AT

*WILLIS CORROON CORP OF NY*
*7 HANOVER SQUARE*
*NEW YORK, NY 10004*

*280128*

62334  (5/95)

JUL-12-2004  10:47      KAUFMAN, BORGEEST & RYAN                        P.06

 *American International Companies*®

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in Item 8 of the Declarations, herein called the "Insurer", agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: DIRECTORS AND OFFICERS INSURANCE

This policy shall pay the Loss of each and every Director or Officer of the Company arising from a Claim first made against the Directors or Officers during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except when and to the extent that the Company has indemnified the Directors or Officers. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE B: CORPORATE LIABILITY INSURANCE

This policy shall pay the Loss of the Company arising from a:

      (i)   Securities Claim first made against the Company, or

      (ii)  Claim first made against the Directors or Officers,

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

2. DEFINITIONS

   (a) "Claim" means:

      (1) a written demand for monetary or non-monetary relief; or
      (2) a civil, criminal, or administrative proceeding for monetary or non-monetary relief which is commenced by:

         (i) service of a complaint or similar pleading; or
         (ii) return of an indictment (in the case of a criminal proceeding); or
         (iii) receipt or filing of a notice of charges.

      The term "Claim" shall include a Securities Claim; provided, however, that with respect to Coverage B(I) only, Claim or Securities Claim shall not mean a criminal or administrative proceeding against the Company.

   (b) "Company" means the Named Corporation designated in Item 1 of the Declarations and any Subsidiary thereof.

   (c) "Continuity Date" means the date set forth in:

      (1) Item 6A of the Declarations with respect to Coverages A and B (II); or

      (2) Item 6B of the Declarations with respect to Coverage B(I); or

      (3) Item 6C of the Declarations with respect to Coverages A and B for a Claim against an Insured arising out of such Insured serving as a director, officer, trustee or governor of an Outside Entity.

   (d) "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of Officers or employees of the Company.

62335 (5/95)                                    2

(b)  "Director(s) or Officer(s)" or "Insured(s)" means:

(1)  with respect to Coverages A and B, (ii), any past, present or future duly elected or appointed directors or officers of the Company.  In the event the Named Corporation or a Subsidiary thereof operates outside the United States, then the terms "Director(s) or Officer(s)" or "Insured(s)" also mean those titles, positions or capacities in such foreign Named Corporation or Subsidiary which is equivalent to the position of Director(s) or Officer(s) in a corporation incorporated within the United States.  Coverage will automatically apply to all new Directors and Officers after the inception date of this policy;

(2)  with respect to Coverage B(i) only, the Company.

(f)  "Listed Event" means any of the following events:

(1)  any event for which the Company has reported or is required to report on Form 8-K filed with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934; or

(2)  any restatement or correction of a Company financial statement contained in any document filed with the Securities and Exchange Commission; or

(3)  any statement or disclosure made by or on the behalf of the Company relating to a prior forecast, estimate or projection of the Company's earnings or sales made by or on behalf of the Company, which statement  or disclosure represents a greater than 15% change from such prior forecast, estimate or projection.

(g)  "Loss" means damages, judgments, settlements and Defense Costs; however, Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Further, with respect to Coverage B only, Loss shall not include damages, judgments or settlements arising out of a Claim alleging that the Company paid an inadequate or unfair price or consideration for the purchase of its own securities or the securities of a Subsidiary.

Notwithstanding the foregoing, with respect to Coverage B(i) only and subject to the other terms, conditions and exclusions of the policy, Loss shall include punitive damages (if insurable by law) imposed upon the Company.

62335 (5/95)                            3

(h)  "No Liability" means, with respect to a Securities Claim made against the Insured(s): (1) a final judgment of no liability obtained prior to trial, in favor of all Insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all Insureds, after exhaustion of all appeals. In no event shall the term "No Liability" apply to a Securities Claim made against an insured for which a settlement has occurred.

(i)  "Outside Entity" means:

(1)  a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

(2)  any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(j)  "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy; however, to the extent that coverage under this policy replaces coverage in other policies terminating at noon standard time on the inception date of such coverage hereunder, then such coverage as is provided by this policy shall not become effective until such other coverage has terminated.

(k)  "Securities Claim" means a Claim made against an Insured which alleges a violation of the Securities Act of 1933 or the Securities Exchange Act of 1934, rules or regulations promulgated thereunder, the securities laws of any state, or any foreign jurisdiction, and which alleges a Wrongful Act in connection with the claimant's purchase or sale of, or the offer to purchase or sell to the claimant, any securities of the Company, whether on the open market or arising from a public or private offering of securities by the Company.

(l)  "Subsidiary" means:

(1)  any corporation of which the Named Corporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries;

(2)  automatically any corporation whose assets total less than 10% of the total consolidated assets of the Company as of the inception date of this policy, which corporation becomes a Subsidiary during the Policy Period. The Named Corporation shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period;

(3)  any corporation which becomes a Subsidiary during the Policy Period (other than a corporation described in paragraph (2) above) but only upon the condition that within 90 days of its becoming a Subsidiary the Named Corporation shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Corporation paying when due any additional premium required by the Insurer relating to such new Subsidiary.

A corporation becomes a Subsidiary when the Named Corporation owns more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries. A corporation ceases to be a Subsidiary when the Named Corporation ceases to own more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to any Claim made against a Subsidiary or any Director or Officer thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary

(m)  "Wrongful Act" means:

(1)  with respect to Individual Directors or Officers, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company, or any matter claimed against them arising out of their serving as a director, officer, trustee or governor of an Outside Entity in such capacities, but only if such service is at the specific written request or direction of the Company.

(2)  with respect to the Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company, but solely as respects a Securities Claim.

3.  **EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of deceased Directors or Officers, and the legal representatives of Directors or Officers in the event of incompetency, insolvency or bankruptcy, who were Directors or Officers at the time the Wrongful Acts upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an Individual Director or Officer for all Claims arising solely out of his or her status as the spouse of an Individual Director or Officer, including a Claim that seeks damages recoverable from marital community property, property jointly held by the Individual Director or Officer and the spouse, or property transferred from the Individual Director or Officer to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an Individual Director or Officer, subject to the policy's terms, conditions and exclusions.

4.  **EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a)  arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b)  arising out of, based upon or attributable to: (1) profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law; or (2) payments to an Insured of any remuneration without the previous approval of the stockholders of the Company, which payment without such previous approval shall be held to have been illegal;

(c)  arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act;

The Wrongful Act of a Director or Officer shall not be imputed to any other Director or Officer for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(c)

62335 (5/95)                                6

(d)  alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)  alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

(f)  alleging, arising out of, based upon or attributable to a Listed Event that occurs no later than 90 days subsequent to the Continuity Date; provided, however, that this exclusion shall only apply with respect to coverage which would have otherwise been afforded under Coverage B(I) of the policy;

(g)  with respect to serving as a director, officer, trustee or governor of an Outside Entity, for any Wrongful Act occurring prior to the Continuity Date if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy;

(h)  alleging, arising out of, based upon or attributable to any actual or alleged act or omission of the Directors or Officers serving in their capacities as directors, officers, trustees or governors of any other entity other than the Company or an Outside Entity, or by reason of their status as directors, officers, trustees or governors of such other entity;

(i)  which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured or the Company; provided, however, this exclusion shall not apply to a wrongful termination of employment Claim brought by a former employee other than a former employee who is or was a Director of the Company;

(j)  for any Wrongful Act arising out of the Insured serving as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or by any director, officer, trustee or governor thereof; or which is brought by any security holder of the Outside Entity, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the Outside Entity, any director, officer, trustee or governor thereof, any Insured or the Company;

(k)  for bodily injury, sickness, disease, death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from libel or slander or defamation or disparagement, or for injury from a violation of a person's right of privacy;

(l) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

(1) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

(2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants;

including but not limited to a Claim alleging damage to the Company or its securities holders.

Pollutants include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

(m) for violation(s) of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974, or amendments thereto or any similar provisions of state statutory law or common law.

5. **LIMIT OF LIABILITY - (FOR ALL LOSS - INCLUDING DEFENSE COSTS)**

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period. Further, any Claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the Declarations.

Defense Costs are not payable by the Insurer in addition to the Limit of Liability. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.

6. **RETENTION CLAUSE**

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company and/or the Insureds and shall remain uninsured, with regard to all Loss under: (i) Coverage A or B(ii) for which the Company has indemnified or is permitted or required to indemnify the Director(s) or Officer(s) ("Indemnifiable Loss"); or (ii) Coverage B(i). A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

62335 (5/95)    8

Notwithstanding the foregoing, solely with respect to a Securities Claim under this policy, the Retention shall only apply to Defense Costs; provided, however, no Retention shall apply for a Securities Claim even as respects Defense Costs in the event of a determination of No Liability of all Insureds, and the Insurer shall thereupon reimburse such Defense Costs paid by the Insured.

7.  NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations.
If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

(a)  The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

   (1)  any time during the Policy Period or during the Discovery Period (if applicable); or

   (2)  within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)  If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(c)  If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons, and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

JUL-12-2004  10:46     KAUFFMAN BURGEEST & RYAN                         P.13

**8.  DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

Under both Coverage A and Coverage B of this policy, except as hereinafter stated, the insurer shall advance, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insurer does not, however, under this policy, assume any duty to defend. The Insureds shall defend and contest any Claim made against them. The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

The Insurer shall have the right to effectively associate with the Company and the Insureds in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured subject to such Insured's written consent. If any Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer.

The Company is not covered in any respect under Coverage A; the Company is covered, subject to the policy's terms and conditions, only with respect to its indemnification of its Directors or Officers under Coverage B(II) as respects a Claim against such Directors and Officers, and subject to the policy's terms and conditions, under Coverage B(I) for a Securities Claim made against the Company. Accordingly, the Insurer has no obligation under this policy for Defense Costs incurred by, judgments against or settlements by the Company arising out of a Claim made against the Company other than a covered Securities Claim, or any obligation to pay Loss arising out of any legal liability that the Company has to the claimant except as respects a covered Securities Claim against the Company.

62335 (5/95)                              10

JUL 12 2004  16:48     KAUFMAN, BORGEEST & RYAN                    P.16

With respect to (i) Defense Costs jointly incurred by, (ii) any joint settlement made by, and/or (iii) any adjudicated judgment of joint and several liability against the Company and any Director or Officer, in connection with any Claim other than a Securities Claim, the Company and the Director(s) or Officer(s) and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Company and the Director(s) or Officer(s) and the Insurer, taking into account the relative legal and financial exposures of and the relative benefits obtained by the Directors and Officers and the Company. In the event that a determination as to the amount of Defense Costs to be advanced under the policy cannot be agreed to, then the Insurer shall advance such Defense Costs which the Insurer states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

9.   PRE-AUTHORIZED SECURITIES DEFENSE ATTORNEYS

Only with respect to a Securities Claim:

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firms"). The list provides the Insured a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of any Securities Claim made against them.

The Insureds shall select a Panel Counsel Firm to defend a Securities Claim made against the Insureds in the jurisdiction in which the Securities Claim is brought. In the event a Securities Claim is brought in a jurisdiction not included on the list, the Insureds shall select a Panel Counsel Firm in the listed jurisdiction which is the nearest geographical jurisdiction to either where the Securities Claim is brought or where the corporate headquarters of the Named Corporation is located. In such instance the Insureds also may, with the consent of the Insurer, which consent shall not be unreasonably withheld, select a non-Panel Counsel Firm in the jurisdiction in which the Securities Claim is brought to function as "local counsel" on the Securities Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Securities Claim.

With the express prior written consent of the Insurer, an Insured may select a Panel Counsel Firm different from that selected by other insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Corporation. At the request of the Insured, the Insurer may in its discretion add to the attached list of Panel Counsel Firms for the purposes of defending a Securities Claim made against the Insured in any specified jurisdiction (including a jurisdiction not originally included in the Panel Counsel list) a Panel Counsel Firm not originally listed for such jurisdiction. The Insurer may in its discretion waive, in part or in whole, the provisions of this clause as respects a particular Securities Claim.

62335 (5/95)                            11

## 10. DISCOVERY CLAUSE

Except as indicated below, if the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right, upon payment of an additional premium of 75% of the "full annual premium", to a period of one year following the effective date of such cancellation or nonrenewal (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy.  As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.  The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal.

In the event of a Transaction, as defined in Clause 12, the Named Corporation shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Corporation may request.  The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide.  In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Corporation at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent.  This policy may also be canceled by or on behalf of the Insurer by delivering to the Named Corporation or by mailing to the Named Corporation, by registered, certified, or other first class mail, at the Named Corporation's address as shown in Item 1 of the Declarations, written notice stating when, not less than 60 days thereafter, the cancellation shall be effective.  The mailing of such notice as aforesaid shall be sufficient proof of notice.  The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Corporation, the Insurer shall retain the customary short rate proportion of the premium herein.

If this policy shall be canceled by the Insurer, the Insurer shall retain the pro rata proportion of the premium herein.

62336 (5/95)                                    12

Payment or tender of any unearned premium by the insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12.  CHANGE IN CONTROL OF NAMED CORPORATION

If during the Policy Period:

a.  the Named Corporation shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

b.  any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of Directors of the Named Corporation, or acquires the voting rights of such amount of such securities;

(either of the above events herein referred to as the "Transaction")

then this policy shall continue in full force and affect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction.  This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time.  The Named Corporation shall also have the right to an offer by the insurer of a Discovery Period described in Clause 10 of the policy.

The Named Corporation shall give the insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

## 13.  SUBROGATION

In the event of any payment under this policy, the insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the insurer to effectively bring suit in the name of the Company and/or the Insureds.  In no event, however, shall the insurer exercise its rights of subrogation against an insured under this policy unless such insured has been convicted of a criminal act, or been judicially determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such insured was not legally entitled.

62335 (5/95)                                    13

14.  OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

In the event of a Claim against a Director or Officer arising out of his or her serving as director, officer, trustee or governor of an Outside Entity, coverage as is afforded by this policy shall be specifically excess of Indemnification provided by such Outside Entity and any Insurance provided to such Outside Entity with respect to its directors, officers, trustees or governors. Further, in the event such other Outside Entity insurance is provided by the Insurer or any member company of American International Group, Inc. ("AIG") (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the maximum aggregate Limit of Liability for all Losses combined covered by virtue of this policy as respects any such Claim shall be reduced by the limit of liability (as set forth on the declarations page) of the other AIG insurance provided to such Outside Entity.

15.  NOTICE AND AUTHORITY

It is agreed that the Named Corporation shall act on behalf of its Subsidiaries and all Insureds with respect to the giving notice of Claim or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.

16.  ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

17.  ARBITRATION

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, shall be submitted to the American Arbitration Association under and in accordance with its then prevailing commercial arbitration rules. The arbitrators shall be chosen in the manner and within the time frames provided by such rules. If permitted under such rules the arbitrators shall be three disinterested individuals having knowledge of the legal, corporate management or insurance issues relevant to the matters in dispute.

Any party may commence such arbitration proceeding in either New York, New York; Atlanta, Georgia; Chicago, Illinois; or Denver, Colorado. The arbitrators shall give due consideration to the general principles of Delaware law in the construction and interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an evenhanded fashion as between the parties, including without limitation, where the language of this policy is alleged to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy (without regard to the authorship of the language, the doctrine of reasonable expectation of the parties and without any presumption or arbitrary interpretation or construction in favor of either party or parties, and in accordance with the intent of the parties.)

The written decision of the arbitrators shall be provided to both parties and shall be binding on them. The arbitrators' award shall not include attorney fees or other costs.

Each party shall bear equally the expenses of the arbitration.

## 18.   ACTION AGAINST INSURER

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insureds' obligation to pay shall have been finally determined either by judgment against the insureds after actual trial or by written agreement of the insureds, the claimant and the insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the insureds or the Company to determine the insureds' liability, nor shall the insurer be impleaded by the insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the insureds or of their estates shall not relieve the insurer of any of its obligations hereunder.

## 19.   HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

62335 (5/95)                              15

This page intentionally left blank

JUL-12-2004  10:44        KHUMMN, BURGEESI & RYHN              9147410025    P.02

## ENDORSEMENT# 1

This endorsement, effective *12:01 am     December 31, 2001*     forms a part of
policy number   *874-91-08*
Issued to *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

Wherever used in this endorsement: 1) "we", "us", "our", and "insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named insured", "First Named Insured", and "insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or insured stated in the declarations page; and 3) "Other insured(s)" means all other persons or entities afforded coverage under the policy.

### WASHINGTON, D.C.
### CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)     Cancellation

     If this policy has been in effect for thirty (30) days or more, the insurer may cancel this policy only if one or more of the following reasons apply:

     1)     Insured has refused or failed to pay a premium due under the terms of the policy;

     2)     Insured or Other insured(s) have made a material and willful misstatement or omission of fact to the insurer or its employees, agents or brokers in connection with any application to, or claim against the insurer; or

     3)     Property or other interest of the insured shall have been transferred to a person other than the insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

     The insurer will mail or deliver to the named insured notice of cancellation at least thirty (30) days prior to the date of cancellation. For cancellation as described under 2) and 3) above, the insurer will mail or deliver a copy of the notice to the Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)     Nonrenewal

     If the insurer decides not to renew this policy the insurer will mail or deliver to the named insured the insurer's notice of nonrenewal at least thirty (30) days before the end of the policy period.

     The insurer will mail or deliver notice of cancellation or nonrenewal to the agent or broker at least five (5) days prior to the insurer's mailing of notice to the named insured.

*END 001*

52136 (8/95)                                    - 1 -

## ENDORSEMENT# 1  (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

AUTHORIZED REPRESENTATIVE

*END 001*

52138 (8/95)                                    - 2 -

ENDORSEMENT# 2

This endorsement, effective *12:01 am*      *December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

CAPTIVE INSURANCE COMPANY EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payments for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon, attributable to the ownership, management, maintenance, operation and/or control by the Company of any captive insurance company or entity including but not limited to any Claim(s) alleging the insolvency or bankruptcy of the Named Corporation as a result of such ownership, operation, management and control.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 2*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

## ENDORSEMENT# 3

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### COMMISSIONS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon, or attributable to:

    (i)    Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign government or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated; or

    (ii)    Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, principal shareholders, or owners or employees, or "affiliates" (as that term is defined in The Securities Exchange Act of 1934, including any officers, directors, agents, owners, partners, representatives, principal shareholders or employees of such affiliates) of any customers of the company or any members of their family or any entity with which they are affiliated; or

    (iii)    Political contributions, whether domestic or foreign.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 3*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

## ENDORSEMENT# 4

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
Issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NUCLEAR ENERGY LIABILITY EXCLUSIONS ENDORSEMENT
### (BROAD FORM)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured(s):

A.  alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

    (1)  nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Company, or discharged or dispersed therefrom; or

    (2)  nuclear material contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Company; or

    (3)  the furnishing by an Insured or the Company of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

    (4)  claims for damages to the Company or its shareholders which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B.  (1)  which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its Limit of Liability; or.

    (2)  with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

*END 004*

<u>ENDORSEMENT# 4</u>  (Continued)

. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means —

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.


All other terms, conditions and exclusions remain unchanged.




AUTHORIZED REPRESENTATIVE


*END 004*

62739 (5/95)                              — 2 —                                   EDO592

## ENDORSEMENT# 5

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PUNITIVE DAMAGES FOR SECURITIES CLAIMS

In consideration of the premium charged, it is hereby understood and agreed that the third paragraph of the Definition of Loss is deleted in its entirety and replaced by the following:

> Notwithstanding the foregoing, solely with respect to Securities Claims, Loss shall include (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to personal profit or advantage, illegal remuneration, deliberate fraud or criminal acts) punitive and/or exemplary damages imposed upon any Insured.

It is further understood and agreed that the enforceability of this endorsement shall be governed by such applicable law that most favors coverage for punitive damages.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 5*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

## ENDORSEMENT# 6

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
Issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PRIOR ACTS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to MFS Communications Company, Inc., the Insurer shall not be liable to make any payment for Loss arising from a Claim alleging a Wrongful Act which occurred prior to September 30, 1995. This policy only provides coverage for Loss arising from a Claim alleging a Wrongful Act occurring on or after September 30, 1995 and prior to the end of the Policy Period and otherwise covered by this policy. Loss(es) arising out of the same or relate Wrongful Act(s) shall be deemed to arise from the first such same or related Wrongful Act.

All other terms, conditions and exclusions remain unchanged.

*END 6*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

## ENDORSEMENT# 7

This endorsement, effective *12:01 am*      *December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### POLLUTION A-SIDE SHAREHOLDER CLAIM COVERAGE

In consideration for the premium charged, it is hereby understood and agreed that as
respects any Claim(s) under Coverage A of this policy only, exclusion (l) of the policy
entitled EXCLUSIONS shall not apply to:

Any non-Indemnifiable Loss arising from a Claim(s) which is brought by a
shareholder of the Company in the form of a shareholder direct, derivative or class
action, but only if such Claim(s) is instigated and continued totally independent of,
and totally without the solicitation of, or assistance of, or active participation of, or
intervention of, any natural person Insured(s) or the Company, or any subsidiary or
affiliate of the Company.

Further provided that for the purposes of the applicability of the coverage provided
under this endorsement, the Company will be conclusively deemed to have
indemnified the Directors or Officers to the extent that the Company is permitted or
required to grant such indemnification pursuant to law, common or statutory, or
contract or the charter or by-laws of the Company (which are hereby deemed to
adopt the broadest provisions of the law which determines or defines such rights of
indemnity). The Company hereby agrees to indemnify the Directors or Officers to
the fullest extent permitted by law including the making in good faith of any
required application for court approval. In no event shall this endorsement be
construed to apply to any Claim(s) in which the Company has indemnified or is
permitted or required to indemnify the Insureds.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 7*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 8

This endorsement, effective  *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## COINSURANCE FOR SECURITIES CLAIMS

In consideration of the premium charged, it is hereby understood and agreed that solely as respects Securities Claims, the following clause is added to the policy:

### COINSURANCE CLAUSE

With respect to Loss under: (i) Coverage B(ii) for which the Company has indemnified or is permitted or required to indemnify the natural person Insured(s), as defined in subparagraphs (1) and (3) of the Definition of "Director(s) or Officer(s) or Insured(s)", pursuant to law, common or statutory, or contract or the Charter or Bylaws of the Company ("Indemnifiable Loss") or (ii) Coverage B(ii), the Insurer shall be liable to pay 80% of such Loss, excess of the retention amount described in Item 5 of the Declarations as respects the first $10,000,000 Limit of Liability described in Item 4 of the Declarations, it being a condition of this insurance that the remaining 20% of each and every such Loss shall be carried by the Insured(s) at their own risk and be uninsured.

With respect to all Loss other than Loss described in the above paragraph, ("non-Indemnifiable Loss") the Insurer shall be liable to pay 100% of such Loss, excess of the retention amount described in Item 5 of the Declarations up to the Limit of Liability described in Item 4 of the Declarations.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 8*

(2/90)

AUTHORIZED REPRESENTATIVE

## ENDORSEMENT# 9

This endorsement, effective *12:01 am*      *December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SECURITIES CLAIM DEFINITION AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the definition of "Securities Claim" is hereby deleted in its entirety and replaced with the following:

"Securities Claim" means a Claim, other than an administrative or regulatory proceeding against, or investigation of a Company, made against any Insured:

(1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

(i) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of a Company; or

(ii) brought by a security holder of a Company with respect to such security holder's interest in securities of a Company; or

(2) brought derivatively on the behalf of a Company by a security holder of such Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.

*END 9*

AUTHORIZED REPRESENTATIVE

(2/80)

JUL-12-2004   10:45        KAUFMAN, BORGEEST & RYAN                9147410025      P.13

<u>ENDORSEMENT# 10</u>

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number   *874-91-08*
issued to   *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FAILURE TO EFFECT AND/OR MAINTAIN
### INSURANCE EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable for any Loss in connection with any Claim(s) made against any
Insured alleging, arising out of, based upon, attributable to any failure or omission on the
part of the Insureds or the Company to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 10*

(2/90)

_____
AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 11

This endorsement effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
Issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

"NO LIABILITY" PROVISION DELETED

In consideration of the premium charged, it is hereby understood and agreed that the
policy is hereby amended as follows:

(1)    The Definition of and all provisions referring to "No Liability" are hereby
deleted in their entirety; and

(2)    The last paragraph of Clause 6  RETENTION CLAUSE is hereby deleted in its
entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 11*

AUTHORIZED REPRESENTATIVE

(2/90)

## ENDORSEMENT# 12

This endorsement, effective *12:01 am      December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### CrisisFundsm

#### (Crisis Communications Management Insurance)

In consideration of the premium charged, it is hereby understood and agreed that this policy
is amended to provide Crisis Management Coverage pursuant to the terms and conditions set
forth below:

1)    The Clause of the policy entitled INSURING AGREEMENTS is amended to add the
following new insuring agreement:

**CRISIS MANAGEMENT COVERAGE**

This policy shall pay the Crisis Management Loss of the Company arising from a Crisis
Management Event first commencing during the Policy Period, up to the amount of
the Crisis Management Fund.

2)    The Section of the policy entitled EXCLUSIONS shall not be applicable to Crisis
Management Loss.

3)    The Section of the policy entitled LIMIT OF LIABILITY, is amended to add the
following:

> The limit of the Insurer's liability for Crisis Management Loss arising from all
> Crisis Management Events occurring during the Policy Period, in the aggregate,
> shall be the amount set forth as the Crisis Management Fund. This limit shall
> be the maximum limit of the Insurer under this policy regardless of the number
> of Crisis Management Events occurring during the Policy Period. Provided,
> however, that this single Crisis Management Event(s) limit shall be part of and
> not in addition to the Limit of Liability stated in the Item of the Declarations
> page entitled LIMIT OF LIABILITY, which shall in all events be the maximum
> liability of the Insurer for all loss under this policy.

4)    There shall be no Retention amount applicable to Crisis Management Loss, and the
Insurer shall pay such Loss from first dollar subject to the other terms and conditions
of this endorsement.

5)    An actual or anticipated Crisis Management Event shall be reported to the Insurer as
soon as practicable but in no event later than thirty (30) days after the Company first
incurs Crisis Management Loss for which coverage will be requested under this
endorsement.

*END 12*

{2/90}

## ENDORSEMENT# 12    (Continued)

This endorsement, effective *12:01 am      December 31, 2001*    forms a part of
policy number  *874-91-08*
Issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

6)    The Section of the policy entitled DEFENSE COSTS, SETTLEMENTS, JUDGMENTS
(INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) shall have no applicability to
Crisis Management Events. There shall be no requirement for the Company to obtain
prior written approval of the Insurer before incurring any Crisis Management Loss,
provided that the Crisis Management Firm selected by the Company to perform the
Crisis Management Services has been approved by the Insurer.

### Definitions

For the purposes of this endorsement, the following definitions shall apply:

A)    "Material Effect on the Company's Common Stock Price" shall mean, within a period
of 24 hours, that the price per share of the Company's common stock shall decrease
by the greater of $5 per share or 10% net of the change in the Standard & Poor's
Composite Index.

B)    "Crisis Management Event" shall mean:

I.    One of the following events which, in the good faith opinion of the Chief
Financial Officer of the Company, did cause or is reasonably likely to cause, a
Material Effect on the Company's Common Stock Price:

(1)    Negative earning or sales announcement

The public announcement of the Company's past or future earnings or
sales, which is substantially less favorable than any of the following: (i)
the Company's prior year's earnings or sales for the same period, (ii)
the Company's prior public statements or projections regarding earnings
or sales for such period, or (iii) an outside securities analyst's published
estimate of the Company's earnings or sales.

(2)    Loss of a patent, trademark or copyright or major customer or
contract

The public announcement of an unforeseen loss of: (i) the Company's
intellectual property rights for a patent, trademark or copyright, other
than by expiration; (ii) a major customer or client of the Company; or
(iii) a major contract with the Company.

END 12

(2/90)

### ENDORSEMENT# 12    (Continued)

This endorsement effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
Issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

    (3)   Product recall or delay

The public announcement of the recall of a major product of the
Company or the unforeseen delay in the production of a major product
of the Company.

    (4)   Mass tort

The public announcement or accusation that the Company has caused
the bodily injury, sickness, disease, death or emotional distress of a
group of persons, or damage to or destruction of any tangible group of
properties, including the loss of use thereof.

    (5)   Employee layoffs or loss of key executive officer(s)

The public announcement of employee layoffs, or the death or
resignation of one or more key executive officer(s) of the Company.

    (6)   Restatement of financial statement

The public announcement of a restatement of the Company's
previously filed financial statements.

    (7)   Elimination or suspension of dividend

The public announcement of the elimination or suspension of a regularly
scheduled dividend previously being paid by the Company.

    (8)   Write-off of assets

The public announcement that the Company intends to write off a
material amount of its assets.

    (9)   Debt restructuring or default

The public announcement that the Company has defaulted or intends to
default on its debt or intends to engage in a debt restructuring.

*END 12*

(2/90)

## ENDORSEMENT# 12    (Continued)

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of policy number  *874-91-08*
issued to  - *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### (10)  Bankruptcy

The public announcement that the Company intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the Company; or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

### (11)  Governmental or regulatory litigation

The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against the Company.

### (12)  Other

Any other event previously consented to by the Insurer which, in the good faith opinion of the Chief Financial Officer of the Company, did cause or is reasonably likely to cause, a Material Effect on the Company's Common Stock Price, but only if such event is specifically scheduled by written endorsement to the policy.

### II.  Unsolicited takeover bid

An unsolicited written offer or bid by any person or entity other than an Insured or any affiliate of any Insured, whether publicly announced or privately made to a director or executive officer of the Company, to effect a Transaction (as Transaction is defined in Clause 12 of the policy) of the Company.

Provided, however, that the term Crisis Management Event shall not include any event relating to:

(1)    any Claim(s) which have been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(2)    any pending or prior litigation as of December 31, 1996;

(3)    the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; provided, however, the

### *END 12*

(2/80)

ENDORSEMENT# 12    (Continued)

This endorsement, effective 12:01 am    December 31, 2001    forms a part of
policy number  874-91-08
issued to   WORLDCOM, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

foregoing shall not apply if the policy contains any endorsement modifying or
deleting, in part or in whole, exclusion (l) of the policy;

(4)   the hazardous properties of nuclear materials; provided, however, the
foregoing shall not apply to any Crisis Management Event(s) arising from the
ownership of, operation of, construction of, management of, planning of,
maintenance of or investment in any nuclear facility.

The descriptions in the headings of the Crisis Management Events are solely for convenience
and form no part of the terms and conditions of coverage.

For the purposes of this endorsement, a Crisis Management Event shall first commence when
the Company or any of its directors or executive officers shall first become aware of the
event and shall conclude at the earliest of the time when the Crisis Management Firm advises
the Company that the crisis no longer exists or when the Crisis Management Fund has been
exhausted.

C)    "Crisis Management Firm" shall mean any public relations firm, crisis management
firm or law firm hired by the Company or its directors, officers or employees to
perform Crisis Management Services in connection with the Crisis Management Event
which has been consented to by the Insurer, the consent for which shall not be
unreasonably withheld. Attached to this endorsement is a list of firms which have
been pre-approved by the Insurer and may be hired by the Company without further
approval by the Insurer;

D)    "Crisis Management Fund" shall mean Fifty Thousand Dollars ($50,000).

E)    "Crisis Management Loss" shall mean the following amounts incurred during the
pendency of or within 90 days prior to and in anticipation of, the Crisis Management
Event, regardless of whether a Claim is ever made against an Insured arising from the
Crisis Management Event and, in the case where a Claim is made, regardless of
whether the amount is incurred prior to or subsequent to the making of the Claim:

(1)    Amounts for which the Company is legally liable for the reasonable and
necessary fees and expenses incurred by a Crisis Management Firm in the
performance of Crisis Management Services for the Company arising from a
Crisis Management Event(s); and

(2)    Amounts for which the Company is legally liable for the reasonable and
necessary printing, advertising, mailing of materials, or travel by directors,

END 12

(2/90)

ENDORSEMENT# 12    (Continued)

This endorsement, effective *12:01* am    *December 31, 2001*    forms a part of
policy number *874-91-08*
issued to *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

officers, employees or agents of the Company or the Crisis Management Firm, in connection with the Crisis Management Event(s).

F)    "Crisis Management Services" means those services performed by a Crisis Management Firm in advising the Company or any of its directors, officers or employees on minimizing potential harm to the Company arising from the Crisis Management Event, including but not limited to maintaining and restoring investor confidence in the Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

END 12

(2/90)

JUL-12-2004  10:46    KAUFMAN, BURGEEST & RYAN    9147410025    P.21

ENDORSEMENT# *12*  (Continued)

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to ... *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PRE-APPROVED CRISIS MANAGEMENT FIRMS

(1)    Abernathy MacGregor Scanlon
       501 Madison Avenue
       New York, NY 10022
       (212) 371-5999
       Contact: James T. M⁻ Gregor

(2)    Burson-Marsteller
       230 Park Avenue South
       New York, NY 10003-1566
       (212) 614-5236
       Contact: Michael Claes

(3)    Patton Boggs, LLP
       2550 M Street, N.W.
       Washington, D.C. 20037
       (202) 457-6000
       Contact: Thomas H. Boggs

(4)    Kekst and Company
       437 Madison Avenue
       New York, NY 10022
       (212) 593-2655
       Contact: Andrew Baer

(5)    Kroll Associates
       900 Third Avenue
       New York, NY 10022
       (212) 833-3385
       Contact: Richard G. McCormick

(6)    Robinson Lerer & Montgomery
       75 Rockefeller Plaza , 6ᵗʰ floor
       New York, NY 10019
       (212) 484-7721
       Contact: Michael Gross

**END 12**

(2/90)

JUL-12-2004  10:47          KAUFMAN, BORGEEST & RYAN          914/416623      P.22

ENDORSEMENT# 12    (Continued)

This endorsement, effective  12:01 am    December 31, 2001    forms a part of
policy number  874-91-08
issued to  WORLDCOM, INC.

by  National Union Fire Insurance Company of Pittsburgh, Pa.


(7)    Sard Verbinnen & Co.
       630 Third Avenue
       New York, NY 10017
       (212) 687-8080
       Contact: Paul Verbinnen or George Sard

(8)    Sitrick & Company
       2029 Century Park East
       Suite 1750
       Los Angeles, CA 90067
       (310) 788-2850
       Contact: Michael Sitrick

(9)    The MWW Group
       1212 Avenue of the Americas - 5th Floor
       New York, NY 10036
       (212) 827-3757
       Contact: Michael Landenar


END 12                                    _____
                                          AUTHORIZED REPRESENTATIVE

(2/90)

JUL-12-2004  10:47        KAUFMAN, BORGEEST & RYAN        514141002J

## ENDORSEMENT# 13

This endorsement, effective  *12:01 am*        *December 31, 2001*        forms a part of
policy number  *874-91-08*
Issued to  *WORLDCOM, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### EMPLOYEES AS CO-DEFENDANTS

In consideration of the premium charged, it is hereby understood and agreed that coverage
as is afforded by this policy is extended to and the definition of "Insured(s)", and
"Director(s) or Officer(s)" is amended to include all employees of the Insured when they
are named as co-defendants in a suit or other legal action with a Director or Officer of the
Insured.

Only when and to the extent that the Company has indemnified such employees for such
Loss pursuant to law, common or statutory, or contract, or the Charter or By-Laws of the
Company duly effective under such law which determines and defines such rights of
indemnity.

*END 13*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

JUL-12-2004  10:47          KAUFMAN BORGEEST & RYAN          9141410025      P.24

ENDORSEMENT# 14

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PRIOR ACTS EXCLUSION FOR LISTED ENTITIES

In consideration of the premium charged, it is hereby understood and agreed that the term
Company is amended to include the entity(ies) listed below, but only for Wrongful Act(s)
committed by such entity(ies) and/or any Insureds thereof which occurred subsequent to
such entity's respective acquisition/creation date listed below. Losses arising from the
same or related Wrongful Act(s) shall be deemed to arise from the first such same or
related Wrongful Act(s).

| LISTED ENTITY(IES) | ACQUISITION/CREATION DATE |
|---|---|
| 1.  Advanced Telecommunications | January 01, 1983 |
| 2.  IBD Communication Group | December 30, 1984 |
| 3.  WIL Tel Network Services | January 05, 1995 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 14*

{2/90}

AUTHORIZED REPRESENTATIVE

JUL-12-2004  10:49      KHUMMHN, BURGEEST & RYHN           5141410025   1.40

ENDORSEMENT# 15 . (Continued)

This endorsement, effective *12:01* am    *December 31, 2001*    forms a part of
policy number   *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

It is further understood and agreed that the Insurer shall not be held responsible for any delay or failure to perform its obligation hereunder due to national, federal, state or municipal action or regulation; strikes or other labor troubles; acts of God, war, riot, insurrection or mutiny; or any other causes, contingencies, or circumstances outside the United States not subject to the Insurer's control which make the fulfillment of this endorsement impracticable; any of which shall, without liability, excuse the insurer from the obligations set forth in this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 15*

AUTHORIZED REPRESENTATIVE

(2/80)

JUL-12-2004  18:49       KAUFMAN, BORGEEST & RYAN              5147410025     P.55

## ENDORSEMENT# 16

This endorsement, effective *12:01 am*       *December 31, 2001*       forms a part of
policy number   *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SUB-LIMIT FOR SPECIFIED SUBSIDIARIES

In consideration of the premium charged, it is hereby understood and agreed that with
regards to Loss in connection with all claims in which one or more of the persons claimed
against are Directors or Officers of the following Subsidiary(ies): Advantage Companies,
Inc. for one or more alleged Wrongful Acts occurring prior to August 11, 1989 in their
respective capacities as Directors or Officers of such Subsidiary(ies), the aggregate Limit
of Liability for all such claims shall be $1,000,000 (hereinafter called the "sub-limit" of
liability"). This sublimit of liability shall be part of and not in addition to the aggregate limit
of liability stated in Item 4 of the Declarations and will in no way serve to increase the
Insurer's Limit of Liability as therein stated. Claims alleging one or more related or same
Wrongful Act shall be deemed to arise out of the first such same or related Wrongful Act.

It is further understood and agreed that exclusion 9ll is deleted to the extent coverage is
afforded under this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 16*

                                              _____
                                              AUTHORIZED REPRESENTATIVE

(2/90)

JUL-12-2004  10:49        KHUFMAN, BURDEEST & KIRN                        5147410025    P.55

ENDORSEMENT# 17

This endorsement, effective *12:01 am*  *December 31, 2001*   forms a part of
policy number  *874-91-08*
issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

SUBSIDIARY – ADDITION

TO THE DEFINITION OF "SUBSIDIARY"

In consideration of the premium charged, it is hereby understood and agreed that the
Definition of "Subsidiary" is hereby amended to include the following entity(ies), subject to
such Subsidiary's respective Continuity Date.

| SUBSIDIARY | CONTINUITY DATE |
|---|---|
| CAI Wireless Communications, Inc. | July 9, 1999 |
| Embratel | September 15, 1998 |
| MCI Communications Corporation | September 15, 1998 |
| Skytel | April 30, 2001 |

For the purpose of the applicability of the coverage provided by this endorsement, the
entities listed above and the Company will be conclusively deemed to have indemnified the
Insureds of the each respective entity to the extent that such entity or the Company is
permitted or required to indemnify such Insureds pursuant to law, common or statutory, or
contract, or its charter or by-laws. The entity and the Company hereby agree to indemnify
the Insureds to the fullest extent permitted by law, including the making in good faith of
any required application for court approval.

Furthermore, for the purpose of the applicability of the coverage provided by this
endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s)
made against any Subsidiary listed above or any Insured(s) thereof:

(1)    alleging, arising out of, based upon or attributable to any pending or prior
        litigation(s) as of such Subsidiary's respective Continuity Date, or alleging or
        derived from the same or essentially the same facts as alleged in such
        pending or prior litigation(s); or

(2)    alleging any Wrongful Act occurring prior to such Subsidiary's respective
        Continuity Date, if an Insured knew or could have reasonably foreseen that
        such Wrongful Act could lead to a Claim under this policy.

*END 17*

(2/90)

JUL-12-2004  10:48      KHUFMHN, BURGEEST & RYHN                314741002J    P.54

This endorsement, effective *12:01 am    December 31, 2001*   forms a part of policy number  *874-91-08*
Issued to  *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

(2)    Exclusion (k) is amended by deleting the phrase, "emotional distress", and by deleting the phrase, "or for injury from libel or slander or defamation or disparagement, or for injury from a violation of a person's right of privacy", to read as follows:

   (k)    for bodily injury, sickness, disease, death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

It is further understood and agreed that solely in connection with Employment Practices Claims, the following exclusions shall apply:

   (1)    The Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon or attributable to any pending or prior litigation as of August 19, 1994 or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

   (2)    The Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured(s) for any alleged Wrongful Act committed prior to August 19, 1994 if any Insured(s), as of such date, knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim.

It is further understood and agreed that the Employment Practices coverage as is provided by this endorsement shall be specifically excess over the Limit of Liability of $25,000,000 as stated in Policy No. 874-33-15 issued by National Union fire Insurance Company of Pittsburgh, Pa. to Worldcom, Inc. .

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 18*

(2/90)    *COPY*

AUTHORIZED REPRESENTATIVE

## ENDORSEMENT# 18    (Cor...nued)

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number *874-91-08*
issued to *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

2.    Americans with Disabilities Act of 1992 (ADA);

3.    Civil Rights Act of 1991;

4.    Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990;

5.    Title VII of the Civil Rights Act of 1964, as amended, including the Pregnancy Discrimination Act of 1978;

6.    Civil Rights Act of 1866, Section 1981; and

7.    Fourteenth Amendment of the U.S. Constitution.

(2)    Solely for the purposes of Employment Practices Claims, the terms "Insured(s)" and "Director(s) or Officer(s)" shall also include any past, present or future employee of the Company, whether such individual is in a supervisory, co-worker or subordinate position or otherwise. Coverage shall automatically apply to all new employees after the inception date of the policy.

### *EXCLUSIONS*

It is further understood and agreed that solely in connection with Employment Practices Claims exclusions (i) and (k) are amended as follows:

(1)    Exclusion (i) is amended by deleting the phrase, "wrongful termination of employment claims", and substituting the phrase, "Employment Practices Claims" (as defined in this endorsement) and by deleting the word "former employee" and substituting the word "employee" to read as follows:

(i)    which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured(s); provided, however, this exclusion shall not apply to an Employment Practices Claim brought by an employee other than an employee who is or was a Director of the Company.

*END 18*

(2/90)    *COPY*

JUL-12-2004  10:49        KHUFMHN, BURUEESI & RYHN              514(410025      P.05

ENDORSEMENT# 18    (Continued)

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to  *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Judgments, Settlements and Defense Costs (Indemnifiable Loss) | $5,000,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts |

OTHER CLAIMS:

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |
| Judgments, Settlements and Defense Costs (Indemnifiable Loss) | $5,000,0000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts |

## *DEFINITIONS*

It is further understood and agreed that for the purposes of this endorsement only, the following definitions shall apply:

(1)    "Employment Practices Claims" means any Claim(s) relating to a past, present or prospective employee of the Company for any actual or alleged: (i) wrongful dismissal, discharge or termination (either actual or constructive) of employment; (ii) employment-related misrepresentation; (iii) wrongful failure to employ or promote; (iv) wrongful deprivation of career opportunity; (v) wrongful discipline; (vi) failure to grant tenure or negligent employee evaluation; (vii) failure to provide adequate employee policies and procedure; (viii) sexual or workplace harassment of any kind, (including the alleged creation of a harassing workplace environment); or (ix) unlawful discrimination, whether direct, indirect, intentional or unintentional.

Employment Practices Claims shall include any Claim(s) brought under state, local, federal or foreign law (whether common or statutory) and shall include, but not be limited to, allegations of violations of the following federal laws (as amended), including regulations promulgated thereunder:

1.    Family and Medical Leave Act of 1993;

*END 18*

(2/90)    *COPY*

JUL-12-2004  10:49       KAUFMAN, BORGEEST & RYAN       914-410023

ENDORSEMENT# 18

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number    *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### EMPLOYMENT PRACTICES ENDORSEMENT

(With Separate Retention and Excess Language)

#### *COVERAGE*

- In consideration of the premium charged, it is hereby understood and agreed that the coverage as is afforded by this policy is extended to include Employment Practices Claims made against any Insured(s) (defined below), whether such Claims are brought by: (i) a past, present or prospective employee of the Company, whether directly or by class action; or (ii) by the Equal Employment Opportunity Commission (EEOC) or any other similar local, state, federal or foreign governmental authority regulating employment practices; or (iii) by any other person or entity, subject to the terms, conditions and exclusions of this endorsement and the policy.

### DECLARATIONS PAGE

It is further understood and agreed that Item 5. RETENTION of the Declarations page is hereby deleted in its entirety and replaced with the following:

ITEM 5.    RETENTION:

#### SECURITIES CLAIMS

| | |
|---|---|
| Judgments & Settlements (all coverages) | None |
| Defense Costs (non-Indemnifiable Loss) | None |
| Defense Costs (Coverage B(i) and Indemnifiable Loss ) | $5,000,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

#### EMPLOYMENT PRACTICES CLAIMS

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |

## END 18

(2/90)

JUL-12-2004  10:45    KHUFFMAN, BURGEESI & RYAN    5147410025    P.05

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of policy number *874-91-08*
issued to   *WORLDCOM, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### Cancellation Clause

In consideration of the premium  charged, it is hereby  understood  and  agreed that notwithstanding any other provision of this endorsement, any provision of this policy respecting cancellation is deleted in  its entirety except to  indicate that this policy  may be cancelled by the insurer for non-payment of premium.

Accordingly, this policy is non-cancellable and all premium shall be deemed earned at inception except for cancellations by the insurer for non-payment of premium.

*END 19*

(2/90)

AUTHORIZED REPRESENTATIVE

JUL-12-2004  10:40        KAUFMAN, BORGEEST & RYAN        5147410023        P.02

## ENDORSEMENT# 20

This endorsement, effective 12:01 am      December 31, 2001      forms a part of
policy number  874-91-08
issued to   WORLDCOM, INC.

by     National Union Fire Insurance Company of Pittsburgh, Pa.

### ORDER OF PAYMENTS ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that:

1.  In the event of Loss arising from any Claim(s) for which payment is due
    under the provisions of this policy but which Loss, in the aggregate, exceeds
    the remaining available Limit of Liability of this policy, then this policy shall:

    (i)    first pay such Loss for which coverage is provided under
           Coverage A of the policy, then with respect to whatever
           remaining amount of the Limit of Liability is available after
           payment of such Loss,

    (ii)   then pay such Loss for which coverage is provided by
           Coverage B of the policy.

2.  In the event of Loss arising from a Claim(s) for which payment is due under
    the provisions of this policy (including those circumstances described in part
    1 of this endorsement), the Insurer shall at the written request of the Named
    Corporation:

    (i)    first pay such Loss for which coverage is provided under
           Coverage A of the policy, then

    (ii)   either pay or hold payment for such Loss for which coverage
           is provided by Coverage B of the policy.

    In the event that the Insurer withholds payment under Coverage B of the
    policy pursuant to the above request, then the Insurer shall at any time in
    the future, at the request of the Company, release such Loss payment to the
    Company, or make such Loss payment directly to an individual Director or
    Officer in the event of covered Loss under any Claim(s) covered under this
    policy pursuant to Coverage A of the policy.

3.  Nothing in this endorsement shall be construed to increase the Limit of
    Liability of the Insurer under this policy which such Limit of Liability shall
    remain the maximum liability of the Insurer under all Claims under all
    Coverage under this policy combined.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 20*

AUTHORIZED REPRESENTATIVE

(2/90)

JUL-12-2004  10:48        KAUFMAN, BORGEEST & RYAN                914741B025    P.31

ENDORSEMENT# 27

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number  *874-91-08*
issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CLAUSE 7(a) AMENDED - NOTICE

## FROM RISK MANAGER OR GENERAL COUNSEL

In consideration of the premium charged, it is hereby understood and agreed that Clause 7. NOTICE/REPORTING PROVISIONS, paragraph (a) is deleted in its entirety and replaced with the following:

(a)    The Company shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured as soon as practicable after the Claim is reported to or first becomes known by the Risk Manager or the General Counsel (or equivalent position) of the Company, but in all events a Claim must be reported no later than either:

(1)    anytime during the Policy Period or during the Discovery Period (if applicable); or

(2)    within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim(s) is reported no later than thirty (30) days after the date such Claim was first made against an Insured.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 21*

AUTHORIZED REPRESENTATIVE

(2/90)

JUL-12-2004  10:48        KHUMMHN, BURUEESI & KIHN              5147410023   P.30

**ENDORSEMENT# 22**

This endorsement, effective  *12:01 am      December 31, 2001*    forms a part of
policy number  *874-91-08*
Issued to    *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FOREIGN CORRUPT PRACTICES ACT EXTENSION

I.

In consideration of  the premium charged,  it is hereby understood  and agreed that Clause
2. DEFINITIONS (g) "Loss" is amended by addition of the following at the end thereof:

> Loss shall also include  (subject to this  policy's other terms,  conditions and
> limitations, including but not  limited to exclusions  relating to  profit or  advantage,
> deliberate fraud or deliberate criminal acts):  (1) civil penalties assessed against  any
> individual Director or  Officer pursuant to Sections  (g) 2(B)  of the  Foreign Corrupt
> Practices Act, 78dd-2(g)(2)(B).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 22*

(2/90)

AUTHORIZED  REPRESENTATIVE

JUL-12-2004  10:47          KAUFMAN, BORGEEST & RYHN          5147410025          P.25

## ENDORSEMENT# 23

This endorsement, effective *12:01 am*     *December 31, 2001*     forms a part of
policy number   *874-91-08*
issued to    *WORLDCOM, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ADDITION TO THE TERM DIRECTOR OR OFFICER

In consideration of the premium charged, it is hereby understood and agreed that the term
"Director or Officer" is amended to include any individual(s) of the Company listed below,
but solely for Wrongful Acts committed in his or her respective capacity(ies) listed below.

| INDIVIDUALS | CAPACITY | CONTINUITY DATE |
|---|---|---|
| Jeff Rushton | CFO of SHL Systemhouse | December 8, 1998 |

It is hereby understood and agreed that this *policy* shall indemnify the *directors* and
*officers* against *loss* in respect of any *wrongful act* committed whilst acting in the capacity
of a shadow director, as defined under Section 741 of the Companies Act 1985, of any
company (any such company hereinafter to be referred to as the "Shadow Directorship
company") that is incorporated and/or domiciled in the UK or the Republic of Ireland, as a
consequence of being a *director* or *officer* of the *company*, other than in respect of any:

(i)     *claim* made whether in the name of or on behalf of any Shadow Directorship
        company or any person who is now or shall be a director or officer of the Shadow
        Directorship company; and/or

(ii)    *claim* made whether in the name of or on behalf or any parent, holding, controlling,
        subsidiary, affiliate or associated company or representative of the Shadow
        Directorship company.

Furthermore, provided that for the purpose of the applicability of the coverage provided by
this endorsement, the Company will be conclusively deemed to have indemnified the
persons afforded coverage by this endorsement to the extent that the Company is
permitted or required to indemnify such persons pursuant to law (common or statutory),
contract, or the charter or by-laws of the Company (which are hereby deemed to adopt
the broadest provision of the law which determines, or defines such rights of indemnity).
The Company hereby agrees to indemnify such persons to the fullest extent permitted by
law, including the making in good faith of any required application for court approval and
the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted
by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection
with any Claim(s) made against an Insured:

(1)     alleging, arising out of, based upon or attributable to any pending or prior
        litigation as of each individual's respective Continuity Date listed above, or
        alleging or derived from the same or essentially the same facts as alleged in
        such pending or prior litigation; and

## END 23

(2/90)

JUL-12-2004  10:47        KAUFMAN, BORGEEST & RYAN              9147410025       P.28

This endorsement, effective *12:01 am*      *December 31, 2001*      forms a part of
policy number  *874-91-08*
issued to    *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

(2)     alleging any   Wrongful Act occurring prior to each individual's respective
Continuity Date if the Insured knew or could have reasonably foreseen that
such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 23*

AUTHORIZED REPRESENTATIVE

(2/90)

JUL-12-2004  10:47        KHUFFIHN: BURGEESI & KTHN        514141602J        r.2:

**ENDORSEMENT# 24**

This endorsement, effective  *12:01 am*        *December 31, 2001*        forms a part of
policy number   *874-31-08*
issued to    *WORLDCOM, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DISCOVERY CLAUSE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to the extent necessary for the policy to provide the following:

Clause 10. DISCOVERY CLAUSE is deleted in its entirety and replaced with the following:

10.    DISCOVERY CLAUSE

Except as indicated below, if the Insurer shall refuse to renew this policy, the Named Corporation shall have the right upon payment of an additional premium amount as shall be determined by the Insurer in its sole and absolute discretion, to a period of one year following the effective date of such nonrenewal (herein referred to as the "Discovery Period"), in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate unless written notice of election of a Discovery Period together with any additional premium due is received by the Insurer no later than thirty (30) days subsequent to the effective date of the nonrenewal.

In the event of a Transaction as defined in Clause 12, the Named Corporation shall have the right, within 30 days of the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Corporation may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions, exclusions and additional premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at inception of the Discovery Period.  The Discovery Period is not cancelable. This Clause 10 and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 24*

AUTHORIZED REPRESENTATIVE

(2/90)

JUL 12 2004   10:41   KROLL FIRM  BURGESS & KING

### ENDORSEMENT# 25

This endorsement, effective *12:01 am*    *December 31, 2001*    forms a part of
policy number   *874-91-08*
Issued to   *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ADDITION TO THE TERM "DIRECTOR(S) OR OFFICER(S)" OR "INSURED(S)"

In consideration of the premium charged, it is hereby understood and agreed that coverage as is afforded by this policy is extended to and the definition of term "Director(s) or Officer(s)" or "Insured(s)" is amended to include the members of the Advisory Board, solely in their capacity as such members, subject to the following September 15, 1998.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the Company is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The Company hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s) made against an Insured:

    (1)    alleging, arising out of, based upon or attributable to any pending or prior litigation as of each individual's respective Continuity Date listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

    (2)    alleging any Wrongful Act occurring prior to each individual's respective Continuity Date if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

*END 25*

_____

AUTHORIZED REPRESENTATIVE

(2/90)

ENDORSEMENT# 26

This endorsement, effective *12:01 am    December 31, 2001*    forms a part of
policy number *874-91-08*
Issued to *WORLDCOM, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ADDITION TO THE TERM "DIRECTOR(S) OR OFFICER(S)" OR "INSURED(S)"
### (GENERAL COUNSEL)

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. DEFINITIONS, Definition of "Director(s) or Officer(s)" or "Insured(s)" is hereby amended to include the General Counsel of the Named Corporation, subject to the following Continuity Date: September 15, 1998.

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the Company is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The Company hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim(s) made against an Insured:

(1)    alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

(2)    alleging any Wrongful Act occurring prior to the Continuity Date listed above, if the Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 26*

_____
AUTHORIZED REPRESENTATIVE

(2/90)

JUL-12-2004  10:45    KAUFMANN, BURGEESI & RYAN    P.22

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

### Alaska

Davis Wright Tremaine
550 W. Seventh Avenue, Suite 1450
Anchorage, AK  99501
Contact:
David W. Oesting          (907) 257-5300

Foster Pepper & Shefelman
601 West Fifth Avenue #500
Anchorage, AK  99501-2226
Contact:
Peter S. Erlichman
Stellman Keehnel
Tim Filer               (206) 447-8998

### California

Brobeck, Phleger & Harrison LLP
Spear Street Tower
One Market
San Francisco, CA 94105
Contact:
Kevin P. Muck
Michael D. Torpey
Sara B. Brody
Tower C Snow Jr.        (415) 442-0900

Brobeck, Phleger & Harrison LLP
550 South Hope Street
Los Angeles, CA 90071
Contact:
Daniel J. Tyukody
Howard M. Privette      (213) 489-4060

Brobeck, Phleger & Harrison LLP
550 West C Street, Ste. 1300
San Diego, CA 92101
Contact:
Christopher H. McGrath
William F. Sullivan     (619) 234-1966

Brobeck, Phleger & Harrison LLP
Two Embarcadero Place
2200 Geng Road
Palo Alto, CA 94303
Contact: David M. Furbush
Meredith N. Landy       (650) 424-0160

Cooley Godward, LLP
4365 Executive Drive, Suite 1100
San Diego, CA 92121
Contact:
William E. Grauer       (858) 550-6050

Cooley Godward, LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Contact:
Stephen C. Neal         (650) 843-5182
William S. Freeman      (650) 843-5037

Cooley Godward, LLP
One Maritime Plaza, 20th Floor
San Francisco, CA 94111
Contact:
Paul A. Renne           (415) 693-2073
Gordon C. Atkinson      (415) 693-2088

Davis Wright Tremaine
Suite 600
One Embarcadero Center
San Francisco, CA 94111-3834
Contact:
Martin Fineman          (415) 276-6500

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Contact:
Philip Bosl             (213) 229-7543

Gibson, Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza
Irvine, CA 92614-8557
Contact:
Wayne W. Smith          (714) 451-4108

Gibson, Dunn & Crutcher LLP
525 University Ave., Ste. 220
Palo Alto, CA 94301
Contact:
John C. Dickey          (415) 463-7324

Heller, Ehrman, White & McAuliffe
333 Bush Street
San Francisco, CA 94104
Contact:
Douglas M. Schwab
M. Laurence Popofsky
Michael J. Shepard      (415) 772-6000

Heller, Ehrman, White & McAuliffe
525 University Avenue
Palo Alto, CA 94301
Contact:
Michael L. Charlson
Norman J. Blears        (650) 324-7000

(Revised (6/00)                    1

JUL-12-2004   10:49        KAUFMAN BURGESS & KIM

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

Heller, Ehrman, White & McAuliffe
4250 Executive Square
7th Floor
San Diego, CA 92037-9103
Contact:
David E. Kleinfeld          (858) 450-8400

Heller, Ehrman, White & McAuliffe
601 South Figueroa Street, 40th Fl.
Los Angeles, CA 90017-5758
Contact:
Jerry L. Marks
Darryl L. Snider          (213) 689-0200

Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
Contact:
Richard Borow
David Schwartz
David Bindler
David Siegel
James F. Elliot
Jim Adler          (310) 277-1010

Latham & Watkins
633 West Fifth Street
Suite 4000
Los Angeles CA, 90071-2007
Contact:
Hugh Steven Wilson          (213) 485-1234

Latham & Watkins
75 Willow Road
Menlo Park, CA 94025
Contact:
Paul H. Dawes          (650) 328-4600

McCutchen, Doyle, Brown & Enerson LLP
355 South Grand Avenue
Suite 4400
Los Angeles, CA 90071-1560
Contact:
John C. Morrissey          (213) 680-6416

McCutchen, Doyle, Brown & Enerson LLP
Three Embarcadero Center
San Francisco, CA 94111
Contact:
David M. Balabanian          (415) 393-2170
Karen L. Kennard          (415) 393-2626

McCutchen, Doyle, Brown & Enerson, LLP
3150 Porter Drive
Palo Alto, CA 94303-1212
Contact:
Mary Huser          (650) 849-4914

Morrison & Foerster
425 Market Street
San Francisco, CA 94104-2482
Contact:
Paul T. Friedman
Melvin R. Goldman          (415) 268-7000

Morrison & Foerster LLP
555 West 5th Street – Suite 3500
Los Angeles, CA 90013-1024
Contact:
Robert S. Stern
B. Scott Silverman          (213) 892-5200

Morrison & Foerster, LLP
19900 MacArthur Boulevard, 12th Floor
Irvine, CA 90017
Contact:
Josephine Staton Tucker          (714) 251-7500

Munger, Tolles & Olson
355 South Grand Avenue–35th Floor
Los Angeles, CA 90071-1560
Contact:
Dennis L. Kinnaird          (213) 683-9264
John W. Spiegel          (213) 683-9152
George M. Garvey          (213) 683-9153

O'Melveny & Myers LLP
400 South Hope Street, 15th Floor
Los Angeles, CA 90071-2899
Contact:
Robert Vanderet
Seth Aronson          (213) 430-6000

O'Melveny & Myers LLP
610 Newport Center
Newport Beach, CA 92660
Contact:
Phillip Kaplan
Brett J. Williamson
Michael G. Yoder          (714) 760-9600

O'Melveny & Myers LLP
275 Battery Street
San Francisco, CA 94111
Contact:
Richard Warmer
Daniel Bookin          (415) 984-8700

(Revised (5/00)                    2

JUL-12-2004  10:58        KNOTTING BURGESST & KIAN

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Orrick Herrington & Sutcliffe LLP
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, CA 94111
Contact:
William Alderman          (415) 773-5944
John H. Kanberg           (415) 773-5469

Orrick Herrington & Sutcliffe LLP
1020 Marsh Road
Menlo Park, CA 84025
Contact:
W. Reece Bader            (650) 614-7440

Paul, Hastings, Janofsky & Walker LLP
555 S. Flower Street
Twenty-Third Floor
Los Angeles, CA 90071-2371
Contact:
J. Allan Maines           (213) 683-6000

Pillsbury Madison & Sutro LLP
650 Town Center Drive, 7th Floor
Costa Mesa, CA 92626-7122
Contact:
Steven O. Kramer
Walter Robinson           (714) 436-6800

Pillsbury Madison & Sutro LLP
101 W. Broadway, Suite 1800
San Diego, CA 92101-8219
Contact:
David E. Kleinfeld        (619) 234-5000

Pillsbury Madison & Sutro LLP
235 Montgomery Street
San Francisco, CA 94104
Contact:
Bruce A. Ericson
William O. Fisher         (415) 983-1000

Sherman & Sterling
555 California Street
San Francisco, CA 94104
Contact:
Susan Samuels Muck        (415) 616-1100
Dean Krystowski
Jeffrey S. Facter

Simpson Thacher & Bartlett
3373 Hillview Avenue
Palo Alto, CA 94304
Contact:
James G. Kreissm an
Charles E. Koob
George M. Newcombe        (650) 251-5000

Simpson Thacher & Bartlett
10 Universal City Plaza
Suite 852
Universal City, CA 91608
Contact:
Barry R. Ostrager
Seth A. Ribner            (818) 755-7000

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Contact:
Frank Rothman
Eric S. Waxman            (213) 687-5000

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 220
Palo Alto, CA 94111
Contact:
James E. Lyons            (650) 470-4500

Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
San Francisco, CA 94301
Contact:
James E. Lyons            (415) 984-2698

Sullivan & Cromwell
1888 Century Park East
Los Angeles, CA 90067-1725
Contact:
Robert A. Sacks           (310) 712-6600

Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo, Alto, CA 94304-1050
Contact:
Bruce G. Vanyo
Steven M. Schatz
Boris Feldman
Daniel Mitz
David Priebe
David S. Steuer
Eileen Marshall
Martin W. Korman
Sarah Good                (650) 493-9300

(Revised (5/00)                    3

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

### Delaware

Blank Rome Comisky & McCauley LLP
1220 Market Street, 8th Floor
Wilmington, DE  19801
Contact:
Cathy L. Reese          (302) 425-6400

Wolf, Block Schorr and Solis-Cohen LLP
One Rodney Square
10th & King Streets
Wilmington, DE  19801
Contact:
David J. Margules       (302) 777-5860

### District of Columbia

Arnold & Porter
555 Twelfth Street, NW
Washington, D.C. 20004-1202
Contact:
Scott Schreiber         (202) 942-5672

Brobeck Phleger & Harrison LLP
Market Square East, Suite 220
701 Pennsylvania Avenue, NW
Washington, DC  20004
Contact:
John B. Missing         (202) 220-6000

Cahill Gordon & Reindel
1990 K Street, NW, Suite 950
Washington, DC 20006
Contact:
Donald J. Mulvihill     (202) 862-8900

Davis, Polk & Wardwell
1300 I Street, N.W.
Washington, DC 20005
Contact:
Scott W. Muller         (202) 962-7000

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Contact:
F. Joseph Warin         (202) 887-3609

Greenberg Traurig
800 Connecticut Avenue, NW, Suite 500
Washington, D.C. 20036
Contact:
Joe Reeder              (202) 331-3100
C. Allen Foster
Eric C. Rowe

Patton Boggs, L.L.P.
2550 M Street N.W.
Washington, D.C. 20037
Contact:
Lanny Davis             (202) 457-6000
Eric A. Kuwana
Ronald S. Liebman

Sherman & Sterling
801 Pennsylvania Avenue, N.W.
Contact: Washington, DC 20004-2604
Contact:
Thomas S. Martin        (202) 508-8000
Jonathan L. Greenblatt

Sullivan & Cromwell
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5805
Contact:
Margaret K. Pfeiffer
Daryl A. Libow          (202) 956-7500

Willkie Farr & Gallagher
Three Lafayette Centre
1155 21st Street N.W.
Washington, D.C. 20036-3384
Contact:
Kevin B. Clark          (202) 328-8000

### Florida

Akerman Senterfitt & Eidson, P.A.
Sun Trust International Center
28th Floor
Miami, FL 33131
Contact:
Stanley H. Wakshlag     (305) 374-5600

Fowler White, Gillen, Boggs, Villareal
and Banker, P.A.
501 East Kennedy Boulevard
Suite 1700
Tampa, Fl 33602
Contact:
Burton W. Wiand
W. Donald Cox           (813) 228-7411

Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131
Contact:
Hilarie Bass            (305) 579-0500

(Revised (6/00)                          4

JUL-12-2004  16:56     KAUFMAN BORGEEST & RYAN

## APPENDIX A
### SECURITIES CLAIMS PANEL COUNSEL LIST

Greenberg Traurig
777 South Flagler Drive
West Palm Beach, FL 33401
Contact:
Mark F. Bideau          (561) 650-7900

Greenberg Traurig
111 North Orange Avenue
Orlando, FL 32801
Contact:
Tucker H. Byrd          (407) 420-1000

Greenberg Traurig
101 East College Avenue
Post Office Drawer 1838
Tallahassee, FL 32302
Contact:
Barry Richard           (850) 222-6891

Holland & Knight
400 North Ashley Drive, Suite 2300
Tampa, FL 33602
Contact:
Frederick S. Schrils
G. Calvin Hayes
Francis Curran          (813) 227-8500

Holland & Knight
50 North Laura Street, Suite 3900
P.O. Box 52687 (Zip 32201)
Jacksonville, Fl 32202
Contact:
George E. Schultz, Jr.
Michael G. Tanner
Fred Lotterhos          (904) 353-2000

Holland & Knight
701 Brickell Avenue, Suite 3000
P.O. Box 015441 (Zip 33101)
Miami, FL 33131
Contact:
Greg Baldwin
Tracy A. Nichols        (305) 374-8500

Holland & Knight
315 South Calhoun Street, Suite 600
P.O. Drawer 810 (Zip 32302)
Tallahassee, FL 32301
Contact:
Robert R. Feagin III
Elizabeth Bevington     (850) 224-7000

Holland & Knight
625 North Flagler Drive
P.O. Box 3208 (33402)
West Palm Beach, FL 33401
Contact:
D. Culver Smith, III (Skip)    (513) 833-2000

Holland & Knight
200 South Orange Avenue
SunTrust Building, Suite 2600
P.O. Box 1526 (Zip 32802)
Orlando, FL 32801
Contact:
William Wilson          (407) 425-8500

McGuire Woods Battle & Boothe
3300 Barnett Center
50 North Laura Street
Jacksonville, FL 32202-3635
Contact:
David M. Wells          (904) 798-2693

Steel, Hector & Davis LLP
200 South Biscayne Boulevard
Miami, FL 33131-2398
Contact:
Lewis F. Murphy, P.A.   (305) 577-2957
Wendy Leavitt

Stroock & Stroock & Lavan LLP
200 South Biscayne Boulevard
Miami, FL 33131-2385
Contact:
Richard B. Simring
Robert W. Turken        (305) 358-9900

Zuckerman Spaeder Taylor & Evans LLP
900 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Contact:
Ronald B. Ravikoff
Thomas J. Meeks
Guy A. Rasco            (305) 358-5000

## Georgia

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
Contact:
Peter Q. Bassett        (404) 881-7343
Mary C. Gill            (404) 881-7000
John Goselin            (404) 881-7000
Rodd R. David           (404) 881-7000

JUL-12-2004  10:50    KAUFMAN, BORGEEST & RYAN                                    P.27

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763
Contact:
M. Robert Thornton
Michael R. Smith              (404) 572-4600

Paul Hastings Janofsky & Walker, LLP
600 Peachtree Street, N.W., Suite 2400
Atlanta, GA 30308-2222
Contact:
J. Allen Maines              (404) 815-2500

Smith Gambrell & Russell LLP
3343 Peachtree Road, N.E.
Suite 3100 - Promenade II
Atlanta, GA 30309-3592
Contact:
David A. Handley            (404) 815-3671
John G. Despriet            (404) 815-3730

Illinois

Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL 60606-6677
Contact:
David H. Kistenbroker     (312) 360-6000
Michael L. O'Shaughnessy

Jenner & Block
One IBM Plaza
Chicago, IL 60611
Contact:
Jerold Solovy             (312) 222-9350
Ronald Marmer             (312) 923-2686
J. Kevin McCall           (312) 923-2686

Kirkland & Ellis
2000 East Randolph Drive
Chicago, IL 60601
Contact:
Garrett B. Johnson
Robert J. Kopecky         (312) 861-2000

Sidley & Austin
One First National Plaza
Chicago, IL 60603
Contact:
Walter C. Carlson         (312) 853-7734
Hille Sheppard            (312) 853-7850
Eugene A. Schoon          (312) 853-7279

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Contact:
Susan Getzendanner
Timothy A. Nelsen         (312) 407-0700

Sonnenschein Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606
Contact:
Christopher Q. King       (312) 876-8224
David L. Schiavone        (312) 876-7483

Louisiana

Locke Liddell & Sapp LLP
601 Poydras Street, Suite 2400
New Orleans, LA 70130-6036
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn               (504) 558-5100

Massachusetts

Hale & Dorr
60 State Street
Boston, MA 02109
Contact:
Jeffrey B. Rudman
John F. Batter
James W. Prendegast       (617) 526-6000

Hutchins Wheeler & Ditmar P.C.
101 Federal Street
Boston, MA 02110
Contact:
David S. Rosenthal
John Hughes               (617) 951-6624

Mintz, Levin, Cohn, Feris, Glovsky &
Popeo P.C.
One Financial Center
Boston, MA 02111
Contact:
Peter M. Saparoff         (617) 542-6000
Patrick J. Sharkey

Ropes & Gray
One International Plaza
Boston, MA 02110-2624
Contact:
John D. Donovan, Jr.      (617) 951-7566

(Revised (6/00)                                    6

JUL-12-2004  10:56    KHUFFHNI BURDEEST & RIAN                                    P.26

## APPENDIX A
### SECURITIES CLAIMS PANEL COUNSEL LIST

Skadden, Arps, Slate, Meager & Flom LLP
One Beacon Street
Boston, MA 02108
Contact:
Thomas J. Dougherty
George J. Skally              (617) 573-4800

Testa, Hurwitz & Thibeault
High Street Tower
125 High Street
Boston, MA 02110
Contact:
Brian E. Pastuszenski        (617) 248-7253
Jordan D. Hershman           (617) 248-7363

### Minnesota

Dorsey & Whitney LLP
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN  55402
Contact:
Brian E. Palmer
Edward J. Pluimer
J. Jackson
Peter S. Hendrixson
Peter W. Carter
Roger J. Magnuson            (612) 340-2600

Faegre & Benson LLP
90 South Seventh Street
Minneapolis, MN  55402-3901
Contact:
Robert L. Schnell
Thomas L. Kimer              (612) 336-3000

Oppenheimer Wolff & Donnelly LLP
Plaza VII Building, Suite 3400
45 South Seventh Street
Minneapolis, MN  55402
Contact:
Craig W. Gagnon
Michael J. Black
Michael E. Keyes             (612) 607-7300

Winthrop & Weinstine, PA
3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN  55402
Contact:
David P. Pearson
Steven C. Tourek
Thomas H. Boyd               (612) 347-0700

### New York

Arnold & Porter
399 Park Avenue
New York, NY 10022-4690
Contact:
Scott Schreiber              (212) 715-1000
Kent A. Yalowitz

Brobeck Phleger & Harrison LLP
1633 Broadway, 47th Floor
New York, NY  10019
Contact:
Francis S. Chlapowski
Gregory A. Markel            (212) 581-1600

Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY  10038
Contact:
Dennis J. Block
Howard R. Hawkins
Jeffrey Q. Smith
Jonathan M. Hoff             (212) 504-6000

Cahill Gordon & Reindel
80 Pine Street
New York, NY 10005
Contact:
Charles A. Gilman
Immanuel Kohn
Thomas J. Kavaler           (212) 701-3000

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
Contact:
Evan R. Chesler
Francis P. Barron
Julie A. North
Keith R. Hummel
Paul C. Saunders
Peter T. Barbur
Richard W. Clary
Robert H. Baron
Ronald S. Rolfe
Rory O. Millson
Thomas G. Rafferty          (212) 474-1000

{Revised (6/00)}                         7

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Contact:
Daniel F. Kolb
Frank S. Moseley
Gary G. Lynch
James W.G. Benkard
Robert F. Wise
Robert B. Fiske          (212) 450-4000

Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, NY 10004
Contact:
Sheldon Raab
Gregory P. Joseph
John A. Borek            (212) 859-8000

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Contact:
A. Bendell
B. David Grais
C. Wesley G. Howell      (212) 351-4000

Greenberg Traurig
MetLife Building
200 Park Avenue
New York City, NY 10166
Contact:
Marshall H. Fishman      (212) 801-9200
Alan Mansfield

Kaye, Scholer, Fierman, Hays & Handler
425 Park Avenue
New York, NY 10022
Contact:
Frederic W. Yerman       (212) 836-8663

Kirkland & Ellis
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
Contact:
Yosef J. Riemer
Frank M. Holozubiec      (212) 446-4800

Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022
Contact:
Gary Naftalis           (212) 715-9100

Latham & Watkins
885 Third Avenue, Suite 1000
New York, NY 10022-4802
Contact:
Hon. Kenneth Conboy
John J. Kirby            (212) 906-1200

Mayer, Brown & Platt
1675 Broadway
New York, NY 10019
Contact:
Dennis P. Orr
Richard A. Spehr
Steven Wolowitz          (212) 506-2500

Milbank, Tweed Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005
Contact:
Russell Brooks           (212) 530-5554

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
Contact:
Anthony M. Radice
Jack C. Auspitz          (212) 468-8000

Paul Hastings, Jaofsky & Walker LLP
399 Park Avenue, 31st Floor
New York, NY 10022-4697
Contact:
J. Allen Maines          (212) 318-6000

Paul Weiss Rifkind Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6054
Martin Flumenbaum
Claudia Hammerman
Daniel J. Beller
Max Gitter
Richard A. Rosen         (212) 373-3000

Roger & Wells LLP
200 Park Avenue
New York, NY 10166
Contact:
James N. Benedict        (212) 878-8000
James B. Weidner
John K. Carroll
Mark Holland
Mark Pomerantz

(Revised (5/00)                          6

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

Schulte Roth & Zabel LLP
900 Third Avenue
New York, NY 10022
Contact:
Daniel J. Kramer
David M. Brodsky
Irwin J. Sugarman
Robert M. Abrahams          (212) 756-2000

Shearman & Sterling
599 Lexington Avenue
New York, NY 10017
Contact:
Jeremy G. Epstein
R. Paul Wickes              (212) 848-8000

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Contact:
Michael J. Chepiga
Bruce D. Angiolillo
Roy L. Reardon
George M. Newcombe
Paul C. Curnin
Peter Kazanoff             (212) 455-2000

Skadden, Arps, Slate, Meagher & Flom LLP
919 Third Avenue
New York, NY 10022
Contact:
Barry H. Garfinkel
Jonathan J. Lerner
Lea Haber Kuck             (212) 735-3000

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York NY 10038
Contact:
Melvin A. Brosterman
Lawrence Greenwald
Robert Lewin               (212) 806-5400

Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498
Contact:
D. Stuart Meiklejohn
Gandolfo V. DiBlasi
John L. Warden
John L. Hardiman
Philip L. Graham, Jr.
Richard H. Klapper         (212) 558-4000

Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
Contact:
Irwin H. Warren
Greg A. Danilow
Joseph Allerhand           (212) 310-8000

Wilkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099
Contact:
David L. Foster
Richard L. Posen
Michael R. Young           (212) 728-8000

Ohio

Jones Day, Reavis & Pogue
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Contact:
John M. Newman             (216) 586-3939
John W. Edwards

Oregon

Davis Wright Tremaine
2300 First Interstate Tower
1300 S.W. Fifth Avenue
Portland, OR 97201
Contact:
John F. McGrory            (503) 241-2300

Foster Pepper & Shefelman
One Main Place
101 S.W. Main Street, 15th Floor
Portland, OR 97204-3223
Contact:
Peter S. Ehrlichman
Stellman Keehnel
Tim Filer                  (503) 221-7799

Lane Powell Spears Lubersky LLP
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Contact:
D. Meredith Wilson
Milo Petranovich
Robert E. Maloney          (503) 778-2100

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

### Pennsylvania

Blank Rome Comisky & McCauley LLP
One Logan Square
Philadelphia, PA 19103-6998
Contact:
Alexander D. Bono
Richard P. McElroy
Jerome R. Richter
Leonard Dubin
Matthew J. Siembieda        (215) 569-5500

Buchanan Ingersoll, PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA  15219-8800
Contact:
John R. Leathers            (412) 562-1880

Cozen and O'Connor
The Atrium
1900 Market Street
Philadelphia, PA 19103
Contact:
Patrick J. O'Connor
Thomas C. Zielinski
H. Robert Fiebach
Anita B. Weinstein
Steven N. Haas             (800) 665-2000

Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Contact:
Seymour Kurland
Jeffrey G. Weil
Frederick G. Herold         (215) 994-4000

Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA 19103-6993
Contact:
Marc J. Sonnenfeld
Elizabeth Hoop Fay          (215) 963-5000

Pepper, Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Contact:
Barbara W. Mather
Jon A. Baughman
Laurence Z. Shiekman
M. Duncan Grant
Robert L. Hickok
Thomas E. Zemaitis          (215) 981-4000

Wolf, Block Schorr and Solis-Cohen LLP
12th Floor - Packard Building S.E.
Corner 15th & Chestnut Streets
Philadelphia, PA 19102-2678
Contact:
Jay A. Dubow
Ian A.L. Strogatz
Jerome J. Shestack
M. Norman Goldberger
Mark L. Alderman            (215) 977-2058

### Texas

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675
Contact:
Lou Bickel
Mike Lowenberg             (214) 969-2800

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
Pennzoil Place -South Tower
711 Louisiana Street
Suite 1900
Houston, TX 77002
Contact:
Charlie Moore
Paula Hinton              (713) 220-5800

Baker & Botts, L.L.P.
910 Louisianna
Houston, TX 77002-4995
Contact:
David D. Sterling          (713) 229-1946

Baker & Botts, L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2916
Contact:
Robert W. Jordan           (214) 953-6518

Brobeck, Phleger & Harrison LLP
301 Congress Avenue, Suite 1200
Austin, TX  78701
Contact:
Paul R. Bessette           (512) 477-5495

Fulbright & Jaworski, L.L.P.
1301 McKinney
Suite 5100
Houston, TX 77010
Contact:
Frank G. Jones
Richard N. Carrell         (713) 651-5151

JUL-12-2004  10:51        KHUFMHN, BURGEESI & KYHN                            P.52

## APPENDIX A
### SECURITIES CLAIMS PANEL COUNSEL LIST

Fullbright & Jaworski, L.L.P.
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Contact:
Karl G. Dial                    (214) 855-8000

Haynes & Boone, L.L.P.
901 Main Street, Suite 3100
Dallas, TX 75202-3789
Contact:
George Bramblett
Noel Hensley                    (214) 651-5000

Jenkins & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, TX 75202
Contact:
John Gilliam                    (214) 855-4306

Jenkins & Gilchrist
1100 Louisiana, Suite 1800
Houston, TX 77002
Conctact:
John Gilliam                    (713) 951-3300

Locke Liddell & Sapp LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201-6776
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (214) 740-8000

Locke Liddell & Sapp LLP
100 Congress Avenue, Suite 300
Austin, TX 78701-4042
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (512) 305-4700

Locke Liddell & Sapp LLP
700 Lavaca, Suite 800
Austin, TX 78701
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (512) 404-2000

Locke Liddell & Sapp LLP
600 Travis
3400 Chase Tower
Houston, TX 77002
Contact:
Brad Foster
John McElhaney
Morris Harrell
Peter Flynn                     (713) 226-1200

Thompson & Knight, PC
1700 Pacific Avenue, Suite 3300
Dallas, TX 75201
Contact:
Timothy R. McCormick            (214) 969-1103

Thompson & Knight, PC
98 San Jacinto Boulevard, Suite 1200
Austin, TX 78701
Contact:
Timothy R. McCormick            (512) 469-6100

Thompson & Knight, PC
801 Cherry Street, Suite 1600
Fort Worth, TX 76102
Contact:
Timothy R. McCormick            (817) 347-1700

Thompson & Knight, PC
1700 Texas Commerce Tower
600 Travis
Houston, TX 77002
Contact:
Timothy R. McCormick            (713) 217-2800

Thompson & Knight, PC
1200 Smith Street, Suite 3600
Houston, TX 77002
Contact:
Timothy R. McCormick            (713) 654-8111

Vinson & Elkins LLP.
2500 First City Tower
1001 Fannin
Houston, TX 77002-6760
Contact:
David T. Hedges, Jr.            (713) 758-2876
Charles W. Schwartz             (713) 758-3852

Vinson & Elkins LLP.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201-2975
Contact:
Orrin L. Harrison III           (214) 220-7715

(Revised (6/00)                  11

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

Vinson & Elkins L.L.P.
One American Center, Suite 2700
600 Congress Avenue
Austin, TX 78701-3200
Contact:
Richard D. Milvenan          (512) 495-8542

Wilson, Sonsini, Goodrich & Rosati
8911 Capital of Texas Highway
North Westech 360, Suite 3350
Austin, TX 78759-7427
Contact:
Bruce G. Vanyo
Paul Tobias               (512) 338-5499

**Virginia:** 

Cooley Godward, LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
Contact:
Robert R. Vieth          (703) 456-8082

Greenberg Traurig
1750 Tysons Boulevard, 12th Floor
McLean, VA 22102
Contact:
Harry M. Glazer
Joseph T. Casey, Jr.     (703) 749-1300

McGuire Woods Battle & Boothe, L.L.P.
One James Center,
901 East Cary Street,
Richmond, VA 23219-4030
Contact:
Warren E. Zirkle         (804) 775-4364

McGuire Woods Battle & Boothe, L.L.P.
Tysons II, Suite 1800
1750 Tysons Boulevard
McLean, VA 22102-3892
Stephen M. Colangelo     (703) 712-5371

**Washington**

Davis Wright Tremaine
2600 Century Square
1501 Fourth Avenue
Seattle, Washington 98101-1688
Contact:
Stephen M. Rummage       (206) 622-3150
Ladd B. Leavens          (206) 622-3150

Foster Pepper & Shefelman
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-2399
Contact:
Peter S. Ehrlichman
Stellman Keehnel
Tom Fller                (206) 447-8998

Heller, Ehrman, White & McAuliffe
701 Fifth Avenue
Seattle, WA 98104-7098
Contact:
George E. Greer
Daniel J. Dunne          (206) 447-0900

Lane Powell Spears Lubersky LLP
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
Contact:
Christopher B. Wells
James B. Stoetzer
James L Robart
Larry S. Gangnes
Rudy A. Englund          (206) 223-7000

Perkins Cole LLP
1201 Third Avenue, Ste. 4800
Seattle, Washington 98101-3099
Contact:
Ronald L. Berenstain
Harry H. Schneider
Barry M. Kaplan          (206) 583-8888

(Revised (6/00)                    12

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ---------------------------------------X
                                            :
 4   In Re:                                 :   Case No. 05-60006
                                            :
 5        REFCO, INC.,                      :
                                            :
 6               Debtor.                    :
                                            :
 7   ---------------------------------------X
     AXIS REINSURANCE COMPANY,              :   07-0712-RDD
 8                                          :
                 Plaintiff,                 :
 9                                          :
                 v.                         :   One Bowling Green
10                                          :   New York, New York
     BENNETT, et al.,                       :
11                                          :   October 12, 2007
                 Defendants.                :
12   ---------------------------------------X

13
              TRANSCRIPT OF HEARING ON SUMMARY JUDGMENT MOTION
14               BEFORE THE HONORABLE ROBERT D. DRAIN
                    UNITED STATES BANKRUPTCY JUDGE
15

16   APPEARANCES:

17   For Tone Grant:          NORMAN L. EISEN, ESQ.
                              Zuckerman Spaeder LLP
18                            1800 M Street NW
                              Washington, D.C.  20036-5802
19
     For Axis Reinsurance:    JOAN M. GILBRIDE, ESQ.
20                            Kaufman, Borgeest & Ryan LLP
                              200 Summit Lake Drive
21                            Valhalla, New York  10595

22   For Joseph Murphy:       JOHN J. JEROME, ESQ.
                              Saul Ewing LLP
23                            1500 Market Street, 38th Floor
                              Philadelphia, Pennsylvania 19102-2186
24

25


                              (Appearances continue on next page.)
```

```
 1                      UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2

 3    APPEARANCES CONTINUED:

 4    For Dennis Klejna,        HELEN B. KIM, ESQ.
         Gerald Sherer,         Baker & Hostetler LLP
 5       William Sexton,        12100 Wilshire Boulevard, 15th Floor
         and Philip Silverman:  Los Angeles, California  90025-7120
 6
                                IVAN O. KLINE, ESQ.
 7                              Friedman & Wittenstein
                                600 Lexington Avenue
 8                              New York, New York  10022

 9    For Robert Trosten:       BARBARA MOSES, ESQ.
                                Orrick, Herrington & Sutcliffe, LLP
10                              666 Fifth Avenue
                                New York, New York  10103

11

12    For Director Defendants:  MICHAEL WALSH, ESQ.
                                Weil, Gotshal & Manges
13                              767 Fifth Avenue
                                New York, New York  10153

14

15

16    Court Transcriber:        RUTH ANN HAGER
                                TypeWrite Word Processing Service
17                              356 Eltingville Boulevard
                                Staten Island, New York 10312

18

19

20

21

22

23

24

25



          Proceedings recorded by electronic sound recording,
          transcript produced by transcription service
```

3

1   (Proceedings began at 10:11 a.m.)

2         THE COURT:  Okay.  We're here on the <u>Refco / Axis</u>

3   <u>Reinsurance Company</u> summary judgment motion.

4         MS. KIM:  Good morning, Your Honor.  Helen Kim with

5   Baker and Hostetler.  I represent defendant -- counterclaim

6   plaintiff, Dennis Klejna, and I'm presenting the oral argument

7   on behalf of Mr. Klejna, as well as counterclaim plaintiffs

8   William Sexton, Gerald Sherer, and Philip Silverman.

9         Your Honor, we seek summary judgment on the grounds

10  that the express terms of the Axis policy requires Axis to pay

11  defense costs as incurred.  There's no dispute between the

12  parties that where the terms of a policy provides for

13  advancement of defense costs insurer must advance until there's

14  been an adjudication of no coverage.  And for that purpose,

15  Your Honor, we have cited the <u>WorldCom</u> and <u>Kozlowski</u> [Ph.]

16  cases, as well as numerous other cases around the country.

17        So we start in this case with the language of the

18  U.S. Specialty policy, the primary policy as to which the Axis

19  policy follows form.  The insuring agreement (a) of the U.S.

20  Specialty policy requires that the insurer pay losses, which

21  includes defense costs as incurred for a claim for wrongful

22  acts, and condition (b)(2) of the primary policy provides that

23  the insurer will pay the covered defense costs on an incurred

24  basis if it is finally determined that any defense costs paid

25  by the insurer are not covered under the policy.

4

1        The insureds agree to repay such noncovered defense

2   costs to the insurer.  So the Axis policy, which follows the

3   form of the U.S. policy, has a two-step process, payment as

4   incurred of defense costs, and repayment of those defense -- of

5   noncovered defense costs if there's a final determination of no

6   coverage.

7        So the crux of the issue before this court is the

8   legal interpretation of Axis's obligation to pay defense costs.

9   Now, Axis takes the position that its obligation to advance

10  defense costs are triggered only when coverage is undisputed.

11  According to Axis, and I quote from its brief, "The Axis policy

12  expressly allows Axis to make the initial determination of

13  whether or not something is covered."

14        Now, we've searched the Axis policy and the

15  underlying primary policy high and low and we can't find any

16  provision in the Axis policy that gives Axis that right and

17  Axis cites none.  I note it seems that U.S. Specialty and

18  Lexington, the first Axis carriers, also couldn't find any

19  provision either because it's undisputed that based on the very

20  same language of that primary policy both U.S. Specialty and

21  Lexington advanced defense costs until the polices were

22  exhausted.

23        We note that condition (d)(2) would be rendered

24  illusory if Axis could avoid its obligation to advance simply

25  by disclaiming coverage.  So when we look at the term "payment

5

1  of covered defense costs," we believe that the term "covered"

2  refers to a Claim -- that's capital C claim and that's a

3  defined term -- for a wrongful act, in this case a securities

4  claim.

5         And to determine whether an action is covered we must

6  look to the face of the pleading, the complaint, to see if

7  there are any facts or grounds alleged that would bring the

8  action within the liability coverage purchased.  That's

9  precisely the approach that was taken by the Appellate Division

10  first department in Kozlowski and other cases as well.  So,

11  Your Honor, we submit that if this were a car accident, this

12  would not be a claim for a wrongful act.  We would acknowledge

13  that based on the pleadings on the face of the complaint that

14  such a claim would not be covered for payment of defense costs.

15         Now, in this case, Axis concedes that the underlying

16  actions constitute a claim which falls within the insuring

17  agreement.  You note that they make that express concession on

18  page 12 of their brief, but it takes the position that it's

19  entitled to apply the knowledge exclusion and that this court

20  must defer to Axis's initial determination that the knowledge

21  exclusion has been triggered.  For that purpose, Axis asserts

22  that the knowledge exclusion has been triggered by

23  Mr. Bennett's alleged knowledge.

24         We submit, Your Honor, that as a matter of law Axis

25  can only invoke a policy exclusion to avoid coverage if it can

6

1   show that the allegations of the complaint cast the pleadings

2   solely and entirely within the policy exclusions.  Both the

3   <u>Tyco</u> case and the <u>Carlin Equities</u> case, which Axis brought to

4   the Court's attention by letter on Wednesday make that point

5   very clear and I want to thank Axis for bringing the <u>Carlin</u>

6   <u>Equities</u> case to the Court's attention and, in fact, if I had

7   found the case myself I would have relied upon it.

8         Both <u>Koslowski</u> and <u>Tyco</u> on all three cases,

9   <u>Koslowski</u>, <u>Tyco</u>, and <u>Carlin Equities</u> make clear that unless

10  it's clear from the face of the pleadings in the underlying

11  action that the claims fall entirely within the scope of an

12  exclusion, the insurer's obligation to advance defense costs

13  remains.  Here Axis cannot meet that burden and it has not.

14        Axis can't establish from the face of the pleadings

15  in our underlying actions that the claims fall within the

16  knowledge exclusion.  In fact, as the Court is aware the issue

17  of Bennett's knowledge, what he knew, and when he knew it is

18  hotly disputed.  It's at the heart of the underlying securities

19  actions, as well as the criminal action against Mr. Bennett and

20  others.  That issue will have to be resolved in those

21  underlying actions and can't be resolved on the face of the

22  pleadings.

23        So we're left with a situation where an exclusion is

24  disputed and, in fact, the counterclaim plaintiffs have

25  asserted that exclusion doesn't even exist at all because it

7

1   was improperly added by Axis after the commencement of the

2   policy period and in terms of the police binder.  We're not

3   aware of any case, and Axis cites none, where advancement was

4   denied based on an exclusion that was disputed or that required

5   proof of a disputed fact.

6           In fact, therefore, Your Honor, Axis has the

7   obligation and retains the obligation to pay defense costs

8   subject to their right of recruitment of those payments if

9   there's a final determination of no coverage.

10          That's the only argument I have, Your Honor, on the

11   primary argument for summary judgment.

12          I do want to briefly address their -- Axis's request

13   for priority -- on priority of payments, if I may.  Your Honor,

14   in their opposition papers, Axis asks the Court to include a

15   finding of priority of payments.  They made that similar

16   request with respect to the indicted officers' motion for

17   preliminary injunctive relief.  Your Honor, we believe that

18   that request is improper.  There's no pleading or motion before

19   the Court requesting allocation or determination of priority as

20   between the parties and that any order in this case in the

21   event the Court grants summary judgment should remain neutral

22   on the issue of priority payment so that payments can be made

23   in accordance with the terms of the policy.

24          Unless Your Honor has any questions.

25          THE COURT:  I may have questions of you after I hear

8

1   from the other parties, but right now, I don't.

2           MS. KIM:  Thank you, Your Honor.

3           MR. WALSH:  Good morning, Your Honor.  Michael Walsh,

4   Weil, Gotshal and Manges on behalf of the director defendants.

5           THE COURT:  Good morning.

6           MR. WALSH:  I concur in Ms. Kim's presentation.  I

7   just wanted to expand a little bit on the contract

8   interpretation so not going to go through everything that she

9   referred to.

10          It seems like, you know, when I look at all the

11  pleadings back and forth when it comes down to those three

12  little words "cover defense costs" and Axis is trying to read

13  so much into that one word "covered," that undefined term

14  basically that they can as a binding matter determine not to

15  pay until everything is resolved in terms of coverage, the

16  insuring agreements and exclusion.  We think that that is an

17  unreasonable interpretation.  We think that it's putting too

18  high a burden on one little undefined word.

19          Our interpretation is, as Ms. Kim said, which defense

20  costs that on their face fall within the terms of the insurance

21  agreement -- insuring agreement, require advance unless and

22  until a court finally determines that coverage does not exist.

23  Ms. Kim, you know, tracked through the various definitions to

24  say that it falled within the insuring agreement.

25          So what we think is a better way to look at this is

9

1   almost a two-part test:  Can the Court make a determination

2   today that the claims fall within the Side A coverage?  The

3   insuring agreements which refer to claim loss, defense costs,

4   and wrongful act, the answer is yes, the claim was covered;

5   step two would be can the Court make a determination today that

6   an exclusion applies.  If the answer is yes, then the claim no

7   longer falls within the policy coverage we're done; if the

8   answer is no, then the claim remains covered for step one until

9   such time as there is such a determination.

10          We think that's the only way to sort of reconcile all

11  the language here, and we think that that's certainly

12  consistent with the, you know, New York policy to give

13  directors what sophisticated businesspeople would have expected

14  in the D&O policy.  We think it's certainly consistent with the

15  WorldCom case, which although it turned on the issue of

16  precision came out the same way requiring the advancement of

17  defense costs pending a final determination on the rescission

18  in question.

19          Axis tries to distinguish that case in two ways.

20  First, they argue that the language in the WorldCom policy is

21  materially different than what we have here in the U.S.

22  Specialty policy, what we call the primary policy, but I think

23  that is much too strained an interpretation.  If you look at

24  the language -- the advancement language in WorldCom, which

25  starts off with the phrase "Under Coverage A and Coverage B the

1  insurer shall advance," I think the only reasonable

2  interpretation of that is that it's referring to covered

3  defense costs, that it is referring to defense costs that come

4  within the insuring provision of Coverage A and Coverage B.

5          As I mentioned earlier, Axis also tries to

6  distinguish <u>WorldCom</u> because it's a rescission case but, you

7  know, we have to look at the ultimate result, Your Honor, and

8  if whether it's rescission or the application of exclusion or

9  any other theory which denies coverage.  It's the same thing

10  for the director defendants, so we don't think that's an

11  appropriate way to distinguish that court.

12          So in summary, since we have -- we don't believe we

13  have any facts that are in dispute here.  We have the

14  underlying litigation which falls within the definition of

15  wrongful acts, et cetera, so the only thing that is left for

16  the Court is this interpretation.  And our position, Your

17  Honor, is that the only reasonable interpretation is the one

18  that we're giving to the policy.  The only interpretation which

19  would, in essence, give effect to the obligation to advance is

20  our interpretation and we request the Court enter a judgment

21  for us on the basis of a summary judgment.

22          THE COURT:  What is on record showing that your

23  clients dispute the exclusion, the fraud exclusion?

24          MR. WALSH:  I think that we submitted statement of

25  facts where we said that the underlying coverage comes within

11

1  the terms of the definition of the policy.  I'm not sure we

2  need to go any further than that.

3          THE COURT:  Okay.

4          MR. EISEN:  Good morning, Your Honor.  Norman Eisen,

5  counsel for Tone Grant and arguing on behalf of Mr. Grant,

6  Mr. Bennett, and Mr. Trosten.

7          Your Honor, we have addressed the issues before the

8  Court once, twice actually on preliminary injunction and twice

9  again today, and we would rely on the arguments advanced by the

10 previous counsel by Ms. Kim and Mr. Walsh and will not belabor

11 the identical arguments for the Court.  If the Court has

12 questions for us at this time or later, of course, we're

13 pleased to entertain them or if the Court would like to hear

14 from us, we're prepared to do that, but we do stand on the

15 identical arguments.  They are the same -- it is the same

16 policy and the same arguments.

17         THE COURT:  Okay.  Again, I may have questions for

18 you after I hear from Ms. Gilbride, but right now I don't.

19         MR. EISEN:  Thank you, Your Honor.

20         MR. JEROME:  Excuse me, Your Honor.  I note that

21 nobody has raised an argument for Mr. Murphy.  Ms. Kim left him

22 out of the description of those to whom she was speaking.  For

23 the record I would just like to say I adopt all of the

24 arguments, [inaudible].

25         THE COURT:  Okay.  All right.  Thank you.

12

1          MS. GILBRIDE:  Good morning, Your Honor.  Joan

2   Gilbride for Axis Insurance Company.

3          THE COURT:  Good morning.

4          MS. GILBRIDE:  Your Honor, we have submitted to Your

5   Honor in an exhibit to our opposition to the motion for summary

6   judgment a copy of the WorldCom policy.  We submit that if you

7   compare the relevant language, it's clear that the language in

8   the Axis policy is different.  WorldCom policy says that the

9   insurer shall advance defense costs, then says in a separate

10  place, they must advance defense costs.  There's no requirement

11  or no indication that those defense costs must be covered.  The

12  language in the Axis policy that makes the Axis policy

13  materially different is the word "covered."  And, Your Honor,

14  frankly based on, you know, years and years of court

15  interpretations that word "covered" has a meaning.  It has a

16  meaning to anyone who purchases insurance, anyone who writes an

17  insurance policy.  The word "covered" has a meaning.  It can't

18  just be deleted and excised from the policy, which is really

19  what the insureds would like Your Honor to do.

20          And, you know, the way the word "covered" has been

21  interpreted is that you must look at the insuring agreement.

22  The insuring agreement has to be triggered.  Then you look at

23  the exclusions and what's left after you look at the insuring

24  agreement minus exclusions is what's covered, so the Court must

25  look at both.  There must be a trigger of the insuring

13

1    agreement and the complaint must not fall within the

2    exclusions.

3          Your Honor has previously ruled that Axis's request

4    that the exclusions be considered has to be litigated

5    elsewhere.  It can't be litigated now.  It overlaps with the

6    underlying securities case and, you know, so Axis is precluded

7    on that basis from litigating the applicability of the

8    exclusions.  But I think Your Honor hit it right on the head

9    when you asked, what is in the record by these insureds to show

10   that the exclusions don't apply.  We submit it's their burden

11   on summary judgment to make that argument and that argument has

12   not been advanced.

13          In fact, we've made the argument that based upon the

14   (8)(k) where Refco essentially admitted that there were

15   undisclosed receivables that disclosed -- that admission is an

16   admission of guilty knowledge on the part of Mr. Bennett.

17   Mr. Bennett signed the warranty.  Mr. Bennett, you know,

18   warranted to the insurer that there was no information at the

19   time he signed that warranty on behalf of all of the insureds,

20   that he had any knowledge or any potential claims.

21          Your Honor has already ruled that we can't get into

22   that and so, you know, we haven't extensively briefed that, but

23   certainly these insureds have not put anything before the Court

24   to support their position that defense costs should be covered.

25          THE COURT:  Well, let me explore that a minute.  The

14

1   Klejna group has done that, right?  They say in their

2   complaints, which they attach, their cross-claims, that Axis

3   inserted the knowledge exclusion after the fact improperly.

4   They also say that the issue of the fraud and its imputation to

5   any of the insureds is at issue in the District Court

6   litigations.

7         MS. GILBRIDE:  Your Honor, that is absolutely in

8   their counterclaim.  It's our understanding based upon your

9   prior ruling that those issues were either not to be explored

10  at this point, but they certainly have not been advanced for

11  summary judgment purposes.

12        THE COURT:  Well, no, but I'm going to get to that in

13  a second.  I mean, is there any doubt from the record -- and I

14  guess I was thinking about the question I asked Mr. Walsh, his

15  clients did move, as did Mr. Eisen's clients, to dismiss Axis's

16  complaint on the basis of the overlap doctrine.  Those motions

17  to dismiss are in the record and they state that the issues on

18  fraud and the warranty will be determined in the District Court

19  actions.

20        So I think their point is that once the Court sees

21  that there is a dispute as to coverage and/or the applicability

22  of an exclusion and/or the right to rescind, the advancement of

23  defense costs needs to continue until that dispute is resolved

24  by judicial order, and I think that's their point rather than

25  that it has to be resolved now.

15

1          MS. GILBRIDE:  Well, Your Honor, we disagree with

2    that point.  We believe that in order to prevail on summary

3    judgment with respect to advancement, the insureds -- all the

4    insureds have to show that the defense costs are covered and to

5    show that there is coverage there has to be not only a trigger

6    of the insuring agreement, but also there -- the exclusions

7    must not apply, so I think their argument puts the cart before

8    the horse.  There has to be --

9          THE COURT:  What case supports that?

10          MS. GILBRIDE:  Your Honor, I think if you look at the

11    Carlin Equities case, I think if you look at the Tyco case, I

12    think if you look at Schiff v. Flack, which is a New York Court

13    of Appeals in 1980, it's clear that the word "covered" is

14    construed --

15          THE COURT:  No, I'm talking about the more narrow

16    issue, which I think is the issue here, which is the issue of

17    whether there's an ability to withhold defense costs pending

18    the determination of a coverage dispute.

19          MS. GILBRIDE:  As far as Axis is aware, the only case

20    that we've been able to find that deals with the precise

21    language in the Axis policy, and I don't think it answers the

22    question that you've just raised, is the Carlin Equities case.

23    I don't believe that there is a case.  I'm not aware of any

24    case that addresses that precise question, but we believe that

25    the language of the policy, and based upon contract

16

1  interpretation principles and insurance contract interpretation

2  principles that our argument, which is that you have to look at

3  those, the insuring agreement and the exclusions is supported

4  by those principles and by, you know, case law which doesn't

5  just deal precisely with this factual scenario, but it deals

6  with the contract interpretation of principles that must --

7  that have to guide the Court's interpretation.

8          THE COURT:  Okay.

9          MS. GILBRIDE:  And, you know, again just to emphasize

10  in the WorldCom case, the posture of that case before the

11  District Court was entirely different than we're in.  In that

12  case, the insurers were seeking to rescind the policy and there

13  was no dispute as to coverage, so I don't believe that there's

14  any case that supports the position that's being advanced by

15  the insureds either.  It's simply an issue that perhaps

16  precisely has not been addressed.

17          Your Honor, we believe our interpretation of the

18  policy is reasonable.  We think, you know, under basic contract

19  interpretation principles that the Court should enforce the

20  policy as written and on that basis we believe that the motion

21  for summary judgment should be denied.

22          THE COURT:  Okay.  On the contract interpretation

23  principles, you didn't really address this I think in your

24  brief, but I'll give you a chance to address it now: what is

25  your response to the statement in the movants' papers in which

17

1   they rely upon <u>WorldCom</u>, as well as three Second Circuit

2   opinions which state that, in the absence of extrinsic

3   evidence, where there is an ambiguity, it must be read against

4   the insurer?

5        MS. GILBRIDE:  Your Honor, I think we've cited

6   several Second Circuit cases which make it clear that if intent

7   is a question of fact, if there's a dispute as to intent, if

8   there are two reasonable interpretations of a policy that that

9   is a question of fact that precludes summary judgment.

10       THE COURT:  But are those insurance company cases

11  that deal with this where there was no evidence of any -- no

12  extrinsic evidence for interpreting an ambiguity?

13       MS. GILBRIDE:  Yes, Your Honor.  We've cited

14  insurance company case -- the <u>Parks</u> case, Second Circuit case,

15  and several other cases we cited deal with the interpretation

16  of insurance contracts and those courts hold that if intent --

17  well, they say that if there's -- if the Court finds that

18  there's an ambiguity, that the Court must look at extrinsic

19  evidence.  We've not made this motion for summary judgment.

20  The insureds have.  It's their burden to establish one way or

21  the other whether there's an ambiguity or not an ambiguity.

22  They've taken inconsistent positions on that, but if the Court

23  finds there's an ambiguity, the Court is obligated to look at

24  extrinsic evidence.  It's not our burden to put that extrinsic

25  evidence before the Court.

18

1          Our position is that there's no ambiguity, Your

2    Honor.  Our position --

3          THE COURT:  Let me explore that.  Why do you say that

4    it isn't your burden to put extrinsic evidence before the

5    Court, given the statements in the case law that say that in

6    the absence of extrinsic evidence an ambiguity will be

7    construed against the insurer?

8          MS. GILBRIDE:  Your Honor, our fundamental position

9    and the position we've advanced from the beginning of this case

10   is that the policy language is clear and unambiguous.

11         THE COURT:  No, I understand that point, but I'm just

12   going to the other point.

13         MS. GILBRIDE:  Okay.  So the insureds have argued or

14   some of the insureds have argued that there may be an

15   ambiguity.  I think essentially that's what they're saying and

16   I am not aware of any case law that says it's the insurer's

17   obligation to establish the insured's argument that there's an

18   ambiguity.  Our position is that there's no ambiguity.

19         And if they want to argue that there is an ambiguity,

20   I think it's their burden to put that information before the

21   Court.  Just for the record, it's not our -- the primary policy

22   with this language, which we are arguing is clear and

23   unambiguous was not a policy drafted by Axis, so we don't

24   have -- it was drafted by another insurer, the primary insurer,

25   so we don't have Axis without, you know, subpoenas or, you

19

1    know, some discovery to find out what exactly was in the mind

2    of the drafter and that's the type of discovery that would

3    normally occur if the Court was to find there was an ambiguity.

4             This -- you know, we're before Your Honor on a very

5    expedited schedule, on a very fast pace, and that's all been at

6    the request of the insureds.  Our position is if we -- you

7    know, we think the language is clear.  We don't think it's

8    ambiguous, so we don't want to point to extrinsic evidence to

9    support their position.

10            THE COURT:  Okay.

11            MS. GILBRIDE:  Do you have any other questions for

12   us, Your Honor?

13            With respect -- I think Your Honor is aware of this,

14   but the other argument advanced by Mr. Klejna's counsel that

15   the carriers below us had the same language and that they --

16            THE COURT:  They don't have the exclusion you have.

17            MS. GILBRIDE:  Exactly.  I don't think I have

18   anything else.  Thank you, Your Honor.

19            MS. KIM:  Well, Your Honor, just briefly.

20            THE COURT:  Well, I'm sorry, but --

21            MS. KIM:  Oh, I'm sorry.

22            THE COURT:  Is there any issue -- if I ruled in favor

23   of the movants here, what would be the consequence?  It would

24   be payment, right?

25            MS. GILBRIDE:  Yes, Your Honor.

20

1          THE COURT:  Okay.  All right.  You can go ahead,

2   Ms. Kim.

3          MS. KIM:  Well, Your Honor, it's our position the --

4   that the terms of the policy are clear and unambiguous and that

5   if there were a -- that there is no provision in the policy

6   that gives Axis the unilateral right to make an initial

7   determination of the application of an exclusion.  In fact, I

8   was reminded of that commercial from the '80s, "Where's the

9   beef?"  They kept saying the terms -- this policy expressly

10  provides that Axis can make that initial determination.  I

11  don't see that anywhere.  They haven't cited any provision

12  anywhere.

13         We believe that in order to have a second sentence of

14  condition (d)(2) apply, the recoupment provision, the repayment

15  provision, the only way that provision ever has any meaning

16  whatsoever is if Axis has an obligation to pay defense costs

17  that are disputed until there is a final determination of no

18  coverage.  Otherwise, Your Honor, they would never -- they

19  could simply disclaim coverage.  They would never even have to

20  reserve -- pay defense costs under a reservation of rights.

21  That scenario would never arise, because under their reading

22  they could just disclaim coverage and there would never be any

23  advancement of disputed defense costs, Your Honor.

24         So we believe it is their burden to come forward with

25  extrinsic evidence.  They didn't do so, and therefore we

21

1  believe that the contractual interpretation is clear.  There

2  has to be advancement of defense costs until there is a final

3  determination -- excuse me -- of no coverage.

4       We note that in the Carlin Equities case there was a

5  determination with respect to the application of an exclusion

6  for one of the insureds.  That was Mr. Mochweller [Ph.].  But

7  that was a determination made on summary judgment from the face

8  of the pleadings.  The reason he was excluded was because it

9  was -- he was admittedly not an officer or director of Carlin

10 and he didn't fall within the management carve-back provision.

11 That was a determination that the Court could make from the

12 face of the pleadings to which there was no dispute.  And I

13 believe that Axis also raised -- posited a problem, an issue.

14 They said, well, the policy also has -- the Axis policy has an

15 exclusion for any case arising out of the McElreath [Ph.] case.

16      Well, if we had submitted and tendered a case that

17 was squarely brought into issue, the allegations of the

18 McElreath case, they could have moved for summary judgment on

19 the face of the pleading saying, no, that's not covered, but

20 they can't do that here, Your Honor.  They have not crossed

21 move for summary judgment, because there is a disputed question

22 as to the underlying coverage applicability of exclusion and I

23 agree with Mr. Walsh's two-part test.

24      If there is an exclusion and the Court cannot

25 determine from the face of the pleadings that the underlying

22

1  action falls entirely within the scope of that exclusion, then

2  the burden remains on the carrier to advance until that

3  underlying question is resolved in the underlying action.

4         MS. GILBRIDE:  Your Honor, can I just address some of

5  the arguments that have been advanced?

6         THE COURT:  Well, does anyone else have any response

7  on it before I hear from Ms. Gilbride?

8         MR. WALSH:  Just a couple of little things, Your

9  Honor.  Michael Walsh, Weil, Gotshal.

10        You asked me a question earlier about, you know, is

11  there facts in this record about the director defendants

12  denying that the exclusion applies.  I'm still not sure if

13  that's, you know, relevant to the discussion but it is a matter

14  of judicial record that we have filed answers to, you know, the

15  complaints in the underlying action where we did deny all those

16  allegations.

17        On point of ambiguity, we're certainly not arguing

18  that the language is --

19        THE COURT:  I'm sorry, did you answer?  I thought you

20  moved to dismiss.  Did you answer also?

21        MR. WALSH:  In the underlying actions.

22        THE COURT:  Oh, I understand.  All right.  The

23  federal -- the District Court actions?

24        MR. WALSH:  yes.

25        THE COURT:  All right.

23

1    MR. WALSH:  On the issue of ambiguity, we're not

2 taking the position that the language is ambiguous.  We think

3 it is unambiguous, but if the Court has to get to that issue,

4 we think that it -- that Rule 56(e) requires Axis to say

5 something about it.  This was their policy.  It's not like

6 advancement is some little tiny provision, you know, in the

7 fine print.  Advancement is sometimes that's the whole purpose

8 of the contract.  Though they were not the drafters of the

9 primary policy, they signed onto the terms of the primary

10 policy.  They've got anything whether it's -- what their intent

11 was, they should have come forward and they didn't, so I think

12 having failed to do that, Your Honor, you could go on -- you

13 could if you were so inclined rule in our factor in terms of

14 summary judgment based on ambiguity, but that's not our

15 argument.

16    THE COURT:  Okay.  Okay.  I think they're done.

17    MS. GILBRIDE:  Okay.  Sure.  Just addressing a couple

18 of things that Ms. Kim argued, Your Honor.

19    She argued that the second sentence of (d)(2) would

20 be superfluous if our position with respect to the first

21 sentence was adopted by the Court.  That's just not accurate.

22    The second sentence of (d)(2) applies in a situation,

23 the exact situation that the primary and first Axis carriers

24 are in where they have advanced defense costs subject to a

25 reservation of rights based on other exclusions, not the same

24

1   exclusions as us, which require that there be an adjudication

2   in fact of the issues in those exclusions.

3          So the purpose of the second sentence of (d)(2) is

4   for those situations where an insurer says, well, we don't

5   think there's coverage but we can't make that determination now

6   based upon the language in those exclusions so we will advance

7   defense costs subject to a reservation of rights and subject to

8   recoupment later if there is an adjudication that satisfies the

9   language of those exclusions.

10          The exclusions that Axis is relying upon do not have

11  that language and, in fact, the argument that's being advanced

12  by the insureds, by some of the insured is -- would make that

13  second sentence of (d)(2) superfluous and it would make the

14  language of the exclusions that require an adjudication in fact

15  superfluous.  Their argument -- so in order to reach the

16  conclusion that they're advancing you'd have to ignore the word

17  "covered" before defense costs and you'd have to ignore the

18  other provisions in the policy which provide mechanisms for

19  reimbursement in the event that there is an exclusion which

20  requires an adjudication in fact.

21          And, you know, then there's (d)(3), Your Honor,

22  which, you know, if you adopt the argument that the insureds

23  are advancing basically it would have been in Axis's interest

24  to say, well, we think one percent of this case is covered, so

25  we'll advance one percent of the defense costs.  And they would

25

1   say, well, 100 percent is covered; (d)(3) would only require us

2   to advance undisputed defense costs and that can't be the way

3   that this works.  That just makes no sense whatsoever.

4          THE COURT:  Although that's how the District Court in

5   the Rigas [Ph.] case determined it.

6          MS. GILBRIDE:  Your Honor, I don't think -- I'm

7   positive that the Rigas policy language did not have the word

8   "covered defense costs."  That was not there.

9          THE COURT:  But on that point, I mean, all of these

10  policies, including the WorldCom policy, allowed the insurer to

11  make the argument that this wasn't covered in some way or

12  another, either in the definition of a "loss" or "injury"

13  because it's a loss "under the policy" and so I just -- I'm of

14  a mind that you're putting too much weight on the word

15  "covered," because an exclusion is an exclusion.  I mean, you

16  don't have to say to someone else "if we really meant it, it's

17  an exclusion" and these cases all deal with exclusions and say,

18  well, if there's an issue about an exclusion, then sorry,

19  insurer, you have to wait until that's determined and advance

20  the defense costs beforehand.

21         MS. GILBRIDE:  Well, Your Honor, I think that that is

22  the position that most insurers thought was the law before you

23  had WorldCom and Tyco.  And I think if we do get into extrinsic

24  evidence, it will be very clear that the word "covered" was put

25  right where it was based upon the court interpretations that an

1  insurer could not rely upon its own interpretation of its own

2  policy language.  So that word "covered" is significant.

3         THE COURT:  But is there any -- but that's just

4  speculation, right?

5         MS. GILBRIDE:  I -- yes.

6         THE COURT:  Okay.

7         MS. GILBRIDE:  It is not -- it is speculation.

8         THE COURT:  All right.

9         MS. GILBRIDE:  But it's based upon knowledge of, you

10  know, how these policy language have -- policy provisions have

11  developed.

12         THE COURT:  Well, no one has asserted that, though.

13         MS. GILBRIDE:  I'm not an expert witness.  I'm not

14  here before the Court as an expert witness.

15         THE COURT:  Okay.

16         MS. GILBRIDE:  No.

17         THE COURT:  Well -- all right.

18         MS. GILBRIDE:  But I think that -- I think that

19  you're right that insurers thought that that was the way it

20  worked.

21         THE COURT:  I didn't say that.

22         MS. GILBRIDE:  Before -- well, I think that, you

23  know, it was a reasonable interpretation of the WorldCom policy

24  to think that if there was an exclusion advanced that you could

25  rely upon your interpretation of the exclusion and there was no

27

1   need to use the word "covered" before defense costs.

2           So if you will, the word "covered" was inserted to

3   make it triply -- you know, very clear to anyone who looks at

4   it --

5           THE COURT:  Well, again, I --

6           MS. GILBRIDE:  -- that in order for there to be

7   advancement --

8           THE COURT:  I mean, if it's on its face, if it's

9   really clear, I mean, again, I go with the judge in the Rigas

10  case.  He seemed to think that you needed to be a lot clearer

11  than that, and then he made his somewhat offhand remark that

12  perhaps the insurers didn't do that because it would affect

13  their ability to sell policies, but --

14          MS. GILBRIDE:  Your Honor, I read that dicta as well.

15  You know, of course, I read that.  I don't think that, you

16  know, it's neither really here nor there nor the issue that we

17  have today.

18          THE COURT:  Okay.

19          MS. GILBRIDE:  You know, our position is that the

20  language is clear.

21          With respect to Mr. Walsh's position with respect to

22  the -- whether they've denied that the exclusion applies, I

23  don't think that there's -- I'm not aware of anything in the

24  underlying action that involves the exclusionary language.  I'm

25  certain that his clients have denied that there's a fraud, but

28

1    I don't think that that is enough evidence to establish that

2    they've denied that the exclusion applies.

3              THE COURT:  Well, but didn't they say in their motion

4    to dismiss that under the overlap doctrine I couldn't decide

5    this coverage issue because the underlying issue of the fraud

6    was at issue in the District Court actions?

7              MS. GILBRIDE:  They did.  They did make that

8    argument.

9              THE COURT:  Okay.

10             MS. GILBRIDE:  Our position is not -- is not based on

11   fraud.  We don't -- you know, we're not basing our coverage

12   position based upon a fraud exclusion.  It's based upon a prior

13   knowledge exclusion and a warranty.

14             THE COURT:  But it's a prior knowledge of fraud.

15             MS. GILBRIDE:  It's a prior knowledge of facts or

16   circumstances that could lead to a claim.  It doesn't have to

17   be prior knowledge of a fraud.  It so happens that in this case

18   apparently -- you know, there are allegations that it was

19   apparently a fraud, but that's not what the exclusion or the

20   warranty letter said.  It's just knowledge of acts or

21   circumstances.

22             THE COURT:  All right.  But there -- I mean, there's

23   no dispute that it has to be wholly within the exclusion to be

24   excluded, right?  I mean, the cases are pretty clear on that.

25             MS. GILBRIDE:  Yes, Your Honor.

29

1          THE COURT:  So, for example, if there's a dispute

2    about fraud and there be one of the counts, of the ones that

3    are being sued, is a fraud suit, then it would seem to me it

4    would -- they'd be denying it, but the exclusion applies.

5          MS. GILBRIDE:  Well, I don't read it that way, Your

6    Honor, but --

7          THE COURT:  Okay.  Can I turn to the cross-motion for

8    a declaration that if I were to grant the movants' motion, the

9    insureds' motion, it's subject to refund?

10          MS. GILBRIDE:  Yes, Your Honor.  That's an argument

11    that Axis is advancing.

12          THE COURT:  What is -- I mean, is -- it's not -- to

13    me it doesn't seem to be an issue now, so you have to, I think,

14    rely on the other basis for a declaratory judgment that somehow

15    your actions are adversely affected by not knowing the answer

16    to that question.  I just -- how would that -- how is that the

17    case here?

18          MS. GILBRIDE:  Well, Your Honor, we believe that Your

19    Honor made it clear that you could interpret the policy.  You

20    could construct the policy as a matter of law.  We're simply

21    asking the Court to construct the policy the same provision

22    that the insureds are relying upon to say that they -- that

23    defense costs should be advanced, that if they are advanced,

24    they should be repaid if there's an ultimate determination.

25          THE COURT:  Well, but the issue is whether it's ripe

30

1  to do that at this point.

2       MS. GILBRIDE:  Well, it's certainly Axis's position

3  that the issue is ripe.  You know, Axis is being asked to

4  advance defense costs where Axis's position is if there's no

5  coverage for the defense costs and Axis issued a policy that

6  says in that situation a second sentence of (d)(2) that if

7  there is an ultimate determination that there's no coverage

8  that Axis is entitled to repayment.

9       THE COURT:  But why -- well, why is this different

10  than cases like WorldCom and Koslowski?  Well, or the G-1

11  Holdings case, where the courts all say as part of their

12  analysis of the contract that the bargain here was to advance

13  the defense costs subject to reimbursement under the provision

14  which has the same language in it essentially that this

15  contract has in (d)(2) that if it's later determined that it

16  wasn't covered that it be reimbursed.  I mean, that -- those

17  weren't declaratory judgments.  Those were statements as part

18  of the rationale of the court's decision in interpreting the

19  contract.

20       My question goes to why does -- why should I be

21  issuing a declaratory judgment on top of that when I don't

22  know, for example, when there's no request or no refusal -- put

23  it that way, no refusal, first, and then no request to enforce

24  the contract in light of the refusal, to refund the advanced

25  defense costs?

31

1          MS. GILBRIDE:  Just addressing your first question,

2    Your Honor, I don't know that a declaratory ruling was

3    requested in those cases that Your Honor is referring to, so

4    for that reason it may not have been addressed by those courts.

5          THE COURT:  Right.

6          MS. GILBRIDE:  Our position is that just simply based

7    upon the Court's inherent power to interpret these insurance

8    policies that Your Honor has the power to say that in the event

9    that it is finally determined that these defense costs are not

10   covered, that they should be reimbursed.

11         THE COURT:  Okay.

12         MS. GILBRIDE:  And it's based upon, you know, the

13   federal declaratory judgment action.

14         THE COURT:  Well, I guess that's where I'm having a

15   problem.  I don't see how it is really based on the federal

16   declaratory judgment statute since there's no immediate

17   controversy and I'm not hearing any argument that there's the

18   type of doubt in Axis's mind that the contract wouldn't be

19   interpreted the way Axis says it should be interpreted.  I

20   mean, no one's --

21         MS. GILBRIDE:  Well, there's a lot of doubt in Axis's

22   mind about that, Your Honor.

23         THE COURT:  Well, where is that stated?  I didn't see

24   that.  Where is the -- where's that hook under the declaratory

25   judgment act?

32

1    MS. GILBRIDE:  Your Honor, I think if you look at the

2 broad powers that are enumerated in that statute, that would --

3 you know, it's our position that Your Honor does have the power

4 to issue --

5    THE COURT:  All right.  I know you said that.

6    MS. GILBRIDE:  -- that sort of --

7    THE COURT:  But I'm not satisfied by that.  I need to

8 hear why I need to do it, because I think I only really have

9 the power if I need to do it.

10    MS. GILBRIDE:  Your Honor, we've, you know, cited in

11 our papers the relevant provisions of the statute.  If Your

12 Honor doesn't agree with that cite, you know, I don't know what

13 more I can say to convince Your Honor of that.

14    THE COURT:  Okay.  All right.  Okay.

15    MS. MOSES:  Barbara Moses, Your Honor.  I represent

16 Mr. Trosten.  Very briefly, just on the last point, the cross

17 motion for an additional declaration of rights under the

18 policy.  What Your Honor said was that you didn't think you had

19 the power to do it unless you needed to do it and I think

20 that's exactly right.  I would approach this issue not so much

21 from the point of view of ripeness, but more fundamentally from

22 the question of whether there is even a justiciable controversy

23 here.  That's a constitutional requirement before a declaratory

24 judgment may be issued.  Since there has been no demand for

25 repayment, no refusal to repay, no showing or suggestion of

33

1  anything other than a doubt in counsel's mind as to whether

2  such a dispute ever would develop in the future, I don't think

3  we have a justiciable controversy here.  Thank you.

4          THE COURT:  Okay.

5          MR. KLINE:  Your Honor, Ivan Kline for Sexton and

6  Sherer.  I think Your Honor has already recognized that

7  Ms. Gilbride's statement was just pure speculation, but just so

8  the record is clear, it's not only speculation but on the face

9  of the document she submitted it's -- herself to the Court --

10 it's wrong in terms of the sequence of how the word "covered"

11 arrived in this policy, since in the Carlin Equity case that

12 she -- that she submitted on Wednesday, the court made clear

13 that that -- which is the identical policy language in the

14 identical primary carrier, that policy was written in 2003, so

15 the language that started here in August 2005 was not a

16 response to WorldCom and Koslowski.  It appeared in 2003 and

17 was continued following the Koslowski decision in 2004 and the

18 WorldCom decision in February 2005.

19         THE COURT:  Okay.

20              [Pause in the proceedings.]

21         THE COURT:  Where's the date of that policy stated in

22 here in the Carlin opinion?

23         MR. KLINE:  The very first paragraph of the opinion,

24 Your Honor.  It says in 2003 Carlin purchased a directors &

25 officers [ph.] and that is the policy where the -- on the

34

1    same -- I think Houston Specialty -- Houston Cad [Ph.], I

2    believe, is the same company as U.S. Specialty.

3              THE COURT:  Okay.

4              MR. KLINE:  It's the same language that is in the

5    primary policy.

6              THE COURT:  Okay.

7              MS. GILBRIDE:  Your Honor, it was pure speculation on

8    my part.

9              THE COURT:  Okay.  All right.

10                   [Pause in the proceedings.]

11             THE COURT:  All right.  I have before me in this

12   adversary proceeding motions for summary judgment in respect of

13   the claim that Axis Reinsurance Company is obligated to advance

14   defense costs to the insured's under its excess liability

15   policy on behalf of directors and officers of Refco, Inc.

16             The movants, all former directors and officers or

17   officers of Refco, are Messrs. Klejna, Sexton, Sherer,

18   Silverman, and Murphy, Messrs. Brightman, Gantcher, Harkins,

19   Jackel [Ph.], Lee, O'Kelley and Shone [Ph.] and Messrs. Grant,

20   Trosten and Bennett.  I believe that includes all the moving

21   insureds.

22             Federal Rule of Civil Procedure 56(c), which is made

23   applicable in bankruptcy proceedings in bankruptcy cases

24   pursuant to Bankruptcy Rule 7056 controls the standard in

25   respect to these motions for summary judgment.  Rule 56(c)

35

provides that summary judgment shall be granted if the

pleadings, depositions, answers to interrogatories and

omissions on file together with affidavits, if any, show that

there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.

Siltex Corporation v. Cantrent [Ph.], 477 U.S. 317 (322 1986).

In deciding a motion for summary judgment, the Court

must determine if there are any material factual issues to be

tried while at the same time since the nonmoving party would be

precluded from a trial if the relief were granted the Court

should resolve ambiguities and draw reasonable inferences in

favor of the party opposing the motion.  Matsushita v. Zenith

Radio Corporation, 475 U.S. 574 (587 1986); Knight v. U.S. Fire

Insurance Company, 804 F.2d 911 (2d Cir. 1986).

The burden ultimately rests on the moving party to

establish the absence of a genuine issue as to any material

fact, Siltex 477 U.S. at 322-23.  The nonmoving party may

oppose a summary judgment motion by making a showing that

there's a genuine issue as to a material fact in support of a

verdict for that party, Anderson v. Liberty Lobby, Inc., 477

U.S. 242 247-48 (1986).  That is the mere existence of a

scintilla of evidence in support of its position will be

insufficient.  There must be evidence on which a jury could

reasonably find for the nonmoving party.  Id.

That is, the nonmoving party may not defeat a summary

36

1 judgment motion by relying on self-serving or conclusory

2 statements.  There must be something more than some

3 metaphysical doubt as to a material fact.  That is, there needs

4 to be specific evidence of a material fact at issue, although

5 of course once that evidence is shown, the Court moves on to

6 the trial stage, that is, the evidence need not be probative at

7 the summary judgment stage.  See generally again, <u>Matsushita v.</u>

8 <u>Zenith</u>, 475 U.S. at 586.

9          In this case the question before the Court is whether

10 there's a genuine issue of material fact as to whether Axis'

11 unilateral decision to deny payment of defense costs to the

12 plaintiff insured's was a breach of the Axis policy.  In

13 determining that issue on summary judgment, the parties have

14 directed me primarily to rely upon the terms of the policy and

15 in particular the terms of the provision governing the

16 advancement of defense costs, paragraph (d)(2), as well as

17 various claims claimed, exclusions to the policy.  They have

18 submitted their statements of undisputed material facts and in

19 Axis's case a response in certain instances controverting those

20 statements.

21          In reviewing that record, it is clear to me that

22 primarily this is a dispute upon which the Court must focus on

23 the language of the relevant provisions of the insurance

24 policy.  Accordingly, this falls into the category as noted by

25 numerous courts that summary judgment is a particularly

37

1    appropriate vehicle for determining insurance coverage

2    disputes.   See United Capital Corporation v. Travelers

3    Indemnity Company of Illinois, 237 F. Supp. 2d 270, (274

4    S.N.D.Y. 2002).  And that is because generally insurance

5    company disputes hinge, as this one does, on the terms of the

6    contract and contract determination generally leads itself or

7    lends itself to summary judgment analysis.

8         I previously determined in this proceeding that the

9    dispute in particular the interpretation of the contract under

10   the dispute is governed by New York law having applied in New

11   York law, choice of law analysis and determined, as I set forth

12   on the record of the hearing on August 30, 2007, that New York

13   choice of law principles given the locus of the dispute and

14   generally speaking the domicile of the parties would lead to

15   New York applying.

16        That transcript is attached to the parties

17   submissions, both Ms. Kim's declaration as well as

18   Ms. Gilbride's declaration in support of Axis's cross motion at

19   Exhibit B.

20        Under New York law generally a contract -- a written

21   contract is to be interpreted so as to give effect to the

22   intention of the parties as expressed in the unequivocal

23   language they've employed, Kruden v. Bank of New York, 957 F.2d

24   961 (976 2d Cir. 1992).  Under New York law if a contract is

25   unambiguous on its face its proper construction is a question

38

1   of law.  The Court should not look beyond its confines to
2   extrinsic evidence if its relevant provisions are clean and
3   unambiguous.  See generally <u>Metropolitan Life Insurance Company</u>
4   <u>v. RJR Nabisco, Inc.</u>, 906 F.2d 884 (889 2d Cir. 1990); <u>WWW</u>
5   <u>Associates, Inc. v. Gencontiari</u> [Ph.], 77 NY 2d 157 (162 1990);
6   and <u>Vermont Teddy Bear Company, Inc. v. 538 Mass Realty</u>
7   <u>Company</u>, 1 NY 3d 470 (2004).

8           Giving the terms of the contract their plain meaning,
9   a court should find contractual provisions ambiguous only if
10  they are reasonably susceptible -- if they are reasonably
11  susceptible to more than one interpretation by reference to the
12  contract alone.  <u>Crummy v. Westpoint Stevens, Inc.</u>, 238 F.3d
13  133 (139 2d Cir. 2000).  Contract language is unambiguous if it
14  has a definite and precise meaning unintended by danger of
15  misconception in the purport of the contract itself concerning
16  which there's no reasonable basis for difference of opinion.
17  <u>Metropolitan Life Insurance v. RJR Nabisco</u>, 986 F.2d -- excuse
18  me -- at 889, language whose meaning is otherwise plain is not
19  ambiguous merely because the parties urge different
20  interpretations in the litigation.  Id.

21          Those contract interpretation rules are generally
22  followed in New York in respect of insurance policies, but in
23  addition to those general principles there are specific
24  contract interpretation rules that apply to insurance policies
25  that are relevant to this dispute or potentially relevant.

39

1          With regard to the first proposition that with regard

2     to the interpretation of the insurance contract, the courts

3     view the plain language of the contract as the best and if

4     plain the only measure of the parties intentions and that the

5     initial interpretation of the contract is a matter of law for

6     the Court to decide is set forth in among other decisions cited

7     by the parties.  In Re:  WorldCom, Inc, Securities Litigation,

8     354 F.Supp. 2d 455 at 463 (464 S.D.N.Y. 2005).

9          However, in that opinion District Judge Cote goes on

10    to state real established rules with regard to insurance

11    contracts, in particular in New York.  That is, first that to

12    the extent an ambiguity exists in respect of an insurance

13    contract governed by New York law and is unresolved by

14    extrinsic evidence, such ambiguity is read against the insurer.

15    See also Nekostis v. Home Insurance Company of Indiana, 31 F.3d

16    910 (113 2d Cir. 1994).  Going on, Judge Cote says the rule

17    that insurance policies are to be construed in favor of the

18    insured as most rigorously applied in construing the meaning of

19    exclusions incorporated into a policy of insurance or

20    provisions seeking to narrow the insurer's liability.

21          Finally, under New York law where a contract of

22    insurance includes the duty to defend or to pay for the defense

23    of its insured and I note that Judge Cote makes no distinction

24    between the two concepts, *i.e.,* duty to defend or duty to pay

25    for the defense of its insured, that duty is "a heavy one" and

40

1  indeed has been found for many years to apply even if the

2  policy of indemnity does not specifically provide for

3  advancement.

4       "In sum" -- again, I'm quoting from the WorldCom

5  opinion at page 464 -- "the duty to pay defense costs is

6  construed liberally and any doubts about coverage are resolved

7  in the insured's favor."  My review of Axis's statement of

8  additional facts and response to statement of undisputed

9  material facts submitted in response to various of the movants,

10 Rule 7056(1) statements that most of the issues in this case

11 are uncontroverted, obviously, the terms of the underlying

12 policy which incorporates with the specific exceptions stated

13 in the Axis policy the primary policy issued by the primary

14 insurer.

15      In addition, Axis does not dispute that the

16 underlying litigation against the insureds constitutes claims

17 as a defined term for wrongful acts as defined in the primary

18 policy or that the movants here are insured or are insureds or

19 that they have incurred and will continue to incur defense

20 costs under -- or in response to the underlying litigations.

21      There's also no dispute and of course the policy

22 speaks for itself that the term "loss" in the primary policy as

23 incorporated with specific exceptions by the Axis policy

24 includes defense costs and insured person is legally obligated

25 to pay as a result of any claim.  It's also not disputed that

41

1  the insureds have given Axis notice on a timely basis of their

2  claim of the policy.

3           What is disputed by Axis is first whether exclusions

4  unique to its policy, which I primarily take to be the prior

5  knowledge exclusion set forth in endorsement number six to the

6  policy, but also other potential exclusions and defenses apply

7  here to prevent the defense costs from being covered under the

8  policy.

9           In addition, the parties dispute whether under the

10  language of the primary policy specifically paragraph (d)(2)

11  Axis is obligated to pay defense costs on an as-occurred basis

12  in light of its contention that the exclusions that it has

13  noted apply and preclude coverage.  The issue was first raised

14  by Axis.  Apparently in a letter attached Exhibit 9 to the Kim

15  declaration disclaiming coverage on the basis of various

16  disclusions -- exclusions as well as breach of warranty.

17           Notably, Axis has not offered any material fact as to

18  any extrinsic interpretation of paragraph (d)(2) that I've

19  referred to or any other provision for that matter of the

20  applicable insurance policies.

21           I conclude based on the record before me for purposes

22  of these motions that, in fact, there is a dispute as to

23  whether the policy exclusions would apply here to render the

24  losses including defense costs not covered by the policies.

25  Specifically, each of the movants, each of the insureds has in

42

1  this adversary proceeding taken the position that it is not

2  precluded from coverage by the knowledge exclusion and

3  furthermore certain of the insureds as set forth in Exhibits

4  10, 12 and 13 of the Kim declaration at paragraphs 43 through

5  45 and in addition taken the position that the knowledge

6  exclusion itself is an improper endorsement to the policy.

7          I previously ruled as is set forth in the transcript

8  of the August 30, 2007 hearing that the issue of whether, in

9  fact, the insured's losses are covered under the Axis policy in

10 light of the prior knowledge exclusion, as well as the other

11 exclusions and defenses raised by Axis, may not be decided at

12 this time in light of the substantial overlap of those issues,

13 *i.e.*, whether in fact there was a prior knowledge of a claim

14 and/or loss.

15         With the issues pending before the District Courts in

16 the multi-district securities litigation as well as in respect

17 to certain of the insureds pending criminal litigation in the

18 Southern District, I won't repeat that ruling now except to

19 note that in my view it was dictated by clear precedent which,

20 as was brought out at the hearing and is set forth in the

21 transcript, essentially puts the interest of the insured in

22 having a prompt determination of such an issue behind the

23 interest of the insured to pursue its defense of the primary

24 litigation that allegedly gives rise to the claim or loss.

25         That context is important to keep in mind, however,

43

1  in connection with the present motions because it sets the

2  stage for the -- what I believe to be fairly narrow issue

3  before me.  Again, that issue ultimately depends upon the

4  Court's interpretation of the following provision, paragraph

5  (d)(2) of the Axis policy which states incorporating the

6  provision from the primary policy, "The insurer will pay

7  covered defense costs on an as-incurred basis.  If it is

8  finally determined that any defense costs paid by the insurer

9  are not covered under this policy, the insured has agreed to

10  repay such noncovered defense costs to the insurer."

11        Axis contends that it is permitted by that language

12  to determine unilaterally not to pay defense costs on an as-

13  incurred basis if it believes that such defense costs are not

14  covered under the policy, that is, that they would be subject

15  to the exclusion or the exclusions under the policy.  The

16  movants contend to the contrary that Axis is obligated under

17  the paragraph that I just read, particularly when construed in

18  light of relevant case law and the presumptions that I noted

19  earlier applying to exclusions and insurance policies generally

20  to mean that until there is a final determination by an

21  objective fact finder that the defense costs are not covered,

22  Axis is obligated to advance them.  They say this again because

23  they contend and I conclude the record supports this that there

24  is a legitimate dispute as to whether defense costs are covered

25  or not under the policy.

44

1       Both sides have asserted principles of contact

2  interpretation or a principle of contract interpretation to

3  assist the Court in determining whether the language that I

4  just quoted is ambiguous or not.  Not surprisingly, they both

5  contend that the language is not ambiguous, although equally

6  not surprising they both contend that it means the opposite of

7  what the other says it means.

8       The principle they relied on primarily is that a

9  court should read a contract in whole giving meaning to all of

10  its parts and avoid interpretation that would render other

11  provisions useless and meaningless and I have looked at the

12  other provisions of the contract, in particular, paragraph 3 as

13  well as the interplay of the two sentences in paragraph (d)(2).

14       Frankly, after having done so, I do not believe that

15  the contract interpretation maxim that I just recited is of

16  much help in that one could conceive of uses for the language

17  in paragraph (d)(2) to support both sides' position.  I believe

18  that (d)(3) is really a provision going to a separate

19  proposition and consistent with, again, the principles pursuant

20  to which courts in New York interpret insurance policies and

21  particularly exclusions to the advancement of defense costs,

22  (d)(3) should be read narrowly and not be used to extend over

23  into interpretation of (d)(2).

24       However, there is a more meaningful point to note

25  about the rest of the policy, which is that nowhere does it

45

1  state that or imply except in (d)(3) in the specific instance

2  covered thereby that the insurer can unilaterally or in the

3  exercise of its reasonable judgment or in any other way

4  withhold defense costs absent a court determination in the

5  event of a dispute as to whether defense costs are covered.

6          In light of the case law that I will go into in a

7  minute, as well as the function of advancing defense costs, I

8  conclude that the absence of such language in addition to the

9  language of (d)(2) says that "The insurer will pay and provide

10 for refund mechanism if noncovered defense costs are finally

11 determined.  "Not to be covered" means that the reasonable and

12 ordinary course colloquial interpretation of paragraph (d)(2)

13 is that absent a final determination by an objective fact

14 finder the insurer is obligated to pay the defense costs

15 notwithstanding its view that those costs are excluded under

16 the policy.

17         As I said, I believe this language is clear in the

18 context of the entire agreement and it's in the absence of that

19 agreement of any provision conferring on the insurer the

20 unilateral ability to make such a determination, but I note to

21 that to the extent that an ambiguity exists the insurer has

22 offered up no extrinsic evidence in support of its position for

23 interpreting paragraph (d)(2).  Consequently, I believe that

24 under the law of New York in the absence of offering up such

25 evidence the ambiguity would have to be interpreted against the

46

1    insurer.   Again, see <u>Macostis v. Home Insurance Company</u>

2    [inaudible], 31 F.3d 110 at 113 2d Cir. 1994, as well as the

3    discussion in <u>Multi-Foods Corporation v. Commercial Liens</u>

4    <u>Insurance Company</u> [Ph.],309 3d 76 (8807 2d Cir. 2002).

5         As I alluded to a moment ago, I'm not writing on a

6    clean slate with regard to this issue.  As far as I can tell,

7    every court that has considered the issue and again I believe

8    it's a narrow issue as to whether during the pendency of a

9    dispute as to coverage under the policy an insurer may withhold

10   the payment defense costs has concluded that to the contrary

11   the insurer is obligated to advance the defense costs with the

12   caveat that if it is clear from the policy itself and claim

13   made against the insured that the claim would not be covered

14   then such an obligation could be decided on a summary judgment

15   basis and no defense costs would need to be advanced.

16        Here as I noted, that issue is not clear.

17   Consequently, I believe that the case law would support my

18   conclusion that Axis is obligated to advance the defense costs.

19   This issue has most recently been dealt with more thoroughly in

20   <u>Federal Insurance Company v. Tico International Limited</u>, 784

21   NYS 2d 920, in which the Court after noting numerous cases that

22   considered the issue in other jurisdictions found that it is

23   "... well settled the duty of insurer to defend its insured or

24   pay its defense costs as distinct from and broader than its

25   duty to indemnify.  The duty exists whether a complaint against

47

1    the insured alleges claims that may be covered under the

2    insurer's policy.  If any portion of a complaint might result

3    in coverage, the insurer must defend or pay defense expenses

4    for all claims, both covered and noncovered.  Conversely, the

5    insurer has no duty if as a matter of law the allegations in

6    the complaint could not give rise to any obligation to

7    indemnify or the allegations fall within the policy exclusion,

8    but the duty to defend or pay defense costs is construed

9    liberally and any doubts about coverage are resolved in

10   insured's favor.  Furthermore, an insurer can only evoke a

11   clause exclusion to avoid coverage if it can show that the

12   allegations in the complaint as to pleading solely and entirely

13   within the policy exclusion."

14           Given the doubt raised by the movants, the insureds

15   in that summary judgment motion as to whether the insurer had

16   met those stringent tests, the Court concluded that pending a

17   final determination of those issues the insurer would need to

18   advance defense costs.  I note that it did so notwithstanding

19   similar facts alleged as to at least one of the defendants

20   alleged fraud which were arguably analogous at least to the

21   conduct of Mr. Bennett.

22           The New York courts have twice since the Koslovsky

23   opinion adopted its rationale, although in one case apparently

24   in dicta in Ghose, G-h-o-s-e, v. CNA Reinsurance Company

25   Limited, 841 NYS 2d 519, Appellate Division First Department

48

1    2007 the Court stated, "We note, however, that the complaints

2    ere not being dismissed on grounds of inconvenient form.  The

3    interim order defense costs would not be disturbed.  New York

4    law requires that a judicial order is a condition precedent to

5    the cessation of payment for defense costs and circumstances

6    where a claim has already been made" citing Koslovsky.

7         Similarly, in Trustees of Princeton University v.

8    National Union Fire Insurance Company of Pittsburgh, 839 NYS 2d

9    437 (Supreme Court, New York County, 2007), the Court after

10   noting many of the same rules of construction that I quoted

11   from the Koslovsky case stated the insureds -- I'm sorry, the

12   insurer's duty to pay defense costs arises when the insured

13   incurs the expenses.  Where coverage is disputed, insurers are

14   required to make contemporaneous interim advances of defense

15   expenses subject to recoupment in the event it is ultimately

16   determined the policy does not cover the claim.

17        A similar finding, albeit in respect of slightly

18   different language was reached by Judge Cote in the WorldCom

19   opinion that I cited earlier.  Axis has attempted to

20   distinguish the WorldCom opinion on two bases, neither of which

21   I conclude succeed.  The first is that Judge Cote was dealing

22   with a defensive rescission as opposed to a specific exclusion

23   in the policy.  I don't accept that distinction because I

24   believe that in either case, the key point was that there was a

25   dispute as to whether there was any obligation to pay on the

49

1   insurer's part.

2           The second basis is that the advancement language in

3   the policy in WorldCom did not contain the word "covered"

4   before defense costs.  And I gather used the word "shall" as

5   opposed to "will" before the word "pay."  But for the same

6   reason that I don't believe the first distinction is

7   meaningful, I don't believe the second one is either.

8           In either case, the issue hinged upon whether the

9   insurer could unilaterally act to withhold payment based on its

10  interpretation of whether it was obligated to pay a coverage or

11  whether the policy was void ab initio.  I believe Judge Cote's

12  logic would apply under either scenario.

13          The issue was addressed -- the issue that I just

14  discussed was addressed expressly by the District Court for the

15  Eastern District of Pennsylvania in Associated Electric and Gas

16  Insurance Services Limited v. Ritas, 382 F. Supp. 2d 685

17  (E.D.P.A. 2004).  Because of a prior Third Circuit opinion, the

18  Court in the Regius case had little trouble finding that the

19  insurer's rescission allegation did not give it the unilateral

20  right to withhold defense costs relying instead upon Little v.

21  MGIC Indemnity Corporation, 836 F.2d 789 (3d Cir. 1987).

22          The Court separately considered however whether a

23  unilateral right existed in respect to advancement of defense

24  costs because of applicable exclusion from coverage including a

25  prior knowledge exclusion, which like this exclusion did not

50

1   require a final adjudication for the exclusion to take effect.

2   As here, however, the Court in the Regius case noted that the

3   prior knowledge exclusion also does not contain any language to

4   suggest that it operates at the discretion of the insurer.

5          In the Regius case, the Court determined that the

6   carriers had a duty to contemporaneously pay defense costs

7   given the language in respect of defense costs and the

8   indemnity policy generally triggering an obligation to pay

9   wherever the insured was legally obligated.  As here, there was

10  no dispute in the Regius case that the insureds owed money to

11  the lawyers defending in civil suits and that this was a legal

12  obligation.  Thus, the carriers had a duty to contemporaneously

13  pay defense costs and it's altered by other language in the

14  policy.

15         The Court concluded that the knowledge exclusion was

16  ambiguous because it settled two different interpretations as

17  to whether a unilateral right was lodged in the insurer and

18  since Pennsylvania law was similar to New York law, it must be

19  construed in favor of the insureds and against the insurers.

20  Here, as I said, I go further and find that the absence of such

21  a provision in light of paragraph (d)(2) means that (d)(2) is

22  not ambiguous, but as I said before based on the absence of any

23  extrinsic evidence offered to clarify any alleged ambiguity,

24  the provision would be construed in favor of the insureds and

25  against the insurer here.

51

1          Two other recent cases from other jurisdictions which

2    generally have the same basic insurance law contract

3    interpretation principles also worth noting, first, G-1

4    Holdings, Inc. v. Reliance Insurance Company, 2006 U.S.

5    District Lexus 17597, District of New Jersey, March 22, 2006,

6    where the Court concluded that although the defendants argue

7    that various exclusions operate to bar the potential that the

8    underlying claims will be covered, "An insurer's duty to defend

9    is determined by comparing the allegations of the underlying

10   complaint with the language of the policy at issue.  Here, the

11   Court has already found that there is a potential for coverage

12   should the alleged facts prove" -- I'm sorry -- "be proven true

13   particularly where again as here the policy provides that if it

14   does not apply" -- I'm sorry -- "that is later adjudicated that

15   it does not apply to the underlying allegations, the policy

16   specifically provides that the insurer would be reimbursed.

17   The insurer is obligated where there is a reasonable potential

18   for coverage to advance the defense costs."

19          The Court in Sometimes Media Group, Inc. v. Royal and

20   Sun Alliance Insurance Company of Canada, 2007 WL 1881 265, Del

21   Super June 20, 2007 makes a similar point.  "Furthermore, the

22   personal exclusions do not override a present contractual duty

23   to advance defense costs unless the defendants can

24   unequivocally now show that all of the obligations in the

25   underlying class action complaint fall within the personal

52

1    conduct exclusions.  Since the defendants have failed to show

2    at this time the applicability of exclusions to International,

3    the Court need not decide the potential applicability of

4    exclusions at this time."

5         Again, the Court noted that the policy provided as

6    paragraph (d)(2) does here "Such advance payments by the

7    insurer shall be repaid to the insurer to the extent that any

8    such insured shall not be entitled under the policy ultimately

9    to such payment."  And then it concluded, "Therefore, the plain

10   language of the policy guaranteeing an advancement of defense

11   costs is not precluded by an imputation of exclusions to

12   International as well as explained earlier to the outside

13   directors."

14        In light of that case law, I conclude that under the

15   language of the policy concluding its incorporation of the

16   extensive case law regarding how such policies are to be

17   interpreted in New York that pending a resolution of the

18   coverage dispute Axis is obligated to advance defense costs.

19   That is, in some instances an issue that the Court could and

20   does decide promptly here because of the substantial overlap

21   document it cannot be decided by me, but that is not a reason

22   for changing the rule that I have just articulated.  As is

23   again, I believe, supported by the Regius case from

24   Pennsylvania where the District Court was precluded by the

25   automatic stay in the Adelphia bankruptcy cacaos from deciding

53

1 a coverage issue and nevertheless concluded that the insurer

2 was obligated to advance the defense costs.  So for those

3 reasons, I will grant the insured's motions for summary

4 judgment.

5         Let me turn then to the cross motion for summary

6 judgment by Axis, which seeks a declaratory judgment that if,

7 in fact, it is subsequently determined by a court that the

8 defense costs are not covered, i.e., that an exclusion applies

9 or for some other reason they're not covered by the policy, the

10 insureds to have received the defense costs are obligated to

11 repay those costs to Axis.

12         Obviously, the contract provision that I quoted

13 earlier, paragraph (d)(2) says what it says.  And the fact that

14 it provides for repayment is an element of my reasoning as it

15 was in numerous other cases that I cited and quoted from.

16 However, I do not believe that Axis has set forth the basis

17 under the declaratory judgment act for a ruling on its motion

18 given that I believe there is no judicable controversy before

19 me, no insurer has refused to return any funds obviously

20 because there's yet to be any determination that such payments

21 were not covered or such losses were not covered under the

22 policy.

23         To my knowledge, no insurer has disclaimed that that

24 would be the appropriate result if such a determination

25 eventually is made and Axis has not pointed me to any such

54

1   disclaimer or other basis to sustain an argument that

2   notwithstanding a right controversy it has legitimate concern

3   that such contractual provision would be breached and,

4   therefore, would be entitled to a determination now.  So

5   consequently, I will deny that motion without prejudice on the

6   basis that, again, it does not set forth the basis on

7   declaratory judgment act for relief given the absence of a case

8   of controversy and a lack of any rightness.

9        There was no formal motion for an allocation of the

10  priority of the payments to be made by Axis.  I have, I

11  believe, dealt with this issue before in my prior rulings in

12  this matter.  I do not believe that request is properly before

13  me in the form of a motion or a properly raised controversy.

14  It may ultimately be one, but in the first instance I believe

15  that there has to be some dispute as to the allocation of

16  priority and that in the absence of such dispute the terms of

17  the contract will govern the party's conduct.

18       So the orders granting the summary judgment motions

19  should provide that the Court has not determined any issue with

20  respect to the priority of the advancement of defense costs and

21  that all parties' rights and indeed all nonparties' rights in

22  respect of priority allocations are fully preserved and

23  reserved.

24       As I normally do when I give a lengthy bench ruling,

25  particularly when I quote cases, I'll go over the transcript of

55

1   my ruling and reserve the right to amend it, both to correct it

2   and to add something if I believe it was -- it should properly

3   added, but my ruling won't change, which is that the summary

4   judgment motions are granted.

5          So I would ask each of the -- well, not each of you,

6   but the respective counsel for the groups of movants and

7   Mr. Murphy to submit orders for their respective clients

8   consistent with my ruling.

9          MS. KIM:  Your Honor, we believe our proposed order

10  is ready.

11         THE COURT:  I don't think I have it on a disk,

12  though.

13         MS. KIM:  I'll submit it, Your Honor.

14         THE COURT:  Okay.  You could email them to chambers.

15         MS. KIM:  Yeah, it says -- already says exactly that

16  same language.

17         THE COURT:  And you should cc: -- you don't need to

18  settle it on Axis, but you should cc: Ms. Gilbride when you

19  send it to chambers.

20         MS. KIM:  Oh, they are.

21         THE COURT:  So that she can make sure it's consistent

22  with my ruling.

23         MS. KIM:  Your Honor, may I raise one housekeeping

24  issue?

25         THE COURT:  Yes.

56

1          MS. KIM:  Mr. Klejna would like to make a motion for

2    summary judgment on coverage.  We believe we can do so without

3    going into the issue of anyone's knowledge because as the

4    Court -- as the Court previously recognized in retaining

5    jurisdiction on the counterclaim plaintiffs' complaint, we can

6    prevail as a matter of law, for example, on the knowledge

7    exclusion by demonstrating that as a matter of law the

8    exclusion is not a part of the policy, because it was

9    improperly added after the fact.  We believe we can show --

10          THE COURT:  But don't they have all the warranty --

11    don't they have the warranty issues as well?

12          MS. KIM:  Well, Your Honor, we can show that the

13    warranty is not a part of the policy as a matter of law also.

14    It's not a part of the allocation.

15          THE COURT:  What I'm going to ask you to do is put

16    this in a letter to me, cc'ing Ms. Gilbride.  It's not

17    something I can --

18          MS. KIM:  Oh, I was just going to ask --

19          THE COURT:  No, I'm not going to give you leave to go

20    forward on the summary judgment motion on just what you've told

21    me today.  I think you have to look at all of the exclusions

22    that Axis has raised and not just the knowledge exclusions and

23    I'm sorry, all of the defenses that Axis has raised and --

24          MS. KIM:  We understand, Your Honor.

25          THE COURT:  -- convince me that there's a reasonable

57

1  basis to go ahead on summary judgment notwithstanding the

2  substantial overlap.

3          MS. KIM:  Yes, sir.  I'll do so, Your Honor.  We

4  don't believe that all the insureds are necessarily in the same

5  position.

6          THE COURT:  No, you're just going to be speaking for

7  your particular client.

8          MS. KIM:  Understood.  Will do.  Thank you, Your

9  Honor.

10          MR. JEROME:  I assume, Your Honor, that she'll also

11  cc: the other insureds if different than --

12          THE COURT:  That's right.

13          MS. KIM:  All parties here.

14          THE COURT:  Okay.  All right.  Okay.  Anything

15  further?

16          ALL ATTORNEYS:  Thank you, Your Honor.

17          (Proceedings concluded at 12:11 p.m.)

18                    *  *  *  *  *  *

19

20

21

22

23

24

25

58

1

2                          * * * * * *

3         I certify that the foregoing is a court transcript

4    from an electronic sound recording of the proceedings in the

5    above-entitled matter, except where, as indicated, the Court

6    has modified the transcript.

7

8

9         _____

10                              Ruth Ann Hager

11   Dated:  October 12, 2007

12

13

14

15

16

17

18

19

20

21

22

23

24

25

59

1

# EXHIBIT I

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

## DECLARATIONS

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-05-A10821      RENEWAL OF: N/A

ITEM 1.   NAMED CORPORATION:   Refco Inc.
550 W. Jackson Blvd., Suite 1300
Chicago, IL 60661

ITEM 2.   POLICY PERIOD:   (a)  Inception Date:  8/11/2005
(b)  Expiration Date: 8/11/2006
at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.   LIMIT OF LIABILITY (inclusive of Defense Costs):
$10,000,000 in the aggregate, for INSURING AGREEMENTS A and B combined

ITEM 4.   RETENTIONS:
(a)  INSURING AGREEMENT A:   $0 or minimum required under applicable law, if any
(b)  INSURING AGREEMENT B(1):   $300,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(5))
(c)  INSURING AGREEMENT B(2):   $500,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(5))

ITEM 5.   PREMIUM:  $395,000.00

ITEM 6.   NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:

HCC GLOBAL FINANCIAL PRODUCTS
P.O. Box 4018
Farmington, CT 06034
Attention: Claims Manager

ITEM 7.   DISCOVERY PERIOD:
(a)  Premium:  100% of the Annual Premium
(b)  Duration:  365 days

ITEM 8.   ENDORSEMENTS ATTACHED AT ISSUANCE:
1117C-IL  991-301  991-302  991-319  991-322  991-413  991-415  991-442  991-444 991-701
991-884 991-820  991-881  991-576  991-1122  80046

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

_Michael J. Schell_                    _[signature]_                    _[signature]_
Secretary                           President                     Authorized Representative

Date: September 13, 2005                                    USSIC-090 (04/2002)

PLAINTIFF'S
EXHIBIT
B

# U. S. SPECIALTY INSURANCE COMPANY

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

#### This is a claims made policy. Please read it carefully.

In consideration of the payment of the premium, and in reliance upon the statements made in the Application, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the Insureds agree as follows:

#### INSURING AGREEMENTS

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B) The Insurer will pay to or on behalf of the Company Loss arising from:

   (1) Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

   (2) Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

#### DEFINITIONS

(A) Application means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B) Claim means:

   (1) any written demand for monetary or non-monetary relief;

   (2) any civil proceeding commenced by service of a complaint or similar pleading;

   (3) any arbitration, mediation or other similar dispute resolution proceeding;

   (4) any criminal proceeding commenced by return of an indictment;

   (5) the receipt by an Insured Person of a target letter or similar document in connection with a criminal investigation of such Insured Person; or

   (6) any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

   including any appeal from any such proceeding.

(C) Company means the Named Corporation and any Subsidiary thereof.

(D) Defense Costs means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation,

U.S. SPECIALTY INSURANCE COMPANY 

adjustment, defense or appeal of a Claim against an Insured Person (or, with respect to Securities Claims, against any Insured), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the Company.

(E)   Insured means the Insured Persons and the Company.

(F)   Insured Person means:

    (1)   any past, present or future director or officer of the Company, including any person in a position which is the functional equivalent of a director or officer with respect to any entity included within the definition of Company or Outside Entity located outside the United States, and

    (2)   with respect only to Securities Claims, any past, present or future employee of the Company.

(G)   Loss means Defense Costs and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

    (1)   an Insured Person is legally obligated to pay as a result of any Claim, or

    (2)   the Company is legally obligated to pay as a result of any Securities Claim;

provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed.  For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any Claim shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such Claim and is most favorable to the Insureds in that regard.

(H)   Named Corporation means the entity designated as such in Item 1 of the Declarations.

(I)   No Liability means all defendant Insureds obtain by reason of a motion to dismiss, motion for summary judgment or trial a final non-appealable judgment in their favor.

(J)   Outside Capacity means service by an Insured Person as a director, officer, trustee, regent or governor of, or in another equivalent executive position with respect to, an Outside Entity, during such time that such service is at the request of the Company.

(K)   Outside Entity means any not-for-profit corporation, association, organization or entity.

(L)   Policy Period means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(M)   Pollutants means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(N)   Securities Claim means a Claim which:

    (1)   is brought by or on behalf of one or more securities holders of the Company in their capacity as such, or

U.S. SPECIALTY INSURANCE COMPANY 

       (2)    arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.

(O)    Subsidiary means any entity:

       (1)    during any time on or before the inception of the Policy Period in which the Named Corporation owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

       (2)    created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, the Named Corporation owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries.

An entity ceases to be a Subsidiary when the Named Corporation ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy with respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective time that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

(P)    Wrongful Act means any:

       (1)    actual or alleged act, error, misstatement, misleading statement, omission or breach of duty:

           (a)    by an Insured Person in his or her capacity as such, including in an Outside Capacity, or

           (b)    with respect only to Securities Claims, by the Company; or

       (2)    matter claimed against an Insured Person solely by reason of his or her service in such capacity or in an Outside Capacity.

EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of Loss in connection with a Claim:

(A)    arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage;

(B)    arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted;

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or

U.S. SPECIALTY INSURANCE COMPANY 

violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to Securities Claims;

(D)    for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants; provided, that this EXCLUSION (D) will not apply to Securities Claims;

(E)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; provided, that this EXCLUSION (E) will apply only to Claims involving employee pension or welfare benefit plans organized or sponsored by the Company for its own employees, and will not apply to Securities Claims;

(F)    brought by or on behalf of, or in the name or right of, the Company, whether directly or derivatively, or any Insured Person, unless such Claim is:

    (1)    brought and maintained independently of, and without the solicitation, assistance or active participation of, the Company or any Insured Person, or

    (2)    for an actual or alleged wrongful termination of employment, or

    (3)    brought or maintained by an Insured Person for contribution or indemnity and directly results from another Claim covered under this Policy, or

    (4)    brought and maintained by an employee of the Company solely to enforce his or her rights as a holder of securities issued by the Company;

provided, that this EXCLUSION (F) will not apply to Claims brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the Company;

(G)    by or on behalf of, or in the name or right of, any Outside Entity, whether directly or derivatively, against an Insured Person for a Wrongful Act in his or her Outside Capacity with respect to such Outside Entity, unless such Claim is brought and maintained independently of, and without the solicitation, assistance or active participation of, the Outside Entity, the Company or any Insured Person;

(H)    arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time; or

(I)    arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation.

For purposes of determining the application of the above EXCLUSIONS, no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act and, except for Wrongful Acts of the Company's chairman of the board, chief executive officer, president, chief financial officer or general counsel, no Wrongful Act of any Insured Person will be imputed to the Company.

DISCOVERY PERIOD

If the Insurer or the Named Corporation fails or refuses to renew this Policy or if the Named Corporation cancels this Policy, any Insured will have the right, upon payment of the Discovery Period Premium set

U.S. SPECIALTY INSURANCE COMPANY 

forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any Wrongful Act actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right to elect coverage within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

EXTENSIONS

(A)     Subject to its terms and conditions, this Policy will afford coverage for Claims for Wrongful Acts of an Insured Person if such Claims are made against the estates, heirs, legal representatives or assigns of an Insured Person who is deceased or against the legal representatives or assigns of an Insured Person who is incompetent, insolvent or bankrupt, to the extent that such Claims would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)     Subject to its terms and conditions, this Policy will afford coverage for Claims for Wrongful Acts of an Insured Person if such Claims are made against the Insured Person's lawful spouse solely by reason of such spouse's legal status as a spouse of the Insured Person or such spouse's ownership interest in property which the claimant seeks as recovery for alleged Wrongful Acts of the Insured Person. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such Claim will be treated as Loss which the Insured Person is legally obligated to pay on account of the Claim made against the Insured Person. This coverage extension does not apply, however, to the extent the Claim alleges any wrongful act or omission by the Insured Person's spouse.

CONDITIONS

(A)     Limit of Liability and Retention

(1)     The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period, whether covered under one or more INSURING AGREEMENTS, will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)     Defense Costs will be part of and not in addition to the Limit of Liability, and payment of Defense Costs will reduce the Limit of Liability. Defense Costs, as incurred, will also be applied against the retention.

(3)     The retention stated in Item 4(b) of the Declarations will apply to Loss, including Defense Costs, which the Company is required or permitted to pay as indemnification or advancement to or on behalf of the Insured Persons, whether or not such Loss is actually paid, unless the Company is unable to pay such Loss as indemnification or advancement solely by reason of its financial insolvency. For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the Named Corporation, each Subsidiary and each Outside Entity, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the Insured Persons to the fullest extent permitted by law.

(4)     The Insurer will be liable only for the amount of Loss in connection with any Claim, which is in excess of the applicable retention stated in Item 4 of the Declarations. Such retention is to be borne by the Insureds and remain uninsured. A single retention will

U.S. SPECIALTY INSURANCE COMPANY 

apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

(5) Notwithstanding the foregoing, with respect to Securities Claims the retentions stated in Items 4(b) and 4(c) of the Declarations will apply only to Defense Costs; provided, that if a Securities Claim is finally resolved by a determination of No Liability, no retention will apply to such Securities Claim even as respects Defense Costs and the Insurer will thereupon reimburse Defense Costs within the retention which shall already have been paid by the Insureds.

(6) One retention amount will apply to the covered portion of each and every single Claim. If a single Claim is covered under more than one INSURING AGREEMENT, the retentions stated in Item 4 of the Declarations will be applied separately to the portions of the Claim covered by each INSURING AGREEMENT, and the sum of the retentions so applied will constitute the retention for each single Claim, which in total will not exceed the largest of the applicable retentions.

(B) Notice of Claims and Reporting Provisions

(1) The Insureds must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any Claim as soon as practicable after it is made.

(2) If written notice of a Claim has been given to the Insurer pursuant to CONDITION (B)(1) above, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, will be considered to have been made at the time such notice was given.

(3) If, during the Policy Period or the Discovery Period (if applicable), the Insureds become aware of any circumstances which may reasonably be expected to give rise to a Claim against the Insureds and if, before the end of the Policy Period or the Discovery Period (if applicable), the Insureds give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such Wrongful Act, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act described in such notice will be considered to have been made at the time such notice of circumstances was given.

(4) All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 6 of the Declarations.

(C) Interrelationship of Claims

All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

(D) Defense Costs, Settlements, Allocation of Loss, Priority of Payments

U.S. SPECIALTY INSURANCE COMPANY 

(1) The Insurer will have no duty under this Policy to defend any Claim. The Insureds must defend any Claim made against them. The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlements, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

(2) The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.

(3) If Loss covered by this Policy and loss not covered by this Policy are both incurred in connection with a single Claim, either because the Claim includes both covered and uncovered matters, or because the Claim is made both against Insured Persons (or, with respect only to Securities Claims, against Insureds) and against others not included within the definition of Insured Person (or, with respect only to Securities Claims, the definition of Insured), the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the Claim and the relative benefits to be obtained by the resolution of the Claim. The Insurer will be obligated to pay only those amounts or portions of Loss allocated to covered matters claimed against Insured Persons (or, with respect only to Securities Claims, against Insureds). If the Insureds and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of Loss, including Defense Costs, which the parties agree is not in dispute.

(4) If the Insurer is obligated to pay Loss, including Defense Costs, under more than one INSURING AGREEMENT, whether in connection with a single Claim or multiple Claims, the Insurer will first pay any Loss payable under INSURING AGREEMENT (A) and, if the Insurer concludes that the amount of all Loss, including Defense Costs, is likely to exceed the Insurer's Limit of Liability, the Insurer shall be entitled to withhold some or all of any Loss payable under INSURING AGREEMENT (B)(1) or (B)(2) to ensure that as much of the Limit of Liability as possible is available for the payment of Loss under INSURING AGREEMENT (A). If no Loss is payable under INSURING AGREEMENT (A), or if the Insurer's obligations under INSURING AGREEMENT (A) have been satisfied, then, subject to the Insurer's Limit of Liability as set forth in Item 3 of the Declarations, the Insurer will pay such Loss as it is secured to pay under INSURING AGREEMENT (B)(1) or (B)(2) in such manner and, in the event of multiple Claims, apportioned among such Claims as the Named Corporation shall direct in writing.

(E) Cancellation or Nonrenewal

(1) The Insurer may cancel this Policy for non-payment of premium by sending no less than ten (10) days notice to the Named Corporation at its last known address. The Insurer may not otherwise cancel this Policy.

(2) The Named Corporation may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the Named Corporation may not cancel this Policy after the effective date of any acquisition of the Named Corporation as described in CONDITION (F) below. If the Named Corporation cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as

U.S. SPECIALTY INSURANCE COMPANY 

practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

(3)  If the Insurer elects not to renew this Policy, the Insurer must give the Named Corporation notice of non-renewal no less than sixty (60) days before the end of the Policy Period.

(4)  If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F)  Changes in Control

(1)  If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to the Named Corporation:

(a)  the Named Corporation merges into or consolidates with another entity such that the Named Corporation is not the surviving entity, or

(b)  another entity, person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Named Corporation, or

(c)  a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Named Corporation;

then coverage under this Policy will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2)  If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to a Subsidiary:

(a)  the Subsidiary ceases to be a Subsidiary, or

(b)  a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Subsidiary;

then coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person thereof will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person thereof will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter.

(G)  Other Insurance and Other Indemnification

(1)  Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

U.S. SPECIALTY INSURANCE COMPANY 

    (2)    All coverage for Loss from Claims against Insured Persons for Wrongful Acts in their Outside Capacities will be specifically excess of, and will not contribute with,

        (a)    any other insurance available to such Insured Persons by reason of their service in Outside Capacities, and

        (b)    any indemnification available to such Insured Persons in connection with their service in Outside Capacities from any source other than the Company, including but not limited to Outside Entities.

(H)    Cooperation and Subrogation

    (1)    In the event of any notice under CONDITION (B) of a Claim or of circumstances which may reasonably be expected to give rise to a Claim, the Insureds will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

    (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the Insureds' rights of recovery, including without limitation the Insured Persons' rights to indemnification or advancement from the Company. The Insureds must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

(I)    No Action against the Insurer

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against an Insured after actual trial or by written agreement of the Insured, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the Insureds to determine the Insurer's liability; nor may the Insurer be impleaded by the Insureds or their legal representatives in any such action.

(J)    Notices and Authority

By acceptance of this Policy, the Insureds agree that the Named Corporation may act on behalf of all Insureds with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the cancellation or renewal of this Policy and the acceptance of any amendments thereto.

(K)    Assignment

No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

(L)    Titles and Headings

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

(M)    Representations and Severability

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

U.S. SPECIALTY INSURANCE COMPANY

No knowledge or information possessed by any Insured will be imputed to any other Insured except for material facts or information known to the person or persons who signed the Application. If any of the particulars or statements in the Application are untrue, this Policy will be void with respect to any Insured who knew of such untruth or to whom such knowledge is imputed.

(N)    Changes

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

(O)    Entire Agreement

By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties with respect to this insurance.

(P)    Territory

This Policy applies to Wrongful Acts actually or allegedly taking place or Claims made anywhere in the world.

(Q)    Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Michael J. Schill

Secretary                                        President

U.S. SPECIALTY INSURANCE COMPANY

ENDORSEMENT NUMBER: 1

ILLINOIS AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on 8/11/05, forms part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company:

In consideration of the premium charged:

DEFINITIONS (D) Defense Costs of the policy has been amended to read:

Defense Costs means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a Claim against an Insured Person (or, with respect to Securities Claims, against any Insured), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the Company or the Insurer.

DISCOVERY PERIOD of the policy has been amended to read:

If the Insurer or the Named Corporation fails or refuses to renew this Policy or if the Named Corporation cancels this Policy, any Insured will have the right, upon payment of the Discovery Period Premium set forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any Wrongful Act actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period.

CONDITIONS (G)(1) Other Insurance and Other Indemnification of the policy has been amended to read:

(1)    Such insurance as is provided by this Policy will share proportionately with similar coverages provided under any other valid and collectible insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

USSIC 11370-01 (08/04)                    Page 1 of 1

ENDORSEMENT NUMBER: 2

EMPLOYMENT PRACTICES LIABILITY EXTENSION – NONENTITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby understood and agreed that:

(1)     DEFINITION (P) Wrongful Act is amended to include any Employment Practices
        Wrongful Act by an Insured Person in his or her capacity as such.

(2)     DEFINITION (F) Insured Person, subsection (2) is amended to read:

        (2)     with respect only to Securities Claims and Claims for Employment
                Practices Wrongful Acts, any past, present or future employee of the
                Company.

(3)     The following DEFINITIONS are added to the Policy:

        Discrimination means:

        (1)     any failure or refusal to hire, failure or refusal to promote, demotion or discharge
                of, or wrongful failure to grant tenure to, any person, or

        (2)     any limitation, segregation or classification of any employee or applicant for
                employment in any way that would deprive or tend to deprive any person of
                employment opportunities or otherwise adversely affect his or her status as an
                employee;

        because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or
        preference, national origin, religion, or other status that is protected pursuant to any
        applicable federal, state or local statute or ordinance.

        Employment Practices Wrongful Act means any actual or alleged:

        (1)     Discrimination,
        (2)     Retaliation,
        (3)     Sexual Harassment,
        (4)     Workplace Harassment,
        (5)     Workplace Tort, or
        (6)     Wrongful Termination.

        Retaliation means retaliatory treatment against an employee of the Company on account
        of such employee's exercise or attempted exercise of his or her rights under law.

        Sexual Harassment means unwelcome sexual advances, requests for sexual favors, or
        other verbal, visual or physical conduct of a sexual nature that is made a condition of
        employment with the Company, is used as a basis for employment decisions by the

891-301
Ed (01/03)                          Page 1 of 2

Company, creates a work environment with the Company that interferes with performance, or creates an intimidating, hostile or offensive working environment.

Workplace Harassment means conduct that creates a work environment with the Company that interferes with performance, or creates an intimidating, hostile or offensive working environment.

Workplace Tort means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the Company.

Wrongful Termination means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

(4)     EXCLUSION (C) will not apply to Loss for mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy caused by an Employment Practices Wrongful Act.

(5)     EXCLUSION (F), subsection (2) is amended to read as follows:

   (2)     for an actual or alleged Employment Practices Wrongful Act;

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement: .

By:_____
            Attorney-in-fact

991-301
Ed (01/03)                          Page 2 of 2

ENDORSEMENT NUMBER: 3

ADD SPECIFIC INDIVIDUALS AS "INSURED PERSONS"

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (F) "Insured Person" is amended to include the following individuals:

Insurance Manager and General Counsel

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
            Attorney-in-Fact

ENDORSEMENT NUMBER: 4

AMEND "LOSS" TO INCLUDE PRE-JUDGMENT
AND POST-JUDGMENT INTEREST

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (G) Loss is amended to read as follows:

(G)   Loss means Defense Costs and any damages, settlements, judgments, pre-judgment interest, post-judgment interest, or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

(1)   an Insured Person is legally obligated to pay as a result of any Claim, or

(2)   the Company is legally obligated to pay as a result of any Securities Claim;

provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any Claim shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such Claim and is most favorable to the Insureds in that regard.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
        Attorney-in-Fact

991-319
Ed (06/03)

Page 1 of 1

ENDORSEMENT NUMBER: 5

EMPLOYED LAWYERS EXTENSION
(SEPARATE LIMIT AND RETENTION)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)   DEFINITION (F) Insured Person is amended to include any Employed Lawyer.

(2)   DEFINITION (P) Wrongful Act is amended to include any act, error, misstatement,
      misleading statement, omission or breach of duty by an Employed Lawyer, in his or her
      capacity as such, in the rendering or failure to render professional legal services for the
      Company; provided, that Wrongful Act shall not include any act, error, misstatement,
      misleading statement, omission or breach of duty by such Employed Lawyer in
      connection with any activities: (1) that are not related to such Employed Lawyer's
      employment with the Company; (2) that are not rendered on the behalf of the Company
      at the Company's written request; or (3) that are performed by the Employed Lawyer
      for others for a fee.

(3)   The following DEFINITION is added to the Policy:

      Employed Lawyer means any past, present or future full-time, salaried employee of the
      Company who is admitted to practice law and who is employed at the time of any
      alleged Wrongful Act as a lawyer full-time for and salaried by the Company.

(4)   The EXCLUSIONS section of the Policy is amended by the addition of the following:

      The Insurer will not be liable to make any payment of Loss in connection with any
      Claim made against an Employed Lawyer:

      (a)   alleging, arising out of, based upon or attributable to any Wrongful Act
            occurring at a time when such Employed Lawyer was not employed as a lawyer
            by the Company;

      (b)   alleging, arising out of, based upon or attributable to any Claim made or any
            prior or pending litigation as of 8/11/05, or alleging or derived from the same
            facts or circumstances as alleged in such pending or prior litigation;

      (c)   alleging, arising out of, based upon or attributable to any Wrongful Act, if as of
            8/11/05, such Employed Lawyer knew or could have reasonably foreseen that
            such Wrongful Act could give rise to a Claim;

      (d)   alleging, arising out of, based upon or attributable to any activities by such
            Employed Lawyer as an officer or director of any entity other than the
            Company.

(5)   For purposes of the applicability of the coverage provided by this endorsement, the
      Company will be conclusively deemed to have indemnified the Employed Lawyer to
      the extent that the Company is permitted or required to indemnify him or her pursuant to

law, common or statutory, or contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The Company hereby agrees to indemnify the Employed Lawyer to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)     The coverage provided by this endorsement shall apply only to Claims made against an Employed Lawyer, provided that, and only for so long as, one or more Insured Persons (other than such Employed Lawyer) are and remain co-defendants in the proceeding along with such Employed Lawyer.

(7)     The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)     Solely for purposes of the coverage provided under this endorsement:

(a)     The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period will not exceed $100,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)     A retention of $100,000 shall apply to Loss resulting from each Claim; provided, such retention shall not apply to Loss incurred by any Employed Lawyer if indemnification of such Loss by the Company is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
        Attorney-in-Fact

991-352
(Ed. 09/03)                                    Page 1 of 1

ENDORSEMENT NUMBER: 6

ERRORS AND OMISSIONS EXCLUSION
WITH MANAGEMENT CARVEBACK

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to
make any payment of Loss in connection with a Claim arising out of, based upon or
attributable to any actual or alleged rendering of or failure to render, whether by the
Company or by any Insured Person, any service for others for a fee; provided, that this
exclusion will not apply to a Claim against an Insured Person for a Wrongful Act in
connection with the management or supervision of the Company or any division or
group therein.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By:  _____
                    Attorney-in-Fact

591-412
Ed (09/00)                        Page 1 of 1

ENDORSEMENT NUMBER: 7

SPECIFIC LITIGATION EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with any Claim arising out of, based upon or attributable to the following litigation:

Edward McElwreath Case

or alleging or derived from the same or essentially the same facts or circumstances as alleged in such litigation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By: _____
Attorney-in-Fact

ENDORSEMENT NUMBER: 8

AMEND POLLUTION EXCLUSION ENDORSEMENT
(A-SIDE CARVEBACK)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (D) of this Policy is amended to read in its entirety as follows:

(D)     for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants; provided, that this EXCLUSION (D) will not apply to Securities Claims; provided further, that this EXCLUSION (D) will not apply to Claims for Loss payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                          Attorney-in-Fact

ENDORSEMENT NUMBER: 9

AMEND EXCLUSION (C) ENDORSEMENT –
A-SIDE CARVEBACK

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (C) is amended to read in
its entirety as follows:

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional
distress, disease or death of any person or damage to or destruction of any
tangible property, including the loss of use thereof, or for injury from any
actual or alleged libel, slander, defamation or disparagement or violation of a
person's right of privacy; provided, that this EXCLUSION (C) will not apply
to:

(1)    Securities Claims, or

(2)    Claims for Loss payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By: _____
Attorney-in-Fact

891-444
Ed. (03/05)

Page 1 of 1

ENDORSEMENT NUMBER: 10

FULL SEVERABILITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, CONDITION (M) Representations and
Severability is amended to read as follows:

(M)   Representations and Severability

The Insureds represent that the particulars and statements contained in the
Application are true, accurate and complete and are deemed material to the
acceptance of the risk assumed by the Insurer under this Policy. This Policy is
issued in reliance upon the truth of such representations. No knowledge or
information possessed by any Insured will be imputed to any other Insured. If
any of the particulars or statements in the Application is untrue, this Policy will
be void with respect to any Insured who knew of such untruth.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____
            Attorney-in-Fact

991-701
Ed (05/03)                         Page 1 of 1

ENDORSEMENT NUMBER: 11

DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)   INSURING AGREEMENTS is amended by the addition of the following:

The Insurer will pay to or on behalf of the Company all Derivative Demand
Investigation Costs incurred by the Company as a result of a Derivative Demand first
received by the Company's Board of Directors and reported in writing to the Insurer
during the Policy Period or the Discovery Period, if purchased, up to the amount of the
Derivative Demand Investigation Costs Sub-Limit.

(2)   DEFINITIONS is amended by the addition of the following:

Derivative Demand means a written demand by one or more shareholders of the
Company made upon its Board of Directors to bring a civil proceeding in a court of law
against an Insured Person for a Wrongful Act.

Derivative Demand Investigation Costs means reasonable fees, costs and expenses
(including but not limited to attorneys' fees and experts' fees) incurred in connection
with the investigation or evaluation of any Derivative Demand, but excluding wages,
salaries, fees, benefits or overhead expenses of any Insured Person.

Derivative Demand Investigation Costs Sub-Limit means $250,000.

(3)   The Insurer's maximum aggregate liability for Derivative Demand Investigation Costs
resulting from all Derivative Demands shall be the amount set forth in the definition of
Derivative Demand Investigation Costs Sub-Limit, regardless of the number of
Derivative Demands received during the Policy Period or the Discovery Period, if
purchased. The Derivative Demand Investigation Costs Sub-Limit shall be part of and
not in addition to the Limit of Liability set forth in Item 3 of the Declarations, and
payment of such Derivative Demand Investigation Costs shall reduce such Limit of
Liability.

(4)   There shall be no retention applicable to Derivative Demand Investigation Costs.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be
effective with the policy.

Effective Date of this endorsement:

By:_____
                          Attorney-in-Fact

991-804
Ed (05/00)

Page 1 of 1

ENDORSEMENT NUMBER: 12

SEPARATE RETENTION FOR SECURITIES CLAIMS
UNDER INSURING AGREEMENT (B)(1)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, solely for purposes of Loss payable
under INSURING AGREEMENT (B)(1) arising from any Securities Claim, the retention stated
in Item 4(b) of the Declarations is amended to be $500,000.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

991-830
Ed. 07/05

Page 1 of 1

ENDORSEMENT NUMBER: 13

NON-RESCINDABLE:
INSURING AGREEMENT (A) ONLY

To be attached to and made a part of Policy No. 24-MGU-05-A10821 , issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
            Attorney-in-Fact

ENDORSEMENT NUMBER: 14

SPECIFIC EVENT(S) EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any event described hereunder.

Excluded Event(s):
Wells Notice/SEC Investigation

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
Attorney-in-Fact

ENDORSEMENT NUMBER: 15

CONTROLLING SHAREHOLDER COVERAGE –
SPECIFIC PERSON(S)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)  The following INSURING AGREEMENT is added to the Policy:

The Insurer will pay to or on behalf of the **Controlling Shareholder Loss** arising from a
**Securities Claim** first made during the **Policy Period** or the **Discovery Period** (if
applicable) against such **Controlling Shareholder** for **Wrongful Acts**, provided, that
one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such
**Securities Claim** along with such **Controlling Shareholder**.

(2)  The following DEFINITION is added to the Policy:

**Controlling Shareholder** means the following person(s):

Philip Bennett

(3)  DEFINITION (E) **Insured** is amended to read as follows:

(E)  **Insured** means: (1) the **Insured Persons**; (2) the **Company**; or (3) the
**Controlling Shareholder** but only with respect to **Securities Claims**.

(4)  DEFINITION (G) **Loss**, subsection (2), is amended to read as follows:

(2)  the **Company** or **Controlling Shareholder** is legally obligated to pay as a
result of any **Securities Claim**;

(5)  DEFINITION (P) **Wrongful Act**, subsection (1)(b), is amended to read as follows:

(b)  with respect only to **Securities Claims**, by the **Company** or by the
**Controlling Shareholder** in his or her capacity as such or any matter
claimed against such **Controlling Shareholder** by reason of his or her status
as such; or

(6)  EXCLUSION (F) is amended to read as follows:

(F)  brought by or on behalf of, or in the name or right of, the **Company**, whether
directly or derivatively, or any **Insured Person** or **Controlling Shareholder**,
unless such **Claim** is:

(1)  brought and maintained independently of, and without the
solicitation, assistance or active participation of, the **Company** or
any **Insured Person**; or

(2)　　for an actual or alleged wrongful termination of employment, or

(3)　　brought or maintained by an Insured Person or a Controlling Shareholder for contribution or indemnity and directly results from another Claim covered under this Policy, or

(4)　　brought and maintained by an employee of the Company solely to enforce his or her rights as a holder of securities issued by the Company;

provided, that this EXCLUSION (F) will not apply to Claims brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the Company;

(7)　　A retention of $300,000 will apply to Loss resulting from each Claim for which coverage is provided under this endorsement; provided, however, that such retention will apply only to Defense Costs and will not apply to any other Loss.

(8)　　CONDITION (F) Changes in Control, subsection (2), is amended to read as follows:

(2)　　If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to a Subsidiary:

(a)　　the Subsidiary ceases to be a Subsidiary, or

(b)　　a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Subsidiary;

then coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person or Controlling Shareholder thereof will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person or Controlling Shareholder thereof will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
　　　　　　　Attorney-in-Fact

990-1122
Ed. 09/05

Page 2 of 2

ENDORSEMENT NUMBER: 16

POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism.  We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002.  The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses.  For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law.  Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.  The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States — (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

SG016
Ed (04/03)

Page 1 of 1

ENDORSEMENT NUMBER: 17

EMPLOYED LAWYERS EXTENSION
(SEPARATE LIMIT AND RETENTION)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

This endorsement replaces and supersedes Endorsement Number 5 ("Employed
Lawyers Extension (Separate Limit and Retention") as of the effective date of this
endorsement.

In consideration of the premium charged:

(1)     DEFINITION (F) Insured Person is amended to include any Employed Lawyer.

(2)     DEFINITION (P) Wrongful Act is amended to include any act, error, misstatement,
misleading statement, omission or breach of duty by an Employed Lawyer, in his or her
capacity as such, in the rendering or failure to render professional legal services for the
Company; provided, that Wrongful Act shall not include any act, error, misstatement,
misleading statement, omission or breach of duty by such Employed Lawyer in
connection with any activities: (1) that are not related to such Employed Lawyer's
employment with the Company; (2) that are not rendered on the behalf of the Company
at the Company's written request; or (3) that are performed by the Employed Lawyer
for others for a fee.

(3)     The following DEFINITION is added to the Policy:

Employed Lawyer means any past, present or future full-time, salaried employee of the
Company who is admitted to practice law and who is employed at the time of any
alleged Wrongful Act as a lawyer full-time for and salaried by the Company.

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

The Insurer will not be liable to make any payment of Loss in connection with any
Claim made against an Employed Lawyer:

(a)     alleging, arising out of, based upon or attributable to any Wrongful Act
occurring at a time when such Employed Lawyer was not employed as a lawyer
by the Company;

(b)     alleging, arising out of, based upon or attributable to any Claim made or any
prior or pending litigation as of 8/11/05, or alleging or derived from the same
facts or circumstances as alleged in such pending or prior litigation;

(c)     alleging, arising out of, based upon or attributable to any Wrongful Act, if as of
8/11/05, such Employed Lawyer knew or could have reasonably foreseen that
such Wrongful Act could give rise to a Claim;

(d)  alleging, arising out of, based upon or attributable to any activities by such Employed Lawyer as an officer or director of any entity other than the Company.

(5)  For purposes of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the Employed Lawyer to the extent that the Company is permitted or required to indemnify him or her pursuant to law, common or statutory, or contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The Company hereby agrees to indemnify the Employed Lawyer to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)  The coverage provided by this endorsement shall apply only to Claims made against an Employed Lawyer, provided that, and only for so long as, one or more Insured Persons (other than such Employed Lawyer) are and remain co-defendants in the proceeding along with such Employed Lawyer.

(7)  The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)  Solely for purposes of the coverage provided under this endorsement:

(a)  The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period will not exceed $1,000,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)  A retention of $100,000 shall apply to Loss resulting from each Claim; provided, such retention shall not apply to Loss incurred by any Employed Lawyer if indemnification of such Loss by the Company is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:      8/11/2005

By _____
Attorney-in-Fact

991-322
(Ed. 09/03)

Page 1 of 1

# EXHIBIT J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

ARCH INSURANCE COMPANY,                          INDEX NO. 600805/06

    Plaintiff,

    -against-

PHILLIP R. BENNETT, LEO R. BREITMAN, NATHAN
GANTCHER, TONE GRANT, DAVID V. HARKINS,
SCOTT L. JAECKEL, DENNIS A. KLEJNA,
THOMAS H. LEE, SANTO C. MAGGIO, JOSEPH
MURPHY, RONALD L. O'KELLEY, PERRY
ROTKOWITZ, SCOTT A. SCHOEN, WILLIAM M.
SEXTON, GERALD SHERER, PHILIP SILVERMAN,
and ROBERT C. TROSTEN,

    Defendants.

---

**REPLY MEMORANDUM IN SUPPORT OF OFFICER DEFENDANTS' MOTION TO
DISMISS OR STAY THE AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

Ona T. Wang
Helen B. Kim
Joseph L. Chairez (*pro hac vice* to be filed)
BAKER & HOSTETLER LLP
666 Fifth Avenue
New York, NY 10103
Tel: 212-589-4200; Fax: 212-589-4201
*Attorneys for Defendants Dennis Klejna
and Joseph Murphy*

Holly Kulka
HELLER EHRMAN LLP
7 Times Square
New York, NY 10036
Tel: 212-847-8601; Fax: 212-763-7600
*Attorneys for Defendant Philip Silverman*

Stuart I. Friedman
Ivan O. Kline
Elizabeth D. Meacham
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Tel: 212-750-8700; Fax: 212-223-8391
*Attorneys for Defendants Gerald Sherer and
William M. Sexton*

Barbara Moses
Rachel Korenblat
MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, NY 10071
Tel: 212-856-9600; Fax: 212-856-9494
*Attorneys for Defendant Robert C. Trosten*

Laura Neish
ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
Tel: 212-704-9600; Fax: 212-704-4256
          -and-
Michael T. Hannafan (*pro hac vice* filed)
Blake T. Hannafan (*pro hac vice* filed)
HANNAFAN & HANNAFAN, LTD.
One East Wacker Drive, Suite 1208
Chicago, IL  60601
Tel: 312-527-0055; Fax:  312-527-0220
*Attorneys for Defendant Tone N. Grant*

TABLE OF CONTENTS

Page

ARGUMENT ................................................................................................................... 1

I.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A
      JUSTICIABLE CONTROVERSY ..................................................................................... 1

      A.    The Entire Complaint Should Be Dismissed As Premature Because No
            Actual Controversy Now Exists Between Arch And Defendants ........................ 1

      B.    At The Very Least, Count III, For A Declaration That The Arch Policy
            Affords No Coverage For Defense Costs, Should Be Dismissed As
            Premature ......................................................................................................... 4

      C.    Counts I And II Are Also Not Ripe Because They Are Based On A
            Contention Of Fact – Bennett's Alleged Prior Knowledge – That Will Be
            Determined In The Underlying Matters .............................................................. 6

            1.    Bennett's Alleged Prior Knowledge Will Be Determined In The
                  Underlying Matters .................................................................................. 6

            2.    Arch Will Not Be Prejudiced By Dismissal Of Counts I And II .............. 8

            3.    In The Alternative, Counts I And II Should Be Stayed Because
                  Bennett Will Invoke His Fifth Amendment Rights .................................. 10

II.   COUNT I SHOULD ALSO BE DISMISSED OR STAYED BECAUSE OF THE
      AWAC DISPUTE RESOLUTION CLAUSE, WHICH BINDS ARCH ......................... 10

CONCLUSION ............................................................................................................. 15

- i -

TABLE OF AUTHORITIES

Page(s)

CASES

*ACandS, Inc. v. Aetna Cas. & Sur. Co.*,
   666 F.2d 819 (3d Cir. 1981).................................................................................. 3

*Access Capital, Inc. v. DeCicco*,
   302 A.D.2d 48, 752 N.Y.S.2d 658 (1st Dep't 2002) .................................... 10

*Allstate Ins. Co. v. Santiago*,
   98 A.D.2d 608, 469 N.Y.S.2d 343 (1st Dep't 1983) ................................... 7

*Am. Ins. Assoc. v. Chu*,
   64 N.Y.2d 379, 487 N.Y.S.2d 311 (1985) .................................................. 1

*Bd. of Educ., Utica School Dist. # 1 v. Delle Cese*,
   65 Misc. 2d 473, 318 N.Y.S.2d 46 (Sup. Ct. Oneida Co. 1971).............. 14

*Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*,
   90 F.3d 671 (2d Cir. 1996)........................................................................ 4

*Clarendon Nat'l Ins. Co. v. Lan*,
   152 F. Supp. 2d 506 (S.D.N.Y. 2001)................................................... 11, 12

*Continental Casualty Co. v. PPG Indus., Inc.*, No. 86 C 6076, 1987 WL 6601
   (N.D. Ill. Feb. 6, 1987)............................................................................ 5

*Corbetta Constr. Co. v. George F. Driscoll Co.*,
   17 A.D.2d 176, 233 N.Y.S.2d 225 (1st Dep't 1962) .............................. 12

*Cutro v. Sheehan Agency, Inc.*,
   96 A.D.2d 669, 466 N.Y.S.2d 733 (3d Dep't 1983) .............................. 4

*Fagnani v Am. Home Assur. Co.*, 64 N.Y.2d 967, 488 N.Y.S.2d 646 (1985) ................ 5

*First State Ins. Co. v. J&S United Amusement Corp.*,
   67 N.Y.2d 1044, 504 N.Y.S.2d 88 (1986) ........................................... 8, 9

*General Re Corp. v. Foxe*,
   177 Misc. 2d 867, 678 N.Y.S.2d 459 (Sup. Ct. N.Y. Co. 1998) .......... 11

*Gulf Underwriters Ins. Co. v. Verizon Commc'ns., Inc.*,
   -- N.Y.S.2d --, 2006 WL 2621039 (1st Dep't Sept. 14, 2006) ............. 11

*Hanna v. Zumpano*,
   267 A.D.2d 1028, 701 N.Y.S.2d 553 (4th Dep't 1999) ....................... 14

*Household Mfg., Inc. v. Liberty Mutual Ins. Co.*, No. 85 C 8519, 1986 WL 4121
   (N.D. Ill. March 27, 1986)....................................................................... 5

*Kalisch-Jarcho, Inc. v. City of New York*,
   72 N.Y.2d 727, 536 N.Y.S.2d 419 (1988) ........................................... 14

*Little v. Willis*,
   55 A.D.2d 854, 390 N.Y.S.2d 347 (4th Dep't 1976)........................ 14, 15

TABLE OF AUTHORITIES
(continued)

<div align="right">Page</div>

*Nardi v. Povich,*
No. 105554/06, 2006 WL 2127714 (Sup. Ct. N.Y. Co. July 31, 2006)
(Fried, J.)...................................................................................................................13

*Nat'l Recreational Prods., Inc. v. Gans,*
46 A.D. 618, 359 N.Y.S.2d 803 (1st Dep't 1974) .......................................................12

*Prashker v. United States Guarantee Co.,*
1 N.Y.2d 584, 154 N.Y.S.2d 910 (1956) ......................................................................7

*President v. Jenkins,*
180 N.J. 550, 853 A.2d 247 (2004)...............................................................................5

*Rhinestone v. New York City Transit Auth.,*
142 A.D.2d 562, 530 N.Y.S.2d 227 (2d Dep't 1988)..............................................14, 15

*Smith Barney Shearson Inc. v. Sacharow,*
91 N.Y.2d 39, 666 N.Y.S.2d 990 (1997) ....................................................................12

*Special Jet Serv., Inc. v. Federal Ins. Co.,* 83 F.R.D. 596 (W.D. Pa. 1979).................5

*State of New York v. Philip Morris Inc.,*
30 A.D.3d 26, 813 N.Y.S.2d 71 (1st Dep't 2006) .................................................12, 13

*United States v. South-Eastern Underwriters Assn.,*
322 U.S. 533 (1944)......................................................................................................13

*Utica Mutual Ins. Co. v. Gulf Ins. Co.,*
306 A.D.2d 877, 762 N.Y.S.2d 730 (4th Dep't 2003) ................................................13

*Verizon New York Inc. v. Broadview Networks, Inc.,*
5 Misc. 3d 346, 781 N.Y.S.2d 211 (Sup. Ct. N.Y. Co. 2004) ...................................13

## OTHER AUTHORITIES

18 Couch on Insurance (2d rev. ed. 1983).......................................................................5

9 U.S.C. § 2...................................................................................................................13

9 U.S.C. §§ 1 *et seq.*....................................................................................................13

Defendants Tone Grant, Dennis A. Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten (collectively, the "Officer Defendants")[1] respectfully submit this Reply Memorandum of Law in support of their motion, pursuant to CPLR 3211 (a)(1), (a)(2) and (a)(7), to dismiss the Amended Complaint For Declaratory Judgment (the "Amended Complaint") in its entirety or, in the alternative, for a stay pursuant to CPLR 2201.

## ARGUMENT

### I.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A JUSTICIABLE CONTROVERSY

#### A.    The Entire Complaint Should Be Dismissed As Premature Because No Actual Controversy Now Exists Between Arch And Defendants

Arch does not dispute that, in order to maintain a declaratory judgment action, there must be an actual controversy, involving "present, rather than hypothetical, contingent or remote, prejudice to plaintiffs." *Am. Ins. Assoc. v. Chu,* 64 N.Y.2d 379, 383, 487 N.Y.S.2d 311 (1985). Nor does Arch dispute that it is a fourth-tier excess carrier, with no obligation to provide any coverage until $40 million in Underlying Insurance[2] has been exhausted. Arch maintains, however, that there is presently an "actual controversy" between it and the Defendants based on the amount of damages claimed by the plaintiffs in certain of the Underlying Matters. (Opp. at 9.) But Arch ignores a number of critical facts demonstrating that it is entirely speculative whether the Arch Policy will ever be triggered.

---

[1] The Officer Defendants are all former officers of Refco, Inc. ("Refco") or its affiliates. In addition to the Officer Defendants, the Defendants in this action include former Refco CEO Phillip Bennett, Santo C. Maggio, Perry Rotkowitz, and seven former directors of Refco. With respect to Rotkowitz, Arch has indicated that it would not oppose Rotkowitz's motion to dismiss to the extent that his motion is without prejudice. (Opp. at 6 n.3.)

[2] All terms defined in the Memorandum in Support of Officer Defendants' Motion to Dismiss or Stay, dated September 18, 2006 ("Initial Br."), are assigned the same meaning here. "Opp." refers to Arch's Memorandum in Opposition to the Officer Defendants' Motion to Dismiss or Stay.

First, there has been no showing as to which, if any, of the claims in the Underlying Matters has any merit as against one or more of the Defendants in this action, many of whom have moved to dismiss some or all of the claims against them. Indeed, the Amended Complaint does not even allege that Defendants' liability will exceed $40 million so as to trigger the Arch Policy.

Equally significantly, the plaintiffs in the Underlying Matters have many sources of recovery other than from the Defendants herein (the "Officer/Director Defendants"). To begin, the Officer/Director Defendants are far from the only defendants in the Underlying Matters. Rather, there are numerous "deep pocket" defendants who are not insureds under the Arch Policy (or any of the Underlying Insurance), thus significantly reducing the realistic exposure of the Officer/Director Defendants. For example, in the consolidated class action securities litigation (the "Securities Litigation") referred to by Arch (Opp. at 9), there are 28 defendants other than the Officer/Director Defendants, including Refco's auditing firm (Grant Thornton) and fifteen investment banking firms that served as underwriters for Refco's securities. (*See* Reply Affirmation of Rachel Korenblat ("Korenblat Reply Aff."), Ex. 1.)

Additionally, one of the non-Officer/Director Defendants, BAWAG P.S.K. Bank für Arbeit und Wirschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG"), has already reached a "global settlement" with the creditors committee in the Refco bankruptcy, the plaintiffs in the Securities Litigation, and Thomas H. Lee entities (the plaintiffs in another of the Underlying Matters specifically cited by Arch (Opp. at 9)) pursuant to which BAWAG will make payments of at least $683 million. (*See* Korenblat Reply Aff., Ex. 2.)  At least $108 million from BAWAG's payments will go to the plaintiffs in the Securities Litigation; at least $84 million will go to Thomas H. Lee entities; and, remaining amounts will go to the Refco creditors, many of whom are the plaintiffs in other Underlying Matters. *Id.* Further, the Refco creditors will be receiving significant payments in the bankruptcy proceedings from other Refco assets, which will greatly reduce their damages. For example, Refco senior subordinated

- 2 -

noteholders, who are part of the plaintiff class in the Securities Litigation, are expected to receive a distribution which constitutes 83.4% of the outstanding balance on these notes. (*Id.* at p. 55 and pp. 12-13 of the Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries.)

Accordingly, notwithstanding the amounts sued for in the Underlying Matters, there is substantial uncertainty as to whether the Arch Policy will ever be triggered, and thus a decision on Arch's claims may well be merely advisory.

None of the cases cited by Arch compels a finding that its action is justiciable. Rather, each of those cases turned on the particular facts before the court, which showed a sufficient likelihood that the policy or policies at issue would be triggered. None of those cases allowed a fourth-tier excess carrier to bring its own declaratory judgment action prior to exhaustion of even the primary insurance, and, none appears to have allowed any insurer with a coverage threshold anywhere near $40 million to maintain such a declaratory judgment action based solely on the amount of damages claimed in an underlying action.

Finally, Arch essentially ignores the public policy concerns raised in our Initial Brief (p. 15) as to the unnecessary burden Arch seeks to impose on the individuals who are supposed to be the beneficiaries of the Arch Policy. Rather, Arch asserts, without elaboration, that "significant policy considerations" support its request for declaratory relief.[3] In actuality, there is no need for Arch to now maintain this action. Most telling in this regard is the fact that none of the other excess insurers in the tower of Directors & Officers liability insurance, including the three beneath Arch, has felt it necessary to bring an action against any of the Officer/Director Defendants, even though each could seek to assert some or all of the same claims as are brought by Arch.

---

[3] The case cited by Arch, *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819 (3d Cir. 1981), is factually inapposite, as it involved a dispute between two insurers as to their obligations to a single insured that was a defendant in several underlying actions.

- 3 -

In sum, the underlying primary policy limits of the U.S. Specialty Policy have yet to be exhausted, none of the excess policies has been triggered, and it remains purely speculative whether Arch's $10 million fourth-tier excess policy will ever be tapped. Thus, Arch's action is premature, and should be dismissed. *See, e.g., Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.,* 90 F.3d 671, 673, 675 (2d Cir. 1996); *Cutro v. Sheehan Agency, Inc.,* 96 A.D.2d 669, 466 N.Y.S.2d 733, 734 (3d Dep't 1983).

**B.     At The Very Least, Count III, For A Declaration That The Arch Policy Affords No Coverage For Defense Costs, Should Be Dismissed As Premature**

In our Initial Brief (p. 16), we showed that Count III of the Amended Complaint fails to allege an "actual controversy," as it is entirely speculative whether Arch's fourth-tier excess policy will ever be triggered for defense fees or costs incurred by Defendants. In response, Arch contends that, in view of the number of Underlying Matters and the number of law firms involved, defense costs alone could exceed the $40 million threshold required to trigger the Arch policy. (Opp. at 12.) But even if this unlikely scenario were ever to occur, it would occur years from now, and thus Arch's claim remains premature. At present, the $10 million primary policy is not even close to being exhausted. U.S. Specialty Insurance Company recently made payments totaling approximately $1.2 million, covering an additional two month period, thereby bringing its total payments to approximately $4.9 million. (*See* Korenblat Reply Aff. Ex. 3.) Even if the pace of $600,000 per month of defense costs continues,[4] which is by no means certain or even likely, the $40 million threshold required to trigger the Arch Policy will not be met for another five years.

Arch also argues that Count III presents an actual controversy because the Defendants' potential liability, combined with their Defense Costs, could exceed the $40 million of Underlying Insurance. (Opp. at 12.) Arch has not articulated, however, how this could cause its

---

[4]  The number of law firms involved may soon decrease since, as noted above, many of the Officer/Director Defendants have moved to dismiss some or all of the claims against them.

policy to be triggered for Defense Costs, and it is plainly speculative as to any such scenario ever occurring.

In any event, even if this Court were to conclude that Count III is somehow justiciable, it should stay Count III pursuant to CPLR 2201. Count III is premised on the definition of "Loss" in the policy issued by Lexington Insurance Company ("Lexington"), the first-tier excess carrier. It is plainly preferable to have the interpretation of the Lexington Policy adjudicated in an action to which Lexington is a party.[5] In that regard, on October 17, certain of the Officer/Director Defendants filed an action against Lexington in the Superior Court of the State of New Jersey, Hudson County, seeking a declaration that the Lexington Policy covers Defense Costs. (*See* Korenblat Aff. Ex. 4.)[6] The other Officer/Director Defendants have been named as additional defendants in that action. In these circumstances, this Court should stay Count III, so that the

---

[5]  Indeed, as a general proposition, courts and commentators agree that additional or excess insurers are not necessary parties to a suit between an insured and its primary or first layer excess insurer. *See, e.g., Continental Casualty Co. v. PPG Indus., Inc.,* No. 86 C 6076, 1987 WL 6601, at * 2 (N.D. Ill. Feb. 6, 1987); *Household Mfg., Inc. v. Liberty Mutual Ins. Co.,* No. 85 C 8519, 1986 WL 4121, at *3 (N.D. Ill. March 27, 1986); 18 Couch on Insurance § 74:618 (2d rev. ed. 1983) ("An excess insurer is not a necessary party to a declaratory judgment proceeding brought by the primary insurer.") *Cf. Special Jet Serv., Inc. v. Federal Ins. Co.,* 83 F.R.D. 596, 599 (W.D. Pa. 1979) (citing 18 Couch, supra, at § 74:505) ("'The fact that an insurer is concerned with the results of a lawsuit does not mean that it is . . . a necessary party therein.'"). Moreover, where, as here, the language of the Lexington Policy concerning coverage of Defense Costs is ambiguous on its face, the New Jersey court may review extrinsic evidence submitted by the parties to resolve the ambiguity so it comports with the reasonable expectations of the insureds. *See Fagnani v Am. Home Assur. Co.,* 64 N.Y.2d 967, 488 N.Y.S.2d 646 (1985); *President v. Jenkins,* 180 N.J. 550, 853 A.2d 247 (2004). Clearly, Arch, as a non-party to the Lexington Policy, is in no position to submit such extrinsic evidence. It is Lexington, not Arch, that is in the best position to litigate the meaning of the Lexington Policy.

[6]  As set forth in our Initial Brief (p. 5), while Lexington has agreed to advance Defense Costs once the U.S. Specialty Policy is exhausted, it has reserved its rights to seek repayment of such advances on the ground that Defense Costs are not covered. In contrast to the Arch Policy, there is little question but that the Lexington Policy will be triggered for Defense Costs.

question of whether the Lexington Policy covers Defense Costs may be determined in the action against Lexington.[7]

**C. Counts I And II Are Also Not Ripe Because They Are Based On A Contention Of Fact – Bennett's Alleged Prior Knowledge – That Will Be Determined In The Underlying Matters**

**1. Bennett's Alleged Prior Knowledge Will Be Determined In The Underlying Matters**

Our Initial Brief (pp. 18-19) set forth the well-established rule that an action for declaratory relief regarding coverage may not be maintained where coverage turns on a factual issue that will be determined in the underlying action. This rule applies squarely to Counts I and II in the Amended Complaint, which seek a declaration that the Arch Policy does not provide coverage for any of the Underlying Matters based on Arch's contention that Bennett possessed knowledge of facts regarding Refco so as to trigger "prior-knowledge" exclusions in the AWAC and Arch Policies.

Arch seeks to downplay or obscure the significance of Bennett's "prior knowledge" in assessing whether the prior-knowledge exclusions are applicable. Arch argues that the exclusions turn on whether the Underlying Matters are claims "arising out of, based upon or attributable to" any "act, error, omission, fact, matter or circumstance" that might give rise to a Claim" and of which "any Insured as of August 11, 2005 has any knowledge." (Opp. at 14-15.) However, Arch ignores the fact that the "knowledge" of an insured that it must prove for this purpose in this case is the very same "knowledge" that is at issue in the Underlying Matters.

Arch cannot dispute that Counts I and II of its Amended Complaint are premised on allegations as to what Bennett knew and when he knew it. The Amended Complaint specifically alleges (*see* Am. Compl. ¶¶ 48, 77, 81) that Bennett had knowledge as of August 11, 2005 of facts and circumstances relating to Refco's financial condition so as to trigger the prior

---

[7] As set forth in our Initial Brief (p. 16 n.8), if not dismissed, all Counts in the Amended Complaint should also be stayed under CPLR 2201 until such time as the Arch Policy is close to being triggered, to avoid prejudice to the Defendants.

knowledge exclusions.[8]  In addition, Arch cannot dispute that Bennett's knowledge of Refco's financial condition is one of the key factual questions that must be determined in the Underlying Matters.  Indeed, the allegations against Bennett in the Amended Complaint are essentially the same as those made against him in the Underlying Matters.  Accordingly, the issue of Bennett's knowledge must be determined in the Underlying Matters, not in this action for declaratory relief.  *See, e.g., Allstate Ins. Co. v. Santiago,* 98 A.D.2d 608, 469 N.Y.S.2d 343 (1st Dep't 1983).

Arch also contends that dismissal of Counts I and II is not required because the factual issue they raise is "far narrower" than the factual issues in the Underlying Matters.  (Opp. at 13.) However, the presence of additional factual issues in the Underlying Matters is irrelevant. The test is whether the factual matter at issue in the coverage action will be determined in the underlying action, as will occur here.  *See, e.g., Prashker v. United States Guarantee Co.,* 1 N.Y.2d 584, 590-93, 154 N.Y.S.2d 910, 915-17 (1956).

Arch's position also ignores the very substantial risk of inconsistent factual findings if the declaratory action proceeds, which risk is just as great even when there are additional factual issues in the underlying actions.  As the Court of Appeals has recognized in dismissing a request for declaratory relief:

> The facts might be decided in one manner in the declaratory judgment action, and differently in the principal actions, with the consequence that the liability of the carrier or lack of it might be decided on facts other than those to be established between the parties in the main action or actions.

*Id.* at 591, 154 N.Y.S.2d at 915.

Notably, Arch has not cited a single relevant case in support of its position.  Rather, Arch cites five out-of-state cases applying the laws of other jurisdictions (Opp. at 15-16), each of

---

[8]  While Arch cites (Opp. at 15, 16) to the language in the policies as to the knowledge of "any Insured" precluding coverage, it has not alleged prior knowledge by any other Defendant.  (Am. Compl. at ¶¶ 48, 77, 81.)  Moreover, even if Arch does seek to amend its complaint so as to add allegations as to prior knowledge of any other Insured, the analysis set forth above and in our Initial Brief will still be fully applicable as long as that person's knowledge is also an issue in the Underlying Matters.

which addressed whether the particular facts known to an insured were sufficient to trigger a "prior knowledge" exclusion – an issue not germane to this motion. None of these cases discusses justiciability, or whether declaratory relief regarding "knowledge" is foreclosed by the inevitable litigation of that very same "knowledge" in the underlying action.

Ultimately, Arch cannot escape the legion of New York cases cited by Defendants, holding that a declaratory judgment of an insurer's obligation to indemnify may be granted before the trial of the underlying action "only if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer may eventually be held liable under its policy." (*See* Initial Br. at 17.) Here, the possibility exists that Bennett did not have "prior knowledge" as alleged by Arch, which would render the exclusions on which Arch relies inapplicable. That factual issue must be resolved in the Underlying Matters.

### 2. Arch Will Not Be Prejudiced By Dismissal Of Counts I And II

Arch contends in the alternative that Counts I and II should not be dismissed because it will be left without an adequate remedy. (Opp. at 16.) Arch is wrong.

Of course, this Court need not even address this contention, since the fact that Bennett's prior knowledge will be determined in the Underlying Matters requires dismissal of these counts for non-justiciability in any event, as we have shown above. *First State Ins. Co. v. J&S United Amusement Corp.*, 67 N.Y.2d 1044, 504 N.Y.S.2d 88 (1986), relied on by Arch, is not to the contrary. In contrast to the case at bar, the exclusion on which the insurer sought to rely in *First State* turned on a factual issue that would not necessarily be determined in the underlying action. Thus, the insurer was given the opportunity to avoid dismissal if it could show that it would consequently be left without an adequate remedy. *Id.* at 1046, 504 N.Y.S.2d at 89.

Even if the availability of another remedy for Arch must be considered, Counts I and II must still be dismissed. Arch has already denied coverage based on the prior knowledge exclusions. *See* Opposition Affirmation of John H. Eickemeyer ("Eickemeyer Aff."), Ex. 1 (denial letter), pp. 12-15. In the context, its remedy is quite clear and adequate: in

- 8 -

conformance with its denial letter, it may simply refuse to indemnify any of the Defendants when and if their liability ever does exceed $40 million so as to trigger the Arch Policy. *See, e.g., First State Ins. Co.*, 67 N.Y.2d at 1046, 504 N.Y.S.2d at 89 (defense of indemnity action by insured is normal remedy for insurer relying on an exclusion).

Arch asserts nonetheless that it may not have an adequate remedy if Counts I and II are dismissed because settlement demands in the Underlying Matters "could occur at any time," and it will then be forced to address such demands "in a climate of substantial uncertainty about the key coverage issues." (Opp. at 17.) However, that identical argument could be made by *any* insurer seeking to pursue a declaratory judgment action to establish the absence of coverage, as there could always be "settlement demands" in any underlying action. Indeed, the entire line of cases cited above and in our Initial Brief as to the non-justiciability of claims such as Counts I and II would be rendered meaningless if Arch's argument were accepted.[9]

Not surprisingly, Arch has not cited to a single case from New York to support its argument as to the absence of an adequate remedy.[10] Moreover, as noted above, the fact that the other excess carriers which have denied coverage based on one or more of the same exclusions cited by Arch have not felt compelled to commence a declaratory judgment action belies any claim of prejudice by Arch.

In contrast to the lack of harm to Arch from a dismissal of Counts I and II, the Defendants will be burdened with needless, extensive, and likely duplicative, costs should these claims go forward. It is indisputable that this declaratory action will involve many of the same

---

[9] If Arch ever does face "settlement demands" in any of the Underlying Matters, it, like any litigant, will simply have to assess the strength of its position, as set forth in its letter denying coverage, in deciding whether to contribute towards a settlement.

[10] Moreover, the Third Circuit case cited by Arch, *ACandS, Inc.*, is inapposite, as noted above (n.2). Arch also cites to the decision by the Refco Bankruptcy Court to lift the automatic stay so as to allow Arch to pursue this action. (Opp. at 18.) That decision, however, did not address justiciability, or any other issue under New York law. Rather, the Bankruptcy Court relied on Arch's representations, based on "duty to defend" cases under Illinois law, on potential prejudice to Arch if it did not pursue an action challenging the directors' and officers' right to coverage. (Eickemeyer Aff., Ex. 2, at 100-01.)

facts and evidence as the Underlying Matters. Discovery will thus not only be lengthy and expensive, and will encompass numerous non-parties, but it will also duplicate much of the discovery in the Underlying Matters.  Imposing such costs on the Defendants – who are supposed to benefit from Arch's Policy, not be victimized by it – is particularly inappropriate in light of the fact that Arch's coverage obligation is $35 million from being triggered.

3.    **In The Alternative, Counts I And II Should Be Stayed Because Bennett Will Invoke His Fifth Amendment Rights**

Bennett, on whom Arch relies on for the "prior knowledge" exclusion, has stated that he will assert his Fifth Amendment privileges if this matter proceeds. (*See* Bennett's Mtn. to Stay.) In Arch's Memorandum of Law in Opposition to Defendant Bennett's Motion to Stay, Arch argues that a stay is not proper if the Fifth Amendment is invoked to benefit oneself.  However, Arch cites case law that holds it is appropriate to grant a stay pending the resolution of a criminal case for the benefit of other parties. (Arch Opp. to Bennett at 4) (citing *Access Capital, Inc. v. DeCicco*, 302 A.D.2d 48, 52, 752 N.Y.S.2d 658, 662 (1st Dep't 2002).)  Arch thus recognizes the logic of staying a declaratory action involving other parties whose rights will depend on the knowledge and testimony of one person, who has stated that he will not testify.

Arch seeks to use the "prior knowledge" exclusions – and thus seeks to use Bennett's alleged knowledge – to avoid coverage for all Defendants, not just for Bennett. The Officer Defendants cannot present a proper defense in this action without Bennett's testimony, yet he has declared that he will assert his Fifth Amendment rights pending the resolution of criminal charges against him.  The prejudice to the Officer Defendants based on Bennett's position is obvious.  Accordingly, even if Counts I and II are not dismissed, they should be stayed as to the Officer Defendants until such time as Bennett will no longer assert his Fifth Amendment rights.

II.    **COUNT I SHOULD ALSO BE DISMISSED OR STAYED BECAUSE OF THE AWAC DISPUTE RESOLUTION CLAUSE, WHICH BINDS ARCH**

Arch contends that it is not bound by the ADR provision found in the AWAC policy because "the only parties to the AWAC ADR provision are AWAC and the insureds." (Opp.

- 10 -

at 19.) AWAC and the insureds are the only signatories to the AWAC Policy. But Arch agreed

to "follow the form" of the AWAC Policy, and is thereby bound by its ADR clause. *See Gulf*

*Underwriters Ins. Co. v. Verizon Commc'ns., Inc.*, -- N.Y.S.2d --, 2006 WL 2621039, at *1 (1st

Dep't Sept. 14, 2006).[11]

Arch agreed in its Policy with the insureds that "the insurance coverage afforded by this

Policy shall apply in conformance with the terms and conditions of the Followed Policy [the U.S.

Specialty Policy] and in conformance with any terms and conditions further limiting or

restricting coverage in this Policy or in any other Underlying Insurance." (Am. Compl. Ex. A

(Section 1 C of the Arch Policy; emphasis added).) The term "Underlying Insurance" includes

the AWAC Policy. *Id.* (Section III C, D; Item 5 of the Declarations Page). Thus, Arch is bound

to the "terms and conditions" of the AWAC Policy, which includes the ADR clause, just as if it

was a party to the AWAC Policy. *See Clarendon Nat'l Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 520

(S.D.N.Y. 2001) ("A nonsignatory to an agreement containing an arbitration provision can be

compelled to arbitrate when the nonsignatory is a party to a separate contractual relationship with

the signatory to the arbitration agreement which incorporates the existing arbitration clause");

*General Re Corp. v. Foxe*, 177 Misc. 2d 867, 880, 678 N.Y.S.2d 459, 468 (Sup. Ct. N.Y. Co.

1998) (finding that nonsignatory to arbitration agreement was bound to agreement because, in

part, nonsignatory agreed to ensure a signatory's obligations under the contract).

Courts routinely find that arbitration and other ADR clauses, such as the AWAC clause,

bind nonsignatories like Arch when the clauses broadly provide that "[a]ny and all disputes or

---

[11]  In *Gulf Underwriters Ins. Co.*, the First Department squarely held that the plaintiff excess
insurance carrier was bound to the primary insurance policy's arbitration clause "by operation of
[the carrier's] excess coverage policy." 2006 WL 2621039, at *1. The court went on to rule that
the insured defendant, Verizon, did not have a right to compel the plaintiff to arbitrate the
plaintiff's declaratory action, but only because the arbitration clause in question narrowly
provided that only claims by the insured against the insurer were subject to arbitration, not
vice versa. *Id.* Thus, the court explained that "[s]ince Verizon is not the insurer, there is no
arbitration requirement which conditions plaintiff's ability to seek judicial review." *Id.* In sharp
contrast, the AWAC ADR provision broadly provides that "[a]ny and all disputes" rising under
the policy "shall be subject to [ADR]." (Am. Compl. Ex. E at 5.)

- 11 -

differences which may arise under the policy . . . shall be subject to [ADR]." (Am. Compl. Ex. E at 5.) *See Clarendon Nat'l Ins. Co.*, 152 F. Supp. 2d at 520-21 (finding arbitration clause similar to the AWAC clause to be binding on a nonsignatory). Undeniably, Count I is a dispute "arising under" the AWAC policy, because Arch seeks to utilize the AWAC prior knowledge exclusion to avoid its contractual duties to the insureds. (*See* Am. Compl. ¶ 79.)

The cases relied upon by Arch for its proposition that "courts exercise caution to avoid foisting the obligations of ADR agreements upon non-parties" (*see* Opp. at 19) are inapposite. Specifically, in *Corbetta Constr. Co. v. George F. Driscoll ·Co.*, 17 A.D.2d 176, 179, 233 N.Y.S.2d 225, 228 (1st Dep't 1962), unlike here, the plaintiff did not execute any agreements incorporating the terms and conditions of the contract that contained the arbitration clause. *Id.* (subcontract at issue did not "incorporate[] the main contract [which provided for arbitration] [or] its terms either directly, by reference or even by implication"). In *Nat'l Recreational Prods., Inc. v. Gans*, 46 A.D. 618, 619, 359 N.Y.S.2d 803, 805 (1st Dep't 1974), the issue was whether a guarantor to an employment contract containing an arbitration clause needed to be a party to an arbitration between the employer and employee. The First Department held that the guarantor need not be a party so long as the guarantor was bound to the results of the arbitration. *Id.* Here, the insureds are not seeking to require that Arch be a party to an ADR proceeding with AWAC; rather, Arch is seeking to negate the ADR provision altogether.

Arch cannot selectively utilize what it deems to be the benefits of the AWAC Policy (*i.e.*, the prior knowledge exclusion) while ignoring the insureds' contractual right to ADR in the same Policy. Nor should this Court permit Arch to eviscerate the insureds' rights through a declaratory judgment action. Indeed, it is well established that New York public policy strongly favors enforcing arbitration clauses. *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 49, 666 N.Y.S.2d 990, 995 (1997) ("[t]his decision [upholding enforcement of an arbitration clause] fortifies and advances the long and strong public policy favoring arbitration"); *State of New York v. Philip Morris Inc.*, 30 A.D.3d 26, 31, 813 N.Y.S.2d 71, 75 (1st Dep't 2006) ("Arbitration is

- 12 -

strongly favored under New York law."). Federal law is in accord. Recently, in *Nardi v. Povich*, No. 105554/06, 2006 WL 2127714, at *4-5 (Sup. Ct. N.Y. Co. July 31, 2006) (Fried, J.), this Court reemphasized the strong federal policy favoring arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA"). *Id.*[12] In a decision holding that a nonsignatory was bound to an arbitration agreement, Justice Fried noted that "any ambiguities as to the scope of an arbitration provision governed by the FAA would be properly resolved in favor of arbitration." *Id.* at 5 (internal quotations omitted). Likewise, the court in *Verizon New York Inc. v. Broadview Networks, Inc.*, 5 Misc. 3d 346, 350 n.4, 781 N.Y.S.2d 211, 214 n.4 (Sup. Ct. N.Y. Co. 2004), stressed that "courts should construe arbitration clauses as broadly as possible and any doubt or ambiguity as to the scope of the arbitration agreement should be resolved in favor of arbitration." *Id.* (internal quotations and citations omitted); *see also Philip Morris, Inc.*, 30 A.D.3d at 31, 813 N.Y.S.2d at 75 ("[a]ny doubts as to whether an issue is arbitrable will be resolved in favor of arbitration").

Arch's position – that it may cherry-pick certain provisions of the AWAC Policy while disregarding the ADR clause – would not only negate the Officer Defendants' right to ADR; if adopted by the courts, it would set an untenable precedent, whereby one insurance carrier in a tower could easily override the contractual rights of insureds under other policies. Indeed, the carrier which did sign the ADR agreement could, as a practical matter, avoid its ADR obligations altogether by arranging for an excess carrier to litigate the dispute by proxy. Such a result would open the door to enormous mischief and offend the strong public policy in favor of ADR.

---

[12] The FAA provides in pertinent part that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Nardi*, 2006 WL 2127714, at *3 (quoting 9 U.S.C. § 2). The FAA is applicable to insurance contracts because "insurance transactions constitute commerce within the meaning of the Commerce Clause." *Utica Mutual Ins. Co. v. Gulf Ins. Co.*, 306 A.D.2d 877, 878, 762 N.Y.S.2d 730, 732 (4th Dep't 2003) (citing *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 553 (1944)).

- 13 -

Arch next contends that this Court should not dismiss or stay Count I because the Officer Defendants have not yet commenced an ADR proceeding against AWAC. (Opp. at 19.) But New York courts have long recognized that defendants need not take affirmative steps to initiate ADR. *See Bd. of Educ., Utica School Dist. # 1 v. Delle Cese*, 65 Misc. 2d 473, 478, 318 N.Y.S.2d 46, 51 (Sup. Ct. Oneida Co. 1971) ("one who does not wish to take the affirmative of compelling arbitration still has the right to have the action at law stayed"). Indeed, the court in *Bd. of Educ., Utica School Dist. # 1* reasoned that "[i]t is traditional that a defendant may ordinarily let a sleeping dog lie until he is in danger of being bitten." *Id.* at 477, 318 N.Y.S.2d at 50 (internal quotations omitted). The insureds are not in immediate danger of "being bitten" by AWAC, which is the third-tier insurance carrier – one tier below Arch. (*See* Officer Defs' Mem. at 6.) Defendants would need to exhaust approximately $22.6 million before the AWAC Policy is triggered. Defendants' "failure" to initiate a premature ADR proceeding against AWAC – to resolve a dispute which is still entirely speculative – cannot be used to justify Arch's attempt to end-run the ADR clause entirely. Tellingly, AWAC has not initiated any ADR proceeding either. This means one of two things: either AWAC (like the insureds) believes that the "dispute" is premature, or else AWAC is in collusion with Arch to avoid its ADR obligations.

Finally, Arch erroneously asserts that Count I cannot be dismissed before the ADR process has been completed. (Opp. at 20.) But the weight of the law is overwhelmingly to the contrary. In actions seeking a declaratory judgment, such as Count I, New York courts routinely "decline to exercise jurisdiction over such an action in favor of the contractual arbitration provisions," regardless of whether those proceedings are completed, pending, or not yet begun. *Hanna v. Zumpano*, 267 A.D.2d 1028, 1028-29, 701 N.Y.S.2d 553, 554 (4th Dep't 1999) (quoting *Little v. Willis*, 55 A.D.2d 854, 390 N.Y.S.2d 347, 348 (4th Dep't 1976)). *See also Kalisch-Jarcho, Inc. v. City of New York*, 72 N.Y.2d 727, 731-32, 536 N.Y.S.2d 419, 421 (1988) (declaratory action was improper in light of arbitration agreement between the parties); *Rhinestone v. New York City Transit Auth.*, 142 A.D.2d 562, 563, 530 N.Y.S.2d 227, 228 (2d

- 14 -

Dep't 1988) (Supreme Court "should have declined to exercise jurisdiction over the claim . . . in deference to the pending arbitration proceeding") (internal citations omitted); *Little*, 55 A.D.2d at 854, 390 N.Y.S.2d at 348 (upholding Supreme Court's dismissal of declaratory action as "proper" because of arbitration clause).

For all of these reasons, Count I should be dismissed, or in the alternative, stayed in accordance with the AWAC ADR provision.

### CONCLUSION

Based on the foregoing, and the reasons discussed in the Officer Defendants' Initial Brief, the Officer Defendants' motion to dismiss or, in the alternative, for a stay should be granted in its entirety.

Dated:  October 31, 2006                      Respectfully submitted,

_Rachel Korenblat_                             _Helen Kim / Rank_
Barbara Moses                                  Ona T. Wang
Rachel Korenblat                               Joseph L. Chairez (*pro hac vice* to be filed)
MORVILLO, ABRAMOWITZ, GRAND,                   Helen B. Kim
IASON, ANELLO & BOHRER, P.C.                   BAKER & HOSTETLER LLP
565 Fifth Avenue                               666 Fifth Avenue
New York, NY 10071                             New York, NY 10103
Telephone:  212-856-9600                       Telephone:  212-589-4200
Facsimile:  212-856-9494                       Facsimile:  212-589-4201

*Attorneys for Defendant Robert C. Trosten*    *Attorneys for Defendants*
                                               *Dennis Klejna and Joseph Murphy*

- 15 -

_Dan Kline / cmk_

Stuart I. Friedman
Ivan O. Kline
Elizabeth D. Meacham
**FRIEDMAN & WITTENSTEIN**
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone:    212-750-8700
Facsimile:     212-223-8391

*Attorneys for Defendants Gerald Sherer and William M. Sexton*

_Holly Kulka / cmk_

Holly Kulka
**HELLER EHRMAN WHITE & MCAULIFFE, LLP**
7 Times Square
New York, NY 10036
Telephone:    212-847-8601
Facsimile:     212-763-7600
*Attorneys for Defendant Philip Silverman*

_Laura Neish / cmk_

Laura Neish
**ZUCKERMAN SPAEDER LLP**
1540 Broadway, Suite 1604
New York, New York 10036
Telephone:    212-704-9600
Facsimile:     212-704-4256
           -and-
Michael T. Hannafan (*pro hac vice* to be filed)
Blake T. Hannafan (*pro hac vice* to be filed)
**HANNAFAN & HANNAFAN, LTD.**
One East Wacker Drive, Suite 1208
Chicago, IL  60601
Telephone:    312-527-0055
Facsimile:     312-527-0220
*Attorneys for Defendant Tone N. Grant*

- 16 -

```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2

 3   ---------------------------------------X
                                           :
 4   In Re:                                :   05-60006
                                           :
 5             REFCO, INC.,                :   One Bowling Green
                                           :   New York, New York
 6                  Debtors.               :   September 11, 2007
     ---------------------------------------X
 7   TONE N. GRANT, et al,                 :   07-2005
                                           :
 8                  Plaintiffs,            :
                                           :
 9                  v.                     :
                                           :
10   AXIS REINSURANCE COMPANY,             :
                                           :
11                  Defendant.             :
     ---------------------------------------X
12                       TRANSCRIPT OF HEARING
13             BEFORE THE HONORABLE ROBERT D. DRAIN
                    UNITED STATES BANKRUPTCY JUDGE
14

15   APPEARANCES:

16   For Plaintiffs:          NORMAN L. EISEN, ESQ.
                              Zuckerman, Spaeder, LLP
17                            1800 M Street, N.W.
                              Washington, D.C.  20036
18
     For Messrs Grant:        HELEN B. KIM, ESQ.
19    and Klejna              Baker & Hostetler, LLP
                              333 South Grand Avenue
20                            Los Angeles, California  90071

21   For Mr. Trosten:         BARBARA MOSES, ESQ.
                              Morvillo, Abramowitz, Grand, Jason,
22                             Anello & Bohrer, P.C.
                              565 Fifth Avenue
23                            New York, New York  10017

24   For Axis:                JOAN M. GILBRIDE, ESQ.
                              Kaufman, Borgeest & Ryan, LLP
25                            99 Park Avenue
                              New York, New York  10016

                         (Appearances continued on next page)
```

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


APPEARANCES CONTINUED:


For Mr. Silverman:        RICHARD CASHMAN, ESQ.
                          Heller, Ehrman, LLP
                          Seven Times Square
                          New York, New York  10036

For Messrs. Sexton and:   IVAN O. KLINE, ESQ.
  Shearer                 Friedman, Wittenstein & Hochman
                          600 Lexington Avenue
                          New York, New York  10022

For RJM, LLC:             STEVEN WILOMOWSKY, ESQ.
                          Bingham, McCutchen, LLP
                          399 Park Avenue
                          New York, New York  10022

For Mr. Murphy:           JOHN J. JEROME, ESQ.
                          Saul Ewing, LLP
                          1500 Market Street
                          Philadelphia, Pennsylvania  19102



Court Transcriber:        CARLA NUTTER
                          TypeWrite Word Processing Service
                          356 Eltingville Boulevard
                          Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

3

1          THE COURT:   Grant v Axis Reinsurance in the Refco

2     case.

3          MR. EISEN:  Good morning, Your Honor.

4          Norman Eisen representing Mr. Grant and I will be

5     arguing on the motion for advancement on behalf of Mr. Grant,

6     Mr. Trosten and Mr. Bennett, although Mr. Trosten and Mr.

7     Bennett's counsel are here as well and they may wish to join in

8     at certain points.

9          THE COURT:  Okay.

10         MR. EISEN:  On behalf of everyone we want to thank

11    the Court for taking the motion on an expedited basis.  We

12    believe that the fundamental issues that are raised by our

13    advancement motion were raised and decided by the Court on the

14    other insurance motion that we were before the Court on less

15    than two weeks ago.  As the Court knows, the criminal

16    defendants -- we refer to them as the presumed innocent

17    defendants in distinction to Axis designation -- joined in the

18    motion for advancement we argued and the Court actually

19    addressed in the course of its holdings -- actually addressed

20    the prejudice to the criminal defendants with respect to the --

21    on the balancing of harms.

22         I will just quickly go through the issues and I think

23    reference to Axis' brief makes clear that fundamentally Axis is

24    rearguing the issues that were before the Court the last time

25    we were here on the question of what the standard is, whether

D R A F T                                                    4

1   this is a prohibitory or mandatory injunction.  The Court has

2   already invoked the reasoning of <u>Worldcom</u> and ruled.  The Court

3   has applied the test of a likelihood of success on the merits

4   or a sufficiently serious question and balance of harms.  There

5   is no new issue in the brief about and we recognize the Court

6   likely went to the sufficiently serious question and balancing

7   the harms prong of that test.  The Court noted as much when it

8   was ruling previously.  There is no new issue in the papers

9   about the likelihood of success on the merits or the

10  sufficiently serious question going to the merits.  It is a

11  reargument of the clause relating -- the disputed clause and

12  the Court has already ruled on that.

13          On the balance of the harms, we would submit that,

14  again, as noted by the Court the harms are even more severe

15  because the criminal defendants are facing trial; it's not

16  merely a question of a risk of financial loss, it is a liberty

17  interest and the most serious liberty interest and any

18  disruption in the preparation for trial as the Court noted is a

19  very, very serious harm indeed.

20          One of the only -- I will not rehash absolutely every

21  argument that the Court has head ad infinitum in the many, many

22  papers that have been filed.  I'll attempt to focus on what's

23  new in Axis' submission and the response.  They do rely on a

24  new case in addressing the balancing of the harms, that is the

25  <u>Gaone v. Twin Cities</u> case.  We obtained from Axis --

```
                    D R A F T                              5
```

 1          THE COURT:  No one gave me a copy of that case.

 2          MR. EISEN:  Your Honor, we had the same problem --

 3          THE COURT:  And consequently I'm not going to

 4    consider it.

 5          MR. EISEN:  Okay.  Then, Your Honor, really the only

 6    other significant --

 7          THE COURT:  Let me -- it's an unpublished decision.

 8          MR. EISEN:  Yes, it is, Your Honor.

 9          THE COURT:  You're all familiar with the Second

10    Circuit rule on citing unpublished decisions.  If I were to

11    consider it as persuasive authority, simply like a Law Review

12    article or the like, I would have expected the parties to have

13    provided it to me since I prepare in advance for these things

14    and this is a preliminary injunction hearing and that's not

15    done and so I'm not going to consider it.

16          MR. EISEN:  Understood, Your Honor, and we certainly

17    are not relying on it and you won't hear anymore about it from

18    us.

19          The only other issue of significance that is new in

20    the papers is the priority of payments issue and that popped

21    up, really, yesterday with the filing of Axis' opposition and

22    then of the motion to intervene.  With respect to proposed

23    intervenors issues, we conferred with them before court this

24    morning and we've also informed Axis of this, the movants today

25    are satisfied to have the identical form of order that the

D R A F T                                            6

1   Court entered last time with the addition of the proposed

2   language that Mr. Klejna's counsel has requested which is to

3   the effect that nothing in this order shall effect the priority

4   of payments issue.  We really do not view the priority of

5   payments issue as procedurally appropriate for a decision

6   before the Court.  It has not been teed up.  It is not ripe.

7   We don't know if there is a disagreement yet.  We haven't had a

8   chance to evaluate it.  Obviously, there's been no factual

9   development, there's been no briefing.  It really is a last

10  ditch attempt to interpose an obstacle to the payment of the

11  fees that the movants today so desperately need in order to

12  avoid disruption of the criminal case.

13          So the issues really being the same we would submit

14  to the Court that it is a straightforward application of the

15  decision that the Court has already rendered and, indeed, was

16  prepared to render but for the Court's request that we file an

17  adversary proceeding of our own and a motion for preliminary

18  injunction which we've done.

19          THE COURT:  What is the -- and there was some

20  confusion about this last time -- billed amount of the defense

21  costs for the three defendants?

22          MR. EISEN:  Your Honor, Axis has provided that

23  information on Page 30 of their opposition and I'll go over

24  that and then I will relate an issue -- conversation that we

25  all had amongst ourselves in the hallway just updating that and

D R A F T                                                    7

1   I know Axis' counsel will correct me if I err.

2           When we were before the Court the last time the total

3   amount was in the neighborhood of $2 million for Axis.  As of

4   Friday, the total amount at issue was in excess of $2.9

5   million.  We certainly do not -- I think it's our position and

6   the other insured's position that none of us begrudge the

7   payment of those sums to the other.  Indeed, for the criminal

8   defendants it is crucial because the pipeline is building up

9   and we have so much work to do and the consequences are so

10  great.  We would ask the Court to order payment of that amount.

11  Approximately $300,000.00 of that $2.9 million has already been

12  paid down or is in the process of being paid down.

13          THE COURT:  Well, let me make sure of that.  The

14  aggregate number you gave me, the $2 million as of last Friday

15  --

16          MR. EISEN:  It's $2.9 million, Your Honor, as of

17  Friday.

18          THE COURT:  I'm sorry.  Then there was $2 million as

19  of the hearing that we had.

20          MR. EISEN:  Yes, Your Honor.

21          THE COURT:  That includes the defense costs of which

22  defendants?

23          MR. EISEN:  I believe that includes the defense costs

24  of all of the parties who were before the Court on the previous

25  motions and --

D R A F T                                    8

1       THE COURT:  Well, let me make sure.  It does not

2   include Mr. Lee; right?

3       MR. EISEN:  I do not know if it includes or not.  I

4   can speak for the five insured individuals represented by

5   Baker, Hostetler and the other firms and I can speak for the

6   three criminal defendants.  I cannot at all speak for Weil,

7   Gotshal's clients, for Mr. Lee.  I'm sure Ms. Gilbride knows

8   the answer to that question.  I do not.

9       THE COURT:  All right.

10       MR. EISEN:  And just to update the Court there have

11   been approximately $1 million in additional invoices that have

12   come in over the weekend and yesterday.

13       MS. GILBRIDE:  I believe that is correct.  I actually

14   anticipated -- to correct you since we're on this topic, I

15   think the $2.9 million as of Friday does include the Thomas H.

16   Lee fees.

17       THE COURT:  It does.  Well, as far as the defendants

18   represented by Ms. Kim and Mr. Goodman, the ones represented by

19   Baker & Hostetler, I gather that that was about

20   $300,000.00/$307,000.00; is that right?

21       MS. GILBRIDE:  That's correct, Your Honor.

22       THE COURT:  And I'm taking that away for the record

23   in the district court?

24                 [Pause in proceedings.]

25       MS. GILBRIDE:  Oh, as of the earlier hearing, Your

```
                        D R A F T                              9
```

1  Honor.

2         THE COURT:  Right.

3         MS. GILBRIDE:  Not as of today.

4         THE COURT:  Right.  No, I understand.

5         MS. KIM:  Your Honor, the $307,000.00 was as of

6  August 30th for the five officer defendants that moved as of

7  that day.

8         THE COURT:  All right.  All five of them?

9         MS. KIM:  All five, not just the Baker, Hostetler --

10         THE COURT:  So that's not just Baker & Hostetler but

11  all five.

12         MS. GILBRIDE:  All five of the moving parties; right.

13         THE COURT:  All right.  Do we know how much is for

14  the movants today in the aggregate?  The three?

15         MR. EISEN:  Your Honor, I --

16         THE COURT:  Well, no, no, no, let me hear the answer.

17         MS. GILBRIDE:  Your Honor, my understanding is as of

18  yesterday for just these moving parties it's $2.9 million.

19         THE COURT:  Just them?

20         MS. GILBRIDE:  Just them.

21         THE COURT:  Just these three?

22         MS. GILBRIDE:  Yes, Your Honor.

23         MS. MOSES:  Your Honor, Barbara Moses, Your Honor,

24  for Robert Trosten.

25         THE COURT:  Well, let me make sure -- there's some

```
                        D R A F T                          10
```

1    conferring going on over here.

2                    [Pause in proceedings.]

3              THE COURT:  Just these three?

4              MS. GILBRIDE:  Yes, Your Honor.

5              THE COURT:  And how much as of the date that I

6    ordered the -- would you have this number as of the date that I

7    ordered the payment for the five represented --

8              MS. GILBRIDE:  Yes.  Yes, that would be $1.6.

9              THE COURT:  $1.6.

10             MS. MOSES:  These are the three numbers for us.

11             THE COURT:  Okay.  But that would be just for these

12   three --

13             MS. GILBRIDE:  Yes, Your Honor.

14             THE COURT:  -- as of the date of the earlier order

15   that I entered?

16             MS. GILBRIDE:  Correct.  As of August 31st; right.

17             THE COURT:  Okay.  Go ahead.

18             MS. MOSES:  I apologize, Your Honor.  I was

19   conferring with Mr. Eisen and I missed your last exchange with

20   Ms. Gilbride.  This is Barbara Moses speaking on behalf of

21   Robert Trosten.  But we, the three movants before the Court

22   this morning, have added up our numbers among ourselves and

23   they don't add up to $2 million.

24             THE COURT:  Well, okay.  I asked Ms. Gilbride two

25   questions; one was as of the most recent date and that was $2.9

D R A F T                               11

1  and I understood and then I asked as of August 31st which was

2  the date of my earlier order and that was $1.6 million.  Have

3  you broken it out that way too?

4          MS. MOSES:  Well, my understanding, Your Honor -- and

5  co-counsel for today's moving parties will correct me if I am

6  wrong -- but my understanding is that as of August 30th the

7  three plaintiffs who are before you today had submitted bills

8  totaling -- I'm doing this in my head so bear with me while I

9  round -- approximately $940,000.00 or maybe $950,000.00.

10         THE COURT:  Okay.

11         MS. GILBRIDE:  We received substantial bills just

12  yesterday from --

13         THE COURT:  No, we're just focusing right now --

14         MS. MOSES:  Right.  That was the August 30th figure.

15         MS. GILBRIDE:  Okay.  From Kramer, Levin.

16         THE COURT:  -- as of August 31st.

17         MR. EISEN:  Yes, that was included.

18         MS. GILBRIDE:  Okay.

19                     [Pause in proceedings.]

20         THE COURT:  So you include bills that cover the

21  period through August 30th in that $950,000.00 number?

22         MS. MOSES:  Your Honor, I'm going to apologize and

23  correct myself on the record.  Mr. Eisen tells me that my

24  figure was incorrect.

25         THE COURT:  Okay.  So is it as of August 31st it's

D R A F T                              12

1  really $1.6 million?

2            MR. EISEN:  It's $1.6 million to $1.7 million, Your

3  Honor.

4            THE COURT:  Okay.

5            MS. GILBRIDE:  That's the same number we have.

6            THE COURT:  Okay.

7            MR. EISEN:  Then just so I'm clear if I may ask Axis

8  through the Court it then goes up to $2.6 as of Friday when the

9  papers were filed according to Axis' motion at Page 30,

10 Paragraph 65, as of Friday, September 7th, Axis had defense

11 bills with a value of over $2.9, of this amount $307 was

12 subject to the Court's August 31st order so $2.9 minus $300 is

13 $2.6 and then as of the weekend and yesterday it is up to $2.9.

14            THE COURT:  Okay.

15            MS. GILBRIDE:  Yes,

16            THE COURT:  And what is that for?  September?

17            MR. EISEN:  No, Your Honor.

18            THE COURT:  Is that the difference is September?

19            MR. EISEN:  No.  With the Court's leave I will

20 explain the pipeline issue.

21            The firms have time going back to June that is in

22 these bills because of the way they're billed at the end of the

23 month.

24            THE COURT:  Okay.

25            MR. EISEN:  So you have June time, you have July time

D R A F T                                    13

1    and how you have August time coming in because August has

2    closed and the bills for August issue at the beginning of

3    September.  From the perspective of the criminal defendants --

4    and I don't believe that the other moving insureds who sought

5    advancement and whose motion we previously joined disagree.

6    What we would like to request the Court to do is to enter an

7    order that would be -- really, the words of which would be

8    identical to the order that was entered last time other than

9    the caption and the introductory paragraph which would provide

10   that the bills should be paid through the date of the order

11   subject to the proviso that nothing in the order effects the

12   priority of payments because, you know, none of us wants -- we

13   recognize as the Court noted previously that it is a narrow

14   ruling confined to the obligation to advance that does not get

15   into other issues.  I would only add that in terms of the

16   equities or the harms to have -- we are already going to be

17   carrying September time while we wait for the issue to be

18   resolved.  We are at the point of having to undertake as is

19   obvious from the bills very substantial work to get ready for

20   trial which is in March and I really think it goes to the

21   spirit and the letter of the cases to -- obviously, I'm not

22   asking the Court to issue an injunction that carries forward.

23   I recognize that there's going to be a motion for summary

24   judgment heard in October but in order to avoid disruption it's

25   important to have some lessening of the liabilities hanging

D R A F T                                    14

1   over the clients in the pipeline and the other movants agree

2   with that provided the language is inserted about the priority

3   of payments.

4          THE COURT:  Well, let me make sure I understand that.

5   I mean I can certainly see them making the argument that they

6   moved first for an injunction and I approved -- ordered the

7   payment of the defense costs through the date of the earlier

8   order so they're in essence now a week or so behind and that

9   may be a meaningful week because of month-end billing and so

10  you're saying they don't oppose your sort of jumping ahead by

11  that extra billing?

12         MR. EISEN:  Your Honor, I think they would ask that

13  that be reciprocal that it also apply to them so the -- and I

14  think that that is --

15         THE COURT:  Well, let me hear from.  They're standing

16  up behind you so --

17         MR. KLINE:  Your Honor, Ivan Kline from Friedman,

18  Wittenstein for two of the other movants, Mr. Sexton and Mr.

19  Shearer.  I know I'm speaking also for Mr. Silverman.  I

20  believe -- because we joined in the same comment with Baker &

21  Hostetler -- our position is that it should be limited to the

22  same date, August 31st or August 30th, whichever it was --

23         THE COURT:  The date of that order.

24         MR. KLINE:  And they should not be jumping ahead and

25  let's be realistic, a bill sent for August time on September

D R A F T                                   15

1   8th is really not due now in any event and lawyers all the time

2   carry their bills for thirty days.  We didn't get payment from

3   U.S. Specialty or Lexington in, you know, a week after the

4   bills were submitted and in all fairness, understanding the

5   situation they're in is really -- we could all wait until

6   October 12th for the bills that are being sent out in

7   September.  That is our position and that this order should not

8   go beyond the same August 31st cutoff under any circumstances.

9           THE COURT:  All right.  Ms. Kim, is that the view for

10  your clients as well?

11          MS. KIM:  Yes, Your Honor.  However, if you are

12  inclined to grant that as of this date --

13          THE COURT:  No, I understand.

14          MS. KIM:  Then, of course, we'd want to be brought to

15  the same and not falling behind, Your Honor.  That's all.

16          THE COURT:  Right.  Okay.  All right.

17          MR. EISEN:  Your Honor, our view is -- and I

18  apologize, I had understood from my conversation from Ms. Kim

19  that she was comfortable, in fact I circulated a form of order

20  that provided today and I had understood that others were

21  comfortable with that form of order and --

22          THE COURT:  Well, as long as they were going to get

23  pushed up but I phrased my question with the assumption that

24  they weren't --

25          MR. EISEN:  I apologize if I did not understand the

D R A F T                                    16

1   admittedly rushed conversation in the hallway.

2           Your Honor, the criminal defendants, though, would

3   submit to the Court that there are different exigencies that

4   apply to our need and if I may the clients will be facing the

5   prospect of uncertainty as you've heard from Axis very

6   substantial August bills on top of very substantial September

7   bills.  It's not just the question of Axis having agreed to pay

8   and waiting a reasonable amount of time for the invoice to be

9   honored, it is th uncertainty and the precise chilling effect

10  on the ability to defend the case that the Worldcom Court was

11  concerned with when it balanced the harms.  I do think in

12  fairness that if the Court were to order this relief that it

13  ought to apply to the intervening parties as well but the

14  criminal defendants are really in a unique situation because of

15  the pendency of the criminal case and it will have a disruptive

16  effect on the ability to defend that case.  They will be

17  incurring enormous costs and so I would ask the Court in a

18  balanced way that also recognized the needs of the intervenors

19  and for that matter of Axis with respect to priority of

20  payments to enter the order that allows us to limit some of the

21  back log.  We're not insisting that those bills be paid

22  tomorrow.  Axis can take a reasonable amount of time to

23  evaluate them.  I understand that there were some deductions

24  that they applied to the bills that the others who were before

25  the Court a little less than two weeks ago submitted and we

D R A F T                                    17

1  don't have any objection to the normal course.  What is

2  difficult for us is to arrive at mid-October carrying millions

3  of dollars in fees for August and for September not knowing

4  whether our clients are going to be able to defend the criminal

5  case.  We think that the case law provides guidance to the

6  Court that in those circumstances it is appropriate to award

7  those fees and, frankly, the context is not irrelevant.  We

8  believe that Axis -- well, I certainly won't rehash the

9  argument -- we think that Axis should have advanced these fees.

10 The first two layers of insurance did advance the fees, we've

11 been in this position of jeopardy for some time and, you know,

12 Axis could have avoided today by, once the Court made its view

13 of the law and the facts clear, agreeing to advance fees we

14 would not be here.  So to some extent Axis has proceeded at its

15 peril.  We think that that raises issues about the good faith

16 of the insurer but that at any rate it is fair and right and

17 equitable for the criminal defendants to have the pipeline

18 lessened somewhat.

19         THE COURT:  Do you or the other two movants have any

20 factual showing that you want to make in respect of the issue

21 of whether in no particular order if I ruled or whatever Court

22 had jurisdiction over this matter ruled against them ultimately

23 that they could reimburse the money advanced?  That would be

24 one issue.  The other issue is their ability to pay currently

25 themselves and, I guess, the third issue is as to the defense

D R A F T                                    18

1  counsel's willingness to proceed with this issue hanging over

2  them or do you intend to rely on the logic that Judge Cote set

3  forth in Worldcom?

4              MR. EISEN:  Your Honor, I'll take those --

5              THE COURT:  In no particular order.

6              MR. EISEN:  -- in no particular order.  I think there

7  are two guiding precedents; one is the Worldcom case on your

8  first question and the other is this Court's decision two weeks

9  ago and this is the exact argument that the insurers made in

10 Worldcom.  I'll just read from the opinion at 469 to 470,

11 "Continental and Twin City argue that Roberts has failed to

12 show irreparable injury because he has not shown that he is

13 unable to retain counsel from his own funds" and then later on

14 the Worldcom Court also addresses the argument about

15 reimbursement and the Court says, the issues here surmount

16 whether an individual director has or does not have sufficient

17 funds to pay counsel when confronted with litigation stemming

18 from services of a corporate director.  In some cases it will

19 be minor, here it is massive, in some cases a director will

20 have great personal wealth, in other cases she will not.  The

21 issue here is whether every director is protected by a policy

22 to have the ongoing payment of defense costs.  So we think that

23 Worldcom -- that that's the wrong question under Worldcom.

24 This is a -- as the Court noted at 87 to 88 of the transcript,

25 this is a massive litigation.  As demonstrated the Court has

D R A F T                                    19

1  the evidence about the size of the bills, it has the evidence

2  about the pending civil cases that it relied on when we were

3  last before the Court.  It certainly is aware of the pending

4  criminal cases and, respectfully, Your Honor, we think that the

5  case law does not require that question to be answered and for

6  the same reason that the Court advanced previously it's

7  appropriate to do so as of today or if the Court -- really, as

8  of today as to all the insureds.  We're not asking for special

9  treatment.  It really is to all the insureds and we wouldn't be

10 here but for Axis' refusal to do that.  Indeed, for their

11 refusal to do something less.

12        THE COURT:  Okay.  What about the other two

13 defendants on that particular question?

14        MS. MOSES:  Thank you, Your Honor.  Barbara Moses for

15 Mr. Trosten.

16        I concur in Mr. Eisen's remarks.  I would also point

17 out that by asking the question together, by coupling the two

18 questions of ability to pay defense costs currently and ability

19 to repay in the event the case ultimately is determined

20 differently, I think Your Honor may have fallen into, perhaps

21 just on a testing the waters basis, what's really a Catch-22

22 that the carrier would like to set up.  On the one hand, they

23 have urged Your Honor and Your Honor rejected this on August

24 30th, correctly we believe, on the one hand they urged Your

25 Honor to require the insureds to prove that they are broke in

```
                         D R A F T                        20
```

1   order to get the advancement to which they are contractually

2   entitled but then in the next breath they have urged Your Honor

3   to rule that if the insureds are broke relief should be denied

4   because they will be at risk of non-repayment should the case

5   turn out adversely later in the day.  It seems to me, Your

6   Honor, that common sense and ordinary principles of equity tell

7   you that they can't have it both ways.  With respect to the

8   ability to repay, let me make the following, I think, also

9   common sense comment which is that the ability of an insured

10  who is facing criminal charges and is subject to a pre-trial

11  asset freeze order to repay at the conclusion of the criminal

12  trial depends in large part on how that trial comes out.  Now,

13  Axis, I think, would like for my client and the other criminal

14  defendants to lose their criminal trial because they will then

15  use that in the coverage dispute but with respect to the

16  ability to repay I say to you that we need the defense costs

17  now in order to insure that the criminal trial comes out in

18  favor of our clients which in turn has a bearing on the ability

19  to repay at the end of the day.

20          THE COURT:  Okay.

21          MR. GOLENBOCK:  Your Honor, Jeffrey Golenbock for Mr.

22  Bennett.

23          I would like to rely on the arguments that have been

24  made by my colleagues.  I don't think I need to add anything

25  further.  I'll, of course, answer any questions Your Honor may

D R A F T                              21

1  have.

2          THE COURT:  Okay.  Thank you.

3          Ms. Gilbride.

4          MS. GILBRIDE:  Your Honor, the first thing I'd just

5  like to note for the record is that we have gone ahead as

6  suggested by Your Honor during the August 30th hearing and made

7  a motion to withdraw the reference.  I think it is important

8  for the Court to be aware of that.  Perhaps you are already

9  aware of that.

10          THE COURT:  I was.  Yes.

11          MS. GILBRIDE:  Okay.  That motion is before the

12  district court.  We're not quite sure where we are procedurally

13  with that so I can't report back where we are and when there's

14  going to be a hearing.  We have certainly asked that there be a

15  hearing expeditiously.  I believe that there will be but we

16  face substantial opposition from the insureds with respect to

17  going that route as suggested by Your Honor on August 30th.

18          In any event, I don't believe we're here today in the

19  same posture that we were here on August 30th.  First of all,

20  the three moving parties here today initially moved to dismiss

21  Axis' complaint.  They joined in that motion.  That motion was

22  granted by Your Honor.  They have now turned around and

23  instituted an adversary proceeding seeking the same relief

24  sought by other moving parties and, Your Honor, I would suggest

25  that that is just fundamentally unfair and an abuse of the

D R A F T                                  22

1   legal system by these moving parties.

2          Additionally, Your Honor, these three defendants are

3   not in the same posture on any test, particularly, one of the

4   three moving parties as the moving parties on August 30th who

5   requested the preliminary injunction.  One of these parties is

6   the individual who signed the warranty letter that Axis relied

7   upon.  He's the individual who signed the application, he's the

8   individual whom the company disclosed in an SEC filing three

9   days after -- excuse me, shortly after the company went public

10  that he had hidden $430 million worth of receivables.  Well,

11  that was information that Axis relied upon as well.  So, Your

12  Honor, I submit we are not in the same position that we were in

13  on August 30th.

14         With respect to the preliminary injunction, Your

15  Honor, I apologize first of all that we did not attach the

16  Gaone transcript.  It's not a published decision.  It's a

17  transcript.  It was before Your Honor on August 30th.  It was

18  submitted by Arch, who sought to intervene on that day.  In any

19  event, we'd be happy to hand up a copy to Your Honor but you've

20  already made it clear that you're not going to rule upon it.

21  This preliminary injunction was brought on very quickly as Your

22  Honor is aware and we apologize, again, for not submitting that

23  but I would strongly urge that the Court consider the

24  propositions that were articulated in that ruling which

25  essentially our position is that what Judge Wood did was simply

D R A F T                                      23

1   apply Second Circuit case law which is clear that if you're

2   going to apply the lower standard for injunction there has to

3   be a balancing of harms.  There's been no factual record made

4   before this Court; not one affidavit, not one individual has

5   come here to testify before Your Honor with respect to the

6   irreparable harm that they have allegedly suffered.  There is

7   no factual record before Your Honor and I submit under Second

8   Circuit law that is simply fatal to an application for a

9   preliminary injunction.

10          Going to the balancing of harms, Your Honor, you

11  know, on the one hand you have individuals who have made no

12  factual showing whatsoever but who have come before Your Honor

13  and said that their defense is going to be devastated because

14  their defense counsel is not paid.  Well, I submit that that

15  should have been submitted to Your Honor in factual form.

16  There should have been evidence submitted to your Court of that

17  not counsels' statements.  But in any event, so there's no

18  factual showing.

19          On the other side of the coin you have an insurance

20  company who has a policy provision that says if we are

21  ultimately successful we are entitled to repayment.  The

22  movants are here on a preliminary injunction.  Rule 65 provides

23  the answer to all of these questions.  If the Court is inclined

24  to grant the preliminary injunction, Your Honor, we would

25  suggest that the Court require the moving parties to post a

D R A F T                                      24

1    bond or some form of security so that in the event some court

2    agrees with Axis' position and finds that we have been

3    wrongfully enjoined that there is then some security for Axis

4    with respect to repayment.  Otherwise, Your Honor is advancing

5    something -- advancing relief to these parties on a very

6    preliminary basis without a full-blown hearing, with Axis'

7    complaint having been dismissed.  So with Axis not having the

8    ability to present its arguments in any shape or form and not

9    even requiring a factual showing by the parties and, you know,

10   Your Honor, we would submit under those circumstances at the

11   very least that the Court order these moving parties to post

12   some form of security in the event that Axis is successful.

13         You know, under the circumstances it's clear that

14   Axis has zero prospect of being repaid if at the end of the day

15   Axis is actually successful in whatever form we are able to

16   actually litigate our dispute.

17         With respect -- I don't know if you want to get into

18   the priority of payments issue, Your Honor, the issue we have

19   there is that separate and apart from defense costs there has

20   been an executed MOU submitted to Axis and as of today if some

21   court ultimately finds that there is actually coverage under

22   the policy and we are required to fund that settlement -- if

23   the Court says we should have considered that settlement as of

24   the date the settlement was executed, Your Honor will be

25   ordering us to advance defense costs in excess of our policy

D R A F T                                          25

1  limits.  Now, we are not at liberty to share that MOU with you

2  but --

3          THE COURT:  But you aren't paying under the MOU;

4  right?  Your clients aren't making a payment.  It's disputing

5  the coverage, I think.

6          MS. GILBRIDE:  Well, we've been asked to fund the

7  settlement.

8          THE COURT:  I know but you're not paying it.

9          MS. GILBRIDE:  I don't know that any determination

10  has been made.  Whether we are going to fund it or not has not

11  come to fruition.

12          THE COURT:  But I thought that Axis disclaimed

13  coverage?

14          MS. GILBRIDE:  Well, we did, Your Honor, but you

15  know, there's a moving target in terms of what the Court is

16  ordering us to do here.

17          THE COURT:  Well, but all I'm saying is the

18  individual -- I'm assuming it's an individual -- who submitted

19  the proposed settlement hasn't sought relief to compel payment;

20  right?

21          MS. GILBRIDE:  Not yet.

22          THE COURT:  Okay.  So how does requiring payment of

23  the defense costs to somebody who hasn't sought that relief and

24  I'm assuming that anyone whose the beneficiary of their policy

25  knows that if this litigation is going on and would make the

D R A F T                                    26

1   same application that if they really wanted to enforce it but

2   hasn't.  How does my ordering the -- if I were to do it -- the

3   advancement of the defense costs put the insurer at a

4   disadvantage?

5           MS. GILBRIDE:  Your Honor, historically, the defense

6   costs have been reimbursed by the two underlying carriers on a

7   first in/first out basis.  So if one was to consider the

8   settlement as of the date it was executed in that line of

9   payments and we do ultimately -- we are required to fund the

10  settlement -- by advancing these defense costs now we could

11  theoretically or we would be asked -- we are being put in a

12  position where we potentially are paying fees --

13          THE COURT:  Well, when was the MOU submitted?

14          MS. GILBRIDE:  When was it executed?  August 30th.

15          THE COURT:  Well, what --

16          MS. GILBRIDE:  Well, it was signed on August 30th.

17          THE COURT:  But when was it submitted to the insurer?

18          MS. GILBRIDE:  July 30th.

19          MR. EISEN:  No.

20          MS. KIM:  Yes, July 30th.

21          MR. EISEN:  The MOU submitted --

22          THE COURT:  But it was signed after it was submitted?

23          MS. KIM:  Your Honor, may I address that issue?

24          THE COURT:  Okay.

25          MS. KIM:  Helen Kim on behalf of Mr. Klejna, Your

D R A F T                              27

1   Honor.  The MOU which was a settlement demand from the lead

2   plaintiffs in the underlying securities litigation in <u>In Re:</u>

3   <u>Refco</u> securities litigation was submitted to Axis on July 30th

4   on the date it was received by Mr. Klejna.

5               THE COURT:  Okay.

6               MS. KIM:  With a request to Axis to assist in the

7   settlement and to --

8               THE COURT:  To assist but as far as a settlement

9   itself, when was that submitted as a settlement?

10              MS. KIM:  Well, we requested Axis to join the

11  negotiations because they have an obligation under the policy

12  to consent to settlement.

13              THE COURT:  All right.  But as far as an obligation

14  to pay money in respect of a settlement --

15              MS. KIM:  Well, Your Honor, it is our position that

16  Axis has an obligation, once it's presented with a signed

17  settlement agreement, to either consent or not consent and so

18  it has to set aside money for a settlement if it consents.

19              THE COURT:  I'm sorry, it wasn't signed when it was

20  submitted to them in July; right?

21              MS. KIM:  Not on July 30th but after --

22              THE COURT:  It was signed at the end of August;

23  right?

24              MS. KIM:  It was signed on August 30th after Axis

25  gave us -- told us to proceed as a prudent uninsured and to

D R A F T                                    28

1  proceed accordingly.

2          THE COURT:  Okay.  So wouldn't that be the relevant

3  date then?

4          MS. KIM:  August 30th; correct, Your Honor.

5          THE COURT:  Okay.

6          MS. KIM:  So what we're saying is -- and this goes to

7  the issue of priority of payments -- as long as any order on

8  the preliminary injunction does not interfere with the priority

9  of payments under the terms of the Axis policy we don't believe

10 that there's a problem.

11         THE COURT:  Okay.  How would it interfere?  Say I

12 were to require payment of these three individual defense costs

13 as of the date of my order which, I forget, was that either

14 August 30th or 31st?

15         MS. GILBRIDE:  The 31st.

16         THE COURT:  How would it interfere with this separate

17 potential obligation?

18         MS. KIM:  It would not, Your Honor.

19         THE COURT:  Well, no, I was asking Ms. Gilbride.

20         MS. KIM:  Oh, I'm sorry.

21         MS. GILBRIDE:  If you were to order today as of

22 August 31st?

23         THE COURT:  Yes.

24         MS. GILBRIDE:  We're just trying to look at the

25 numbers and figure this out.  We were anticipating that Your

```
               D R A F T                              29
```

1  Honor might be inclined to award advancement of defense costs

2  as of today.

3           THE COURT:  No, well, that wasn't my question.

4           MS. GILBRIDE:  Okay.  I know.  So I don't have the

5  answer readily available.  I apologize.

6           MS. KIM:  If it's $2.1 million as of August 31st

7  which were the numbers that we discussed earlier there would be

8  nothing, Your Honor.  No interference whatsoever.

9           THE COURT:  All right.

10          MS. GILBRIDE:  Your Honor, I think that if it was as

11 of August 31st I agree that we would still be within the policy

12 limits.

13          THE COURT:  All right.  I'm not saying that that's

14 where I'm going on this.  I'm not saying that's -- no one

15 should read this as a determination of any allocation or

16 priority issues.

17          MS. KIM:  We understand, Your Honor.

18          THE COURT:  It's just that we're trying to figure out

19 the facts.

20          MS. KIM:  That's right, Your Honor, and we agree with

21 Your Honor.

22          MR. EISEN:  Your Honor, were the Court to decide to

23 enter the identical order as last time effective as of today,

24 the date of the order, it could also address this issue by

25 simply including the sentence that Ms. Kim requested.  We and

D R A F T                                30

1  Ms. Kim's clients agree on that that this order does not effect

2  the priority of payments in any way.

3          THE COURT:  Well, I know that an order can say that

4  but as a practical matter it might wouldn't it?

5          MR. EISEN:  No, Your Honor, we think it would not

6  because the insurer is perfectly capable, as they've

7  demonstrated, of taking positions on the legal issues.  The

8  priority of payment issue is, we think, a Mankwait issue.  The

9  settlement has not been presented much less approved.  They

10 could certainly pay up to the limits without any risk.

11         THE COURT:  Well, no, let me -- as I understand Axis'

12 point, it's this, that although they have disclaimed coverage

13 ultimately they might have to pay on the settlement and since

14 the settlement came in as of a date that preceded some of these

15 bills, you know, the ones in September they would be paying

16 these bills -- the post-September bills -- potentially out of

17 sequence, first come/first serve.  Now, maybe that's not right,

18 maybe that priority doesn't depend on first come/first serve

19 necessarily but that's their point.

20         MR. EISEN:  Your Honor --

21         THE COURT:  And they wouldn't have any ability

22 necessarily to get it back or reallocate it necessarily.

23         MR. EISEN:  Your Honor, the issue is clouded because

24 the amount of the settlement is unknown.  However, I can

25 represent to the Court based on conversations with various

D R A F T                               31

1  persons attempting to determine, you know, would you pay the

2  bills as of the beginning of September, mid-September, so on

3  and so forth, that the -- we believe it would be possible to

4  without implicating the priority of payments issue at all to

5  pay the bills through Friday but, again, there is a safe harbor

6  for this which is simply to provide in the order to have us

7  agree that pending the resolution in October the insurer only

8  needs to pay up to the amount of the settlement.  If, for

9  example, the settlement is $6.5 million --

10       THE COURT:  No, I understand your point.  All right.

11  So that would be a cap --

12       MR. EISEN:  That is a way to accommodate the harms

13  that the criminal defendants are facing and at the same time

14  give Axis a safe harbor.

15       THE COURT:  Okay.

16       MS. MOSES:  May I add a word, Your Honor, on the

17  priority of payment issue?  A word which is, I think,

18  particularly appropriate given Ms. Gilbride's comments

19  concerning consistency in litigation position.

20       We were required to initiate a new adversary

21  proceeding and to submit a pleading -- an adversary complaint -

22  - demanding payment of our defense costs in an ongoing schedule

23  in order to properly put this issue before Your Honor and be in

24  a position to ask Your Honor for a preliminary injunction for

25  that relief.  The settlement issue has never been teed up in

D R A F T                                    32

1  any pleading.  So, clearly, whether the Court has if you will

2  jurisdiction to rule on it at this point --

3          THE COURT:  Well, I don't think they're asking me to

4  rule on it, I think they're saying that as far as the balance

5  of the harms go is I should take it into account.

6          MS. MOSES:  Well, second, Your Honor, Ms. Gilbride

7  has also asked Your Honor where's the evidence and has in

8  effect asked Your Honor to ask us for evidence of financial

9  condition but, again, there has been no evidence presented to

10 Your Honor of the settlement or its amount or any of its

11 particulars and, third, Your Honor, as we all know we have not

12 had an opportunity to brief this point but as we all know from

13 having practiced in federal court and under Rule 23 any

14 settlement in <u>In Re:  Refco</u> would have to be approved both

15 preliminarily and finally after a notice and comment period by

16 Judge Lynch before it would be binding on anyone.

17         THE COURT:  Okay.

18         MR. EISEN:  Your Honor, in addition to the very last

19 point that Ms. Gilbride made, I do think that we and Ms. Kim's

20 client and the other insureds agree that that language that she

21 suggested to the order that this does not effect the priority

22 of payments would allow the insurer to pay up to what's

23 available and then provide a safe harbor for the test.

24         May I very quickly be heard on Ms. Gilbride's other

25 points?

D R A F T                                    33

1          THE COURT:  Well, I hadn't finished asking her

2   questions.

3          MR. EISEN:  Okay.  I'll sit down.

4          THE COURT:  You can be briefly but after I -- I want

5   to go back over something that we spent a lot of time on the

6   last hearing, the interpretation of the provision of the U.S.

7   Specialty policy that says the insurer will pay covered defense

8   costs on an as incurred basis and as I understand it Axis'

9   argument is that these defense costs aren't "covered" under the

10  policy?

11         MS. GILBRIDE:  Yes, Your Honor.

12         THE COURT:  But is that based simply on the

13  exclusions?

14         MS. GILBRIDE:  Yes.  It's based upon the warranty and

15  --

16         THE COURT:  Well, the warranty is not part of the

17  policy is it?

18         MS. GILBRIDE:  Well, it becomes part of the policy

19  and it provides for its own remedy, Your Honor.  It becomes an

20  exclusion by its own terms.  At the bottom of the warranty it

21  provides that it becomes part of the policy and becomes an

22  exclusion and it does not require any filing of adjudication of

23  facts, it simply requires that Axis in good faith make a

24  determination whether it applies to the facts before it and

25  determine whether or not there's coverage.

D R A F T                                      34

1          THE COURT:  Well, now you're moving away from the

2    warranty, too, the overall argument?

3          MS. GILBRIDE:  No, I was just saying what the remedy

4    is that the warranty provides.

5          THE COURT:  Okay.  All right.

6          Then I guess my other question on this same contract

7    issue is you point to the following paragraph, Paragraph 3,

8    which is dealing with the allocation of losses covered and

9    losses not covered and say that that's further indication that

10   the insurance carrier was given the authority under this

11   contract to act unilaterally if it wasn't able to agree and my

12   question is, I guess, why go through that distinction at all in

13   three if coverage pertains already?  Why isn't that just a

14   separate provision dealing with allocation?  I mean if -- as I

15   take it your first argument is you can act unilaterally as to

16   whether something is covered or not.  Why would the parties

17   then have a whole separate provision that would say the same

18   thing?

19         MS. GILBRIDE:  Your Honor, we pointed to condition

20   (d)(3) simply as evidence that the entire policy should be

21   construed in context.  So our position is not that you should

22   go to (d)(3) with respect to this dispute, we rely solely with

23   respect to this dispute on (d)(1) but we rely upon (d)(3) as

24   evidence to be in support of our position under (d)(2), (d)(3)

25   is a provision that you actually utilize when there's covered

D R A F T                                                35

1   and uncovered claims.    So Your Honor is absolutely right that

2   you would not utilize (d)(3) in this dispute.  We were simply

3   pointing it out to show that it is consistent with Axis'

4   interpretation of (d)(2).  Our position is that (d)(2) says in

5   the first instance if defense costs are not covered if the

6   policy is not triggered then Axis, acting in good faith, of

7   course, would not have to advance defense costs.

8              THE COURT:  Okay.  Thanks.

9              MR. EISEN:  Your Honor, I'll take them in order and I

10  will attempt to be brief.

11             Ms. Gilbride's first point was that after joining in

12  the motion to dismiss for us now to seek advancement is an

13  abuse.  As the Court well remembers, we did not just join in

14  the motion to dismiss, in the alternative we also joined in the

15  motion to advance and in response the Court asked us to take

16  procedural steps.  We've done that.  We've been crystal clear

17  throughout that we believe there's a legal obligation to

18  advance so I think there's no inconsistency there.

19             In terms of the factual record issue, I really would

20  point the -- she first makes the point about irreparable harm

21  and then about the balance of the harms.  Our factual showing

22  is exactly the same factual showing that the other moving

23  insureds made.  It's exactly the same factual showing on both

24  of those points as was approved in Worldcom so I think that

25  this is an argument that was made and that was rejected and

D R A F T                              36

1  that does not --

2        THE COURT:  Well, I guess the only distinction there

3  is there seemed to be agreement between the parties last week

4  that the five Ds and Os that were covered by the injunction

5  last week were fairly well-healed and I mean that was a point

6  that Axis made and no one really disputed it and that doesn't

7  go to the point of irreparable harm but it does go to their

8  other point about ability to reimburse and I understand your

9  colleague's point about the Catch-22 or a Hobson's Choice but I

10 think that may be a distinction between last week's record and

11 today's.

12       MR. EISEN:  Your Honor, I do think it is clear in the

13 Worldcom case that given the volume of the defense costs here -

14 - for example, as the Court knows in the KPMG criminal

15 litigation there was recently fact-finding by the district

16 court about what it costs to defend these cases.  Given the

17 volume the precise -- you know, it is a harm on anyone and that

18 that factual showing is not required, we think, under the case

19 law.

20       I would also -- it goes to, I guess, Ms. Gilbride's

21 repeated statements both here today and in the brief that

22 there's zero prospect of repayment.  That really turns the

23 presumption of innocence on its head.  We believe the clients

24 will be acquitted.  We're looking to the Court for the interim

25 time so that we can keep working in September and at the

D R A F T                                    37

1   beginning of October towards that goal and to presume that --

2   and Ms. Gilbride's conclusion really turns the legal

3   presumption on its head -- we think that she's made the wrong

4   analysis and she has not shown that there is zero prospect of

5   repayment and, of course, I think zero prospect is an

6   overstatement.

7           On the priority of payments issue we've already made

8   the point that there is a solution which is to include the

9   language and then the interpretation issues, we think, have

10  already been decided by the Court and those are queued up for

11  summary judgment so I won't speak to those now unless the Court

12  wishes me to.

13          THE COURT:  Okay.  Anyone else?

14          MR. CASHMAN:  Your Honor, may I be heard for one

15  moment?

16          THE COURT:  Yes.  Sure.  I'm sorry, which one of

17  these movants do you represent?

18          MR. CASHMAN:  I represent defendant Philip Silverman.

19  He was among those who received the benefit of Your Honor's

20  preliminary injunction last week.

21          THE COURT:  Okay.

22          MR. CASHMAN:  I just wanted to underscore, Your

23  Honor, that I do not believe the issue of priority of payments

24  is appropriately before Your Honor this morning.  I think I

25  would be remiss being here today, having listened to all these

D R A F T                                    38

1   arguments, if I did not simply point out to Your Honor that

2   there are various conflicting interests among the insureds that

3   would have to be assessed in connection with any priority of

4   payment argument that were made and so I think the only issue

5   that ought to be addressed here today is simply whether or not

6   defense costs should continue to be advanced at the request of

7   the moving defendants here and through what date, I think.

8   Those are the only issues that need to be addressed and ought

9   to be addressed because all the other issues are complicated

10  and raise varying issues that are not before you today and the

11  policy itself does not offer a simple solution to those issues.

12          THE COURT:  Okay.  Well, let me hear somebody who

13  hasn't spoken yet.

14          MR. WILOMOWSKY:  Good morning, Your Honor.  Steven

15  Wilomowsky of Bingham, McCutchen, LLP on behalf of RJM, LLC,

16  the plan administrator.

17          Your Honor, I just want to make a point on the record

18  with regard to this motion because the tie-in that brings these

19  parties to this Court is the lift stay aspect, is obviously the

20  Refco aspect, but it does not follow necessarily that if the

21  Court's analysis that led to the lifting of the automatic stay

22  to the extent applicable for the other defendants necessarily

23  applies to the movants that are here today and the reason is,

24  Your Honor, the movants today, particularly Mr. Bennett and Mr.

25  Trosten, have not filed proof of claim against the estates.

D R A F T                                    39

1   Mr. Grant, also, he did file a proof of claim.  His claim has

2   been estimated at zero dollars for all purposes including

3   distribution.

4           To the extent that in considering today's motion Your

5   Honor, taking into account impact on the estate, I think that

6   there is a difference between just, for example, Mr. Klejna,

7   who does have a claim filed against the estate and then,

8   presumably, even though that hasn't been litigated or allowed

9   or disallowed yet but at least it's a claim that's there that

10  potentially that any recoveries that they are able to get out

11  of Axis or any other insurer is going to serve to reduce the

12  claim against the Debtor's estates, whereas, with respect to

13  the recoveries, for example, that may be achieved by Mr.

14  Bennett, the only thing that's doing is really reducing

15  availability of insurance proceeds for other people who do have

16  claims and whose claims would be reduced if they were able to

17  receive insurance proceeds.

18          So we haven't taken a position in this litigation,

19  it's been until now, certainly, it hasn't been -- early on in

20  the cases there had been some involvement, we had been involved

21  with Lexington and it's been a close call among the plan

22  administrators whether to -- this whole process is an expensive

23  one and it's been a very time-consuming litigation for the

24  parties here and so we've been reluctant to get involved since,

25  ultimately, there are no dollars -- there are no actually

D R A F T                                40

1   dollars that can come out of this policy that can come back

2   into the estates but we did want to say that to the extent that

3   Your Honor is reviewing today's motion both in terms of its own

4   jurisdiction and in terms of the lift stay standards and

5   elements, we would note that the estate is not going to be

6   benefitted to the extent that, for example, Mr. Bennett were to

7   recover from these proceeds.

8        THE COURT:  Whether you take Judge Berra's version of

9   it or Judge Gerber's version of it doesn't <u>Adelphia</u> control

10  here?  I mean there's been -- at this point they're simply

11  indicted, they're not convicted and under the <u>Adelphia</u> case law

12  which I think is the most thorough discussion of this issue,

13  wouldn't they be entitled to the money?  Leaving aside issues

14  of allocation which, again, I don't think I'm going to get into

15  but assuming that there are no allegation issues, don't they

16  come first?

17       MR. WILOMOWSKY:  Well, two responses to that.  First,

18  to the extent -- if one supposes that the automatic stay is

19  applicable here and I understand that that could be an open

20  question --

21       THE COURT:  Well, I don't think there's -- people

22  should stop talking about the automatic stay.

23       MR. WILOMOWSKY:  Okay.

24       THE COURT:  It's a plan injunction.

25       MR. WILOMOWSKY:  Okay.

```
                          D R A F T                            41
```

 1          THE COURT:  The confirmation order is really clear on

 2    this in Paragraph 34.

 3          MR. WILOMOWSKY:  Okay.  That's correct, Your Honor.

 4          THE COURT:  So when people are saying "automatic

 5    stay" I'm translating it in my head --

 6          MR. WILOMOWSKY:  They mean --

 7          THE COURT:  -- the plan injunction.

 8          MR. WILOMOWSKY:  Okay.  You got it, Your Honor.

 9          THE COURT:  So that's what we're talking about.

10          MR. WILOMOWSKY:  All right.  In response to your

11    question I think that the differences here is that at least

12    what Adelphia speaks to is the access that the parties can have

13    to the policy notwithstanding the fact that they may be under

14    criminal indictment or whatever their situation might be.  I

15    think it's a separate question as to -- and I may be

16    misremembering Adelphia but I don't think that there was a

17    question in terms of the claims or at least the jurisdictional

18    question, I guess, which is if there is no possible benefit to

19    the estate then should this be something -- should this Court

20    be enjoining -- should be requiring this particular result from

21    Axis when either way there isn't going to be any possibility of

22    a benefit to the estate even in the form of a reduced claim.

23    That's the question, I guess.

24          THE COURT:  Well, but it, I guess -- okay.  Now I

25    understand your point now.  It's a jurisdictional point you're

D R A F T                                           42

1   raising as opposed to a lifting of an injunction point.

2          MR. WILOMOWSKY:  I think so, Your Honor.

3          THE COURT:  But as far as jurisdiction goes in

4   addition to the narrow benefit issue isn't there jurisdiction

5   premised on the fact that the policy itself is property of the

6   estate and I'm being asked to interpret it and, secondly, the

7   fact that it's one in a layer of excess coverage and at some

8   point if the policy is interpreted properly and the facts play

9   out properly in that layer -- in that sequence of layers the

10  estate will benefit because there will be insurance that will

11  pay claims either of Ds and Os or of other claimants -- third

12  parties -- who were under the plan made the appropriate

13  election to look to the litigation and obviously the insurance

14  that is behind the litigation.

15         MR. WILOMOWSKY:  I think that's right, Your Honor.  I

16  think though that ironically though the granting of this motion

17  is more likely -- if you assume -- if we don't present --

18         THE COURT:  No, but you see that goes to the merits

19  as opposed to jurisdiction.  I understand but sometimes you

20  have --

21         MR. WILOMOWSKY:  I understand, Your Honor.  That was

22  it.  I think I've said enough.

23         THE COURT:  Okay.

24         MR. JEROME:  Your Honor, may I be heard?

25         THE COURT:  Yes.

D R A F T                                  43

1          MR. JEROME:  Your Honor, I represent Joseph P. Murphy

2    along with Baker, Hostetler.  Mr. Murphy was an officer of

3    Refco in charge of marketing and ran the regulated company

4    which as Your Honor may recall was sold in these bankruptcy

5    proceedings.  Now, Mr. Murphy, as an officer of Refco is

6    unfortunately embroiled in the various class actions.  He was

7    also a beneficiary of the various insurance policies which are

8    contested.

9          I think the dark and somewhat unstated fact here is

10   that as the assets -- and I'm not saying that it shouldn't be

11   done and that's not appropriate -- but equitably and fairly,

12   the unhappy fact is that as assets are burned for criminal

13   defense I have no doubt that the consequence of that will be

14   that Mr. Murphy will not in fact have enough funds from

15   insurance proceeds to answer to any judgment that might be

16   levied against him and I also think he probably will not have

17   sufficient funds to defend himself in the class actions given

18   what I know and maybe my knowledge is deficient and Your Honor

19   knows, sometimes that happens with me, but it may be I'm right

20   and I think that I am.

21         So in terms of weighing the harm and the equities

22   here, while I'm not suggesting that the criminal defendants are

23   entitled to the relief that they seek here I would like to

24   suggest that there is an opportunity that we have, an

25   opportunity of constricted time which we have between now and

D R A F T                                      44

1   October 12th when Your Honor will be called upon to make a

2   decision in respect of the permanent injunction.  I would hope

3   that in that constrained time frame we would, perhaps, resort

4   to some form of mediation and I know, Your Honor, the other

5   insurance companies are not before you and I'm certainly not

6   asking that this Court, although it has the power, to compel

7   mediation.  I'm suggesting that the parties in the interests of

8   trying to iron out these various issues which will continue,

9   Your Honor, to come before this Court because each and every

10  insurance company is going to deny coverage and is going to be

11  before this Court or some other court arguing this for months

12  on end.  I think that if Your Honor would at least on the

13  record, while not compelling arbitration, suggest that it might

14  be a good idea for the parties to engage in between now and

15  October 12th and in addition to the parties, those other

16  insurers who are not before Your Honor may at least get a

17  friendly message which would encourage them to sit down and try

18  to at least get the process started.  I think that the result

19  of an appropriately negotiated, successful mediation could

20  result in evening out, I think, some of the tawdry races that

21  we're witnessing in terms of first come/first serve, have you

22  gotten your bills in or haven't you and in point of fact, Mr.

23  Murphy's $13,000.00 bill for July wasn't filed on time.  We

24  were seven days late.

25          I know we'd like to avoid this and I think mediation,

D R A F T                                    45

1   hopefully, if it could resolve these matters could resolve

2   this, I think, unseemly race to the insurance courthouse.  So,

3   Your Honor, I would respectfully request that this Court at

4   least on the record encourage the parties to come to some form

5   of mediation.  I might add that there has been some discussion

6   between the parties on the subject and I think that some of

7   them might be favorably disposed to doing so.  If some of the

8   parties fall out and don't want to do it, that doesn't mean

9   that other parties involved, particularly my client, my shared

10  client, couldn't benefit from the mediation and in no way,

11  shape or form, Your Honor, am I suggesting that the mediation

12  would prejudice these proceedings or interfere with what's

13  going to happen on October 12th.  I am suggesting that we have

14  a window of time and I would hope that the Court would

15  encourage us and urge us to resort to mediation.

16          With that, Your Honor, I thank you very much for your

17  indulgence.

18          THE COURT:  Okay.

19          MR. EISEN:  Your Honor, I have a couple of very brief

20  points and then Ms. Moses will conclude on behalf of the

21  insureds.

22          With respect to counsel for Mr. Murphy's statement,

23  we wholeheartedly agree.  I don't know that it is necessary or

24  appropriate to be part of an order.  I take it there's no

25  disagreement as with the Debtor's position, they haven't

D R A F T                                          46

1   objected to the relief we seek and we think that the idea of

2   all sitting down and talking, bringing the other insurers to

3   the table is a good idea.  So, certainly, the movants today do

4   not need to be ordered to do that.  I do think that the

5   counsel's statement does emphasize the value of issuing an

6   order as of today that will apply to the payments of these fees

7   so that this race is not to the disadvantage of some.

8   Obviously, we think the disadvantage is greater as to the

9   criminal defendants.

10          On the jurisdictional point that the Debtor raised,

11  the Court responded more eloquently and knowledgeably than I

12  can and I would only echo those points by saying, you know, it

13  really is one dispute that all of the movants are queuing up

14  for the Court.  The Court has already found that it has

15  jurisdiction and as the Debtor noted, Mr. Grant had filed the

16  claims, they were disputed.

17          Then, finally, I looked back at whether it was agreed

18  or not as to the means of the previous movants and in fact it

19  was hotly contested.  Axis made the point very forcefully that

20  the previous insureds had not made a showing either that they

21  can't pay or that they can repay and the previous insureds

22  replied with equal force that that is not the test and I think

23  the Court will find that the record is completely devoid of

24  that evidence because under Worldcom and under Your Honor's

25  holding that showing is not required in a mega case of this

D R A F T                                              47

1   kind and with that I will yield to my colleague.

2          MS. MOSES:  Very briefly, Your Honor, and we do

3   appreciate the time you've devoted to this matter this morning.

4          Mr. Jerome used the term "unseemly" with respect to

5   the various insureds' request for defense payments.  I think

6   the only thing that can be said about that is that my client,

7   Mr. Trosten, and the other indicted plaintiffs, Mr. Bennett and

8   Mr. Grant, did not indict themselves.  They did not choose to

9   be criminal defendants, they are not --

10         THE COURT:  Well, I think he was just talking about a

11  rush to get bills in.  I think that's all he meant by that.

12         MS. MOSES:  Right.

13         MR. JEROME:  That's correct, Your Honor.  Thank you.

14         MS. MOSES:  With respect to the mediation point no

15  lawyer wants to be in the position of resisting a suggestion of

16  mediation and I certainly am not going to put myself in that

17  position but I do think it is fair to point out that while the

18  parties can and I hope they will voluntarily discuss a

19  potential non-litigation solution to this issue between now and

20  October 12th, nothing that we do between now and October 12th

21  can stop the clock with respect to the underlying actions,

22  either civil or criminal, and particularly given Axis' history

23  of resisting to the very last moment and sometimes beyond and

24  its demonstrated reluctance to write a check until and unless

25  it is specifically ordered to do so by this Court, my own view,

D R A F T                                    48

1    Your Honor, is that settlement discussions with an eye towards

2    possibly a global settlement involving the higher tier carriers

3    as well will be far more effective and far more likely to

4    succeed after October 12th if, indeed, that is the date for

5    summary judgment.  Thank you.

6              THE COURT:  Okay.  Do you have anything to say, Ms.

7    Gilbride?

8              MS. GILBRIDE:  Yes, just very, very briefly, Your

9    Honor.

10             With respect to the arguments advanced by both

11   counsel that the Worldcom decision controls somehow whether or

12   not Your Honor has to consider balancing of harms, I would just

13   simply submit that the Worldcom court did not consider

14   balancing of harms in any way, shape or form.  It didn't say

15   that you don't consider it, it simply wasn't considered.  There

16   is Second Circuit authority precisely on point which says that

17   the balancing of harms must be considered when the Court orders

18   a preliminary injunction.

19             With respect to the Catch-22 that counsel and Your

20   Honor are concerned about, respectfully, there is a provision

21   in the Federal Rules that deal with that precise issue, it's

22   Rule 65(c) which states that when ordering a preliminary

23   injunction a Court can and should but has discretion, of

24   course, order that the party who is being awarded the

25   preliminary injunction either post a bond or securitize the

D R A F T                                      49

1  amounts being awarded and, respectfully, I think that that

2  deals with the Catch-22 situation that counsel is referring to

3  and, perhaps, was meant for just that situation.

4        With respect to the priority of payments issue, Your

5  Honor, I haven't had a chance to confer with Baker & Hostetler

6  but if Your Honor so desires a copy of the MOU in camera with

7  consent of counsel, we'd be happy to submit that to you if you

8  so desire.

9        I have nothing further.  Thank you.

10       THE COURT:  Okay.

11       MR. EISEN:  Your Honor, could I just respond to the

12  Worldcom point because it is in the case?

13       THE COURT:  No, I read -- I know.

14       I'm going to take a look at Judge Woods' decision so

15  you can hand that up to me and I'm going to take a break but

16  before I do that I'm going to deal with the two pre-trials that

17  I put at the end of the calendar and then I'll come back to you

18  all probably by -- hopefully, by 12:00 or 12:15 so you can

19  check your Blackberrys and make some phone calls and I'll be

20  back around 12:15 or so is my guess with a ruling.

21       ALL ATTORNEYS:  Thank you, Your Honor.

22       THE COURT:  So if you could hand that up and then

23  I'll take the American Express v. Rodriguez or Gloria Ramirez.

24                    [Off the record.]

25       THE CLERK:  Please be seated.

D R A F T                            50

1       THE COURT: Before the Court is a motion for a

2   preliminary injunction brought by Messrs. Grant, Trosten and

3   Bennett in this adversary proceeding in which they are

4   ultimately seeking a declaratory judgment and permanent

5   injunction against Axis Reinsurance Company, an excess insurer

6   that is currently in line in the tier of insurance coverage

7   obtained by the debtor, Refco, Inc., for its officers and

8   directors and itself.

9       Procedurally, I should go through the history of this

10  matter briefly.  The first step in respect of this insurance

11  company or insurance coverage dispute was taken by Axis in

12  initiating an adversary proceeding against not only Grant,

13  Trosten and Bennett but the other officers and directors of

14  Refco, Inc. who have made claims in respect of the policy as

15  well as Refco for a declaratory judgment that Axis was not

16  obligated to pay under the policy.

17      That was followed by different responses by various

18  groups of defendants.  First, one group of defendants

19  represented by Weil, Gotshal moved to dismiss Axis' adversary

20  complaint. Second, another group of officers and directors made

21  a counterclaim for the advancement of defense costs, and third,

22  the present group, Grant, Trosten and Bennett joined in or

23  purported to join in both of those requests for relief.  I

24  granted the motion to dismiss Axis' request for a declaratory

25  judgment as to its obligation generally under the policy to

D R A F T                                          51

1  provide coverage on the basis of the so-called substantial

2  overlap doctrine as set forth in numerous cases, including --

3  by Judge Cote in <u>In re: Worldcom, Inc. Securities Litigation</u>,

4  2002 W.L. 31729501 (S.D.N.Y., December 5, 2002) as well as in

5  <u>Adelphia</u> and <u>Enron</u>.

6        The basis set forth in my bench ruling was that

7  ultimately the facts that Axis would need to establish to

8  prevail on its claim and to the contrary the facts that the

9  defendants would need to refute to defeat Axis' claim

10 substantially overlap with facts that would also in all

11 likelihood arise in the pending securities litigation before

12 District Judge Lynch as well as potentially in the District

13 Court criminal litigation against Grant, Trosten and Bennett.

14       Turning then to the counterclaim and related request

15 for a preliminary injunction, I determined that there was a

16 likelihood of success on the merits and irreparable harm and

17 absent such sufficient questions going to the merits and the

18 balance of harms in favor of the counter-claimants to support

19 an injunction requiring the advancement of their defense costs

20 billed through the date of my order.

21       However, I also concluded that procedurally the

22 request for the same relief by Messrs. Grant, Trosten and

23 Bennett was not properly before me as they themselves had not

24 made a counterclaim and there was no adversary proceeding

25 asserting their claims against Axis and consequently no basis

```
                    D R A F T                          52
```

1  for granting them a preliminary injunction.  They subsequently

2  remedied that procedural defect by commencing an adversary

3  proceeding and seeking and obtaining expedited hearing on their

4  motion for a preliminary injunction for the advancement of

5  defense costs.

6          I should note as an aside that the parties should,

7  unless I'm missing something, promptly consolidate this

8  adversary proceeding with the counterclaim which is now its own

9  adversary proceeding brought by the defendant's representative

10 in part by Baker & Hostetler.

11         I won't go over at length the findings that I made

12 and the rulings that I made at the prior hearing.  They're set

13 forth in the transcript which I've reviewed as far as typos and

14 misheard words are concerned corrected and I hope that's what

15 the parties have.  I think it is.

16         I'll note that there was a procedural matter that --

17 consistent with some of my remarks on the record Axis has

18 subsequently moved in the District Court for withdrawal of the

19 reference of the adversary proceeding and that well may be

20 heard before the hearing that I've scheduled for mid-October on

21 the ultimate relief requested by the counterclaim plaintiffs

22 and by Grant, Trosten and Bennett against Axis.

23         However, pending a determination of that motion for

24 withdrawal of the reference I continue to have jurisdiction and

25 as noted at the prior hearing and I think is reiterated today

D R A F T                                                53

1  in the colloquy with counsel for the Refco plan administrator,

2  I believe I have jurisdiction over this matter and this

3  adversary proceeding because it is one in which I am asked to

4  interpret the provisions of the Axis policy which is property

5  of the debtor's estate and secondly because the payments under

6  the policy affect distributions to creditors in this estate,

7  either creditors with indemnification claims such as the

8  directors and officers or perhaps ultimately securities law

9  creditors and others who have made claims not only against

10  Refco but also against officers and directors and under the

11  plan who agreed to a mechanism for pursuing those claims

12  jointly with the Refco estate.

13        This motion before me also seeks relief from -- what

14  it says is the automatic stay to permit payment of the

15  insurance proceeds in respect of the advancement of defense

16  cost which is also a core matter.  However, as I noted at the

17  last hearing, Paragraph 34 of the confirmation order provides

18  that the automatic stay itself is no longer in place.  However,

19  it also notes that it does not otherwise amend the plan and the

20  other provisions of the confirmation order which does contain

21  its own plan injunction which may be implicated by the payment

22  of the defense costs.

23        In any event, because of that request which I am

24  taking as a request for relief from the plan injunction as

25  opposed to from the automatic stay, I also as a third basis

D R A F T                                                54

1  have jurisdiction here because ultimately I'm being asked to

2  interpret the plan and enforce the plan by considering relief

3  from the injunction in the plan.

4         In short, the basis for the request for a preliminary

5  injunction is the movants' contention that under the applicable

6  insurance policies, which include the primary policies as

7  incorporated in the Axis policy, Axis is obligated to advance,

8  that is pay defense costs subject to reimbursement if it's

9  ultimately concluded that such defense costs were not covered

10 under the policy.

11        The movants contend that that contractual language

12 when coupled with the various presumptions regarding

13 interpretation of insurance policies under New York law

14 particularly provisions of insurance policies dealing with

15 exclusions and dealing with defense costs is clear and that

16 there's a substantial likelihood that they would prevail on the

17 merits.

18        They also contend that given the amount of defense

19 costs that have been incurred to date and the fact that they

20 are criminal defendants subject to freeze orders the failure to

21 advance the defense costs irreparably harms them in that it

22 impairs their ability to mount an effective defense in this

23 case of a criminal indictment.

24        They also contend that even if they were not a

25 substantial likelihood of success the balance of harms tips in

D R A F T                                          55

1   their favor given the foregoing contentions and the opposite

2   consideration that Axis is a very substantial corporation and

3   that it agreed to make these payments and take the risk of non

4   payment in the policy.

5          Finally, they state as a matter of public policy they

6   should not be saddled with the payment of the defense costs

7   since that would vitiate the purpose of a DNO policy and

8   ultimately discourage parties from serving as officers and

9   directors of a corporation.

10          They have not presented any other evidence than the

11  amount of the defense costs and the fact that they are facing a

12  criminal trial in March of 2008 and the request for me to take

13  judicial notice of freeze orders.  That is, they've not offered

14  evidence as to their financial condition or the law firm's

15  willingness to work with the overhanging uncertainty as to

16  whether they would ultimately be paid for conducting the

17  movants' defense.

18          Axis has responded by first disputing that there was

19  a substantial likelihood that the movants would ultimately

20  prevail on the merits.  It is also contended that as a factual

21  matter irreparable harm has not been shown and that neither has

22  a balance of the equities tipping in favor or balance of the

23  harms tipping in favor of the movants.  They also contend that

24  the public policy cited by some of the courts that have

25  previously considered this issue is less significant where an

D R A F T                                          56

1   officer and director is the subject of a criminal indictment

2   and is being defended in a criminal proceeding.  It has sought

3   a bond under Rule 65(c) as well.

4           Finally, it has contended that the relief that is

5   sought here is fundamentally inequitable because the movants

6   had previously joined in the motion which was successful to

7   dismiss Axis' declaratory judgment complaint.

8           As far as the amount of the defense cost is

9   concerned, I believe the record is now clear that through the

10  date of my prior injunction order, August 31st, the costs

11  billed was approximately $1.6 million for these three movants

12  and that is approximately $2.9 million as of today.  The policy

13  itself has a $10 million limit.

14          Clearly, as far as these defendants are concerned,

15  they have been in serious litigation mode with very large

16  defense costs being incurred since July of this year and it is

17  likely that that will continue over the next several months as

18  they prepare for trial in what appears to be a complex, at

19  least as a factual matter, case.  And I'll note in that regard

20  that I take judicial notice of the cost incurred by the Refco

21  estate of examining the facts and circumstances surrounding the

22  claims that at least overlap with the claims against Mr.

23  Bennett and the other two criminal defendants, costs which I

24  had to approve before they were paid.

25          Let me turn to the last point raised by Axis first.

D R A F T                                           57

1   I concluded last week that it is not inequitable to proceed

2   with this claim and to grant preliminary injunctive relief

3   notwithstanding the movants' prior request to dismiss Axis'

4   complaint although they along with Weil, Gotshal were

5   successful in that request or the Weil, Gotshal defendants were

6   successful in that request.  I do not believe there is a basis

7   for judicial estoppel here because I believe that the issues

8   pertaining to the motion to dismiss are fundamentally different

9   than the issues presented by the claim asserted in the present

10  adversary proceeding as well as the counterclaim asserted by

11  the other defendants.

12          As I noted previously, the basis for this request is

13  one in which I need not consider the factual issues that

14  overlap with the District Court securities litigation and the

15  criminal litigation but rather need only consider the language

16  of the contract, that is the insurance policies and the related

17  warranty and applicable case law.  If, in fact, I were to

18  conclude ultimately that Axis was not obligated to advance

19  defense costs but could withhold those costs pending a

20  determination as to whether they were -- whether Axis would be

21  successful in concluding that this denial of coverage was

22  appropriate and correct then there would be an overlap and at

23  that point this adversary proceeding and the adversary

24  proceeding brought by the counterclaim parties would be either

25  stayed or dismissed without prejudice pending the development

D R A F T                                          58

1  of those facts in the multi district securities litigation

2  and/or the criminal case.  But I believe I can and unless the

3  reference is withdrawn I must consider whether as a matter of

4  reading the insurance policies and the case law and the related

5  warranty whether there is a separate obligation to advance

6  defense costs prior to determination of the underlying coverage

7  dispute based on whether there was a represent -- a breach of

8  the representation -- a breach of the so-called warranty and/or

9  the exclusions in the policy relied upon by Axis for disclaimer

10 of coverage.

11         Turning then to the other defenses raised by Axis,

12 let me address first the appropriate standard by which I should

13 consider the motion here for a preliminary injunction.  Axis

14 contends that because the relief sought here is one in which

15 Axis would be compelled to advance defense costs, this is a

16 request for mandatory injunctive relief rather than for a

17 prohibitory injunction.  Consequently, Axis argues I need to

18 consider the request pursuant to a heightened standard that

19 applies to mandatory injunctions where I would have to find on

20 the merits a substantial likelihood that the plaintiffs would

21 ultimately prevail.  See, for example, Tom Doherty Associates,

22 Inc. v. Sabian Entertainment, Inc., 60 F.3d 2735 (2d Cir.

23 1995).  In that case, the Second Circuit noted that the

24 distinction between a mandatory and a prohibitory injunction

25 has been the subject of criticism and particularly noted the

D R A F T                                        59

1    criticism of that standard in respect of breach of contract

2    cases where one party's assertion that the status quo is merely

3    being maintained is another party's assertion that that party

4    is actually breaching the status quo by breaching the

5    underlying agreement.

6            This very issue was addressed by what I believe to be

7    the leading case or the most relevant case to the issues before

8    me, that is Judge Cote's opinion in In re: Worldcom, Inc.

9    Securities Litigation, 354 F. Supp. 2d. 455 (S.D.N.Y. 2005) in

10   which she concluded ultimately that the heightened standard for

11   a preliminary mandatory injunction does not apply to a motion

12   for a preliminary injunction for the advancement of defense

13   costs for the reason that -- for the reasons that she lays out

14   at Page 463 of that opinion.  She notes first that in that

15   matter as well as here given that the amount at issue is well

16   under the policy limit that a preliminary injunction would not

17   make it difficult or impossible to render a meaningful remedy

18   to a defendant who prevails on the merits at trial in that only

19   part of the benefits to which the director, in this case the

20   directors and officers are seeking ultimately would be covered

21   here in the injunction.  And, secondly, that the policy itself

22   contemplated reimbursement.

23           That view was also recently followed in Great

24   American Insurance Company v. Gross, 2005 U.S. District Lexus

25   8003 (E.D. Virginia, May 3, 2005) which was vacated on other

D R A F T                                                  60

1   grounds, 468 F. 3d 199 (4th Cir. 2006).

2        So I don't believe that I must follow the heightened

3   standard requiring the finding of clear likelihood or a

4   likelihood of success on the merits.  Nevertheless, I have

5   considered obviously whether there would be a likelihood of

6   success on the merits as did Judge Cote in the <u>Worldcom</u> case

7   but did not limit my inquiry to that analysis but considered

8   also the regular standard.

9        I conclude that, as did Judge Cote in her words,

10  nevertheless even if the heightened standard applies I believe

11  that the movants here have established a clear likelihood of

12  success on the merits.

13       Let me turn to the merits now.  As Judge Cote

14  recognized, under New York law, and as an aside I previously

15  concluded that New York law should apply to disputes in respect

16  of this insurance coverage for the reasons set forth in my

17  earlier bench ruling, while the plain language of an insurance

18  agreement as with any contract covered by New York law is the

19  best evidence and if unambiguous the only evidence of the

20  parties' intentions and as a matter of aw for the Court to

21  decide in respect of insurance contracts to the extent of an

22  ambiguity exists and is unresolved by extrinsic evidence such

23  ambiguity is read against the insurer.  The rule that insurance

24  policies are to be construed in favor of the insured is most

25  rigorously applied in construing the meaning of exclusions

D R A F T                                      61

1  incorporated into a policy of insurance or provision seeking to

2  narrow the insurer's liability. And, finally, that where a

3  contract of insurance includes the duty to defend or to pay for

4  the defense of its insured that duty is a heavy one.

5         As set forth by Judge Cote, in addition, under New

6  York law, including as interpreted by the Appellate Division in

7  the Koslowski Tyco case, as well as by numerous Southern

8  District courts, the duty of an insurer to pay an insured's

9  defense costs is distinct from and broader than its duty

10 ultimately to indemnify even where the policy does not provide

11 specifically for when defense costs are to be advanced.  It has

12 been held that they need to be advanced as incurred under a

13 liability policy as set forth in Judge Baer's Newway decision.

14        Moreover, it appears clear to me under New York law

15 that the duty to pay defense costs exists whenever a complaint

16 against the insured alleges claims that may be covered under

17 the insurer's policy.  That is, if it appears from the face of

18 the underlying complaint against the insured that there is an

19 issue as to whether that complaint sets forth a claim that may

20 be covered the costs would need to be advanced.  See, for

21 example, the Koslowski Tyco case as well as the Newway decision

22 which appears at 1997 U.S. District Lexus 11884 (S.D.N.Y.

23 August 12, 1997).

24        The opposition to the motion by Axis attempts to make

25 a distinction between situations where the courts have

D R A F T                                      62

1   considered refusal to pay defense costs because the insurer has

2   sought or has taken the position that the policy was rescinded.

3   It has also taken the position that there should be a

4   distinction between the present matter and decisions which have

5   dealt with the duty to defend as opposed to a duty to advance

6   defense costs.  But I conclude based on my review of the case

7   law that where an insurer takes the position that a claim is

8   not covered and therefore it is not obligated to advance

9   defense costs those distinctions are not meaningful in that

10  they apply in cases of rescission, cases where there's an

11  alleged obligation to advance and cases where there's an

12  alleged obligation to defend.

13          For example, in the Tyco Koslowski matter the insurer

14  alleged that the underlying claims were not covered and

15  therefore the defense costs would not be covered either.  The

16  Court held, however, that unless the insurer has no duty as a

17  matter of law it would have an obligation to advance the

18  defense costs stating that the duty to defend or pay defense

19  costs is construed liberally and any doubts about coverage are

20  resolved in the insured's favor.  Furthermore, an insurer can

21  only invoke a policy exclusion to avoid coverage if it can show

22  that the allegations in the complaint cast that pleading solely

23  and entirely within the policy exclusions.  The duty to defend

24  arises when the action is brought and is unaffected by the

25  outcome of the action.  See, also, Pepsico, Inc. v. Continental

D R A F T                                          63

1  Casualty Company, S.D.N.Y. 1986, McGinnis v. Employer's

2  Reinsurance Corporation, 648 F. Supp. 1263 (S.D.N.Y. 1986), The

3  Great American Insurance Company v. Gross case that I referred

4  to earlier and G1 Holdings, Inc. v. Hayman -- I'm sorry, G1

5  Holdings, Inc. v. Reliance Insurance Company, 2006 U.S.

6  District Lexus 17597 (D. New Jersey, March 22, 2006).

7         Axis' response, in addition to saying that it need

8  not advance the costs pending resolution of the dispute, is

9  that it is clear from the language of the insurance policy

10 itself that there is no way that it would be obligated to

11 provide coverage here.

12        As I noted in my prior ruling on the earlier request

13 for an injunction, this is ultimately premised upon Axis'

14 reading of Paragraph D2 of the underlying policy which states

15 that the insurer will pay covered defense costs on an as

16 incurred basis.  If it is finally determined that any defense

17 costs paid by the insurer are not covered under this policy the

18 insured's agree to repay such non covered defense costs to the

19 insurer.  Axis contends that because of the word covered in the

20 first sentence it need not pay costs that are not covered under

21 the policy.

22        I conclude that it is likely that that interpretation

23 will not prevail given the foregoing case law as well as the

24 provision when read as a whole which first requires the insurer

25 to pay covered defense costs on an as incurred basis, i.e. not

D R A F T                                        64

1  waiting until an ultimate determination but as incurred with

2  out of pocket payment.  Secondly, the second sentence which

3  provides for reimbursement if it is finally determined that any

4  defense costs paid by the insurer were not covered.  Axis

5  contends that the word covered in the first sentence has to

6  mean covered by the policy but I have two responses to that.

7           The first is that I see little difference between

8  that argument and an argument that says that as in the cases

9  that I previously cited a defense cost falls into an exclusion

10 because it's not for costs determined to have arisen from

11 defense of a claim covered by a policy, i.e. the policy it was

12 argued in those other cases doesn't cover certain types of

13 claims and therefore the defense costs also would not fall into

14 the coverage of the policy.  Notwithstanding those arguments,

15 courts like the Koslowski court determined that the costs

16 should be advanced pending ultimate determination of that

17 issue.

18          Secondly, covered when one looks at the definition of

19 defense costs and loss in the first sentence, covered as used

20 in the first sentence after looking at those definitions could

21 mean whether it pertained to insured persons or not or whether

22 those persons had become legally obligated or not to make the

23 payments of their defense costs.

24          So, in any event, I believe that ultimately it is

25 likely that the movants here would prevail on the merits.  I

D R A F T                                              65

1   conclude that the following paragraph of the policy which deals

2   with the allocation of losses covered and losses not covered by

3   the policy does little to advance Axis' interpretation and may

4   slightly advance the movants' in that it would seem to be

5   superfluous if Axis' interpretation were the correct one.  That

6   is, you would not need to provide for a distinction between

7   losses covered and losses not covered if the insurer could

8   withhold under Paragraph 2, defense costs that it believed were

9   not covered.

10         I do not believe the language which again requires

11  payment on an as incurred basis is materially different from

12  the language quoted by Judge Cote in the Worldcom case and

13  would need to be far clearer to create an exclusion here.

14         Turning to the issue of irreparable harm, Judge Cote

15  found in Worldcom that wherever individual officers and

16  directors were faced with substantial defense costs that were

17  not being paid they would -- they were subject to irreparable

18  harm.  As she says, it is impossible to quantify the impact on

19  a litigant of a failure to have adequate representation at this

20  critical stage of litigation.  The ability to mount a

21  successful defense requires competent and diligent

22  representation.  The impact of an adverse judgment will have

23  ramifications beyond the money that will necessarily be

24  involved.  That's especially true as noted by Judge Gerber in

25  the Adelphia Regis case where the insured or the beneficiary of

D R A F T                                          66

1  the policy is the subject of a criminal proceeding.

2          Judge Cote's not alone in finding irreparable harm in

3  these circumstances.  It was also found in the G1 and Gross

4  cases that I cited earlier as well as in McPeek v. Travelers

5  Casualty & Surety Company of America, 2006 U.S. District

6  Lexus -- I'm sorry, excuse me.  Let me back up.

7          It was recognized in the Bondex International, Inc.

8  v. Hartford Accident & Indemnity Company case, 2006 U.S.

9  District Lexus 50083 (N.D. Ohio, July 21, 2006) to apply in a

10  case of an individual beneficiary or insured under a director's

11  and officer's policy but would not apply to a corporation at

12  least absent evidence of insolvency which again I believe

13  heightens or puts a fine point upon the burden faced by an

14  individual here.

15          There is one case that takes a contrary view and that

16  is the McPeek case that I started to cite earlier.  McPeek v.

17  Travelers Casualty & Surety Company of America, 2006 U.S.

18  District Lexus 28619 (W.D. Pennsylvania, May 10, 2006) in which

19  the Court found there was not irreparable harm because there

20  had not been a showing, a factual showing that the

21  beneficiaries there would be unable to mount a defense.

22          There may conceivably be circumstances where an

23  additional factual showing would need to be made to establish

24  irreparable harm in this context but I believe that there's a

25  sufficient record before me to show irreparable harm given the

D R A F T                                       67

1   substantial amount of the defense costs, the freezing of the

2   defendant's assets and the fact that they're subject to

3   criminal exposure.  So to the extent that I find McPeek at all

4   persuasive I believe it's distinguished under the present

5   circumstances as did Judge Cote.  Therefore, I've concluded,

6   although I do not believe the heightened standard needs to

7   apply, that the movants meet it here.

8           Turning, however, to the ordinary standard for a

9   preliminary injunction, I've already discussed the merits and

10  even if one were not to take the view that there was a clear or

11  substantial likelihood of success, for the reasons I've stated

12  I believe there is definitely sufficient issues going to the

13  merits that I would turn then to the balance of harms as the

14  merits are fair ground for litigation.

15          I conclude that the balance of harms tips decidedly

16  in favor of the movants here.  I believe that although she did

17  not have a heading in her opinion in which she balanced the

18  harms, Judge Cote did consider the harm not only to the movant

19  in not granting injunctive relief but also to the potential

20  harm to the insurer were she to grant the relief and concluded

21  as I conclude here that the balance of harms tip decidedly in

22  favor of the movant and that is she discussed the fact that the

23  -- in her belief there was no undue hardship on the insurer as

24  its liability is ultimately capped and secondly, that the

25  policy set out a mechanism that the insurer bargained for for

D R A F T                                    68

1   reimbursement ultimately and that particularly in light of the

2   potential harm to the movant and the public interest in favor

3   of advancing the defense costs, the insurer should not be

4   entitled to more.

5            In a more explicit analysis on both the <u>McPeek</u> and

6   <u>Great American v. Gross</u> case, similarly found a balance of

7   harms tipping in favor of the movant as well as the public

8   interest being in favor of the movant.

9            As noted at oral argument, Axis had cited to me an

10  unpublished, including not appearing on either Lexus or

11  Westlaw, ruling by Judge Wood in a civil matter, <u>Gayon v. Twin</u>

12  <u>City Fire Insurance Company</u>.  I've reviewed that

13  notwithstanding the Second Circuit's rule on citation to

14  unpublished opinions and the fact that a copy of the ruling was

15  not obtainable by the Court or provided to the Court prior to

16  oral argument and I conclude first that the decision by Judge

17  Wood is distinguishable in that she had to my mind a far

18  different view of the underlying merits of the case which is a

19  very different case than the case before me.  Note further that

20  while she mused that cases such as Worldcom may not have

21  considered sufficiently the balance of harms or the balance of

22  the equities, I do not view her as ultimately ruling on that

23  basis.

24           In any event, again, as I distinguished the McPeek

25  case, I believe that the amount at issue here and the fact that

D R A F T                              69

1  this is a criminal matter distinguish the present matter from

2  Gayon.

3         As far as Axis' request that the movants post a bond

4  under Rule 65(c) incorporated by Rule 7065, I again follow the

5  logic set forth by Judge Cote in Worldcom which was also

6  adopted by the Great American v. Gross and G1 cases that I

7  cited earlier effectively to require a bond here in my view

8  would vitiate the entire ruling particularly since these are

9  individual defendants.  In essence, it would under the guise of

10 obtaining a bond require the movants to pay for insurance all

11 over again notwithstanding the language of the policy.

12        So I exercise my discretion not to require a bond in

13 these circumstances. I do so also mindful that the amount that

14 I'm going to require to be advanced is well within the capped

15 amount of the policy and that as I noted earlier the ultimate

16 issues here are teed up for a final determination in 31 days

17 and that leads into the last part of my ruling.

18        It was requested by Axis that I rule as to the proper

19 allocation or priority of payment of funds directed to be paid,

20 if any, by me. I do not believe that request is appropriately

21 before me given the seriousness of it the parties who would be

22 affected by it and the limited amount of notice.  As

23 importantly, I don't believe it's a ripe question because I

24 don't believe any other priority or any priority issues are

25 necessarily determined by my ruling today and further, although

D R A F T                                    70

1  this is not critical to my ruling, I don't believe that my

2  ruling today would put Axis in a position of acting at its

3  peril and paying out one way or another under the policy which

4  is generally disclaimed and refused to pay out under absent a

5  judicial ruling requiring it to do so.

6        It appears to me that therefore an order requiring

7  payment with a full reservation of rights as to the allocation

8  or priority of payment generally under the policy is

9  appropriate.  I've determined given the record as to the

10 billing of costs and the incurrence of costs that it would be

11 appropriate to require Axis to advance the defense costs to

12 these three movants billed through the date of my prior order

13 so that there's no, if you will, acceleration of billing, and

14 that in my view the costs through the date of the prior order

15 were in large measure billed in the ordinary course and I think

16 appropriately paid.

17       I also believe that requiring the payment through

18 that date puts these three movants on an even footing with the

19 other movants who previously obtained the preliminary

20 injunction.  Given that I will be ruling unless the reference

21 is withdrawn at or around October 12th, I believe that my

22 present ruling would provide sufficient comfort to the law

23 firms defending these three individuals that they will continue

24 to provide the same level of service going forward without the

25 necessity of paying them the additional amounts that have been

D R A F T                                    71

1  billed starting in September and through today and that such

2  payments would not be necessary to avoid irreparable harm in

3  light of this ruling.

4           So it's been represented by counsel for the movants

5  that they would propose an order that's substantially similar

6  if not essentially similar to the prior injunction that I had

7  entered I believe it would contain the language about though

8  the reservation and preservation of all issues as to priority

9  of payment.  Have you -- do you have such an order?

10          MR. EISEN: Your Honor, I have the following order. I

11 also have a disk.  This order is identical other than changing

12 the identities of the parties.  I provided a copy to Ms.

13 Gilbride and I provided a copy to Ms. Kim before the hearing

14 today.  If the Court likes as last time I can hand this draft

15 up and the Court can --

16          THE COURT: Does it have the language about the

17 reservation of rights as to priority?

18          MR. EISEN: It does not have the language about

19 reservations of rights.

20          THE COURT: All right.  Well, you should consider the

21 injunction effective as of today but I think you should

22 circulate that language because I think it's meaningful to the

23 parties and you can submit an order tomorrow.  It's 1:20 now.

24 You may get it in today but submit it with that language.  You

25 don't have to settle it on the parties but they'll have some

D R A F T                                      72

1  time.  You should email it to them at the same time you submit

2  it to Chambers.  They can tell me if it doesn't agree with my

3  ruling.

4          MR. EISEN: I will, Your Honor.

5          MS. GILBRIDE: Your Honor, given the amount of money

6  involved and the fact that we've only recently received most of

7  these bills, Axis would respectfully request a reasonable

8  amount of time to review the bills and --

9          THE COURT: It's the same as the last ruling.  I think

10 it's -- it doesn't change anything as far as the policy, as far

11 as your other rights under the policy including reviewing the

12 bills, et cetera.

13         MS. GILBRIDE: It's just the turnaround time.  Since

14 we've just gotten the bills it does take a little bit of time

15 to review the bills.

16         THE COURT: Again, this doesn't change that.  I'm not

17 saying you pay them tomorrow.

18         MS. GILBRIDE: I think the order says that we pay them

19 within ten days of the order.

20         MR. EISEN: Your Honor, if I understand the Court

21 correctly, it's only the bills that were presented to Axis as

22 of the Court's previous --

23         THE COURT: The date was August 31st.

24         MR. EISEN: August 31st.

25         MS. GILBRIDE: Presented to us or through that day?

D R A F T                                    73

1          THE COURT: Yes, billed.  Billed.

2          MR. EISEN: It's that the -- what I understood the

3     Court to be saying was the insurers had -- if the insurer had

4     the bills in hand as of August 31.

5          THE COURT: Okay.

6          MS. GILBRIDE: Thank you.

7          THE COURT: Now, as far as -- I know we're having -- I

8     had previously scheduled a telephonic conference on the 14th.

9     I saw the result in front of Jude Koetl. I don't know whether

10    there will be a motion for a stay or not.  I don't know where

11    you're going with withdrawal of the reference but I would like

12    to keep this on track for the 12th.  So --

13         MS. KIM:  Yes, Your Honor, that is our intention to

14    keep the motion for summary --

15         THE COURT: So I think we should still have that

16    conference on the 14th.

17         MS. KIM: That's fine, Your Honor. With respect to

18    Judge Koeltl, Judge -- we had an oral argument last Wednesday.

19         THE COURT: I read the -- someone attached the

20    transcript and the ruling.  So I'm up to date on that I think

21    unless there -- I read what was attached to the exhibit as an

22    exhibit.

23         MS. KIM: Well, actually that transcript, Axis

24    submitted a letter --

25         THE COURT: I saw that.  I saw that.  Very well.

D R A F T                                    74

1   Raise the issue of mediation.  This is perhaps an appropriate

2   thing for the parties to do.  I did not hear Axis say whether

3   it would be amenable to mediation or not. I think it would need

4   to include the other insurers.  It seems to me that the parties

5   should consider mediation but I don't believe that these issues

6   should be put on hold unless there is substantial progress in

7   such a mediation.  It seems to me that, as I noted at the last

8   hearing --

9        MS. GILBRIDE: Just so Your Honor is clear, it was

10  actually Axis' suggestion initially.

11       THE COURT: That's fine.  I'm happy if Axis wants to

12  mediate but I think there are other insurers involved and that

13  would be fine to have happen but there's a -- I believe there's

14  a legal regime that governs in this area where insurers refuse

15  to pay under policies and the parties are free to mediate but

16  that legal regime governs and I think it needs to be followed

17  because there are consequences beyond just a ruling by the

18  Court as to whether the insured failed to pay or not.  So I'm

19  not going to hold off in the litigation unless there's

20  substantial progress on a mediation and I encourage the parties

21  to try to make substantial progress on it.  But I'm afraid the

22  parties means not just Axis but other parties.  This is not a

23  litigation matter.  This is a mediation matter and I think is a

24  practical matter to mediate it you're going to need other

25  parties, the other insurers.

                    D R A F T                              75

1          Ms. Kim.

2          MS. KIM: Your Honor, just one last housekeeping

3    matter.  Our intervention motion, I don't think anyone -- no

4    one opposed it.  So if you could just --

5          THE COURT: That's fine.  I obviously heard you all.

6    Again, the two proceedings should be consolidated I believe.

7    They raise the same issues in terms of interpreting the

8    contract at least.

9          MR. EISEN: Your Honor, we would move for

10   consolidation.  If the Court wants to order that now then we'll

11   take the appropriate steps with the clerk.

12         THE COURT: Do you want to think about that?

13         MS. GILBRIDE: Your Honor, we would appreciate an

14   opportunity to consider that.

15         THE COURT: That's fine.  That's fine.  It seems to me

16   it's sort of --

17         MR. EISEN: Thank you, Your Honor.

18                        *  *  *  *  *

19

20

21

22

23

24

25

D R A F T                                      76

1    I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5                              _____

6                                        Shari Riemer

7 Dated:   September 12, 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25