WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Greg A. Danilow (GD 1621)
Michael F. Walsh (MW 8000)

Attorneys for Appellees Leo R.
Breitman, Nathan Gantcher, David V.
Harkins, Scott L. Jaeckel, Thomas H.
Lee, Ronald L. O'Kelley, and Scott A.
Schoen

BAKER & HOSTETLER LLP
12100 Wilshire Blvd., Suite 1500
Los Angeles, CA 90025
Telephone: (310) 979-8460
Facsimile: (310) 820-8859
Helen B. Kim (HK 8757)

Attorneys for Appellee Dennis A.
Klejna

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone: (212) 672-1996
Facsimile: (212) 672-1920
John J. Jerome (JJ 2413)

Attorneys for Appellee Joseph Murphy

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391
Stuart I. Friedman (SF 9186)
Ivan Kline (IK 9591)

Attorneys for Appellees William M.
Sexton and Gerald M. Sherer

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 832-8300
Facsimile: (212) 763-7600
Richard Cashman (RC 4769)

Attorneys for Appellee Philip
Silverman

ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
Telephone: (212) 704-9600
Norman L. Eisen (NE 1198)
Thomas G. Macauley (TM 3944)
Laura E. Neish (LN 0040)

Attorneys for Appellee Tone N. Grant

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Telephone: (212) 907-7300
Jeffrey T. Golenbock (JG 2217)
Adam C. Silverstein (AS 4876)

Attorneys for Appellee Phillip R.
Bennett

MORVILLO, ABRAMOWITZ,
GRAND, IASON, ANELLO &
BOHRER, P.C.
565 Fifth Avenue
New York, NY 10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494
Barbara Moses (BM 2952)
Rachel Korenblat (RK 0170)

- and -

LAW OFFICES OF GABRIEL DEL
VIRGINIA
641 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (212) 371-5478
Gabriel Del Virginia (GV 4951)

Co-Attorneys for Appellee Robert C.
Trosten

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

AXIS REINSURANCE COMPANY,   :

  :

      Appellant,   :   No. 07-CV-7924 (GEL)

  :

      v.   :

  :

PHILLIP R. BENNETT, *et al.*,   :   [caption continued on next page]

  :

      Appellees.   :

-------------------------------------------------------------------x

## APPELLEES' JOINT RESPONSE TO AXIS REINSURANCE COMPANY'S APPEAL FROM THE BANKRUPTCY COURT'S ORDERS DISMISSING AXIS'S COMPLAINT AND GRANTING APPELLEES' MOTIONS FOR SUMMARY JUDGMENT

```
------------------------------------------------------x
In re                                          :
                                               :    Chapter 11
REFCO, INC., et al.,                           :    Case No. 05-60006 (RDD)
                                               :    (Jointly Administered)
                          Debtors.             :
------------------------------------------------------x
AXIS REINSURANCE COMPANY,                      :
                                               :
                          Plaintiff,           :
                                               :    Adv. Proc. No. 07-01712 (RDD)
              v.                               :
                                               :
PHILLIP R. BENNETT, et al.,                    :
                                               :
                          Defendants.          :
------------------------------------------------------x
TONE N. GRANT, et al.,                         :
                                               :
                          Plaintiffs,          :
                                               :
              v.                               :    Adv. Proc. No.  07-2005 (RDD)
                                               :
AXIS REINSURANCE COMPANY,                      :
                                               :
                          Defendant.           :
------------------------------------------------------x
LEO R. BREITMAN, et al.,                       :
                                               :
                          Plaintiffs,          :
                                               :
              v.                               :    Adv. Proc. No.  07-2032 (RDD)
                                               :
AXIS REINSURANCE COMPANY,                      :
                                               :
                          Defendant.           :
------------------------------------------------------x
AXIS REINSURANCE COMPANY,                      :    (1) No. 07-CV-9420 (GEL)
                                               :    (2) No. 07-CV-9842 (GEL)
                          Plaintiff,           :    (3) No. 07-CV-10302 (GEL)
                                               :
              v.                               :
                                               :
PHILLIP R. BENNETT, et al.,                    :
                                               :
                          Defendants.          :
------------------------------------------------------x
TONE N. GRANT, et al.,                         :
                                               :
                          Plaintiffs,          :
                                               :
              v.                               :    No. 07-CV-9843 (GEL)
                                               :
AXIS REINSURANCE COMPANY,                      :
                                               :
                          Defendant.           :
------------------------------------------------------x
```

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................... 1

COUNTER-STATEMENT OF ISSUES PRESENTED ............................... 3

STATEMENT OF FACTS ....................................................................... 4

ARGUMENT ........................................................................................ 14

I. Axis Has Waived Its Appeal of the Dismissal Order ......................... 14

II. The Bankruptcy Court's Retention of the Counterclaims and Consideration of the Issue of Advancement of Defense Costs Was Not Inappropriate Simply Because the Axis Complaint Was Dismissed .................................................... 17

III. The Bankruptcy Court Properly Granted Summary Judgment to the Insureds on the Issue of Advancement Based on the Unambiguous Terms of the Axis Policy and Extensive Legal Precedent ..................................................... 18

  A. New York Law Compels the Advancement of Defense Costs Where an Insurer Has Disclaimed Coverage Under a D&O Policy ........................................................ 19

  B. The Axis and WorldCom Policy Provisions Are Substantially Similar ................................................... 23

  C. Axis's Construction of the D&O Policies Is Inconsistent with the Unambiguous Terms of the Policies ......................... 25

  D. Kozlowski and Carlin Equities Do Not Require the Bankruptcy Court to Determine That the Exclusions Relied on by Axis are Inapplicable Prior to Ordering the Advancement of Defense Costs ............................................. 29

IV. Public Policy Supports the Bankruptcy Court's Decision to Require Axis to Advance Defense Costs ....................................... 32

CONCLUSION ..................................................................................... 34

# TABLE OF AUTHORITIES

**CASES**                                                                                                      **PAGE(S)**

*In re Adelphia Commc'ns Corp.*,
    302 B.R. 439 (Bankr. S.D.N.Y. 2003)................................................................................15

*Associated Elec. & Gas Ins. Servs. v. Rigas.*,
    382 F. Supp. 2d 685 (E.D. Pa. 2004)................................................................13, 19, 22, 29

*Bailey v. United Airlines*,
    279 F.3d 194 (3d Cir. 2002) ................................................................................15

*Carlin Equities Corp. v. Houston Cas. Co.*,
    No.05-cv-9508-LAP, 2007 WL 2456958 (S.D.N.Y. Aug. 24, 2007) .................19, 29, 30, 31

*Century 21, Inc. v. Diamond State Ins. Co.*,
    442 F.3d 79 (2d Cir. 2006) ................................................................................20

*Fed. Ins. Co. v. Kozlowski*,
    792 N.Y.S.2d 397 (N.Y. App. Div. 2005) ................................................................ *passim*

*Fed. Ins. Co. v. Tyco Int'l Ltd.*,
    784 N.Y.S.2d 920 (N.Y. Sup. Ct. 2004), *aff'd in part, mod. in part sub nom.*,
    *Fed. Ins. Co. v. Kozlowski*, 792 N.Y.S.2d 397 (N.Y. App. Div. 2005) ...........................13, 30

*Frank v. United States*,
    78 F.3d 815 (2d Cir. 1996) ................................................................................15

*G-I Holdings, Inc. v. Reliance Ins. Co.*,
    No. 00-cv-6189 (DMC), 2006 U.S. Dist. LEXIS 17597 (D.N.J. Mar. 22, 2006) ...........13, 22

*Hartford Accident & Indem. Co. v. Pac. Employers Ins. Co.*,
    862 F. Supp. 160 (S.D. Tex. 1994)................................................................................27

*Little v. MGIC Indem. Corp.*,
    649 F. Supp. 1460 (W.D. Pa. 1986), *aff'd,* 836 F.2d 789 (3d Cir. 1987) ..............................34

*Little v. MGIC Indem. Corp.*,
    836 F.2d 789 (3d Cir. 1987) ................................................................................22

*Murphy v. Lexington Ins. Co.*,
    No. L-5004-06 (N.J. Super. Ct. Law Div. Aug. 3, 2007) ......................................................29

*Nat'l Union Fire Ins. Co. v. Xerox Corp.*,
    792 N.Y.S.2d 772 (N.Y. Sup. Ct. 2004),
    *aff'd,* 807 N.Y.S.2d 344 (N.Y. App. Div. 2006) .........................................................15, 16, 33

*Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.),*
    391 F. Supp. 2d 541 (S.D. Tex. 2005) ..............................................................22, 34

*Nu-Way Envtl., Inc. v. Planet Ins. Co.,*
    No. 95 Civ. 573, 1997 WL 462010 (S.D.N.Y. Aug. 12, 1997) ...............................33

*PepsiCo. Inc. v. Cont'l Cas. Co.,*
    640 F. Supp. 656 (S.D.N.Y. 1986) ........................................................................22

*Sun-Times Media Group, Inc. v. Royal & SunAlliance Ins. Co.,*
    No. 06C-11-108-RRC, 2007 WL 1811265 (Del. Super. Ct. June 20, 2007).........................13

*Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.,*
    314 N.E.2d 37 (N.Y. 1974).............................................................................32, 33

*Trs. of Princeton Univ. v. Nat'l Union Fire Ins. Co.,*
    839 N.Y.S.2d 437, available at No. 650202/06,
    2007 WL 1063870 (N.Y. Sup. Ct. April 10, 2007) ........................................13, 22

*United Capital Corp. v. Travelers Indem. Co.,*
    237 F. Supp. 2d 270 (S.D.N.Y. 2002) ..................................................11, 12, 13

*In re WorldCom, Inc. Sec. Litig.,*
    354 F. Supp. 2d 455 (S.D.N.Y. 2005) ........................................................ *passim*

**OTHER AUTHORITY**

16A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
    *Federal Practice & Procedure Juris* 3d § 3974.1 (2d ed. Supp. 1994) ..........................14, 15

## PRELIMINARY STATEMENT

Appellee-Insureds are the insured parties under certain D&O policies purchased by Refco, including a policy issued by Axis. As a result of the collapse of Refco, the Insureds are defendants in numerous suits. The Insureds sought and continue to seek payment of their respective defense costs from Refco's D&O insurers, including Axis. To avoid payment of the Insureds' defense costs, Axis commenced a declaratory judgment action before the Bankruptcy Court in Refco's chapter 11 cases requesting a determination that certain exclusions purportedly in its D&O insurance policy applied.[1] Certain Insureds moved to dismiss the Axis complaint, while others filed counterclaims seeking affirmative relief on the issue of policy coverage and Axis's obligation to advance defense costs. The Bankruptcy Court dismissed Axis's complaint, but retained the counterclaims. Ultimately, the Bankruptcy Court entered summary judgment for the Insureds requiring Axis to advance defense costs. Axis filed notices of appeal from both the dismissal of its complaint and the grant of summary judgment on defense costs.

The Bankruptcy Court dismissed Axis's complaint because the facts required to establish the application of the purported exclusions in the policies on which Axis relied in its complaint – that Refco's former CEO Phillip R. Bennett committed acts that were not disclosed to Axis – substantially overlapped with the issues in the underlying criminal and tort actions against the Insureds. The law is clear that if such a substantial overlap exists, the court considering the coverage litigation must defer to, and wait for, the findings in the underlying actions. In its appellate brief, Axis does not challenge that ruling or argue that the order dismissing its complaint should be reversed. Thus, it has waived that portion of its appeal.

---

[1] The very existence of the exclusions relied on by Axis are hotly disputed by the Insureds.

The minor focus of Axis's appellate brief is whether the Bankruptcy Court should have dismissed the Insureds' counterclaims when it dismissed Axis's complaint.  Axis argues that the Bankruptcy Court ruled inconsistently and unfairly by refusing to consider the "coverage" issues raised by Axis, while at the same time retaining jurisdiction to adjudicate the "coverage" issues raised by the Insureds.  In fact, no inconsistency or unfairness exists.  Axis sought a decision of no coverage based on certain exclusions to its policy – and the Bankruptcy Court correctly concluded that these exclusions cannot be applied without the adjudication of the same facts at issue in the underlying actions.  However, the Bankruptcy Court concluded that issues raised by the Insureds' request for advancement is one of contractual interpretation and does not overlap with or require resolution of the factual issues in the underlying actions.

The Bankruptcy Court held that, as a matter of contract interpretation and application of New York law, Axis was required to advance defense costs *pending* a final determination of coverage.  In New York, an insurer's duty under a D&O policy to defend its insured (or advance defense costs to its insured) is broader than its duty to indemnify.  This means that the insurer must defend or pay the costs of defending against claims that, if proven, may not be covered by the underlying policy.  In essence, directors and officers are (vis-à-vis their insurer) innocent until proven guilty – and their D&O insurer is duty-bound to provide them the means to defend their innocence.  This result is fair because Axis has the right under the terms of its policy to recoup defense costs if a court ultimately determines that the Insureds are not entitled to coverage.  This is the remedy Axis bargained for when it agreed to provide insurance on the terms and conditions of its policy.

The balance of Axis's brief is an attempt to show that the Bankruptcy Court's contract interpretation and application of New York law was wrong.  Axis asserts that it issued a

*unique policy authorizing the insurer to unilaterally deny coverage* and thus avoid payment of defense costs, whenever the *insurer believes* a matter is outside the indemnification provided by the policy.  For example, where a claim for a wrongful act is made against an officer or director and such claim alleges conduct that, *if true*, would be excluded, Axis asserts it has the right under the policy to refuse to pay defense costs, notwithstanding the fact that the allegations may be untrue.  Thus, according to Axis, its duty to advance defense costs is actually *less* than its duty to indemnify – a proposition completely at odds with New York law.

Axis's policy is not materially different from other insurance policies the courts in New York have interpreted.  As the New York cases make clear, unless the court can determine that coverage does not exist based on the face of the pleadings in the underlying actions, defense costs must be advanced.  Moreover, the notion that an insurer who is paid to protect the insureds could decide – unilaterally as if it were a court of law – that an insured is not entitled to defense costs runs counter to the very purposes of D&O insurance.  Axis goes too far.  The protection it bargained for, and agreed to, under the policy is clear and unambiguous:  It has the right to recoup defense costs that ultimately are determined not to be covered.

## COUNTER-STATEMENT OF ISSUES PRESENTED

Whether the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") erred in granting the Appellee insureds' motion for summary judgment to require excess insurance carrier Appellant Axis Reinsurance Company ("Axis") to advance defense costs in the underlying actions, pending a final judicial determination of coverage, where it is undisputed that (a) defense costs are covered under the excess policy issued by Axis (the "Axis Policy"), (b) the underlying actions fall within the definition of "Claims" that are covered by the Axis Policy, and (c) the primary policy, to which the Axis Policy follows

form, expressly requires the carrier to advance defense costs "as incurred," unless and until there is a final determination that such costs are not covered.

## STATEMENT OF FACTS

### A.    Refco and the Underlying Actions

On or about October 17, 2005, Refco, Inc. and most of its direct and indirect subsidiaries (collectively, with Refco, Inc.'s predecessor, Refco Group Ltd., LLC, "Refco") filed voluntary petitions for relief in the Bankruptcy Court under chapter 11 of title 11 of the United States Code.

The collapse of Refco in October 2005 and the bankruptcy filings that quickly followed led to the commencement of a series of civil lawsuits, government investigations, and criminal proceedings against the insureds (the "Underlying Actions").  A number of these proceedings remain pending.[2]  Of particular note, each of the Appellees is a former officer or director of Refco (collectively, the "Insureds") and a defendant in *In re Refco, Inc. Securities Litigation*, 05 Civ. 8626 (S.D.N.Y.) (the "Securities Litigation"), a putative class action brought on behalf of Refco bondholders and shareholders.  Discovery in the Securities Litigation is presently ongoing, and the Insureds have incurred and are continuing to incur substantial legal expenses in connection with the Securities Litigation.  Moreover, three Insureds are awaiting trial in *United States v. Bennett, et al.*, 05 Cr. 1192 (S.D.N.Y.), which is scheduled to commence on March 17, 2008, and are incurring significant defense costs to prepare for trial.

---

[2] Each of the insureds properly gave notice of the Underlying Actions in which they were named to the insurers in the Refco "tower" of liability insurance, and requested coverage from such insurers under the policies described below.  Axis does not dispute that it was given proper notice of the Underlying Actions by the insureds.  (Axis Desig. Item 4 ¶¶ 6, 101, 133, 137.)

B.     **The Refco D&O Policies**

Prior to the commencement of Refco's bankruptcy cases, Refco obtained D&O liability insurance for the benefit of its directors and officers.  Refco's D&O insurance is structured as a "tower," consisting of a primary policy and five excess policies providing for a total of $70 million of coverage for the policy period of August 11, 2005, to August 11, 2006.[3]

1.     **The U.S. Specialty Policy**

U.S. Specialty Insurance Company ("U.S. Specialty") issued the primary policy (Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821) for the period August 11, 2005, to August 11, 2006 (the "Policy Period"), with a $10 million limit of liability (the "Primary Policy") (Axis's Designation of Items in Record on Appeal and Statement of Issue Presented, dated October 26, 2007 (hereinafter, "Axis Desig.") Item 2.)

The Primary Policy names as "Insured Persons" "any past, present or future director or officer of the Company . . . ." (*Id.* at Definition (F).)  It provides those directors and officers with coverage for "Loss arising from Claims . . . against the Insured Persons for Wrongful Acts."  (*Id.* at Insuring Agreement (A).)   "Loss," as defined by the Primary Policy, includes "Defense Costs . . . an Insured Person is legally obligated to pay as a result of any Claim . . . ." (*Id.* at Definition (G) and Endorsement No. 4.)

Each of the Insureds is a former officer or director of Refco (Axis Desig. Item 4), and Axis does not dispute that the Underlying Actions against the Insureds constitute "Claims" for "Wrongful Acts" as defined in the Primary Policy.

---

[3]  The tower of Refco's D&O insurance is as follows:  (1) U.S. Specialty Insurance Company ($10 million primary coverage); (2) Lexington Insurance Company ($7.5 million excess of $10 million); (3) Axis Reinsurance Company ($10 million excess of $17.5 million); (4) Allied World Assurance Company ($12.5 million excess of $27.5 million); (5) Arch Insurance Company ($10 million excess of $40 million); and (6) XL Insurance Company ($20 million excess of $50 million).

The Primary Policy explicitly requires U.S. Specialty to advance defense costs as incurred:

> The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.

(Axis Desig. Item 2 at Condition (D)(2).)

### 2.    **The Lexington Policy**

Lexington Insurance Company ("Lexington") issued the first excess policy (Directors and Officers Insurance and Company Reimbursement Policy No. 1620924) in the amount of $7.5 million for the Policy Period (the "Lexington Policy"). (Appellees' Counter-Statement of Issues and Counter-Designation of Record dated November 2, 2007 (hereinafter, "Appellee Desig.") Ex. 1.)

The Lexington Policy "follows the form" of the Primary Policy. Accordingly, the Lexington Policy "indemnif[ies] the Insured . . . in accordance with the applicable insuring agreements, terms, conditions and exclusions of the Underlying Policy . . . ." (*Id.* at § I.)

### 3.    **The Axis Policy**

Axis issued the second excess policy (SecureExcess Policy No. RNN 506300) in the amount of $10 million for the Policy Period (Axis Desig. Item 1.)

Like the Lexington Policy, the Axis Policy "follows the form" of the Primary Policy and, accordingly, provides coverage "in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to any other applicable Underlying Insurance [*i.e.* the Lexington Policy]," except to the extent that the Axis Policy contains its own provisions that further limit or restrict coverage otherwise provided by the Primary Policy and the Lexington Policy. (*Id.* at § I.)

The Axis Policy defines "Claim(s)" as "event(s) which take place during the Policy Period and which trigger(s) coverage under the insuring agreement(s) of the Underlying Insurance." (*Id.* at (II), Definitions (A).)  Accordingly, a "Claim" for a "Wrongful Act" brought against the Insureds that falls within the Primary Policy also falls within the Axis Policy.  There is no dispute that the Underlying Actions are "Claims" against the Insureds (and other insured officers and directors) for "Wrongful Acts" that are covered by the Primary Policy and the Axis Policy.

The Axis Policy expressly states that when, as here, the Primary Policy and Lexington Policy are exhausted, it will "continue as primary insurance." (*Id.* at § IV (Reduction or Exhaustion of Underlying Limits (B).)  Specifically, it provides that "[i]f the Underlying Limits are wholly exhausted solely due to actual payment under the Underlying Insurance, this Policy shall continue to apply as primary insurance with respect to the applicable Insurance Product(s) . . . ." (*Id.*)  The Axis Policy also explicitly provides that defense costs are covered:

> **THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS.**

(*Id.* at Declarations Page.) (bold and capital letters in original).

### C.     U.S. Specialty's and Lexington's Payment of Defense Costs

Complying with the terms and scope of Refco's D&O liability insurance policies, U.S. Specialty and Lexington – the primary and first excess insurers – advanced defense costs to Refco's former officers and directors.  Both U.S. Specialty and Lexington requested and received permission from the Bankruptcy Court for relief from the automatic stay to advance defense costs to the Insureds.  (Appellee Insureds Klejna, Sexton, Sherer and Silverman's Counter-

Designation of the Record and Counter-Statement of the Issue on Appeal (hereinafter, "Second Appellee Desig") at Exs. 2, 4.)[4]

Thereafter, U.S. Specialty and Lexington complied with their coverage obligations and advanced defense costs to the Insureds until the limits of their respective policies were exhausted, subject to their rights to seek repayment under the second sentence of Condition (D)(2) in the event it is finally determined that the Insureds' claims are not covered.  (Second Appellee Desig. at Exs. 3, 7.)

