**Wayne E. Borgeest**
**Joan M. Gilbride**
**Robert A. Benjamin**
**KAUFMAN BORGEEST & RYAN LLP**
**200 Summit Lake Dr**
**Valhalla, New York 10595**
**(914) 741-6100 (Telephone)**
**(914) 741-0025 (Facsimile)**
**wborgeest@kbrlaw.com**
**jgilbride@kbrlaw.com**
**rbenjamin@kbrlaw.com**

*Attorneys for Axis Reinsurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                      :
AXIS REINSURANCE COMPANY,                          :       No. 07-CV-07924-GEL
                                                                      :
                              Plaintiff,                        :
            v.                                                    :
                                                                      :
PHILLIP R. BENNETT, et al.,                            :
                                                                      :
                              Defendants.                   :
                                                                      :
------------------------------------------------------------------- X
                                                                      :
In re                                                            :       Chapter 11
                                                                      :
REFCO, INC., et al.,                                        :       Case No. 05-60006-RDD
                                                                      :
                              Debtors.                        :       Jointly Administered
                                                                      :
------------------------------------------------------------------- X
                                                                      :
AXIS REINSURANCE COMPANY,                          :       Adv. Proc. No. 07-01712-RDD
                                                                      :
                              Plaintiff,                        :
            v.                                                    :
                                                                      :
PHILLIP R. BENNETT, et al.,                            :
                                                                      :
                              Defendants.                   :
                                                                      :
------------------------------------------------------------------- X
                                                                      :

TONE N. GRANT, et al.,                                    :    Adv. Proc. 07-02005-RDD
                                                          :
                            Plaintiffs,                   :
               v.                                         :
                                                          :
AXIS REINSURANCE COMPANY,                                 :
                                                          :
                            Defendant.                    :
                                                          :
----------------------------------------------------------- X
                                                          :
LEO R. BREITMAN, et al.,                                  :    Adv. Proc. No. 07-02032-RDD
                                                          :
                            Plaintiffs,                   :
               v.                                         :
                                                          :
AXIS REINSURANCE COMPANY,                                 :
                                                          :
                            Defendant.                    :
                                                          :
                                                          :
----------------------------------------------------------- X
                                                          :
AXIS REINSURANCE COMPANY,                                 :    (1) No. 07-CV-09420-GEL
                                                          :    (2) No. 07-CV-09842-GEL
                            Plaintiff,                     :    (3) No. 07-CV-10302-GEL
               v.                                         :
                                                          :
PHILLIP R. BENNETT, et al.,                               :
                                                          :
                            Defendants.                   :
                                                          :
----------------------------------------------------------- X
                                                          :
TONE N. GRANT, et al.,                                    :    No. 07-CV-09843-GEL
                                                          :
                            Plaintiffs,                   :
               v.                                         :
                                                          :
AXIS REINSURANCE COMPANY,                                 :
                                                          :
                            Defendant.                    :
                                                          :
----------------------------------------------------------- X

## TABLE OF CONTENTS

INTRODUCTION.............................................................................................1

AXIS REINSURANCE COMPANY SEEKS A STAY OF THE BANKRUPTCY
COURT'S ORDER OF OCTOBER 19, 2007 WHICH WILL RESULT IN
RENDERING THE PENDING APPEAL MEANINGLESS.........................................1

STATEMENT OF THE FACTS........................................................................2

I.      BACKGROUND ON AXIS'S DENIAL OF REFCO'S CLAIM.......................2

II.     SANTO MAGGIO'S GUILTY PLEA.................................................3

ARGUMENT...............................................................................................4

I.      THE BANKRUPTCY COURT'S ADVANCEMENT ORDER SHOULD
        BE STAYED PENDING A DECISION ON THE APPEAL...............................4

        A.      Axis Has a Strong Likelihood of Success on Appeal..............................5

        B.      Axis Will Suffer Irreparable Injury Absent a Stay................................8

        C.      The Insureds Will Not Be Harmed by a Stay........................................10

        D.      The Issues in this Appeal Have Important Public Policy
                Dimensions............................................................................11

CONCLUSION............................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Am. Ref Fuel Co. v. Res. Recycling, Inc.*, 722 N.Y.S.2d 570 (N.Y. 2001) .................... 12

*Brenntag Intern. Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) ......... 9

*Federal Insurance Company v. Kozlowski*, 792 N.Y.S.2d 397 (1st Dep't 2005) ........... 7

*Federated Strategic Income fund v. Mechala Group Jamaica Ltd.*,
1999 WL 993648 (S.D.N.Y. 1999) ..................................................................................... 9

*Garden City Irrigation, Inc. v. Salamanca*, 7 Misc.3d 1014(A), 801 N.Y.S.2d 234
(N.Y. Sup. Ct. Apr. 18, 2005) ........................................................................................... 9

*In re Adelphia Communications Corp.*, 361 B.R. 337 (S.D.N.Y. 2007) ......................... 5

*Mohammed v. Reno*, 309 F.3d 95 (2d Cir. 2002)) ............................................................. 5

*Phillip Bros. v. El Salto, S.A.*, 487 F. Supp. 91 (S.D.N.Y. 1980) ................................... 9

*Servidone Constr. Co. v. Sec. Ins. Co.*, 477 N.E.2d 441 (N.Y. 1985) ........................... 12

*Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*,
848 N.E.2d 597 (Ill. App. 2006) ..................................................................................... 12

*U.S. Fidelity & Guar. Co. v. Copfer*, 400 N.E.2d 298 (N.Y. 1979) ................................ 12

## AXIS REINSURANCE COMPANY SEEKS A STAY OF THE BANKRUPTCY COURT'S ORDER OF OCTOBER 19, 2007 WHICH WILL RESULT IN RENDERING THE PENDING APPEAL MEANINGLESS

Axis Reinsurance Company ("Axis") files this motion to stay an Order entered on October 19, 2007 (the "Advancement Order") by the Bankruptcy Court in an adversary proceeding in the bankruptcy case for Refco, Inc. ("Refco").[1]  Despite Axis's denial of coverage and without reaching the merits of Axis's substantive coverage defenses, the Bankruptcy Court granted the Insureds' motions for summary judgment and ordered Axis to advance the Defense Costs to the Insureds under a directors and officers liability insurance policy issued by Axis to Refco.  An appeal of this Advancement Order is currently pending before this Court and was fully briefed on January 9, 2008.  Axis seeks this immediate stay of the Bankruptcy Court's Advancement Order until the appeal is decided or, alternatively requests that the Court require the Insureds to post a bond to ensure that Axis will be able to recover the advanced Defense Costs in the event that Axis prevails on its appeal.

In addition to the arguments previously advanced before the Bankruptcy Court, recent events have occurred that further underscore the need for a stay pending the appeal. As discussed below, Santo C. Maggio, a former Refco executive and an Insured under the Policy, has pled guilty, admitting that he and other Insureds committed criminal fraud.  If this Court does not issue an immediate stay of the Advancement Order, then any victory by Axis on the appeal will be hollow as no Court will have a realistic ability to make Axis whole again.

---

[1] The name "Refco," as used throughout this brief, refers to Refco, Inc., the publicly traded company formed pursuant to the August 2005 initial public offering, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO. "Refco" also refers to subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

## STATEMENT OF THE FACTS

### I.    BACKGROUND ON AXIS'S DENIAL OF REFCO'S CLAIM.

This Court has the appeal pending before it and is very familiar with the background of this case.[2] Briefly however, in October 2005, following the revelation that over a seven-year period, its former Chairman, President and Chief Executive Officer, Phillip Bennett, hid hundreds of million of dollars of uncollectible receivables, Refco announced that its prior financial statements could no longer be relied upon.[3]  This announcement, just two months after going public and four months after obtaining the directors and officers liability policy at issue,[4] sparked dozens of civil and criminal actions against Refco and various Refco executives (the "Underlying Actions").

On March 6, 2006, Axis denied coverage under the Axis Policy to all insureds under the Axis Policy, including the Insureds,[5] for any claims arising out of Refco's demise on the following grounds: (1) breach of a January 21, 2005 Warranty Letter executed by Bennett on behalf of all Insureds under the Axis Policy; (2) the "Knowledge Exclusion" (Endorsement 6); (3) an Exclusion in the Application; and (4) the Pending and Prior Litigation Exclusion.  *See* Exhibit A to the Declaration of Joan M. Gilbride,

---

[2] Axis refers this Court to the Appellate Brief pending before it for a more complete recitation of the facts and procedural posture and it incorporates that brief by reference herein.

[3] A detailed description of the Refco fraud can be found in the 363 page Examiner's Report (Bankr. S.D.N.Y. filed July 11, 2007) (05-60006, Doc. 5530).  The Examiners Report recounts the detailed factual basis for the allegations of fraud against Bennett and others.

[4] Axis issued Securexcess Policy Number RNN 506300 (the "Axis Policy") to Refco with a policy period commencing August 11, 2005, in anticipation of Refco's late spring, early summer IPO in 2005. *See* Exhibit B to the Gilbride Stay Decl.

[5] The Insureds other than Refco, the individual directors and officers (herein "Individual Insureds") have divided themselves into four categories: (1) the "Officer Insureds" – Klejna, Murphy, Sexton, Sherer and Silverman; (2) the "Director Insureds" – Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen; (3) the "Indicted Insureds" – Bennett, Grant and Trosten; and (4) the "Cooperating Defendant" – Maggio (collectively "Insureds").

dated January 14, 2008 (hereinafter "Gilbride Stay Decl."). Axis concluded, based on the tacit public admissions in Refco's SEC filings, that Bennett and potentially certain other insureds did have such knowledge or information at the relevant times.

Following no response from the Insureds, in May 2007, Axis commenced a declaratory judgment action seeking a judicial declaration that, pursuant to these terms of the Axis Policy, conditions and exclusions, there is no coverage under the Axis Policy in connection with the Underlying Actions. Before Axis could even begin to present its case in support of its declaratory judgment action, the Bankruptcy Court for the Southern District of New York, dismissed Axis's declaratory judgment action in its Order of August 31, 2007 and permitted various Insureds to continue their counterclaims against Axis, and other Insureds to initiate their own proceedings, seeking to force Axis to advance Defense Costs. *See* Exhibit C to the Gilbride Stay Decl. Thereafter, on October 19, 2007, the Bankruptcy Court issued the Advancement Order, which granted the summary judgment motions of the Insureds, and ordered that Axis advance their Defense Costs until such time as the Axis Policy is exhausted or there is a final adjudication on the issue of whether the Underlying Actions are covered under the Policy. *See* Exhibit D to the Gilbride Stay Decl. It is from these actions of the Bankruptcy Court that the pending appeal is taken.

## II.    SANTO MAGGIO'S GUILTY PLEA

On December 19, 2007, Santo C. Maggio, a former senior Refco executive and an Insured under the Axis Policy, pleaded guilty before the United States District Court for the Southern District of New York to two counts of securities fraud, one count of conspiracy to commit securities fraud, and one count of wire fraud. The Information to

3

which Mr. Maggio allocuted, provides an overview of the sordid story of how Mr.
Maggio along with his co-conspirators, Phillip R. Bennett, Tone N. Grant, and Robert C.
Trosten, engaged in criminal fraud and deceit in their efforts to hide the true financial
health of Refco. *See* Exhibit E to the Gilbride Stay Decl.

As further detailed in his plea and the Information, Mr. Maggio admitted that
from the late 1990s to October 2000, he "participated with others to hide the true
financial health of Refco from banks, counter-parties, auditors and investors." *See*
Exhibit F to the Gilbride Stay Decl. at p. 17.  He further admitted that "with my
knowledge and active participation Refco's substantial losses were covered up as
revenues padded [sic] and certain operating expenses were moved off its book." *See*
Exhibit F to the Gilbride Stay Decl. at p. 18.

Mr. Maggio's guilty plea and his allocution to the fraud that was perpetrated with
his coconspirators serves to underscore what Axis has been arguing all along – that this
Claim is excluded from coverage under the Axis Policy and the Bankruptcy Court should
not have ordered the advancement of Defense Costs where there is no coverage under the
Policy.

## ARGUMENT

### I.    THE BANKRUPTCY COURT'S ADVANCEMENT ORDER SHOULD BE STAYED PENDING A DECISION ON THE APPEAL

Axis easily satisfies the requirements for a stay of the Bankruptcy Court's
Advancement Order.  A Court considers four factors in determining whether to grant a
stay pending appeal under Federal Rule of Bankruptcy Procedure 8005: "(1) whether the
movant will suffer irreparable injury absent a stay, (2) whether a party will suffer
substantial injury if a stay is issued, (3) whether the movant has demonstrated a

4

substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected." *In re Adelphia Communications Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007). The decision to grant the stay involves a balancing of the four factors, wherein a stronger showing on one factor may excuse a lesser showing on another. *Id.* at 347 (citing *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)). Axis passes this test with flying colors.

### A.    Axis Has a Strong Likelihood of Success on Appeal.

Although not strictly necessary to obtain a stay, Axis can demonstrate a <u>substantial</u> likelihood of success on the merits of its appeal.

Axis argues in its appeal that the Bankruptcy Court's retention of the Insureds' counterclaims and grant of permission to initiate adversarial proceedings on the advancement issue, while dismissing Axis's complaint on the same issue, was imprudent and caused great injury and injustice to Axis. Once the Bankruptcy Court dismissed Axis's Complaint it should have also dismissed the Insureds' counterclaims.

Given the admissions made by Refco and Mr. Maggio, Axis's position is stronger than ever that the Axis Policy does not afford coverage to the Insureds. As stated more fully in the appeal, the reason Axis denied coverage in its March 6, 2006 correspondence to the Insureds is simple. In three separate and distinct documents, Refco warranted to Axis that if any of the directors and officers of Refco knew of anything which might result in a Claim under the Policy, that Claim would be excluded from coverage for all Insureds.[6] These provisions are each part of the Axis Policy and none of these provisions

---

[6] The purpose of these provisions was to ensure that the Policy, which incepted on the same day as the Refco IPO, would only provide coverage from the IPO forward. In other words, the intent was to start with a clean slate.

require a "final adjudication" or "in-fact" finding.   Axis reviewed the many lawsuits

submitted for coverage arising out of Refco's demise, Refco's filings with the SEC

regarding the active participation in the fraud by Bennett, and, on March 6, 2006, denied

coverage based, in part, on these three provisions. *See* Exhibit A to the Gilbride Stay

Decl.

Now, in addition to the above considerations, on December 19, 2007, Mr.

Maggio, an Insured under the Axis Policy, pleaded guilty to – among several other things

– securities fraud – and admitted to knowledge of the fraud at Refco prior to the

underwriting of the Axis Policy. *See* Exhibits E and F to the Gilbride Stay Decl.  To the

extent that there ever was any dispute as to the facts upon which Axis based its coverage

disclaimer – and Axis contends there never was any such dispute – Mr. Maggio's guilty

plea puts any possible dispute to rest.  One of the Insureds has now admitted that he, and

others (including Bennett, Trosten, and Grant), conspired to defraud banks,

counterparties, auditors and investors.  There can be no doubt that these Insureds knew

that their actions, if discovered by the public, would result in a Claim under the Axis

Policy.  This is precisely the situation that Axis contracted to exclude from coverage.

Three separate provisions provide that Axis does not have to do the very thing that the

Bankruptcy Court has ordered – pay for a Claim based on things the Insureds knew about

before the IPO.  It is now beyond cavil that the Claim is excluded from coverage.

The plain terms of the Axis Policy provide only for payment of ***covered*** Defense

Costs.  The Axis Policy requires that Axis make the initial determination of whether or

not something is covered.  Furthermore, the policy terms do not impose upon Axis a duty

to defend such as may be found in other types of liability insurance.  In fact, the Axis

Policy provides that "[t]he Insurer will have no duty under the Policy to defend any

6

Claim. The Insureds must defend any Claim made against them." *See* Exhibit G to the Gilbride Stay Decl. at p. 8, Condition D(1).

Condition D(2) provides for the payment of "covered Defense Costs on an as-incurred basis." *See* Exhibit G to the Gilbride Stay Decl. Defense Costs is a defined term – meaning costs incurred in connection with the defense of a Claim. The exclusions in the Warranty, the Knowledge Endorsement, and the Application all mandate that the Axis Policy does not respond to this Claim. Since the Axis Policy does not provide coverage for this Claim, costs incurred in defense of these matters are not Defense Costs incurred in defense of a Claim covered by the Axis Policy. *Federal Insurance Company v. Kozlowski*, 792 N.Y.S.2d 397, 404 (1st Dep't 2005) (holding no duty to pay Defense Costs where the claim is excluded from coverage). Based on the express Policy terms, Axis, having reasonably denied coverage, is not obligated to advance any Defense Costs unless or until the Insureds are able to establish that Axis's denial of coverage was incorrect.

The Bankruptcy Court's bifurcation of the coverage and advancement issues put the cart before the horse. Without coverage, there can not be any advancement requirement under the Policy.[7] The Bankruptcy Court ignored this analytical process and jumped right over "coverage" to get to the advancement issue. This is precisely the flaw in the Bankruptcy Court's logic. Cases cited by the Insureds and relied upon by the Bankruptcy Court either deal with rescission, which is not at issue in this case, or are based on exclusions which cannot, by their express terms, be triggered without a future event – final adjudication. The Axis Policy is materially different from the policies at

---

[7] Counsel to the Insureds already admitted that "you really can't litigate [the advancement issue] in the abstract by itself without the coverage under the policy also being in dispute." 8/30 Tr. at p. 11; *See* Exhibit H to the Gilbride Stay Decl.

7

issue in these other cases. The Axis Policy only requires the advancement of "covered Defense Costs" and the exclusions relied upon by Axis are immediately applicable.

### B.    Axis Will Suffer Irreparable Injury Absent a Stay.

It cannot be disputed that Axis will suffer irreparable injury if it is forced to provide the Insureds with extra contractual, gratuitous coverage — *i.e.,* coverage that was never contracted for under the terms of the Axis Policy. That injury is compounded by the fact that, here, once the payments have been made, Axis will have no practical ability to recover the amounts paid. Because the Insureds will incur further Defense Costs and, potentially, the cost of settlements or judgments in the underlying lawsuits, Axis is likely to have no ability to recoup the amounts it advances.

The Advancement Order of the Bankruptcy Court requires Axis to advance Defense Costs to the Insureds until such time as Axis receives a favorable adjudication of coverage under the Policy, or the $10 million Limit of Liability is exhausted by the defense cost payments subject to the Order.    *See* Exhibit D to the Gilbride Stay Decl. Axis appealed this Order to the District Court and it was fully briefed on January 9, 2007. During the pendency of this appeal, Axis has been complying with the Order and has paid a total of over $7 million in Defense Costs to the Insureds. Of this amount, over $5 million has been paid towards the defense of the Indicted Insureds, over $1.3 million has been paid towards the defense of the Officer Insureds, and over $737,000 has been paid towards the defense of the Director Insureds. At this time, Axis has paid over $7 million of its $10 million Limit of Liability, with over 70% of that payment going towards the Indicted Insureds – the very same individuals who have now been implicated as

8

coconspirators in Mr. Maggio's guilty plea. *See* the Affidavit of Harold Neher, dated January 14, 2008 (hereinafter "Neher Aff.") at ¶ 4.

While in some cases monetary damages may be determinable and compensated for by a Court judgment, thus precluding irreparable harm, the Courts have found that circumstances may exist such that irreparable harm may arise from monetary damages. As the Second Circuit Court has stated a "more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action that the parties cannot be returned to the positions they previously occupied." *Brenntag Intern. Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). *See* also *Federated Strategic Income fund v. Mechala Group Jamaica Ltd.*, 1999 WL 993648 (S.D.N.Y. 1999) (Plaintiffs' inability to recover any monetary damages due to defendant's threatened insolvency justified a finding of irreparable harm); *Phillip Bros. v. El Salto, S.A.*, 487 F. Supp. 91, 95 (S.D.N.Y. 1980) (movant demonstrated irreparable harm where movant "might encounter difficulty collecting a money judgment"); *Garden City Irrigation, Inc. v. Salamanca*, 7 Misc.3d 1014(A), 801 N.Y.S.2d 234 (N.Y. Sup. Ct. Apr. 18, 2005) (recognizing irreparable injury results where party is unable to enforce a judgment and entering preliminary injunction to avoid transfer of assets).

In the instant case, Axis should not be penalized by its present inability to detail the specifics of the Insureds' financial wherewithal. Despite Axis's arguments to the Bankruptcy Court during an earlier application of the Insureds for an injunction, in which Axis argued that the preliminary injunction analysis required the Insureds to make a showing that they would be able to repay Axis if it were determined that Axis in fact had no obligation to advance Defense Costs, the Insureds refused to make such a showing,

and the Bankruptcy Court did not require it. Despite repeated opportunities, the Insureds have steadfastly refused to offer any evidence whatsoever about their economic circumstances. Thus, although the Axis Policy provides for repayment of Defense Costs, the Insureds have steadfastly refused to provide any representation that they can and will comply with this provision. Indeed, the amounts at issue and the circumstances that the Insureds face (i.e., ongoing civil and criminal litigation that currently is in discovery) normally would make the prospect of repayment highly unlikely. *See* Neher Aff. at ¶ 5.

Thus, if the requested stay is not granted, Axis will be denied a remedy even if it prevails on its appeal, rendering its appeal irrelevant. The "loss of appellate rights is a quintessential form of prejudice. Thus, where the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *Adelphia*, at 361 B.R. at 348. An appeal is moot when "during the pendency of an appeal, events occur that would prevent the appellate court from fashioning effective relief." The only meaningful remedy is to grant Axis a stay of the Advancement Order.

### C.    The Insureds Will Not Be Harmed by a Stay.

The Insureds will not be harmed by a stay of the Advancement Order. This dispute concerns payment of law firm invoices. It is certainly not uncommon for law firms to bill clients on bi-monthly or even quarterly schedules. The Insureds have never made the slightest showing or offered a shred of evidence to the Bankruptcy Court that a delay in payment of the invoices would disrupt their defense efforts or arrangements. Indeed, despite being given repeated opportunities to do so, the Insureds have steadfastly refused to offer any evidence whatsoever about their economic circumstances. If the

10

Insureds are going to claim some perceived "irreparable harm" let them lay bare their evidence before this Court so that it may be weighed and measured by the judicial standards that should be applicable to all parties.

Moreover, the length of the stay necessary to resolve this appeal should be very short. The issues have already been fully briefed and the matter is pending before the Court. Accordingly, there is no harm to the Insureds in permitting this brief stay. However, there is irreparable harm to Axis in being denied even the shortest of stays while the Court reviews the appeal.

### D.    The Issues in this Appeal Have Important Public Policy Dimensions.

No public policy is served by gifting the Insureds millions of dollars to reward them for successfully defrauding their Insurer. As discussed above, it has been admitted by one Insured that he and his coconspirators knew that they were engaging in securites fraud when they contracted with Axis for D&O insurance. By granting advancement under these circumstances, and under the terms of the Axis Policy, the Bankruptcy Court rewarded these Insureds.

In this case, the Insureds requested, and the Bankruptcy Court granted, an order that Axis advance Defense Costs despite the fact that: (1) the Axis Policy requires Axis to advance only *covered* Defense Costs on an as-incurred basis; (2) Axis had denied coverage based on clear policy exclusions; and (3) there has been no determination that Axis's denial of coverage was wrongful. Recent events such as the Maggio guilty plea confirm that there is no coverage for this Claim under the Axis Policy.

Furthermore, the issues which the appeal will address, have the potential to overturn settled insurance law holding that an insurer has the discretion to deny coverage

11

for claims subject to the consequences that its coverage determination is held incorrect.[8] The Bankruptcy Court's ruling that insurers cannot exercise their policy exclusions until blessed by a Court would render those policy exclusions nugatory and mandate coverage litigation for virtually every disputed claim involving a director or officer. Accordingly, the pending appeal is significant to public interests beyond the parties to this dispute.

[Remainder of the page intentionally left blank]

---

[8] *Servidone Constr. Co. v. Sec. Ins. Co.*, 477 N.E.2d 441, 444 (N.Y. 1985) (insurer that wrongfully refuses to defend may lose right to consent to settlement); *Am. Ref Fuel Co. v. Res. Recycling, Inc.*, 722 N.Y.S.2d 570, 574 (N.Y. App. Div. 2001) (insurer that denies coverage loses right to insist on insured's cooperation); *U.S. Fidelity & Guar. Co. v. Copfer*, 400 N.E.2d 298 (N.Y. 1979) (insurer that breached duty to defend liable for compensatory damages); *Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*, 848 N.E.2d 597, 603 (Ill. App. 2006) (rejecting insured's argument that allowing insurer to deny coverage without advancing Defense Costs gives insurer too much power in light of bad faith protections).

## CONCLUSION

For the reasons set forth above, Axis respectfully requests that the Court exercise its equitable power to lessen the irreparable harm to Axis by issuing an Order to (1) stay enforcement of the Bankruptcy Court's October 19, 2007 Advancement Order pending resolution of this appeal; or, in the alternative, (2) require the Insureds to post a security bond.

Dated: January 14, 2008

Respectfully submitted,

KAUFMAN BORGEEST & RYAN LLP

By: _____
Wayne E. Borgeest
Joan M. Gilbride
Robert A. Benjamin
200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
wborgeest@kbrlaw.com
jgilbride@kbrlaw.com
rbenjamin@kbrlaw.com

*Attorneys for Plaintiff Appellant*
*Axis Reinsurance Company*

13

**Wayne E. Borgeest**
**Joan M. Gilbride**
**Robert A. Benjamin**
**KAUFMAN BORGEEST & RYAN LLP**
**200 Summit Lake Dr**
**Valhalla, New York 10595**
**(914) 741-6100 (Telephone)**
**(914) 741-0025 (Facsimile)**
**wborgeest@kbrlaw.com**
**jgilbride@kbrlaw.com**
**rbenjamin@kbrlaw.com**

*Attorneys for Axis Reinsurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                          :

AXIS REINSURANCE COMPANY,        :    No. 07-CV-07924-GEL

                  Plaintiff,    :

        v.                :

PHILLIP R. BENNETT, et al.,        :

               Defendants.   :
-------------------------------------------------------------- X
                          :

In re                          :    Chapter 11

                          :

REFCO, INC., et al.,           :    Case No. 05-60006-RDD

                  Debtors.    :    Jointly Administered
-------------------------------------------------------------- X
                          :

AXIS REINSURANCE COMPANY,        :    Adv. Proc. No. 07-01712-RDD

                  Plaintiff,    :

        v.                :

PHILLIP R. BENNETT, et al.,        :

               Defendants.   :
                          :

```
-------------------------------------------------------------- X
                                                               :
TONE N. GRANT, et al.,                                         :        Adv. Proc. 07-02005-RDD
                                                               :
                               Plaintiffs,                     :
            v.                                                 :
                                                               :
AXIS REINSURANCE COMPANY,                                      :
                                                               :
                               Defendant.                      :
                                                               :
-------------------------------------------------------------- X
                                                               :
LEO R. BREITMAN, et al.,                                       :        Adv. Proc. No. 07-02032-RDD
                                                               :
                               Plaintiffs,                     :
            v.                                                 :
                                                               :
AXIS REINSURANCE COMPANY,                                      :
                                                               :
                               Defendant.                      :
                                                               :
                                                               :
-------------------------------------------------------------- X
                                                               :
AXIS REINSURANCE COMPANY,                                      :        (1) No. 07-CV-09420-GEL
                                                               :        (2) No. 07-CV-09842-GEL
                               Plaintiff,                      :        (3) No. 07-CV-10302-GEL
            v.                                                 :
                                                               :
PHILLIP R. BENNETT, et al.,                                    :
                                                               :
                               Defendants.                     :
                                                               :
-------------------------------------------------------------- X
                                                               :
TONE N. GRANT, et al.,                                         :        No. 07-CV-09843-GEL
                                                               :
                               Plaintiffs,                     :
            v.                                                 :
                                                               :
AXIS REINSURANCE COMPANY,                                      :
                                                               :
                               Defendant.                      :
                                                               :
-------------------------------------------------------------- X
```

## DECLARATION OF JOAN M. GILBRIDE

I, Joan M. Gilbride, declare under penalty of perjury that the following declaration is true and accurate and made based on my personal knowledge except where otherwise stated:

1.    I am a member of Kaufman Borgeest & Ryan LLP, attorneys for plaintiff Axis Reinsurance Company ("Axis") in this action.

2.    This Declaration submits true and accurate copies of documents in support of Appellant Axis's Motion for a Stay of the Bankruptcy Court's Order Granting Summary Judgment Requiring Axis to Advance Defense Costs Prior to an Adjudication of Coverage.

3.    Attached as Exhibit A is the March 6, 2006 letter from Wayne E. Borgeest to Pam Sylwestrzak.

4.    Attached as Exhibit B is a true and accurate copy of Axis's Securexcess Policy RNN 506300 (the "Axis Policy").

5.    Attached as Exhibit C are true and accurate copies of the August 31, 2007 Orders of Judge Robert D. Drain granting Insureds' Application for a Preliminary Injunction Ordering Advancement of Defense Costs by Axis and granting Insureds' Motion to Dismiss the Axis Complaint.

6.    Attached as Exhibit D is a true and accurate copy of the October 19, 2007 Order of Judge Robert D. Drain granting Insured's Summary Judgment Motions and ordering the advancement of Defense Costs.

7.    Attached as Exhibit E is the Information to which Santo C. Maggio allocuted to on December 19, 2007.

8.    Attached as Exhibit F is the Santo C. Maggio Plea transcript of December 19, 2007.

9.    Attached as Exhibit G is a true and accurate copy of U.S. Specialty Insurance Company Directors, Officers and Corporate Liability Insurance Policy 24-MGU-05-A10821.

10.    Attached as Exhibit H is a true and accurate copy of the transcript of the August 30, 2007 oral argument on the Application for a Preliminary Injunction Ordering Advancement of Defense Costs and Motion to Dismiss.


I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Dated: Valhalla, New York
       January 14, 2008


Joan M. Gilbride
KAUFMAN BORGEEST & RYAN LLP
200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
jgilbride@kbrlaw.com

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER*
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*††
JONATHAN B. BRUNO*
PAUL J. COLUCCI

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN*
MARGARET J. DAVINO*††

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
THOMAS GIBBONS
HEATHER LASCHEWER*
CAROL S. DOTY††
ADEOLA I. ADELE
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON
ROCCO P. MATRA◊
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
FRANK K. STAIANO††
JACQUELINE B. TOMASSO
JENNIFER PILZ
GINA M. HOGUE*
MICHAEL R. JANES
YAEL WEPMAN*

R. EVON HOWARD☼
LEONARD B. COOPER†
JULIE ANN LEVINSOHN¤
JOHN B. MULLAHY*
JEFFREY C. GERSON††
CATHERINE KELLEHER*
REBECCA GOODMAN
PETER IANNACE‡‡
ANDREW R. JONES
CHRISTOPHER GOMPRECHT
JAMES T. DE SILVA
KEITH L. KAPLAN††
DANIEL C. LYNCH*
VINCENT C. ANSALDI††
BRENDA CORREA*
DAVID J. VARRIALE*††
DOUGLAS J. DOMSKY
KIMBERLY CRESPO
TIMOTHY E. McCARTHY*
JEFFREY A. GRALNICK
TRACEY REISER-PERTOSO††
KATHERINE J. HOOPER††
DAMIEN SMITH
ANDREW S. KOWLOWITZ*•

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
‡‡ ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
♦ ALSO ADMITTED IN FL
★ ADMITTED IN FL ONLY
■ ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
¤ ADMITTED IN NJ & MA ONLY
• ADMITTED IN CA, VA, DC ONLY
☼ BARRISTER AT LAW
    ADMITTED IN ENGLAND & WALES

March 6, 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Pam Sylwestrzak
Senior Vice President
Marsh USA, Inc.
500 West Monroe Street
Chicago, IL 60661-3630

|  |  |  |  |
|---|---|---|---|
| Re: | Insured | : | Refco, Inc. |
|  | Claimant | : | Various – *See* Exhibit A, attached |
|  | Policy No. | : | 506300 |
|  | Claim No. | : | BH 9826 |
|  | Our File No. | : | 481.001 |

Dear Pam:

As you know, we represent AXIS US Insurance ("Axis"). This is further to our December 16, 2005 letter, wherein we generally reserved all of Axis's rights in law and equity, as well as our March 1, 2006 letter attaching the issued policy. We are attaching to this letter, as Exhibit A, a schedule of all matters for which Axis has received notice under the captioned policy (the "Noticed Matters"). **We request that you immediately review the attached Exhibit A and advise us if you believe any matter noticed to Axis is not listed.** We again also ask that all communications on this matter be directed to the undersigned, on behalf of Axis.

We are directing this letter to you as the authorized agent of the Insureds, including the individual Insured Persons. To the extent that you are not acting as the authorized representative for any of the Insureds, please immediately advise us of the proper representative for any such Insureds.

The purpose of this letter is to describe the workings of the Axis Policy, to convey Axis's position regarding coverage, and to reserve Axis's rights. Axis has reviewed the Noticed Matters in light of the Policy provisions. Please be aware that we do not

NEW YORK CITY OFFICE
99 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291

LONG ISLAND OFFICE
1305 FRANKLIN AVENUE
GARDEN CITY, NEW YORK 11530
TELEPHONE: 516-248-6000
FACSIMILE: 516-248-0677

CALIFORNIA OFFICE
CORPORATE CENTER AT MALIBU CANYON
26635 WEST AGOURA ROAD
CALABASAS, CALIFORNIA 91302
TELEPHONE: 818-880-0992
FACSIMILE: 818-880-0993

NEW JERSEY OFFICE
9 CAMPUS DRIVE
PARSIPPANY, NEW JERSEY 07054
TELEPHONE: 973-451-9600
FACSIMILE: 973-451-0150

attribute any merit to the Noticed Matters, and reference them herein only to describe the matter submitted for coverage. In this letter we also make certain requests for information. Those requests are generally in bold. Should further pertinent information come to light, Axis may revise its position accordingly, and it reserves the right to do so. Nothing in this letter, including any requests for information, is intended to waive any rights Axis may have under the Policy, at law, or in equity, all of which are expressly reserved. Axis's position is necessarily based upon information that has been made available to us at this point. If you have any other information we should consider, please let us know. Axis will reevaluate its coverage position described herein upon the receipt of any relevant information.

We have had the opportunity to review the Noticed Matters, as well as the various coverage letters submitted by the primary carrier, US Specialty Insurance Company ("HCC" and the "Primary Policy") and the first excess carrier, Lexington Insurance Company ("Lexington" and the "Lexington Policy"). For the reasons set forth below, Axis is denying coverage for each of the Noticed Matters. Additionally, Axis expressly reserves its right to rescind the captioned policy and any prior policy.

## THE LITIGATION
### Noticed Matters

To date, Axis has received notice of twenty-four matters. *See* Schedule of Litigation, attached at Exhibit A. The Noticed Matters consist of: (1) federal securities putative class actions; (2) a derivative action; (3) a criminal action; (4) state court tort actions; (4) a breach of contract and fraud action (Sillam); (5) adversary proceedings brought in bankruptcy court; and (6) an action based on fraudulently obtaining a loan (BAWAG).

**Securities Class Actions**

1. Frontpoint Financial Services, Inc., et al. v. Refco Inc., et al., No. 05-cv-08663-GEL, complaint filed (S.D.N.Y., 10/11/05);

2. Jonathan Glaubach, et al. v. Refco Inc., et al., No. 05-cv-08692, complaint filed (S.D.N.Y., 10/12/05);

3. Miriam Lieber, et al. v. Refco Inc., et al., No. 05-cv-08667-LAP, complaint filed (S.D.N.Y., 10/12/05);

4. Sandra E. Weiss, et al. v. Refco Inc., et al., No. 05-cv-08691-GEL, complaint filed (S.D.N.Y., 10/12/05);

5. Anthony L. Wakefield, et al. v. Refco Inc., et al., No. 05-cv-08742-GEL, complaint filed (S.D.N.Y., 10/14/05);

6. Jacob Baker, et al. v. Phillip R. Bennett, et al., No. 05-cv-08923, complaint filed (S.D.N.Y., 10/19/05);

7. Craig Becker, et al. v. Refco Inc., et al., No. 05-cv-08929-GEL, complaint filed (S.D.N.Y., 10/20/05);

8. Bruce Nathanson, et al. v. Phillip R. Bennett, et al., No. 05-cv-08926-GEL, complaint filed (S.D.N.Y., 10/20/05);

9. American Financial International Group – Asia, LLC, et al. v. Refco Inc., et al., No. 05-cv-08988-PKC, complaint filed (S.D.N.Y., 10/21/05);

10. Ravindra Mettupatti, et al. v. Phillip R. Bennett, et al., No. 05-cv-09048, complaint filed (S.D.N.Y., 10/24/05);

11. Todd Weiss, et al. v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, complaint filed (S.D.N.Y., 10/26/05);

12. Scott K. Weit, et al. v. Phillip R. Bennett, et al., No. 05-cv-09611-GEL, complaint filed (S.D.N.Y., 11/11/05);

13. City of Pontiac General Employees' Retirement System, et al. v. Phillip R. Bennett, et al., No. No. 05-cv-09941, complaint filed (S.D.N.Y., 11/23/05).