### D.    Axis's Refusal to Advance Defense Costs, the Axis Complaint and the Bankruptcy Court's August 30, 2007 Preliminary Injunction Orders

By letter dated March 6, 2006 (Axis Desig. Item 15), Axis denied coverage to the Insureds for the Underlying Actions.

On May 23, 2007, Axis commenced an adversary proceeding in the Bankruptcy Court (the "Axis Complaint") against the Insureds.  The Axis Complaint contained four counts, each purporting to set forth a separate ground for Axis's position that the Axis Policy does not provide coverage for any of the Insureds for any of the Underlying Actions.  (Axis Desig. Item 4.)  Axis sought to deny coverage on the basis of (i) a purported warranty letter signed by Phillip R. Bennett ("Bennett") (which does not refer to and was not incorporated into the Axis Policy), (ii) a knowledge exclusion (which was not part of the Axis Policy as bound), (iii) an alleged omission in the application for insurance signed by Bennett, and (iv) a pending and prior

---

[4] Because Lexington initially took the position that its policy did not provide coverage for defense costs, two of the Insureds – Dennis Klejna and Joseph Murphy – commenced an action in the Superior Court of New Jersey seeking a declaration that the Lexington Policy did provide coverage for defense costs.  In the course of that proceeding, Lexington agreed to advance defense costs, subject to an agreement to reimburse Lexington in the event it was ultimately determined that defense costs were not covered.  Thereafter, the New Jersey Superior Court entered summary judgment against Lexington, holding that "the Lexington Excess Policy covers defense costs and fees."  *See Murphy v. Lexington Ins. Co.*, No. L-5004-06, slip op. at 2 (N.J. Super. Ct. Law Div. Aug. 3, 2007) (Second Appellee Desig. Ex. 6).

litigation exclusion. (*See id.* and Appeal at 2-3.) In any event, each of the purported exclusions depends on facts that are at issue in the Underlying Actions.

On or about July 12, 2007, Insureds Klejna, Murphy, Sherer, Sexton, and Silverman (the "Officer Insureds") answered the Axis Complaint and filed counterclaims seeking a declaration that they are entitled to coverage under the Axis Policy, and an injunction to compel Axis to pay for Losses (which include Defense Costs) in the Underlying Actions in accordance with the Axis Policy.[5] (Axis Desig. Items 8, 9, 10.) Axis did not seek dismissal of the Officer Insureds' counterclaims. Instead, on August 16, 2007, Axis filed answers. (Second Appellee Desig. Exs. 9, 10.) On August 23, 2007, Axis filed its answer to the Amended Answer and Counterclaims of Insureds Klejna and Murphy. (*Id.* at Ex. 11.)

On July 12, 2007, the Officer Insureds also filed a motion for preliminary injunctive relief to compel Axis to advance defense costs under the Axis Policy. (Axis Desig. Item 5.) Insureds Grant, Bennett, and Trosten (collectively, the "Indicted Insureds") joined in the Officer Insureds' motion for advancement, but did not, at that time, file answers or counterclaims.

After Axis's counsel confirmed at oral argument on August 30 that Axis would not pay the Insureds' defense costs (Axis Desig. Item 11 at 27), the Bankruptcy Court granted the Officer Insureds' motion for a preliminary injunction requiring Axis to advance defense costs for attorneys' fees and costs submitted to Axis as of the date of the Bankruptcy Court's Order. Specifically, the Bankruptcy Court's August 31, 2007 Order directed Axis

> to advance … payment of the Defense Costs of Movants [Klejna, Murphy, Sexton, Sherer and Silverman] in the Underlying Actions that have been billed through the date of this Order, pending a final determination by this

---

[5] On or about July 31, 2007, Insureds Klejna and Murphy filed an Amended Answer and Counterclaims to similar effect. (Axis Desig. Item 10.)

Court of Movants' claim that Axis has no right to withhold Defense Costs (a) unilaterally or (b) until there is a final determination by a court of competent jurisdiction of Axis' denial of coverage under the Axis Policy.

(Axis Desig. Item 12.)

### E.    The Dismissal of the Axis Complaint

On July 12, 2007, the same day that the Officer Insureds moved for preliminary injunctive relief on the issue of advancement of defense costs, Insureds Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen (the "Director Insureds") moved to dismiss the Axis Complaint. The Indicted Insureds also joined the Director Insureds' motion to dismiss. The Indicted Insureds also moved, in the alternative, to stay the action pending the outcome of their criminal proceedings (as well as joining the Officer Insureds' motion for advancement, as noted above).

On August 30, 2007, the Bankruptcy Court dismissed the Axis Complaint without prejudice, holding that "a declaratory judgment action commenced by an insurer seeking a determination of coverage under an insurance contract should be dismissed without prejudice or stayed where there is a substantial overlap of the underlying factual issues in such coverage determination action and factual issues will be adjudicated in a pending underlying tort action or criminal proceeding." (Axis Desig. Item 13 at 2 (the "Dismissal Order").) The Bankruptcy Court also found that there is "substantial overlap of the factual issues raised in this coverage determination commenced by Axis and the underlying tort and criminal proceedings referenced in the Complaint pending before the United States District Court for the Southern District of New York." (*Id.*)

### F.    The Bankruptcy Court's September 11, 2007 Preliminary Injunction Order

Despite advancing the Officer Insureds' defense fees and costs, Axis refused to advance the defense fees and costs of its other Insureds absent a separate court order requiring

them to do so.  Therefore, on September 5, 2007, the Indicted Insureds commenced another adversary proceeding against Axis likewise seeking a declaration that Axis is required to advance defense costs under the Axis Policy and an injunction to compel advancement.  (Axis Desig. Items 17, 19.)

On the same date, the Indicted Insureds moved for a preliminary injunction directing Axis to advance defense costs incurred by them in connection with the Underlying Actions.

On September 11, 2007, the Bankruptcy Court heard oral argument on their motion (Axis Desig. Item 21) and, by order dated September 12, 2007, directed Axis to advance the Indicted Insureds' defense costs for invoices submitted to Axis on or before August 31, 2007 (*i.e.*, the same relief previously granted to the Officer Insureds).  (*Id*. at Item 22.)

G.    **The Director Insureds' Adversary Proceeding
for Advancement of Defense Costs**

On September 17, 2007, the Director Insureds commenced a separate adversary proceeding against Axis also seeking a declaration that Axis is required to advance defense costs under the Axis Policy and an injunction to compel advancement.  (Axis Desig. Items 23, 24.)

H.    **The Bankruptcy Court's Entry of Summary
Judgment on Advancement of Defense Costs**

On October 12, 2007, the Insureds all moved for summary judgment on their claims for permanent injunctive relief to require Axis to advance defense costs as incurred under the Axis Policy until the Axis Policy is exhausted or until there has been a final judicial determination that the Insureds are not entitled to coverage under the Axis Policy.

By Order, dated October 19, 2007, as amended on October 22, 2007, the Bankruptcy Court granted the motions for summary judgment in their entirety.  (Axis Desig. Item 36; Appellee Desig. Ex. 3.)  The Bankruptcy Court noted, at the outset, that this type of

dispute regarding "the scope of insurance coverage for defense costs" is "particularly appropriate . . . for summary judgment," citing *United Capital Corp. v. Travelers Indemnity Co.*, 237 F. Supp. 2d 270, 274 (S.D.N.Y. 2002), because insurance policy disputes "hinge . . . on the terms of the contract, and contract determination often lends itself to summary judgment analysis."  (Axis Desig. Item 36, Ex. A at 4.)

Noting its August 30, 2007 determination that New York law governs the interpretation of the Axis Policy (*Id*. at 5), the Bankruptcy Court relied on principles of contract interpretation under New York law, including the obligation to construe any ambiguity against an insurer and to construe insurance policies in favor of the insured when interpreting the meaning of exclusions incorporated into a policy of insurance or provisions seeking to narrow the insurer's liability.  (*Id*. at 5-7.)

Turning to the issue whether Axis is contractually bound to advance defense costs prior to the final determination of coverage, the Bankruptcy Court focused on Condition (D)(2) of the Primary Policy, which is incorporated by reference into the Axis Policy.  (*Id*. at 10-11.)  In response to Axis's claim that it possesses the unilateral right to deny coverage under Condition (D)(2), the Bankruptcy Court noted that "nowhere does it state that, or even imply . . . that the insurer can unilaterally or in the exercise of its reasonable judgment or in any other way withhold defense costs absent a court determination in the event of a dispute as to whether defense costs are covered."  (*Id*. at 12-13.)  In light of the case law emphasizing "the logic and policy behind requiring the advancement of disputed defense costs," the Bankruptcy Court concluded that

> the absence of such language, in addition to the language of (d)(2), which again, says that the insurer will pay covered costs and in the next sentence provides for a refund mechanism if defense costs are finally determined to have not been covered, that the reasonable and ordinary course colloquial interpretation of paragraph (d)(2) is that, absent a final determination by an objective fact finder, the

> insurer is obligated to pay defense costs that the insured reasonably
> contends are covered, notwithstanding the insurer's view that those
> costs are excluded or not covered under the policy.  In other words,
> unless the insured's position on coverage is clearly, facially wrong,
> the agreement contemplates that defense costs will be advanced
> subject to later refund if the coverage dispute ultimately is
> determined in the insurer's favor.

(*Id*. at 13: 7-21.)  The Bankruptcy Court held that this interpretation was "clear in the context of the entire agreement, particularly because of the refund mechanism in (d)(2) and the absence in the agreement of any provision conferring on the insurer the unilateral ability to make such a determination."  (*Id*. at 13: 22-26)  The Court further noted that, to the extent that an ambiguity existed, Axis "has offered up no extrinsic evidence to support its interpretation of paragraph (d)(2)" and therefore determined that "such an ambiguity," to the extent it existed, had to be construed against Axis.  (*Id*. at 14: 1-6.)

Finally, in granting summary judgment in favor of the Insureds, the Bankruptcy Court observed that it was not "writing on a clean slate," and specifically cited to other decisions granting advancement of defense costs, specifically, *In re WorldCom, Inc. Securities Litigation,* 354 F. Supp. 2d 455 (S.D.N.Y. 2005); *Federal Insurance Co. v. Tyco International Ltd.,* 784 N.Y.S.2d 920 (N.Y. Sup. Ct. 2004), *aff'd in part, mod. in part sub nom., Federal Insurance Co. v. Kozlowski,* 792 N.Y.S.2d 397 (N.Y. App. Div. 2005); *Trustees of Princeton University v. National Union Fire Insurance Co.,* 839 N.Y.S.2d 437, available at No. 650202/06, 2007 WL 1063870 (N.Y. Sup. Ct. Apr. 10, 2007); *Associated Electric & Gas Insurance Services Ltd. v. Rigas*, 382 F. Supp. 2d 685 (E.D. Pa. 2004); *G-I Holdings, Inc. v. Reliance Insurance Co.,* No. 00-cv-6189 (DMC), 2006 U.S. Dist. LEXIS 17597 (D.N.J. Mar. 22, 2006); and *Sun-Times Media Group, Inc. v. Royal & SunAlliance Ins. Co. of Canada,* No. 06C-11-108-RRC, 2007 WL 1811265 (Del. Super. June 20, 2007).  (Axis Desig. Item 36, Ex. A at 15-22.)

On October 22, 2007, Axis appealed from the Bankruptcy Court's October 19, 2007 Order.

## ARGUMENT

In this appeal, Axis purports to challenge two orders entered by the Bankruptcy Court. With respect to the Bankruptcy Court's order dismissing Axis's complaint, Axis has waived its appeal because it fails to challenge the Bankruptcy Court's ruling on the merits. With respect to the advancement of defense costs, the Bankruptcy Court properly granted summary judgment to the Insureds based on the unambiguous terms of the Axis policy and extensive legal precedent. New York law is clear that Axis may not avoid its obligation to advance defense costs by simply disputing coverage. Moreover, Axis's arguments that it may unilaterally disclaim coverage are inconsistent with the clear terms of the policy and public policy. Axis has an obligation to advance defense costs and the Bankruptcy Court's summary judgment order should be affirmed.

## I.    Axis Has Waived Its Appeal of the Dismissal Order

According to Axis's Designation of Items in Record on Appeal and Statement of Issues Presented with respect to the Dismissal Order, the issue on appeal is whether the Bankruptcy Court was correct to dismiss the Axis Complaint "based on the supposed overlap of issues and facts to be determined in the declaratory judgment coverage action and the Underlying Action currently pending before Judge Lynch in the District Court . . . ." *See Axis Reinsurance Co. v. Breitman, et al.*, Case No. 07-cv-09842-GEL (S.D.N.Y.) (Dkt. No. 2).

Notwithstanding that preliminary filing, nowhere in Axis's appeal brief (the "Appeal") is this issue presented or argued. Axis neither challenges the substantial overlap doctrine nor its application to the facts here. The rule is clear that "to assure consideration of an issue by the court the appellant must both raise it in [the] "Statement of Issues" and pursue it in

the "Argument" portion of the brief . . . ."  *See* 16A Charles Alan Wright, Arthur R. Miller &

Edward H. Cooper, Federal Practice & Procedure Juris 3d § 3974.1 (2d ed. Supp. 1994); *see also*

*Frank v. United States*, 78 F.3d 815, 832-33 (2d Cir. 1996) (holding that appellee/cross-appellant

waived his right to raise an issue on appeal where he "mentioned the . . . claim in the 'issues'

section [of the brief] and attempted to present it to [the circuit court] by referring to his

arguments to the district court, [but] failed to present an argument or a 'conclusion stating the

precise relief sought' with respect to it" and further noting that "[i]ssues not sufficiently argued

are in general deemed waived and will not be considered on appeal . . . simply stating an issue [is

insufficient]: an appellant . . .  must state the issue *and* advance an argument"); *Bailey v. United*

*Airlines*, 279 F.3d 194, 204 (3d Cir. 2002) ("[A]lthough [appellant] included in his statement of

the issues [in his brief] to be raised . . . whether the trial court improperly refused to grant a

reasonable extension of the discovery deadline, he failed to argue this issue in his brief . . . [and

t]herefore, this argument was waived." (internal quotation marks omitted)).  Thus, Axis has

waived its appeal of the Bankruptcy Court's Dismissal Order.

        Nevertheless, if this Court were to review the Bankruptcy Court's Dismissal

Order on the merits, it is clear the Bankruptcy Court's Dismissal Order was proper.  It is well-

settled that where the factual predicates necessary to a coverage dispute are being adjudicated in

a pending tort action or criminal proceeding, the coverage actions must be dismissed or stayed in

deference to those underlying proceedings.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 302 B.R.

439, 455 (Bankr. S.D.N.Y. 2003) ("[T]he Court . . . [s]tays proceedings in the Declaratory

Judgment Action insofar as they relate, in any way, to requests for rescission of the D & O

Policies . . . subject to modification and/or reconsideration at the conclusion of the criminal trials

. . . ."); *Nat'l Union Fire Ins. Co. v. Xerox Corp.*, 792 N.Y.S.2d 772, 783 (N.Y. Sup. Ct. 2004),

*aff'd*, 807 N.Y.S.2d 344 (N.Y. App. Div. 2006) (granting defendants' motion to dismiss insurer's motion for declaratory judgment on non-coverage because the "cause of action is not ready for determination, and will likely be fully determined in the context of the various securities actions.").

In dismissing the Axis Complaint, the Bankruptcy Court properly determined that the application of the exclusions claimed by Axis could not be determined at this time without delving into factual issues that substantially overlapped with issues in the Underlying Actions. As the Bankruptcy Court observed:

> Ultimately the facts that Axis would need to establish to prevail on its claim and, to the contrary, the facts that the defendants would need to refute to defeat Axis' claim substantially overlap with facts that would also in all likelihood arise in the pending securities litigation before District Judge Lynch, as well as, potentially, in the District Court criminal litigation against Grant, Trosten and Bennett.

(Axis Desig. Item 21 at 51: 21 – 52: 2.)[6]  Because the facts at issue in Axis's coverage dispute are substantially similar to the facts at issue in the Underlying Actions before the District Court, the Bankruptcy Court properly abstained from deciding the issue of coverage until the Underlying Actions are adjudicated and correctly dismissed the Axis Complaint.

---

[6] The Dismissal Order merely postponed, but did not eliminate, Axis's ability to adjudicate coverage based on the exclusions raised by Axis, but did *not* address any other coverage issues. (Axis Desig. Item 21 at 51:15-16.)  Axis is free to seek a determination of coverage based on exclusions that do not require factual determinations that substantially overlap with issues in the Underlying Actions.

## II.    The Bankruptcy Court's Retention of the Counterclaims and Consideration of the Issue of Advancement of Defense Costs Was Not Inappropriate Simply Because the Axis Complaint Was Dismissed

Axis asserts that the Bankruptcy Court's retention of the counterclaims brought by the Officer Insureds and the entry of preliminary injunction orders compelling Axis to advance defense costs was inconsistent with its decision to dismiss the Axis Complaint.

There is no inconsistency between dismissing the Axis Complaint and retaining the Officer Insureds' counterclaims (including the counterclaims for advancement) because the counterclaims – unlike the Axis Complaint – do not require resolution of facts that substantially overlap with issues in the Underlying Actions. As the Bankruptcy Court explained, in order for Axis to prevail on its Complaint, Axis was required to show (1) that the claimed exclusions are part of the Axis Policy and (2) that the exclusions were triggered by Bennett's actual prior knowledge. (Axis Desig. Item 11 at 89-90.) In contrast, to prevail on the coverage portion of the counterclaims, the Officer Insureds need only prove that the claimed exclusions are *not* part of the Axis Policy – an issue which does not require the resolution of any issues that substantially overlap with the factual issues in the Underlying Actions. (*Id.*)

As for the counterclaims relating to advancement, the Insureds need only prove an issue of contractual interpretation that can be decided solely on the language of the D&O policies. Because the issue of advancement – an issue of law – was not intertwined with the Underlying Actions, it was appropriate for consideration by the Bankruptcy Court.[7] (*Id.*)

---

[7] At the September 11, 2007 preliminary injunction hearing, Axis once again argued that the Bankruptcy Court's ruling on the advancement of defense costs was inconsistent with the Court's prior dismissal of the Axis Complaint. Again, the Bankruptcy Court properly rejected Axis's position upon determining that the issue of advancement of defense costs did *not* overlap with issues to be determined in the Underlying Actions and thus could be immediately adjudicated. As the Bankruptcy Court stated, "the basis for [the request for advancement] is one in which I need not consider the factual issues that overlap with the District Court securities litigation and the criminal litigation but rather need only consider the language of the contract,

In summary, there has never been a risk of inconsistent rulings or piecemeal litigation, as Axis suggests, because no ruling on the exclusions was ready to be made by any court – and the Bankruptcy Court's rulings were limited only to those issues that do not overlap with the Underlying Actions.[8]  Furthermore, Axis has no basis to complain about the Bankruptcy Court's retention of the Officer Insureds' counterclaims for the simple reason that Axis never moved to dismiss the counterclaims.  To the contrary, Axis filed *answers* to those counterclaims and thereby joined issue.  (Second Appellee Desig. Exs. 9, 10, 11.)

## III.    The Bankruptcy Court Properly Granted Summary Judgment to the Insureds on the Issue of Advancement Based on the Unambiguous Terms of the Axis Policy and Extensive Legal Precedent

The Axis Policy requires the advancement of "covered" defense costs on an as-incurred basis.  (Axis Desig. Items 1, 2.)  In the "Statement of the Facts" and the introduction to Point II of its brief, Axis asserts that it has the right under the Axis Policy to determine unilaterally whether defense costs are "covered" and the corollary right to deny advancement if it determines that coverage does not exist.  (Appeal at 4, 13-14.)  However, Axis fails to identify any provision in the policy that supports that position.  As the Bankruptcy Court noted,

> nowhere does [the policy] state that . . . the insurer can unilaterally or in the exercise of its reasonable judgment or in any other way withhold

---

that is the insurance policies and the related warranty, and applicable case law."  (Axis Desig. Item 21 at 58: 1-6.)

[8] Axis also argues that the Bankruptcy Court's denial of Arch Insurance Company's ("Arch") request to intervene was inconsistent with its preliminary injunctions requiring advancement of defense costs.  Arch, a later tiered insurer in the Refco D&O insurance tower, previously commenced a declaratory judgment action similar to the Axis Complaint a year earlier with the New York State Supreme Court.  The Arch complaint had similarly been dismissed due to the substantial overlap doctrine.  Hardly acting inconsistently, the Bankruptcy Court excluded Arch in no small part due to its concern that "if I permitted [Arch] to intervene . . . [it] would be an end run around that order [issued by the New York state court]."  (Axis Desig. Item 11 at 18: 12-13.)

> defense costs absent a court determination in the event of a dispute as to
> whether defense costs are covered.