**Shareholder Derivative Action**

14. Verun Mehta, et al. v. Phillip R. Bennett, et al., No. 05-cv-08748, complaint filed (S.D.N.Y. 10/14/05).

**Criminal Proceedings**

15. United States of America v. Phillip R. Bennett, et al., No. 05-MAG 1720, complaint filed (S.D.N.Y. 10/12/05).

**State Court Actions**

16. Banesco Holding C.A., et al. v. Refco Inc., et al., No. 05603681 (Supreme Court of New York, 10/17/05);

17. Miura Financial Services v. Refco Inc., et al., No. 05603683 (Supreme Court of New York, 10/17/05);

KAUFMAN BORGEEST & RYAN LLP
442053_1                                    Page 3

18. Multiplicas Casa De Bolsa v. Refco Inc., et al., No. 05603683 (Supreme Court of New York, 10/17/05).

**The Sillam Action**

19. Bankruptcy Trust of Gerard Sillam v. Refco Group, LLC, et al., No. 05603931 (Supreme Court of New York 11/04/05).

**Adversary Actions**

20. Markwood Investments v. Refco Capital Markets, Ltd and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05);

21. Banco De America, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05);

22. BAC International Bank v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05);

23. Reserve Invest (Cyprus) Ltd v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

**The BAWAG Action**

24. BAWAG P.S.K., et al. v. Refco, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

**D&O INSURANCE PROGRAM**

Refco, through its broker Marsh, approached various insurers in July 2004 attempting to place a tower of Private Company D&O insurance in anticipation of an eventual public offering. As a result of this solicitation, Refco Group Ltd., LLC was insured by a tower of D&O insurance with a Policy Period from August 5, 2004 to August 5, 2005. This was later extended to August 11, 2005 (the "04/05 Policy"). After the August 11, 2005 IPO, Refco, Inc. ("Refco") was insured by a tower of Public Company D&O insurance with a Policy Period from August 11, 2005 to August 11, 2006 (the "05/06 Policy").

**Private Company Policy Tower – The 04/05 Policy**

**HCC Primary** – The Primary Policy on the 04/05 Policy tower (the "04/05 Primary") was written by HCC. The 04/05 Primary provided a $10 million Limit of Liability, excess a retention of $500,000. This 04/05 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

(B) The Insurer will pay to or on behalf of the Insured Organization Loss arising from Claims first made against it during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

The 04/05 Primary excluded Claims based on Wrongful Acts allegedly committed prior to June 4, 2004. Coverage for E&O clams also was excluded.

**Greenwich First Excess** – The Greenwich first excess layer to the 04/05 Policy tower (the "Greenwich 04/05 Policy") insured $10 million excess of the $10 million 04/05 Primary. The Greenwich 04/05 Policy followed form to the terms and conditions of the 04/05 Primary Policy.

The Greenwich 04/05 Policy included a Pending and/or Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending prior to August 5, 2004.

**Axis Second Excess** – The Axis second excess layer to the 04/05 Policy tower (the "Axis 04/05 Policy") insured $10 million excess of the $20 million in Underlying Limits. The Axis 04/05 Policy followed form to the 04/05 Primary, or any more restrictive Underlying Policy. The Axis 04/05 Policy repeats the exclusion for Pending and/or Prior Litigation as of August 5, 2004.

The Axis 04/05 Policy also contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 2 is marked effective August 5, 2004 and is dated April 25, 2005.

## Public Company Policy Tower – The 05/06 Policy

**HCC Primary** – The Primary Policy on the 05/06 Policy tower (the "05/06 Primary") was written by HCC. The 05/06 Primary provided a $10 million Limit of Liability, excess retentions of nil/$500,000/$500,000. This 05/06 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B) The Insurer will pay to or on behalf of the Company Loss arising from:

(1) Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

(2) Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

Coverage also was extended pursuant to Endorsement 11, to include Derivative Demand Investigative Costs:

The Insurer will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased, up to the amount of the Derivative Demand Investigation Costs Sub-Limit [$250,000].

Coverage was further extended pursuant to Endorsement 15, to include Controlling Shareholder Coverage:

The Insurer will pay to or on behalf of the Controlling Shareholder Loss arising from a Securities Claim first made during the Policy Period or the Discovery Period (if applicable) against such Controlling Shareholder for Wrongful Acts, provided, that one or more Insured Persons and/or the Company are and remain co-defendants in such Securities Claim along with such Controlling Shareholder.

Phillip Bennett was defined as the Controlling Shareholder. A $300,000 retention was to apply to Defense Costs under this coverage extension, but did not apply to any other Loss under the extension.

**Lexington First Excess** – The Lexington first excess layer to the 05/06 Policy tower (the "Lexington 05/06 Policy") insures $7.5 million excess of the $10 million 05/06 Primary. The Lexington 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy.

The Lexington 05/06 Policy also includes a Pending and Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending on or prior to August 4, 2004.

**Axis Second Excess** – The Axis second excess layer to the 05/06 Policy tower (the "Axis 05/06 Policy") provides a Limit of Liability of $10 million excess of $17.5 million in Underlying Limits. The Axis 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy, or any more restrictive Underlying Policy.

The Axis 05/06 Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

> In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.
>
> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy also contains a Knowledge Exclusion Endorsement at Endorsement 6 which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy notes a Prior and Pending Claim Date of June 4, 2004.

**February 8, 2005 HCC Application**

Phillip Bennett completed an HCC application "for Directors, Officers and Private Organization Liability Coverage" and signed it on February 8, 2005. This application asks at Question 12:

(a) Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b) Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Bennett did not check either box for Questions 12(a) and 12(b).

**January 14, 2005 Axis Warranty**

Axis requested and received a warranty (the "Axis Warranty"). The Axis Warranty states:

(a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Axis Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005.

## COVERAGE DISCUSSION

The Noticed Matters are excluded from coverage under both the Axis 04/05 Policy and the Axis 05/06 Policy based on: (1) the Axis Warranty; and (2) the Application for the Axis 04/05 Policy and the Axis 05/06 Policy. Moreover, the Noticed Matters are additionally excluded under the Axis 05/06 Policy based on: (1) the Claim made date; and (2) the Knowledge Exclusion. Axis also reserves its rights to rescind both Policies based on material misrepresentation in the application. Finally, additional terms and conditions further serve to exclude or limit coverage if coverage were otherwise available, which it is not. All of the foregoing is detailed below.

Each of the Noticed Matters is excluded from coverage under the Axis 04/05 Policy and the Axis 05/06 Policy pursuant to the Axis Warranty, attached at Exhibit B. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. It is inconceivable that Mr. Bennett was not aware of the alleged fraud when he executed the Axis Warranty "on behalf of all Insureds under the Policy." The Axis Warranty explicitly excludes coverage for all Insureds for any Claim arising from the undisclosed knowledge. Accordingly, each of the Noticed Matters is excluded from coverage for all Insureds and Axis hereby denies coverage.

Each of the Noticed Matters also is excluded from coverage based on the Application for the Axis 04/05 Policy and the Axis 05/06 Policy.[1] Question 12(b) to the Application required disclosure of any known "fact, circumstance or situation. . . [which]

---

[1]     The Axis 04/05 Policy contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to Axis Reinsurance Company on U.S. Specialty Insurance Company's form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

The Axis 05/06 Policy also contains similar wording at Endorsement 5. Accordingly, the February 8, 2005 application was explicitly incorporated as the application for the Axis 04/05 Policy (Private Company) and again when Axis issued the Axis 05/06 Policy (Public Company).

might result in a claim being made." The Application further states that Axis will not be "liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b)." Mr. Bennett had a duty to disclose the alleged financial fraud in answer to Application question 12(b). His failure to disclose such fraud excludes coverage for any Claim brought in connection with the financial fraud. Accordingly, Axis is further denying coverage for each of the Noticed Matters because each is brought in connection with information which should have been disclosed in Application question 12(b).

We note that the Axis Warranty and the Application do not contain an adjudication requirement. We further note that Axis's denial of coverage on these two grounds is as to all Insureds. The Axis Warranty and the Application were filed on behalf of all Insureds. Accordingly, Axis denies coverage for each of the Noticed Matters because each of the Noticed Matters arises out of information which was known to Mr. Bennett, and others, at the time he completed the Axis Warranty and the Application, on behalf of all Insureds.

In addition to the Axis Warranty and the Application, Axis separately denies coverage under the Axis 05/06 Policy for each of the Noticed Matters because each is a Claim first made before the inception of the Axis 05/06 Policy, on August 11, 2005. The Noticed Matters are interrelated, as defined in Condition (C) of the 05/06 Primary Policy.[2] All of the Noticed Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others whereby unreported loans were made between various entities in an effort to disguise financial losses. This alleged fraud was reflected in the financial statements which are the subject of the Noticed Litigation. Additionally, the BAWAG action concerns Mr. Bennett's loan transactions in connection with the alleged fraud. The bankruptcy court adversary proceedings and state court tort actions arise from Refco customers' inability to access assets held by Refco – which assets were inaccessible due to the alleged fraud. Finally, the Sillam action alleged fraud in the Refco financial statements issued in connection with the IPO. Accordingly, each of the Noticed Matters is connected to the allegedly fraudulent scheme to manipulate Refco's financial results and Axis is treating each of the Noticed Matters as a single interrelated Claim. The Noticed Matters are deemed a Claim first made on the date the first such Noticed Matter was made. The Sillam action raised related allegations in its earlier June 30, 2005 complaint. This places a Claim made date for the Noticed Matters at least as early as June 30, 2005.[3] As this is prior to the August 11, 2005 inception of the Axis 05/06

---

[2] Condition (C) of the 05/06 Primary Policy states:

> All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

[3] The Sillam action references an earlier September 8, 2004 complaint which would also potentially bring the Claim Made date prior to the inception of the Axis 05/06 Policy.

Policy, the Noticed Matters would constitute a Claim Made prior to the Axis 05/06 Policy Period.

Axis further denies coverage under the Axis 05/06 Policy based on the Knowledge Exclusion Endorsement. The Knowledge Exclusion Endorsement excludes coverage for any Claims based on facts any Insured had knowledge of at the inception of the Policy. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. As with the Axis Warranty, we think it inconceivable that Mr. Bennett was not aware that his actions "might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy" on the inception date of the Axis 05/06 Policy, August 11, 2005. Coverage on this basis is not only denied as to Mr. Bennett, but also as to all Insureds under the Policy.

In addition to the above grounds for denial of coverage for the Noticed Matters, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy on the basis of fraud in the Application. The Application required Refco to attach, as part of the Application, audited financial statements for the two years preceding the Application. Refco has since admitted that its financial statements from 2002 through 2005 cannot be relied on. As noted above, both the Axis 04/05 Policy and the Axis 05/06 Policy were issued in material reliance upon the Insured's representations in all parts of the Application, including the attached financial statements. Accordingly, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy. Axis explicitly reiterates our March 1, 2006 letter wherein Axis issued the Axis 05/06 Policy, which letter is hereby incorporated by reference. In that letter Axis noted that the issuance and delivery of the Axis 05/06 Policy should not be interpreted as a ratification of the existence of a valid insurance contract.

*     *     *

While the foregoing is dispositive of Axis's coverage responsibilities in connection with the Noticed Matters, additional terms and conditions would serve to limit or exclude coverage if the Noticed Matters were not excluded in their entirety, which they are. For the sake of completeness, we will detail those terms and conditions which would also limit or exclude coverage of the Noticed Matters.[4]

---

The Sillam action further references an earlier April 25, 2003 complaint brought in France. We do not currently have a translated version of this April 25, 2003 complaint, but it may contain related allegations which would dictate a Claim Made date for the Noticed Matters of April 25, 2003, prior to the inception of the 04/05 Policy. Accordingly, coverage would also be denied under the Axis 04/05 Policy.

[4] The Noticed Matters have only been submitted to Axis for coverage under the Axis 05/06 Policy. Accordingly, our discussion in this section focuses only on the Axis 05/06 Policy. Axis has herein denied coverage for the Noticed Matters under the Axis 04/05 Policy, but other coverage limitations may exist if coverage were otherwise afforded under the Axis 04/05 Policy, which it is not. Axis will provide a more detailed coverage analysis under the Axis 04/05 Policy if Insureds were to submit the Noticed Matters for coverage under the Axis 04/05 Policy. Axis reserves all rights available in the Axis 04/05 Policy, in law, and in equity, including, but not limited to, the right to rescind the Axis 04/05 Policy.

The Axis 05/06 Policy follows form to the Primary Policy, or more restrictive Underlying Insurance. Axis directs your attention to the definition of Loss in the Lexington 05/06 Policy. The Lexington 05/06 Policy does not include Defense Costs within its definition of Loss. Accordingly, Axis adopts this more restrictive definition of Loss. As such, Defense Costs are not covered by the Axis 05/06 Policy.

The Axis 05/06 Policy, at Clause IX(A), requires that the Insured give notice of any Claim to Axis contemporaneously and in the same manner as notice is required to be given to HCC. The Primary Policy, at Condition B(1) and (4), requires that notice of Claims be given as soon as practicable, in writing, and by certified mail. To the extent that Axis did not receive notice as soon as practicable and in the prescribed manner, Axis reserves its rights.

As noted above, the 05/06 Primary Policy only insures the Refco entity (and Refco Subsidiaries) for Securities Claims and Derivative Demand Investigative Costs. Certain of the Noticed Matters do not name individual defendants and do not qualify as Securities Claims. The 05/06 Primary Policy, at Condition D(3), provides for an allocation where a Claim contains covered and non-covered matters. Axis reserves its right to exclude from coverage any Claims that are not Securities Claims against Refco or any of its Subsidiaries.

The 05/06 Primary Policy provides coverage pursuant to Insuring Agreements A and B(1) for Insured Persons. Insured Persons is defined to include present and past directors or officers of Refco, and employees solely with respect to Securities Claims. **For each individual named as a defendant in the Noticed Matters at Exhibit A, please identify: (1) current position, if currently employed; (2) date the current position was assumed; (3) any prior positions and dates prior positions were held; and (4) whether Refco will be indemnifying the individual. If Refco is permitted or required to indemnify and/or if Refco has determined that it will or will not indemnify any of the individual defendants, please provide us with a copy of the Board resolution providing such indemnification decision.**

The 05/06 Primary Policy also provides coverage based on Refco Subsidiaries. Subsidiary is defined at Definition (O) of the 05/06 Primary Policy as any entity:

(1) during any time on or before the inception of the Policy Period in which [Refco Inc] owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

(2) created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, [Refco Inc.] owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent

thereof), either directly or indirectly through one or more other Subsidiaries.

An entity ceases to be a Subsidiary when [Refco Inc.] ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or legal equivalent thereof), wither directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy will respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective date that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

**For each entity named as a defendant in any of the Noticed Matters at Exhibit A, please identify: (1) whether such entity is or ever was a Subsidiary; (2) the effective date such entity became a Subsidiary; and (3) if applicable, the effective date such entity ceased to be a Subsidiary.** Axis reserves its right to deny coverage for any entity named as a defendant in the Noticed Matters which is not Refco Inc. or a Subsidiary, as defined above.

Endorsement 15 of the 05/06 Primary Policy extends coverage to Philip Bennett as Controlling Shareholder for Securities Claims where he is co-defendant with another Insured Person or the Company. To the extent that certain of the Noticed Matters are not Securities Claims, coverage would not be available under this Endorsement. Also, even if certain of the Noticed Matters are Securities Claims, coverage under this Endorsement 15 would only be available where, and so long as, another Insured Person and/or the Company is a co-defendant with Mr. Bennett. Axis also notes Clause (8) of Endorsement 15 which amends the Change in Control section of the 05/06 Primary Policy. This change limits coverage under Endorsement 15 to Wrongful Acts allegedly committed prior to Refco's bankruptcy filing on October 17, 2005. Axis reserves its rights to deny coverage under this Endorsement 15 for any Claims based on Wrongful Acts allegedly committed on or after October 17, 2005.

Additionally, the definition of Loss is limited to amounts insurable by law. It is well-settled that Loss does not include the restoration or disgorgement of ill-gotten gain. Thus, insurance cannot be used to pay an Insured for amounts an Insured wrongfully acquires or is forced to return, or to pay the corporate obligations of the Insured. Accordingly, pursuant to the well-known Vigilant, Conseco, and Level 3 cases, any amounts eventually sought as disgorgement would not be recoverable as Loss.

Exclusion (A) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a

final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage

To the extent that any Insured is subject to a final adjudication establishing that the Insured received any profit or advantage to which such Insured was not legally entitled, Axis reserves the right to deny coverage for such Insured.

Exclusion (B) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted

To the extent that any Insured is subject to a final adjudication establishing that the Insured committed a criminal or deliberately fraudulent or dishonest act, Axis reserves the right to deny coverage for such Insured.

Axis has not yet identified and established the relationship between or among each of the parties to each of the Noticed Matters. The "Insured vs. Insured" exclusion at Exclusion (F) of the 05/06 Primary Policy, as modified by Endorsement 15, may serve to exclude certain of the Noticed Matters from coverage. Axis reserves its rights accordingly.

Further to Axis's above denial based on the Claim made date of this interrelated Claim, Axis specifically notes Exclusion (H) of the 05/06 Primary Policy which excludes Claims:

Arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time

**Please provide us with copies of any notices of claims or circumstances sent in respect of any policy of which this Policy is a renewal or replacement, including, but not limited to, the 04/05 Policy tower.** Axis reserves its rights to deny coverage for any matters excluded subject to this Exclusion (H).

The Axis 05/06 Policy only applies excess of and does not contribute with any other valid and collectable insurance, pursuant to Condition (G)(1) of the 05/06 Primary Policy. **Please provide us with a schedule of any applicable insurance available to Refco, Inc., any Subsidiaries, or any Insured Persons which is not otherwise noted in**

**this letter.** To the extent that other insurance is available to such Insureds, Axis reserves it right to deny coverage.

Certain of the Noticed Matters allege that Refco improperly denied access to customer accounts as a result of the alleged fraud orchestrated by Mr. Bennett, and others. Endorsement 6 to the 05/06 Primary Policy excludes Claims, in relevant portion:

> Arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the Company or by any Insured Person, any service for others for a fee; provided, that this exclusion will not apply to a Claim against an Insured Person for a Wrongful Act in connection with the management or supervision of the Company or any division or group therein.

Axis reserves its right to deny coverage for any matter properly excluded by this Endorsement 6.

Refco has been the subject of a well-publicized SEC investigation.[5] Endorsement 14 to the 05/06 Primary Policy notes that the "Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any [Wells Notice or SEC Investigation]." It appears that several of the Noticed Matters are based upon the SEC Investigation. Accordingly, any Claim "arising out of, based upon or attributable to" the SEC Investigation would be excluded and Axis reserves its rights.

Axis reminds Insureds of Condition (D)(1) of the 05/06 Primary Policy which states, in relevant part:

> The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlement, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

No settlement of a covered Claim will be binding upon Axis without Axis's express consent and Axis reserves its rights accordingly. Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent.

Axis further reminds Insureds, especially given the Insured's bankruptcy posture, of Condition (K) to the 05/06 Primary Policy which states that "[n]o assignment of

---

[5] We are also aware that Refco received a Wells Notice during the Policy Period, but are not privy to the subject matter thereof. **Please provide us with a copy of the Wells Notice and any response thereto.** Axis reserves its rights in connection with this Wells Notice accordingly.

interest under this Policy will bind the Insurer without the Insurer's written consent." Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent and Axis specifically reserves its rights in this regard.

Finally, Axis notes Condition (H)(1) to the 05/06 Primary Policy which notes, in relevant part, that "the Insureds will give the Insurer all information, assistance and cooperation that the Insurer my reasonably request."

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions or exclusions of the Axis 04/05 Policy or the Axis 05/06 Policy. Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the Axis 04/05 Policy or the Axis 05/06 Policy, at law, or in equity, all of which are expressly reserved. Axis reserves the right to alter, supplement or modify this statement of its coverage position as other and additional information may become available. Axis's denial of coverage of the Noticed Matters is necessarily based upon information that has been made available at this point. If you have any other information we should consider, please let us know.

If you have any questions in connection with the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest

Enclosures
Exhibit A – Noticed Matters
Exhibit B – Axis Warranty


cc:
Tracy Forsyth, Axis
Leslie Ahari, Ross Dixon & Bell LLP, Counsel to US Specialty
Barbara Seymour, D'Amato & Lynch, Counsel to Lexington

# EXHIBIT A

## Schedule of Noticed Litigation

1. Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

2. Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

3. Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

4. United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

5. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

6. Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

7. Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill

& Partners, L.P., HSBC Securities (USA) Inc., William Blaire & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

8.  Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

9.  Miura Financial Services v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New York, 10/17/05).

10. Multiplicas Casa De Bolsa v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New York, 10/17/05).

11. Jacob Baker, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

12. Craig Becker, On Behalf of Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

13. Bruce Nathanson, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc., No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

14. American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al., No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

15. Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L.

O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc., No. 05-cv-09048, (S.D.N.Y. 10/24/05).

16. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

17. Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al., No. 05603931 (Supreme Court of New York 11/04/05).

18. Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of  America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG  Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

19. Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco Administration LLC; Refco Capital LLC; Refco Capital Holdings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco

Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

20. Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

21. Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

22. BAC International Banks, Inc. v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

23. Reserve Invest (Cyprus) Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

24. City of Pontiac General Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v. Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer, Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrilly Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc and Grant Thornton LLP, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

**EXHIBIT B**

Axis Warranty[1]

 REFCO

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

  a.  No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

_See attached_

  b.  No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: _Refco Group BTD. LLC_

Signature: _Nip Bur_

Title: _President & CEO._

(Chairman of the Board or President)

Date: _Jan 21. 2005._

---

[1] Also attached to the Axis Warranty, but not included here are: (1) a January 14, 2005 memo from Ellen Brooks to Phillip Bennett requesting Bennett complete the warranty; and (2) a January 14, 2005 letter from Grant Cornehls to Ellen Brooks describing and attaching the Louis Capital Markets, L.P. v. Refco Group Ltd., LLC, et al. suit. It appears the letter and suit were both attached to the memo sent to Bennett. Axis does not contend that the Luis Capital Markets suit is related to the Noticed Matters.



## SECUREXCESS DECLARATIONS

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

| **COMPANY**: Axis Reinsurance Company | **POLICY NUMBER**: RNN 506300 |
|---|---|

| | |
|---|---|
| Item 1.  **Policyholder**:<br>Refco, Inc.<br>550 West Jackson Boulevard<br>Suite 1300<br>Chicago, IL 60661 | Item 2.  **Policy Period**:<br>  a.  Inception Date: August 11, 2005<br>  b.  Expiration Date: August 11, 2006<br><br>  Both dates at 12:01 a.m. at the<br>    address listed in Item 1 |

Item 3.   Limits of Liability (inclusive of defense costs):
  a.   Each **Claim**                                                          $ 10,000,000
  b.   Maximum aggregate Limit of Liability for all **Claim(s)**
        During the **Policy Period** of all **Insurance Products**    $ 10,000,000

Item 4.   **Underlying Insurance** and **Insurance Products**:   See Endorsement No. 1

Item 5.   Endorsements Attached at Inception: SE 1000, SE 1300, SE 0522, SE 1010, MU 1032, Manuscript #6

Item 6.   Notices to **Insurer**:
Notice of **Claim(s)** To Be Sent To:            All Other Notices To Be Sent To
Axis Financial Insurance Solutions Claims      Axis Financial Insurance Solutions
Address:  Connell Corporate Park                   Address:  Connell Corporate Park
          Three Connell Drive                                      Three Connell Drive
          P.O. Box 357                                               P.O. Box 357
          Berkeley Heights, NJ 07922-0357                 Berkeley Heights, NJ 07922-0357

| Item 7.  Pending and Prior Claim Date: 06/04/04 | Item. 8  Terrorism Coverage Premium:<br>$10,000 |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_Dean Lukac_
Authorized Representative

_9/1/05_
Date

_Kevin J. McJean_

_Michael E. Morrill_

Secretary

President

SE 0100 (Ed. 02 03)                Page 1 of 1                **Printed in U.S.A.**

# SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the **Underlying Insurance** and all information provided to the **Insurer** and any or all of the **Underlying Insurers**, and subject to the provisions of this Policy, the **Insurer** and the **Policyholder**, on its own behalf and on behalf of all **Insureds**, agree as follows.

## I.    INSURING AGREEMENT

With respect to each **Insurance Product**, the **Insurer** shall provide the **Insureds** with insurance during the **Policy Period** excess of all applicable **Underlying Insurance**. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable **Primary Policy** and, to the extent coverage is further limited or restricted thereby, to any other applicable **Underlying Insurance**.   In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable **Underlying Insurance**.

The insurance afforded under this Policy shall apply only after all applicable **Underlying Insurance** with respect to an **Insurance Product** has been exhausted by actual payment under such **Underlying Insurance**, and shall only pay excess of any retention or deductible amounts provided in the **Primary Policy** and other exhausted **Underlying Insurance**.

## II.    DEFINITIONS

**A.**    **Claim(s)** means the event(s) which take place during the **Policy Period** and which trigger(s) coverage under the insuring agreement(s) of the **Underlying Insurance**.

**B.**    **Insurance Product** means each separate type of insurance identified as an **"Insurance Product"** in Endorsement No. 1 to this Policy.

**C.**    **Insured(s)** means any person(s) or entity(ies) that may be entitled to coverage under the **Primary Policy** at its inception.

**D.**    **Insurer** means the company identified as **"Insurer"** in the Declarations.

**E.**    **Policy Period** means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

**F.**    **Policyholder** means the person(s) or entity(ies) identified in Item 1. in the Declarations.

**G.**    **Primary Policy** means the specific policy identified as the **"Primary Policy"** under the applicable **Insurance Product** listed in Endorsement No. 1 to this Policy.

**H.**    **Sublimit** means any **Underlying Limits** which:

    1.    applies only to a particular grant of coverage under such **Underlying Insurance**; and
    2.    reduces and is part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in Item 4 of the Declarations.

**I.**    **Underlying Insurance** means each insurance policy which constitutes all or part of an **Insurance Product**, as scheduled in Endorsement No. 1 to this Policy.

**J.**    **Underlying Insurers** means any or all of the companies who issued the policies of **Underlying Insurance**.

**K.**    **Underlying Limits** means, with respect to each **Insurance Product**, an amount equal to the aggregate of all limits of liability for each **Insurance Product** stated in Endorsement No. 1 to this Policy, plus the

uninsured retention or deductible, if any, applicable to the **Primary Policy** under such **Insurance Product**.

## III.  CONDITIONS OF COVERAGE

**A.**  For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

**1.**  All of the **Underlying Insurance** in effect as of the inception date of the **Policy Period** shall be maintained in full effect with solvent insurers throughout the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** as provided in Section IV. below; and

**2.**  All **Insureds** shall comply fully with all of the provisions of this Policy.

**B.**  As a condition precedent to coverage under this Policy, the **Insured** shall give to the **Insurer** as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any **Underlying Insurance**, ii) any **Underlying Insurance** not being maintained in full effect during the **Policy Period**, or iii) an **Underlying Insurer** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

**C.**  If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the **Insurer** of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change.  No amendment to any **Primary Policy** or **Underlying Insurance** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Insurer so agrees in writing.  The Insurer may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Insurance** on the **Insured** paying any additional premium required by the **Insurer** for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Policyholder** must give the **Insurer** written notice of any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

## IV.  REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

**A.**  If the **Underlying Limits** are partially reduced solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as excess insurance over the remaining **Underlying Limits**.

**B.**  If the **Underlying Limits** are wholly exhausted solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as primary insurance with respect to the applicable **Insurance Product(s)** and the retention or deductible, if any, applicable under the **Primary Policy(ies)** shall apply under this Policy.

**C**  If any **Underlying Limits** are subject to a **Sublimit** then coverage hereunder shall not apply to any **Claim** which is subject to such **Sublimit**, provided however, that the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such **Claim** subject to such **Sublimit**.

## V.  LIMITS OF LIABILITY

**A.**  The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the **Insurer's** liability for each **Claim** under the applicable **Primary Policy**, and shall be the maximum amount payable by the **Insurer** under this Policy for a single **Claim**, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.

**B.** The amount stated in Item 3.b. in the Declarations shall be the maximum aggregate amount payable by the **Insurer** under this Policy with respect to all **Claims** during the **Policy Period** for all **Insurance Products**.

**C.** This Policy does not provide coverage for any **Claim** not covered by the **Underlying Insurance**, and shall drop down only to the extent that payment is not made under the **Underlying Insurance** solely by reason of exhaustion of the **Underlying Insurance** through payments thereunder, and shall not drop down for any other reason. If any **Underlying Insurer** fails to make payments under such **Underlying Insurance** for any reason whatsoever, including without limitation the insolvency of such **Underlying Insurer**, then the **Insureds** shall be deemed to have retained any such amounts which are not so paid. If the **Underlying Insurance** is not so maintained, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Insurance** been so maintained.

**D.** Payment by the **Insurer** of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

## VI. SETTLEMENTS AND DEFENSE

**A.** No **Insured** under this Policy may, without the **Insurer's** prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

**B.** The **Insurer** may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable **Underlying Insurance** has been exhausted.

**C.** The **Insured**, and not the **Insurer**, has the duty to defend all **Claims** under this Policy.

## VII. SUBROGATION

**A.** In the event of payment under this Policy, the **Insurer** shall be subrogated to all rights of recovery of each and all **Insureds** against any person or organization, and the **Insureds** shall do whatever is necessary to secure those rights to the satisfaction of the **Insurer**, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of such **Insureds**.

**B.** Any amount recovered after payment under this Policy and any **Underlying Insurance** policies shall be apportioned among the Insurer and the **Underlying Insurers** net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

## VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the **Policyholder** shall be the sole agent of all **Insureds** with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

## IX. NOTICE

**A.** With respect to any **Claim**, situation that could give rise to a **Claim**, or other matter as to which insurance may be sought under this Policy, the **Policyholder** or any **Insured** must give the **Insurer** written notice contemporaneously with and in the identical manner required by the applicable **Primary Policy**.

**B.** All notices under this Policy shall be sent to the **Insurer** at the address set forth in Item 6. in the Declarations.

## X.  MODIFICATION, CANCELLATION AND NONRENEWAL

**A.**  No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the **Insurer**.

**B.**  The **Policyholder** may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

**C.**  The **Insurer** may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the **Policyholder** written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the **Policy Period** shall terminate at the date and hour specified in the notice.

**D.**  The **Insurer** shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the **Policyholder**.

**E.**  The **Insurer** shall have no obligation to renew this Policy upon its expiration. If the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice to the **Policyholder** by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

**F.**  Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any **Underlying Insurance** is rescinded by agreement or legal process for fraud or other material misrepresentation by the **Policyholder** or any of the **Insureds**, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any **Insurance Product** containing such rescinded **Underlying Insurance**.

## XI.  EXCLUSIONS

The **Insurer** shall not be liable for any amount in any **Claim** taking place during the **Policy Period** and arising under any **Insurance Product**, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

**A.**  Any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

**B.**  Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

Endorsement No. <u>1</u>

Effective date of this endorsement:  12:01 a.m. on<u>: August 11, 2005</u>
To be attached to and form part of Policy Number:<u> RNN 506300</u>
Issued to:<u> Refco, Inc.</u>
By:<u> Axis Reinsurance Company</u>

# SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

The Schedule of **Underlying Insurance** and **Insurance Products** is as follows:

    **A.  Insurance Product:**   <u>Directors and Officers Liability</u>

      **1.**  **Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| HCC | 24-MGU-05-A10821 | $10,000,000 | 08/11/05-08/11/06 |

      **2.**  Other Underlying Policies

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| Lexington | 1620924 | $7,500,000 | 08/11/05-08/11/06 |

All other provisions remain unchanged.

_Sean Lukse_
Authorized Representative

_9/11/05_
Date

Endorsement No. 2

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In the event you need to contact someone about this Policy for any reason, please contact us at:

Axis Reinsurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ  07922-0357
Fax No.:  1 (908) 286-5600

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

Illinois Department of Insurance
Consumer Division of Public
Services Section
Springfield, Illinois 62767

Endorsement No. 3

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# ILLINOIS AMENDATORY ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

1.  Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL**, paragraph **C.** is amended by deleting the words "delivering or" in the first sentence and the words "delivery or" in the second sentence of that provision.

2.  Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL,** paragraph **F.** is deleted.  Provided, however, the **Insureds** and the **Insurer** hereby agree that the **Insurer** shall have the same rights under law to rescission that it had if Section X. F. had not been included in the Policy or deleted by this endorsement.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date    9/1/05

**SE 0522 (Ed. 0205)**                                                      **Printed in U.S.A.**

Endorsement No. 4

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## PRIOR NOTICE EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed that the **Insurer** shall not be liable for any amount from any **Claim** which is based upon, arising from, or attributable to or in consequence of any fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

SE1010 0203

Endorsement No. 5

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company


# MANUSCRIPT APPLICATION ENDORSEMENT

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed by the **Insurer** and **Insureds** that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the **Insurer** as the Application for this Policy.


Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The **Insurer** has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to **Insurer** using its own Application form.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

MU1032  2/2003

Endorsement No. 6

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

**Knowledge Exclusion**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed that this Policy does not respond to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the **Policy Period**, any **Insured** had knowledge and had reason to suppose might give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                                   X
                                                   :  Chapter 11
In re                                              :
                                                   :  Case No. 05-60006 (RDD)
REFCO INC., et al.,                                :
                                                   :  Jointly Administered
                Debtors.                           :
                                                   :
--------------------------------------------------------------------- X

AXIS REINSURANCE COMPANY,                          :
                                                   :  Adv. Proc. No. 07-01712-rdd
                Plaintiff,                         :
                                                   :
        v.                                         :
                                                   :
PHILLIP R. BENNETT, et al.,                        :
                                                   :
                Defendants.                        :
--------------------------------------------------------------------- X
```

**ORDER GRANTING, IN PART, MOTION TO REQUIRE AXIS REINSURANCE
COMPANY TO PAY OFFICER AND DIRECTOR DEFENSE COSTS IN UNDERLYING
LITIGATIONS AND FOR RELIEF FROM THE AUTOMATIC STAY,
TO THE EXTENT APPLICABLE, FOR THE ADVANCEMENT OF SUCH DEFENSE
COSTS AND TO PERMIT CERTAIN OFFICERS TO PROSECUTE CLAIMS
<u>AGAINST AXIS REINSURANCE COMPANY</u>**

Upon the motion (the "Motion"), dated July 12, 2007, of Dennis Klejna, Joseph Murphy,

William M. Sexton, Gerald Sherer and Philip Silverman  ("Movants") To Require Plaintiff to

Pay their Defense Costs In Underlying Litigations And For Relief From The Automatic Stay, To

the Extent Applicable, To Permit Plaintiff To Advance And/Or Pay Such Defense Costs And To

Permit Defendants To Prosecute Claims Against Insurance Company, pursuant to 11 U.S.C. §

362(d), Bankruptcy Rule 4001(a), and Bankruptcy Rule 7065; and the Court having reviewed the

Motion and the objections and other pleadings related thereto; and upon the record of the August 30, 2007 hearing thereon (the "Hearing"); and the Court having found that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) adequate and sufficient notice of the Motion and the Hearing were given to all parties in interest and no other or further notice is necessary or required, and (iii) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court at the Hearing.

Therefore, it is hereby ORDERED that:

1.    The Motion is granted to the extent provided herein and otherwise denied without prejudice.

2.    All capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Axis Policy, as may be the case.

3.    Under Bankruptcy Rule 7065, effective ten days after entry of this Order Axis is directed, upon the exhaustion of the Lexington Policy, to advance, subject to a complete reservation of rights, privileges and defenses of the parties under the Axis Policy, the payment of the Defense Costs of Movants in the Underlying Actions that have been billed through the date of this Order, pending a final determination by this Court of Movants' claim that Axis has no right to withhold Defense Cost advances (a) unilaterally or (b) until there is a final determination by a court of competent jurisdiction of Axis' denial of coverage under the Axis Policy.

4.    The automatic stay imposed by 11 U.S.C. § 362(a), to the extent applicable, is hereby

modified (a) to permit the foregoing advancement of Defense Costs and (b) to permit the Movants to bring declaratory judgments or actions seeking monetary or equitable relief against Axis relating to Side A of the Axis Policy and matters related thereto.

5.    Axis shall notify counsel to the Plan Administrators of the Modified Joint Chapter 11 Plan (the "Refco Plan") of Refco, Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Plan Administrators") when the advancement of Defense Costs hereunder exceeds $100,000 in the aggregate, and in increments of $100,000 thereafter; provided, that if individual statements for Defense Costs exceed $100,000, Axis need only notify the Plan Administrators of payment of such bills, without breaking such advances into $100,000 increments.

6.    Entry of this Order shall be without prejudice to the right of the Plan Administrators or any party in interest to seek the reimposition of the automatic stay, to the extent it applies, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to Movants and Axis.

7.    Nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in paragraph 4 hereof.

8.    The Movants have stated that they intend to make a dispositive motion for a determination of whether Axis is entitled under the Axis Policy to withhold the advance of Defense Costs unilaterally or before coverage therefor is finally determined, and this Court has informed the parties that, subject to proper notice and briefing, it has reserved time on October 12, 2007 to hold a hearing on such a motion.  Axis has informed the Court and the Movants that it intends to seek an expedited appeal of this Order, and the Court therefore has not directed the parties to propose a briefing schedule for such a dispositive motion.  Subject to any ruling in

connection with such appeal, this Court will hold a telephonic status conference on September

14, 2007 at 2:00 p.m. on the scheduling of briefing and a hearing on the dispositive motion.

Counsel for the Movants shall initiate such call.


Dated: August 31, 2007
      New York, New York


                                     _____/s/ Robert D. Drain_____
                                     UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
| | |
|---|---|
| In re | :   **Chapter 11** |
| **REFCO, INC.,** *et al.*, | :   **Case No. 05-60006 (RDD)** |
|               **Debtors.** | :   **(Jointly Administered)** |

-------------------------------------------------------------------x

| | |
|---|---|
| **AXIS REINSURANCE COMPANY,** | : |
| | : |
|           **Plaintiff,** | : |
| | : |
|        **v.** | :   **Adv. Proc. No. 07-01712 (RDD)** |
| | : |
| **PHILLIP R. BENNETT, LEO R. BREITMAN,** | : |
| **NATHAN GANTCHER, TONE GRANT,** | : |
| **DAVID V. HARKINS, SCOTT L. JAECKEL,** | : |
| **DENNIS A. KLEJNA, THOMAS H. LEE,** | : |
| **SANTO C. MAGGIO, JOSEPH MURPHY,** | : |
| **RONALD L. O'KELLEY, SCOTT A. SCHOEN,** | : |
| **PERRY ROTKOWITZ, GERALD SHERER,** | : |
| **WILLIAM M. SEXTON, PHILIP SILVERMAN,** | : |
| **ROBERT C. TROSTEN, AND DOES 1 TO 10,** | : |
| | : |
|          **Defendants.** | : |

-------------------------------------------------------------------x

**ORDER DISMISSING THE COMPLAINT**
**OF AXIS REINSURANCE COMPANY**

Upon the motion (the "Motion"), dated July 12, 2007, of Defendants Leo R.

Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L.

O'Kelley, and Scott A. Schoen (the "Director Defendants"), for an order dismissing the

Complaint, dated May 23, 2007, of Axis Reinsurance Company ("Axis") pursuant to Rule

7012(b) of the Federal Rules of Bankruptcy Procedure, as more fully set forth in the Motion; and

the Court having jurisdiction to consider and determine the Motion pursuant to 28 U.S.C. §§ 157,

1334 and 2201; and due notice of the Motion having been provided; and upon all pleadings filed

with this Court, and the hearing held before the Court on August 30, 2007 (the "Hearing"); and it

appearing that the relief requested is appropriate; and all objections to the relief requested having

been overruled by the Court; and after due deliberation and consideration, and for good and

sufficient cause appearing therefor for the reasons stated by the Court on the record of the

Hearing:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:

      A.      Applying New York choice of law rules, the Court concludes that New

York law applies to the Axis directors and officers liability insurance policy referenced in the

Complaint, the interpretation and application of the policy, and the dispute raised by the

Complaint.

      B.      Under New York law, a declaratory judgment action commenced by an

insurer seeking a determination of coverage under an insurance contract should be dismissed

without prejudice or stayed where there is a substantial overlap of the underlying factual issues

in such coverage determination action and factual issues that will be adjudicated in a pending

underlying tort action or criminal proceeding.

      C.      There is substantial overlap of the factual issues raised in this coverage

determination action commenced by Axis and the underlying tort and criminal proceedings

referenced in the Complaint pending before the United States District Court for the Southern

District of New York.

NOW, THEREFORE, It Is Ordered that:

      1.      The Motion is granted in all respects.

      2.      The Axis Complaint filed in the above-captioned adversary proceeding is

dismissed, without prejudice.

Dated:   August 31, 2007
         New York, New York

                    /s/ Robert D. Drain
                    United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                              :
                                                   :    **Chapter 11**
REFCO, INC., et al.,                               :
                                                   :    **Case No. 05-60006 (RDD)**
                                                   :
                     Debtors.                      :    **(Jointly Administered)**
------------------------------------------------------------------x
                                                   :
AXIS REINSURANCE COMPANY,                           :
                                                   :
                     Plaintiff,                    :
                                                   :
          v.                                       :    **Adv. Proc. No. 07-01712 (RDD)**
                                                   :
                                                   :
PHILLIP R. BENNETT, et al.,                         :
                                                   :    [caption continued on next page]
                     Defendants.                   :
------------------------------------------------------------------x

## <u>ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT</u>

*402488.1*

```
-----------------------------------------------------------------x
                                                                 :
TONE N. GRANT, et al.,                                           :
                                                                 :
                    Plaintiffs,                                  :
                                                                 :
              v.                                                 :    Adv. Proc. No.  07-2005 (RDD)
                                                                 :
AXIS REINSURANCE COMPANY,                                        :
                                                                 :
                    Defendant.                                   :
-----------------------------------------------------------------x
                                                                 :
LEO R. BREITMAN, et al.,                                         :
                                                                 :
                    Plaintiffs,                                  :
                                                                 :
              v.                                                 :    Adv. Proc. No.  07-2032 (RDD)
                                                                 :
AXIS REINSURANCE COMPANY,                                        :
                                                                 :
                    Defendant.                                   :
-----------------------------------------------------------------x
```

Upon the motions (the "Motions"), dated September 25, 2007, of Tone N. Grant, Robert C. Trosten, Phillip R. Bennett, Dennis Klejna, William M. Sexton, Gerald Sherer, Philip Silverman, Joseph Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen (the "Moving Insureds"), for entry of an order, pursuant to Fed. R. Civ. P. 56, applicable to this proceeding pursuant to Fed. R. Bankr. P. 7056, granting summary judgment against Axis Reinsurance Company ("Axis"), all as more fully set forth in the Motions; and the Court having jurisdiction to consider the Motions and the relief requested therein pursuant to 28 U.S.C. §§ 157, 1334, and 2201; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motions having been provided; and the Court having reviewed the Motions and the objections and other pleadings related thereto; and upon the record of the October 12, 2007

2

hearing thereon; and after due deliberation and sufficient cause appearing therefor, the Court having found for the reasons stated in Exhibit <u>A</u> hereto, which amends and supersedes the Court's bench ruling appearing in the October 12, 2007 hearing transcript, that no genuine issue of material fact exists and that the Moving Insureds are entitled to judgment as a matter of law, it is hereby

ORDERED that the Motions are granted in all respects; and it is further

ORDERED that under the terms of the Axis Policy Axis shall advance, subject to a complete reservation of rights, privileges, and defenses of the parties under the Axis Policy,[1] Defense Costs incurred by the Moving Insureds in defense of the various matters asserted against them related to the demise of Refco, Inc. (the "Claim"), unless and until: (1) there is a final determination that (a) the Claim is not covered by the Axis Policy, or (b) such Defense Costs are not covered under the Axis Policy; or (2) the Limit of Liability of the Axis Policy has been exhausted; and it is further

ORDERED that Axis shall notify counsel to the Plan Administrators of the Modified Joint Chapter 11 Plan (the "Refco Plan") of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Plan Administrators") when the advancement of Defense Costs hereunder exceeds $2 million in the aggregate, and in increments of $100,000 thereafter; provided, that if individual statements for Defense Costs exceed $100,000, Axis need only notify the Plan Administrators of payment of such bills, without breaking such advances into $100,000 increments; and it is further

ORDERED that entry of this Order shall be without prejudice to the right of the Plan Administrators or any party in interest to seek the re-imposition of the injunction provided

---

[1] Capitalized terms used but not defined herein having the meanings ascribed to such terms in the Motions and the insurance policies referred to therein.

for in the Refco Plan, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to the Insureds and Axis; and it is further

ORDERED that nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in the third decretal paragraph hereof; and it is further

ORDERED that Axis' (a) motion seeking a declaratory judgment with regard to the Moving Insureds' obligations under the Axis policy to refund advanced Defense Costs and (b) request for a determination of the priority and proper allocation of Defense Costs or other Losses under the Axis Policy and denied without prejudice to the rights of all parties to and beneficiaries of the Axis Policy regarding such issue; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Moving Insureds file a memorandum of law in support of the Motion is hereby waived, and it is further

ORDERED that this Order shall be deemed to constitute a separate order on each of the Motions.


Dated: October 19, 2007
       New York, New York


/s/Robert D. Drain_____
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :   <u>INFORMATION</u>
        -v-                         :
                                    :   07 Cr.
SANTO C. MAGGIO,                    :
                                    :
                Defendant.          :
                                    :
------------------------------------x


## <u>COUNT ONE</u>

**(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make False Filings With The SEC, To Make Material Misstatements To Auditors, Bank Fraud and Money Laundering)**

The United States Attorney charges:

### <u>RELEVANT ENTITIES AND PERSONS</u>

1.   At certain times relevant to this Information, Refco, Inc. was a Delaware corporation with its principal place of business in New York, New York.   From at least the mid-1990s, the business of Refco, Inc. and its predecessor entities included providing execution and clearing services for exchange-traded derivatives and providing prime brokerage services in the fixed income and foreign exchange markets.   Refco, Inc. held its initial public offering of common stock on or about August 10, 2005.   Prior to on or about August 10, 2005, Refco, Inc.'s predecessor entities were privately held.   Refco, Inc. and its predecessor entities are referred to herein collectively as "Refco."

2.   At all times relevant to this Information, Phillip

R. Bennett, a coconspirator not named as a defendant herein, was
the President and Chief Executive Officer of Refco. At all times
relevant to this Information, Bennett had a substantial ownership
interest in Refco, directly and indirectly.

3.    At certain times relevant to this Information,
Robert C. Trosten, a coconspirator not named as a defendant
herein, held senior management positions at Refco. Among other
positions, Trosten was Chief Financial Officer of Refco, a
position he held from in or about May 2001 until in or about
August 2004, when he left the company.

4.    At certain times relevant to this Information,
Tone N. Grant, a coconspirator not named as a defendant herein,
held a senior management position at Refco. From at least in or
about 1997 through in or about June 1998, Grant was the President
of Refco. At certain times relevant to this Information, Grant
indirectly held a significant ownership interest in Refco.

5.    At certain times relevant to this Information,
SANTO C. MAGGIO, the defendant, held senior management positions
at Refco. Among other positions, MAGGIO was an Executive Vice
President of Refco, and the President and Chief Executive Officer
of Refco Securities LLC, a wholly owned subsidiary of Refco.

6.    At all times relevant to this Information, Bank
Für Arbeit Und Wirtschaft Und Österreichische Postparkasse
Aktiengesellschaft,("BAWAG"), was the fourth largest bank in

2

Austria.  BAWAG was owned at various times by, among other
entities, the Austrian Trade Unions Association, formally known
as Österreichischer Gewerkschaftsbund (ÖGB).  At various times
relevant to this Information, BAWAG indirectly held a substantial
ownership interest in Refco.

7.    At all times relevant to this Information, Refco
Group Holdings, Inc. ("RGHI") was a privately-held Delaware
corporation that held a substantial ownership interest in Refco.
At various times relevant to this Information, RGHI was owned in
whole or in part by Phillip R. Bennett and Tone N. Grant.

## THE SCHEME TO DEFRAUD

8.    From at least as early as in or about the late
1990s, SANTO C. MAGGIO, the defendant, at the direction of
Phillip R. Bennett and together with others known and unknown,
schemed to hide the true financial health of Refco from its
banks, counterparties, auditors, and investors.  Starting at
least as early as the late 1990s, Bennett, MAGGIO, and their
coconspirators embarked on a strategy to mask the true
performance of Refco's business in order to sell the company for
Bennett and MAGGIO's own benefit and that of Refco's owners other
than Bennett.  To that end, over the ensuing years, Bennett,
MAGGIO, and others known and unknown systematically (1) covered
up both Refco's own losses and customer losses for which Refco
became responsible; (2) moved Refco operating expenses off the

3

company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

9.     In furtherance of this scheme, Phillip R. Bennett, SANTO C. MAGGIO, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC").  The scheme included obtaining, through fraud, the following:  lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57 per cent of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

## Early Origins Of Refco's Financial Problems

10.     In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by Phillip R. Bennett, Tone N.

Grant and one other partner. As of early 1997, RGHI owed Refco at least approximately $106 million. Starting later in 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business. In response to these losses, at various times between in or about May 1997 and in or about October 2005, Bennett, and later, SANTO C. MAGGIO and their coconspirators, moved losses and expenses out of Refco and into RGHI, and artificially padded Refco's revenues at the expense of RGHI, in an effort to hide Refco's true liabilities, manipulate its reported earnings, and thereby seek to defraud a purchaser into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners. This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion (the "RGHI receivable"). The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed

to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

### Historical Losses

11.  As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco.  In the later 1990s, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million.  These customer losses included the following:

### Asian Debt Crisis Customers

12.  In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed

market conditions, they totaled approximately $185 million.

### Customer 1

13.  In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call from the CME, using the proceeds of a short-term loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the loan.

14.  Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, Phillip R. Bennett, Tone N. Grant, SANTO C. MAGGIO, and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses.  In addition, Bennett and others significantly misrepresented the size of the loss to Refco's auditors.

15.  Philip R. Bennett, SANTO C. MAGGIO, and others, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1

7

from the trading losses to be transferred to become a debt from RGHI to Refco.

### *Refco Expenses Moved To RGHI*

16.  Beginning at least as early as 1999, Phillip R. Bennett and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI.

17.  The result of these actions by Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators was to contribute to the large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.  Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

### Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett,

MAGGIO, and others caused Refco systematically to fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, approximately $100 million a day. Bennett, MAGGIO, and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

### BAWAG Invests In Refco

19. By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions. In order to address that problem, in or about late 1998, Bennett sought a capital contribution from BAWAG. In a transaction that closed in 1999, BAWAG, through an affiliate, purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

9

## Hiding The RGHI Receivable

20.  Throughout the period covered by this Information, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including Phillip R. Bennett.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, Phillip R. Bennett and SANTO C. MAGGIO, among others, directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.  At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  Bennett and, later, MAGGIO and others, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end

10

on February 28, 1998 through the fiscal year-end on February 29, 2004. Bennett, MAGGIO and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, Phillip R. Bennett, SANTO C. MAGGIO and others, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, Phillip R. Bennett and SANTO C. MAGGIO's year-end, and starting in 2004, quarter-end cover-up transactions were of two types:  transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to May 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |

| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24. These transactions typically followed standard patterns. For example, in or about February 2000, SANTO C. MAGGIO, Phillip R. Bennett and others caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a. Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco. At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million. In or about March 2000, the transactions were reversed, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan. To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar

12

to the agreements that follow:

        (i).      On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

        (ii).     On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by Bennett on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

        (iii).    On or about the same date, Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

     b.   At or around the same time as the transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was reversed.  Refco lent

$300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI. RGHI then used the $300 million to pay off the loan from BAWAG.

25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, SANTO C. MAGGIO and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

26.  At various times prior to August 2004, Phillip R. Bennett, SANTO C. MAGGIO, and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI. In particular, Bennett, MAGGIO and others caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

14

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

## Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.  Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

## Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted Phillip R. Bennett in hiding the RGHI receivable in the manner described above, Bennett and SANTO C. MAGGIO caused Refco to assist BAWAG in hiding its own balance sheet problems.  In or

about early 2000, BAWAG entrusted approximately €350 million of
BAWAG's funds to an investment advisor, who by the end of 2000
reported to the bank that he had lost substantially all of those
funds.  In order to disguise this loss on its balance sheet,
BAWAG arranged through Bennett and MAGGIO to hold in an account
at Refco certain worthless bonds and other investments that
Refco, at Bennett and MAGGIO's direction, maintained at a false
value that, over time, reached at least approximately €500
million.  These fake assets were purportedly housed at Refco and
maintained at an inflated value for BAWAG's benefit until 2005.

### Bennett's "Exit Strategy" Develops

29.  In or about 2003, Phillip R. Bennett caused Refco
to hire an investment bank (the "Investment Bank"), to assist in
selling Refco.  Bennett asked the Investment Bank to find a major
investment bank or commercial bank to purchase Refco, but no such
buyer was found to be interested.  After efforts to sell Refco to
such a first line buyer failed, Bennett directed the Investment
Bank to look for other purchasers for the company, with the
understanding that it would be taken public.

30.  In connection with Phillip R. Bennett's plan to
sell Refco, Bennett, SANTO C. MAGGIO, and others (a) continued to
siphon Refco expenses and losses into RGHI, and (b) padded
Refco's reported revenue in order to hit budgeted income targets
set by Bennett and others to disguise the ongoing operational

16

problems at the company.

## The Fraudulent Leveraged Buyout Transaction

31.    In or about 2003, Phillip R. Bennett, SANTO C. MAGGIO, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

### Lies To Thomas H. Lee Partners

32.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.    The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements

17

misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

      b.   The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

      33.  In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

      34.  In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the note underwriters and note purchasers the following false and misleading information:

      a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

      b.   Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in

fact, caused the Asian Debt Crisis Customer Losses; and

        c.   Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### *Lies To The Bank Syndicate*

        35.  In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

        a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

        b.   Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

        c.   Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to

RGHI for the purpose of hiding them.

     36.  The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| Trosten | $48 million |
| Grant | $16 million |
| Other Former Equity Partners | $81.5 million |
| MAGGIO | $5.75 million |
| Other Refco Officers, Employees, and Affiliated Parties | $106.25 million |

## Bennett Plans To Take Refco Public

     37.  After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, SANTO C. MAGGIO, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

     38.  Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett, SANTO C. MAGGIO, and others

continued their manipulation of Refco's finances:   At each quarter and year-end period, Bennett and MAGGIO caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and Bennett and MAGGIO continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.   Bennett and MAGGIO caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
| --- | --- | --- | --- |
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

39.   Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.   In particular, Bennett and MAGGIO caused the following transactions, among others, to artificially inflate Refco's revenues:

        a.   On or about February 11, 2005, Bennett and

MAGGIO caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

b.   On or about February 17, 2005, Bennett and MAGGIO caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a result of the transactions. The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

40.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

41.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. Phillip R. Bennett signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

42.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K.  Phillip R. Bennett signed the annual report on or about July 19, 2005, in New York, New York.  Bennett also signed two certifications regarding the annual report.  In those certifications, Bennett attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company."  As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

43.  On or about August 8, 2005, Refco filed an S-1

registration statement with the SEC in connection with its
initial public offering of common stock.   Phillip R. Bennett
signed that registration statement on or about August 8, 2005, in
New York, New York.

44.   The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by Phillip R. Bennett each
required the disclosure of (a) certain transactions between Refco
and its management and (b) certain debts owed directly or
indirectly by any executive officer of Refco to Refco, during
Refco's past fiscal year and, for the registration statements,
during Refco's prior two fiscal years.   These disclosures were
required in order to apprize investors of, among other things,
potential conflicts of interest by management.

45.   The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by Phillip R. Bennett each
failed to disclose the related party transactions and the related
party indebtedness between Refco and RGHI outlined above.   In
particular, these public filings failed to disclose: (a) the
existence of hundreds of millions of dollars of indebtedness by
RGHI to Refco during 2004 and 2005; (b) the transactions at
quarter- and fiscal year-end during 2004 and 2005 by which RGHI
temporarily paid down its debt to Refco, the guaranties by Refco
of the third party lenders' loans to RGHI, and the subsequent re-
assumption of the debt by RGHI, each of which was a related party

transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

46.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Phillip R. Bennett, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in Refco.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

47.  In or about late August 2005, after the completion of Refco's IPO, Phillip R. Bennett and SANTO C. MAGGIO caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were reversed.

### Public Disclosure Of The Related Party Debt

48.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10,

2005, having received an emergency loan in that approximate
amount from BAWAG.

49.    On or about October 10, 2005, Refco issued a press
release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company
> believes that the receivable was the result of the
> assumption by an entity controlled by Mr. Bennett
> of certain historical obligations owed by
> unrelated third parties to the Company, which may
> have been uncollectible. The Company believes that
> all customer funds on deposit are unaffected by
> these activities. Independent counsel and forensic
> auditors have been retained to assist the Audit
> Committee in an investigation of these matters.

50.    Following Refco's announcement, the market price
of Refco stock plummeted, resulting in a loss of well more than
$1 billion in market capitalization.

51.    On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.   Refco's common stock was
subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

52.    From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,

26

SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely:  (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

27

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

53.    It was a part and object of the conspiracy that
SANTO C. MAGGIO, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon a person,
in connection with the purchase and sale of notes issued by Refco
and the common stock of Refco, Inc., all in violation of Title
15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

54.    It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, in reports and

documents required to be filed with the SEC under the Exchange
Act, and the rules and regulations promulgated thereunder, would
and did make and cause to be made statements which were false and
misleading with respect to material facts, in violation of Title
15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings – Securities Act

55.  It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly would and did make
and cause to be made, in a registration statement filed with the
SEC under the Securities Act of 1933, untrue statements of
material facts and omissions to state material facts required to
be stated therein and necessary to make the statements therein
not misleading, in violation of Title 15, United States Code,
Section 77x.

### Wire Fraud

56.  It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, having devised and
intending to devise a scheme and artifice to defraud and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

57.   It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and Phillip R. Bennett, an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act of 1934 and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

## Bank Fraud

58.   It was further a part and object of the conspiracy

that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

59.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

60.  Among the means and methods by which SANTO C. MAGGIO, the defendant, and others known and unknown, and their co-conspirators would and did carry out the conspiracy were the

31

following:

        a.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to the public the size of customer losses for which Refco was responsible.

        b.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators transferred losses incurred by Refco to Bennett's company, RGHI.

        c.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

        d.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators caused Refco to file false and fraudulent statements with the SEC.

        e.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators made and caused to be made material false statements and omissions to Refco's auditors.

        f.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

### Overt Acts

61.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, Phillip R. Bennett and Tone N. Grant misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, Phillip R. Bennett and Tone N. Grant signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

33

     d.   On or about February 20, 2004, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $720 million loan from Refco Capital Markets, Ltd., to a customer.

     e.   On or about April 27, 2004, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party receivables had been fully disclosed to the auditors.

     f.   On or about May 17, 2004, Phillip R. Bennett and Tone N. Grant met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

     g.   On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Robert C. Trosten approximately $48 million.

     h.   On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Tone N. Grant approximately $4 million.

     i.   On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the defendant, approximately $5.75 million.

     j.   On or about August 8, 2004, Phillip R. Bennett caused RGHI to transfer to TONE N. GRANT approximately

$12 million.

          k.   On or about February 23, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $345 million loan from a Refco customer to RGHI.

          l.   On or about April 6, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-4 registration statement.

          m.   On or about May 25, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $450 million loan from a Refco customer to RGHI.

          n.   On or about July 19, 2005, in New York, New York, Phillip R. Bennett signed Refco's annual report on Form 10K.

          o.   On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

          p.   On or about August 26, 2005, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $420 million loan from Refco Capital Markets, Ltd., to a customer.

          q.   On or about September 6, 2005, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the

defendant, approximately $7,668,600.

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

62.    The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

63.    From in or about the late 1990s up to in or about 2004, in the Southern District of New York and elsewhere, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

36

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The United States Attorney further charges:

64.  The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

65.  From in or about the late 1990s up to in or about October 2005, in the Southern District of New York and elsewhere, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of

business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT FOUR

### (Wire Fraud)

The United States Attorney further charges:

66.   The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

67.   On or about July 19, 2005, in the Southern District of New York, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, the electronic transmission of Refco Form 10-K from New York, New York to Virginia.

(Title 18, United States Code, Sections 1343 and 2).

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOUR

68.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5, as alleged in Counts One, Two and Three; and wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One and Four of this Information, SANTO C. MAGGIO shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following: At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendant is jointly and severally liable.

## SUBSTITUTE ASSETS PROVISION

69.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

39

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 371, 981, 982, 1343; Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)

_____
MICHAEL J. GARCIA
United States Attorney

40

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

SANTO C. MAGGIO,

Defendant.

## INFORMATION

07 Cr.

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

7CJAAMAGP1.txt

1

```
7CJAAMAGP              Plea
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,
3
4              v.                           07 SD 312 (RLE)
4
5   SANTO C. MAGGIO,
5
6                  Defendant.
6
7   ------------------------------x
7
8                                    New York, N.Y.
8                                    December 19, 2007
9                                    11:30 a.m.
9
10
10  Before:
11
11                 HON. RONALD L. ELLIS,
12
12                                    Magistrate Judge
13
13
14                      APPEARANCES
14
15  JAMES B. COMEY
15       United States Attorney for the
16       Southern District of New York
16  NEIL BAROFSKY
17  CHRISTOPHER GARCIA
17       Assistant United States Attorney
18
18  PAUL SHECHTMAN
19       Attorney for Defendant Maggio
19
20  SCOTT E. HERSHMAN
20       Attorney for Defendant Maggio
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
7CJAAMAGP              Plea
1           (Case called)
2           MR. BAROFSKY:  Neil Barofsky and Christopher Garcia
3   for the government.
4           Good morning, your Honor.
5           MR. SCHECTMAN:  Paul Shechtman, for Mr. Maggio, with
6   Scott Hershman, for Mr. Maggio.
7           THE COURT:  Okay.  I understand that he is going to be
8   pleading to an information.
9           MR. SCHECTMAN:  Correct, your Honor.
10          THE COURT:  Has he waived indictment yet?
11          MR. SCHECTMAN:  You have the paperwork.  We're ready
12  to waive.
```

Page 1

```
                              7CJAAMAGP1.txt
13              THE COURT:  We will do those separately.  Treat the
14    waiver as it should be and then I'll consider the taking of the
15    plea.
16              MR. SCHECTMAN:  Sounds right.
17              COURTROOM DEPUTY:  You are Santo Maggio?
18              THE DEFENDANT:  Yes.
19              COURTROOM DEPUTY:  Have you signed this waiver of
20    indictment.
21              THE DEFENDANT:  Yes.
22              COURTROOM DEPUTY:  Before you signed it did you
23    discussion it with your attorney?
24              THE DEFENDANT:  Yes.
25              COURTROOM DEPUTY:  Did he explain it to you?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

3

```
7CJAAMAGP                      Plea
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  Do you understand what you are doing?
 3              THE DEFENDANT:  Yes.
 4              COURTROOM DEPUTY:  Do you understand that you are
 5    under no obligation to waive indictment?
 6              THE DEFENDANT:  Yes.
 7              COURTROOM DEPUTY:  Do you understand that if you do
 8    not waive indictment, if the government wants to prosecute you
 9    they will have to present this case to a grand jury which may
10    or may not indict you?
11              THE DEFENDANT:  Yes.
12              THE COURT:  Do you realize by that by signing this
13    waiver of indictment you have given up your right to have this
14    case presented to a grand jury?
15              THE DEFENDANT:  Yes, I do.
16              COURTROOM DEPUTY:  Have you seen a copy of the
17    information?
18              THE DEFENDANT:  Yes, I did.
19              THE COURT:  Would you like for me to read it to you?
20              THE DEFENDANT:  No.
21              COURTROOM DEPUTY:  How do you plead?
22              THE DEFENDANT:  Guilty.
23              COURTROOM DEPUTY:  The case has already been assigned
24    to Judge Stein.
25              MR. SCHECTMAN:  Correct.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

4

```
7CJAAMAGP                      Plea
 1              MR. BAROVSKY:  Your Honor, we consent to the defendant
 2    being released on his own recognizance.
 3              MR. SCHECTMAN:  We don't object to that.
 4              THE COURT:  Technically to the information you are
 5    supposed to plead "not guilty".
 6              MR. SCHECTMAN:  I think that is right and it is my
 7    apologies.
 8              THE DEFENDANT:  I plead not guilty now and then later
 9    of guilty.
10              MR. SCHECTMAN:  Not guilty at this time, your Honor,
11    but we will be entering a guilty plea.
12              THE COURT:  Objection.  All right.  Now, the actual
13    plea has been referred by Judge Stein; is that it?
14              MR. BAROFSKY:  Yes, your Honor.
15              THE COURT:  And how many counts in the information?
16              MR. BAROFSKY:  Your Honor, there are four counts.
17              THE COURT:  what is he pleading to?
                              Page 2
```

7CJAAMAGP1.txt
```
18              MR. BAROFSKY:  All four counts, Judge.
19              THE COURT:  Okay.  Mr. Maggio, this matter has been
20     referred to me before Judge Stein for the purpose of taking
21     your plea.  Did you consent to proceed before a United States
22     magistrate judge on your felony plea allocution?
23              THE DEFENDANT:  Yes.
24              THE COURT:  Before you signed it did you discuss it
25     with your attorneys?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    5

```
       7CJAAMAGP              Plea
1               THE DEFENDANT:  Yes, your Honor.
2               THE COURT:  Did they explain it to you?
3               THE DEFENDANT:  Yes.
4               THE COURT:  Do you understand that you have an
5     absolute right to have this proceeding before a United States
6     district judge?
7               THE DEFENDANT:  Yes, I do.
8               THE COURT:  You are voluntarily proceeding before a
9     United States magistrate judge?
10              THE DEFENDANT:  Yes.
11              THE COURT:  Mr. Maggio, you are charged in a four
12     count information.  Count One of the information charges you,
13     well, conspiracy to commit securities fraud, wire fraud, bank
14     fraud and money laundering and to make false filings with the
15     SEC and material misstatements to auditors in violation of
16     Title 18 U.S.C. Sections 371.  This crime carries a maximum
17     sentence of five years imprisonment, a maximum fine which is
18     the greatest of either $250,5000 or twice the gross pecuniary
19     gain derived from the offense or twice the gross pecuniary loss
20     to persons other than yourself as a result of the offense.
21     There is a $100 special assessment and a term of supervised
22     release of three years.
23              Counts Two and Three of the information charge you
24     with securities fraud in violation of Title 15 U.S.C. Section
25     78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    6

```
       7CJAAMAGP              Plea
1     Regulations Section 240, 10 (B) (5) and each of those counts
2     carries a maximum sentence of 20 years imprisonment, a maximum
3     fine which is the greatest of either five million dollars or
4     twice the gross pecuniary gain derived from the offense and
5     twice the gross pecuniary loss of persons other than yourself
6     as a result of the offense.  Each also has a $100 special
7     assessment and a term of supervised release of three years.
8               Count four of the information charges you with wire
9     fraud in violation of Title 18 U.S.C. Section 1343 and carries
10     a maximum sentence of 0 years imprisonment, a maximum fine
11     which is the greatest of either $250,000 or twice the gross
12     pecuniary gain derived from the offense, or twice the gross
13     pecuniary loss to person others than yourself as a result of
14     the offense.  It carries a $100 special assessment and a term
15     of supervised release of three years.
16              A total maximum sentence of incarceration on the
17     information is 65 years imprisonment.  In addition to the
18     foregoing the Court must order restitution with respect to the
19     information and in accordance with U.S.C.
20              In addition, if you are sentenced to any period of
21     supervised release and violate the conditions of your
22     supervised release you may be sentenced to all or part of the
                              Page 3
```