(Axis Desig. Item 36, Ex. A at 12: 24 – 13: 4.)  Based on facts similar to the present case, the

*Rigas* court observed that

> [i]t would be possible for carriers issuing D&O policies to explicitly
> reserve to themselves the unfettered discretion whether to advance defense
> costs – but that language does not appear in these policies.  No doubt, as a
> matter of business common sense, the Carriers might be reluctant to issue
> a policy with such a draconian power, because they might find it difficult
> to sell such a policy in the marketplace.
>
> *            *            *
>
> Insurance carriers do not function as courts of law.  If a carrier wants the
> unilateral right to refuse a payment called for in the policy, the policy
> should clearly state that right.  This policy does not do so.

382 F. Supp. 2d at 701.

Axis further argues that the Bankruptcy Court (i) inappropriately based its

decision on the *WorldCom* case, (ii) misinterpreted the terms of the Axis Policy, (iii) failed to

properly apply the *Kozlowski* and *Carlin Equity* cases, and (iv) was incorrect to conclude that

public policy reasons supported its decision.  The following sections set forth the law in New

York on the issue of advancement of defense costs and then refute each of Axis's arguments.

A.    **New York Law Compels the Advancement of Defense Costs Where an
      Insurer Has Disclaimed Coverage Under a D&O Policy**

The law in New York is very clear – an insurer is required to advance defense

costs pending a final determination of coverage.  This requirement flows from the broad scope of

an insurer's duty to defend or pay defense costs for an insured.  As stated recently by the New

York Appellate Division,

> [t]he rule is well settled that the duty to defend is broader than the duty to
> indemnify . . . [and that] the same allegations that trigger a duty to defend
> trigger an obligation to pay defense costs.  Both an insurer's duty to
> defend and to pay defense costs under liability insurance policies must be
> construed broadly in favor of the policyholder.

*Kozlowski*, 792 N.Y.S.2d at 402 (internal quotation marks and citations omitted). *See also Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 82-83 (2d Cir. 2006) (under New York law, "a defense obligation may be avoided only where there is no possible factual or legal basis on which an insurer's duty to indemnify under any provision of the policy could be held to attach") (internal quotation marks and citations omitted).

A leading decision on point, applying this principle, is *In re WorldCom, Inc. Securities Litigation*, which held that the commencement of a coverage dispute does not absolve the insurance company of its duty to advance defense costs.  354 F. Supp. 2d at 467.  In *WorldCom*, Continental Casualty Company – one of the excess D&O insurance carriers – advised WorldCom that, based on WorldCom's false financial statements, Continental considered its policy to be void and rescinded.  Continental subsequently commenced an action in the Southern District of New York seeking a determination that it had properly rescinded the policy.  The bankruptcy court in WorldCom's chapter 11 case stayed that suit.  *Id.* at 461.

Ultimately, Bert Roberts – a former chairman of the board of WorldCom – sought an order directing Continental to advance defense costs.  In its defense, Continental argued that it had no obligation to advance defense costs because the policy was properly rescinded.  *Id.* at 462-63.  Judge Cote rejected Continental's position and held that an "insurer is bound by the obligations in [its] contract to advance defense costs until the contract is found to be rescinded." *Id.* at 466 (*quoting Rigas*, 382 F. Supp. 2d at 691).  In reaching that conclusion, Judge Cote enumerated key principles under New York insurance law.  First, she noted that "'[t]he rule that insurance policies are to be construed in favor of the insured is most rigorously applied in construing the meaning of exclusions incorporated into a policy of insurance or provisions seeking to narrow the insurer's liability.'"  *Id.* at 464 (citations omitted).  In addition, the court

noted that the duty to pay for the defense of the insured, if included in the contract, is (i) a "heavy one," (ii) "independent of the ultimate success of the suit against the insured," and (iii) "construed liberally and any doubts about coverage are resolved in the insured's favor." *Id.* (citations and internal quotation marks omitted).

*WorldCom* is directly applicable to the dispute between Axis and the Insureds. Like Continental, Axis disclaimed coverage and sought a declaratory judgment that it had no obligation to the Insureds. As in *WorldCom*, the Insureds here seek to enforce Axis's contractual obligation to advance defense costs under its policy, pending a determination on whether certain exclusions or other defenses to coverage apply. For the reasons stated in *WorldCom*, the Court should uphold the Bankruptcy Court's decision that Axis must advance defense costs at this time.

The court in *Kozlowski* also made clear that a coverage dispute does not affect the insurer's duty of advancement. 792 N.Y.S.2d at 401. In *Kozlowski*, the court considered whether the insurer had the right to avoid its obligations to pay defense costs by asserting that the policy had been rescinded (on the basis of alleged fraudulent inducement) and that an exclusion had been triggered, without a judicial determination of either matter. The court held that until the insurer's rescission claim or its invocation of an exclusion was adjudicated in its favor, its obligation to pay defense costs remained in effect. *Id.* at 402. Specifically, the court recognized that "the duty to defend or pay defense expenses turns solely on whether, as to each of the underlying actions, the complaint alleges any facts or grounds that bring the action within the liability coverage purchased." *Id.* It then stated, in language also applicable here, that

> under a directors and officers liability policy calling for the reimbursement of defense expenses . . . insurers are required to make contemporaneous interim advances of defense expenses where coverage is disputed, subject to recoupment in the event it is ultimately determined no coverage was

> afforded.  The duty to pay arises at the time the insured becomes legally
> obligated to pay.

*Id.* at 403 (internal quotation marks and citations omitted).

Other courts in New York also have held that an insurance company's attempt to deny coverage or rescind its policy did not affect the duty of advancement.  *See*, *e.g.*, *PepsiCo. Inc. v. Cont'l Cas. Co.*, 640 F. Supp. 656, 660 (S.D.N.Y. 1986) (finding ongoing duty to pay defense costs as incurred in securities fraud action, when insurer was obligated under policy to pay costs unless a final judgment found "material dishonesty" by directors and officers); *Trs. of Princeton Univ.*, 2007 WL 1063870 at *5 ("Where coverage is disputed, insurers are required to make contemporaneous interim advances of defense expenses subject to recoupment in the event it is ultimately determined the Policy does not cover the claim.").

Courts outside New York are also in accord.  *See*, *e.g.*, *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 794 (3d Cir. 1987) ("[I]mposing upon the insurer a duty to pay loss as the insured incurs legal obligation for such loss, subject to [recoupment]"); *G-I Holdings, Inc. v. Reliance Insurance Co.,* 2006 U.S. Dist. LEXIS 17597, at *7-8 (where underlying action fell within insuring agreement in D&O policy, insurer was obligated to advance defense costs notwithstanding potential application of exclusion in policy); *Newby v. Enron Corp.* (*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*), 391 F. Supp. 2d 541, 573 (S.D. Tex. 2005) (insurers, regardless of policy exclusion for "dishonesty," had duty to reimburse defense costs as incurred until final adjudication of criminal proceedings); *Rigas*, 382 F. Supp. 2d at 702 (rejecting insurer's attempt to refuse payment of defense costs based on unilateral rescission of policy and insurer's decision that exclusions were applicable until further adjudication as to lack of coverage).

**B.**     **The Axis and WorldCom Policy Provisions Are Substantially Similar**

Axis argues that the rule on advancement enunciated in *WorldCom* does not apply because the advancement provision in the Axis Policy is materially different than the advancement provision in the policy interpreted by Judge Cote.  (Appeal at 14-17.)  The relevant provisions are:

| WorldCom Policy | Axis Policy |
|---|---|
| Under both Coverage A and Coverage B of this policy, except as hereinafter stated, the Insurer shall advance, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim.  Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.  354 F. Supp. 2d at 459. | The Insurer will pay covered Defense Costs on an as-incurred basis.  If it is finally determined that any Defense Costs paid by the insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.  (Axis Desig. Item 2, Condition (D)(2) at p. 8) |

Under the Axis Policy, the "Insurer will pay covered Defense Costs on an as-incurred basis.  If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer."  (Axis Desig. Item 2 at 8.)  Axis argues that the use of the word "covered" in the first sentence means that defense costs need not be advanced until there is a final adjudication of coverage and that the *WorldCom* policy does not contain such a provision.  The Bankruptcy Court considered and rejected this argument, concluding that the difference in language between the two policies was immaterial.

In particular, the *WorldCom* policy provided "[u]nder both Coverage A and Coverage B of this policy, except as hereinafter stated, the Insurer shall advance, at the written

request of the Insured, Defense Costs prior to the final disposition of a Claim."  354 F. Supp. 2d at 459 (emphasis omitted); Appeal at 16.  The use of the phrase "[u]nder both Coverage A and Coverage B" in the *WorldCom* policy means that advances need be made only for defense costs that fall within the coverage of the policy.  Thus, the language is substantially equivalent to the phrase "covered Defense Costs" in the Axis Policy.  Moreover, the duty to advance under the WorldCom policy "prior to the final disposition of a Claim" is not materially different from the requirement under the Axis Policy to advance defense costs "as incurred," subject to the second sentence which requires the repayment of advanced Defense Costs if it is finally determined that such costs are not covered under the policy.  As explained by the Bankruptcy Court,

> I do not believe the language, which, again, requires payment on an "as incurred," basis is materially different from the language quoted by Judge Cote in the WorldCom case and would need to be far clearer to create an exclusion here.

(Axis Desig. Item 21 at 66: 1-5.)

In addition to asserting that the terms of the policy in *WorldCom* are materially different, Axis argues that this Court should disregard *WorldCom* because the insurer in that case sought to rescind the policy, and not invoke an exclusion.  Whether styled as a rescission action or an action to exclude a claim, an insurer's efforts to contest payment to an insured does not obviate the insurer's obligation to advance defense costs pending adjudication of the contested matter.  The Bankruptcy Court did not misinterpret the *WorldCom* case, as Axis suggests.  Rather, the Bankruptcy Court understood that the *WorldCom* case involved rescission – as opposed to the application of an exclusion – and concluded that such distinction is "not meaningful."  (*Id.* at 62: 13-25.)  The Bankruptcy Court also noted that

> [i]n either case [rescission or exclusion], the issue hinged upon whether the insurer could unilaterally act to withhold payment based on its interpretation of whether it was obligated to pay: here, whether the claim were excluded from coverage, in WorldCom, whether the policy was void

ab initio.  I believe Judge Cote's logic in finding a duty to pay pending judicial determination of the underlying dispute would apply under either scenario.

(Axis Desig. Item 36, Ex. A at 18: 8-15.)

### C.    Axis's Construction of the D&O Policies Is Inconsistent with the Unambiguous Terms of the Policies

Axis argues that the Bankruptcy Court, in reaching its decision, deleted the word "covered" from the first sentence of Condition (D)(2), thus interpreting the Axis Policy to provide a benefit to the Insureds to which Axis did not subscribe and which the Insureds did not purchase.  (Appeal at 18.)  Axis is incorrect, and in fact, the Bankruptcy Court's interpretation of Condition (D)(2) is correct.

According to Axis, advancement of covered defense costs is required only if *Axis* unilaterally determines that no exclusions in the Primary Policy or the Axis Policy apply to bar coverage.  (Appeal at 4, 13-14.)  If Axis determines that an exclusion is triggered, then according to Axis, there is no coverage.  The Insureds reject this narrow view.  Rather, as long as the claim falls within the policy's insuring agreement, it is covered *unless and until* there is a final determination that an exclusion applies.  Normally, this difference in position can be resolved by a declaratory action filed by either party.  However, in the present situation, where the exclusions asserted by Axis depend on disputed facts that substantially overlap the Underlying Actions, there is a gap between a determination of initial coverage and a final determination on whether any exclusions apply.  Axis would prefer its interpretation because it puts the burden of that delay on the Insureds – just when they need the advancement of defense costs the most.  But the law in New York is to the contrary – advancement of defense costs are required pending final determination of coverage.  *See WorldCom*, 354 F. Supp. 2d 455.

Adopting the Insureds' interpretation, the Bankruptcy Court neither deleted the word "covered" nor construed the meaning differently in the first and second sentences of Condition (D)(2). The Bankruptcy Court's interpretation of the Primary Policy recognizes that for purposes of advancement, defense costs initially are "covered," even though at some future time they may be determined to be "non-covered." [9]

This view is supported by the second sentence of Condition (D)(2), which requires that costs advanced must be returned if it is ultimately determined that the claims are not covered. Condition (D)(2) explicitly contemplates and governs the situation where, as here, defense costs that fall within the insuring agreements are incurred (thus giving rise to an immediate duty to advance), but the applicability of policy exclusions has not yet finally been determined. As a protection, Condition (D)(2) provides the insurer with the right to get its funds back.

This result is further supported by the fact that the exclusions under the Policy are subject to the obligation to advance. The lead-in to the list of exclusions provides that "[u]nless otherwise specifically stated or provided for *in CONDITION (D)(2)* or elsewhere in this Policy, the Insurer will not be liable to make any payment of Loss in connection with [an excluded] Claim . . . ." (Axis Desig. Item 2 at 4) (emphasis added). The lead-in to the section on Exclusions is important because when read with Condition (D)(2) it indicates that the Insurer *will* be liable to pay the types of Losses provided in Condition (D)(2) – *i.e.*, defense costs – even

---

[9] Notably, the Primary Policy defines "Defense Costs" to include "reasonable fees, costs and expenses . . . resulting from the investigation, adjustment, defense or appeal of a Claim against and Insured Person . . . ." (Axis Desig. Item 2 at Definitions (D).) This definition of Defense Costs thus includes attorneys' fees incurred by the Insureds for both covered claims (*i.e.*, Claims for Wrongful Acts) and non-covered claims (*i.e.*, Claims other than for Wrongful Acts). The word "covered" in the first sentence of Condition (D)(2) of the Primary Policy clarifies that only Defense Costs incurred in connection with Claims that fall within the Insuring Agreements will be paid for by the insurer.

though ultimately it may be determined that such defense costs relate to an excluded claim. In other words, such defense costs are "covered" for purposes of the Insurer's obligation to advance unless and until a final determination is made that an exclusion applies.

Further, there is no merit to Axis's charge that the Insureds' interpretation of "covered" ignores the applicability of exclusions in the first sentence of Condition (D)(2). The Insureds readily acknowledge that "covered" in the first sentence includes exclusions, to the extent that the application of an exclusion can be determined at the time Defense Costs are incurred on the face of the pleading in the underlying action for which they are incurred. In this case, however, Axis's exclusions cannot be determined at this time because the facts necessary to a final determination as to whether the exclusions apply are material to the Underlying Actions.

Axis further argues that the Bankruptcy Court erred by ignoring "the difference between exclusions which explicitly contain a "final adjudication" requirement, and those which do not." (Appeal at 21-22.) This issue is a red herring. Axis is bound by Condition (D)(2) to advance defense costs unless and until there is a final determination of non-coverage. The fact that certain exclusions also include that requirement is irrelevant. It also does not matter that one of the exclusions relied on by Axis appears in its excess policy and not the Primary Policy. Exclusions in the Axis Policy are subject to the same conditions as those in the Primary Policy unless the Axis Policy expressly states that such conditions do not apply. *See Hartford Accident & Indem. Co. v. Pac. Employers Ins. Co.*, 862 F. Supp. 160, 162 (S.D. Tex. 1994) ("Follow-form policies extend the limits and operate under the rules of [the original policy]. Unless there is an express exception to the form of the primary insurance, the excess carrier must act according to the primary insurance policy's terms."). The Axis Policy contains no such express limitations. Rather, the Axis Policy provides that the provisions of the Primary Policy affecting coverage are

applicable to it, other than as expressly limited by the Axis Policy. Accordingly, a "final determination" of non-coverage by a court of law is required.

Axis also contends that the Bankruptcy Court's ruling would mean that if a claim were made that is indisputably not covered, such as a claim related to the "Edward McElwreath case" (a prior litigation identified in Endorsement 7 as an exclusion to the policy's coverage), Axis would be forced to advance defense costs until it was permitted to obtain a judicial declaration that the exclusion applied. (Appeal at 22 n. 13.) Axis's attempt to extrapolate the consequences of the Bankruptcy Court's ruling into a parade of horribles fails. If, as Axis hypothesizes, the Insureds made a claim related to the "Edward McElwreath Case" and Axis denied such claim, Axis could and no doubt would seek a declaratory judgment in order to have this exclusion finally determined. In the case of a claim based on the "Edward McElwreath Case," the exclusion at issue would not be substantively intertwined with the Underlying Actions. Therefore, there would be no need for a court to defer consideration of the exclusion on the merits, and the declaratory judgment action would be quickly resolved. Indeed, the Bankruptcy Court would be able to adjudicate this exclusion on the merits based on the face of the policy and the underlying claim, and there would have been no occasion to direct advancement of defense costs pending a determination of coverage."[10] *See* Section III.D hereof.

Axis also points to Condition (D)(3) of the Primary Policy to support its position that it unilaterally may decline coverage and refuse to advance the Insureds' defense costs. (Appeal at 22.) Condition (D)(3) applies only where a claim includes both a loss covered and a

---

[10] Judge Drain plainly recognized that if the applicability of an exclusion could be determined on the face of the policy and the complaint in the underlying action, then defense costs would not have to be advanced for such action. (Axis Desig. Item 36, Ex. A at 13, 14.)

loss not covered by the policy.[11]  This provision is completely inapplicable here because Axis has denied coverage for all losses and, as such, there is no allocation to perform.  Moreover, if Axis's interpretation of Condition (D)(2) were correct it would not need Condition (D)(3) at all, because Axis could use Condition (D)(2) to deny coverage of a portion of a claim.  In any event, Axis has never invoked Condition (D)(3) to disclaim coverage and cannot do so now.[12]

> **D.** **_Kozlowski_ and _Carlin Equities_ Do Not Require the Bankruptcy Court to Determine That the Exclusions Relied on by Axis are Inapplicable Prior to Ordering the Advancement of Defense Costs**

Axis asserts that the decisions in _Kozlowski_, 792 N.Y.S.2d 397 (N.Y. App. Div. 2005) and _Carlin Equities Corp. v. Houston Casualty Co._, No. 05-cv-9508-LAP, 2007 WL 2456958 (S.D.N.Y. Aug. 24, 2007) stand for the proposition that where an insurer has denied coverage based on any policy exclusion, there is no duty to advance defense costs unless a court has determined that the insurer's coverage position is incorrect.  (Appeal at 25.)  Neither case even remotely stands for that proposition.  Rather, these cases support the Insureds' position that when the applicability of an exclusion involves disputed facts (_i.e._, facts to be determined in the

---

[11] For example, the Primary Policy specifically excludes coverage for ERISA related claims.  If a complaint in the Underlying Actions alleged violations of both the securities laws and ERISA, then the Insureds' claims would include both covered and non-covered claims.  Based on the exclusions relied on by Axis, the Insureds' claims cannot be bifurcated between covered and non-covered claims.

[12] Even if this Court were to find the policy language to be ambiguous, it is well settled that ambiguities must be construed in favor of the Insureds and against Axis.  _See WorldCom_, 354 F. Supp. 2d at 464 ("To the extent an ambiguity exists . . . such ambiguity is read against the insurer."); _Rigas_, 382 F. Supp. 2d at 698 (holding that because "there are two reasonable interpretations of [a provision in the policy] . . . this part of the policy must be considered ambiguous and must be construed for the Insureds."); _Murphy v. Lexington Ins. Co._, No. L-5004-06, slip op. at 2 (N.J. Super. Ct. Law. Div. Aug. 3, 2007) (noting that "[u]nder both New York and New Jersey law, any ambiguity in an insurance contract is construed against the insurer in favor of coverage" and holding that the Lexington Excess Policy covers defense costs and fees).  Moreover, the Bankruptcy Court found that Axis "has offered up no extrinsic evidence to support its interpretation of paragraph (d)(2)."  (Axis Desig. Item 36, Ex. A at 13-14, 20.)

Underlying Actions), the insurer must advance defense costs for such action pending the later

determination of coverage.  In contrast, where the applicability of an exclusion can be decided

solely on the basis of the language of the insurance policy and the nature of the underlying claim

(as opposed to the merits of that claim), the applicability of an exclusion can be immediately

determined on the merits.

In *Carlin Equities*, the insurer refused to advance defense costs on the ground that

the "Errors and Omissions" exclusion barred coverage.  The "Errors and Omissions" exclusion

provided that no coverage was available for any claim against a non-director or non-officer based

on actions taken in connection with the rendering of services for a fee.[13]  *Id.* at *6. In considering

whether that exclusion was applicable, Judge Preska solely looked to the allegations in the

underlying actions.  Following the decisions in *WorldCom* and *Federal Insurance Co. v. Tyco

International, Ltd.*, No. 6005007/03, 2004 WL 583829 (N.Y. Sup. Mar. 5, 2004), Judge Preska

stated that the advancement of defense costs was required under the policy unless the allegations

in the underlying complaint "'cast that pleading solely and entirely within the policy

exclusions.'"  *Id.* at *7 (quoting *Tyco*).  The complaint named both the chief operating officer

and a non-officer employee and the court concluded that, although Carlin is alleged to have

earned fees from the acts complained of, the D&O policy exclusion rendered the non-officer

employee without coverage and only covered the chief operating officer.  *Carlin*, 2007 WL

2456958 at *7.