```
                           7CJAAMAGP1.txt
23      supervised_release as authorized by statute without any credit
24      for time already served on supervised release.
25              Do you understand that?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
        7CJAAMAGP              Plea
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  So you understand these penalties as I've
 3      read them to you?
 4              THE DEFENDANT:  Yes, I do.
 5              THE COURT:  Have you seen a copy of the information in
 6      which the government makes these charges against you?
 7              THE DEFENDANT:  Yes, I do.
 8              THE COURT:  Have you discussed it with your attorneys?
 9              THE DEFENDANT:  Yes, your Honor.
10              THE COURT:  Are you prepared to enter a plea today?
11              THE DEFENDANT:  Yes, I am.
12              THE COURT:  Santo Maggio, how do you plead?
13              THE DEFENDANT:  Guilty.
14              THE COURT:  Mr. Maggio, before I can recommend that
15      your plea be accepted I must determine that you understand the
16      plea and its consequences, that the plea is voluntary and that
17      there's a factual basis for the plea.  For that purpose I must
18      ask you a number of questions and your answers must be under
19      oath.  Do you understand that the answers you give under oath
20      may subject you to prosecution for perjury if you do not tell
21      the truth?
22              THE DEFENDANT:  Yes, I do.
23              THE COURT:  Raise your right hand.
24              (Defendant Santo C. Maggio sworn)
25              THE COURT:  Thank you.  Please state your full name
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
        7CJAAMAGP              Plea
 1      for record.
 2              THE DEFENDANT:  Santo C. Maggio.
 3              THE COURT:  How far did you go in school?
 4              THE DEFENDANT:  I finished high school.
 5              THE COURT:  Are you currently being treated by a
 6      doctor or psychiatrist for any reason?
 7              THE DEFENDANT:  No.
 8              THE COURT:  Are you currently on any medications which
 9      might effect you in being alert for this proceeding?
10              THE DEFENDANT:  No.
11              THE COURT:  Are you any difficulty seeing, hearing or
12      understanding anything that I am saying?
13              THE DEFENDANT:  No.
14              THE COURT:  Have you had enough time to discuss with
15      your attorneys how you wish to plead?
16              THE DEFENDANT:  Yes.
17              THE COURT:  Are you satisfied with your attorneys?
18              THE DEFENDANT:  Yes.
19              THE COURT:  Do you understand what the government says
20      that you did?
21              THE DEFENDANT:  Yes.
22              THE COURT:  Do you understand that have you a right to
23      plead not guilty?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Do you understand that you have a right to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                              Page 4
```

7CJAAMAGP1.txt

7CJAAMAGP                    Plea
1  trial by jury on these charges?
2           THE DEFENDANT:  Yes.
3           THE COURT:  Do you understand that if you are to plead
4  not guilty and go to trial you would be presumed innocent until
5  the government proved your guilt beyond a reasonable doubt?
6           THE DEFENDANT:  Yes, I do.
7           THE COURT:  Do you understand that if you were to go
8  to trial you would have a number of important constitutional
9  rights including the right to be represented by counsel and to
10 have counsel appointed for you if you cannot afford an
11 attorney?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Do you understand that at trial you cannot
14 be forced to testify against yourself?
15          THE DEFENDANT:  Yes.
16          THE COURT:  Do you understand at a trial you would
17 have the right to confront and cross-examine witnesses called
18 by the government?
19          THE DEFENDANT:  Yes.
20          THE COURT:  Do you understand that at a trial you
21 would have the right to testify yourself and to call witnesses
22 on your behalf and to compel their attendance by subpoena if
23 necessary?
24          THE DEFENDANT:  Yes.
25          THE COURT:  Do you understand that if your guilty plea
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

7CJAAMAGP                    Plea
1  is accepted there will be no trial of any kind and the only
2  remaining steps in your case will be a presentence report and
3  sentencing by Judge Stein?
4           THE DEFENDANT:  Yes.
5           THE COURT:  Have you discussed with your attorney the
6  role that the sentencing guidelines play in sentencing?
7           THE DEFENDANT:  Yes.
8           THE COURT:  Do you understand that the district judge
9  will retain discretion regardless of what calculations there
10 are under the guidelines?
11          THE DEFENDANT:  Yes.
12          THE COURT:  Do you understand that the calculation
13 under the guidelines will take into account a number of factors
14 including the actual conduct in which you engaged, any victims
15 of the offense, the role that you played in the offense,
16 whether or not you have accepted responsibility for your acts,
17 whether you have any criminal history or whether you have
18 engaged in any obstruction of justice; do you understand that?
19          THE DEFENDANT:  Yes.
20          THE COURT:  Between now and the date of sentencing the
21 probation department will conduct an investigation and will
22 prepare a presentence report.  Your attorney, the government
23 and Judge Stein will receive copies.  Both your attorney and
24 the government will have the opportunity to object if they
25 believe anything in the report is inaccurate; do you understand
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

7CJAAMAGP                    Plea
1  that?
2           THE DEFENDANT:  Yes.
3           THE COURT:  Do you understand that until the
                        Page 5

7CJAAMAGP1.txt
```
 4    presentence report is prepared neither your attorney nor the
 5    government, nor Judge Stein will be able to determine precisely
 6    what range of penalties will be calculated under the
 7    guidelines.
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  Do you understand than regardless of
10    calculation and the guidelines your sentence cannot exceed the
11    maximums that I advised you of earlier?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Do you understand that under certain
14    circumstances both you and the government may have the right to
15    appeal the sentence imposed.
16              THE DEFENDANT:  Yes.
17              THE COURT:  Do you understand that if the sentence is
18    more severe than you expected you will be bound by your guilty
19    plea and will not be permitted to withdraw it?
20              THE DEFENDANT:  Yes.
21              THE COURT:  You understand that parole has been
22    abolished and that if you are sentenced to any term of
23    imprisonment you will be required to serve the entire term?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Mr. Maggio, are you a citizen of the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    12
```
      7CJAAMAGP              Plea
 1    United States?
 2              THE DEFENDANT:  Yes, I am.
 3              THE COURT:  Mr. Maggio, I have been handed up a plea
 4    agreement from your case.  Have you had an opportunity to
 5    review and go over this agreement with your attorneys?
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  Do you understand that one of the
 8    provisions in the plea agreement is that you admit the
 9    forfeiture allegation in the information and that you agree to
10    forfeit to the United States a sum of money equal to two
11    billion, four hundred million dollars?
12              THE DEFENDANT:  Yes.
13              THE COURT:  That is what it says, right?
14              MR. BAROFSKY:  Yes, your Honor, that number is
15    correct.
16              Your Honor, the plea cooperation agreement also
17    provides, however, that in satisfaction of that amount there
18    are certain schedules attached to the plea agreement which the
19    government will accept in satisfaction of that judgment.
20              MR. SCHECTMAN:  We don't have quite that much, your
21    Honor.
22              THE COURT:  Okay.  I thought had I too many zeros
23    myself at first.
24              MR. SCHECTMAN:  No, you read it right.
25              THE COURT:  That represents the amount of the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    13
```
      7CJAAMAGP              Plea
 1    proceedings obtained as a result of the offense; do you
 2    understand that?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  You also understand that any forfeiture
 5    would not be treated as satisfaction of any fine, restitution,
 6    cause of imprisonment or any other penalty the Court may
 7    impose?
 8              THE DEFENDANT:  Yes.
                          Page 6
```

7CJAAMAGP1.txt
```
 9              THE COURT:  And as indicated in the agreement, there
10   is a scheduled pay of assets.  You have seen the schedule and
11   you have gone over it with your attorneys?
12              THE DEFENDANT:  Yes.
13              THE COURT:  To make sure that it's accurate?
14              THE DEFENDANT:  Yes.
15              MR. SCHECTMAN:  Judge, I might point out for the
16   record there is a Schedule B as well, which are assets that are
17   in Mrs.~Maggio's name that are being forfeited as part of the
18   plea and there is a separate agreement that need not concern
19   your Honor in this matter involving Mrs.~Maggio.
20              THE COURT:  Is that correct, Mr. Maggio, there is also
21   a Schedule B?
22              THE DEFENDANT:  Yes.
23              THE COURT:  That's Mrs.~Maggio's assets?
24              THE DEFENDANT:  Yes.
25              THE COURT:  That is also covered by the agreement that
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                14

7CJAAMAGP                      Plea
```
 1   you made with the government?
 2              THE DEFENDANT:  Yes.
 3              THE COURT:  You are also understand the agreement
 4   provides that you cooperate fully with the United States
 5   attorney's office?
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  And that in exchange for that cooperation,
 8   assuming that the office determines that you have made full and
 9   accurate disclosures to them, the government has agreed that it
10   will submit a motion pursuant to Section 5K1.1 of the
11   sentencing guidelines in your favor?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Do you understand that if for any reason
14   the government determines that it will not file such a motion
15   you will not be allowed to withdraw your plea?
16              THE DEFENDANT:  Yes.
17              THE COURT:  You understand that even if the government
18   files such a motion sentencing will still be at the sole
19   discretion of the Court?
20              THE DEFENDANT:  Yes, I did.
21              THE COURT:  Is there anything else in the agreement
22   that I might want to highlight?
23              MR. BAROFSKY:  No, your Honor.
24              THE COURT:  All right.  Other than the representations
25   in this agreement, have any promises been made to you by anyone
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                15

7CJAAMAGP                      Plea
```
 1   to influence you to plead guilty?
 2              THE DEFENDANT:  No.
 3              THE COURT:  This constitutes the sole agreement that
 4   you have?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  Has anyone promised you a specific
 7   sentence if you plead guilty?
 8              THE DEFENDANT:  No.
 9              THE COURT:  Has anyone made any threats to you to
10   influence you to plead guilty?
11              THE DEFENDANT:  No.
12              THE COURT:  Are you making this plea voluntarily of
13   your own freewill and choice?
```
                          Page 7

7CJAAMAGP1.txt
14          THE DEFENDANT:  Yes, I am.
15          THE COURT:  The elements of the offense is?
16          MR. BAROFSKY:  Your Honor, for Counts One defendant's
17   is charged with conspiracy.  The government would be required
18   to prove each of the elements beyond a reasonable doubt.
19   First, that there is an assistance of a an agreement or
20   understanding to commit one of the objects charged in the
21   information.
22          Second, the defendant knowingly became a member of
23   that agreement or understanding.
24          And third, that one of the conspirators or
25   cococonspirators or Mr. Maggio knowingly committed at least one
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                              16

7CJAAMAGP                   Plea
1    overt act in furtherance of the conspiracy during its life.
2          With respect to the securities frauds counts in two
3    and three, first, the defendant in connection with the purchase
4    or sale of securities, here the notes that are described in
5    Count Two and the common stock of Revko that's referenced in
6    Count Three did one or more of the following:  Employed a
7    devise, scheme or artifice to defraud or made an untrue
8    statement of a material fact or admitted to state a material
9    fact which made what was said under the circumstances
10   misleading or engaged in an act, practice or course of business
11   that operated or would operate as a fraud or deceit upon a
12   purchase of a seller for securities.
13          Second the defendant acted knowingly, willfully with
14   the intent to defraud.
15          And third, the defendant used or caused to be used any
16   means or instruments of transportation or communication in
17   interstate commerce or use of the mails in furtherance of that
18   fraudulent conduct.
19          and with respect to the Count Four wire fraud, first,
20   that there was a scheme or artifice to defraud that existence
21   the defendant must have participated in the scheme with the
22   intent to defraud misrepresentations or omissions must have
23   related to a material fact, that the scheme was executed to
24   obtain money or property.
25          And finally, that in execution of the scheme the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                              17

7CJAAMAGP                   Plea
1    defendant used or caused to be used interstate wires or that
2    such use was reasonably foreseeable to him.
3          THE COURT:  Mr. Maggio, did you hear that recitation?
4          THE DEFENDANT:  Yes.
5          THE COURT:  Did you understand that if the government
6    were to proceed to trial against you it would have the burden
7    of proving each element for each offense, that is, each count
8    beyond a reasonable doubt.
9          THE DEFENDANT:  Yes.
10          THE COURT:  Did you commit the offenses for which you
11   have been charged, Mr. Maggio?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Tell me what you did.
14          MR. SCHECTMAN:  Judge, if it's acceptable to you
15   Mr. Maggio has written out a statement that I think speaks to
16   all four crimes.
17          THE COURT:  Considering the complexities here I'll
18   allow him to read and then if it's not he could fill in the
                        Page 8

7CJAAMAGP1.txt
19  gaps.
20         THE DEFENDANT:  Your Honor, from the late 1990s to
21  October 2005 I was a senior executive at Revko Ink.  During
22  that period I participated with others to hide the true
23  financial health of Revko from banks, counter-parties, auditors
24  and investors.  With my knowledge and active participation
25  Revko's substantial losses were covered up as revenues padded
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

18

7CJAAMAGP              Plea
1  and certain operating expenses were moved off its book.  Among
2  the acts I personally engaged in the signing of loan agreements
3  referencing paragraphs 61-D and 61-P of the indictment.
4         As a result of my conduct and that of my
5  coconspirators false financial statements were issued to obtain
6  debt financing from the public including 9 percent senior
7  subordinated notes referenced in Count Two of the indictment.
8         To consummate the sale of 57 percent of Revko to a
9  group headed by Thomas H. Lee in 2004 and to obtain $800
10  million in bank financing the same year and to effect the Revko
11  initial public offering in 2005.  Moreover, with my knowledge
12  false financial statements were filed with the SEC including
13  form 10K referencing Count Four.  The mails and interstate
14  wires were used as part of the fraudulent scheme.
15         I deeply regret my conduct and the harm that it has
16  caused.
17         THE COURT:  First of all, with respect to all of the
18  activities that you've indicate you participated in it
19  knowingly?
20         THE DEFENDANT:  Yes.
21         THE COURT:  Okay.  Where did this take place.
22         THE DEFENDANT:  In New York, New York.  Manhattan, New
23  York.
24         THE COURT:  You said coconspirators, so other people
25  had agreed with you to effectuate this scheme?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

19

7CJAAMAGP              Plea
1         THE DEFENDANT:  Yes.
2         THE COURT:  And the intent of this scheme was to
3  defraud?
4         THE DEFENDANT:  Yes.
5         THE COURT:  Now, I know you mentioned the notes and I
6  think you mentioned the 2005 initial offering that was
7  addressed to Count Three of the information, that is, whether
8  or not you had a scheme to defraud people based on the value of
9  the stock?
10         THE DEFENDANT:  Correct, your Honor.
11         THE COURT:  Mr. Maggio?
12         THE DEFENDANT:  Yes.
13         THE COURT:  That did involve false statements?
14         THE DEFENDANT:  Yes.
15         THE COURT:  False filings that you've indicated?
16         THE DEFENDANT:  Yes.
17         THE COURT:  Now, you said you used the mails which
18  interstate -- I mean, you used the mails, a phone?  How did you
19  use --
20         THE DEFENDANT:  Yes, used regular mail.  We used
21  Express Mail.  We used e-mail all to effect the scheme.
22         THE COURT:  You submitted false statements in the
23  mail?
                        Page 9

```
                              7CJAAMAGP1.txt
     24          THE DEFENDANT:  False statements, loan agreements as
     25     referenced here, yes.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                        20
           7CJAAMAGP              Plea
      1          THE COURT:  Okay.  Any --
      2          MR. BAROFSKY:  Your Honor, I'll just represent to the
      3     Court that with respect to Count Four, the wire transmission
      4     did in fact originate in the Southern District of New York in
      5     Manhattan and was wired outside of the Southern District to
      6     Virginia.
      7          THE COURT:  Anything else?
      8          MR. SCHECTMAN:  Nothing, your Honor.
      9          MR. BAROFSKY:  No, your Honor.
     10          THE COURT:  I am depending on you here.  Does any
     11     either counsel know of any reason why I should not recommend
     12     that this plea not be accepted?
     13          MR. BAROFSKY:  No, your Honor.
     14          MR. SCHECTMAN:  No, your Honor.
     15          THE COURT:  Based on defendant's allocution and the
     16     recommendations by the government I find that the defendant
     17     understands the nature, the charges and consequences of his
     18     guilty plea.  I also find that the plea is voluntary and that
     19     there is a factual basis for the plea.  I, therefore, recommend
     20     that the plea be accepted and direct that a presentence report
     21     be reaped.
     22          Sentencing will take place before Judge Stein on.
     23          MR. BAROFSKY:  May 9, at 2 p.m.
     24          THE COURT:  Is there anything else that needs to be
     25     addressed today.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                        21
           7CJAAMAGP              Plea
      1          MR. BAROVSKY:  Not from the government, your Honor.
      2          MR. SCHECTMAN:  Not from the offense.
      3          THE COURT:  We are adjourned.
      4                            o 0 o
      5
      6
      7
      8
      9
     10
     11
     12
     13
     14
     15
     16
     17
     18
     19
     20
     21
     22
     23
     24
     25
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                Page 10
```

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

## DECLARATIONS

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-05-A10821          RENEWAL OF: N/A

ITEM 1.    NAMED CORPORATION:     Refco Inc.
           550 W. Jackson Blvd., Suite 1300
           Chicago, IL 60661

ITEM 2.    POLICY PERIOD:   (a)  Inception Date:  8/11/2005
                            (b)  Expiration Date: 8/11/2006
                            at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.    LIMIT OF LIABILITY (inclusive of Defense Costs):
           $10,000,000 in the aggregate, for INSURING AGREEMENTS A and B combined

ITEM 4.    RETENTIONS:
           (a)  INSURING AGREEMENT A:          $0 or minimum required under applicable law, if any
           (b)  INSURING AGREEMENT B(1):       $300,000 for Loss arising from Claims alleging the same
                                               Wrongful Act or related Wrongful Acts (waivable under the
                                               circumstances described in CONDITION (A)(5))
           (c)  INSURING AGREEMENT B(2):       $500,000 for Loss arising from Claims alleging the same
                                               Wrongful Act or related Wrongful Acts (waivable under the
                                               circumstances described in CONDITION (A)(5))

ITEM 5.    PREMIUM: $395,000.00

ITEM 6.    NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:

           HCC GLOBAL FINANCIAL PRODUCTS
           P.O. Box 4018
           Farmington, CT 06034
           Attention: Claims Manager

ITEM 7.    DISCOVERY PERIOD:
           (a)  Premium:  150% of the Annual Premium.
           (b)  Duration:  365 days

ITEM 8.    ENDORSEMENTS ATTACHED AT ISSUANCE:
           1117C-IL  991-301  991-302  991-319  991-322  991-412  991-415  991-442  991-444 991-701
           991-804 991-830  991-861  991-876  991-1122  80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

_Michael L. Schell_                    _[signature]_                    _[signature]_

        Secretary                          President                    Authorized Representative

Date: September 23, 2005                                                USSIC-990 (04/2002)

**EXHIBIT**

**B**

# U. S. SPECIALTY INSURANCE COMPANY

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

#### This is a claims made policy. Please read it carefully.

In consideration of the payment of the premium, and in reliance upon the statements made in the Application, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the Insureds agree as follows:

## INSURING AGREEMENTS

(A)  The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B)  The Insurer will pay to or on behalf of the Company Loss arising from:

    (1)  Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

    (2)  Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

## DEFINITIONS

(A)  Application means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)  Claim means:

    (1)  any written demand for monetary or non-monetary relief,

    (2)  any civil proceeding commenced by service of a complaint or similar pleading,

    (3)  any arbitration, mediation or other similar dispute resolution proceeding,

    (4)  any criminal proceeding commenced by return of an indictment,

    (5)  the receipt by an Insured Person of a target letter or similar document in connection with a criminal investigation of such Insured Person, or

    (6)  any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

including any appeal from any such proceeding.

(C)  Company means the Named Corporation and any Subsidiary thereof.

(D)  Defense Costs means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation,

U.S. SPECIALTY INSUR~~~CE COMPANY 

adjustment, defense or appeal of a **Claim** against an **Insured Person** (or, with respect to **Securities Claims**, against any **Insured**), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the **Company**.

(E)    **Insured** means the **Insured Persons** and the **Company**.

(F)    **Insured Person** means:

    (1)    any past, present or future director or officer of the **Company**, including any person in a position which is the functional equivalent of a director or officer with respect to any entity included within the definition of **Company** or **Outside Entity** located outside the United States, and

    (2)    with respect only to **Securities Claims**, any past, present or future employee of the **Company**.

(G)    **Loss** means Defense Costs and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

    (1)    an **Insured Person** is legally obligated to pay as a result of any **Claim**, or

    (2)    the **Company** is legally obligated to pay as a result of any **Securities Claim**;

provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed.  For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insureds** in that regard.

(H)    **Named Corporation** means the entity designated as such in Item 1 of the Declarations.

(I)    **No Liability** means all defendant **Insureds** obtain by reason of a motion to dismiss, motion for summary judgment or trial a final non-appealable judgment in their favor.

(J)    **Outside Capacity** means service by an **Insured Person** as a director, officer, trustee, regent or governor of, or in another equivalent executive position with respect to, an **Outside Entity**, during such time that such service is at the request of the **Company**.

(K)    **Outside Entity** means any not-for-profit corporation, association, organization or entity.

(L)    **Policy Period** means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(M)    **Pollutants** means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(N)    **Securities Claim** means a **Claim** which:

    (1)    is brought by or on behalf of one or more securities holders of the **Company** in their capacity as such, or

U.S. SPECIALTY INSURANCE COMPANY 

      (2)    arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(O)   **Subsidiary** means any entity:

      (1)    during any time on or before the inception of the **Policy Period** in which the **Named Corporation** owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**; or

      (2)    created or acquired during the **Policy Period** during any time in which, as a result of such creation or acquisition, the **Named Corporation** owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**.

An entity ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**. The coverage afforded under this Policy with respect to **Claims** against a **Subsidiary** or any **Insured Person** thereof will apply only in respect of **Wrongful Acts** committed or allegedly committed after the effective time that such entity becomes a **Subsidiary** and prior to the time that such entity ceases to be a **Subsidiary**.

(P)   **Wrongful Act** means any:

      (1)    actual or alleged act, error, misstatement, misleading statement, omission or breach of duty:

            (a)    by an **Insured Person** in his or her capacity as such, including in an **Outside Capacity**, or

            (b)    with respect only to **Securities Claims**, by the **Company**; or

      (2)    matter claimed against an **Insured Person** solely by reason of his or her service in such capacity or in an **Outside Capacity**.

## EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim**:

(A)   arising out of based upon or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** gained such a profit or advantage;

(B)   arising out of, based upon or attributable to the commission by any **Insured** of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** so acted;

(C)   for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or

U.S. SPECIALTY INSURANCE COMPANY 

violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to **Securities Claims**;

(D)   for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, that this EXCLUSION (D) will not apply to **Securities Claims**;

(E)   for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; provided, that this EXCLUSION (E) will apply only to **Claims** involving employee pension or welfare benefit plans organized or sponsored by the **Company** for its own employees, and will not apply to **Securities Claims**;

(F)   brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person**, unless such **Claim** is:

   (1)   brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

   (2)   for an actual or alleged wrongful termination of employment, or

   (3)   brought or maintained by an **Insured Person** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

   (4)   brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company**;

   provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company**;

(G)   by or on behalf of, or in the name or right of, any **Outside Entity**, whether directly or derivatively, against an **Insured Person** for a **Wrongful Act** in his or her **Outside Capacity** with respect to such **Outside Entity**, unless such **Claim** is brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Outside Entity**, the **Company** or any **Insured Person**;

(H)   arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related **Wrongful Acts** alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time; or

(I)   arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation.

For purposes of determining the application of the above EXCLUSIONS, no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person** who did not have actual knowledge of, or directly participate in the commission of, such **Wrongful Act** and, except for **Wrongful Acts** of the **Company's** chairman of the board, chief executive officer, president, chief financial officer or general counsel, no **Wrongful Act** of any **Insured Person** will be imputed to the **Company**.

DISCOVERY PERIOD

If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set

U.S. SPECIALTY INSURANCE COMPANY 

forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right contained within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

EXTENSIONS

(A)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, to the extent that such **Claims** would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the **Insured Person's** lawful spouse solely by reason of such spouse's legal status as a spouse of the **Insured Person** or such spouse's ownership interest in property which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Person**. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such **Claim** will be treated as **Loss** which the **Insured Person** is legally obligated to pay on account of the **Claim** made against the **Insured Person**. This coverage extension does not apply, however, to the extent the **Claim** alleges any wrongful act or omission by the **Insured Person's** spouse.

CONDITIONS

(A)     <u>Limit of Liability and Retention</u>

(1)     The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period**, whether covered under one or more INSURING AGREEMENTS, will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)     **Defense Costs** will be part of and not in addition to the Limit of Liability, and payment of **Defense Costs** will reduce the Limit of Liability. **Defense Costs**, as incurred, will also be applied against the retention.

(3)     The retention stated in Item 4(b) of the Declarations will apply to **Loss**, including **Defense Costs**, which the **Company** is required or permitted to pay as indemnification or advancement to or on behalf of the **Insured Persons**, whether or not such **Loss** is actually paid, unless the **Company** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency. For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the **Named Corporation**, each **Subsidiary** and each **Outside Entity**, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the **Insured Persons** to the fullest extent permitted by law.

(4)     The Insurer will be liable only for the amount of **Loss** in connection with any **Claim**, which is in excess of the applicable retention stated in Item 4 of the Declarations. Such retention is to be borne by the **Insureds** and remain uninsured. A single retention will

U.S. SPECIALTY INSURANCE COMPANY 

apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

(5)    Notwithstanding the foregoing, with respect to **Securities Claims** the retentions stated in Items 4(b) and 4(c) of the Declarations will apply only to **Defense Costs**; provided, that if a **Securities Claim** is finally resolved by a determination of **No Liability**, no retention will apply to such **Securities Claim** even as respects **Defense Costs** and the Insurer will thereupon reimburse **Defense Costs** within the retention which shall already have been paid by the **Insureds**.

(6)    One retention amount will apply to the covered portion of each and every single **Claim**. If a single **Claim** is covered under more than one INSURING AGREEMENT, the retentions stated in Item 4 of the Declarations will be applied separately to the portions of the **Claim** covered by each INSURING AGREEMENT, and the sum of the retentions so applied will constitute the retention for each single **Claim**, which in total will not exceed the largest of the applicable retentions.

(B)    Notice of Claims and Reporting Provisions

(1)    The **Insureds** must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any **Claim** as soon as practicable after it is made.

(2)    If written notice of a **Claim** has been given to the Insurer pursuant to CONDITION (B)(1) above, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** of which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, will be considered to have been made at the time such notice was given.

(3)    If, during the **Policy Period** or the Discovery Period (if applicable), the **Insureds** become aware of any circumstances which may reasonably be expected to give rise to a **Claim** against the **Insureds** and if, before the end of the **Policy Period** or the Discovery Period (if applicable), the **Insureds** give written notice to the Insurer of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such **Wrongful Act**, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** described in such notice will be considered to have been made at the time such notice of circumstances was given.

(4)    All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 6 of the Declarations.

(C)    Interrelationship of Claims

All **Claims** alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single **Claim** and will be considered to have been made at the time the earliest such **Claim** was made.

(D)    Defense Costs, Settlements, Allocation of Loss, Priority of Payments

U.S. SPECIALTY INSURANCE COMPANY

(1)    The Insurer will have no duty under this Policy to defend any **Claim**. The **Insureds** must defend any **Claim** made against them. The **Insureds** may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the Insurer's prior written consent. Only those settlements, stipulated judgments and **Defense Costs** to which the Insurer has consented will be recoverable as **Loss** under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**.

(2)    The Insurer will pay covered **Defense Costs** on an as-incurred basis. If it is finally determined that any **Defense Costs** paid by the Insurer are not covered under this Policy, the **Insureds** agree to repay such non-covered **Defense Costs** to the Insurer.

(3)    If **Loss** covered by this Policy and loss not covered by this Policy are both incurred in connection with a single **Claim**, either because the **Claim** includes both covered and uncovered matters, or because the **Claim** is made both against **Insured Persons** (or, with respect only to **Securities Claims**, against **Insureds**) and against others not included within the definition of **Insured Person** (or, with respect only to **Securities Claims**, the definition of **Insured**), the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the **Claim** and the relative benefits to be obtained by the resolution of the **Claim**. The Insurer will be obligated to pay only those amounts or portions of **Loss** allocated to covered matters claimed against **Insured Persons** (or, with respect only to **Securities Claims**, against **Insureds**). If the **Insureds** and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of **Loss**, including **Defense Costs**, which the parties agree is not in dispute.

(4)    If the Insurer is obligated to pay **Loss**, including **Defense Costs**, under more than one INSURING AGREEMENT, whether in connection with a single **Claim** or multiple **Claims**, the Insurer will first pay any **Loss** payable under INSURING AGREEMENT (A) and, if the Insurer concludes that the amount of all **Loss**, including **Defense Costs**, is likely to exceed the Insurer's Limit of Liability, the Insurer shall be entitled to withhold some or all of any **Loss** payable under INSURING AGREEMENT (B)(1) or (B)(2) to ensure that as much of the Limit of Liability as possible is available for the payment of **Loss** under INSURING AGREEMENT (A). If no **Loss** is payable under INSURING AGREEMENT (A), or if the Insurer's obligations under INSURING AGREEMENT (A) have been satisfied, then, subject to the Insurer's Limit of Liability as set forth in Item 3 of the Declarations, the Insurer will pay such **Loss** as it is required to pay under INSURING AGREEMENT (B)(1) or (B)(2) in such manner and, in the event of multiple **Claims**, apportioned among such **Claims** as the **Named Corporation** shall direct in writing.

(E)    <u>Cancellation or Nonrenewal</u>

(1)    The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the **Named Corporation** at its last known address. The Insurer may not otherwise cancel this Policy.

(2)    The **Named Corporation** may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the **Named Corporation** may not cancel this Policy after the effective date of any acquisition of the **Named Corporation** as described in CONDITION (F) below. If the **Named Corporation** cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as

U.S. SPECIALTY INSURANCE COMPANY 

practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

(3)     If the Insurer elects not to renew this Policy, the Insurer must give the **Named Corporation** notice of non-renewal no less than sixty (60) days before the end of the **Policy Period**.

(4)     If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F)     <u>Changes in Control</u>

(1)     If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to the **Named Corporation**:

(a)     the **Named Corporation** merges into or consolidates with another entity such that the **Named Corporation** is not the surviving entity, or

(b)     another entity, person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Named Corporation**, or

(c)     a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Named Corporation**;

then coverage under this Policy will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2)     If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a)     the **Subsidiary** ceases to be a **Subsidiary**, or

(b)     a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

(G)     <u>Other Insurance and Other Indemnification</u>

(1)     Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

U.S. SPECIALTY INSURANCE COMPANY 

    (2)    All coverage for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Capacities** will be specifically excess of, and will not contribute with,

        (a)    any other insurance available to such **Insured Persons** by reason of their service in **Outside Capacities**, and

        (b)    any indemnification available to such **Insured Persons** in connection with their service in **Outside Capacities** from any source other than the **Company**, including but not limited to **Outside Entities**.

(H)    <u>Cooperation and Subrogation</u>

    (1)    In the event of any notice under CONDITION (B) of a **Claim** or of circumstances which may reasonably be expected to give rise to a **Claim**, the **Insureds** will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

    (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation the **Insured Persons'** rights to indemnification or advancement from the **Company**. The **Insureds** must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

(I)    <u>No Action against the Insurer</u>

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against an **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **Insureds** to determine the Insurer's liability; nor may the Insurer be impleaded by the **Insureds** or their legal representatives in any such action.

(J)    <u>Notices and Authority</u>

By acceptance of this Policy, the **Insureds** agree that the **Named Corporation** may act on behalf of all **Insureds** with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the cancellation or renewal of this Policy and the acceptance of any amendments thereto.

(K)    <u>Assignment</u>

No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

(L)    <u>Titles and Headings</u>

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

(M)    <u>Representations and Severability</u>

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

**U.S. SPECIALTY INSURANCE COMPANY**

No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(N)    <u>Changes</u>

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

(O)    <u>Entire Agreement</u>

By acceptance of this Policy, the **Insureds** and the Insurer agree that this Policy (including the **Application** and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties with respect to this insurance.

(P)    <u>Territory</u>

This Policy applies to **Wrongful Acts** actually or allegedly taking place or **Claims** made anywhere in the world.

(Q)    <u>Conformity to Statute</u>

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary                                    President

U.S. SPECIALTY INSURANCE COMPANY

ENDORSEMENT NUMBER: 1

## ILLINOIS AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on 8/11/05, forms part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company:

In consideration of the premium charged:

DEFINITIONS (D) <u>Defense Costs</u> of the policy has been amended to read:

**Defense Costs** means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured Person** (or, with respect to **Securities Claims**, against any **Insured**), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the **Company** or the Insurer.

DISCOVERY PERIOD of the policy has been amended to read:

If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period.

CONDITIONS (G)(1) <u>Other Insurance and Other Indemnification</u> of the policy has been amended to read:

(1)    Such insurance as is provided by this Policy will share proportionately with similar coverages provided under any other valid and collectible insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

USSIC 1117C-IL (06/04)                     Page 1 of 1

ENDORSEMENT NUMBER: 2

**EMPLOYMENT PRACTICES LIABILITY EXTENSION – NONENTITY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby understood and agreed that:

(1)     DEFINITION (P) **Wrongful Act** is amended to include any **Employment Practices Wrongful Act** by an **Insured Person** in his or her capacity as such.

(2)     DEFINITION (F) **Insured Person**, subsection (2) is amended to read:

    (2)     with respect only to **Securities Claims** and **Claims** for **Employment Practices Wrongful Acts**, any past, present or future employee of the **Company**.

(3)     The following DEFINITIONS are added to the Policy:

**Discrimination** means:

    (1)     any failure or refusal to hire, failure or refusal to promote, demotion or discharge of, or wrongful failure to grant tenure to, any person, or

    (2)     any limitation, segregation or classification of any employee or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or preference, national origin, religion, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**Employment Practices Wrongful Act** means any actual or alleged:

    (1)     **Discrimination,**
    (2)     **Retaliation,**
    (3)     **Sexual Harassment,**
    (4)     **Workplace Harassment,**
    (5)     **Workplace Tort,** or
    (6)     **Wrongful Termination.**

**Retaliation** means retaliatory treatment against an employee of the **Company** on account of such employee's exercise or attempted exercise of his or her rights under law.

**Sexual Harassment** means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made a condition of employment with the **Company**, is used as a basis for employment decisions by the

**Company,** creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Harassment** means conduct that creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Tort** means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the **Company.**

**Wrongful Termination** means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

(4)     EXCLUSION (C) will not apply to **Loss** for mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy caused by an **Employment Practices Wrongful Act.**

(5)     EXCLUSION (F), subsection (2) is amended to read as follows:

(2)     for an actual or alleged **Employment Practices Wrongful Act;**


All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement: .

By:_____
             Attorney-in-fact

ENDORSEMENT NUMBER: 3

### ADD SPECIFIC INDIVIDUALS AS "INSURED PERSONS"

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (F) **"Insured Person"** is amended to include the following individuals:

Insurance Manager and General Counsel

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
         Attorney-in-Fact

991-302                          Page 1 of 1
Ed (05/00)

ENDORSEMENT NUMBER: 4

**AMEND "LOSS" TO INCLUDE PRE-JUDGMENT
AND POST-JUDGMENT INTEREST**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (G) **Loss** is amended to read as follows:

    (G)    **Loss** means **Defense Costs** and any damages, settlements, judgments, pre-judgment interest, post-judgment interest, or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

        (1)    an **Insured Person** is legally obligated to pay as a result of any **Claim**, or

        (2)    the **Company** is legally obligated to pay as a result of any **Securities Claim**;

provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insureds** in that regard.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

            By: _____
                       Attorney-in-Fact

ENDORSEMENT NUMBER: 5

**EMPLOYED LAWYERS EXTENSION
(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer.**

(2)     DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement, misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her capacity as such, in the rendering or failure to render professional legal services for the **Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement, misleading statement, omission or breach of duty by such **Employed Lawyer** in connection with any activities: (1) that are not related to such **Employed Lawyer's** employment with the **Company**; (2) that are not rendered on the behalf of the **Company** at the **Company's** written request; or (3) that are performed by the **Employed Lawyer** for others for a fee.

(3)     The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the **Company** who is admitted to practice law and who is employed at the time of any alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company.**

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

The Insurer will not be liable to make any payment of **Loss** in connection with any **Claim** made against an **Employed Lawyer:**

(a)     alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring at a time when such **Employed Lawyer** was not employed as a lawyer by the **Company;**

(b)     alleging, arising out of, based upon or attributable to any **Claim** made or any prior or pending litigation as of 8/11/05, or alleging or derived from the same facts or circumstances as alleged in such pending or prior litigation;

(c)     alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of 8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that such **Wrongful Act** could give rise to a **Claim;**

(d)     alleging, arising out of, based upon or attributable to any activities by such **Employed Lawyer** as an officer or director of any entity other than the **Company.**

(5)     For purposes of the applicability of the coverage provided by this endorsement, the **Company** will be conclusively deemed to have indemnified the **Employed Lawyer** to the extent that the **Company** is permitted or required to indemnify him or her pursuant to

991-322                                    Page 1 of 1
(Ed. 09/03)

law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)     The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)     The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)     Solely for purposes of the coverage provided under this endorsement:

(a)     The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $100,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)     A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such **Loss** by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
              Attorney-in-Fact

991-322                                   Page 1 of 1
(Ed. 09/03)

ENDORSEMENT NUMBER: 6

**ERRORS AND OMISSIONS EXCLUSION
WITH MANAGEMENT CARVEBACK**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the **Company** or by any **Insured Person**, any service for others for a fee; provided, that this exclusion will not apply to a **Claim** against an **Insured Person** for a **Wrongful Act** in connection with the management or supervision of the **Company** or any division or group therein.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                        Attorney-in-Fact

ENDORSEMENT NUMBER:  7

## SPECIFIC LITIGATION EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with any **Claim** arising out of, based upon or attributable to the following litigation:

Edward McElwreath Case

or alleging or derived from the same or essentially the same facts or circumstances as alleged in such litigation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____

Attorney-in-Fact

991-415
Ed. 09/05

Page 1 of 1

ENDORSEMENT NUMBER: 8

**AMEND POLLUTION EXCLUSION ENDORSEMENT**
**(A-SIDE CARVEBACK)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (D) of this Policy is amended to read in its entirety as follows:

(D)     for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, that this EXCLUSION (D) will not apply to **Securities Claims**; provided further, that this EXCLUSION (D) will not apply to **Claims** for **Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
            Attorney-in-Fact

ENDORSEMENT NUMBER: 9

## AMEND EXCLUSION (C) ENDORSEMENT –
## A-SIDE CARVEBACK

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (C) is amended to read in its entirety as follows:

(C)     for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to:

(1)     **Securities Claims,** or

(2)     **Claims** for **Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
        Attorney-in-Fact

ENDORSEMENT NUMBER: 10

**FULL SEVERABILITY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, CONDITION (M) <u>Representations and Severability</u> is amended to read as follows:

(M)     <u>Representations and Severability</u>

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
        Attorney-in-Fact

991-701                          Page 1 of 1
Ed (09/03)

ENDORSEMENT NUMBER: 11

## DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)   INSURING AGREEMENTS is amended by the addition of the following:

The Insurer will pay to or on behalf of the **Company** all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** or the Discovery Period, if purchased, up to the amount of the **Derivative Demand Investigation Costs Sub-Limit.**

(2)   DEFINITIONS is amended by the addition of the following:

**Derivative Demand** means a written demand by one or more shareholders of the **Company** made upon its Board of Directors to bring a civil proceeding in a court of law against an **Insured Person** for a **Wrongful Act.**

**Derivative Demand Investigation Costs** means reasonable fees, costs and expenses (including but not limited to attorneys' fees and experts' fees) incurred in connection with the investigation or evaluation of any **Derivative Demand**, but excluding wages, salaries, fees, benefits or overhead expenses of any **Insured Person.**

**Derivative Demand Investigation Costs Sub-Limit** means $250,000.

(3)   The Insurer's maximum aggregate liability for **Derivative Demand Investigation Costs** resulting from all **Derivative Demands** shall be the amount set forth in the definition of **Derivative Demand Investigation Costs Sub-Limit**, regardless of the number of **Derivative Demands** received during the **Policy Period** or the Discovery Period, if purchased. The **Derivative Demand Investigation Costs Sub-Limit** shall be part of and not in addition to the Limit of Liability set forth in Item 3 of the Declarations, and payment of such **Derivative Demand Investigation Costs** shall reduce such Limit of Liability.

(4)   There shall be no retention applicable to **Derivative Demand Investigation Costs.**

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:_____

Attorney-in-Fact

991-804                          Page 1 of 1
Ed (06/00)

ENDORSEMENT NUMBER: 12

**SEPARATE RETENTION FOR SECURITIES CLAIMS
UNDER INSURING AGREEMENT (B)(1)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, solely for purposes of **Loss** payable
under INSURING AGREEMENT (B)(1) arising from any **Securities Claim**, the retention stated
in Item 4(b) of the Declarations is amended to be $500,000.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By:_____
            Attorney-in-Fact

ENDORSEMENT NUMBER: 13

## NON-RESCINDABLE:
## INSURING AGREEMENT (A) ONLY

To be attached to and made a part of Policy No. 24-MGU-05-A10821 , issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
            Attorney-in-Fact

991-861                          Page 1 of 1
Ed (04/04)

ENDORSEMENT NUMBER: 14

**SPECIFIC EVENT(S) EXCLUSION**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any event described hereunder.

     Excluded Event(s):
     Wells Notice/SEC Investigation

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

     Effective date of this endorsement:

               **By:**_____
                         Attorney-in-Fact

ENDORSEMENT NUMBER: 15

## CONTROLLING SHAREHOLDER COVERAGE –
## SPECIFIC PERSON(S)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)     The following INSURING AGREEMENT is added to the Policy:

The Insurer will pay to or on behalf of the **Controlling Shareholder Loss** arising from a **Securities Claim** first made during the **Policy Period** or the Discovery Period (if applicable) against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**.

(2)     The following DEFINITION is added to the Policy:

**Controlling Shareholder** means the following person(s):

Philip Bennett

(3)     DEFINITION (E) **Insured** is amended to read as follows:

(E)     Insured means:  (1) the **Insured Persons**; (2) the **Company**; or (3) the **Controlling Shareholder** but only with respect to **Securities Claims**.

(4)     DEFINITION (G) **Loss**, subsection (2), is amended to read as follows:

(2)     the **Company** or **Controlling Shareholder** is legally obligated to pay as a result of any **Securities Claim**;

(5)     DEFINITION (P) **Wrongful Act**, subsection (1)(b), is amended to read as follows:

(b)     with respect only to **Securities Claims**, by the **Company** or by the **Controlling Shareholder** in his or her capacity as such or any matter claimed against such **Controlling Shareholder** by reason of his or her status as such; or

(6)     EXCLUSION (F) is amended to read as follows:

(F)     brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person** or **Controlling Shareholder**, unless such **Claim** is:

(1)     brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

(2)   for an actual or alleged wrongful termination of employment, or

(3)   brought or maintained by an **Insured Person** or a **Controlling Shareholder** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

(4)   brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company**;

provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company**;

(7)   A retention of $300,000 will apply to **Loss** resulting from each **Claim** for which coverage is provided under this endorsement; provided, however, that such retention will apply only to Defense Costs and will not apply to any other **Loss**.

(8)   CONDITION (F) <u>Changes in Control</u>, subsection (2), is amended to read as follows:

(2)   If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a)   the **Subsidiary** ceases to be a **Subsidiary**, or

(b)   a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____

Attorney-in-Fact

ENDORSEMENT NUMBER: 16

**POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE**

   To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002. The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses. For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States —— (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure: (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

ENDORSEMENT NUMBER: 17

**EMPLOYED LAWYERS EXTENSION
(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

This endorsement replaces and supersedes Endorsement Number 5 ("Employed Lawyers Extension (Separate Limit and Retention")) as of the effective date of this endorsement.

In consideration of the premium charged:

(1)    DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer**.

(2)    DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement, misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her capacity as such, in the rendering or failure to render professional legal services for the **Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement, misleading statement, omission or breach of duty by such **Employed Lawyer** in connection with any activities: (1) that are not related to such **Employed Lawyer's** employment with the **Company**; (2) that are not rendered on the behalf of the **Company** at the **Company's** written request; or (3) that are performed by the **Employed Lawyer** for others for a fee.

(3)    The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the **Company** who is admitted to practice law and who is employed at the time of any alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company**.

(4)    The EXCLUSIONS section of the Policy is amended by the addition of the following:

The Insurer will not be liable to make any payment of Loss in connection with any **Claim** made against an **Employed Lawyer**:

(a)    alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring at a time when such **Employed Lawyer** was not employed as a lawyer by the **Company**;

(b)    alleging, arising out of, based upon or attributable to any **Claim** made or any prior or pending litigation as of 8/11/05, or alleging or derived from the same facts or circumstances as alleged in such pending or prior litigation;

(c)    alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of 8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that such **Wrongful Act** could give rise to a **Claim**;

991-322
(Ed. 09/03)

Page 1 of 1

(d)    alleging, arising out of, based upon or attributable to any activities by such **Employed Lawyer** as an officer or director of any entity other than the **Company**.

(5)    For purposes of the applicability of the coverage provided by this endorsement, the **Company** will be conclusively deemed to have indemnified the **Employed Lawyer** to the extent that the **Company** is permitted or required to indemnify him or her pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)    The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)    The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)    Solely for purposes of the coverage provided under this endorsement:

(a)    The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $1,000,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)    A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such **Loss** by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:    8/11/2005

By    _____
                Attorney-in-Fact

991-322                              Page 1 of 1
(Ed. 09/03)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------X
                                        :
In Re:                                  :  05-60006
                                        :
     REFCO, LLC,                        :
                                        :
              Debtor.                   :
----------------------------------------X
                                        :
AXIS REINSURANCE COMPANY,               :  07-1712
                                        :
              Plaintiff,                :
                                        :
              v.                        :  One Bowling Green
                                        :  New York, New York
BENNETT, et al.,                        :
                                        :  August 30, 2007
              Defendants.               :
----------------------------------------X
```