---

[13] Specifically, the exclusion provided that "[n]o coverage will be available under this Policy for Loss, including Defense Costs, from Claims for any actual or *alleged* act . . . in connection with the rendering of . . . any services for others for a fee or commission . . . ." *Carlin*, 2007 WL 2456958 at *4 (emphasis added).  The "management carveback" stated that "[the Errors and Omissions Exclusion] is not intended, however . . . to apply to Loss, including Defense Costs, in connection with any Claim against an Insured Person who is a director or officer of the Insured Organization to the extent that such Claim is for a Wrongful Act by such Insured Person . . . ." *Id*.

Critically, the court in *Carlin Equities* did not determine any disputed facts in order to establish the applicability of the exclusion in the coverage litigation, as Axis seeks to do here. In fact, the Insureds are not aware of any case – and Axis cites none – in which advancement was denied based on a disputed exclusion or based on an exclusion that requires proof of a disputed fact.

Finally, as Axis points out (Appeal at 24), the policy language with respect to the advancement of defense costs in *Carlin Equities* was identical to the language in Condition (D)(2) (requiring the advancement of "covered Defense Costs on an as-incurred basis"). *Id.* at *4. This similarity, however, was irrelevant to the *Carlin Equities* court's ability to adjudicate the applicability of the exclusion in that case.

Nor does *Kozlowski* further Axis's arguments. Rather, as set forth above, the Appellate Division held in *Kozlowski* that where an insurer disputes coverage based on an exclusion, it must advance defense costs unless it is clear from the face of the complaint in the underlying action that the claim cannot fall within the coverage of the policy. 792 N.Y.S.2d at 402-03. Axis's selective quote from *Kozlowski* (Appeal at 24) suggests that the court affirmatively considered the personal profit exclusion on the merits. *Id.* Based on a fuller quote, it is clear that the court could not determine the effect of the personal profit exclusion on the ultimate issue of coverage.

> Thus, while Federal must pay defense costs as they are incurred in the securities action and the criminal proceeding, its ***ultimate*** liability for such costs is only with respect to such liabilities as fall under the coverage provided. To the extent such liabilities are excluded from coverage by the personal profit exclusion, Federal is not required to pay for defense costs. Since this allocation [of covered and non-covered matters] cannot be made at this juncture and the duty to defend is broader than the duty to indemnify, ***Federal must pay all defense costs as incurred***, subject to recoupment . . . .

*Id.* at 404 (emphasis added). Contrary to Axis's argument, nothing in the *Kozlowski* decision requires the determination of an exclusion which rests on proof of disputed facts as a prerequisite to obtaining the advancement of defense costs.

In the present case, the Bankruptcy Court ruled that the applicability of the particular exclusions relied on by Axis in denying coverage cannot be determined before the substantially similar issues are resolved in the Underlying Actions. In those circumstances, the Bankruptcy Court, following the precedent in *WorldCom*, *Kozlowski*, *Rigas*, and other cases, properly held that advancement of defense costs was required until a determination on the exclusions could be made.

**IV.      Public Policy Supports the Bankruptcy Court's Decision
          to Require Axis to Advance Defense Costs**

Axis's assertion that it has the unilateral and unfettered right to determine "coverage" for purposes of advancing defense costs is contrary to the Insureds' reasonable expectations in having D&O coverage and conflicts with long-standing public policy which prohibits insurance carriers from summarily denying the advancement of defense costs.

Refco obtained D&O liability insurance for its officers and directors in order to insure them against claims of wrongful conduct. As a key component of such insurance (and often, the only part of relevance), the directors and officers are entitled to be paid defense costs, as incurred. The claims arising from the Underlying Actions are precisely the types of claims for which the Insureds would have thought themselves covered. As discussed by the court in *Thomas J. Lipton, Inc. v. Liberty Mutual Insurance Co.*,

> [w]e cannot think that, given the economic and factual setting in which
> these policies were written, an ordinary business man in applying for
> insurance and reading the language of these policies when submitted,
> would not have thought himself covered against precisely the damage
> claims now asserted [against the insured].

314 N.E.2d 37, 39 (N.Y. 1974) (rejecting insurer's interpretation of insurance policy to exclude

coverage for the claims at issue which would have rendered the coverage illusory).

        If Axis had the unilateral right to withhold defense costs simply because it alleged

that a coverage exclusion was applicable – or even where no such allegation had been made (as

Axis does not assert its unilateral decision-making is restricted to when exclusions are alleged) –

then the insurance would be illusory, and the Insureds would be left with no recourse.  Prior to

trial, innocent directors and officers would be deemed guilty . . . by the insurer!  Axis's position

would render its policy "phantom insurance."  *See Nat'l Union Fire Ins. Co. v. Xerox Corp.*, 792

N.Y.S.2d 772, 782 (N.Y. Sup. Ct. 2004).  Axis's position is not and cannot be correct.  "[T]o

hold otherwise would not provide insureds with protection from financial harm that insurance

policies are presumed to give . . . ."  *Nu-Way Envtl., Inc. v. Planet Ins. Co.*, No. 95 Civ. 573,

1997 WL 462010, at *3 (S.D.N.Y. Aug. 12, 1997).

        Such action by an insurer not only renders the very insurance (purchased for a

hefty premium) worthless, but has the potential to chill the willingness of qualified individuals to

serve as directors and officers.  As noted by Judge Cote in *WorldCom*,

        D&O insurance is not only designed to provide financial security for the
        individual insureds, but also plays an important role in corporate
        governance in America.  Unless directors can rely on the protections given
        by D&O policies, good and competent men and women will be reluctant
        to serve on corporate boards.

354 F. Supp. 2d at 469.  Moreover, these policy considerations outweigh Axis's concerns

regarding whether the individual Insureds have sufficient funds to pay their own legal fees.  *Id.* at

470.  D&O insurance should be available regardless of personal wealth; however, directors and

officers who are not independently wealthy are precisely those who most need advancement of

defense costs.

*WorldCom* is not the only decision emphasizing the importance of public policy. In *Little v. MGIC Indemnity Corp.*, the court concluded that, if a D&O insurer could "withhold payment whenever charges of intentional dishonesty are leveled against directors and officers . . . then [D&O] insurers would be able to withhold payment in virtually every case" and expose directors and officers to "staggering" defense costs and "financial ruin."  649 F. Supp. 1460, 1468-69 (W.D. Pa. 1986), *aff'd*, 836 F.2d 789 (3d Cir. 1987).  Additionally, in the *Enron* securities litigation, the court took note of public policy concerns relating to the insurers' advancement of defense costs in reaching its conclusion that insurers were required to pay legal fees until criminal proceedings pending against insureds were concluded and a final adjudication had been made.  *See Enron*, 391 F. Supp. 2d at 574 (citing *Little*, 649 F. Supp. at 1468-69); *see also Xerox*, 792 N.Y.S.2d at 775 ("In these circumstances, National's position would render this policy to be 'phantom' insurance.").

Axis's point that D&O insurance is voluntary and that the Insureds do not have a legal "right" to such insurance is irrelevant because Refco purchased D&O coverage for the Insureds.  Accordingly, the Insureds are entitled to receive the benefits they contracted for and Axis must fulfill its contractual obligations, including its duty to advance defense costs to the Insureds, as incurred.

## **CONCLUSION**

As a matter of law, the Insureds are contractually entitled to have their defense costs borne by Axis and the other D&O insurers, unless and until a final determination of non-coverage is made. The parties have contracted to address the very situation in which Axis now finds itself (where coverage has yet to be determined) and, by the terms of its bargain, Axis must advance defense costs. For this reason, U.S. Specialty and Lexington have already advanced defense costs and, as nothing in the Axis Policy exempts it from the Primary Policy's

requirements, Axis may not reject its obligation to do the same. For the reasons discussed in the

argument above, Axis's appeal from the Bankruptcy Court's grant of summary judgment should

be denied.

Dated: December 21, 2007
       New York, New York

/s/ Michael F. Walsh
Greg A. Danilow, Esq. (GD 1621)
Michael F. Walsh, Esq. (MW 8000)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Appellees Leo R. Breitman,
Nathan Gantcher, David V. Harkins,
Scott L. Jaeckel, Thomas H. Lee,
Ronald L. O'Kelley, and Scott A. Schoen*

/s/ Helen B. Kim
Helen B. Kim, Esq. (HK 8757)

BAKER & HOSTETLER LLP
12100 Wilshire Blvd., Suite 1500
Los Angeles, CA 90025
Telephone: (310) 979-8460
Facsimile: (310) 820-8859

*Attorneys for Appellee Dennis A. Klejna*

/s/ Laura E. Neish
Norman L. Eisen, Esq.
Thomas G. Macauley (TM 3944)
Laura E. Neish (LN 0040)

ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
Telephone: (212) 704-9600

*Attorneys for Appellee Tone N. Grant*

/s/ Ivan Kline
Stuart I. Friedman, Esq. (SF 9186)
Ivan Kline, Esq. (IK 9591)

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391

*Attorneys for Appellees William M.
Sexton and Gerald M. Sherer*

/s/ Jeffrey T. Golenbock
Jeffrey T. Golenbock, Esq. (JG 2217)
Deborah A. Adler (DA 8587)

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Telephone: (212) 907-7300

*Attorneys for Appellee Phillip R. Bennett*

/s/ Barbara Moses
Barbara Moses, Esq. (BM 2952)
Rachel Korenblat, Esq. (RK 0170)

MORVILLO, ABRAMOWITZ,
GRAND, IASON, ANELLO &
BOHRER, P.C.
565 Fifth Avenue
New York, NY 10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494

/s/ John J. Jerome
John J. Jerome (JJ 2413)
Timothy E. Hoeffner (TH 4195)

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone: (212) 672-1996
Facsimile: (212) 672-1920

*Attorneys for Appellee Joseph Murphy*

/s/ Richard Cashman
Richard Cashman, Esq. (RC 4769)

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 832-8300
Facsimile: (212) 763-7600

*Attorneys for Appellee Philip Silverman*

/s/ Gabriel Del Virginia
Gabriel Del Virginia, Esq. (GV 4951)

LAW OFFICES OF GABRIEL DEL
VIRGINIA
641 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (212) 371-5478

*Co-Attorneys for Appellee Robert C.
Trosten*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY   10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Greg A. Danilow (GD 1621)
Michael F. Walsh (MW 8000)

Attorneys for Appellees Leo R.
Breitman, Nathan Gantcher, David V.
Harkins, Scott L. Jaeckel, Thomas H.
Lee, Ronald L. O'Kelley, and Scott A.
Schoen

BAKER & HOSTETLER LLP
12100 Wilshire Blvd., Suite 1500
Los Angeles, CA   90025
Telephone: (310) 979-8460
Facsimile: (310) 820-8859
Helen B. Kim (HK 8757)

Attorneys for Appellee Dennis A.
Klejna

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone: (212) 672-1996
Facsimile: (212) 672-1920
John J. Jerome (JJ 2413)

Attorneys for Appellee Joseph Murphy

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY   10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391
Stuart I. Friedman (SF 9186)
Ivan Kline (IK 9591)

Attorneys for Appellees William M.
Sexton and Gerald M. Sherer

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY   10036
Telephone: (212) 832-8300
Facsimile: (212) 763-7600
Richard Cashman (RC 4769)

Attorneys for Appellee Philip
Silverman

ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY   10036
Telephone: (212) 704-9600
Norman L. Eisen (NE 1198)
Thomas G. Macauley (TM 3944)
Laura E. Neish (LN 0040)

Attorneys for Appellee Tone N. Grant

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
437 Madison Avenue, 35th Floor
New York, NY   10022
Telephone: (212) 907-7300
Jeffrey T. Golenbock (JG 2217)
Adam C. Silverstein (AS 4876)

Attorneys for Appellee Phillip R.
Bennett

MORVILLO, ABRAMOWITZ,
GRAND, IASON, ANELLO &
BOHRER, P.C.
565 Fifth Avenue
New York, NY   10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494
Barbara Moses (BM 2952)
Rachel Korenblat (RK 0170)

- and -

LAW OFFICES OF GABRIEL DEL
VIRGINIA
641 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (212) 371-5478
Gabriel Del Virginia (GV 4951)

Co-Attorneys for Appellee Robert C.
Trosten

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

AXIS REINSURANCE COMPANY,                          :
                                                   :
                    Appellant,                     :        No. 07-CV-7924 (GEL)
                                                   :
        v.                                         :
                                                   :
PHILLIP R. BENNETT, *et al.*,                      :        [caption continued on next page]
                                                   :
                    Appellees.                     :
------------------------------------------------------------------x

**APPENDIX OF UNREPORTED CASES CITED IN SUPPORT OF
APPELLEES' JOINT RESPONSE TO AXIS REINSURANCE
COMPANY'S APPEAL FROM THE BANKRUPTCY COURT'S
ORDERS DISMISSING AXIS'S COMPLAINT AND GRANTING
APPELLEES' MOTIONS FOR SUMMARY JUDGMENT**

```
------------------------------------------------x
In re                                           :
                                                :   Chapter 11
REFCO, INC., et al.,                            :   Case No. 05-60006 (RDD)
                                                :   (Jointly Administered)
                Debtors.                        :
------------------------------------------------x
AXIS REINSURANCE COMPANY,                       :
                                                :
                Plaintiff,                      :
                                                :
                v.                              :   Adv. Proc. No. 07-01712 (RDD)
                                                :
PHILLIP R. BENNETT, et al.,                     :
                                                :
                Defendants.                     :
------------------------------------------------x
TONE N. GRANT, et al.,                          :
                                                :
                Plaintiffs,                     :
                                                :
                v.                              :   Adv. Proc. No.  07-2005 (RDD)
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
                Defendant.                      :
------------------------------------------------x
LEO R. BREITMAN, et al.,                        :
                                                :
                Plaintiffs,                     :
                                                :
                v.                              :   Adv. Proc. No.  07-2032 (RDD)
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
                Defendant.                      :
------------------------------------------------x
AXIS REINSURANCE COMPANY,                       :   (1) No. 07-CV-9420 (GEL)
                                                :   (2) No. 07-CV-9842 (GEL)
                Plaintiff,                      :   (3) No. 07-CV-10302 (GEL)
                                                :
                v.                              :
                                                :
PHILLIP R. BENNETT, et al.,                     :
                                                :
                Defendants.                     :
------------------------------------------------x
TONE N. GRANT, et al.,                          :
                                                :
                Plaintiffs,                     :
                                                :
                v.                              :   No. 07-CV-9843 (GEL)
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
                Defendant.                      :
------------------------------------------------x
```

# INDEX TO UNREPORTED CASES

**CASES**                                                                    **TAB**

*Carlin Equities Corp. v. Houston Cas. Co.*,
   No.05-cv-9508-LAP, 2007 WL 2456958 (S.D.N.Y. Aug. 24, 2007) ......................................1

*G-I Holdings, Inc. v. Reliance Ins. Co.*,
   No. 00-cv-6189 (DMC), 2006 U.S. Dist. LEXIS 17597 (D.N.J. Mar. 22, 2006) ...................2

*Murphy v. Lexington Ins. Co.*,
   No. L-5004-06 (N.J. Super. Ct. Law Div. Aug. 3, 2007) ........................................................3

*Nu-Way Envtl., Inc. v. Planet Ins. Co.*,
   No. 95 Civ. 573, 1997 WL 462010 (S.D.N.Y. Aug. 12, 1997) ................................................4

*Sun-Times Media Group, Inc. v. Royal & SunAlliance Ins. Co.*,
   No. 06C-11-108-RRC, 2007 WL 1811265 (Del. Super. Ct. June 20, 2007)............................5

Tab
1

Slip Copy
(Cite as: 2007 WL 2456958 (S.D.N.Y.))

Page    3

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

**CARLIN EQUITIES CORP., Plaintiff,**
v.
**HOUSTON CASUALTY CO., Defendant.**

**No. 05 Civ. 9508(LAP).**

Aug. 24, 2007.

MEMORANDUM AND ORDER

LORETTA A. PRESKA, U.S.D.J.

**\*1** This action arises out of the refusal of Defendant Houston Casualty Co. ("Houston"), a Texas property and casualty company, to pay defense costs to Plaintiff Carlin Equities Corp. ("Carlin"), a corporation organized under the Business Corporation Law of New York. In 2003, Carlin purchased a Directors, Officers and Private Organization Liability Insurance Policy Number 14-MG-03-A1734 ("the Houston Policy") from Houston. Carlin was sued, along with others, in an action entitled Hayim A. Regensberg v. Generic Trading of Philadelphia, LLC, Carlin Equities Corp., Shear Offman Inc., Ronald Shear and Donald Motschwiller (the "Regensberg Suit") in the Supreme Court of the State of New York. Regensberg asserts in that action that he opened an account with Defendants for the purpose of engaging in day trading and that Carlin and the other named Defendants encouraged him to engage in trading in excess of his financial resources, resulting in an alleged financial loss of $3.5 million between January 1999 and December 2001. (Regensberg Complaint ¶¶ 15, 17, 18.) [FN1]

> FN1. "Regensberg Complaint" refers to the Complaint filed in the underlying dispute of Hayim A. Regensberg v. Generic Trading Philadelphia, LLC, et al., which is attached as Exhibit B to the Affirmation of Craig M. Hirsch, Esq., in Support of Motion for Partial Summary Judgment, dated December 29, 2006, ("Hirsch Aff.").

Carlin now moves for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the basis that it is entitled to

reimbursement and advancement of defense costs by Houston in connection with the Regensberg Suit under the law of New York [FN2] and the plain terms of the Houston Policy. Carlin contends that both New York law and the Houston Policy provide for the contemporaneous payment of defense costs to Carlin subject to potential repayment after a final determination of the pending suit. Houston argues that no payment is required because there is no coverage.

> FN2. The parties seem to agree that New York law is applicable.

Jurisdiction and Venue

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332. Specifically, this Court has jurisdiction because Plaintiff is a New York corporation and Defendant is a Texas company and the amount in controversy exceeds $75,000. Venue is proper in this district because Plaintiff's principal place of business is in New York County and that is also where the Houston Policy was purchased.

Factual Background

A. The Underlying Dispute

On October 10, 2003, Hayim A. Regensberg filed the Regensberg Suit against Carlin and related individuals and entities. (Carlin 56.1 Stmt. ¶ 1.) [FN3] In addition to Carlin, Defendants in the Regensberg Suit are Generic Trading of Philadelphia, LLC, Shear Offman, Inc., Ronald Shear and Donald Motschwiller. The underlying Defendants filed an Answer to the Regensberg Complaint on November 17, 2003. (Regensberg Answer.) [FN4] Defendant Generic Trading of Philadelphia, LLC, ("Generic Trading") is organized under the laws of the State of Delaware with its principal place of business in the State of New York, County of New York, and is a securities brokerage firm set up for qualifying individuals to trade broker-dealer capital. (Regensberg Complaint, ¶ 4.) Defendant Shear Offman, Inc., ("Shear Offman") is organized under the laws of the State of Delaware and is the Managing Member of Generic Trading and controls Carlin. (Regensberg Complaint, ¶ 6.) The Regensberg Answer asserts that "Shear Offman is ... the managing member of Generic." (Regensberg Answer, ¶ 6.) Defendant

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Slip Copy
(Cite as: 2007 WL 2456958, *1 (S.D.N.Y.))

Ronald Shear ("Shear") is an individual with offices in the State of New York, County of New York, and controls Shear Offman and is Chief Compliance Officer of Generic Trading and of Carlin. (Regensberg Complaint, 17,) Defendant Donald Motschwiller ("Motschwiller") is an individual with offices in the State of New York, County of New York, and is "affiliated" with Generic Trading and with Carlin. (Regensberg Complaint, ¶ 8.)

> FN3. "Carlin 56.1 Stmt." refers to Carlin Equities Corporation's Statement Pursuant to Local Civil Rule 56.1(a) in support of its Motion for Partial Summary Judgment. The material facts recounted herein are undisputed, unless otherwise noted.

> FN4. "Regensberg Answer" refers to the Verified Answer and Counterclaims in the Regensberg Suit, attached as Exhibit C to the Hirsch Aff.

\*2 The Regensberg Suit currently is pending before the Supreme Court of the State of New York. (Carlin 56.1 Stmt. ¶ 1.) In his complaint, Regensberg alleges that Carlin and the other Defendants designated his account as a broker-dealer account, even though he was not a registered representative or otherwise qualified to have such an account and that, as a result of this broker-dealer designation, they were able to advance Regensberg credit for day trading at margin levels which otherwise would not have been available to him. (Regensberg Complaint, ¶¶ 13, 14.) With Shear's approval, Motshcwiller allegedly was responsible for permitting Shear Offman to open the account complained of for Regensberg. (Regensberg Complaint, ¶ 8.) Regensberg further alleges that the Defendants in the Regensberg Suit encouraged and permitted him to engage in excessive trading at unsuitable margin levels, that, as a result, he was exposed to an unacceptable level of risk, and that Defendants were able to earn excessive commission revenues associated with the excessive trading. (Regensberg Complaint, ¶ 16.)