TRANSCRIPT OF HEARING ON MOTIONS
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Klejna/Murphy:          MATTHEW R. GOLDMAN, ESQ.
                            HELEN B. KIM, ESQ.
                            Baker & Hostetler LLP
                            3200 National City Center
                            1900 East 9th Street
                            Cleveland, Ohio  44114-3485

For Director Defendants:    MICHAEL F. WALSH, ESQ.
                            SCOTT E. COHEN, ESQ.
                            Weil, Gotshal & Manges LLP
                            767 Fifth Avenue
                            New York, New York  10153-0119

For Axis Reinsurance:       JOAN M. GILBRIDE, ESQ.
                            WAYNE BORGEEST, ESQ.
                            ROBERT A. BENJAMIN, ESQ.
                            Kaufman, Borgeest & Ryan LLP
                            200 Summit Lane Drive
                            Valhalla, New York 10595


                            (Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


APPEARANCES CONTINUED:


For Defendants Schoen,      PAUL FERRILLO, ESQ.
  Jaekel Lee, Harkins,      Weil, Gotshal & Manges LLP
  Brightman, O'Kelly        767 Fifth Avenue
  and Gantscher:            New York, New York  10153-0119


For Phillip Silverman:      RICHARD CASHMAN, ESQ.
                            Times Square Tower
                            7 Times Square
                            New York, New York  10036-6524


For Tone Grant:             NORMAN L. EISEN, ESQ.
                            Zuckerman Spaeder LLP
                            1800 M Street NW, Suite 1000
                            Washington, D.C.  20036-5802


For Phillip Bennett:        DEBORAH ADLER, ESQ.
                            Golenbock, Eiseman, Assor,
                              Bell & Peskoe LLP
                            457 Madison Avenue
                            New York, New York  10022


For Arch Insurance:         DANIEL STANDISH, ESQ.
                            Wiley Rein LLP
                            1776 K Street NW
                            Washington, D.C.  20006


For Robert Trosten:         RACHEL M. KORENBLAT, ESQ.
                            Morvillo, Abramowitz, Grand,
                              Jason, Anello & Bohren, PC
                            565 Fifth Avenue
                            New York, New York  10017


                            (Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


APPEARANCES CONTINUED:



For Sexton and Sherer:     IVAN O. KLINE, ESQ.
                           Friedman & Wittenstein
                           600 Lexington Avenue
                           New York, New York  10022



Court Transcriber:         RUTH ANN HAGER
                           TypeWrite Word Processing Service
                           356 Eltingville Boulevard
                           Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

4

1   (Proceedings began at 10:20 a.m.)

2              THE COURT:  Okay.  Refco and the Axis Reinsurance

3   matters.

4                   [Pause in the proceedings.]

5              MR. GOLDMAN:  Good morning, Your Honor.

6              THE COURT:  All right.  There are a number of

7   matters on that generally come under the heading of the Axis

8   Reinsurance matters.

9              Have the parties discussed any particular order

10  that they want to proceed in?

11             MR. GOLDMAN:  Good morning, Your Honor.  Matthew

12  Goldman, Baker & Hostetler.  I will be speaking on behalf of

13  what we have called the moving defendants, the parties seeking

14  a preliminary injunction for advancement of defense costs.

15             Yes, I have spoken with Joan Gilbride -- yeah.  I

16  have spoken with Joan Gilbride.  I believe at least insofar as

17  Axis and the other moving defendants are concerned, the

18  appropriate procedure would be that this Court first determine

19  whether or not Arch should be permitted to intervene so that we

20  can determine whether or not they would be heard.

21             THE COURT:  Right.  I agree with you.

22             MR. GOLDMAN:  Our suggestion --

23             THE COURT:  I'd go with that first.

24             MR. GOLDMAN:  Okay.  Thank you, Your Honor.  Then

25  our suggestion would be that we proceed with the motion to

5

1  advance defense costs, the motion to file by the motions to

2  dismiss or to stay.  And insofar as the lift stay motions are

3  concerned, there is no objection to lifting the stay to the

4  extent that it is applicable to deal with the defense cost

5  issues.  That's not in dispute at all.  The only thing that is

6  potentially at issue in the lift stays in my supplemental

7  motion asking for permission to also enter into settlements.

8  We can put that at the end because nothing about the lift stay

9  interferes with this argument.

10            THE COURT:  Okay.  I appreciate that probably a

11  fair amount of thought went into that order of proceeding and

12  perhaps some tactical considerations, too, but it strikes me

13  given the lack of any opposition, except the limited amount to

14  the part of the lift stay motion that it ought to be be lifted

15  for all purposes, that I should hear the motion to dismiss

16  first and then deal with the issue of advancing defense costs,

17  particularly since the debtor doesn't seem to care about that

18  and it appears to be no dispute because they haven't taken any

19  position whatsoever on this and they've not opposed lifting the

20  stay.

21            MR. GOLDMAN:  Your Honor, I didn't actually say

22  it's that material in that order.

23            THE COURT:  Okay.

24            MR. GOLDMAN:  So, yeah, if the Court wishes to do

25  dismissal first, that is fine with us, Your Honor.

6

1                THE COURT:  Okay.  That's fine.

2                MR. GOLDMAN:  All right.  So I think then that

3      means that we start with intervention?

4                THE COURT:  So I need to hear from Arch, then,

5      first.

6                MR. GOLDMAN:  Thank you, Your Honor.

7                MR. STANDISH:  Good morning, Your Honor.  Daniel

8      Standish of Wiley Rein on behalf of Arch Insurance Company.

9                Your Honor, we seek to intervene in this case for

10     the limited purpose of opposing the request for the advancement

11     of defense costs notwithstanding the existence of a coverage

12     defense that bars coverage for the claim in its entirety.

13               Arch is in the same tower of insurance as Axis.

14     Arch has the policy that is ten million dollars excess of 40

15     million dollars.  At this point, the underlying limits have

16     been depleting rapidly.  We understand that the burn rate at

17     this juncture is about two million dollars a month.

18               The demand is that the officer defendants in this

19     case have made that Axis pay for their defense fees and costs

20     on an as-incurred basis notwithstanding the existence of a

21     threshold defense.  That is an issue that will affect Arch, as

22     well, in two different ways.  One, it will affect the amount of

23     the policy limits that remain under the Arch layer, as well as

24     affect Arch's rights potentially as a precedential matter if and

25     when Arch's policy is reached, which at this point given the

7

1    burn rate at least the amounts incurred would certainly

2    implicate that level.  So for that reason, Arch has a very

3    strong interest of that particular issue.

4            Arch also feels strongly about intervening in this

5    case because as Your Honor may recall in June of 2006 Your

6    Honor gave leave for Arch to file its declaratory judgment

7    action in New York Supreme Court in order to obtain an

8    adjudication of the coverage issues.  Your Honor found that

9    Arch would be prejudiced if it were unable to do so.

10           Once we got before Justice Freedman, the officer

11   defendants who are now demanding that Axis advance defense fees

12   and costs argued to Justice Freedman that the Arch suit should

13   be dismissed without prejudice, because it was totally

14   speculative whether or not the erosion of the underlying layers

15   would ever occur and Arch's policy would be implicated.  And

16   even if it did implicate Arch's layer, Arch could simply stand

17   on its denial and refuse to pay, thus directly contrary to the

18   position that they've now taken before this court in demanding

19   advancement.

20           So for that reason, we feel that Arch's interest --

21           THE COURT:  That wasn't the only reason they

22   opposed it, right?

23           MR. STANDISH:  That was not the only reason.

24   That's correct, Your Honor.  There was also an argument that it

25   would overlap with the underlying facts at issue in the

8

1  criminal prosecution going forward.

2          But Justice Freedman specifically did not reach

3  the issue of whether or not the insurers could be obligated to

4  include advance defense fees and costs notwithstanding the

5  existence of a threshold coverage defense.

6          Arch has moved promptly to intervene, Your Honor.

7  We've briefed this contemporaneously.  We filed with our

8  intervention papers our opposition to the request for

9  advancement and we don't feel that any of the defendants would

10  be prejudiced by the intervention.  In fact, it would be far

11  more efficient to adjudicate this issue in the context of the

12  same proceeding than have it litigated again at some future

13  juncture against Arch in a separate pleading.

14          So for that reason, Your Honor, we submit that

15  permissive intervention is appropriate here and should be, Arch

16  should be permitted to be in for this purpose.

17          THE COURT:  But it's not necessarily the same

18  issue, is it?

19          MR. STANDISH:  With respect to the primary policy

20  language it is, Your Honor.  Both the Axis policy and the Arch

21  policy incorporate by reference the language on which the

22  officers are relying for the advancement of defense fees and

23  costs.  They're focusing in the primary policy in condition (d)

24  that says that the insurer shall advance the covered advanced

25  costs on an as-incurred basis.  The dispute over whether or not

9

1   the advancement of covered advanced costs is required when the

2   policy excludes the defense costs is the same issue as to both

3   Axis and Arch.

4           The only distinction is in the policy provisions

5   on which Arch and Axis are relying for the denial of coverage.

6   Arch has its own prior knowledge exclusion in its policy and

7   there is no dispute in that case that that exclusion exists and

8   that it applies.  There's a dispute in the Axis case over

9   whether or not the exclusion actually is in the policy.  Axis

10  obviously takes the position that it is, but that dispute

11  doesn't exist as to Arch.

12          But with respect to the primary policy language,

13  the question of whether advancement of "covered defense costs"

14  means you have to advance uncovered defense costs is precisely

15  the same.

16          THE COURT:  Okay.

17          MR. STANDISH:  Thank you, Your Honor.

18          MR. KLINE:  Good morning, Your Honor.  Ivan Kline

19  from Friedman & Wittenstein in New York.

20          We represent in this action two of the officer

21  defendants, William Sexton and Sherer, arguing against the

22  intervention on behalf of them as well as defendants Klejna,

23  Murphy and Silverman, who are the five sort of moving insureds

24  on the advancement motion.

25          And even assuming there is some common question of

10

1    law, this is clearly a case where the Court should exercise its

2    discretion to deny the motion.  This case is about coverage

3    under the Axis policy, not the Arch policy.  We've asserted a

4    counterclaim against Axis; under the Axis policy we have not.

5    They are not mentioned or in any way involved the Arch policies

6    and we've made an advancement motion solely as against Axis

7    because its policy is now the one that's up, so to speak.

8            We have no claims against Arch.  We haven't asked

9    for advancement against Arch.  Arch wants to litigate not just

10   advancement in the abstract.  It specifically says it wants to

11   intervene to litigate whether the Arch policy requires Arch to

12   advance defense costs, but nobody's made that request, so I

13   don't know against whom they're going to litigate that, because

14   we haven't made the motion.  So procedurally there is a flaw in

15   what they seek to do, because nobody is seeking relief against

16   Arch, so they can't really be heard on an issue of when their

17   policy requires advancement of defense costs.  In fact, they

18   rely very clearly on a specific provision of their policy,

19   which we have not briefed, we have not addressed because we

20   have no claims against them.

21           There's also a procedural flaw which their own

22   proposed opposition brief sets out and that they didn't address

23   in their reply when we pointed it out.  They state in their

24   proposed brief and in opposing advancement that in order for

25   there to be an advancement motion, there has to be an

11

1  underlying claim to support the request for relief, which

2  advancement would go with.  For example, the five moving

3  insureds have counterclaims against Axis and it's those

4  counterclaims with declaratory injunctive relief that support

5  our request for advancement.

6          Arch points that out because it says others aren't

7  really empowered to advancement anyway, but then it still seeks

8  to adjudicate advancement under its policy just by itself

9  without being hooked on in any way to any claim by or against

10  it.  And it's created its own procedural conundrum.  It

11  recognized it can't come in here to seek to intervene and

12  litigate coverage under the policy, because that would be

13  barred by Justice Freedman's order.  So instead they're seeking

14  just to litigate this advancement issue, but you can't really

15  litigate that in the abstract by itself without the "coverage"

16  under the policy also being in dispute.  They themselves state

17  that in their proposed opposition brief.

18          In terms of the other procedural flaw would be if

19  Your Honor granted that intervention, you know, then what?  We

20  haven't made a motion against Arch, so how can Your Honor

21  adjudicate whether advancement is required under the Arch

22  policy when we haven't briefed it, and we have no intention at

23  this point of briefing it, and may never have to brief it.

24          And in terms of judicial efficiency, some court is

25  going to have the coverage dispute against Arch unless it, you

12

1   know, goes away due to one cause or another.  It's not going to

2   be this court, because by their own statement they can't come in

3   here now to seek to adjudicate coverage.  So to have this court

4   somehow rule in the abstract on advancement under the Arch

5   policy simply makes no sense when some other court will have

6   the coverage issue.  And in both cases they're going to be

7   raising the prior knowledge exclusion in their policy as the

8   key provision to look at.

9           Now, clearly for purposes of efficiency, if we

10  ever want to seek advancement under the Arch policy, we'll have

11  to do something.  We'll have to do it in some court where

12  coverage is also at issue.  And in terms of what Arch's counsel

13  said we're already inconsistent positions, advancement was not

14  an issue before this.

15          THE COURT:  Oh, you don't have to get into that

16  one.

17          MR. KLINE:  All right.  I think that covers the

18  points I want to make, unless Your Honor has some further

19  questions.

20          THE COURT:  Okay.  Why isn't counsel right that, as

21  you said, the common issue here is coverage under the primary

22  policy and coverage was raised in state court so why isn't this

23  really an end run around the state court decision?

24          MR. KLINE:  There are different coverage issues.

25  This coverage issue is not reached by Justice Freedman.  At

13

1  pages 3 to 4 of the rule --

2          THE COURT:  But she said it was premature and this

3  shouldn't be happening now.

4          MR. KLINE:  She found that the litigation of the

5  application of the Arch exclusion was premature.  What Justice

6  Freedman did not reach was the question that is being presented

7  by the motion for preliminary injunction to be argued this

8  morning of whether or not under language of the primary policy

9  and applicable law an insurance company that has denied,

10  regardless of the basis, can't -- has to be obligated to advance

11  defense fees and costs notwithstanding the existence of that

12  coverage defense when the demand is made and has to instead

13  litigate issues of coverage all the way to a conclusion and

14  then try to recoup those amounts.

15          That limited question is the question on which

16  Arch seeks to intervene here, and that's the question that's

17  presented by the motion for preliminary judgment.  Regardless

18  of what the specific coverage defense is, the common issue is

19  whether or not given the language of the primary policy that

20  only requires the advancement of covered defense costs, the

21  Court should turn a blind eye to that language and enforce the

22  advancement of those defense fees and costs anyway until there's

23  some final adjudication in the coverage litigation.

24          THE COURT:  But I mean, you're using the same term,

25  "covered," "coverage."  It's the same term and it's the same

14

1  analysis, isn't it, that she went through?

2         MR. KLINE:  No, Your Honor.  The analysis --

3         THE COURT:  I mean, I understand that she had an

4  alternative basis for her ruling, so one of her bases -- we

5  went through this point on coverage.

6         MR. KLINE:  Your Honor, Justice Freedman did not

7  look at the advancement language in the policy.  In the Supreme

8  Court, the director defendants actually asked Justice Freedman

9  to enter an order for the advancement of defense fees and costs

10  until final adjudication of the coverage issue.  And in her

11  opinion she expressly did not reach that issue, so the specific

12  issue on which we seek to intervene in this matter were reached

13  by Justice Freedman.

14         THE COURT:  They're not asking for it here.

15         MR. KLINE:  They are, Your Honor, in their

16  preliminary injunction papers.

17         THE COURT:  Not from Arch.

18         MR. KLINE:  They are asking it from Axis and it

19  will be the same issue under the primary policy language

20  because both Arch and Axis incorporate by reference conditions

21  D-2 and D-3, which are at issue in this case.

22         Because of that overlap Arch has an interest in

23  the income.  I have no doubt that depending on the outcome here

24  one side or the other will be able to tout that, if and when

25  the Arch layer is ever reached.  And, given the burn rate on

15

1    defense expenses and the demands for settlement that are now

2    being bandied about, I have no doubt that the existence of

3    coverage under the Arch policy will be squarely at issue in the

4    very near future based on the communications that we're

5    receiving.  And at that point, we're going to have to deal with

6    this issue.  It's much more efficient to deal with the issue in

7    one proceeding when that same language is at issue on that

8    issue.

9              THE COURT:  Even though you have different

10   language in your own policy from --

11             MR. KLINE:  The exclusionary language differs.

12   That's correct, Your Honor.

13             THE COURT:  Okay.

14             MR. STANDISH:  Your Honor, I just want to

15   reiterate.  Their motion very clearly says they seek to

16   intervene to litigate the issue whether the Arch policy

17   requires Arch to advance defense costs.  They're not coming in

18   seeking to just talk about whether in general we can get

19   advancement or whether under the Axis policy we're entitled to

20   advancement and question whether they even have standing to do

21   that.

22             In that sense, they're like any insurer that may be

23   out there that may have language similar to the primary policy

24   in any case.  You wouldn't allow that insurer to come and

25   intervene in this case.  And here, they've already been told by

1    Justice Freedman they really can't do what they're now seeking

2    to do.  And if you look at their proposed brief, it's full of

3    references that their policy, their prior knowledge to

4    exclusion: they're seeking to argue the applicability of that

5    exclusion albeit to try to avoid advancement as against them,

6    which has not been sought.

7                THE COURT:  Okay.  Arch Insurance Company has

8    moved for permission to intervene under Rule 24(b) incorporated

9    by Bankruptcy Rule 7024 in this declaratory judgment litigation

10   between a lower tier insurer, Axis Reinsurance Company and

11   various defendants, former directors and officers of Refco,

12   Inc.  The movant acknowledges that there's not a complete

13   overlap of the issues in the Axis Reinsurance litigation and

14   the litigation that it would want to pursue if it were

15   permitted to intervene, which would be to seek a declaratory

16   judgment that it -- that is, Arch -- would not be obligated

17   under the Arch policy to advance defense costs to the directors

18   and officer beneficiaries of Refco's insurance with it.  That is

19   because exclusions relied upon by Arch in its policy differ

20   from exclusions relied upon by Axis.

21                The common issue that Arch relies upon for

22   purposes of Rule 24(b) is language in the first-tier policy

23   pertaining to covered claims as they relate to defense costs,

24   among others -- or "losses," as defined in the policy -- which

25   is a link in the logical chain that if broken might prevent

17

1   Arch from pursuing certain of its arguments, if not all of
2   them, that it does not have to advance coverage.  No
3   beneficiary of the policy has actually apparently at this time
4   sought to compel Arch to advance coverage.  I would also note
5   that the debtor in this case has appeared to be completely
6   neutral on the issue and is not a party to this litigation and
7   has taken no position whatsoever.
8           It appears to me that to the extent that it is a
9   common issue of law (and fact to the extent there's any factual
10  issue) in interpreting the relevant insurance policies, it
11  would not be a proper exercise of my discretion to permit Arch
12  to intervene.  As is clear from the briefing on the motions
13  before the Court today in connection with the Axis Reinsurance
14  matter, first, the actual language of the policy is important.
15    Second, issues of ripeness or whether the Axis litigation is
16  premature are important and are to some extent fact driven, in
17  particular driven by the claimed exigencies faced by the policy
18  beneficiaries, the officers and officers who have felt the
19  pinch of not getting the coverage at that tier.
20          To my mind, it would therefore be inefficient to
21  include Arch in this litigation at this time, and it would
22  instead be efficient to pursue the issues that are truly before
23  the Court in this litigation: that is, the issues involving
24  Axis and the directors and officers' claims against Axis and not
25  use this litigation as a funnel to invite any prospective

18

1   insurer to join some sort of massive proceeding.

2          That's compounded by two other considerations.

3   First, I note that Arch pursued in New York State court

4   declaratory judgment litigation regarding the terms of its own

5   policy and "coverage" under that policy, and the state court

6   ruled that that litigation was premature.  It seems to me, in

7   large extent this is an end run around that ruling -- that,

8   i.e., Arch's request to intervene here would be an end run

9   around that ruling -- and at a minimum that if I permitted Arch

10  to intervene, we would be frequently interrupted in litigation

11  by considerations of whether what Arch is in particular seeking

12  at that particular moment (if I permitted it to intervene)

13  would be an end run around that order or whether the order

14  would be binding on it.

15         Finally, as I noted at the pretrial conference on

16  this matter, I continue to have some concern, given (a) that

17  Refco's plan is confirmed and effective and substantially

18  consummated and (b) that Refco, the debtor, has no

19  participation in this litigation at all, as to the extent of my

20  jurisdiction over it.  And in light of all the other factors

21  that I've already mentioned arguing that I should not exercise

22  my discretion to further expand this adversary proceeding to

23  involve other insurers, it seems to me that Arch's issues, if

24  they're to be brought at all, should be brought in another court

25  when they become ripe.

19

1       So I'm not sure which of these counsel here took

2   the lead on this matter, but certainly you could submit an

3   order consistent with my ruling denying the motion.

4       I would ask you just to send a -- well, you can

5   work it out among yourselves.  I'd just ask one of you to send a

6   copy to Arch's counsel.  You don't have to settle it on him, but

7   just send him a copy at the same time you're sending it to

8   chambers, or as a courtesy you may want to send it to him a day

9   before, so he can determine that it's consistent with my ruling.

10

11      MR. KLINE:  Okay.  No problem.

12      THE COURT:  Okay.  Okay.  All right.  So that

13  leads to the motion to dismiss.

14              [Pause in the proceedings.]

15      MR. WALSH:  Michael Walsh from Weil, Gotshal &

16  Manges on behalf of all of what we call the director

17  defendants.  That's Brightman, Ganter, Harkins, Jeakel, Lee,

18  O'Kelly and Schoen.  It seems like Your Honor is very familiar

19  with the background here, but I can just run through the

20  structure if that would be helpful.

21      THE COURT:  Okay.

22      MR. WALSH:  Refco arranged the known insurance in

23  the amount of 70 million dollars.  That consists of a primary

24  policy and five excess policies.  Axis provides a third tier in

25  that tower, that is, the second excess policy and all of the

20

1    excess policies follow the form of the primary policy, except

2    to the extent that they're explicitly different.  This means

3    that the excess insurers are actually bound by the terms of the

4    primary policy.  The language that's key to today's dispute both

5    in connection with the motion to dismiss and the motions to

6    compel advancement is the language in the primary policy that

7    requires the advancement of defense costs as they're incurred

8    and unless it is finally determined that such costs are not

9    covered.

10            We understand that this issue is now coming to a

11   head with respect to Axis because that the coverage or the

12   amount under the primary policy and the amount under the first

13   excess policy are almost used up, at least that's our

14   understanding.  So I know this states the obvious, but the only

15   reason we're here, Your Honor, is because Axis wants you to tell

16   them that they don't have to advance defense costs.  And the

17   rest of us, even though we've chosen different ways to oppose

18   that, are here because we want to make sure that they do pay.

19   Now, we recognize that Axis had two valid choices here.  The

20   first is to advance defense costs with a reservation of rights,

21   which is what we think is what the policy envisions, and the

22   second is seek a declaratory judgment that the costs are not

23   covered by the policy.

24            Now, U.S. Specialty, the insurer under the primary

25   policy, and Lexington, the insurer on the first excess chose --

21

1   ultimately chose option one, and they just they reserved their

2   rights, and Axis has chosen option two.

3             We recognize that seeking a declaratory judgment

4   of coverage can be perfectly appropriate.  And, for example, if

5   there were no underlying litigation claims or if the litigation

6   claims were -- did not overlap, we're not disputing the

7   procedure.  What we are disputing is when there's a substantial

8   overlap of the underlying facts, we believe the law is clear.

9   A declaratory judgment may not precede and has to defer to the

10  underlying litigation for a determination of those facts.  And

11  we believe this is pretty much the universal rule.  We don't

12  think the rule is different in Illinois than in New York.  I

13  think the rule is exactly the same.

14            And, Your Honor, there are at least two key

15  reasons for that rule.  The first is that there is a

16  significant risk that a determination -- an early determination

17  in the coverage action -- would be prejudicial in the

18  underlying actions either through collateral estoppel, the law

19  of the case, or even -- or for other issues.

20            The second reason is since if you're litigating the

21  same issues at the very least you're duplicating effort.  You're

22  running up even more defense costs, more expenses on the very

23  same things, and that seems to be counter to good sense and

24  issues of judicial economy.

25            So we filed our motion to dismiss and we believe

22

1  that what we're saying in the motion to dismiss is that because

2  the courts are clear, the courts are clear that when there is a

3  substantial overlap the coverage action must defer, that under

4  Rule 12(b)(6) Axis is not in a position to be able to prove

5  their case and therefore dismissal without prejudice is

6  appropriate.

7            Now, let me get to the core of the issue, which is

8  substantial overlap.  Here in Refco, on the one hand, we've got

9  the criminal and fraud actions.  And the factual issues

10  underpinning those actions all relate to whether Bennett and

11  others manipulated Refco's books and records.  All of the

12  alleged actions that relate to the manipulation appear in the

13  indictment and in the various securities complaints, and

14  interestingly enough, they're all explicitly referred to in

15  Axis's complaint.

16            On the other hand, we have the coverage action.

17  Now, Axis's characterization is that the factual issue is

18  whether Bennett failed to disclose potential claims based on

19  his alleged manipulation of the books and records.  But saying

20  it that way doesn't change the fact that the facts are really

21  the same.  Without the alleged manipulation, there's nothing

22  really to disclose.

23            Axis points to Illinois law, in particular the

24  <u>Guidant</u> [Ph.] case as determinative.  First of all, we strongly

25  disagree that Illinois law applies, and I can come back to

23

1  this, Your Honor, but the absence of a choice of law in the

2  contract means that under New York's choice of law rules look at

3  various factors, the most important of which is the location of

4  the insured risk.  And, given that Refco's principal place of

5  business was in New York, that's where the executive officers

6  did their business and all the allegations related to coverage

7  issues were about actions taken by certain executive officers,

8  it's hard to argue that New York was not the location of the

9  insured risk.  But even if New York law applied, we think that

10  the answer on substantial overlap would be the same and we're

11  going to focus on Guidant.

12          Now, before I do, though, I do want to make a

13  point that there are Illinois decisions on the issue of whether

14  advancement is appropriate during the pendency of a coverage

15  action where New York law and Illinois law appear to differ

16  markedly, and that is why we believe New York law is the law

17  that should apply here.  But for the substantial overlap, we

18  think the test is pretty much the same.

19          So in Guidant, what was going on?  In the

20  underlying actions, you have essentially a bunch of personal

21  injury claims that were couched in language of fraud.  And I'm

22  assuming that they were done that way because today's medical

23  dominated society if you're going to have something implanted in

24  your body, undoubtedly you're going to be signing a waiver, an

25  assumption of the risk.  And the only way around that is to

24

demonstrate that you are not told all of the appropriate facts.
 So the underlying factual issue is the misrepresentation about
the safety of the medical device and the risk of the medical
device.

          In the coverage action, however --

          THE COURT:  Well, can I -- I'm sorry.  Go ahead.
Go ahead.

          MR. WALSH:  in the coverage action, however, it's
not that the device was actually defective or unsafe, but that
complaints had been received by the company, that the company
knew about and didn't disclose, so that's why the Guidant case
made a distinction and we can -- they were saying that we can
make a determination.  The trial court can make a determination
that as a factual matter, yes, they received complaints or,
yes, they didn't receive complaints, and it's not really
dependent upon whether the device was defective or not.

          So the distinction with our case is in Refco you
can't make that distinction.  Without one, you can't have the
other.  At the end of the day, Axis can't get up and explain to
you what was it that Bennett should have disclosed if in fact
he did not manipulate the books or he did not commit fraud.
What was there to disclose?

          So as you noted earlier, Your Honor, although not
involving Axis, this is not the first time this issue came up.
 Justice Freedman addressed this very issue in connection with

25

1   Arch's request for a determination on coverage.

2          The way I view it, Your Honor, this is a classic

3   problem of putting the cart before the horse.  You've got all

4   these -- this huge multi-district securities action that's all

5   coming together and you've got the criminal complaints, and then

6   you've got this coverage action.  And what I foresee is if this

7   coverage action really went forward on the issues and was going

8   to determine the issues of what Bennett did, what he thought,

9   et cetera, every plaintiff in the securities actions would have

10  to come into this court, and all the discovery about all the

11  facts would be taking place in this court.  And it just seems

12  completely backwards in my mind that the coverage dispute

13  becomes the litigation for all these issues rather than the

14  underlying actions.  I just don't think that can be right.

15         From a policy perspective, I have to ask myself

16  what, you know, what's the purpose of the D&O policy, and it's

17  to protect officers and directors against claims for

18  misconduct.  And in my view, it would completely defeat that

19  policy if the end result was that the insurer could do an end

20  run and avoid the defense costs and get a ruling that could be

21  used against the insured in the underlying actions.  That's not

22  what people will open all this insurance for.  That doesn't

23  provide any protection at all, so the answer here is, you know,

24  clearly Axis has an issue here.  They have to -- in our view,

25  they have to advance defense costs but they have the right to

26

1   get those costs back once there is a decision on coverage if,

2   in fact, it does go against the insureds.

3           On the part of the defendants, though, if they

4   don't get defense costs, they -- any insurance may very well be

5   a lower.  We think the courts have assessed those competing

6   risks and come down on this issue in favor of the insured.

7           So in this situation, we believe it's perfectly

8   appropriate that the insurer has to wait for the results of the

9   underlying action, and that's what you have today, and that's

10  our reason, Your Honor, for asking the Court to dismiss the

11  case.