The Regensberg Complaint alleged that Carlin and the other Defendants committed "Wrongful Acts," including fraudulent and non-negligent conduct with various levels of scienter, and asserted multiple causes of action against Defendants without specifying which Defendant is responsible for which alleged acts. (Carlin 56.1 Stmt. ¶ 3.) The Regensberg Complaint alleged that: (1) Defendants

breached the agreement and the implied covenant of good faith and fair dealing by opening and maintaining an account in violation of applicable rules and regulations (Regensberg Complaint, ¶ 21); (2) Defendants' breach of contract defeated the purpose of the contract (Regensberg Complaint, ¶ 24); (3) Defendants breached certain duties including, inter alia, the duty to "know their customer" and to deal fairly with Regensberg and refrain from encouraging and permitting unsuitable trading (Regensberg Complaint, ¶ 28); (4) Defendants knew or should have known that opening the account and providing Regensberg with unacceptable levels of leverage was unsuitable for Regensberg (Regensberg Complaint, ¶ 32); (5) Defendants entrusted Regensberg with a broker-dealer account which created an unreasonable risk of harm to him (Regensberg Complaint, ¶ 41); and (6) Defendants have been unjustly enriched at Regensberg's expense and equity and good conscience demands that the Defendants not retain the commissions revenue received. (Regensberg Complaint, ¶ 44.)

On January 9, 2004, Houston informed Carlin that it was denying insurance coverage under the Houston Policy for any loss arising from the Regensberg Complaint. (Carlin 56.1 Stmt. ¶ 5.) This action followed.

B. The Houston Policy

Houston issued and delivered to Carlin the Houston Policy, which insured Carlin and others named or identified in the Policy for loss, including defense costs, for "Wrongful Acts." (Carlin 56.1 Stmt. ¶ 4.) The Houston Policy, a claims made policy (Houston Policy at p. 2), was in effect when the Regensberg Complaint and Regensberg Answer were filed, [FN5] (Carlin 56.1 Stmt. ¶ 4.) The Houston Policy defines "Loss" as:

> FN5. The Houston Policy is attached as Exhibit A to the Declaration of Mary E. Borja, Esq., dated January 30, 2007, ("Borja Decl."), which includes the Houston Policy Declarations and Carlin's Renewal Application, items not present in the copy of the Houston Policy submitted by Plaintiff Carlin. As the Court referred to these additional documents, it will cite to the copy of the Houston Policy submitted by Ms. Borja.

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

**\*3** Defense costs and any damages, settlements, judgments, back pay awards and front pay awards or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that an Insured is legally obligated to pay as a result of any Claim; provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any Claim shall be Insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such Claim and is most favorable to the Insureds in that regard.
(Houston Policy at p. 4.)

The Houston Policy offers two types of coverage: Insuring agreement (A) provides that "the Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts." (Houston Policy at p. 2) (emphasis added). Insuring agreement (B) provides that "the Insurer will pay to or on behalf of the Insured Organization Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts." (Id. at p. 2) (emphasis added). The Houston Policy defines Insured Organization as "Named Organization and any Subsidiary thereof." (Id. at p. 4.). Here, Carlin is the Named Organization. (See Declarations, bates stamp no. 000000, Ex. A of Borja Decl. at 3.) The Houston Policy defines Insured Person as "any past, present or future director, officer, managing member, manager or Employee of the Insured Organization, including any person in a position which is the functional equivalent thereof with respect to any entity included within the definition of Insured Organization located outside the United States." (Houston Policy at p. 4.) According to the Houston Policy, Subsidiary means any entity:
(1) during any time on or before the inception of the Policy Period in which the Named Organization has or controls, either directly or indirectly through one or more Subsidiaries, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers; or

(2) subject to Condition (F)(3), created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, the Named Organization has or controls, either directly or indirectly through one or more Subsidiaries, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers.
(Id. at p. 5.)

The Houston Policy defines "Wrongful Act" as:
(1) any Employment Practices Wrongful Act (a) by the Insured Organization, or (b) by an Insured Person in his or her capacity as a director, officer, member, manager or Employee of the Insured Organization; (2) any other actual or alleged act, error, misstatement, misleading statement, omission or breach of duty (a) by the Insured Organization, or (b) by an Insured Person in his or her capacity as a director, officer, member, manager or Employee of the Insured Organization or in an Outside Capacity; or (3) any matter claimed against an Insured Person solely by reason of his or her service (a) as a director, officer, member, manager or Employee of the Insured Organization, or (b) in an Outside Capacity.
**\*4** (Id. at p. 6.)

The Houston Policy contains an endorsement (the "Endorsement") entitled "Errors and Omissions Exclusion (With Management Carveback)." (Houston Policy, Endorsement Number: 1.) The Endorsement states:
(1) No coverage will be available under this Policy for Loss, Including Defense Costs, from Claims for any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.
(Endorsement Number: 1, bates stamp no. 000001, Ex. A of Borja Decl. at 4.) Part two of the Endorsement is the Management Carveback, which states:
(2) Paragraph (1) is not intended, however, nor shall it be construed, to apply to Loss, including Defense Costs, in connection with any Claim against an Insured Person who is a director or officer of the Insured Organization to the extent

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

that such Claim is for a Wrongful Act by such Insured Person who is a director or officer of the Insured Organization in connection with the management or supervision of any division, Subsidiary or group of the Insured Organization offering any of the aforementioned services. (Id.)

As to defense costs, the Houston Policy states, "The Insurer will pay covered Defense Costs on an as-incurred basis." (Houston Policy at p. 12.) According to the Houston Policy, "If it is later determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer." (Id.) As a result of this provision, Carlin asserts that Houston must reimburse and advance Carlin's defense costs unless and until there is a final determination of non-coverage. (Carlin 56.1 Stmt. 18.)

## Discussion

### I. Legal Standard for Summary Judgment

"Summary Judgment is proper 'if the pleadings, depositions, answers, interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed.R.Civ.P. 56(c)). A motion for summary judgment will be granted when the record is taken as a whole and a rational trier of fact could not find that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Id. (quoting Fed.R.Civ.P. 56(e)). On summary judgment, the inferences drawn shall be viewed in the light most favorable to the party opposing the motion. Id. Summary judgment is therefore appropriate if the evidence requires that a reasonable factfinder would be "compelled to accept the view of the moving party." This is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir.1998). In this case, the question before the Court is whether there is a genuine issue of material fact as to whether Defendant's decision to deny payment of defense costs to Plaintiff in the Regensberg Suit was a breach of the Houston

Policy.

### II. Application

#### A. "Insured Persons" and "Insured Organizations"

*5 The parties are in agreement that according to the Insuring Agreements, see supra p. 9, Carlin is an "Insured Organization" because it is the named organization on the Houston Policy. The parties also are in agreement that Shear, in his role as Chief Compliance Officer of Generic Trading of Carlin, is an "Insured Person" because he is clearly a "past present or future director, officer, managing member, manager, or Employee of the Insured Organization ...." Further, as alleged in the Regensberg Complaint, Motschwiller is a registered representative and employee of Carlin and therefore is an "Insured Person" under the Houston Policy as well.

Shear Offman and Generic Trading cannot be "Insured Organizations" because they are not named organizations on the Houston Policy and are not subsidiaries of Carlin within the meaning of the Houston Policy. Plaintiff argues that Shear Offman is a subsidiary based on its alleged control of Carlin. However, when Carlin submitted its Renewal Application to Houston in order to renew its Policy, Carlin responded that the section requiring a list of subsidiaries was not applicable, thus indicating that Carlin did not have any subsidiaries within the meaning of the Houston Policy. (Renewal Application at p. 1.) [FN6]

> FN6. Neither Generic Trading, Shear Offman, nor any other entity was listed as a subsidiary on Carlin's Renewal Application or on its financial statements. (Exs. A and B, respectively to the Borja Decl .)

Carlin notes that its financial statements for the year ended December 31, 2001, state the following under "Related Party Transactions:" "The company earned approximately $83.4 million of commissions from Generic Trading of Philadelphia, LLC, a related company whose managing member is a shareholder of the Company." (Ex. B to Borja Decl. at p. 11.) Also, as noted above, the Regensberg Answer asserts that "Shear Offman is ... the managing member of Generic." (Regensberg Answer, ¶ 6.) Such references are insufficient to

Slip Copy
(Cite as: 2007 WL 2456958, *5 (S.D.N.Y.))

demonstrate coverage. Carlin makes no showing that Generic Trading or Shear Offman is a subsidiary of Carlin, that is, that Carlin "ha[d] or controll [ed] ... through one or more Subsidiaries, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers ." (Houston Policy at p. 5.) At oral argument, Carlin's counsel argued that the overlapping ownership of Carlin, Generic Trading, and Shear Offman led to the inference of Carlin's control within the meaning of the definition of subsidiary, but the record discloses no basis for inferring the very precise control requirements contained in the Houston Policy definition. Accordingly, neither Shear Offman nor Generic Trading has been shown to be a subsidiary of Carlin within the meaning of the Houston Policy and therefore neither has been shown to be covered under the Houston Policy as an Insured Organization.

B. "Wrongful Acts"

The Insuring Agreements provide that the loss must arise from "Wrongful Acts" in order to be covered under the Houston Policy. According to the definition of "Wrongful Acts" as stated above, the Insured Person must be acting "in his or her capacity as director, officer, member or Employee of the Insured Organization," here, Carlin. Defendant Shear is admitted to be an officer of Carlin (Regensberg Answer, ¶ 7) and, as Chief Compliance Officer of Carlin, is alleged to have acted in his capacity as director, officer, member or Employee of the Insured Organization. (Regensberg Complaint, ¶ 7.) Thus, Shear clearly is alleged to have engaged in a Wrongful Act within the definition in the Houston Policy.

*6 Defendant Motschwiller is alleged to be "affiliated" with Carlin and to have told Regensberg that, "with the knowledge and complete approval of the firm's [i.e., Carlin's] Chief Compliance Officer, defendant Shear, defendants would provide [Regensberg] with legal and appropriate means to gain greater leverage which would result in [Regensberg] earning greater trading profits." (Regensberg Complaint, ¶¶ 8, 35.) The combination of Motshcwiller's "affiliation" with Carlin and his making the representations complained of to Regensberg "with the knowledge and complete approval" of Carlin's Chief Compliance Officer, bring Motschwiller within the definition of "acting

in his ... capacity as ... [an] employee" of Carlin. Thus, Motschwiller is alleged to have engaged in a Wrongful Act within the meaning of the Houston Policy.

Houston argues that admissions made by Carlin in the Regensberg Answer pertaining to the duties and responsibilities of Shear and Motschwiller demonstrate that the Houston Policy does not cover these individuals. Regarding Motschwiller, Houston points out that, in an effort by Carlin to avoid liability in the Regensberg Suit, Carlin admits that Motschwiller acted "as an employee of and on behalf of Defendant Generic." (Regensberg Answer, ¶¶ 48, 49.) Regarding Shear, Houston similarly points out that Carlin admits that Shear "acted as an employee of Shear Offman, which was and is the member manager of Defendant Generic," once again apparently in order for Carlin to avoid liability in the Regensberg Suit. (Id. at ¶¶ 50, 51.)

Writing for the Court of Appeals, the late Judge Milton Pollack described an argument such as this one as "farfetched" in United States Fidelity & Guaranty Company v. Executive Insurance Company, 893 F.2d 517, 519 (2d Cir.1990). He wrote: "If an insurer could escape its duty to defend by pointing to denials of liability in a potential insured's answer, it might never have to defend." Id. at 519-20. Applying that reasoning here, admissions made by Carlin in the Regensberg Answer shall not be considered in determining whether the Houston Policy covers the actions alleged in the Regensberg Complaint. Accordingly, the Regensberg Complaint has alleged Wrongful Acts within the meaning of the Houston Policy.

C. "Errors and Omissions Exclusion (with Management Carveback)"

As noted above, the "Errors and Omissions Exclusion (with Management Carveback)" provides: (1) No coverage will be available under this Policy for Loss, including Defense Costs, from Claims for any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Slip Copy
(Cite as: 2007 WL 2456958, *6 (S.D.N.Y.))

Page  8

(2) Paragraph (1) is not intended, however, nor shall it be construed, to apply to Loss, including Defense Costs, in connection with any Claim against an Insured Person who is a director or officer of the Insured Organization to the extent that such Claim is for a Wrongful Act by such Insured Person who is a director or officer of the Insured Organization in connection with the management or supervision of any division, Subsidiary or group of the Insured Organization offering any of the aforementioned services.

*7 Houston argues that because Carlin is alleged to have earned fees from the acts complained of, the Exclusion applies. Among other arguments, Carlin argues that the Management Carveback applies because the Claim [FN7] "is for a Wrongful Act by [Shear] who is an officer ... of [Carlin] in connection with the management or supervision of any division ... or group of [Carlin] ...."

FN7. The parties do not dispute that the Regensberg Suit is a Claim within the meaning of the Policy.

The Errors and Omissions Exclusion must be read as it is written. It has been held that "an insurer can only invoke a policy exclusion to avoid coverage if it can show that 'the allegations in the complaint cast that pleading solely and entirely within the policy exclusions.' " Federal Ins. Co. v. Tyco Int'l Ltd., Index No. 6005007/03, 2004 WL 583829, slip op. at *6 (N.Y.Sup. Mar. 5, 2004) (quoting Int'l Paper Co. v. Continental Cas. Co., 35 N.Y.2d 322, 325 (1974)). In general, under New York law, insurance contracts are to be interpreted in such a way so as to give effect to the intent of the parties as it is expressed in the clear language of the contract. In re Worldcom, Inc. Securities Litigation, 354 F.Supp.2d 455, 464 (S.D.N.Y.2005) (quoting Bowman v. Allstate Ins. Co., 238 F.3d 468, 470 (2d Cir.2001)). Insurance policies are to be construed in favor of the insured, and this rule is applied most strictly in determining the meaning of exclusions or provisions seeking to narrow the insurer's liability. Id. (quoting Ingersoll Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, 306 (2d Cir.1987)). The duty to pay defense costs must be "construed liberally and any doubts about coverage are resolved in the insured's favor." Id. (quoting Federal Ins. Co. v. Tyco Int'l Ltd., Index Ho. 6005007/03, 2004 WL 583829, slip op. at *6 (N.Y.Sup. Mar. 5, 2004)).

Seidel v. Houston Casualty Company, 375 F.Supp.2d 211, 223 (S.D.N.Y.2005), is an analogous case in which the same Defendant, Houston, refused further coverage of defense costs to Seidel and the other plaintiffs by relying on its policy's Errors and Omissions Exclusion (with Management Carveback). In Seidel, the Management Carveback was identical to the one in the Houston Policy in the present case. See id. at 223. The Court explained that "[t]he heart of this conflict rests in the proper reading of the Management Carveback," a clause that is included with the intention that some customer claims will be covered, specifically those that relate to management decision-making. Id. at 223-24.

Here, Shear, an Insured Person, is alleged to have approved the acts complained of in his position as Chief Compliance Officer of Carlin. Such an allegation makes Shear's activities "in connection with the management or supervision of" Carlin and thus within the Management Carveback. Also, Chief Compliance Officer is a managerial or supervisory position, and, to the extent that the Regensberg Complaint alleges that Shear approved the acts in question at Generic, neither "division" nor "group" is defined in the Houston Policy. Based on the cross-ownership between and among Carlin, Generic and Shear Offman, those entities can be considered part of the Carlin "group." At the least, as noted above, any ambiguity within the policy should be resolved in favor of the insured, and the words "division" and "group" are clearly ambiguous within the Houston Policy.

*8 Defendant Motschwiller, while admittedly an employee of Carlin, is not alleged or admitted to be an officer or director of Carlin and thus is not covered by the Management Carveback.

Conclusion

For the reasons stated above, Plaintiff's motion for partial summary judgment [dkt. no. 21] is granted with respect to Plaintiffs Carlin and Shear, and denied with respect to Plaintiffs Motschwiller, Generic Trading and Shear Offman.

Counsel shall confer and inform the Court by letter no later than September 14 how they propose to proceed.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Slip Copy
**(Cite as: 2007 WL 2456958, \*8 (S.D.N.Y.))**

SO ORDERED.

2007 WL 2456958 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Tab
2

LEXSEE 2006 U.S. DIST LEXIS 17597

**G-I HOLDINGS INC. and SAMUEL J. HEYMAN, Plaintiffs, v. RELIANCE INSURANCE COMPANY, HARTFORD FIRE INSURANCE COMPANY, and TWIN CITY FIRE INSURANCE COMPANY, Defendants.**

**Civil Action No. 00-CV-6189 (DMC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2006 U.S. Dist. LEXIS 17597*

**March 22, 2006, Decided**

**NOTICE:**     [*1] NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Reconsideration denied by *G-I Holdings, Inc. v. Reliance Ins. Co., 2006 U.S. Dist. LEXIS 45272 (D.N.J., June 29, 2006)*

**PRIOR HISTORY:** *G-I Holdings, Inc. v. Reliance Ins. Co., 2004 U.S. Dist. LEXIS 29592 (D.N.J., Mar. 23, 2004)*

**COUNSEL:** For GAF CORPORATION, SAMUEL J. HEYMAN, Plaintiffs: ANTHONY BARTELL, MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For RELIANCE INSURANCE COMPANY, Defendant: ANTHONY J. LAPORTA, WHITE & WILLIAMS, LLP, PARAMUS, NJ; BRIAN R. ADE, BONNER, KIERNAN, TREBACH & CROCIATA, ESQS., PARSIPPANY, NJ.

For GREAT AMERICAN INSURANCE COMPANY, Defendant: RAYMOND A. KRESGE, KLETT LIEBER ROONEY & SCHORLING, A PROFESSIONAL CORPORATION, NEWARK, NJ.

For HARTFORD FIRE INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, Defendants: CELESTINE MONTAGUE, WHITE AND WILLIAMS LLP, CHERRY HILL, NJ.

For NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION, Cross Claimant: PETER A. OLSEN, FRANCIS & BERRY, MORRISTOWN, NJ.

For HARTFORD FIRE INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, Cross Defendants: CELESTINE MONTAGUE, WHITE AND WILLIAMS LLP, CHERRY HILL, NJ.

**JUDGES:** Dennis M. Cavanaugh, U.S.D.J.

**OPINION BY:** Dennis M. Cavanaugh

**OPINION**

*DENNIS M. CAVANAUGH, U.S.D.J.:*

This matter comes before the Court upon motion by Plaintiffs G-I Holdings Inc. and Samuel J. Heyman ("Plaintiffs") for advancement of defense costs. Pursuant to this Court's Order of June 1, 2005, the parties [*2] in the instant action have submitted additional briefing on the issue of Defendant Hartford's duty to advance defense costs to Plaintiffs under the separate Hartford D&O policy. After carefully considering the submissions of the parties and based upon the following, it is the finding of this Court that Plaintiffs' demand for advancement of defense costs is **granted.**

**I. BACKGROUND** [1]

1   A recitation of the full background of this complex matter is unnecessary here and can be found in this Court's March 23, 2004 Opinion denying summary judgment. *See G-I Holdings Inc. and Samuel Heyman v. Reliance Ins. Co. et al., 2004 U.S. Dist. LEXIS 29592, Civil Action No. 00-6189 (D.N.J. Mar. 23, 2004).*

  

On January 2, 2003, Plaintiffs filed a motion for summary judgment seeking, among other relief, a declaration that they are entitled to the advancement of the costs of defending certain pending fraudulent conveyance and tort actions against them in other courts. Plaintiffs assert their entitlement to such funds pursuant to directors' [*3] and officers' ("D&O") insurance policies issued by Defendants Reliance Insurance Company ("Reliance"), assumed by Hartford Insurance Company and Twin City Fire Insurance Company, a wholly owned subsidiary of Hartford Insurance Company, (collectively "Hartford"), and issued by Great American Insurance Company ("Great American"). [2] This Court denied Plaintiffs' summary judgment motion in an Opinion and Order dated March 23, 2004. On April 8, 2004, Plaintiffs filed a motion for reconsideration of the Court's Order pursuant to *Local Civil Rule 7.1(g)*. This Court denied the motion to reconsider in an Opinion and Order dated June 29, 2004. Plaintiffs filed a motion for certification for appeal on September 20, 2004, which this Court denied on June 1, 2005. In that same Opinion and Order the Court ordered the parties to submit further briefing regarding the discrete issue of advancing of defense costs under the Hartford D&O Policy.

> [2]    Reliance entered statutory liquidation proceedings in the Commonwealth of Pennsylvania after the initial filing of this action, and Plaintiffs have agreed to pursue their claims against Reliance in those proceedings.

### [*4] II. *DISCUSSION*

Plaintiffs argue that Hartford bears an immediate obligation to advance Plaintiffs' defense costs pursuant to the language of the D&O policy issued by Hartford ("the Hartford policy" or "Policy"). Relying on prior rulings of this Court and other case law, Plaintiffs advance the theory that the Hartford Policy potentially provides coverage for the underlying "Creditors Committee Action" (captioned *Official Committee of Asbestos Claimants of G-I Holdings, Inc. v. Samuel J. Heyman,* 01-8529). Hartford contests Plaintiffs' assertions, arguing that because this Court has yet to resolve whether the underlying allegations implicate the Policy, a declaration regarding the existence of a duty to advance defense costs is premature. This Court agrees with the legal reasoning advanced by Plaintiffs.