12          THE COURT:  Okay.  So you take the view that I

13  don't need to look at the policy language itself and interpret

14  on the merits whether -- on a 12(b)(6) basis -- whether Axis is

15  right or not.  You just say it's premature?

16          MR. WALSH:  Your Honor, it is our expectation that

17  if this action was dismissed and especially if it was dismissed

18  with the determination that New York law applies that Axis

19  would go ahead and advance.  You know, they're a highly, highly

20  reputable company.  If, however, they stand up today and say

21  you know, no way we're advancing, then we'll have to go the next

22  step, but what we're asking for today is a dismissal.

23          THE COURT:  Okay.  Thank you.

24          MS. GILBRIDE:  Good morning, Your Honor.  Joan

25  Gilbride for Axis Reinsurance Company, Kaufman, Borgeest &

27

1  Ryan.

2          I'm a little confused after hearing oral argument

3  from the director defendants on their motion for dismissal.

4  Essentially, what they've sought from this court is a complete

5  dismissal of this action, but at the same time they appear to

6  be suggesting that they should get some sort of affirmative

7  relief in the form of advancement of defense costs.

8          THE COURT:  Not Mr. Walsh's clients.

9          MS. GILBRIDE:  It's just -- it's -- what they're

10 essentially seeking, though, Your Honor, is an inconsistent

11 result.

12         THE COURT:  But his clients haven't sought that.

13 They haven't sought any sort of affirmative relief.  They just

14 sought dismissal.

15         MS. GILBRIDE:  I just think it's important to note

16 that Axis's position has been, Axis's position for over a year,

17 is that there is no coverage for this matter under its policy.

18  They took this position over a year ago.  Axis is not going to

19 change that position if this action gets dismissed. In fact,

20 what the director defendants have said in their papers and I

21 think have suggested to Your Honor is if this action is

22 dismissed, they would have no alternative but to turn around

23 and seek relief under the policy in another forum.  And I think

24 that just demonstrates the inconsistency, which a dismissal of

25 this action would result in, particularly in light of the fact

28

1   that there are other defendants, other insureds who are seeking

2   affirmative relief from Your Honor.  In any event --

3          THE COURT:  But why would that be the case if the

4   other forum were, for example, the court handling the

5   underlying litigation?  Then all the discovery could be the

6   same, all the trials could be the same.  There wouldn't be two

7   courts with potentially conflicting rulings or conflicting

8   schedules, and particularly for the criminal defendants, risks

9   about the Fifth Amendment.

10          MS. GILBRIDE:  Well, Your Honor, that leads into

11   really what is the heart of this dismissal motion, which is

12   whether or not there are overlapping facts.  We believe the

13   issue is not whether there's substantial overlap of the facts,

14   but whether the ultimate issues in the two dispute are the same

15   and I think that that's clearly the test under Illinois law,

16   which we submit applies to this dispute.

17          And the ultimate issues in the two cases are

18   ultimate facts, the ultimate issues that the Court must

19   determine are entirely different.  The facts in the coverage

20   dispute concern -- we have a warranty letter that we received

21   from the insured.  The question is was the warranty letter

22   signed.  It was signed on behalf of all insureds.  Was there

23   knowledge by Mr. Bennett or any other insured at the time that

24   warranty letter was signed which might have led anyone to

25   assume that there could potentially be a claim.

29

1          Those issues are very different than the issues

2    that are in dispute in the securities fraud action, Your Honor.

3     You know, Axis does not have to establish that there was a

4    fraud here.  They simply have to establish that there was

5    knowledge that there was this warranty letter that was signed.

6     There's a knowledge exclusion in the policy, which we

7    understand there's issues about that.  Those issues are not in

8    dispute in the underlying securities litigation.

9          THE COURT:  I'm sorry.  Knowledge of what?

10          MS. GILBRIDE:  Knowledge of whether or not there

11    were facts at the time that the policies that was entered into

12    that could potentially lead to a claim.  That doesn't --

13          THE COURT:  And isn't the -- all of the litigation

14    brought against the Ds and Os a "claim" or potentially a

15    "claim"?

16          MS. GILBRIDE:  It is, Your Honor.  But it's not the

17    only claim that either Mr. Bennett or any other insured could

18    have had knowledge of at the time they signed that warranty

19    letter.

20          THE COURT:  But it's the only claim that they're

21    claiming on the policy on.

22          MS. GILBRIDE:  Well, I think it's -- you know, it's

23    a big picture "claim," but there were other issues and it's

24    important to note that the warranty and the prior knowledge

25    exclusion don't require knowledge of a claim.  They require

30

1    knowledge of a fact, a circumstances, a situation.  It's

2    extremely broad, Your Honor.

3         So, for example, if there was an auditor's letter

4    that was written in 2003 that Mr. Bennett was aware of and he

5    was aware that there were issues raised in that auditor's letter

6    that could potentially result in a claim and which ultimately

7    did result in partially at least in some of the claims.

8         THE COURT:  But aren't I right in assuming that by

9    now any litigant or more practically speaking any plaintiff's

10   lawyer would have jumped in and brought the claims against

11   these directors and officers and that therefore it's in the

12   litigation that's pending?

13        MS. GILBRIDE:  I think that that's a correct

14   assumption, Your Honor.

15        THE COURT:  So aren't I also correct that in that

16   litigation that's pending won't those people also want to obtain

17   discovery of auditor's letters that he might've been aware of or

18   that any of the other directors might have been aware of or any

19   of the other facts that would relate to a claim, because that's

20   what they're trying to establish, a claim.  Isn't it a complete

21   overlap of the policy?

22        MS. GILBRIDE:  Your Honor, I think there's no

23   question that there are overlapping facts in dispute.  There's

24   no question.  But the ultimate facts and the ultimate issues

25   that need to be decided in the coverage dispute are much

31

1   narrower and more focused than the very broad issues that are

2   in dispute in the underlying securities fraud litigation.  And

3   in fact, the coverage --

4           THE COURT:  I thought you were making the argument

5   the other way around.  I thought you were saying that, in fact,

6   the securities litigation is more focused because we could

7   be -- anything that might have gone through Bennett's mind could

8   exclude Axis from having to pay.  I mean, that's a pretty -- I

9   mean, I guess that's something that you can assert given the way

10  that provision is phrased -- "might give rise to a claim" --

11  although it kind of makes you wonder whether the insurance is

12  completely illusory.  But you're saying that the -- maybe I

13  misunderstood you then.  You're saying that the actual

14  litigation, the criminal litigation and then the securities

15  action and the like would be more narrowly focused or wider

16  focused?

17          MS. GILBRIDE:  I think, you know, narrow or wider

18  in different areas I think, Your Honor, but the important issue

19  is that the ultimate facts to be determined in the two actions

20  are different, and I think that's the test.  No one in the

21  securities litigation is going to care one way or the other

22  factually whether or not Mr. Bennett signed a warranty for an

23  insurance application.  That's simply not going to be an issue.

24          THE COURT:  Well, if you're talking that there's a

25  factual dispute as to whether the thing was actually executed?

32

1          MS. GILBRIDE:  I don't really think that's in

2     dispute, but that is, in fact, what we have to establish in

3     order to prevail in our coverage.

4               THE COURT:  But don't you think that the district

5     judge presiding over that litigation could decide that pretty

6     quickly?

7               MS. GILBRIDE:  Your Honor, I don't think that's an

8     issue that's before the district judge.  It's not an issue --

9               THE COURT:  No, but if, in fact, I determine that

10    this litigation before me is premature, particularly in light

11    of my very tenuous jurisdiction given that Refco's plan is

12    confirmed and effective and the provisions of the confirmation

13    order, which clearly contemplate that this type of litigation

14    could be elsewhere, why shouldn't the -- why shouldn't the easy

15    lifting issue not control this thing and the hard lifting issue

16    should, i.e., all the discovery as to whether there really was

17    something related to a fraud, which is already before the

18    district courts which probably have those issues?  What --

19    they're going to be doing the heavy lifting.  Why have two

20    courts do the heavy lifting, which requires all the parties to

21    duplicate the heavy lifting in two different forums because of

22    what appears to be perhaps even a hypothetical issue as to

23    whether Bennett signed the memorandum, which is easy lifting?

24    Why not have the district judge do that, too?

25               MS. GILBRIDE:  Your Honor, I -- you know, another

33

1    procedural conundrum that we're faced with here is that

2    dismissal is not sought by all of the insureds, so -- and there

3    are --

4                THE COURT:  No, but I can --

5                MS. GILBRIDE:  -- counterclaims --

6                THE COURT:  In controlling my docket, I can

7    certainly do that, particularly when I have real doubts about

8    jurisdiction.  That's what Judge Gonzalez did in <u>WorldCom</u>.

9                MS. GILBRIDE:  Your Honor, I -- you know,

10   obviously that is within your discretion and your control.  Our

11   position simply is that this is a dispute that does not involve

12   all of the over-arching issues that are involved in the

13   securities litigation.

14               THE COURT:  But other than whether Mr. Bennett

15   signed the memorandum or the warranty, what other issues are

16   different?

17               MS. GILBRIDE:  Just the very fact of the

18   insurance, Your Honor, it's not an issue in the underlying

19   securities litigation.

20               THE COURT:  What do you mean by that?

21               MS. GILBRIDE:  Whether or not there's coverage,

22   whether or not their defense costs are covered.

23               The issue -- the other motion that we're here on

24   today, the advancement of defense costs, whether or not those

25   defense costs will be covered, that's not an issue that is in

34

1    dispute or before --

2              THE COURT:  It could certainly --

3              MS. GILBRIDE:  -- Judge Lynch.

4              THE COURT:  It can certainly come before Judge

5    Lynch, though, couldn't it?  I mean, it came before Judge Cote

6    after Judge Gonzalez said he didn't have jurisdiction in

7    <u>WorldCom</u>.

8              And as a practical matter, as we all know,

9    litigations are also a forum for settlement, and as we all know

10   insurance in these settings is a major aspect, sometimes the

11   only aspect, but always a major aspect of the currency for

12   settlement.  So I would think whether it's Judge Lynch or a

13   special master he's going to appoint or a mediator, that's --

14   you know, it's going to be front and center there as a practical

15   matter.

16             And I'm sure that if there's a mediation or

17   settlement discussion in the securities litigation -- obviously

18   this doesn't apply to criminal litigation, but in the securities

19   litigation -- that one of the issues that the insurers will

20   raise, even if it's not teed up formally in front of Judge

21   Lynch, but in the negotiations is, well, "we don't have to pay

22   for this.  It's not covered, so, plaintiffs' lawyers, you should

23   look somewhere else.  Lower your demand, because you're settling

24   two things."  You're not only settling the fraud case, you're

25   settling whether this exclusion applies.

1          MS. GILBRIDE:  Well, Your Honor, one of the

2   practical issues that Axis faced in deciding which forum to

3   bring this litigation in is that there is no diversity

4   jurisdiction, so we could not be before Judge Lynch or any

5   other district judge, so there was no way for us as a practical

6   matter to get before Judge Lynch.  That was a consideration,

7   but we felt it was appropriate to bring the action in this

8   court, Your Honor, because of the fact that obviously that

9   we're -- you know, the bankrupt -- the debtor is here before

10  Your Honor and, you know, based upon prior rulings of Your

11  Honor with respect to the insurance policy, we believe that

12  this was an appropriate forum to be in.

13          THE COURT:  Well, I haven't made any rulings as --

14  you mean, the lift stay issue?

15          MS. GILBRIDE:  Yes, Your Honor.

16          THE COURT:  Okay.  But the plan confirmation order

17  says that "Notwithstanding anything in the plan or confirmation

18  order to the contrary, nothing in the plan or confirmation

19  order including, but not limited to the injunction provisions

20  shall be construed to prevent present or former directors and

21  officers of the Debtors from seeking and obtaining coverage and

22  payments from insurance policies of Refco, Inc. or from

23  insurance policies of any other Refco Entity by litigation

24  against relevant insurance companies nor to prevent insurance

25  companies, from making such payments."

1          MS. GILBRIDE:  Your Honor, we don't read that as

2   allowing us to affirmatively bring a declaratory judgment

3   action.  And perhaps it was an incorrect reading of that

4   provision, but our understanding was that was limited to the

5   individual directors --

6          THE COURT:  Okay.  But it's a --

7          MS. GILBRIDE:  -- and officers.

8          THE COURT:  -- big difference between seeking

9   relief from the stay and starting, you know, a whole

10  declaratory -- anyway, I'm not faulting you on that. Obviously,

11  we're here.  But I'm still having a hard time seeing why there

12  isn't overlap.

13         MS. GILBRIDE:  Your Honor, I could not stand in

14  front of you and honestly say there is no overlap.  There is

15  absolutely overlap.  It's just a question of whether the overlap

16  is of some facts, and there are some, many facts that are -- do

17  overlap, but there's not overlap of the ultimate facts and the

18  ultimate issues that are going to be determined in each

19  litigation.

20          This is a dispute that's about coverage.  There are

21  some issues that are similar that we've raised in terms of

22  Mr. Bennett's knowledge and other insureds' knowledge, but the

23  issue before Your Honor is an issue of policy interpretation,

24  contract interpretation.  The issue in the securities

25  litigation is an issue of whether or not there was fraud on the

37

1    shareholders, and that's certainly not an issue that's in our

2    case, whether or not there was a fraud.

3              THE COURT:  But --

4              MS. GILBRIDE:  So we don't believe that the

5    ultimate issue is --

6              THE COURT:  But isn't Mr. Walsh's argument right

7    that the prior knowledge of a claim that's the ultimate basis

8    for the disclaimer of coverage here and of defense costs, the

9    obligation to advance defense costs, isn't that different than

10   the types of fraud at issue in the Guidant [Ph.] case?

11             MS. GILBRIDE:  Your Honor, you know, I think that

12   the Guidant case is very on point with the issues that are at

13   issue here.  In Guidant, the question was whether or not there

14   was a nondisclosure of an underlying situation to the insurer.

15    It's the very same issue --

16             THE COURT:  No, but of what?

17             MS. GILBRIDE:  Of whether or not there was

18   litigation or prior claims, so it's almost -- it's very on

19   point, Your Honor.

20             THE COURT:  But your provision doesn't say that.

21   You're not looking to deny coverage here because Bennett didn't

22   disclose to you that there was an investigation in place and

23   that there was a claim that had been asserted.  It's that the

24   condition that might give rise to something like that was not

25   revealed to your client.

38

1          MS. GILBRIDE:  That's correct, Your Honor, but I

2    think that --

3          THE COURT:  And so --

4          MS. GILBRIDE:  -- the issu --

5          THE COURT:  -- if the fraud actions that were

6    pending in Guidant were not about what was already known to --

7    what specific claims that had been filed were already known to

8    the insured -- they were about whether the insured failed to

9    disclose information to the investing public about what it had

10   been doing with its medical business, if that litigation had

11   been about the failure to disclose -- if the 10K in that

12   litigation had failed to disclose specific litigation claims or

13    medical claims against it, there would have been an overlap,

14   right?

15         MS. GILBRIDE:  Well --

16         THE COURT:  But that's not what it was about.

17         MS. GILBRIDE:  Well, respectfully, Your Honor, I

18   think that issue in Guidant was whether or not -- was about

19   whether or not certain claims were disclosed to the insurer.

20   The situation that we have here --

21         THE COURT:  Not the securities litigation.

22         MS. GILBRIDE:  Not the securities litigation.

23         THE COURT:  Right.

24         MS. GILBRIDE:  But the claims involving the

25   products.  But I -- you know, respectfully I just, I think that

39

1   it's -- the question is whether or not there was nondisclosure

2   and whether it was about the securities litigation or not

3   securities litigation.  It was about facts that were known at

4   the time.  Here --

5           THE COURT:  No, but it's important to know what --

6   to distinguish what the particular facts are.  I mean, the

7   policy if -- if you're the -- if you're the court presiding over

8   the insurance dispute, you have to ask yourself, well, what

9   will I learn from the securities law action that will either be

10  dispositive or provide real guidance as to my dispute.  And in

11  the Guidant case if you're the judge presiding over that

12  insurance dispute, I'm not sure that those facts are relevant

13  because it's a different type of fraud.  There are two different

14  types of fraud that are being litigated.  The fact -- the

15  underlying nondisclosure is different.

16          MS. GILBRIDE:  I think that's -- it's correct that

17  the underlying nondisclosure was different.  There's no

18  question, but I think it was the fact of the nondisclosure that

19  was the issue and it was the same issue in both cases but the

20  ultimate issue in both cases was different, so I believe that

21  the Guidant -- how the Guidant court determined that issue is

22  very instructive in this situation for Your Honor.

23          THE COURT:  But isn't this doctrine of prematurity

24  or ripeness, isn't it really ultimately a doctrine based upon

25  considerations of fairness and efficiency as opposed to, you

40

1    know, distinctions or technical distinctions between the

2    ultimate issue in each matter?  I mean, obviously the ultimate

3    issue is going to be different in each matter because it's a

4    given that the people suing for securities fraud are not

5    specifically suing to enforce the terms of an insurance policy,

6    so it's -- you know, there's always going to be a difference on

7    the ultimate issue in some respects.

8            MS. GILBRIDE:  Your Honor, I do believe that it is

9    an issue of fairness and judicial economy and I believe -- you

10   know, we have a ripe dispute.  There's no question, but there's

11   a ripe dispute right now between Axis and its insureds.  Axis

12   is getting requests for advancement and requests to -- all

13   sorts of requests for depletion of its policy limits.  So

14   there's no question but that we have a ripe dispute and that we

15   believe that this is the appropriate forum to be in to resolve

16   that dispute.

17           We do not believe -- you know, all of the issues

18   that are in dispute in the securities litigation are not in

19   dispute in this case.  This is -- and I apologize if there was

20   any misimpression given, but I believe this is a much more

21   narrow --

22           THE COURT:  But isn't there always a dispute?  I

23   mean, it's not really a ripeness issue, is it?  If it were a

24   ripeness issue, then this doctrine of overlap wouldn't apply,

25   because the courts don't say that the securities -- that the

41

1  court handling the securities law case has to decide the

2  insurance dispute.  It just says that we're not going to -- we,

3  the insurance court, are not going to decide it.  Now, am I

4  right on that?

5          MS. GILBRIDE:  I think you are right on that, Your

6  Honor.  I think -- and what I was trying to articulate not very

7  clearly apparently was that you were asking whether this was

8  about judicial economy and fairness to the parties and I think

9  that that is what this is about and that is what drives that

10 doctrine, and this -- no one can suggest that this dispute is

11 premature.  This is not a premature dispute.  There is

12 certainly a dispute.  There is a dispute that can be litigated.

13  We believe it will be a much more narrow litigation than the

14 securities litigation that's in the District Court before Judge

15 Lynch.  And we believe that it serves the interests of judicial

16 economy and fairness to all parties.  And, you know, in

17 particular Axis who's being asked to make payments as policy

18 limits without being allowed to get a ruling from a court that

19 there's no coverage under the policy.

20          THE COURT:  But isn't -- doesn't in effect what

21 these overlap cases hold is that the insurer, you know, has to

22 take a back seat on that?  I mean, isn't that a consequence of

23 these decisions?

24          MS. GILBRIDE:  I think that is.  When -- and I

25 think when that happens the reason it happens is because the

42

1    issues that are in the coverage litigation are going to be

2    decided in the underlying litigation.  So, for example, if

3    there's an underlying dispute that involves issues of negligence

4    and issues of intentional conduct and the insurer is saying,

5    well, we don't cover intentional conduct, in those situations

6    courts -- and that's the vast majority of the cases that deal

7    with this issue -- the courts say, well, it's a waste of our

8    time to decide whether there was negligence or intentional

9    conduct, because that will be decided in the underlying case.

10              THE COURT:  Right.

11              MS. GILBRIDE:  Here, that's not the situation.  The

12   coverage issue that we have, whether or not the prior knowledge

13   exclusion applies and whether or not the warranty letter

14   applies, are not going to be decided in the securities

15   litigation.

16              So for those reasons, Your Honor, I don't

17   believe --

18              THE COURT:  I thought you were going somewhere

19   else.

20              MS. GILBRIDE:  -- the dismissal --

21              THE COURT:  I guess I thought you were going

22   somewhere else with that, which is that were going to have to

23   take our chances on advancing or not advancing defense costs

24   pending a decision, and that -- and I thought you were going to

25   say -- that's not fair and the cases don't deal with that issue,

43

1  but don't they?

2      MS. GILBRIDE:  Your Honor, I don't believe they do

3  because as far as I know, there's not one case cited before Your

4  Honor which has the precise language that is at issue in this

5  dispute where Axis is only required to advance covered defense

6  costs.

7      THE COURT:  But that --

8      MS. GILBRIDE:  Not --

9      THE COURT:  I'm sorry, go ahead.

10     MS. GILBRIDE:  No, I was just going to -- none of

11 the cases that have been put before Your Honor deal with that

12 precise issue and that certainly has not been an issue in any

13 dismissal rulings that have been put before Your Honor.

14     THE COURT:  But isn't it the case that the insurers

15 are declining -- in the cases where there's a dismissal without

16 prejudice based on this doctrine of substantial overlap, isn't

17 it the case that the insurers have denied coverage or sought to

18 rescind, which would include rescission of their obligation to

19 pay defense costs?

20     MS. GILBRIDE:  I think in the vast majority of the

21 cases that have so held, Your Honor, the situation was that you

22 have an insurer, a duty-to-defend insurer who was required to

23 advance defense costs, and was taking a position that because

24 there was negligence and intentional conduct they didn't have to

25 defend -- they didn't have to pay defense or provide a defense

44

1    for any of those claims.

2                    THE COURT:  Right.

3                    MS. GILBRIDE:  So in that situation where the

4    Court said the coverage dispute is premature, the insurer did

5    have a duty to defend the entire action, but our situation --

6                    THE COURT:  So it was ripe because they had to pay

7    the money even though they said they didn't have to.

8                    MS. GILBRIDE:  It was ripe, but based on the

9    policy language that was in dispute in those cases, I think

10   here the distinguishing fact is that Axis's policy only requires

11   it to advance "covered" defense costs.

12                    THE COURT:  But doesn't everyone have a

13   distinguishing fact, that's why they brought their lawsuit to

14   rescind, you know.  I mean --

15                    [Laughter.]

16                    THE COURT:  I understand your --

17                    MS. GILBRIDE:  Yeah.

18                    THE COURT:  -- point --

19                    MS. GILBRIDE:  Your Honor --

20                    THE COURT:  -- of a specific provision, but --

21                    MS. GILBRIDE:  Yeah.  I'm not sure how to answer

22   that.  I think that was in jest, but obviously there's always

23   different disputed facts.

24                    I don't think I have anything more to add on this

25   issue unless Your Honor has any further questions for me.

45

1                    THE COURT:  Okay.

2                    MS. GILBRIDE:  But, you know, in summation I would

3    say that, you know, we don't believe dismissal is the

4    appropriate remedy.  If Your Honor is concerned about the

5    overlaps and facts, there are other remedies that could be

6    considered, particularly a stay or stay as part of the action

7    is that was what Your Honor is --

8                    THE COURT:  Well, the directors and officers

9    represented by Mr. Walsh are looking for dismissal without

10   prejudice.  They recognize that this issue is going to come up

11   if it's not settled somewhere.  So I mean, isn't that tantamount

12   to a stay?

13                   MS. GILBRIDE:  Your Honor, I think they do --

14                   THE COURT:  And --

15                   MS. GILBRIDE:  -- in the alternative ask for a

16   stay.

17                   THE COURT:  Well, someone -- I don't think so.  I

18   think that's the criminal defendants --

19                   MS. GILBRIDE:  Okay.  Okay.

20                   THE COURT:  -- that are asking for a stay.

21                   MS. GILBRIDE:  That's my confusion, then.

22                   THE COURT:  I under -- this is kind of off the --

23   you can stay up there if you want.

24                   MS. GILBRIDE:  Sure.

25                   THE COURT:  But it's addressed to everybody and

46

1    really it's off the point, but I -- does anyone know how the

2    insurance litigation got before Judge Cote?  I would assume

3    that there would have been lack of diversity there as well.

4    Maybe no one argued -- maybe no one raised the issue.

5              MALE SPEAKER:  Your Honor, I believe there's a

6    motion of jurisdiction --

7              THE COURT:  There was.

8              MALE SPEAKER:  -- actions were filed by the

9    carriers in the same courthouse and --

10             THE COURT:  Okay.

11             MALE SPEAKER:  -- it was before Judge Cote.

12             THE COURT:  All right.

13             MALE SPEAKER:  Little different situation.

14             THE COURT:  All right.

15             MR. FERRILLO:  Your Honor, Paul Ferrillo from

16   Weil, Gotshal.  I was with Mr. Borgeest in that case, too.

17   There's another piece to that was I think Judge Cote took part

18   of this on the related jurisdiction and that the --

19             THE COURT:  Under bankruptcy.

20             MR. FERRILLO:  It was -- yes, on -- for the 1334.

21    She took a piece of it on the 1334.

22             THE COURT:  Well, that's conceivable here, I would

23   think.  I mean, I -- as I said, I've got -- I raised this

24   jurisdictional issue at the pretrial conference and I was

25   convinced enough then, since the policy is property of the

47

estate, and there's some possibility that it will flow over in

some way to the estate, that there could be jurisdiction here,

but as you all know my jurisdiction becomes constricted after a

plan goes effective.  And while it may still exist, it may

much -- it may more -- much more readily be employed by the

District Court that in an action that for a lot of reasons it

would be efficient for the District Court to employ it that

way, so I wouldn't necessarily rule out that you couldn't raise

it in that forum, but that's neither here nor there, I guess.

          MS. GILBRIDE:  Thank you, Your Honor.

          THE COURT:  Okay.

          MR. WALSH:  Except a couple points, Your Honor.

First of all, I don't have any problem with your jurisdiction in

this case, but I understand the posture of the case is in --

          THE COURT:  Well, let me be clear.  I've not

determined that I lack jurisdiction.  It's just that I need to

be careful about it and not over-extend it and let other issues

sort of creep in through the limited jurisdiction that I have.

          MR. WALSH:  I appreciate that, Your Honor.

          I just wanted to respond to a couple of things

that were said.  And perhaps I heard this wrong, but I thought

what was said was that what -- in Guidant the standard was not

a substantial overlap and I think that's incorrect.  Guidant

says "As a general matter a declaratory judgment action to

determine an insurer's duty to indemnify its insured should not

48

1    be decided prior to the adjudication of the underlying action

2    where the issues to be decided in both actions are

3    substantially similar."  So that's the standard under <u>Guidant</u>.

4            And we have essentially the same effect in New

5    York in the <u>Xerox</u> case where the Court said that "The general

6    rule is that a declaratory judgment as to a carrier's obligation

7    to indemnify may be granted in advance of trial of the

8    underlying tort action only if it can be concluded as a matter

9    of law that there is no possible factual or legal basis on

10   which the insurer may eventually be held liable under this

11   policy."  So I think that that sets the standard.  It doesn't

12   have to be, you know, precisely the same.

13           And, in fact, if there wasn't a substantial

14   overlap, I have to ask the question why is it that Axis spent

15   five pages and 20 paragraphs reciting the allegations in the

16   indictment and the Grant memo?  I think the only answer is

17   because those facts are key to the issue of -- that there had

18   to be disclosure of claims.

19           The only other thing I want to point out is the

20   contract, and maybe this goes to the issue of fairness, but the

21   contract requires advancement unless there's a "final

22   determination," and I think that's the quandry that Axis finds

23   itself in and that's what they should do.  They should live up

24   to their contract.  Thank you, Your Honor.

25           MS. GILBRIDE:  Your Honor, just briefly because I

49

 1  can't let it go unchallenged, but the policy does not require

 2  advancement.  It requires advancement of "covered" defense

 3  costs, but --

 4              THE COURT:  I know.  Mr. Walsh sort of cut back

 5  his statement that he wasn't seeking a determination as to the

 6  policy.

 7              MS. GILBRIDE:  And it's a very key word in the

 8  policy and it's, you know --

 9              THE COURT:  I understand there's a heated dispute

10  over that issue.

11                   [Pause in the proceedings.]

12              THE COURT:  Does anyone else want to be heard on

13  this particular motion; that is, the motion to dismiss?

14              MR. GOLDMAN:  Your Honor, Matthew Goldman.  I'm

15  assuming that the Court will proceed after this two-hour

16  motion.  It's --

17              THE COURT:  Yes.

18              MR. GOLDMAN:  -- our view obviously that -- I've

19  listened to a lot of what I was going to say already being

20  discussed with the Court, so --

21              THE COURT:  Okay.

22              MR. GOLDMAN:  -- I presume I'll get an opportunity

23  to be heard on that issue, Your Honor.

24              THE COURT:  Okay.

25              MR. GOLDMAN:  Thank you, Your Honor.

50

1          THE COURT:  Absolutely.  Also, the motion for

2    relief from the stay.

3                [Pause in the proceedings.]

4          THE COURT:  All right.  I have before me a motion

5    by certain defendants in this adversary proceeding, namely

6    Messrs. Brightman, Gantscher, Harkins, Jaekel, Lee, O'Kelly and

7    Schoen, who define themselves as the "director defendants," to

8    dismiss the adversary proceeding under Federal Rule 12(b)(6)

9    incorporated by Bankruptcy Rule 7012.  The standard for

10   determining a motion to dismiss is well recognized; that is,

11   the Court must accept all factual allegations in the complaint

12   as true, although the plaintiff must plead more than labels and

13   conclusions, and a formulaic recitation of the elements of the

14   cause of action will not do. See Bell Atlantic Corporation v.

15   Toombley, 127 Supreme Court 1965, 1995 (2007).  But, with the

16   caveat announced in the Bell Atlantic case or reaffirmed in the

17   Bell Atlantic case, the Court should determine whether, based

18   on the facts set forth in the complaint as well as other

19   sources that the courts are permitted to examine under Rule

20   12(b)(6) (including in particular documents incorporated in the

21   complaint by reference and matters which the Court may take

22   judicial notice of), the plaintiff should be entitled to

23   ultimately submit evidence and establish the facts alleged or

24   whether it should be precluded as a matter of law from going

25   forward.  Here these particular debtor defendants -- director

51

1    defendants -- are seeking dismissal without prejudice on a

2    relatively narrow basis.  That is, unlike certain of the other

3    beneficiaries of the Axis Reinsurance policy, they're not asking

4    the Court to determine that Axis is required to advance defense

5    costs by the terms of the policy.

6            Instead, although they're obviously not agreeing

7    with Axis's position that it's not required to advance those

8    costs, these director defendants contend that because of the

9    substantial overlap of the issues raised by Axis's declaratory

10   judgment complaint with the issues pending in respect of the

11   underlying claims which the beneficiaries contend trigger their

12   rights under the policy in the District Court in pending

13   securities litigation as well as in any other litigation, but

14   primarily that litigation, that the Court should not proceed

15   here with a determination of essentially those same issues, or

16   at least issues that substantially overlap with the issues

17   pending in the District Court.

18           This basis for dismissal without prejudice is well

19   recognized in the case law.  See National Union Fire Insurance

20   Company v. Xerox Corporation, 792 N.Y.S. 2d. 772 (New York

21   Supreme Court 2004), affirmed 807 NYS 2d. 344 (New York

22   Appellate Division 2006) as well as In Re:  Adelphia

23   Communications Corporation, 302 B.R. 439 (Bankr. S.D.N.Y.

24   2003).

25           It is not only, however, a principle in New York,

52

1 but also recognized, it appears to me, based on reading the

2 parties' pleadings, generally throughout the country; and Axis,

3 I believe, acknowledges the fundamental proposition that if

4 there is a substantial overlap of the issues in coverage

5 litigation with other pending litigation related to the claims

6 to be covered that the coverage litigation should take the back

7 seat.

8        Axis contends, however, that as a factual matter there is

9 not an overlap that would require a dismissal here.  It relies

10 heavily upon a decision out of Illinois, <u>Alliance Insurance</u>

11 <u>Company v. Guidant Corp.</u>, 839 NE 2d. 113 (Ill. App. 2005) in

12 making its argument.

13        I should note, however, that the <u>Guidant</u> case

14 enunciates the general proposition that a declaratory judgment

15 action to determine an insurer's duty to indemnify its insured

16 should not be decided prior to the adjudication of the

17 underlying action where the issues to be decided in both

18 actions are substantially similar.  That's at page 120.

19        So it appears to me, at least on the general

20 proposition, that there's no real conflict between the law of

21 New York and the law of Illinois here -- on this key

22 proposition of law.  And where there is no such conflict, the

23 court need not continue with a choice of law analysis.

24        However, I will do so because there is some

25 distinction, although I don't think a major one, between how the

53

1    <u>Guidant Corp.</u> case -- I'm sorry, the <u>Guidant Corp.</u> court

2    analyzed the overlap issue from how other courts have done so

3    in New York.

4            In that regard, although this is more relevant to

5    Axis's interpretation of its rights in respect of the policy

6    generally, which are not being litigated here by these

7    particular director defendants, Axis contends that this dispute

8    in this declaratory judgment action is governed by Illinois

9    law, whereas the director defendants contend, to the contrary,

10   that it should be governed by New York law.

11           I've not seen a provision in the policy itself

12   setting forth the choice of law, and no one has cited that to

13   me.  Instead, they have properly set forth the choice of law

14   rule in the absence of such a provision, which is that New York

15   choice of law rules should apply here given that this action is

16   being determined by a court in New York, and that the center of

17   gravity analysis (which, as far as I'm concerned, is

18   substantially the same as if not entirely the same as

19   substantial contacts analysis) would apply as to disputes in

20   respect of insurance coverage.

21           The parties also generally agree on the factors to

22   be considered in connection with such an analysis.  In looking

23   at those factors here, and taking note particularly of Refco,

24   Inc.'s headquarters and the place where its executives took the

25   actions or allegedly took the actions at issue here, as well as

54

1  the residence of substantially all the defendants, the

2  headquarters of the insurer, but primarily where the underlying

3  activity occurred, it appears to me that New York law should

4  apply.

5        And, therefore, to the extent that there is any

6  substantive difference on the so-called "substantial overlap

7  doctrine," I would follow the dictates of New York law and as

8  it applied by the New York cases.

9        In considering those cases, it appears to me that

10  the rationale for applying the doctrine fits these particular

11  circumstances.  That rationale is twofold.  First and most

12  important, it reflects a policy not to prejudice the parties'

13  rights in the underlying pending action with the risk of -- in

14  particular in criminal actions, but also in civil actions --

15  having to make disclosures and litigate in two forums with

16  potentially inconsistent results; and, as importantly in this

17  context -- and particularly given the insurance context and the

18  issue of advancing defense costs, greatly increased cost --

19  that rationale dovetails into the second rationale, which is

20  one based on judicial efficiency.

21        As discussed at oral argument, it appears to me

22  that this is not -- this doctrine is not really one that should

23  best be defined as "ripeness," per se, because there is

24  obviously a ripe issue that is being deferred in the cases that

25  apply the doctrine.  That is, the insurer contends one way or

55

 1   another that it is not responsible for paying under its policy,

 2   but the courts say nevertheless that that issue should not be

 3   decided first where there's substantial overlap with the

 4   underlying litigation.  Rather, the insurer should either

 5   perform its obligations or at its own risk not perform them and

 6   contend later that it never had an obligation to perform them

 7   as the underlying litigation proceeds.

 8           I note in this respect that as set forth at length

 9   by Judge Cote in In Re:  WorldCom Inc. Securities Litigation,

10   354 F. Supp. 2d. 455 (S.D.N.Y. 2005), there are strong policies

11   under New York law with regard to interpreting insurance

12   policies in favor of the insured -- particularly in construing

13   the meaning of exclusions incorporated into a policy of

14   insurance or provisions seeking to narrow the insurer's

15   liability -- and, further, that the distinct and separate duty

16   of an insurer to pay defense costs, that is, distinct and

17   separate from a duty to indemnify, is broader than the duty to

18   indemnify and not to be taken lightly as a policy matter.  That

19   may help to explain in addition to notions of fairness and

20   efficiency why this doctrine goes beyond the doctrine of

21   ripeness.

22           Now, turning to Axis's argument that there is not a

23   substantial overlap between the litigation pending before me

24   and the multi-district securities litigation and other

25   litigation that it is asserted by the defendants here to give

56

1  rise to an obligation to advance defense costs (and if

2  liability is ultimately found or there's a settlement, an

3  obligation to pay indemnification), it appears clear to me that

4  there is indeed a substantial overlap between that litigation

5  and the declaratory judgment litigation before me.