Plaintiffs cite a number of cases for the proposition that defense costs must be advanced, including *Little v.*

*MGIC Indemnity Corp., 836 F.2d 789, 794 (3d Cir. 1987); Associated Electric & Gas Ins. Services, Ltd. et al. v. Rigas et al., 382 F. Supp. 2d 685, 691, 2004 WL 540451, *13 (E.D.Pa. 2004); Federal Ins. Co. v. Tyco Int'l Ltd., 2 Misc. 3d 1006A, 784 N.Y.S.2d 920, 2004 WL 583829, [*5] *6 (N.Y.Sup. 2004); Brown et al. v. American International Group, Inc. et al., 339 F. Supp. 2d 336, 2004 U.S. Dist. LEXIS 20969 (D.Mass. Oct. 19, 2004); In re WorldCom, Inc. Sec. Litig., 354 F. Supp. 2d 455, 467, 2005 U.S. Dist. LEXIS 1466, *28 (S.D.N.Y. 2005).* Defendants however maintain that these cases can be distinguished from the instant action because contrary to Plaintiffs' assertions, this Court has yet to make a determination that the underlying claims suggest a reasonable potential for coverage.

The Hartford Policy provides in Section I, Insuring Agreements:

> (A) DIRECTORS AND OFFICERS' LIABILITY
>
> Except for **Loss** which the Insurer pays pursuant to Insuring Agreement (B) of this Policy, the Insurer will pay on behalf of the **Directors** and **Officers Loss** which the **Directors** and **Officers** shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period**...against the **Directors** and **Officers** for a **Wrongful Act** which takes place during or prior to the **Policy Period.**

(See Cert. of Anthony Bartell, Ex. B, pg 1)(emphasis in original). In *Little,* the Third Circuit examined [*6] a D&O policy substantially similar to the Hartford policy at issue. *836 F.2d 789, 792-3.* The Third Circuit found the phrase "legally obligated to pay" in the policy's coverage provisions meant that the insurer's duty to pay defense costs arises contemporaneously with the director or officer's obligation to pay those costs. *Id. at 793.* The *Little* Court further held that the insurer was required to advance the policyholder's defense costs subject to reimbursement should it be found that the claims were excluded from policy coverage. *Id. at 796.*

Thus, a general reading of the policy indicates that Hartford is required to advance defense costs. However, the Hartford Policy is structured so that it begins with a general descriptions of coverage, followed by exclusions.

  

Defendants argue that various exclusions operate to bar the potential the underlying claims will be covered. Specifically, Defendants direct this Court's attention to the pollution exclusion in Section V(E), which they claim operates as a bar to coverage as a matter of law. Defendants further argue that Defendants have not alleged an insurable "loss" under the policy and [*7] that the claim was not made during the policy period.

The Court is aware of Defendants concerns that the Policy will eventually be adjudicated by way of this action to exclude coverage for the underlying claims. However, an insurer's duty to defend is determined by comparing the allegations in the underlying complaint with the language of the policy at issue. See *Voorhees v. Preferred Mutual Ins. Co., 128 N.J. 165, 173-4, 607 A.2d 1255 (1992)* (citing *Danek v. Hommer, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), aff'd o.b., 15 N.J. 573, 105 A.2d 677, (1954))*. Here, the Court has already found that there is a potential for coverage should the alleged facts be proven true. (See Opinion, March 23, 2004, pg 22.). Although certain ambiguities exist regarding the relevant policy period, and the applicability of the pollution provision, this Court is bound to resolve "any ambiguities...in favor of the policyholders." *See, e.g. Atlantic Employers Ins. Co. v. Chartwell Manor, 280 N.J. Super 457, 464-65, 655 A.2d 954 (App. Div. 1995); Central Nat'l Ins. Co. v. Utica Nat'l Ins. Group, 232 N.J.Super. 467, 470, 557 A.2d 693 (App.Div.1989)*. Moreover, should it later be adjudicated [*8] that the policy does not apply to the underlying allegations, the Policy specifically provides for the insurer to be reimbursed. [3]

[3]   See Section III "Insurer shall advance on behalf of the Insureds Claims Expenses which **Directors** and **Officers**...have incurred in connection with **Claims** made against them, prior to disposition of such Claims, provided always

that to the extent it is finally established that any such Claims Expenses are not covered under this Policy, the Insureds, as appropriate, agree to repay the Insurer such non-covered Claims Expenses."

In light of the above, it is the finding of this Court that Defendants have a obligation to advance defense costs to Plaintiffs in the underlying actions subject to the final outcome of the instant action. As such, Plaintiffs motion to compel is granted.

### III. *CONCLUSION*

Plaintiffs' motion to compel advancement of defense costs is **granted.** An appropriate Order accompanies this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date: [*9] March 23, 2006

## ORDER

This matter coming before the Court upon motion by Plaintiffs G-I Holdings Inc. and Samuel J. Heyman ("Plaintiffs") to compel the advancement of defense costs by Defendants Hartford Fire Insurance Company under the Hartford D&O policy; the Court having carefully considered the submissions of all parties; and for the reasons stated in the Court's Opinion issued on this day;

IT IS on this 23rd day of March, 2006,

ORDERED that Plaintiffs' motion to compel advancement of defense costs to Plaintiffs under the Hartford D&O policy is **granted.**

Dennis M. Cavanaugh, U.S.D.J.

Date: March 22, 2006

  

Tab
3

**BAKER & HOSTETLER, LLP**
John J. Carney, Bar No. 02569-1990
666 Fifth Avenue
New York, NY 10103
Telephone:    212-589-4200
Facsimile:    212-589-4201

Helen B. Kim (admitted pro hac vice)
333 S. Grand Avenue
Los Angeles, CA 90071
Telephone:    213-975-1611
Facsimile:    213-975-1740

*Attorneys for Plaintiffs*
*Dennis Klejna and Joseph Murphy*

**FILED**

AUG 0 3 2007

JOSEPH CHARLES, JR., J.S.C.

**FILED**

AUG - 3 2007

JOSEPH CHARLES, JR., J.S.C.

| | |
|---|---|
| JOSEPH MURPHY and DENNIS KLEJNA,<br><br>             Plaintiffs,<br><br>    vs.<br><br>LEXINGTON INSURANCE COMPANY;<br>PHILLIP R. BENNETT, LEO R. BREITMAN,<br>NATHAN GANTCHER, TONE N. GRANT,<br>DAVID V. HARKINS, SCOTT L. JAECKEL,<br>THOMAS H. LEE, RONALD L. O'KELLEY,<br>SANTO C. MAGGIO, PHILIP SILVERMAN,<br>SCOTT A. SCHOEN, WILLIAM M. SEXTON,<br>GERALD SHERER, ROBERT C. TROSTEN;<br>and DOES 1 through 20, inclusive,<br><br>            Defendants, | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION:  HUDSON COUNTY<br>CIVIL ACTION<br>DOCKET NO.  L-5004-06<br><br><br><br>**[PROPOSED] ORDER** |

THIS MATTER having been opened to the Court on motion by Baker & Hostetler LLP,

counsel for Plaintiffs Joseph Murphy and Dennis Klejna, seeking entry of an order granting

summary judgment to the Plaintiffs; upon notice to Tompkins McGuire, Wachenfeld & Barry,

attorneys for defendant Lexington Insurance Company ("Lexington") and the Court having

considered the Stipulation of Facts and Law submitted by the parties; and good cause having been shown:

IT IS on this ___3rd___ day of August 2007, that the Court hereby determines:

1.      The Lexington Excess Policy is ambiguous on its face as to whether the Lexington Excess Policy covers Defense Costs.

2.      Under both New York and New Jersey law, any ambiguity in an insurance contract is construed against the insurer and in favor of coverage. *See Tonkin v. California Ins. Co. of San Francisco,* 294 N.Y. 326, 328-29 (1945) ("If a policy of insurance is written in such language as to be doubtful or uncertain in its meaning, all ambiguity must be resolved in favor of the policy holder and against the company") (1945) (citation omitted); *Araya v. Farm Family Casualty Ins. Co.,* 353 N.J. Super. 203, 210 (2002) (citation omitted).

3.      New Jersey courts have applied this principle of contract interpretation to hold that when there is an ambiguity between the declarations page and the policy, the declarations page controls. *See Araya v. Farm Family Casualty Ins. Co.,* 353 N.J. Super. 203, 209 (2002) ("reasonable expectations of coverage raised in the declaration page cannot be contradicted by the policy's boilerplate unless the declaration page itself so warns the insured") (quoting at 210 *Lehrhoff v. Aetna Casualty & Surety Co.,* 271 N.J. Super. 340, 346-47 (App. Div. 1994)).

4.      Based on the foregoing, this Court determines the Lexington Excess Policy covers defense costs and fees.

IT IS ORDERED that Plaintiffs' motion seeking summary judgment is hereby GRANTED; and it is

FURTHER ORDERED that the Plaintiffs will present their bills to Lexington by August 1, 2007. If the Court enters an Order in Plaintiffs' favor before September 7, 2007, then Lexington will pay those bills less any deductions for any unreasonable fees and any fees not reasonably related to the *Murphy* and federal bankruptcy motions within 30 days after the entry of this Court's Order in the Plaintiffs' favor or by September 14, 2007, whichever of those two dates is the earliest. If the Court enters an Order in favor of Plaintiffs on or after September 7,

-2-

STIPULATION OF FACTS AND LAW;
[PROPOSED] ORDER

2007, then Lexington shall have up to but not more than 14 days from the date the Court issues the Order to make payment; and it is

FURTHER ORDERED that in the event Lexington disallows any legal fees or costs and Plaintiffs disagree with Lexington's position, Plaintiffs will submit the bills to the Court for a binding determination on the reasonableness of the fees under Rules 4:42-9 and 4:42-8; and it is

FURTHER ORDERED that a copy of this Order shall be served upon Lexington's counsel within seven (7) days of the date hereof.

IT IS SO ORDERED:


Hon. Joseph Charles, Jr.

STIPULATION OF FACTS AND LAW;
[PROPOSED] ORDER

# Tab
# 4

Not Reported in F.Supp.
**(Cite as: 1997 WL 462010 (S.D.N.Y.))**
<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

**NU-WAY ENVIRONMENTAL, INC., Plaintiff,**
v.
**PLANET INSURANCE COMPANY, Defendant.**

No. 95 Civ. 573(HB).

Aug. 12, 1997.

Opinion and Order

BAER, District Judge.

**\*1** Plaintiff brought this cause of action for a judgment declaring that: (1) defendant has a duty to indemnify plaintiff for damages or settlement related to a legal action brought against plaintiff (the "South Carolina action") and (2) defendant has a duty to indemnify plaintiff for its costs in defending against the South Carolina action on a contemporaneous basis. Both parties moved for summary judgment and by Opinion and Order dated September 30, 1996, I granted plaintiff's motion with respect to the first issue. I address the second issue now. For the reasons stated below, plaintiff's motion for summary judgment is granted.

I. Background

Familiarity with the facts of this case is presumed, and I recite only those facts relevant to this Opinion. On or about February 17, 1992 defendant Planet Insurance Company ("Planet") issued a "Contractor's Pollution Legal Liability" insurance policy to Nu-Way Environmental, Inc. ("Nu-Way") (the "Policy"). The Policy provides that Planet will:

indemnify the INSURED against LOSS the INSURED has or will become legally obligated to pay as a result of CLAIMS first made against the INSURED and reported to the Company, in writing, during the POLICY PERIOD.

See Stip. of Facts, Ex. A, Policy, "Insuring Agreement". The Policy defines "LOSS" as:

monetary awards or settlements of compensatory damages arising from: a. BODILY INJURY as defined herein, or b. PROPERTY DAMAGE as defined herein, and ... costs, charges and expenses

incurred in the ... defense of claims for such compensatory damages.

See Stip of Facts, Ex. A, Policy, "Definitions" (emphasis added). Finally, the Policy provides that defendant:

shall have the right but not the duty to assume the adjustment of any claim or the defense of any suit.

See Stip. of Facts, Ex. A, Policy, "Claim or Suit Provisions."

On or about May 5, 1992, plaintiff entered into an agreement with Yeargin, an agent for the Carolina Eastman Division to provide the necessary labor and equipment to remove and dispose of water and sludge from the bottom of a concrete basin at the Eastman site (the "Eastman agreement"). See Stip. of Facts, Ex. C, Agr. btw. Nu-Way and Yeargin. On April 28, 1992 plaintiff entered into a separate agreement with Soil Remediation Company ("SRC") under which SRC was to process the material plaintiff removed from the Eastman site and use it to manufacture bricks (the "SRC agreement"). SRC had formed a joint venture with Yadkin, a brick manufacturer, whereby SRC contracted for the delivery of petroleum-contaminated soils to Yadkin for brick manufacture processing.

A chemical analysis was performed on the soil and a Vice President of Nu-Way certified that the only contamination contained in the soil was Virgin Fuel Oil #6. Plaintiff's analysis did not reveal that the soil was also contaminated with Dowtherm, which prohibited its use in the manufacture of the bricks. SRC and Yadkin commenced an action against Nu-Way in the Court of Common Pleas of the State of South Carolina. [FN1] SRC and Yadkin alleged that SRC delivered the contaminated soil to Yadkin where it became mixed with other soils, thereby rendering them useless because of the Dowtherm contained in the soil delivered by SRC. Accordingly, SRC and Yadkin alleged breach of contract, breach of an express warranty, and fraudulent concealment and sought indemnification under the terms of the SRC Agreement.

FN1. On February 7, 1997 this action was consolidated with a second South Carolina action brought in 1994 by Yadkin against Nu-Way and others after it appeared that Yadkin and SRC required separate counsel (the "Consolidated Action"). Burke Aff. ¶¶ 5-6. The 1994 South

Not Reported in F.Supp.

**Page 12**

**(Cite as: 1997 WL 462010, \*1 (S.D.N.Y.))**

Carolina action was based on the same set of facts as the 1992 South Carolina action, named parties related to the first action and included causes of action against Nu-Way for negligence, breach of implied warranties, trespass, and nuisance. Burke Aff. ¶ 3. Thus, Nu-Way faced identical claims for breach of implied warranty and of negligence in both the 1992 and the 1994 South Carolina actions. Id.

\*2 On February 25, 1994 the South Carolina court granted summary judgment in favor of SRC and Yadkin and against Nu-Way on the breach of contract and indemnity claims. However, when Nu-Way submitted a claim for coverage under the Policy, Planet denied coverage to Nu-Way. Defendant stated that "[s]ince the claim did not involve a pollution condition arising out of the performance of a covered operation," the claim is not within the Policy. This lawsuit ensued. [FN2]

FN2. As noted above, my September 30, 1996 Opinion found that plaintiff's claim did involve a pollution condition arising out of the performance of a covered operation, and therefore defendant is obligated under the terms of the Policy to indemnify plaintiff for any damages or settlement arising out of the South Carolina action.

II. Discussion

Defendant argues that because the Policy is an indemnification policy it has no duty to defend the plaintiff in the South Carolina action and has no duty to reimburse plaintiff for its defense costs until the covered claim is finally adjudicated or settled. Plaintiff argues, however, that defendant is obligated under the Policy to defend plaintiff and to pay its defense costs as they are incurred.

It is clear from the language of the Policy that the defendant is under no duty to defend the plaintiff in the South Carolina action. However, the inquiry into defendant's duties does not end there because the "duty to provide reimbursement for defense costs as they are incurred [is] a duty separate from the duty to defend." Fight Against Coercive Tactics v. Coregis Ins. Co., 926 F.Supp. 1426, 1432 (D.Colo.1996). See also In re Kenai Corp., 136 B.R. 59, 63 (S.D.N.Y.1992).

The key question becomes, therefore, whether or

not under this type of policy defendant has a duty to contemporaneously reimburse plaintiff for its defense costs. While some courts have found a duty to pay the defense costs as incurred exists under policies similar to the one here, see e.g., Okada v. MGIC Indem. Corp., 823 F.2d 276, 280 (9th Cir.1986), others have held that no such duty exists. See e.g., Kenai Corp., 136 B.R. at 63-4. The general rule, however, is that absent express language to the contrary, an insurer that does not undertake the duty to defend the insured has a duty to pay the insured's defense costs as they come due. 1 Allan Windt, Insurance Claims & Disputes § 6.20 (3d ed.1995). Therefore, this court has held where the insurance policy does not impose a duty to defend, provides for payment of defense costs, and is silent as to the timing of payment of such costs, the insurer has a duty of contemporaneous payment of defense costs. See McGinniss v. Employers Reinsurance Corp., 648 F.Supp. 1263, 1271 (S.D.N.Y.1986) (holding that in an insurance policy to pay the insured for loss sustained, where loss was defined as "amounts which the insured becomes legally obligated to pay," defendant had an obligation to pay defense costs as incurred); Pepsico v. Continental Cas. Co., 640 F.Supp. 656, 659 (S.D.N.Y.1986) (same). See also Fight Against Coercive Tactics, 926 F.Supp. at 1434. Furthermore, "without contemporaneous payment of defense costs the insurance would not truly protect the insureds from financial harm caused by suits against them." McGinniss, 648 F.Supp. at 1271 (citation and internal quotation marks omitted).

\*3 The cases in which this court has held otherwise are readily distinguishable from the instant case. For example, in In re Ambassador Group, this court analyzed a directors and officers liability insurance policy that was silent as to the time defense costs were to be reimbursed. 738 F.Supp. 57, 63 (S.D.N.Y.1990). Central to the court's conclusion that such costs should not be reimbursed contemporaneously was a clause in the policy that established priority of the payment of insurance proceeds. Id. The court concluded that this clause necessarily precluded the contemporaneous payment of defense costs. Id. Because the policy at issue here does not contain such a provision, I find that the reasoning of In re Ambassador Group is unpersuasive.

This court arrived at the same conclusion in

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.
**(Cite as: 1997 WL 462010, \*3 (S.D.N.Y.))**

another case involving a directors and officers liability policy.   See In re Kenai, 136 B.R. 59 (S.D.N.Y.1992).   However, in that case the court reasoned that to hold that the insurer must pay defense costs contemporaneously would compel insurers to "pay some losses that are not covered by their policies."  136 B.R. at 63.   That concern is absent here where my September 30, 1996 Opinion answered in the affirmative the question of whether or not the claim against plaintiff in the South Carolina action would be covered under the Policy. Therefore, In re Kenai is also inapplicable.

   Because the Policy is silent with respect to payment of defense costs, because other courts have held that a duty of contemporaneous payment exists under policy language similar to the language at issue here, and because to hold otherwise would not provide insureds with protection from financial harm that insurance policies are presumed to give, defendant has a duty under the Policy to reimburse plaintiff for its defense costs of the South Carolina action on a contemporaneous basis. [FN3]

>    FN3. Plaintiff argues that today's holding should also apply to its defense of the entire Consolidated Action.   See supra, note 1. I agree.   In my September 30, 1996 Opinion, I held that the situation that gave rise to the 1992 South Carolina action constituted an event that falls under the Policy because it arises out of and is related to the excavation of soil, a covered operation under the Policy.   Opinion at 6. Today I hold that the defendant is obligated under the Policy to reimburse plaintiff for defense costs in the South Carolina action on a contemporaneous basis.   Since the 1992 South Carolina action has been consolidated with the 1994 South Carolina action and since the 1994 South Carolina action arises out of the same set of facts as the 1992 action, I find that defendant is under an obligation to reimburse plaintiff for its defense costs in the Consolidated Action on a contemporaneous basis as well.

### III. Conclusion

   For the reasons stated above, plaintiff's motion for summary judgment is GRANTED.   Defendant must reimburse plaintiff for the reasonable costs it incurred and continues to incur in defending the South Carolina actions.

SO ORDERED.

   1997 WL 462010 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Tab
5

Slip Copy
(Cite as: 2007 WL 1811265 (Del.Super.))
< KeyCite History >

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware,
New Castle County.

SUN-TIMES MEDIA GROUP, INC., et al.,
Plaintiffs,
v.
ROYAL & SUNALLIANCE INS. CO. OF
CANADA, et al., Defendants.

C.A. No. 06C-11-108 RRC.

Submitted: April 9, 2007.
Decided: June 20, 2007.

On Plaintiffs Sun-Times Media Group, Inc., Dwayne O. Andreas, Richard R. Burt, Raymond G. Chambers, Marie-Josee Kravis, Robert S. Strauss, A. Alfred Taubman, James R. Thompson, Lord Weidenfeld of Chelsea, and Leslie H. Wexner's "Motion for Partial Summary Judgment Against Certain Defendants on The Duty to Pay Defense Costs." GRANTED.

John E. James, Esquire and Richard L. Horwitz, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

James W. Semple, Esquire and Matthew F. Lintner, Esquire, Morris James LLP, Wilmington, Delaware, Attorneys for Defendants.

MEMORANDUM OPINION

COOCH, J.

**\*1** Before the Court is Plaintiffs' motion for partial summary judgment that seeks a declaratory judgment from this Court that certain insurer Defendants have a duty under the applicable policies to pay Plaintiffs' defense costs with respect to a related civil action in Illinois. The issues raised by this motion are (1) whether there is a genuine issue of material fact regarding choice of law that would preclude summary judgment; (2) whether the "personal conduct" exclusions contained in the insurance policies, as a matter of law, prevent the present advancement of defense costs; (3) whether either the consent-to-settle or cooperation clauses of the insurance polices have been violated, as a matter of law, thereby preventing the present advancement of defense costs; and, (4) whether the priority-of-payments clause of the insurance polices prevents, as a matter of law, the present advancement of defense costs to Plaintiffs.