6          Axis as set forth in its complaint is relying

7  primarily, although not exclusively, upon a "warranty" letter,

8  so called by Axis, received at the time that -- or "in

9  connection with," in the words of the complaint, "the

10 underwriting of the Axis policy."  That warranty letter

11 provides as follows:  "(a) No person or entity proposed for

12 this insurance is cognizant of any facts, circumstance,

13 situation, act, error or omission which he, she, it has reason

14 to suppose might afford grounds for any Claim [as such term is

15 defined in the policy] such as would fall within the scope of

16 the proposed insurance" and then one exception is listed to

17 that.

18         And then "(b) No person or entity proposed for this

19 insurance is cognizant of any inquiry investigation or

20 communication which he, she, it has reason to suppose might

21 give rise to a Claim [as such term is defined within the

22 policy] such as would fall within the scope of the proposed

23 insurance."

24         Other bases for the rejection of coverage are set

25 forth in paragraphs 49 and 50 of the complaint, as well as

57

1  paragraphs 52 and 53, but it seems to me that, leaving aside

2  issues of what's in the policy itself as opposed to what's

3  extrinsic to it and may give rise to some other claim, the

4  focus of the discussion regarding overlap has been over the

5  language quoted, and more particularly over the language quoted

6  in paragraph "(a)" of the so-called warranty.

7         It appears to me that if one considers the fact

8  that the plaintiffs in the securities fraud litigation are

9  suing the defendants in respect of "claims" or what would be

10 "claims" if they prevailed, they will be seeking in discovery

11 and seeking to prove, the defendants' "cognizance of

12 circumstances, situations, acts, errors or omissions that would

13 give rise to such a claim," i.e., their knowledge of, and/or

14 participation in frauds and other bases for the claims in the

15 securities action.  That will be the subject of the discovery -

16 - which, as is evident by the enormous costs that have already

17 been incurred (and I note here that we're now here in the third

18 layer or the second layer of excess coverage), is enormous --

19 multi-million dollars -- the plaintiffs will be, if they've not

20 already been, seeking to obtain from the defendants. Those are

21 also the issues that I believe that if the litigation is

22 decided on its merits will be determined by the District Court.

23

24         As I said in oral argument, I believe those are

25 also issues that would come up in any settlement discussions

58

1  with the insurer and the insurer's inevitable statement to the

2  plaintiffs that even if the defendants are liable the

3  plaintiffs shouldn't look to the insurers because they

4  disclaimed coverage under this warranty and the other

5  provisions set forth in the complaint.

6       So I believe that there is indeed a substantial

7  overlap between the issues raised in the complaint and the

8  pending litigation.  That's highlighted by the fact that the

9  complaint relies almost exclusively, if not exclusively, on

10  recitations from either -- well, recitations from documents

11  filed in the securities action or related criminal proceedings

12  to establish the breach of the warranty and the insurer's rights

13  under the other exclusions referred to in the complaint.

14       I believe these facts distinguish this matter from

15  the matter before the Court in the <u>Guidant</u> case, where it

16  appears clear to me that the court considering insurance

17  coverage issues in the <u>Guidant</u> case had to consider different

18  underlying factual issues as to the nature of the -- as to a

19  different type of fraud that would have given rise to arguably

20  a denial of coverage.

21       As I noted at oral argument, the issues that do

22  not overlap here -- and inevitably there will be some because

23  we're dealing with here an insurance policy as opposed to the

24  facts that might give rise to a right under the policy or under

25  related documents to disclaim coverage -- should not guide my

59

decision.  Those differences do not call into question issues

of efficiency or fairness.  As I said before, the heavy lifting

in this dispute is over the underlying factual point as to

whether there was knowledge of conditions giving rise to a

"claim."  That's heavy lifting in the first instance by the

parties in their discovery and in the second instance by the

parties and the court in determining the merits of that

contention, and that's already going to be taking place in the

District Court.  It seems to me that, therefore, this

litigation should be deferred under the substantial overlap

cases to await determination by the District Court of those

underlying issues.

It also seems to me that there is a basis as

discussed in oral argument, if the District Court agrees, for

the District Court to have jurisdiction over these issues if

they are to be teed up there, as was done in the WorldCom

Securities case, which involved a similar situation where a

plan had been confirmed and gone effective and the bankruptcy

court had some concern about how involved it should be in

issues that should be primarily between third parties to the

bankruptcy case.

So on that basis, I will grant the director

defendants' motion to dismiss, without prejudice, although I

would strongly encourage the parties if they were ultimately to

pursue this litigation to pursue it in a different forum

60

1   because of the jurisdictional concerns that I've raised.

2           Mr. Walsh, you can submit an order to that effect

3   after circulating it to counsel for Axis.

4           MR. WALSH:  I will do that, Your Honor.

5           THE COURT:  And I suppose to your allies in the

6   defendant group.

7           MR. WALSH:  Thank you, Your Honor.

8           THE COURT:  Okay.

9           MS. GILBRIDE:  Your Honor, if I may just to

10  clarify, you've now dismissed the entire litigation?

11          THE COURT:  Well, that's my inclination.  I'll hear

12  oral argument, but that's my inclination.  I'll hear oral

13  argument on this motion, but it seems to me it all should go.

14          MS. GILBRIDE:  Your Honor, it seems to me if

15  another court, another forum is going to hear this issue, there

16  really is no --

17          THE COURT:  Well, you know what?  As far as the

18  other defendants are concerned, that's my preliminary ruling.  I

19  don't want to -- I said specifically to Mr. Goldman and his

20  colleagues that I would hear them out on this other point, but

21  that's my strong inclination.

22          In other words, he has an uphill fight.

23          MR. GOLDMAN:  And I heard that, Your Honor.  Okay.

24   So I guess it's one of the disadvantages of going last.  You

25  get so many other things resolved for you and said.  Let me

61

1    make this easier for all -- everyone.

2              First of all, there's no reason for me to discuss

3    facts.  I don't think there's a single fact that has been raised

4    in here in our papers that has not been discussed by the Court

5    so far this morning: the provisions in question, and the

6    primary insurance policy, the follow-on provisions, and et

7    cetera.

8              I would add that I felt and feel that the Court

9    has raised the jurisdiction issue, of course, at the pretrial

10   hearing as well as today.  I will indicate for the benefit of

11   the Court that we in fact -- the reason I stated on the record

12   I believed this Court had subject matter jurisdiction under

13   1334 was that the estate continues to have an interest in

14   potentially obtaining proceeds of these policies; and in that

15   situation I would add, although it's not before the Court

16   immediately, that in the lift stay motion I reached agreement

17   with Mr. Kirschner's counsel that I am to put on the record that

18   we must provide him notice and give him an opportunity to be

19   heard if he wishes to be heard regarding any compromise

20   precisely because he recognizes that that interest is one of

21   import to him and, of course, we have no difficulty with that.

22             The Court did recognize as I had neglected to in

23   my moving papers, but did remember last night, that the plan

24   confirmation order in fact dealt with the lift stay issues that

25   were raised, but I don't think that that changes the Section

62

1    1334 issue and I don't think that the Section 1334 basis for

2    jurisdiction --

3                THE COURT:  No, I'm not --

4                MR. GOLDMAN:  Yeah.

5                THE COURT:  I agree with you.  I'm not -- and my

6    holding is not based on a finding that I lack jurisdiction,

7    only -- it only reflects that it's another factor in the

8    conclusion I reached that under the substantial overlap cases

9    the underlying basis for that doctrine would apply here, which

10   is that as bankruptcy cases end there's kind of a fade in the

11   role of the bankruptcy court. And when the case law is already

12   pointing you to go to the other court, that's another factor

13   that just increases my inclination to send it to the other

14   court.

15               MR. GOLDMAN:  I understand, Your Honor.  I would

16   add -- I would recognize, as we all must, the brave new world

17   of post-confirmation jurisdiction as it is, but I would add

18   further and would stress for the Court -- Your Honor, you have

19   acknowledged, I think, all of as I said the facts that I would

20   have reported to you in respect of our preliminary injunction

21   motion.  The one which I think you've also acknowledged earlier

22   in these arguments is that we are -- that Axis is, as they say,

23   up to bat.

24               The harm which Judge Cote identified for us as

25   defendants and actions particularly, of course, for the people

63

1    on whom -- on whose bases I speak who we have usually

2    characterized as the so-called innocent defendants is that we

3    will have disruption which Judge Cote identified as harm that

4    it has to be addressed immediately.  Lexington is out.  We are

5    facing immense obligations to proceed in these matters and we

6    need to have a lack of disruption of our ability to have a

7    defense mounted on behalf of the defendants.

8              I would add also the Court has identified that

9    Axis is relying and primarily on an interpretation of the word

10   "covered" in its policy language to argue that they can make

11   that determination on their own and ignore the obligation to

12   advance the costs -- defense costs "as incurred" with a

13   concomitant right of access to seek recoupment later on after

14   it is "finally determined" that -- presumptively by a court and

15   not by Axis -- that the defense costs should not have been

16   advanced.

17             And, of course, as the Court has already

18   acknowledged, this is language which has been identified as

19   important as a matter of case law and policy both by Judge Cote

20   and in the Kozlowski [Ph.] case.

21             We face that concern now.  We face the need for

22   the Court and not Axis to determine their obligation to advance

23   defense costs.  It is not just because they say so.  We face

24   the need now for a determination that it is covered as we have

25   identified in our moving papers, and, of course, the Court is

64

1    clearly familiar with them.  The case law is consistent that it

2    is simply a question of looking to see whether the issue in

3    dispute fits within the policy.  This is a securities

4    litigation.  It is expressly with an ensuring agreement (a) the

5    word "securities litigation" is there.  If this was a medical

6    malpractice case against one of these people, it'd be an

7    entirely different policy, but that's not the issue.  That's

8    what coverage is all about.  So we believe, Your Honor, that we

9    have merited or established a basis to proceed with the

10   preliminary injunction.

11           As the Court is well aware, we proceeded in the

12   manner that -- of a preliminary injunction -- as had happened

13   in WorldCom.  We believe we have the basis to prevail.  We

14   believe we've shown the necessary likelihood of success to do so

15   and given that we are going to face an almost immediate

16   disruption in defense efforts, we would ask the Court now to

17   enter the preliminary injunction with the understanding that we

18   would then be able to address any further issues that the Court

19   has at a later time.

20           Your Honor, my co-counsel reminds me that to the

21   extent that the Court is concerned about issues attentu --

22   dealing with the underlying merits, which we do not believe are

23   necessary to address in this situation, it is possible for the

24   Court to stay such portions of this proceeding.

25           As the Court is aware, this is a request for

1   partial relief.  That is what Judge Cote was looking at.  It's

2   not a request for complete relief.  It's a request for

3   advancement.  Thank you, Your Honor.

4           THE COURT:  Okay.

5           MS. GILBRIDE:  Your Honor, in view of the Court's

6   ruling on the prior motion, I believe that this issue of

7   advancement should be left for another court.  Since Your Honor

8   has deferred this litigation to another court, we're clearly

9   going to be in front of another court on this coverage issue

10  and I think in view of the Court's ruling on the director

11  defendants' motion that the Court should not rule on the

12  preliminary injunction hearing before it.

13          Be that as it may, with respect to the preliminary

14  injunction, we think that there's a very high standard that the

15  insureds must get past in order to get a preliminary injunction

16  with respect to defense costs.  We don't think they've even come

17  close to satisfying that.  They have not established

18  irreparable harm.  They've not even tried to establish

19  irreparable harm.

20          We don't think that they can establish the

21  likelihood of success on the merits.  Whether it's a substantial

22  likelihood or not, you know, we believe that it would be a

23  substantial likelihood that they have to establish because we

24  do believe that this is a mandatory injunction that they're

25  seeking and seeking to change the status quo.  The status quo

66

1    right now and has been for the past year is that Axis has

2    denied coverage for this case.

3          With respect to the merits of Axis's coverage

4    position, the policy language before Your Honor that's at issue

5    in this hearing is not the language that was before the Court

6    in the <u>WorldCom</u> hearing or in any of the -- the Kozlowski

7    hearing.  It was not the language that was at issue in any of

8    those cases.

9          Axis's language clearly states that they have to

10   advance only "covered" defense costs and the argument that's

11   being advanced by the insureds simply ignores that language.

12   There's another section of the policy --

13          THE COURT:  Well, I think they're saying that if

14   you interpret it the way Axis wants, then, in fact, the other

15   language that you're -- I think you're about to quote to me --

16   would be superfluous, which is, you know, fundamental contract

17   interpretation doctrine that you should never render another

18   provision superfluous, but --

19          MS. GILBRIDE:  I think if you look at the entirety

20   of Section (d) it's clear that that language is not superfluous.

21    It starts out by saying that Axis will advance covered defense

22   costs.  It then goes on to talk about if Axis advances defense

23   costs and ultimately they're not covered that they're ripe --

24   they're subject to recoupment by Axis.  That's for the situation

25   where there is an exclusion upon which an insurer reserves

67

1    rights, for example, a fraud exclusion that requires an

2    adjudication of fraud.  In that circumstance, the insurer would

3    reserve rights subject to a final adjudication of fraud and

4    then seek to recoup those defense costs at the end of the

5    litigation of the underlying case.

6              Section (d)(3), which is the allocation provision,

7    must also be considered in this context and the allocation

8    provision clearly says that if there's a dispute as to covered

9    and uncovered claims, the parties have to exercise best efforts

10   to come to a determination.  But if they cannot, then Axis must

11   only advance undisputed defense costs and --

12             THE COURT:  I probably opened up a can of worms,

13   because I -- not that I'm not fascinated by these contract-

14   interpretation points -- but because I think the ultimate issue

15   here is -- well, they're not making a motion for summary

16   judgment based on interpretation of the insurance policy.  It's

17   his motion for an injunction, so --

18             MS. GILBRIDE:  I --

19             THE COURT:  -- I understand.

20             MS. GILBRIDE:  Okay.  So, Your Honor, our position

21   is that based on your prior ruling, we don't believe that Your

22   Honor should rule on this motion for preliminary injunction,

23   but if you do, we don't believe that they've satisfied the

24   procedural threshold for recovery under Rule 65.

25             If Your Honor was so inclined to grant relief our

68

1    position is that Axis would request that there be a bond

2    established by the insureds that are seeking this relief that

3    would provide some assurance for Axis to recover in the event

4    that ultimately at the end of the day Axis prevails in its

5    coverage position.

6              THE COURT:  Okay.

7              MS. GILBRIDE:  Thank you, Your Honor.

8              MR. GOLDMAN:  I will not repeat myself.

9              Your Honor, two items: (1) the papers make this

10   point clear.  If Axis', I would say, strained interpretation of

11   the word "covered" were considered by the Court to be a valid

12   interpretation that would merely create an ambiguity we are

13   right in the situation of the Adelphia / Regis case: that

14   ambiguity should be construed in favor of the insured. But in

15   any event what we would like to stress for the Court is that

16   the urgency given that the Lexington policy exhausted in mid-

17   July of not having a disruption of the defense costs or the

18   reason we've sought injunctive relief and the language -- we

19   would be very happy to have the Court refer the underlying

20   coverage dispute that we will undoubtedly have with Axis and

21   the duty of theirs to step up and ultimately pay the covered

22   policy referred to Judge Lynch but we are requesting that this

23   Court rule on our preliminary injunction at this time in our

24   favor in order to avoid a disaster.

25             THE COURT:  All right.

69

1              MR. GOLDMAN:  Thank you, Your Honor.

2              THE COURT:  Okay.  Did someone else want to speak?

3              MR. EISEN:  Your Honor, Norman Eisen from

4    Zuckerman, Spaeder on behalf of the officer defendants who are

5    the indicted defendants as well.  I'll be very brief.

6              THE COURT:  Okay.

7              MR. EISEN:  But we joined in the motion and if I

8    may just add a couple of points just to emphasize Mr. Goldman's

9    points which are even more acute as to the three defendants.

10   We are facing trial in March.  The trial was continued from

11   October because of the enormous amount of discovery that needs

12   to be reviewed, so it is an even sharper dilemma for us.  We

13   would submit that the question is the Court having resolved the

14   choice of law question and the applicability of New York law

15   that under the <u>WorldCom</u> case it's a straightforward issue.  The

16   Court can't split this off in the same sense that the previous

17   advancement questions have by consent come before the court on

18   a lis se [sic] posture.  There's a narrow issue here that the

19   Court can separate off comfortably within the scope of its

20   jurisdiction and refer the rest elsewhere and --

21             THE COURT:  Well, I can't refer anything.

22             MR. EISEN:  Understood.  The rest can go elsewhere

23   but there is an independent basis for the Court to say, I will

24   address this narrow question.  It is, given the Court's

25   previous rulings, a straightforward one we think and let the

1   parties go off to resolve the issues where they may.  Opposing

2   counsel has made clear that Axis will not pay.  It was

3   virtually the first statement that was made.  It doesn't

4   believe that this is covered.  Months have passed since the end

5   of May when the complaint was filed.  These issues have been

6   joined and have been before the Court on motions for almost two

7   months, as you know, Your Honor is more familiar with the

8   WorldCom case than I am, there was a substantial lapse of time

9   there while these jurisdictional issues were resolved and I

10  think on behalf of all the defendants who are very actively

11  engaged in this civil and/or criminal litigation, but

12  particularly the ones who are facing the criminal issues, Your

13  Honor would really be exercising the Court's equity

14  jurisdiction to address this narrow question and leave the

15  parties to address the larger coverage issues in another forum

16  and with that I will -- unless the Court has any questions for

17  me I'll be seated.

18              THE COURT:  No, that's okay.  Thanks.

19              MR. EISEN:  Thank you, Your Honor.

20              MR. GOLDMAN:  I apologize to the Court.  Your

21  Honor, may I ask the Court's indulgence --

22              THE COURT:  You get the last word.

23              MR. GOLDMAN:  Thank you.

24              I just wanted to add for the Court that I had

25  realized before and should have mentioned that I -- yes, I

71

1    don't think that referral here is actually the option.  The

2    counterclaim is pending.  It's my understanding that the Court

3    does not believe at present it lacks subject matter

4    jurisdiction as to the issues raised by the counterclaim, and

5    so I would on that basis indicate to the Court that since the

6    counterclaim is pending and I believe the Court does have 1334

7    subject matter jurisdiction, that is a basis for the Court to

8    consider the preliminary injunction and grant it.

9              THE COURT:  _I.e._, what you're saying is, if I

10   dismiss the adversary proceeding you'd still have a separate

11   proceeding pending?

12             MR. GOLDMAN:  Absolutely, Your Honor, that's what

13   the counterclaim is there for.

14             THE COURT:  Well, what about the issue about

15   likelihood of success on the merits?

16             MR. GOLDMAN:  I believe that we have shown that we

17   would likely be able to prevail on the merits in the manner

18   that Judge Cote has described and as we have discussed at

19   length this morning.

20             THE COURT:  Because your argument is, I would have

21   not to get into whether there was a fraud or not because it's

22   simply a matter of contract interpretation.

23             MR. GOLDMAN:  Correct, Your Honor, as to the

24   advancement obligation.  Ultimately, there will be a

25   determination before Judge Cote --

72

1          THE COURT:  Right, as to the advancement issue.

2          MR. GOLDMAN:  Exactly.

3          MR. KLINE:  Your Honor, may I just be heard to

4    supplement one point, and I apologize.  Ivan Kline for Friedman

5    & Wittenstein.

6          Part of what's in our counterclaims is the fact

7    that even if Mr. Bennett's knowledge is shown we still have

8    coverage and we can adjudicate that and none of the issues

9    relevant to that will be before any other court because the

10   policy provisions or document relied upon by Axis is simply not

11   part of the policy.  The warranty is not part of the policy and

12   a prior knowledge exclusion is not in the policy.  Those have

13   nothing to do with Mr. Bennett's knowledge and will not be

14   adjudicated anywhere else, there will be no discovery in any

15   other case that relates to those issues.  That's what our

16   counterclaims are largely premised on.  Even if one assumes

17   knowledge or it's shown elsewhere, we still have coverage.

18   This Court, really, is the right court and as of now the only

19   court that can adjudicate our position on that and those are

20   what support our advancement request.

21          MS. GILBRIDE:  Your Honor, thank you for allowing

22   me to have the last word.  I hope it is the last word.  But,

23   frankly, what I'm hearing is that the insureds want to have

24   their cake and eat it too.  Your Honor has shown a disposition

25   to dismissing the action because you believe there's a

73

1    substantial overlap in the issues.  The counterclaims are based

2    on the very same disputed facts and disputed issues that are

3    asserted in our claim.

4            THE COURT:  See, let's explore that for a second.

5     They're saying that they're not because for them to win on the

6    -- they're saying for this advancement-of-cost issue all I have

7    to do is interpret the insurance policy as to what those

8    provisions that you and I went through mean as opposed to

9    finding that in fact they were triggered.  For you to win you

10   have to prevail on both issues.  You have to find that they

11   were triggered, too.  You have to convince the Court that they

12   were triggered.

13           MS. GILBRIDE:  Your Honor, in order for them to

14   prevail on their counterclaims they have to show that their

15   claims are covered claims.

16           THE COURT:  I know but that begs the question --

17   that has me assuming your interpretation of the contract is

18   right.

19           MS. GILBRIDE:  Well, Your Honor, you only get to

20   that interpretation -- I think in order to get to that issue

21   you need to determine whether or not the underlying claims --

22   it's the cart and the horse here.  I mean --

23           THE COURT:  But why is that?  Why would I need any

24   discovery as to what any of these defendants knew about the

25   alleged fraud if in fact the duty to advance defense costs is

74

1    something that has to wait for -- I'm sorry -- doesn't have to

2    -- your client's being relieved of the duty to advance defense

3    costs has to await a final determination on the merits that

4    it's a funding mechanism as opposed to an ultimate liability

5    mechanism?

6              MS. GILBRIDE:  But, Your Honor, our position is

7    that it is --

8              THE COURT:  Well, I know that's your position, but

9    in terms of deciding the issue it doesn't really implicate the

10   substantial overlap doctrine.  I'm not sure it does.

11             MS. GILBRIDE:  I believe it does, Your Honor, and

12   I believe it's fundamentally unfair --

13             THE COURT:  But why?

14             MS. GILBRIDE:  Because basically our position is

15   that the claims are not covered and you have to determine that

16   by looking at the underlying acts and finding whether or not

17   the warranty applies and whether or not the prior knowledge

18   exclusion applies.  I think that you can't do one without the

19   other, Your Honor.

20             THE COURT:  They could prevail without that; it's

21   just that only you have to win on both points.  They could win

22   on one.

23             MS. GILBRIDE:  But for them to win on one there

24   has to be an excision of a word from the insurance policy, the

25   word "covered" --

75

```
1              THE COURT:  Well, but again, that's the --
2              MS. GILBRIDE:  -- and I don't think Your Honor --
3    respectfully, I don't think Your Honor can make a determination
4    without getting into the facts on that regardless --
5              THE COURT:  But what facts?  I mean either it's
6    not ambiguous and it's based on the plain meaning of the
7    document or it's somewhat ambiguous but construed against the
8    insurer or the insurer is able to say, well, even if you
9    construe it against me it's still --
10             MS. GILBRIDE:  I think in order to grant a
11   preliminary injunction, Your Honor, you have to get the
12   substantial likelihood of success on the merits and I don't
13   think --
14             THE COURT:  But isn't -- again, I confess what --
15             MS. GILBRIDE:  Mr. Goldman.
16             THE COURT:  No.  No, that was --
17             MS. GILBRIDE:  Mr. Kline.  Mr. Eisen.
18             THE COURT:  No.  I'm going somewhere else.
19             MS. GILBRIDE:  Okay.
20             THE COURT:  When I read your argument about the
21   defendants taking inconsistent positions I kind of dismissed
22   that right away because it was in the context of the motion to
23   dismiss and, clearly, Mr. Walsh's clients weren't taking
24   inconsistent positions.  So I didn't even think about it,
25   whether they were inconsistent or not, but I'm not sure they
```

76

1    are inconsistent.  I mean Mr. Walsh's clients want your claim

2    dismissed, but even if you hadn't made that claim wouldn't any

3    beneficiary of this policy have a right to start a lawsuit

4    saying that you've wrongfully failed to pay?

5              MS. GILBRIDE:  Yes, of course --

6              THE COURT:  Now, I thought that wasn't truly ripe

7    -- when I came into this I thought that wasn't truly ripe -- in

8    the real term of ripeness, because other than saying you want

9    me to determine whether you don't have to pay you hadn't said

10   "we won't pay," but I thought I heard you say at the beginning

11   of this hearing --

12             MS. GILBRIDE:  We said --

13             THE COURT [to Ms. Kim]:  I'll do the talking.

14             MS. KIM:  Sorry.

15             THE COURT:  I thought I heard you say at the

16   beginning of this hearing, no matter whether you dismiss or not

17   "we won't pay," and that makes it ripe to me, I think.  I mean

18   if Axis is saying literally today, we're not going to go back

19   and rethink this and consider whether -- now that Judge Drain

20   is not going to decide for us whether we have to pay or not,

21   whether we're going to take the risk of not paying -- which,

22   you know, is certainly a legitimate thing for an insurer to do.

23    It's one thing to act unilaterally, it's another thing to ask

24   a court for a determination of whether they're acting properly.

25    At this point Axis would be acting unilaterally.  That raises

77

1  some fairly serious issues, you know, and maybe creates

2  potential liability beyond the coverage so -- but if you're

3  telling me today Axis has already made that decision, it's

4  going to act unilaterally and not withhold the money, then this

5  is ripe.

6          MS. GILBRIDE:  Your Honor, I can't make a

7  representation one way or the other about what Axis will do

8  because we didn't know what your ruling was going to be and so

9  --

10          THE COURT:  Well, no, but I thought you told me --

11  I mean I don't have a court reporter here, we're on electronic

12  transcript -- at the beginning of the hearing that --

13          MR. BORGEEST:  Your Honor, Wayne Borgeest on

14  behalf of Axis.  May I be heard briefly?

15          THE COURT:  On behalf of?

16          MR. BORGEEST:  Axis.

17          THE COURT:  Okay.

18          MR. BORGEEST:  If I may, Your Honor, Axis denied

19  coverage over a year ago so the company staked out its position

20  well over a year ago.  The position --

21          THE COURT:  Yes, but at that point it didn't

22  really matter.  I mean you could always change your mind --

23          MR. BORGEEST:  Well, no --

24          THE COURT:  No one was asking you for money then.

25          MR. BORGEEST:  Well, I think it did matter.  I

78

1   think that counsel was free to bring --

2                THE COURT:  Do you really want to say that?

3                MR. BORGEEST:  Counsel was free to challenge --

4                THE COURT:  I mean --

5                MR. BORGEEST:  Your Honor, Axis did not get so

6   much as a letter disputing the denial.

7                THE COURT:  But --

8                MR. BORGEEST:  I think what the counterclaim

9   defendants are saying is that for purposes of your jurisdiction

10  it's okay for them to prove that their clients were wrongly

11  treated but in denying us our prosecution of our complaint for

12  declaratory judgment of no coverage you're not allowing us to

13  prove that we are correct in our position and that obviously is

14  an absurd result.

15               THE COURT:  It's not, I don't think so.  I'm

16  sorry, I beg to differ because it's two different issues.

17               MR. BORGEEST:  No, but we filed an action for a

18  declaration of the Court --

19               THE COURT:  Right.

20               MR. BORGEEST:  -- that there's no coverage for

21  these individual insureds.

22               THE COURT:  I understand and --

23               MR. BORGEEST:  They have counterclaimed saying

24  that there is coverage for their insureds.

25               THE COURT:  No, they have not.  They have

1  counterclaims saying that your client has to advance defense

2  costs.

3                    MR. BORGEEST:  That's correct.

4                    THE COURT:  And they have a different

5  interpretation of the contract than your client has.

6                    MR. BORGEEST:  But, Your Honor.

7                    THE COURT:  They say that that provision is a

8  funding mechanism subject to recoupment or reimbursement.  You

9  say it's a coverage issue.

10                    MR. BORGEEST:  With all due respect, Your Honor,

11  Your Honor cannot --

12                    THE COURT:  With all due respect I read it and

13  that's what it says.

14                    MR. BORGEEST:  But, Your Honor, with all due

15  respect the Court cannot find that there is a funding

16  obligation without finding that there is coverage.

17                    THE COURT:  I disagree completely.

18                    MR. BORGEEST:  Well, then we have a disagreement

19  but --

20                    THE COURT:  I can't find that there is no funding

21  obligation without finding that the insurer has no underlying

22  liability, but in terms of the issues as to the meaning of the

23  contract and what the provisions mean, as far as coverage and

24  the reference to "finally determined," that has nothing to do

25  with the evidence that's going to be coming out in the

80

1    litigation in the District Court.

2              MR. BORGEEST:  But, Your Honor, how can the Court

3    find that there's a funding obligation in the face of a claim

4    which you now want us to take over to another courthouse where

5    we are going to prosecute the claim to find that there is no

6    coverage?

7              THE COURT:  Oh, no, this litigation would have to

8    be limited to a fairly narrow set of issues.  It would not get

9    into that issue.

10             MR. BORGEEST:  Your Honor, we're being put in a

11   very awkward position.  We responded to the motion to dismiss

12   by saying that we would litigate our coverage issues in a

13   narrow fashion without burdening the underlying securities

14   litigation.  Your Honor has given an indication that you're

15   inclined to reject that --

16             THE COURT:  Because it wouldn't happen.

17             MR. BORGEEST:  -- because of the overlap.

18             THE COURT:  Right.

19             MR. BORGEEST:  If there's overlap for our claim

20   for a declaration of no coverage there necessarily must be

21   overlap with their declaration of some claim that funding in

22   the absence of a determination of coverage.

23             THE COURT:  All right.  I thought you were going

24   to stand up to say something completely different which is that

25   this isn't ripe --

81

1          MR. BORGEEST:  I'm sorry, Your Honor.

2          THE COURT:  -- and the insurer has really not made

3     up its mind, but I think we're just repeating the same

4     argument.

5          So, is the insurer saying it's not going to pay or

6     not?

7          MR. BORGEEST:  Your Honor, the insurer issued a

8     denial letter well over a year ago that went unchallenged.

9          THE COURT:  I understand that, but there's -- I

10    also understand that there's a big difference, and potentially

11    a legal difference as far as the insurer's liability, when push

12    really comes to shove and the request is made, because they

13    need the money -- they've gone through the first layer of

14    excess -- that it really won't fund, because that's when the

15    damages start and that's when penalties start for the insurer.

16     So that's a very serious decision for an insurance company to

17    make.

18          MR. BORGEEST:  It is and that's the reason why we

19    filed a declaratory judgment action --

20          THE COURT:  I understand, and that's why I thought

21    the insurer was deciding to act not unilaterally but to try to

22    get a judicial determination, and I don't fault you for that.

23    That's a good thing.  That's what responsible parties do; but,

24    although I had not decided this until preparing for this

25    hearing, it's not going to work here.  I can't give you that

82

1    determination.  So now you have to decide whether you're going

2    to act unilaterally -- in which case I think this motion is

3    ripe -- or not, and I'm happy to give you a little time to

4    decide that.

5              MR. BORGEEST:  Your Honor, we're prepared to

6    litigate the issue of coverage.  That's why we're here.  The

7    contract itself by its terms --

8              THE COURT:  You lost on that point.

9              MR. BORGEEST:  Okay.  Let me turn to another point

10   then.

11             THE COURT:  Okay.

12             MR. BORGEEST:  The contract by its terms gives

13   Axis the unilateral right to determine how much of the defense

14   costs are covered and how much it will pay.  Contractually, it

15   gives Axis that right unilaterally.

16             THE COURT:  I am happy to determine those issues

17   here -- those contract interpretation issues if you're telling

18   me that if I don't determine them you're going to withhold

19   coverage.

20             MR. BORGEEST:  Your Honor, we came here, filed

21   this action prepared to litigate the contract issues.  All

22   we're saying is you can't litigate some and not all.

23             MS. GILBRIDE:  Your Honor, you're asking us to go

24   to another courthouse to litigate this.

25             THE COURT:  No, I'm asking you to tell me whether

83

1   in fact your client's going to pay or not.  If they're not,

2   then I think this is ripe.  If they are going to advance

3   defense costs or they're considering it, it's either not ripe

4   or I'll give your clients some more time to consider this

5   issue.

6           MS. GILBRIDE:  Our position has consistently been

7   that we're not going to advance defense costs in the absence of

8   a judicial determination that we must.  Our policy says that we

9   -- it says that we must advance covered defense costs.

10          THE COURT:  Okay.  Then I believe this issue is

11  ripe.  So I have been persuaded -- Mr. Goldman has persuaded me

12  that I should dismiss the underlying action brought by Axis but

13  keep the counterclaim on the docket.

14          It seems to me as a practical matter it may make

15  sense to move to withdraw the reference of this matter, but

16  that's not something I can do.  I also need to know -- because

17  there's no record here really -- as to when these costs are

18  going to kick in.

19          MR. GOLDMAN:  Your Honor, they've already kicked

20  in.  We have bills that were submitted to Axis approximately

21  two weeks ago for July-time because the Lexington policy

22  exhausted with the payment of June-time so they have the bills,

23  we're waiting for payment.

24          MR. KLINE:  I don't believe this is a dispute,

25  Your Honor.

84

1             MS. GILBRIDE:  That's correct.

2             THE COURT:  There are outstanding bills?  How

3    much?

4             MS. GILBRIDE:  Approximately $2 million has been

5    submitted to us in the past month.

6             THE COURT:  And when were they submitted?

7             MS. GILBRIDE:  Plus, there's been a settlement

8    demand tendered to the carrier.

9             THE COURT:  When were the bills submitted?

10            MS. GILBRIDE:  Over the course of the last several

11   weeks.

12            THE COURT:  Well, we're really just talking about

13   the defense costs here; right?  Because the settlement demand

14   is going to be subject to a fairness hearing, notice to the

15   Refco Trustee and the like.  That money is not going to come

16   out-of-pocket for quite some time.

17            MR. GOLDMAN:  That's correct, Your Honor.

18   Obviously, Judge Lynch would have to have an approval on that

19   in accordance with Rule 23.

20            THE COURT:  What is your response on the bond

21   point?

22            MR. GOLDMAN:  In brief, Your Honor, it turns the

23   policy upside down.  They're asking us to be their insurer.

24   The policy terms are express.  I don't think there's any

25   difficulty interpreting it as exactly as the Court has

85

1   identified it, a funding vehicle.  It would be the same as

2   every --

3          THE COURT:  Well, no, I was just identifying the

4   issue not -- I wasn't --

5          MR. GOLDMAN:  I understand.  I understand, Your

6   Honor.  It would be the same as asking every automobile

7   accident person to bond the costs until the insurer decides

8   whose liable.  It doesn't work that way.  That's what insurance

9   is for.  That's what the particularity of an insurance contract

10  is all about.  It's their obligation to assume that risk and

11  contractually we would assert we will convince this Court that

12  they assume precisely that risk with the language that they

13  drafted.

14         THE COURT:  Is the discovery -- has there been any

15  change in the intensity of the litigation in terms of the

16  incurrence of legal fees and the like?

17         MR. GOLDMAN:  I'm sorry, the securities

18  litigation, Your Honor?

19         THE COURT:  Yes.

20         MR. GOLDMAN:  Yes, discovery started.

21         THE COURT:  And there's no like hiatus or anything

22  like that, it's moving ahead?

23         MR. GOLDMAN:  No.  We're not in hiatus world, Your

24  Honor.  We're in an incurring debt world.

25         THE COURT:  And you say the criminal trial is now

86

1   on for March?

2              MR. EISEN:  Yes, Your Honor, and there has been, I

3   think -- because we were set initially for October -- there was

4   a very intense period which I think is some of what's in the

5   pipeline as a result of the continuance.  I know I was able to

6   take my summer vacation, so I think that there has been some

7   lessening there, although obviously we're going to need to get

8   ready for that as well.

9              THE COURT:  You've agreed upon the amount of the

10  legal bills that have been submitted?