This Court has determined that there is no genuine issue of material fact regarding choice of law that precludes summary judgment as to defense costs. In addition, the Court has determined that, at this juncture, there has been no showing by Defendants that the personal conduct exclusions have been violated so as to preclude the advancement of defense costs. Furthermore, this Court has also determined that, at this juncture, Defendants have not made a sufficient showing that either the cooperation clause or the consent-to-settle provision have been violated, so as to preclude advancement of defense costs. Lastly, the Court has determined, on the present record, that the priority-of-payments clause does not prevent the present advancement of defense costs. [FN1] Therefore, Plaintiffs' motion is GRANTED.

> FN1. If it can be shown at a later appropriate time that the insureds were not entitled to defense costs, the insurers can presumably recover any defense costs that are found to have been improperly paid out, pursuant to the terms of the applicable policies. Van Horn Aff., E-File 13594161, Ex. 1, at 10. (James Van Horn was general counsel for International, and is now working as a consultant for International. Van Horn Aff. at ¶ 2.)

I.    FACTUAL    AND    PROCEDURAL
BACKGROUND

Plaintiffs' complaint seeks a declaration of coverage under their excess directors' and officers' ("D & O") insurance policies issued by Defendants. Plaintiffs claim to have incurred over $20 million (and expect to incur over $40 million) in defense costs as a result of defending themselves in multiple lawsuits that arose out of an alleged fraudulent scheme devised by certain inside directors of Plaintiff Sun-Times Media Group, Inc. f/k/a Hollinger International, Inc. ("International"). The complaint further asserts that Defendants are

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

obligated to pay those defense costs and have wrongfully refused to do so.

Plaintiff International is a Delaware corporation with its principal place of business in Illinois. International's Canadian parent companies are Hollinger Inc. [FN2] and Ravelston Corporation Limited ("Ravelston"). [FN3] Plaintiffs Dwayne O. Andreas, Richard R. Burt, Raymond G. Chambers, Marie-Josee Kravis, Robert S. Strauss, A. Alfred Taubman, James R. Thompson, Lord Weidenfeld of Chelsea, and Leslie H. Wexner (collectively the "Outside Directors") are nine of International's former outside directors. Eight of the above Outside Directors are citizens of the United States and one (Lord Weidenfeld) is a citizen of the United Kingdom.

> FN2. Hollinger Inc. presently owns approximately 17% of the equity of International and beneficially holds approximately 67% of the overall voting power of International. Van Horn Aff., at ¶ 3.

> FN3. At all material times Ravelston beneficially owned 78% of Hollinger Inc. Van Horn Aff., at ¶ 4.

**\*2** In 2002, International purchased liability insurance in a tower of insurance totaling $130 million in limits with a policy period of July 1, 2002 to July 1, 2003. The policies cover International, Ravelston, Hollinger Inc., and the individual directors and officers of those entities.

American Home Assurance Company ("American Home") and Chubb Insurance Company ("Chubb") sold the primary and the first two excess insurance policies in the tower. The American Home and Chubb policies have combined limits of $50 million, constituting the first $50 million of the insurance tower.

Defendants Royal & SunAlliance Insurance Company of Canada, ACE INA Insurance Company, and Zurich Insurance Company (collectively the "Third Layer Insurers") also sold excess D & O liability insurance. The Third Layer Policy has a $40 million limit of liability and is excess of the $50 million in underlying insurance sold by American Home and Chubb.

Defendants AXA Corporate Solutions Assurance,

Temple Insurance Company, Continental Casualty Company, Lloyd's Underwriters, GCAN Insurance Company f/k/a Gerling Global Canada, and ACE INA Insurance Company (collectively the "Fourth Layer Insurers") additionally sold excess D & O insurance that has a $40 million limit of liability and is excess of the $90 million in underlying insurance.

The Third Layer Insurers promised to insure Plaintiffs as follows:
> The Insurer agrees to provide to the Insureds insurance coverage excess of the Underlying Polices for Claims first made during the Policy Period against the Insured Persons for Wrongful Acts. Such coverage shall be in accordance with and subject to the same warranties, terms, conditions, exclusions and limitations (except as regards the premium, the amount and limits of liability, the Policy Period, and except as otherwise provided herein) as are contained in or as may be added to the Primary Policy and, to the extent coverage is further limited or restricted thereby, to any other Underlying Policy. In no event shall this Policy grant broader coverage than the coverage provided by the most restrictive of any of the Underlying Policies. [FN4]

> FN4. Van Horn Aff., Ex. 4, at 1.

As described in the insuring agreements of the underlying American Home Policy, the Third Layer Insurers agreed to pay all "Loss" arising out of any claims made against International and/or the Outside Directors during the policy period for "Wrongful Acts."

Coverage A under the policies insures the Outside Directors and states in pertinent part:
> This policy shall pay the Loss of any Insured Person arising from a Claim ... made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person.... [FN5]

> FN5. Van Horn Aff., Ex. 1, at 1.

Coverage B under the policies insures International and provides:
> (i) Organization Liability: This policy shall pay the Loss of any Organization arising from:
> a. a Securities Claim;

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



*3 b. an Oppressive Conduct Claim; or
c. a Canadian Pollution Claim,

made against such Organization for any Wrongful Act of such Organization.
(ii) Indemnification of Insured Person: This policy shall pay for the Loss of an Organization arising from a Claim made against an Insured Person ... for any Wrongful Act of such Insured Person, but only to the extent that such Organization has indemnified such Insured Person. [FN6]

FN6. Id.

"Loss" is defined to include:
[D]amages (including aggravated damages), settlements, judgments (including pre/post-judgment interest on a covered judgment), Defence Costs and Crisis Loss;  [FN7]

FN7. Id. at 4.

The term "Wrongful Act" is defined as:
(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act ...:
(i) with respect to any Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such....
(2) with respect to an Organization, any actual or alleged breach of duty, neglect, error, misstatement, mis-leading statement, omission or act by such
Organization, but solely in regard to (a) any Securities Claim or Oppressive Conduct Claim.... [FN8]

FN8. Id. at 6.

The policy also dictates the order in which claims are to be paid and gives priority to individual insureds:
22. In the event of Loss arising from a covered Claim for which payment is due under the provisions of this policy, then the Insurer shall in all events:
(a) first, pay Loss for which coverage is provided under Coverage A and Coverage C of this policy; then
(b) only after payment of Loss has been made

pursuant to Clause 22(a) above, with respect to whatever remaining amount of the Limit of Liability is available after such payment, at the written request of the chief executive officer of the Named Entity, either pay or withhold payment of such other Loss for which coverage is provided under Coverage B(ii) of this policy; and then
(c) only after payment of Loss has been made pursuant to Clause 22(a) and Clause 22(b) above, with respect to whatever remaining amount of the Limit of Liability is available after such payment, at the written request of the chief executive officer of the Named Entity, either pay or withhold payment of such other Loss for which coverage is provided under Coverage B(i) and D of this policy. [FN9]

FN9. Id. at 15-16.

In addition, the policy contains a "cooperation" clause that states:
The Insurer shall at all times have the right, but not the duty, to participate in the investigation, settlement, or defence of any Claim covered by this Policy which appears to the Insurer to be likely to involve the Insurer, even if the Underlying Limit has not been exhausted. The Parent Company and the Insureds shall give the Insurer full co-operation and such information as it may require. [FN10]

FN10. Van Horn Aff., Ex. 4, at 2-3.

Moreover, the policy contains a "consent-to-settle" provision that states:
*4 The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defence Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defence Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defence, the prosecution, and the negotiation of any settlement of any Claim that involves or appears reasonably likely to involve the Insurer. [FN11]

FN11. Van Horn Aff., Ex. 1, at 10.

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Furthermore, the policy creates a duty to advance defense costs as follows:

THE INSURER MUST ADVANCE DEFENCE COSTS, EXCESS OF THE APPLICABLE RETNETION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM. [FN12]

FN12. Id. at 1.

The Primary Policy also contains certain exclusions that define when there is no coverage. The relevant exclusions read as follows:

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled;

(c) arising out of, based upon or attributable to the committing in fact of any deliberate criminal or deliberate fraudulent act by the Insured;

For the purpose of determining the applicability of the forgoing Exclusions 4(a) through 4(c) ... only facts pertaining to and knowledge possessed by any past, present, or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent position) of an Organization shall be imputed to an Organization. [FN13]

FN13. Id. at 7-8.

The Policy also provides a way for insurers to recover defense costs that are later shown to have been improperly advanced by stating:

Such advance payments by the Insurer shall be repaid to the Insurer by each and every insured or Organization, severally according to their respective interests, in the event and to the extent that any such insured or Organization shall not be entitled under this policy to payment of such Loss. [FN14]

FN14. Id. at 10.

Lastly, the policy contains a provision known as the Worldwide Extension that provides that certain parts of the policies will be superseded by filings in the United States with various regulatory officials that are more favorable to the Insured than the terms and conditions of the American Home primary policy. The Extension states:

In regard to Claims brought and maintained solely in a Foreign Jurisdiction against an Organization formed and operating in such Foreign Jurisdiction or an Insured Person thereof for Wrongful Acts committed in such Foreign Jurisdiction, the Insurer shall apply to such Claim(s) those terms and conditions (and related provisions) of the Foreign Policy registered with the appropriate regulatory body in such Foreign Jurisdiction that are more favourable to such Insured than the terms and conditions of this policy. [FN15]

FN15. Id. at 6.

* * *

*5 From January 1999 until about May 2001, International's inside directors, Lord Conrad Black, David Radler, John Boultbee, and Peter Atkinson (collectively the "Inside Directors") allegedly took part in a scheme to defraud International, its public shareholders, and Canadian tax authorities. After receiving a demand letter from a major shareholder in May 2003, International formed a Special Committee of the Board to conduct an independent investigation of the allegations. That committee issued a report in August 2004 that described how the Inside Directors allegedly ran a "corporate kleptocracy" that supposedly looted International of hundreds of millions of dollars. [FN16]

FN16. Smick Aff., E-File 13769450, Ex. H, at 4. (Joseph M. Smick is a partner at the firm of Sedgwick, Detert, Morgan & Arnold, LLP. In that capacity, he was retained by Defendant Zurich Insurance Company. Smick Aff., at 2.)

Subsequently, in August 2005, federal criminal charges were brought against Ravelston, Radler, and Mark Kipnis (International's former General Counsel) in the United States District Court for the Northern District of Illinois. The indictment was later amended to add Black, Boultbee, and Atkinson as defendants. The criminal action alleged that the defendants "devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property, and their intangible right of honest services, to defraud the Canadian tax authorities of tax revenue, and to obtain money and property from these victims by means of materially false and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

fraudulent pretenses, representations, promises and omissions." [FN17] Radler entered into a voluntary plea agreement with the U.S. Attorney whereby he voluntarily pled guilty to count one of the indictment and admitted to the underlying facts involving the fraudulent scheme. Recently, Ravelston also entered into a plea agreement. [FN18] The Court understands that the criminal trial, which began March 14, 2007, is still continuing.

FN17. Def. Opposition to Pl. Mot. for Partial Summ. J., E-file 13751962, Ex G, at ¶¶ 7-8.

FN18. Tr. of March 16, 2007 Oral Argument, E-File 14506275, at 11.

The alleged fraudulent scheme also spawned numerous civil lawsuits. On December 9, 2003, Cardinal Value Equity Partners, LP filed a derivative action on behalf of International in the Delaware Court of Chancery (the "Cardinal Derivative Action"). Pursuant to a settlement agreement executed on May 2, 2005, American Home and Chubb funded a settlement of the Cardinal Derivative Action in the amount of $50 million, thereby exhausting all insurance coverage beneath the Third Layer Policy. The Superior Court of Justice in Ontario, Canada (the "Canadian Court" where related legal proceedings have taken place) and the Court of Chancery have each approved the Cardinal Derivative Action settlement.

Moreover, several securities class actions were filed on behalf of International's shareholders in Illinois and Canada, naming International, Hollinger Inc., Ravelston, the Inside Directors and the Outside Directors as defendants. Three separate complaints originally filed between February 2, 2004 and April 4, 2004 in Illinois Federal Court were consolidated in August 2004 ("Illinois Class Action"). Six of eight counts are alleged securities violations, and the remaining two counts allege breach of fiduciary duty. [FN19] In addition to the alleged securities violations, the Illinois Class Action alleges that the Outside Directors recklessly disregarded the facts regarding the self-dealing and related party transactions. In addition, the Illinois Class Action complaint alleges that the Outside Directors, by virtue of their positions at International, knew or were reckless in not knowing that public disclosures regarding certain of International's asset sales and

management services agreements were false or incomplete. Furthermore, that complaint alleges various "Wrongful Acts" in connection with specific transactions involving International and allegations regarding management services between International and its subsidiaries.

FN19. Id. at 58.

*6 Both International and the Outside Directors have incurred costs in defending the Illinois Class Action, and now seek reimbursement from the Third Layer Insurers, who have denied coverage for the Illinois Class Action. International has been funding the Illinois Class Action ongoing defense costs of the Outside Directors.

At the time International filed its complaint in this Court on November 9, 2006, [FN20] there were two related pending "applications" [FN21] in the Canadian Court. [FN22] On May 13, 2005, Hollinger Inc. had filed an application against American Home, Chubb, the Third Layer Insurers, the Fourth Layer Insurers, International, Ravelston, Cardinal, the Inside Directors, the Outside Directors, [FN23] and others seeking an order:

FN20. International amended the complaint on November 13, 2006 to add the Outside Directors as plaintiffs.

FN21. An application is apparently a type of legal proceeding in Canada usually reserved for cases where material facts are not in dispute. It appears that there is no right to conduct or receive documentary discovery and evidence is usually presented to the court through affidavits. Hoaken Aff., E-File 13655555, at ¶ 3. (Eric R. Hoaken is lead Canadian counsel for International in its insurance-related litigation. Hoaken Aff., at ¶ 5.)

FN22. Two other applications had also been filed in Canada: one by International on May 12, 2005 and one by American Home and Chubb on May 13, 2005. However, both of these applications were essentially resolved by the Canadian Court's authorization of the Cardinal Settlement. Def. Opening Brief in Support of their Mot. to Dismiss or Stay, E-File 13594161, at 10-11.

FN23. Although the Outside Directors were named as respondents in this application, it is undisputed

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Slip Copy
(Cite as: 2007 WL 1811265, *6 (Del.Super.))

**Page 20**

that none of them "ever attorned to the jurisdiction of Ontario or participated in any way in the various applications." Hoaken Aff., at ¶ 15.

a. declaring that the payment by [American Home and Chubb] for the Cardinal Settlement would not exhaust, diminish, or otherwise alter the obligations owed by [American Home and Chubb] to [Hollinger] Inc.;
b. in the alternative, enjoining [American Home and Chubb] from entering into the Cardinal Settlement;
c. declaring that [American Home and Chubb] and [the Third and Fourth Layer Insurers] have a duty to indemnify [Hollinger] Inc. and pay all defense costs and expenses in certain of the Underlying Actions, including, inter alia, the Illinois Securities Litigation; and
d. any further relief that the court deems just. [FN24]

> FN24. Def. Opening Brief in Support of their Mot. to Dismiss or Stay, at 8. See also id. at Ex F. Similarly, on that same date, Black and his wife, Lady Barbara Amiel Black, had filed an application in the Canadian Court against American Home, Chubb, the Third Layer Insurers, and the Fourth Layer Insurers seeking an order:
> a. declaring that the payment by [American Home and Chubb] for the Cardinal Settlement would not exhaust, diminish, or otherwise alter the obligations owed by [American Home and Chubb] to Black;
> b. declaring that [American Home and Chubb] and [the Third and Fourth Layer Insurers] have a duty to indemnify Black and pay all defense costs and expenses in certain of the Underlying Actions, including, inter alia, the Illinois Securities Litigation; and
> c. any further relief that the court deems just. [FN25]

> FN25. Id. at 11. See also id. at, Ex I.

On January 10, 2007, Plaintiffs filed the instant motion for partial summary judgment seeking an order declaring that the Third Layer Insurers have a duty to pay past and future defense costs incurred by Plaintiffs in the Illinois Class Action (In Re Hollinger International Securities Litigation, No. 04C-0834 (N.D.Ill.)). [FN26] Subsequently, on January 18, 2007, Defendants filed a motion to stay first-party discovery. The motion to stay first-party

discovery was followed by a motion to dismiss or stay Plaintiffs' complaint filed on January 25, 2007. [FN27]

> FN26. As stated previously, International and the Outside Directors have been sued in numerous actions arising from the Inside Directors' alleged fraudulent scheme; however, Plaintiffs have limited this motion to seeking a declaration that the Third Layer Insurers have a duty to pay past and future defense costs in one specific case, In Re Hollinger International Securities Litigation. Plaintiffs state that the parties "may be able to use the Court's ruling on this motion to resolve the Third Layer Insurers' obligations regarding the other actions at issue." Pl. Opening Brief in Support of their Mot. for Partial Summ. J., E-file 13418024, at 1.

> FN27. In a separate opinion issued today, the Court has denied Defendants' motion to dismiss and their motion to stay first-party discovery. Sun-Times Media Group, Inc., et al. v. Royal & SunAlliance Ins. Co. of Canada, et al., C.A. No. 06C-11-108 RRC, Cooch, J. (June 20, 2007).

The Canadian Court issued a decision on March 22, 2007 dismissing both the Hollinger Inc. and the Blacks applications as "premature." The Canadian Court held that "the knowledge possessed by Radler is imputed to [Hollinger] Inc." [FN28] However, the Canadian Court held further that "until more is known, the plea and settlement by Radler and the Agreement made by [Hollinger] Inc., at the very least require further exploration." [FN29] In addition, the Canadian Court determined the insurance policy was one of indemnity. The Canadian Court went on to state that in an indemnity policy, "one must look to see which claims could result in indemnity. If they cannot, there is no obligation to advance defence costs." [FN30]

> FN28. Def. March 23, 2007 letter to the Court, E-File 14233870, Ex 1, at ¶ 43.

> FN29. Id. at ¶ 46.

> FN30. Id. at ¶ 28.

**\*7** The Canadian Court reasoned that it did not have enough information to determine whether the underlying claims could result in indemnity, as well as whether the personal conduct exclusions

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



contained in the applicable policies would preclude either indemnification or advancement of defense costs to either the Blacks or Hollinger Inc. Similarly, the Canadian Court declared that "[i]f Conrad Black is acquitted and civil proceedings do not proceed, he may well be entitled to claim defence costs of the civil proceedings named above and can renew his request at that time." [FN31] Hollinger Inc. has apparently appealed the decision. [FN32] The record does not indicate whether the Blacks have also appealed the Canadian Court's decision.

> FN31. Id. at ¶ 47.

> FN32. Pl. April 9, 2007 letter to the Court, E-File 14421046.

## II. THE PARTIES' CONTENTIONS

In this motion for partial summary judgment, the Plaintiffs seek advancement of defense costs for expenses incurred defending the Illinois Class Action. Plaintiffs assert that courts routinely decide an insurer's defense obligations as a matter of law on summary judgment. [FN33] Plaintiffs contend that it is undisputed that certain of the claims in the Illinois Class Action are securities claims. Plaintiffs further contend that the plain language of the policy guarantees advancement of such defense costs. In addition, Plaintiffs point out that, unlike here, the Canadian applications dealt with "oppressive conduct" claims. [FN34]

> FN33. Pl. Opening Brief in Support of their Mot. for Partial Summ. J., at 9.

> FN34. "Oppressive conduct" claims are defined in the insurance policy as: "a Claim brought by or on behalf of a shareholder of an Organization against the Organization or any Executive of the Organization with respect to such shareholder's interest in securities of such Organization, whether directly or by class action, which alleges a violation of the oppression or unfairly prejudicial provisions of the Canada Business Corporations Act...." Van Horn Aff., Ex. 1, at 5.

Moreover, Plaintiffs assert that none of the exclusions contained in the policy should preclude the present advancement by the Third Layer Insurers of defense costs. Plaintiffs claim that Radler's plea

agreement cannot apply to them because the Illinois Class Action includes transactions that were not part of Radler's guilty plea. Therefore, Plaintiffs contend that none of the exclusions contained in the policy apply because as a matter of law the fraudulent acts of Radler are not imputed to International or to the Outside Directors.

Moreover, Plaintiffs assert that, on the present record, there has been no breach of the cooperation clause that now precludes advancement of defense costs. In addition, Plaintiffs argue that the consent-to-settle provisions of the policies were not breached by the settlement in the Cardinal action, and should not be used to preclude the advancement of defense costs. Therefore, Plaintiffs contend that both the Outside Directors and International are entitled at this time to the advancement of defense costs. [FN35]

> FN35. Plaintiffs request further proceedings to determine the amount of defense costs. Pl. Opening Brief in Support of their Mot. for Partial Summ. J., at 23.

Although Plaintiffs concede that they theoretically might ultimately have to repay the advanced defense costs to the Third Layer Insurers, they argue that that possibility is no reason not to grant their present requests for defense costs. Plaintiffs assert that now is not the appropriate time to decide the applicability of any exclusions. [FN36] Plaintiffs contend that even if it is shown at a later time that they were not now entitled to defense costs (because of their falling within the exclusions), the Third Layer Insurers can recover any defense costs that are found to have been improperly paid out.