11             MS. KIM:  Your Honor, the practice has been that

12  the parties simply submit the bills to the carrier and there

13  has not been any requirement of consent or --

14             THE COURT:  No, I'm not talking about consent,

15  just literally what the amount is of the bills.

16             MR. KLINE:  Your Honor, no one of us would have

17  any way to know the total because --

18             THE COURT:  No, I thought you might have conferred

19  among --

20             MR. KLINE:  No.  We only see our own.  Only Axis

21  would know the --

22             MS. KIM:  Yes.  All we do, Your Honor, is submit

23  the bills and we understand it's a first come/first serve basis

24  and then they let us know when it's exhausted.  That's exactly

25  what happened with the U.S. Specialty and the Lexington

87

1  policies.

2           THE COURT:  But you say it's about $2 million?

3           MS. GILBRIDE:  Yes, Your Honor.  I mean we've just

4  gotten the bills in, so they haven't been the subject of any

5  sort of a review for what's been incurred but that's the gross

6  amount.

7           MR. CASHMAN:  Your Honor, I'm sorry, I haven't

8  spoken yet.  This is Richard Cashman.  We represent one of the

9  officer defendants, Philip Silverman, and I just wanted to

10 respond to Your Honor's question, and that is there are bills

11 that are coming, as well, because there has been a lot of

12 activity in these cases.

13          MS. KIM:  What do you recommend [sic]?

14          THE COURT:  Well, it seems to me that on the issue

15 of the contract interpretation one could get to that issue very

16 quickly.  It's a matter of contract interpretation and

17 consequently unless someone has a different view I should not

18 be thinking here about a lengthy injunction and if it is to be

19 teed up here it should be teed up promptly.

20          I continue to think, although this is beyond my

21 power, that given the existence of a securities action and the

22 inevitable tie-ins to settlements that a district judge might

23 want to have the reference but that's not for me to decide.

24          I also know that law firms generally are prepared

25 to wait a little bit for payment of their bills.  So I'm really

88

focusing on the ones that have been billed and not on some sort
of general green light for anything coming due over the next
several weeks or months. But I am prepared to conclude on the
basis of my review of the general principles set forth in the
WorldCom case with regard to how courts look at provisions in
indemnity policies in respect of the advancement of defense
costs, as well as the particular language at issue here on Page
8 of the policy, that as far as the "merits" aspect of a motion
for a preliminary injunction is concerned there is either a
substantial likelihood of success on the merits or -- and I
strongly emphasize the "or," because this is more where I'm
focusing -- sufficient questions going to the merits which in
light of the balance of the harms here would mean that on the
issue of the merits the movants have sustained that prong of
their request for a preliminary injunction. Going to the
"harms," although it is asserted -- and I accept this -- that
certain of the defendants are wealthy individuals, the amount
of the defense costs here -- $2 million -- following upon the
primary carriers' coverage limits being exceeded tells me that
these are extremely substantial defense costs that need to be
incurred as part of this schedule that's been set out by the
various courts -- the criminal court in particular, but also
the district court in the securities litigation -- and that to
run the risk of not having counsel proceed or to substantially
cut back upon their efforts because of unpaid bills is a

89

1    tremendous potential harm, particularly in a criminal context

2    (and I note that as Judge Gerber has in the <u>Adelphia</u> case,

3    there is a significant distinction between an indictment and a

4    conviction and the criminal trial is at the trial stage, not

5    the appellate stage).

6            That leaves, I believe, the issue initially raised

7    by counsel for Axis, and pressed by counsel for Axis, that a

8    ruling granting the request for a preliminary injunction is

9    fundamentally inconsistent with a ruling dismissing Axis'

10   underlying case, which obviously I just issued.  I do not

11   believe that it is inconsistent with that ruling or unfair to

12   Axis.  As I noted before, for Axis to prevail in its

13   declaratory judgment action it needs to prove two things: one,

14   it needs to prove that its interpretation of the contract --

15   the insurance policy -- as well as potentially the related

16   warranty, is the right interpretation, the correct

17   interpretation.  That is not a matter that substantially

18   overlaps with litigation anywhere else.  In particular, it

19   doesn't substantially overlap with litigation in the District

20   Court in the securities law action or with litigation in the

21   criminal action.  However, if Axis' interpretation of the

22   contracts as they apply to the duty to advance defense costs is

23   incorrect, then the plaintiffs on the cross-claim or the

24   counterclaim prevail as far as the defense costs advancement

25   issue is concerned.  Therefore, it seems to me that those

90

1  issues -- those contract interpretation issues -- are discrete

2  and can be decided by me.  As I noted, Axis needs to win two

3  things in order to not advance defense costs, however. In

4  addition to having its interpretation of the contract prevail,

5  it also has to convince a Court that the exclusions or its

6  right to rescind or its right under the warranty, so-called,

7  have been triggered, and that is what overlaps as I have

8  previously found, with the District Court litigation in the

9  criminal case. But it seems to me the plaintiffs' claim here --

10 and the only plaintiffs that would be left would be the

11 counterclaim plaintiffs -- is not subject to that problem and

12 can go forward.  As you can tell from my earlier remarks, I

13 toyed with the idea of somehow putting this off or delaying it

14 so that the whole matter could be joined with the District

15 Court litigation, because I think that in terms of settlement

16 and the like that may make sense, but that's not something I

17 can do, and I do have an obligation to exercise my jurisdiction

18 unless it's withdrawn from me, except where the law requires me

19 not to as in the "substantial overlap" case law. And so, there

20 having been a counterclaim filed which can survive as the only

21 claim in this adversary proceeding, I have jurisdiction to

22 determine the motion for a preliminary injunction.  I don't

23 believe that it is unfair to exercise that jurisdiction here or

24 inequitable, and, therefore, the equitable relief sought can

25 and should be granted.

91

1          There has been a request for a bond to be posted,
2     but as Mr. Goldman said and as I believe the case law provides,
3     that would be tantamount to advancing one's own defense costs
4     and contrary to the case law.
5          So let me be clear: as I said before, it seems to
6     me that the injunctive relief that I'm ordering here should be
7     limited to bills that are outstanding; and I believe this is
8     the case, but I want to be clear -- I am doing nothing more
9     than saying that.  The insurer, Axis, is directed to advance
10    defense costs based upon the beneficiaries' definition of or
11    interpretation of the provisions on Page 8 requiring
12    advancement, _i.e._, if there are other provisions, or to the
13    extent there are other provisions, of the insurance policy that
14    apply to the advancement of defense costs other than the issue
15    that's been teed up here -- _i.e._, whether there needs to be a
16    final determination or not -- I'm not overwriting those
17    provisions.  This just goes to the dispute as to whether there
18    needs to be a final determination of coverage or not related to
19    the advancement of defense costs.  So, for example, if Axis has
20    the ability to review for reasonableness or the like under the
21    insurance policy, that's not being overridden by this ruling.
22    The only thing that Axis is being directed to do is to comply
23    with the provision that requires defense costs to be advanced,
24    subject to the final determination, and we should schedule the
25    final hearing on this promptly, which I view to be a matter

92

1  that can be decided based on review of the contract unless

2  someone else tells me otherwise.

3          The parties have obviously done a lot of briefing

4  on the merits already of that issue.

5          MR. GOLDMAN:  Yes, Your Honor.

6          THE COURT:  So if we did this --

7          MR. GOLDMAN:  Your Honor, just one moment.

8              [Pause in proceedings.]

9          MR. GOLDMAN:  Your Honor, having conferred with

10  the small group of co-counsel we have here I think our

11  assessment is certainly if Axis wishes to file in a further

12  brief on the contract interpretation issue which we have always

13  felt is the narrow issue we have been presenting we would then

14  file a responsive brief and we would schedule with the Court's

15  cooperation as early as the latter part of September for a

16  further hearing on this.

17          THE COURT:  It would be on a motion for a summary

18  judgment though; right?

19          MR. GOLDMAN:  Yes, Your Honor, we could file a

20  motion for summary judgment.

21          THE COURT:  Or, I guess, a motion to dismiss.  It

22  could be either one.  It would really be a motion -- well --

23          MR. GOLDMAN:  We'll do a motion for partial

24  summary judgment.  That's what we're going to do.

25          [Other attorneys commenting in the background]

93

1          MR. GOLDMAN:  That's what we're going to do,

2     narrowed to the issues that the Court has identified we are

3     focused upon.

4          MS. GILBRIDE:  Your Honor, respectfully, on behalf

5     of Axis we intend to file an immediate appeal of Your Honor's

6     ruling today.

7          THE COURT:  Okay.

8          MS. GILBRIDE:  So we would ask that that be

9     factored into whatever briefing schedule is going to be

10    established.  We understand we have to do that within the next

11    ten days and we would ask that the order ordering us to advance

12    defense costs be deferred until we can get an appeal filed with

13    the District Court.

14         MR. GOLDMAN:  I understood that to be a request

15    for a stay?

16         THE COURT:  As long as it's an expedited appeal.

17         MS. GILBRIDE:  Oh, we intend to file it, you know,

18    as quickly as we can.

19         THE COURT:  No, no, that you request expedited

20    treatment --

21         MS. GILBRIDE:  Yes, we will.  We will, Your Honor.

22         THE COURT:  All right.  I mean I could actually --

23    I have a lot going on at the end of September and beginning of

24    October in various cases but I could give you October 12th just

25    for your own purposes and you could tell the District Court

94

1    that.

2              October 12th.  Friday.

3              MR. GOLDMAN:  Is that after the NCBJ?  I believe

4    it is actually or is it during?

5              THE COURT:  I don't know.

6              MR. GOLDMAN:  It doesn't --

7              THE COURT:  If it is -- I wasn't going to be going

8    to that.

9              MR. GOLDMAN:  I gathered.

10             THE COURT:  But I could give you that date.

11             MR. GOLDMAN:  One moment if I may, Your Honor.

12             THE COURT:  But I am inclined to grant this

13   request.  It seems to me while it's important to deal with the

14   billing issue -- for a lot of reasons I'm inclined to grant

15   this request.

16             MR. GOLDMAN:  And Your Honor let me make one

17   comment and then my co-counsel will speak if I may.  We have so

18   much expense coming up. The fear is that this not be

19   characterized as a stay that the appellate court presumes can

20   be continued --

21             THE COURT:  No, I don't -- that's why I asked for

22   --

23             MR. GOLDMAN:  -- I don't know that ten days

24   doesn't matter but six weeks does.

25             THE COURT:  That's why I requested an expedited --

95

1    that we'd be conditioning it upon an expedited appeal.

2                MR. KLINE:  Your Honor, can I suggest it might be

3    more appropriate -- we don't mind if they're given ten days to

4    pay but it should be incumbent upon them to get a stay from the

5    District Court.

6                THE COURT:  But you can do that in ten days.

7    That's easy to do.

8                MR. KLINE:  Right.  But absent a stay from the

9    District Court they should be required to follow Your Honor's

10   order and pay; otherwise they'll just file and say we don't

11   have to pay.

12               THE COURT:  My view is this issue could be well

13   teed up for the District Court within ten days, and I think

14   that's what counsel intended.

15               MR. KLINE:  I think with all respect it should --

16               THE COURT:  So I will -- it's stayed for ten days

17   but that's more than sufficient time to put in an appeal.

18               MR. GOLDMAN:  I understand.

19               THE COURT:  I know lawyers can wait ten days on

20   payment of their bills but I'm also, as I said, very cognizant

21   of the fact that the bills are very large and they're going to

22   be increasing in the future and that this issue on the merits

23   really needs to be decided very quickly -- this contract

24   interpretation issue -- and so I'm telling you all that I would

25   be free on October 12th to hear it, and I think that may be

96

1    useful for the District Court also, but I'm not going to impose

2    a briefing schedule on you because the next step of this is

3    going to be at the District Court; but as everyone now

4    understands that step has to result in some action by the

5    District Court within the next ten days or my stay is going to

6    be gone -- the stay that applies now is going to be gone.

7              MR. GOLDMAN:  That's fine.

8              Your Honor, we will be bringing on a summary

9    judgment motion probably before the District Court -- partial

10   summary judgment -- but that --

11             THE COURT:  All right.  But I think the October

12   date gives people -- particularly given all the work that they

13   have done on it and, I'm sure, will be doing on it, people will

14   be reciting these provisions of the insurance agreement in

15   their sleep and will be well enough prepared for a hearing in

16   October.

17             MR. GOLDMAN:  That already has happened.

18             THE COURT:  Okay.  That leaves the stay motion.

19             MR. GOLDMAN:  The stay motion and I --

20             THE COURT:  All right.  But before we go to that

21   you'll need to give me an order --

22             MR. GOLDMAN:  Yes.

23             THE COURT:  -- and you should do it promptly

24   because that's what's going to start their appeal, obviously,

25   and that needs to go forward promptly so --

97

1          MS. GILBRIDE:  There would be two orders, Your

2     Honor, right?

3          THE COURT:  Well, Mr. Walsh is going to give me an

4     order dismissing the main -- the adversary claim brought by

5     Axis, and Baker & Hostetler is going to give me an order

6     granting the preliminary injunction in connection with their

7     cross-claim, or counterclaim, excuse me.

8          MS. GILBRIDE:  Your Honor, if I heard you

9     correctly the ten days would then start to run from the date

10    that you sign that order?

11         THE COURT:  Well, from the entry of the order.

12         MS. GILBRIDE:  Right.

13         THE COURT:  No, no, I'm sorry, the ten days on the

14    --

15         MS. GILBRIDE:  To get an expedited --

16         THE COURT:  For the injunction?  Yes.

17         MS. GILBRIDE:  Yes.

18         THE COURT:  Yes.

19         MR. GOLDMAN:  All right, Your Honor, just because

20    we have discussed the stay issue at some length I have nothing

21    further to add.  I only wanted to make one -- I'll call it the

22    tangential point -- one of the reasons why we have sought the

23    stay modification to the extent it was necessary in light of

24    the plan confirmation order was precisely because demands to

25    the insurers need to be made under cooperation provisions in

98

1  many of these policies for them to put it in line for payment.
2   Obviously, they make their determinations in response but I
3  certainly did -- that was a primary reason why we wanted to get
4  this clarification and, of course, it's my understanding that
5  nothing in today's ruling with respect to the preliminary
6  injunction motion changes the fact that we would submit a
7  demand to the insurer.  It doesn't mean they're going to pay
8  it, obviously, but it does mean we have the right to do that.
9  That's in large part what the lift stay motion is all about.
10  We have, as I have said, agreed we will provide notice to Mr.
11  Kirschner regarding our doing so.
12          THE COURT:  Okay.
13          MR. KLINE:  Your Honor, Ivan Kline from Friedman &
14  Wittenstein.
15          It's been a long morning and I'll be very brief.
16  Our only point of our response is really we believe it would be
17  more appropriate to make sure that a particular settlement is
18  back before this Court for approval given that this is the
19  Court that has jurisdiction over the policy and has all the
20  insureds before it and no other court has that; whether it's in
21  the context of the stay or not to stay or using your authority
22  under Section 105 is really less important than we simply
23  believe that there should be some mechanism whereby a
24  particular settlement would be subject to this Court's review
25  and approval to make sure that all of the parties' rights

99

1    including those of the estate and those of other insureds are

2    not being prejudiced in any way, and I believe actually in the

3    letter from Axis that was submitted on their reply even

4    suggests that whatever the proposed settlement is would be one,

5    for example, that might prejudice the rights of other insureds.

6     I still don't know what the details are, so it's hard for us

7    to comment on that, but our point was simply we have no problem

8    with the concept of the stay being lifted to allow for the

9    payment of settlements; it's simply that we think it should be

10    in one form or another, a particular settlement should be

11    before this Court.

12          THE COURT:  Okay.  Well, again, I quoted the

13    language in Paragraph 34(c) of the confirmation order which I

14    believe enables the beneficiaries of the policies -- not just

15    the debtor but the other beneficiaries -- to seek and obtain

16    coverage and payments from those policies.

17          Now, it may be that the consequences of doing that

18    will affect the debtor in a way that would require some relief

19    here in terms of either a settlement or 9019 or the other

20    provisions of the plan but it's hard for me to conceive what

21    those would be and it seems to me that as long as there is

22    advance notice, not retroactive notice, but advance notice, of

23    any proposed settlement, that the plan administrator on behalf

24    of the estate will be able to protect the estate's rights and

25    that's, I gather, what Mr. Kirschner has concluded also.

100

1        It seems to me that the other beneficiaries, to

2    the extent the settlement involves insurance or -- well, I'll

3    leave it at that.  I mean obviously there are contribution

4    issues, too, but to the extent a settlement involves insurance

5    it should get notice of a settlement as far as approval by a

6    District Court is concerned in the MDL, for example.  So I

7    think as long as there is proper notice to other affected

8    parties that your concerns are taken into account.

9            MR. KLINE:  Your Honor, could I just ask then that

10    the order that they submit recite that there must be advance

11    notice, because I believe that the order they submitted calls

12    for post-disbursement notice --

13            THE COURT:  You're right.

14            MR. KLINE:  -- which is of no use for the

15    settlement

16            THE COURT:  It needs to be adequate advance

17    notice.

18            MR. KLINE:  And could the other insureds be

19    included in that so that if we wanted to seek relief in this

20    Court we could do so?  Frankly, I don't think Judge Lynch will

21    have any interest in hearing the claim of one insured against

22    another.  I think Judge Lynch's only concern in a Rule 23

23    approval is fairness to the plaintiffs in the class which is a

24    different issue.

25            So if we could just get that the notices to the

101

1  plan administrator and the other insureds in advance I think we
2  would withdraw any objection to their motion.
3        MS. KIM:  Well, Your Honor, I'd like to know "in
4  advance" of what? -- because all that we are seeking here is to
5  make sure that the automatic stay is not used as some kind of
6  procedural bar that interferes with the normal course under the
7  insurance policy for the carrier to determine whether or not a
8  settlement is reasonable, or not.  Obviously, any settlement
9  would be subject to the consent of the carrier and so what I
10 don't want to happen is to be required to give notice before
11 seeking consent or obtaining consent from the carrier -- after
12 the carrier.
13       THE COURT:  You're talking about getting advance
14 notice of approval by the court presiding over the litigation?
15  Is that what you're talking about?
16       MS. KIM:  Oh, that's fine.  We don't have any
17 problem getting advance notice.  Of course, we'd be required to
18 give notice to the parties to the underlying litigation.  They
19 would get notice just like any other party in terms of
20 obtaining approval before Judge Lynch on any settlement so I
21 just want it to be clear on the record what they're seeking.
22       THE COURT:  Well, I was asking you.  Is that what
23 you had in mind?
24       MR. KLINE:  All I'm asking is whatever advance
25 notice they promised Mr. Kirschner that we get.  I don't know

102

1    what they meant by advance notice to Mr. Kirschner but it must

2    be before disbursements.

3                THE COURT:  All right.  So you're --

4                MR. GOLDMAN:  We have no problem with that, Your

5    Honor.  Obviously we will circulate to him and to others an

6    order.  We have to have Mr. Kirschner look at it as well but

7    that order won't come in today. It will probably come in

8    tomorrow.

9                THE COURT:  Okay.  That's fine.

10                MR. GOLDMAN:  Your Honor, if I may we had

11    submitted to the Court a proposed order and as I review it in

12    respect of the preliminary injunction I think it is consistent

13    with the Court's ruling except that I would suggest that we

14    insert -- as it say there, "obligated to pay defense costs," I

15    would insert "ten days after entry of this order."

16                MS. GILBRIDE:  Your Honor, you know, I don't have

17    that order in front of me at the moment but I believe that's an

18    order ordering us to advance defense costs on behalf of all

19    insureds, not just the remaining insureds, No. 1, and I think

20    there's a reference to future costs in the order as well?  I'd

21    like the opportunity to review it before.

22                MR. GOLDMAN:  I think what we'll do is give her a

23    copy of what I have in my hands, Your Honor, if that's all

24    right.

25                THE COURT:  Well, let me take a look at it first.

103

1    Let me just take a quick look at it.

2                    [Pause in proceedings.]

3            THE COURT:  Well, this applies to the defined term

4    "movants" not all the parties.

5            MR. GOLDMAN:  Your Honor, just on -- we have no

6    objection to it applying to other insureds, just so the Court

7    understands that.

8            MR. EISEN:  Your Honor, if I may, we joined -- the

9    other defendants joined in so if the Court is inclined -- and

10   obviously our situation was part of the Court's reasoning.  If

11   the Court is inclined after this order we'd just ask --

12           THE COURT:  No, your clients did join in.

13           MS. GILBRIDE:  Your Honor, there are no

14   counterclaims asserted on behalf of his clients.  There's no --

15   they have not answered, they have not asserted counterclaims,

16   there is no basis for the Court to order advancement of defense

17   costs on behalf of his clients.

18           MR. WALSH:  Nonetheless, Your Honor, there is an

19   advancement obligation and it seems completely illogical to

20   make a determination for one and not the other.

21           THE COURT:  That's true, but it's also -- it's

22   procedurally -- you can make a motion promptly but there's no -

23   -

24           MS. GILBRIDE:  They made a motion to dismiss.

25           THE COURT:  No, no, they made a motion to dismiss

104

1   your client's claims but the only motion for a preliminary

2   injunction before me and the only counterclaim before me is --

3              MR. WALSH:  We understand that, Your Honor, so if

4   that's what Axis requires that we go through all the procedural

5   --

6              THE COURT:  Well, it's what I require.

7              MR. WALSH:  Okay.  Then we'll do that.

8              THE COURT:  And the same for the criminal

9   defendants.

10             MR. EISEN:  Your Honor, our joinder in the

11  existing motion --

12             THE COURT:  That's not sufficient.

13             MR. EISEN:  Just to be clear, so what does Your

14  Honor require?  That additional counterclaims --

15             THE COURT:  On an adversary proceeding basis,

16  which is what the counterclaim was, you need to start an action

17  for advancement of defense costs and seek preliminary

18  injunctive relief.

19             MR. EISEN:  Your Honor, is it sufficient to -- you

20  know, the posture that we were in up to this point was we had

21  joined in the motion to dismiss so there was no pleading

22  requirement for us before today.  Pleading is held in -- it was

23  the motion to dismiss the insurers' claims and we did join in

24  the motion for preliminary injunction so --

25             THE COURT:  But, procedurally, I'm not comfortable

105

1   with that.

2                    MR. EISEN:  Just so I understand the parameters of

3   that, if that is filed around the representation that's going

4   to be filed may we be included or can we within that ten day

5   period of the order are we going to need to submit --

6                    THE COURT:  No.  I think you're going to need to

7   go through the procedural hoops.

8                    MR. EISEN:  Will that require an additional

9   hearing or can we just submit those -- I only ask that question

10  --

11                   THE COURT:  I don't know.  I'll have to decide

12  that.  I don't know.  I would find it unlikely, but let me read

13  the pleadings.

14                   MR. EISEN:  Thank you, Your Honor.

15                   THE COURT:  Okay.  They're all different.  Your

16  clients, although I doubt it, might be multi-millionaires or

17  multi-multi-millionaires.  I don't know.  I know one of Mr.

18  Walsh's clients is.

19                   MR. WALSH:  Was that taking inflation into

20  account, Your Honor?

21                   THE COURT:  No.  No, they're not.  They're not.

22  They're not withdrawing it.

23                   MS. GILBRIDE:  So you could dismiss the action.

24  They're not even parties.

25                   THE COURT:  No, I said they can start their own

106

1   action and as part of that adversary proceeding seek injunctive

2   relief.

3             MS. GILBRIDE:  It's slightly inconsistent.

4             THE COURT:  Well, I've already ruled on that.

5             MR. EISEN:  Your Honor, at the risk of delaying

6   things may I quickly suggest another alternative that I think

7   would be easier for the Court which is to allow us the option

8   of intervention as opposed to filing independent adversary

9   proceedings?

10            THE COURT:  I'm not aware of such an option.

11            MR. EISEN:  Okay.

12            THE COURT:  I'm just not.  So somehow you need to

13  tee it up so that it's before me as far as an affirmative

14  claim.

15            MR. EISEN:  Understood and if we're able to puzzle

16  out another basis that we believe --

17            THE COURT:  I'm not precluding you from puzzling

18  out another basis.

19            MR. EISEN:  Thank you, Your Honor.

20            THE COURT:  Okay.  So by movants here -- the

21  defined term "movants" is just your clients; right?

22            MR. GOLDMAN:  The five that are named in the

23  motion.

24            THE COURT:  Right.  It's not those who joined in

25  the motion or anything like that?

107

1           MR. GOLDMAN:  That's correct.  That is the

2    definition.

3           THE COURT:  All right.

4                 [Pause in proceedings.]

5           THE COURT:  Defense costs -- as I recall the

6    motion it's interpreted open-endedly; right?  It's going

7    forward as well?  And my ruling just covered defense costs

8    incurred today?

9           MR. GOLDMAN:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. GOLDMAN:  The motion defines it as the

12   contract defines it, Your Honor.

13          MS. GILBRIDE:  Your Honor, not to interrupt but

14   does it make sense to include your order on the dismissal

15   motion in this order as well so that for purposes of an appeal

16   that there's one order?

17          THE COURT:  No.

18          MS. GILBRIDE:  Okay.

19          THE COURT:  Okay.  Let me tell you what I've

20   written here because I believe this is the nature of my ruling

21   -- and it's Paragraph 3 -- "Effective ten days after entry of

22   this order Axis is directed upon the exhaustion of the

23   Lexington policy to pay defense costs of movants in the

24   underlying actions billed through the date of this order until

25   such time"  -- I'm sorry -- "pending a final determination by

108

1    this Court of Axis' claimed right to withhold such defense cost

2    payments until there's a final determination of its denial of

3    coverage under the Axis policies."  Because I'm not going to be

4    making a determination generally of coverage as this order had

5    provided.

6              MR. GOLDMAN:  So as I understand it and I believe

7    this is what the Court had discussed, we would have a right to

8    ask the Court to consider further defense costs presumptively

9    on or about October 12th?

10             THE COURT:  Yes, because this is just a

11   preliminary injunction.  We're going to have the final hearing

12   -- I can't have the final hearing on October 12th.

13             MR. GOLDMAN:  Yes.  I do not have a problem with

14   that language, Your Honor.

15             THE COURT:  All right.  So just to be clear, and I

16   think this is important for the record, too, I will not be

17   determining all of the issues as to whether your clients are

18   covered for defense costs.  What I am determining is whether

19   Axis is required to advance those monies now --

20             MR. GOLDMAN:  We understand that, Your Honor.

21             THE COURT:  -- as opposed to their argument which

22   is that because of the language on Page 8 that they could say

23   these aren't "covered" and, therefore, they don't have to be

24   advanced.

25             MR. GOLDMAN:  We understand that that is the

109

1  dispute the Court is considering.

2          MR. EISEN:  Your Honor, with the Court's leave, I

3  will be brief.  Our bills are also before Axis.  As the Court

4  knows, we joined in the motion.  We do not -- I've conferred

5  with my colleagues -- all of the indicted defendants -- the

6  presumptively innocent defendants as Your Honor noted -- are in

7  the most -- according to the Court's reasoning in the most --

8          THE COURT:  I can't do it.  I can't do it on the

9  procedural posture that we're in.  I understand logically your

10 clients' position, but they have not a procedural setting, I

11 believe, to seek a preliminary injunction.  They haven't

12 started an adversary proceeding, they haven't made a

13 counterclaim.  They are defendants in an adversary proceeding

14 that I've dismissed, and they have no counterclaim that

15 survived, because they didn't make a counterclaim.

16         MR. EISEN:  Your Honor, I understand.  I believe

17 it would not be improvident, though, for the Court to issue an

18 order that construes -- because it's the same policy at least

19 as to the --

20         THE COURT:  But orders don't do that.  I'm sorry,

21 I can't do that.  I won't do that.  You've heard my ruling.

22 There are aspects of a request for a preliminary injunction

23 that may not apply, conceivably, to your clients or to other

24 defendants, but on the fundamental issues you've heard my

25 ruling as to likelihood of success on the merits or the balance

110

1    of harms and substantial questions going to the merits and

2    that's as far as you could tell your clients that they could

3    have any sort of comfort at this point.

4              MR. EISEN:  Your Honor, whatever the balance of

5    harms may be as to others the assets have been frozen for the

6    defendants.

7              THE COURT:  Well, I understand, but sometimes, I

8    think -- not sometimes, always, unless the other side is

9    willing to waive it, and they're not waiving it and I

10   understand why -- you have to go through the procedural hoops.

11             MR. EISEN:  Thank you, Your Honor.

12             THE COURT:  Okay.  I've looked at the rest of the

13   order except for a numbering problem and my inserting after

14   "seeking reimposition of the automatic stay" in the next to the

15   last paragraph "to the extent it applies," I don't have any

16   other changes in it.

17             MR. GOLDMAN:  Thank you, Your Honor.

18             THE COURT:  Do you have a disc?

19             MR. GOLDMAN:  Not with us, Your Honor.

20             THE COURT:  Okay.  All right.  Well, then what I'd

21   ask you to do is to e-mail what you handed me, to chambers and

22   I'll mark it up as I read out.

23             MR. GOLDMAN:  Okay.  We will arrange that this

24   afternoon.

25             THE COURT:  Okay.

111

1          MR. GOLDMAN:  Thank you very much.

2          MS. GILBRIDE:  Your Honor, will we get the

3  dismissal order this afternoon as well?

4          THE COURT:  I don't know.  Are you going to submit

5  it to me?

6          MR. WALSH:  We'll try, Your Honor.

7          THE COURT:  Okay.  If not, it will be tomorrow.

8  It will get out very promptly.

9          MS. GILBRIDE:  Okay.  Thank you.

10          MR. EISEN:  Your Honor, one very quick -- it's not

11  on that motion.  Not at all.

12          THE COURT:  A different point?  Okay.  Good.

13          MR. EISEN:  We had a stay motion before the Court.

14   I believe the need for the stay motion has been obviated by

15  the overlap.

16          THE COURT:  It's moot.  It's moot.

17          You're right I should have addressed that but I

18  believe it's moot.

19          MR. EISEN:  Thank you, Your Honor.

20          THE COURT:  And in fact you could insert that in

21  the dismissal motion if you want or submit your separate order

22  on that if you wish.  You could talk to Mr. Walsh about that.

23                    *  *  *  *  *

24

25

112

1                        * * * * *

2        I certify that the foregoing is a court transcript from

3    an electronic sound recording of the proceedings in the above-

4    entitled matter, except where, as indicated, the Court has

5    modified the transcript.

6

7

8

9                                        Ruth Ann Hager

10   Dated:  August 31, 2007

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                    :

AXIS REINSURANCE COMPANY,          :      No. 07-CV-7924 (GEL)

               Plaintiff,      :

        v.                     :

PHILLIP R. BENNETT, et al.,         :

               Defendants.    :

                                      :

-------------------------------------------------------------- X
                                      :

In re                                 :      Chapter 11

REFCO, INC., et al.,            :      Case No. 05-60006 (RDD)

               Debtors.       :      Jointly Administered

-------------------------------------------------------------- X
                                      :

AXIS REINSURANCE COMPANY,          :      Adv. Proc. No. 07-1712-RDD

               Plaintiff,      :

        v.                     :

PHILLIP R. BENNETT, et al.,         :

               Defendants.    :

-------------------------------------------------------------- X
                                      :

TONE N. GRANT, et al.,            :      Adv. Proc. 07-2005-RDD

               Plaintiffs,     :

        v.                     :

AXIS REINSURANCE COMPANY,          :

               Defendant.     :

-------------------------------------------------------------- X

1

|                                         |   |                          |
|-----------------------------------------|---|--------------------------|
| LEO R. BREITMAN, et al.,                | : | Adv. Proc. No. 07-2032-RDD |
|                                         | : |                          |
| Plaintiffs,                             | : |                          |
| v.                                      | : |                          |
|                                         | : |                          |
| AXIS REINSURANCE COMPANY,               | : |                          |
|                                         | : |                          |
| Defendant.                              | : |                          |
|                                         | : |                          |

----------------------------------------------------------------- X

|                                         |   |                          |
|-----------------------------------------|---|--------------------------|
| AXIS REINSURANCE COMPANY,               | : | (1) No. 07-CV-9420-GEL   |
|                                         | : | (2) No. 07-CV-9842-GEL   |
| Plaintiff,                              | : | (3) No. 07-CV-10302-GEL  |
| v.                                      | : |                          |
|                                         | : |                          |
| PHILLIP R. BENNETT, et al.,             | : |                          |
|                                         | : |                          |
| Defendants.                             | : |                          |
|                                         | : |                          |

----------------------------------------------------------------- X

|                                         |   |                          |
|-----------------------------------------|---|--------------------------|
| TONE N. GRANT, et al.,                  | : | No. 07-CV-9843-GEL       |
|                                         | : |                          |
| Plaintiffs,                             | : |                          |
| v.                                      | : |                          |
|                                         | : |                          |
| AXIS REINSURANCE COMPANY,               | : |                          |
|                                         | : |                          |
| Defendant.                              | : |                          |
|                                         | : |                          |

----------------------------------------------------------------- X

## AFFIDAVIT OF HAROLD NEHER IN SUPPORT OF APPELLANT AXIS INSURANCE COMPANY'S MOTION TO STAY

State of New Jersey    )
                       )ss:
County of Union        )

I, Harold Neher, swear and state as follows:

1.      My name is Harold Neher.  I am over 18 years of age.  I make this affidavit on personal knowledge.

2.      I am an Assistant Vice President at Axis Specialty US Services, Inc.  Part of my job description includes responsibility for claims management involving policies underwritten by Axis Reinsurance Company ("Axis").  I am also generally familiar with underwriting policies at Axis and in the industry.

3.      If Axis is forced to continue to pay the Insureds' defense costs in accordance with the Bankruptcy Court's October 19, 2007 Order, Axis will suffer irreparable harm for the reasons set forth below.

4.      During the pendency of this appeal, Axis has been complying with the Bankruptcy Court's Order and Axis has paid over $7 million of its $10 million Limit of Liability.  Of this amount, over $5 million has been paid towards the defense of the Indicted Insureds, over $1.3 million has been paid towards the defense of the Officer Insureds, and over $737,000 has been paid towards the defense of the Director Insureds.

5.      Axis does not possess any information, and the Insureds have steadfastly refused to provide any information, indicating that they will have the ability to repay the amounts Axis has paid, and is paying, pursuant to the Bankruptcy Court's Order, if Axis obtains a determination that such amounts must be repaid.  Indeed, the amounts at issue and the circumstances that the respondents face (*i.e.*, ongoing civil and criminal litigation

that currently is in discovery) normally would make the prospect of repayment highly unlikely.

6.      In an effort to provide such assurance, Axis requested that the Insureds be required to post a security bond for the amounts that Axis is ordered to advance. The Insureds refused and the Bankruptcy Court denied the request.

7.      The Bankruptcy Court's Order requires Axis to advance defense costs to the Insureds despite Axis's denial of coverage. The ability to enforce policy exclusions is critical to an insurer's ability to successfully and rationally underwrite directors and officers liability insurance risks. Policy exclusions represent those risks that an insurer such as Axis has determined it cannot or will not underwrite. When an insurer such as Axis underwrites its policies, part of its calculation of the risk presented is based on its understanding that it will be able to enforce its policy exclusions.

8.      If Axis is not able to enforce its policy exclusions — that is, if it is forced to make payments under its policies despite having denied coverage, and in the absence of a court determination that its coverage denial was wrong — Axis will suffer damage because the policies it has in place were underwritten with a contrary understanding. Such damage includes, at a minimum, lost premiums (*i.e.*, additional premium Axis would have demanded had it known it would be forced to insure risks it believed were excluded); unforeseeable claims expense (*i.e.*, payments on claims it believed were excluded); and litigation costs (*i.e.*, costs incurred to obtain judicial declarations of no coverage whenever Axis seeks to enforce a policy exclusion).

4

9.     Furthermore, Axis is part of a public company that must answer to its shareholders regarding its finances.   A $10 million dollar Claim is not immaterial, particularly when it is being paid out on a Claim that Axis has denied and which Axis has little hope of ever recovering if it prevails on its appeal of the Bankruptcy Court's Order.

Date:  January 14, 2008

Harold Neher

Sworn to before me and subscribed
in my presence this 14th day of January, 2008.

NADINE S. LEWIS
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Aug. 9, 2009

5