> FN36. Pl. Reply Brief in Support of their Mot. for Partial Summ. J., E-file 13864146, at 8

*8 In response, Defendants argue that partial summary judgment for advancement of defense costs is not appropriate. Defendants argue that the Court must first determine choice of law in order to apply the appropriate insurance principles. [FN37] Defendants argue that because Plaintiffs do not advance an argument as to which state law applies with respect to interpretation of the insurance contracts, [FN38] but rather make only general statements that the law of some state in the United States will apply, summary judgment is improper.

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
(Cite as: 2007 WL 1811265, *8 (Del.Super.))

[FN39] In addition, Defendants argue that a choice of law determination is necessary to determine applicable policy provisions because without a choice of law determination, it is impossible to know whether the Worldwide Extension applies. Defendants assert that without knowing whether the Worldwide Extension applies, there exists a material issue of fact that should defeat summary judgment. [FN40] Defendants have not suggested the need for further discovery and contend that the present record is enough to defeat summary judgment. [FN41]

> FN37. Tr. of March 16, 2007 Oral Argument, at 74.

> FN38. Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 4 ("Defendants have failed to demonstrate any conflict of law between Canada and any potentially applicable law in the United States (i.e., Illinois, New York, or Delaware).").

> FN39. Tr. of March 16, 2007 Oral Argument, at 73-74.

> FN40. Def. Opposition to Pl. Mot. for Partial Summ. J., at 8.

> FN41. Defendants advised the Court that they did not bring their own summary judgment motion because of their pending motion to dismiss or stay. Tr. of March 16, 2007 Oral Argument, at 71.

Moreover, the Defendants argue that the Outside Directors have no claim for defense costs as a matter of law because International is currently advancing their costs in the Illinois Class Action, and that therefore only International has a ripe claim for reimbursement of defense costs under the policy. Defendants further assert that International is not entitled to defense costs because it is precluded under two exclusions in the applicable policies. Defendants specifically cite exclusion 4(a) stating:
[T]he Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled. [FN42]

> FN42. Van Horn Aff., Ex. 1, at 7.

And 4(c)

[T]he Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured) arising out of, based upon or attributable to the committing in fact of any deliberate criminal or deliberate fraudulent act by the Insured. [FN43]

> FN43. Id.

Defendants also rely on the imputation clause contained at the end of the exclusions stating that:
For the purpose of determining the applicability of the forgoing Exclusions 4(a) through 4(c) ... only facts pertaining to and knowledge possessed by any past, present, or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent position) of an Organization shall be imputed to the Organization. [FN44]

> FN44. Id. at 8.

Defendants argue that Radler's fraudulent, criminal acts are imputed to International because Radler was the President, Chief Operating Officer, and a director of both International and Hollinger Inc. Because, Defendants argue, the exclusions release the Insurers from their duty to advance defense costs, and because the Outside Directors have no present claim because they are not currently being indemnified under the policy, the Defendants state there is no duty to advance costs at this time as a matter of law.

*9 Furthermore, Defendants assert that the Cardinal Settlement violated the consent-to-settle and cooperation clauses defined in the policy, and violation of these clauses should release the Third Layer Insurers from the duty to advance costs.

Lastly, the Defendants state that the policy contains a priority-of-payment clause, which states that Insured Persons are to receive compensation before any Organization. The Third Layer Insurers argue that because Black's application for coverage was dismissed in Canada, it is impossible to advance costs to International because there has been no determination as to whether any Insured Person is allowed coverage. Defendants suggest that the Court must wait to see if any Insured Persons are owed coverage before any defense costs can be advanced to International. [FN45]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw®

Slip Copy
(Cite as: 2007 WL 1811265, *9 (Del.Super.))

FN45. Def. Opposition to Pl. Mot. for Partial Summ. J., at 11.

## III. DISCUSSION

### A. Standard of Review

Partial or full summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [FN46] If, however, the record indicates that material facts are in dispute, or if "it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances," then summary judgment will not be granted. [FN47] Although the moving party has the burden of demonstrating that no material issues of fact are in dispute and it is entitled to judgment as a matter of law, the facts must be viewed "in the light most favorable to the nonmoving party." [FN48] Furthermore, "[f]rom those accepted facts the court will draw all rational inferences which favor the non-moving party." [FN49]

FN46. Super. Ct. Civ. R. 56(c).

FN47. Cook v. City of Harrington, 1990 WL 35244, at *3 (Del.Super.) (citing Ebersole v. Lowengrub, 180 A.2d 467 (Del.1962)).

FN48. Mason v. United Servs. Auto. Ass'n, 697 A.2d 388, 392 (Del.1997).

FN49. Merrill v. Crothall-American, Inc., 606 A.2d 96, 99 (Del.1992).

In the instant motion, the Defendants argue issue of fact only in connection with the choice of law issue and the applicability of the Worldwide Extension. All other Defendants' contentions are issues of law.

### B. The Choice of Law Issue Does Not Preclude Summary Judgment Because There Is No Conflict Between United States And Canadian Law

The Court must first decide whether the choice of law issue would preclude summary judgment. Defendants assert that Canadian law will apply to the interpretation of the policy and, absent a determination of applicable law, summary judgment is inappropriate. Defendants contend that choice of law presents an issue of fact that warrants the denial of all aspects of Plaintiffs' motion for partial summary judgment. Specifically, Defendants argue that "there exists an issue of material fact as to what terms and conditions apply to coverage for the Underlying Actions." [FN50]

FN50. Def. Opposition to Pl. Mot. for Partial Summ. J., at 8

In Eon Labs Manufacturing, Inc. v. Reliance Insurance Co., the Delaware Supreme Court stated that, absent any conflict, the Court may apply general principles that are consistent with the law of either jurisdiction. [FN51] In the instant motion, choice of law is not an issue that otherwise precludes the grant of summary judgment at this time because there is no demonstrated conflict between applicable U.S. and Canadian law. [FN52]

FN51. Eon Labs Mfg., Inc. v. Reliance Ins. Co., 756 A.2d 889, 892 (Del.2000) (applying general insurance contract principles where the principles are consistent with the law of both jurisdictions).

FN52. See C M, Inc. v. Canadian Indem. Co., 482 F.Supp. 780, 782 (D.S.D.1980) rev'd on other grounds (noting similarities between U.S and Canadian law, and stating that in insurance matters both Canadian and U.S. courts look at the laws of the other jurisdiction).

*10 Despite Defendants' assertion that the Court must now decide which law will apply, Defendants, who carry the burden of demonstrating a conflict, fail to provide any authorities evidencing a conflict between U.S. and Canadian law on the issue of interpretation of insurance contracts. [FN53] Even though Defendants urge the Court to apply the "most significant relationship" test of the Restatement (Second) of Conflict of Law § 188 (1971), the Court does not need to undergo such analysis because there is no demonstrated conflict. [FN54] Therefore, like the Delaware Supreme Court did in Eon Labs, the Court will apply general insurance contract principles. [FN55] Because it is unnecessary to decide choice of law at this time, the still-unsettled choice of law question does not preclude partial summary judgment in the instant

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



motion.

FN53. Def. Opposition to Pl. Mot. for Partial Summ. J., at 9-10. The Court also notes that Defendants provided the Court with very little substantive Canadian law, citing to only five Canadian sources. See Enigma Holdings, Inc. v. Gemplus Intern. S.A., 2006 WL 2859369, at *8 (N.D.Texas) (stating that the "[d]efendants as the party seeking to apply foreign law have the burden of proving its substance to a reasonable certainty").

FN54. 15A C.J.S. Conflict of Laws § 28 (2002) ("The Court need not engage in any choice of law analysis where no conflict is established between laws of the states which are potentially applicable."). See also Atchison, Topeka & Santa Fe Railway Co. v. Stonewall Ins. Co., 2000 WL 34001583 (D.Kan.) (holding that the defendant insurers had the burden to demonstrate a conflict of laws and absent such a demonstration there would be no need to apply conflict of law rules).

FN55. Eon Labs, 756 A.2d at 892.

Furthermore, because the Court is not required to make a choice of law determination, there is no need to decide now the possible applicability of the Worldwide Extension. Plaintiffs argue that regardless of the ultimate terms of coverage, the Third Layer Insurers would have no stronger defenses to coverage than they assert now. [FN56] Because the Court does not need to determine choice of law in the instant motion, there is no need to address the possible applicability of the Worldwide Extension at this time, and therefore no genuine issue of material fact exists in connection with this issue.

FN56. Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 3.

C. The Two Personal Conduct Exclusions Do Not Override The Present Duty Of The Third Layer Insurers to Advance Defense Costs Contained In The Policy.

The plain language of the insurance policy states:
THE INSURER MUST ADVANCE DEFENCE COSTS, EXCESS OF THE APPLICABLE RETNETION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM. [FN57]

FN57. Van Horn Aff., Ex. 1, at 1. In the instant motion, both the Outside Directors and International seek defense costs for the Illinois Class Action. The insurance policy specifically provides coverage for both "Wrongful Acts" and "Securities Actions." Because six of the eight counts in the Illinois Class Action are securities claims against International and the remaining two counts are breach of fiduciary duty, and that action consists of allegations of "Wrongful Acts" against the Outside Directors, the Illinois Class Action is covered by the plain language of the insurance policy. Furthermore, the present motion for partial summary judgment seeking defense costs for the Illinois Class Action is different from the claims considered by the Canadian court because the claims at issue there were oppressive conduct claims, not securities actions or wrongful conduct allegations against individuals, which are the claims at issue here.

Because the claims in the Illinois Class Action are specifically covered by the policy, and the policy is one of indemnity, one must look to see which claims could result in indemnity because only claims that could potentially result in indemnity lead to an obligation to advance defense costs. Because the claims in the Illinois Class Action are specifically covered under the insurance policy, and could potentially result in indemnity, the duty to advance defense costs is now triggered. [FN58]

FN58. See In re Worldcom, Inc. Sec. Litig., 354 F.Supp.2d 455, 464 (S.D.N.Y.2005) (stating that the duty to defend arises whenever a claim could potentially fall within the terms of the policy); Wedtech Corp. v. Federal Ins. Co., 740 F.Supp. 214, 221 (S.D.N.Y.1990); PepsiCo v. Continental Casualty Co., 640 F.Supp. 656, 659-60 (S.D.N.Y.1986); see also Brady v. i2 Techs. Inc., 2005 WL 3691286, *3 (Del.Ch.) (stating that [a]dvancement is an option to borrow, triggered upon the initiation of a lawsuit or proceeding)

*11 In addition, because the Outside Directors and International are defined separately under the policy, the Court must consider the claim of International and the claims of the Outside Directors separately. Both parties have a right to seek declaratory relief under 10 Del. C. § 6503, which authorizes a cause

Westlaw.

Slip Copy
(Cite as: 2007 WL 1811265, *11 (Del.Super.))

Page 25

of action for a declaration of a party's rights. [FN59] The Outside Directors are defined as "Insured Persons" under the policy, and although they are currently being reimbursed by International, [FN60] they have incurred defense costs as a result of the Illinois Class Action even though International is paying the costs. The fact that International has paid some or all of the costs does not relieve the Third Layer Insurers from their duty under the policy to advance defense costs.

> FN59. Gilmour v. PEP Modular Computers, Inc., 1995 WL 791001, at * 2 (Del.Super.) (stating a party may seek declaratory relief when a legal relationship is called into question); see also Energy Partners Ltd. v. Stone Energy Corp., 2006 WL 2947483, at *6 (Del.Ch.) (noting that "[p]arties to a contract can seek declaratory judgment to determine 'any question of construction or validity' and can seek a declaration of 'rights, status or other legal relations thereunder.' ").

> FN60. Def. Opposition to Pl. Mot. for Partial Summ. J., at 11.

Furthermore, the Outside Directors are not precluded from seeking defense costs by either of the two personal conduct exclusions, both related to the Radler plea agreement. The plain language of the imputation clause states:

For the purpose of determining the applicability of the forgoing Exclusions 4(a) through 4(c) ... only facts pertaining to a knowledge possessed by any past, present, or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent position) of an Organization shall be imputed to the Organization. [FN61]

> FN61. Van Horn Aff., Ex.1 at 8. This language specifically refers to an "Organization," not an individual. Even though Defendants argue that the Radler plea agreement should preclude coverage because of the imputation of fraud, this logic does not apply to the Outside Directors because they are not defined as an "Organization" under the terms of the policy. All parties agree that the personal conduct exclusions would not apply to the Outside Directors.

> Moreover, International, in addition to the Outside Directors, is permitted to recover its own defense

costs as well as the costs it paid the Outside Directors, and is not precluded from coverage by the either of the two personal conduct exclusions. Even though the Third Layer Insurers rely on the imputation of the two personal conduct exclusions to preclude coverage, the policy contains an unequivocal duty to advance defense costs prior to the final disposition of a claim by stating:

THE INSURER MUST ADVANCE DEFENCE COSTS, EXCESS OF THE APPLICABLE RETNETION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM. [FN62]

> FN62. Id. at 1. In addition, the policy is one of indemnity, so one must look to see which claims could result in indemnity because only claims that could potentially result in indemnity lead to an obligation to advance defense costs. Because the claims in the Illinois Class Action are specifically covered under the insurance policy, and could potentially result in indemnity, the duty to advance defense costs is triggered. [FN63]

> FN63. See In re Worldcom, 354 F.Supp.2d at 464 ("The duty to pay defense costs 'exists whenever a complaint against the insured alleges claims that may be covered under the insurer's policy.' ").

Furthermore, the personal exclusions do not override a present contractual duty to advance defense costs unless the Defendants can unequivocally now show that all of the allegations in the Illinois Class Action complaint fall within the personal conduct exclusions. [FN64] Defendants have failed to show at this juncture that any of the exclusions are definitely imputed to International. Even though Defendants argue that Radler's guilty plea imputes the exclusions to International, the Illinois Class Action includes transactions that were not part of Radler's guilty plea. Defendants attempt to expand the scope of Radler's guilty plea by arguing the exclusions require a broad reading. However, an exclusion clause in an insurance contract is construed strictly to give the interpretation most beneficial to the insured. [FN65] Because the Defendants have failed to show at this time the applicability of the exclusions to International, the Court need not decide the potential applicability of the exclusions at this time. [FN66]

> FN64. See Int'l Paper Co. v. Cont'l Casualty Co.,

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



35 N.Y.2d 322, 361 N.Y.S.2d 873, 320 N.E.2d 619, 621 (N.Y.1974) (stating that if an insurer seeks to be relieved of a duty to defend, it carries the burden of showing the policy exclusions apply); see also Happy House Amusement v. New Hampshire Ins. Co., 135 N.H. 719, 609 A.2d 1231, 1232-33 (N.H.1992); United States Fidelity & Guar. Co. v. Johnson Shoes, 123 N.H. 148, 461 A.2d 85, 87 (N.H.1983).

FN65. See, e.g., Alstrin v. St. Paul Mercury Ins. Co., 179 F.Supp.2d 376, 400 (D.Del.2002) (stating that an "illegal profit" exclusion should be construed strictly); see also Cochran v. State Farm Mut. Auto. Ins. Co., 298 So.2d 173, 174 (Fla.Dist.Ct.App.1974) (stating that "grants of coverage must be interpreted broadly in favor of the existence of insurance while limitations thereon, or exclusions, must be interpreted narrowly against the insurance company").

FN66. Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 8.

*12 Even if it were shown at a later time that the exclusions apply, this still does not prevent the advancement of defense costs at the present time because the policy provides that the Insured must pay back money they received but were not entitled to. The policy specifically says that:

Such advance payments by the Insurer shall be repaid to the Insurer by each and every insured or Organization, severally according to their respective interests, in the event and to the extent that any such insured or Organization shall not be entitled under this policy to payment of such Loss. [FN67]

FN67. Van Horn Aff., Ex. 1, at 10. Therefore, the plain language of the policy guaranteeing an advancement of defense costs is not precluded by any imputation of exclusions to International, as well as (as explained earlier) to the Outside Directors.

D. The Consent-to-Settle And Cooperation Clauses Were Not Breached As A Result Of The Cardinal Settlement, And Do Not Preclude The Advancement Of Defense Costs.

The cooperation clause and the consent-to-settle provisions also do not preclude the present advancement of defense costs. The cooperation clause allows the insurer the opportunity to participate in the case by stating in pertinent part:

The Insurer shall at all times have the right, but not the duty, to participate ... settlement ... of any Claim covered by this Policy which appears to the Insurer to be likely to involve the Insurer. [FN68]

FN68. Van Horn Aff., Ex. 4, at 2-3. However, this cooperation clause implies that the insurer must accept coverage in order to involve itself in the litigation because an insurer that has not accepted coverage should not have a right to force the insureds to forgo a settlement that is in their best interests. [FN69] Here, the Third Layer Insurers never accepted coverage for the Cardinal action and never consented to the Cardinal settlement. [FN70] Defendants contend that they had only reserved their rights with respect to coverage as of the time of the Cardinal settlement, [FN71] but Defendants have not shown that the Plaintiffs violated the cooperation clause. Because the Defendants reserved their rights with respect to coverage and later denied coverage, they should not have "veto power" [FN72] over the settlement process. [FN73] When the Defendants reserved their rights to accept coverage, Plaintiffs were allowed to take reasonable measures to defend themselves, including settlement. [FN74]

FN69. Miller v. Shugart, 316 N.W.2d 729, 733-34 (Minn.1982) (stating that "while the ... insureds have a duty to cooperate with the insurer, they also have a right to protect themselves against plaintiff's claim ... Nor, do we think, can the insurer who is disputing coverage compel the insureds to forgo a settlement which is in their best interests").

FN70. Reidy Aff., E-file 13864146, Ex. 4, at 4. (Andrew M. Reidy is a partner in the law firm of Howrey LLP in Washington D.C. and counsel for both International and the Outside Directors. Reidy Aff. at ¶ 3.)

FN71. Def. Opposition to Pl. Mot. for Partial Summ. J., at 20.

FN72. Plaintiffs state that they fear that non-participating insurers could hold a "veto" over a settlement not within their limits. Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 13.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



FN73. See, e.g., Miller, 316 N.W.2d at 733-34 (stating that an insured did not breach the cooperation clause when the insurer was contesting coverage).

FN74. Ins. Co. of N. Am. v. Spangler, 881 F.Supp. 539, 545 (D.Wy.1995) ("The insurer's insertion of a policy defense by way of reservation or nonwaiver agreement narrows the reach of the cooperation clause and permits the insured to take reasonable measures to protect himself against the danger of personal liability.").

In addition, the consent-to-settle provision does not preclude the advancement of defense costs because the consent of the Third Layer Insurers was not required. The consent-to-settle provision states: The Insureds shall not ... enter into any settlement agreement ... or incur any Defence Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defence Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defence, the prosecution, and the negotiation of any settlement of any Claim that involves or appears reasonably likely to involve the Insurer. [FN75]

FN75. Van Horn Aff., Ex. 1, at 10. *13 All the policy requires is that consent is obtained from the parties actually funding the settlement. Because no funds from the Third Layer Insurers were used to fund the Cardinal Settlement, Plaintiffs were not required to obtain consent. [FN76]

FN76. Pl. Reply Brief in Support of their Mot. For Partial Summ. J., at 13-14.

Furthermore, the Cardinal Settlement did not prejudice the Defendants. [FN77] Even though Defendants argue that they are prejudiced because they are involved in coverage litigation and face the prospect of paying for claims other than the Cardinal Settlement, this argument fails because Defendants have failed to prove that the outcome of the underlying case would have been different had there been cooperation. [FN78] Because the Defendants were not prejudiced by the Cardinal Settlement and never accepted any coverage for the Settlement,

neither the cooperation clause nor the consent-to-settle provision was breached. [FN79] Therefore, there is a duty to advance defense costs.

FN77. M.F.A. Mut. Ins. Co. v. Cheek, 66 Ill.2d 492, 6 Ill.Dec. 862, 363 N.E.2d 809, 813 (Ill.1977) ("[U]nless the alleged breach of the cooperation clause substantially prejudices the insurer in defending the primary action, it is not a defense under the contract").

FN78. 22 HOLMES' APPLEMAN ON INSURANCE 2D § 138.7 (2003) ("To prove actual prejudice, the insurer must prove that the outcome of the underlying case would have been different had the insurer received the cooperation of the insured.")

FN79. Despite Plaintiffs' arguments that Joseph Smick's affidavit is prejudicial against their case, it is unnecessary for the Court to discuss credibility at this time. Tr. of March 16, 2007 Oral Argument, at 63-64.

E. The Priority-of-Payments Clause Does Not Preclude The Advancement of Defense Costs.

Lastly, the priority-of-payment provision is not an issue in the current motion because the Outside Directors will receive advancement of defense costs. Although the Defendants argue that they cannot pay International because the priority-of-payments provision states that Insured Persons must be paid before an Organization, this argument is not persuasive here because the Outside Directors are going to receive advancement of defense costs. Therefore, both the Outside Directors and International are entitled to compensation under the policy.

IV. CONCLUSION

For the above reasons, Plaintiffs' motion for partial summary judgment against the Third Layer Insurers on the duty to pay defense costs is GRANTED. [FN80]

FN80. The Court will undertake appropriate proceedings, as requested by Plaintiffs, to determine the amount of defense costs that the Third Layer Insurers must now pay.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
**(Cite as: 2007 WL 1811265, \*13 (Del.Super.))**

   IT IS SO ORDERED.

   2007 WL 1811265 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.